Auto Loss Trans to Ficklin - Submitted By:37230                    DJA0133

The following action(s) were taken on this loss:
Reassign Loss

Bulk transfer for Unit move

 **May 20, 2017 at 10:38 a.m. CT**    L1279 - Jimmy Ficklin    Documentation Number 98

Received demand and medical from insured atty Dated 4/28/2017. Due 5/28/2017
$50K UIM limit.

Other party had no insurance.

 **May 24, 2017 at 5:14 p.m. CT**    L1279 - Jimmy Ficklin    Documentation Number 99

I am going to set this file and her parents claim up for SIR now that I know
that she is having symptoms similar to a brain injury.

I have the reserve on this underlying claim at $50K UM limit

I am increasing the reserve on the parents claim file which is excess to
$200,000 UM.

This is the parent's policy with UM/UIM of 300/500.

Elizabeth Fortson's auto policy has claim #16743005-3. It has 50/100 UM/UIM

She is a family member with her vehicle shown as garaged at her parents
address. She rents her residence in Cary, NC and is shown as a college
student working on a bachelor degree.

NC policies and stackable.

Claimant is uninsured.

Completed majority of the medical review of Elizabeth Fortson.

I do not have an actual demand the Elizabeth's attorney just sent me the
medical for review. She is still treating.

Discussed with MGR and we will send the medical to neurologist for review. I
will obtain recommendation from defense counsel in this jurisdiction.

The main alleged medical problem that may be related to the accident is
carotid artery dissection. It begins as a tear in one of the carotid arteries
of neck , which allows blood under the arterial pressure to enter the wall of
the artery and split its layers. The Dissection of the internal carotid
artery can occur intracranially or extracranially, with the latter being more
frequent. Internal carotid artery dissection can be caused by major or minor

Garrison P&C 0000383

DJA0134

trauma.

The symptoms she is experiencing are She has intermittent facial numbness/weakness in various locations, increased difficulty swallowing large items, increased difficulty with activities she used to excel at, such as drawing and crochet, stammering and word finding difficulty and forgetfulness. She has sensitivity to bright light and loud noises. She has decreased grip strength. She has had may of these symptoms since her accident but seem to be worsening.

**May 24, 2017 at 5:25 p.m. CT**       L1279 - Jimmy Ficklin       Documentation Number 100

SIR 6/7

**May 24, 2017 at 5:26 p.m. CT**       L1279 - Jimmy Ficklin       Documentation Number 101

OBC to Elizabeth Fortson's atty. I wanted to let him know that I am still reviewing the medical he submitted and want to determine her current status.

**May 25, 2017 at 12:32 p.m. CT**       L1279 - Jimmy Ficklin       Documentation Number 102

Per doc # 41 in double file 00272015-15 I spoke with Elizabeth's atty and I am sending a reservation of rights out to Elizabeth Fortson through her atty. The medical records and our records raise a question as to whether Elizabeth Fortson was residing with her parents Mr. and Mrs. Alvin Fortson, at the time of the accident. Unless there is information to the contrary, Elizabeth, does not qualify as an insured under her parents policy since she was not a resident of their household.

**May 26, 2017 at 2:21 p.m. CT**       L1279 - Jimmy Ficklin       Documentation Number 103

Panel counsel in Wake county near Raleigh, NC where accident occurred. This is Firm of Hedrick, Gardner, Kincheloe and Garofalop. contact is Mel Garofalo phone is (919)-832-9424. I want to discuss a potential Neurologist or other specialist.

**May 26, 2017 at 3:24 p.m. CT**       L1279 - Jimmy Ficklin       Documentation Number 104

General Correspondence-S200
Status: Submitted
Address: MICHAEL J MALONE
4600 MARRIOT DRIVE
SUITE 150
RALEIGH NC 27612-3367

Garrison P&C 0000384

DJA0135

Delivery Option: Fax
Channel Info: 9194200475

**May 26, 2017 at 3:33 p.m. CT**       L1279 - Jimmy Ficklin       Documentation Number 105

Per IET, I contacted NI's attorney and advised I am sending him the $50,000
UIM limit under Elizabeth Fortson's auto policy. I faxed in a letter as well.
I have not received notice of liens or subrogation claims to date. I included
in my letter that they are responsible for paying any liens or subrogation
claims out of the check.

With respect to double file 00272015-15, which is NI's parents auto policy.
He has my reservation of rights and understands the issue with respect to the
question whether she qualifies as an insured under their policy since she
lives at a different address. He is going to gather documentation to support
that she stayed with her parents quite often and may qualify as a resident of
their household.

**May 26, 2017 at 3:43 p.m. CT**       L1279 - Jimmy Ficklin       Documentation Number 106

I am closing file to subro. We will possibly have subro for UIM on the double
file 2720215-15 if there is coverage for Elizabeth Fortson under her parent's
policy.

It has a 300/500 UIM limit.

**May 26, 2017 at 3:43 p.m. CT**       L1279 - Jimmy Ficklin       Documentation Number 107

Make Contact
Associated To: ELIZABETH V FORTSON
Status of Make Contact was changed from New to Complete by L1279.

**May 26, 2017 at 3:43 p.m. CT**       L1279 - Jimmy Ficklin       Documentation Number 108

Make Contact
Associated To: JACOB THOMPSON
Status of Make Contact was changed from New to Complete by L1279.

**May 26, 2017 at 3:43 p.m. CT**       L1279 - Jimmy Ficklin       Documentation Number 109

Take Statement
Associated To: ELIZABETH V FORTSON
Status of Take Statement was changed from New to Not Applicable by L1279.

Garrison P&C 0000385

DJA0136



**May 26, 2017 at 3:43 p.m. CT**    L1279 - Jimmy Ficklin    Documentation Number 110

Take Statement
Associated To: JACOB THOMPSON
Status of Take Statement was changed from New to Not Applicable by L1279.

**May 26, 2017 at 3:47 p.m. CT**    L1279 - Jimmy Ficklin    Documentation Number 111

Payment Requested
Payment Requested for USD 50000.00 to payee
HENDREN AND MALONE and ELIZABETH VFORTSON for:
Combined Uninsured/Underinsured Motorists Bodily Injury - ELIZABETH V FORTSON

**May 26, 2017 at 3:57 p.m. CT**    40360 - Brian ███    Documentation Number 112

Manager Review - Check Approval - -UMBI $50K
$50k Auth in IET
Hold harmless letter sent with UIM offer -Approved check

**May 26, 2017 at 3:58 p.m. CT**    40360 - Brian ███    Documentation Number 113

Payment Approved
Payment Approved for USD 50000.00 to payee
HENDREN AND MALONE and ELIZABETH VFORTSON for:
Combined Uninsured/Underinsured Motorists Bodily Injury - ELIZABETH V FORTSON

**May 26, 2017 at 3:58 p.m. CT**    40360 - Brian ███    Documentation Number 114

CLAIM CLOSED
CLAIM CLOSED TRANSACTION SENT ON 05/26/2017

**USAA  May 26, 2017 at 3:58 p.m. CT**  View Conversation
A payment of $50,000.00 was issued 05/26/2017 to HENDREN AND MALONE and ELIZABETH V
FORTSON for your auto claim. The nature of payment is: Payment under Combined
Uninsured/Underinsured Motorists Bodily Injury coverage.

**May 26, 2017 at 9:43 p.m. CT**    99999 -    Documentation Number 115

CLAIM SENT TO ISO
CLAIM SENT TO ISO

Garrison P&C 0000386

DJA0137



**May 30, 2017 at 10:52 a.m. CT**    41314 - Stacy ▇▇▇▇    Documentation Number 116

NEW LOSS REVIEW/ SUB INJ
THIS IS A UM LOSS.
FILE ALREADY W/WILBER
WILL SEND THE UMBI INFO TO THEM
REFUSING FILE.

**December 4, 2017 at 2:26 a.m. CT**    Q2476 - Anil ▇▇▇▇    Documentation Number 117

CLAIM CLOSED
CLAIM CLOSED TRANSACTION SENT ON 12/04/2017

**December 4, 2017 at 2:26 a.m. CT**    Q2476 - Anil ▇▇▇▇    Documentation Number 118

Voucher – 824958 – $4579.71 – WAKEMED –
12/1/2017

9042 58 Voucher Keyed – UM Refund

**December 4, 2017 at 7:54 p.m. CT**    99999 -    Documentation Number 119

CLAIM SENT TO ISO
CLAIM SENT TO ISO

**December 5, 2017 at 8:03 p.m. CT**    99999 -    Documentation Number 120

CLAIM SENT TO ISO
CLAIM SENT TO ISO

**December 8, 2017 at 7:53 a.m. CT**    71045 - Mary ▇▇▇▇    Documentation Number 121

RECOVERY/ WILBER
To: 'DebtNet'
SENT SUPPORTS

Update total amount $58362.70
All exposures closed

Collision Amount : 6,962.70
Comp Amount :

Garrison P&C 0000387

DJA0138



UMPD Amount : 1750.00
RR Amount :
MP Amount :
PIP Amount :
UM/UIM Amount : 50,000.00
Deductible : 0
Waived Y/N : y
Salvage Amount : -350.00
Total Amount : 58362.70

**January 19, 2018 at 8:02 p.m. CT**    99999 -        Documentation Number 122

    CLAIM SENT TO ISO
    CLAIM SENT TO ISO

**January 21, 2018 at 7:17 p.m. CT**    99999 -        Documentation Number 123

    CLAIM SENT TO ISO
    CLAIM SENT TO ISO

**April 27, 2018 at 6:39 p.m. CT**    99999 -        Documentation Number 124

    CLAIM SENT TO ISO
    CLAIM SENT TO ISO

**May 16, 2018 at 6:31 p.m. CT**    99999 -        Documentation Number 125

    CLAIM SENT TO ISO
    CLAIM SENT TO ISO

**July 20, 2018 at 9:54 a.m. CT**    S9348 - Opal ▮▮▮        Documentation Number 126

    IBC REP TO REP
    S/W JOSE
    NEEDED TO RMV IV FROM POLICY
    ADVS CLAIM CLOSED (1/20/18) EXP FOR SUBRO
    NFQ

**February 12, 2019 at 10:57 a.m. CT**    39422 - Arlene Vela        Documentation Number 127

    Please print capture certified policy into
    e-doc and diary 4251-35.

Garrison P&C 0000388

DJA0139



Requestor: Arlene Vela
Requestor phone: 8-4689

Thank you.

**February 14, 2019 at 11:20 a.m. CT**   36452 - Juleen     Documentation Number 128

recd request for cert copy of policy/completed/snt for notary
signatures/after signatures notary will upload to edocs

**February 15, 2019 at 3:31 p.m. CT**   V7366 - Jennifer     Documentation Number 129

**February 15, 2019 at 3:33 p.m. CT**   V7366 - Jennifer /     Documentation Number 130

Garrison P&C 0000389

DJA0140

Reviewing Integrated View oldest to newest          Data as of 02-20-2019 at 8:20:58 AM CT

≤ Page **2** of 2 ≥



Garrison P&C 0000390

MS. ELIZABETH FORTSON # 1674 30 05  L/R # 3  DOL: 10/02/2016

DJA0141

Loss Summary

Add to Loss: select

**Loss Event Overview**
- ELIZABETH V FORTSON – Number
- Loss Details
- Claims Plan
- Alerts
- Exposures
- Invoices & Requests
- Payment
- Financials
- Liability Assessment
- Policy
- RALEIGH PD – Police/Fire

**IV 2004 CADILLAC CTS 4D**
- ELIZABETH V FORTSON – Driver, Owner

**CV 2012 HYUNDAI**
- JACOB THOMPSON – Driver, Owner
- eDocs

Loss Event Overview | Claims Documentation | Integrated View

Refresh | Exit | To Bottom

Toolbar

⚠ The deductible for Collision has already been waived.

Payments | Payment Settings

Payments ▾
☐ Search by date range

**Review Payments**

| Requested Date | Amount Payee | Issued Date | Method | Status |
|---|---|---|---|---|
| 01/25/2017 | $50,000.00 HENDREN AND MALONE and ELIZABETH V FORTSON | 05/26/2017 | Printed check | Cleared |
| 01/24/2017 | $5,000.00 WAKEMED | 01/22/2017 | Printed check | Cleared |
| 12/05/2016 | $6,962.70 ELIZABETH V FORTSON | 12/05/2016 | Printed check | Cleared |
| 11/14/2016 | $1,350.00 ELIZABETH V FORTSON | 11/14/2016 | Printed check | Cleared |
| 11/14/2016 | $400.00 ELIZABETH V FORTSON | 11/14/2016 | Printed check | Cleared |

**Refunds**

| Voucher ID | Amount Remitter | Processed Date |
|---|---|---|
| 0824958 | $4,579.71 WAKE MED | 12/04/2017 |

Refresh | Exit | To Top

CLR Help

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 9 of 598

http://wwwlmt.usaa.com/...appid=WRLOSSSUMMARY&lossnumber=003&desktop_integration=Y&detail_page_alias=WrLossSummary&tool_id=PCLOSSFOLDER&USAA_BROWSER_COMM_ORIGINATOR=&trans_log_conv_nr=340&remember_number_dispc=0167430452C20/2019 8:32:03 AM]

TAB 11                                                              DJA0142

Amount:        $1,350.00              Sequence Number: 7292076350
Account:       [REDACTED]             Capture Date:    01/17/2017
Bank Number: 11900571                 Check Number:    16678277

FACE OF DOCUMENT HAS A COLORED BACKGROUND. THE BACK CONTAINS AN ARTIFICIAL WATERMARK. HOLD AT ANGLE TO VIEW.

USAA Garrison Property and Casualty Insurance Company      **0016678277**
PO Box 33490                              51-44/119 CT      DATE
USAA® San Antonio, TX 78265                                 11/14/2016

                                                            CHECK AMOUNT
                                                            $***1,350.00

PAY **One Thousand Three Hundred Fifty and 00/100 s**

TO    ELIZABETH V FORTSON
THE
ORDER
OF:

USAA #: 016743005  / LR #: 3

NATURE OF PAYMENT:
Payment under Uninsured Motorists Property Damage Coverage ELIZABETH V
FORTSON, 2004 CADILLAC CTS 4D, loss of use of vehicle
BANK OF AMERICA - HARTFORD, CT              VOID 180 DAYS FROM ISSUE DATE      AUTHORIZED SIGNATURE

⑈0016678277⑈ [REDACTED]      22400156650

4598848

EACH PAYEE MUST ENDORSE EXACTLY AS DRAWN
RUB VIGOROUSLY AND COLOR WILL CHANGE
For Deposit Only to the acct

Electronic Endorsements:

Date         Sequence       Bank #       Endrs Type    TRN    RRC    Bank Name
01/17/2017   007292076350   111310346    Rtn Loc/BOFD   Y             BANK OF AMERICA, NA

| | | |
|---|---|---|
| Amount: | $400.00 | Sequence Number: 7292076384 |
| Account: | | Capture Date: 01/17/2017 |
| Bank Number: 11900571 | | Check Number: 16678276 |

FACE OF DOCUMENT HAS A COLORED BACKGROUND. THE BACK CONTAINS AN ARTIFICIAL WATERMARK, HOLD AT ANGLE TO VIEW.

USAA Garrison Property and Casualty Insurance Company
PO Box 33490
San Antonio, TX 78265

51-44/119 CT

**0016678276**

DATE
11/14/2016

CHECK AMOUNT
$**400.00

PAY **Four Hundred  and 00/100 s**

TO
THE
ORDER
OF:     ELIZABETH V FORTSON

USAA #: 016743005  / LR #: 3

NATURE OF PAYMENT:
Payment under Uninsured Motorists Property Damage Coverage less $100.00
Deductible. ELIZABETH V FORTSON, 2004 CADILLAC CTS 4D. $400
BANK OF AMERICA - HARTFORD, CT          VOID 180 DAYS FROM ISSUE DATE

AUTHORIZED SIGNATURE

⑈0016678276⑈                    224001566500⑈

4598847

EACH PAYEE MUST ENDORSE EXACTLY AS DRAWN

RUB VIGOROUSLY, AND COLOR WILL CHANGE

Electronic Endorsements:

| Date | Sequence | Bank # | Endrs Type | TRN | RRC | Bank Name |
|---|---|---|---|---|---|---|
| 01/17/2017 | 007292076384 | 111310346 | Rtn Loc/BOFD | Y | | BANK OF AMERICA, NA |

| | | | |
|---|---|---|---|
| Amount: | $6,962.70 | Sequence Number: | 9492157751 |
| Account: | | Capture Date: | 12/20/2016 |
| Bank Number: | 11900571 | Check Number: | 16867916 |

USAA Garrison Property and Casualty Insurance Company
PO Box 33490
San Antonio, TX 78265

51-44/119 CT

0016867916

DATE
12/05/2016

CHECK AMOUNT
$**6,962.70

PAY **Six Thousand Nine Hundred Sixty-Two and 70/100 s**

TO
THE
ORDER
OF:

ELIZABETH V FORTSON

USAA # 018743005 -/ LR # 3

NATURE OF PAYMENT:
Total Loss Payment under Collision Coverage, deductible has been waived.
ELIZABETH V FORTSON, 2004 CADILLAC CTS 4D*FEDEX*
BANK OF AMERICA - HARTFORD, CT

VOID 180 DAYS FROM ISSUE DATE

*Stuart Porter*

AUTHORIZED SIGNATURE

"0016867916"    2240015665"

7336.

12258829  021  0029  0290  20161219
USAA FSB + SAT          >>314074269<<
>>314074269<<

Electronic Endorsements:

| Date | Sequence | Bank # | Endrs Type | TRN | RRC | Bank Name |
|---|---|---|---|---|---|---|
| 12/19/2016 | 012258829 | 314074269 | Rtn Loc/BOFD | Y | | USAA FEDERAL SAVINGS |
| 12/20/2016 | 009492157751 | 11300016 | Pay Bank | N | | |
| 12/19/2016 | 3490465925 | 111900057 | Pay Bank | N | | JPMORGAN CHASE BANK, |

CONFIDENTIAL

TAB 12                                    DJA0145



www.diminishedvaluecheck.com
9716-B Rea Rd. #130 | Charlotte, NC 28277 | 704-464-2065 | jim@dvcheck.com

## Umpire Report – Appraisal Clause

| Date | 08/26/2020 |
|---|---|
| **Vehicle Owner:** | Elizabeth Fortson |
| **Appraiser 1:** | Brian Manning |
| **Appraiser 2:** | David Lucas |
| **Vehicle:** | 2004 Cadillac CTS |
| **VIN:** | 1G6DM577440177648 |
| **Date of Loss:** | 10/02/2016 |

### Purpose of Appraisal

In accordance with your request, I have agreed to act as umpire in the determination of fair market value for the subject vehicle as of the 10/02/2016 loss.

The fair market value appraised by Brian Manning  was $8,300
The fair market value appraised by David Lucas was $6,951

### My findings are as follows:

This award does not include tax, title, license fees etc.

It is my determination as umpire that the 2004 Cadillac CTS owned by Elizabeth Fortson had a fair market value of $7,800 on the 10/02/2016  date of loss.

_____          08/26/2020
Jim Marshall CPCU, AIC, ASE
Owner, DVCHECK LLC

©Copyright 2020 DVCHECK LLC All rights reserved.  The contents of this document including text, layout, and logos are the sole property of DVCHECK LLC and are protected by United States and international copyright law. Unauthorized use and/or duplication of this material without express and written permission from DVCHECK LLC is strictly prohibited.

TAB 13



Garrison Property and Casualty Insurance Company

# YOUR UNCASHED USAA CHECK

ELIZABETH V FORTSON
201 S ELLIOTT RD APT 734
CHAPEL HILL NC 27514-5981

 **Please Cash Your Settlement Check**

January 4, 2021

Dear Ms. Fortson,

The claim settlement check below hasn't cleared our bank. Please cash the check as soon as possible, or contact us within 60 days if you need a replacement check.

| | |
|---|---|
| Payee: | ELIZABETH V FORTSON |
| USAA policyholder: | Elizabeth V Fortson |
| Claim number: | 016743005-003 |
| Check number: | 029300600 |
| Amount: | $1,490.61 |
| Date of issue: | September 2, 2020 |
| Date of loss: | October 2, 2016 |
| Loss location: | Raleigh |

If you don't cash the check or contact us within 60 days from the date of this letter, we'll consider these funds unclaimed and begin the process to turn the funds over to the state as required by law.

**For Questions or Help With Your Claim**
If you have questions or need help with your claim, you can contact us quickly and easily:

- On usaa.com
- Using USAA's Mobile App
- By calling 210-531-8722 x35377

As always, we appreciate the opportunity to serve all your financial needs.

You may submit correspondence or questions to me. My contact information is:

| | **Address:** | USAA Claims Dept.<br>P.O. Box 33490<br>San Antonio, TX 78265 |
|---|---|---|
| | **Fax:** | 1-800-531-8669 |

016743005 - 003 - 9034 - 61

127160-0818

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 14 of 598

 **Phone:**                        210-531-8722 x35377

Sincerely,

Alexandra Sammon
Theft / Fire 8
Garrison Property and Casualty Insurance Company

Garrison Property and Casualty Insurance Company, a subsidiary of USAA Casualty Insurance Company, is authorized to use the USAA logo, a registered trademark of United Services Automobile Association.

# TAB 14
# DJA0148 - DJA0158

# FILED UNDER
# SEAL

# TAB 15
# DJA0159 - DJA0168

# FILED UNDER
# SEAL

TAB 16                                                      DJA0169

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**Civil Action No. 1:19-CV-00294-CCE-JLW**

| | | |
|---|---|---|
| ELIZABETH V. FORTSON. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Catherine C. Eagles |
| | ) | Magistrate Judge Joe L. Webster |
| GARRISON PROPERTY AND | ) | |
| CASUALTY INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DECLARATION OF GREGORY GOEBEL**
**IN SUPPORT OF GARRISON'S MOTION FOR SUMMARY JUDGMENT**

1.      I, Gregory Goebel, am over 21 years of age, of sound mind, and otherwise competent to make this declaration.

2.      I make this declaration as to matters of my own personal knowledge.

3.      I have been retained by counsel for Garrison in this matter to provide opinions based on my experience in the automotive sales and service industry.

4.      I offer this declaration in support of Garrison's Motion for Summary Judgment. Many of the issues addressed in this declaration will also be addressed in detail in a forthcoming expert report, to be served by the deadline for expert disclosures in this matter.

5.      I am a dealership consultant, trainer, publisher, and author in the retail auto industry – specializing in used vehicles and auto finance – and former owner and operator of three separate franchise auto dealership locations as well as four separate independent used vehicles sales locations.

4839-2994-2770.1

6.    I have over 40 years of experience in auto dealership sales and service operations, used vehicle remarketing, reconditioning, sales, valuation, and pricing.

7.    My curriculum vitae, including a list of professional publications, and a description of my qualifications are appended to this declaration as Exhibit 1.

8.    In my opinion, CCC's two-step condition adjustment methodlogoy is directly in-line with auto industry practices.

9.    It is consistently recognized in every facet of the auto industry that the condition of a motor vehicle plays a *significant* factor in determining its value and that a vehicle's value increases as its condition improves.

10.    Vehicles advertised for sale at auto dealerships are generally in better condition than those being driven by private parties.

11.    This is due both to the dealer's selection of better-than-average vehicles for retail sale and reconditioning steps dealers take to make those vehicles as desirable as possible.

12.    Therefore, it is valid and appropriate to assume that vehicles listed for sale by dealerships are in "Dealer Ready" or "Very Good" condition.

13.    Vehicles in everyday use by private parties suffer from wear and tear, requiring reconditing before being listed for retail sale by dealers.  Despite the extreme cosmetic care taken by a small percentage of motor vehicle owners, and the regular maintenance that is required to be (but not always) performed, normal wear takes place on every vehicle driven by private parties.

14.    However, dealers are selective in choosing which used vehicles to retail.

15.    The retail business of selling motor vehicles, whether at a franchise dealership or an independent pre-owned dealership, is extremely competitive.  Often, consumers choose to purchase a vehicle from one dealer or another based on as little as a $100 difference in sales

2

price.  Similarly, the closer a used vehicle seems to being new – both in appearance and performance – often drives consumer decision making.  Hence, dealers are extremely sensitive to the condition of the vehicles that sit for sale on their lots.

16.     Dealers are selective in choosing which vehicles to remarket for retail sale, choosing those vehicles that tend to be in better condition than the broader population of vehicles in everyday use.  According to vAuto,[1] one of the keys to success for dealers retailing used vehicles is to be selective in the vehicles they choose to retail.  (*See* Exhibit 2.)

17.     As a result, only approximately 25% of all vehicles traded into a motor vehicle dealer are retained for retail sale, as dealers are looking for only the best-of-the-best.  Dealers use a very discerning eye when they appraise trade-ins or purchase vehicles at auctions or from private parties.

18.     If dealers are not highly selective, they risk that the delta between (1) the cost to acquire the vehicle plus the cost of necessary reconditioning and (2) the ultimate sale price (after negotiation) will be insufficient to provide an adequate profit.  As a result, dealers only sell at retail vehicles that are the highest quality of all those traded in or purchased.

19.     Dealers also recondition used vehicles before retailing them.  In my opinion, based on decades of experience and as confirmed by used vehicle industry data and sources, motor vehicle dealers go to great lengths to present the vehicles they offer for retail sale in the best condition possible, both cosmetically and mechanically.  Consequently, the condition of vehicles at the time a dealer lists them for retail sale is a significant improvement over the condition that they were in at the time of trade in.

---

[1] vAuto is the largest and most authoritative resource used by auto dealers to stock and source retail inventory for sale.  It offers education for retail dealers in both sourcing and making vehicles ready for sale.  It is used by over 10,000 retail auto dealers.

3

20.     The practice in the industry is for dealers to go through a specific process to inspect, service, and repair vehicles prior to offering them for retail sale.  This is often referred to as "reconditioning."  The vehicle inspection and steps taken to recondition vehicles for retail resale are extensive, even on newer model vehicles with lower milage.  This was also noted by vAuto.  (*See* Exhibit 2.)

21.     Dealers go through this process, despite that it takes effort and costs money, because it improves the value of the vehicles and enables them to compete against other dealers.

22.     Even vehicles that have been lightly used, properly serviced, and are nearly new go through this process so that it looks brand new and is in new or like-new mechanical condition.

23.     Notably, dealers list their motor vehicles for sale on their websites, generally with a large number of photos.  These photos show the physical condition of the vehicles inside and out and give dealers further incentive to ensure that the vehicles they list for retail sale are in better condition than otherwise similar vehicles in everyday use.

24.     According to Patrick Manzi, the Chief Economist for NADA, at the end of 2020, the average cost to recondition a pre-owned automobile was $951, while the average cost to recondition a truck was $818, making the overall weighted average $900.  (*See* Exhibit 3.)  This represents the amount of money that a dealer spends to make their vehicles "Very Good" or "Dealer Ready" before ever offering them for sale.  This cost results in a retail value higher than the reconditioning and acquisition costs of the vehicle.

25.     Consistent with this data, my extensive experience consulting for and training used motor vehicle dealers around the country further confirm that dealers spend significant time and money reconditing used vehicles to improve their appearance and mechanical condition.

4

26.     Dealers also sell Certified Pre-Owned ("CPO") vehicles which are in like-new or "Excellent" condition.  Approximately 7% of used vehicles sold in 2019 were manufacturer-supported CPO.  (*See* Exhibit 4.)  Approximately an additional 4% were third-party CPO, where the third parties are companies other than manufactures that manage their own CPO programs.  These vehicles require extensive program-mandated mechanical and cosmetic reconditioning that ultimately extends the vehicle warranty to a term and milage that is sometimes much longer than the manufacture's original new vehicle warranty.

27.     Dealers also sell vehicles that are not CPO, but that are nonetheless in exceptional condition.  Vehicles may also have one or more component groups in like-new or "Exceptional" condition, even while the rest of the vehicle is otherwise in Dealer Ready or Very Good condition.  For example, a vehicle may have a brand-new set of tires put on it, or a new windshield installed, during the reconditioning process.

28.

29.     It is standard within the used car industry for dealers to look at the retail price other dealers are asking for a car of the same make, model, and year, with similar mileage and options, to assist in valuing a car for trade in and to determine at what retail price to list a vehicle.  In doing so, it is customary in the industry for a dealer to assume that vehicles listed for retail sale at other used car dealers have been fully reconditioned, and that such reconditioning is

4839-2994-2770.1

reflected in the listed retail price.  This is because it is standard industry practice to recondition used vehicles prior to listing them for retail sale and because it is impossible to physically inspect every vehicle being used for comparison purposes – neither time would allow it nor the fact that it would require a competing dealer to reveal their proprietary practices and internal pricing and margins.  This is also true not only of retail auto dealers, but of used car value guides such as NADA and Kelly Blue Book.

30.    Finally, using retail list prices overvalues vehicles.  Retail *list* prices are typically higher than transaction prices, because list prices are typically set with room for discounts during negotiation, which occurs in the majority of transactions, and can represent thousands of dollars, depending on the vehicle, with both older and less expensive vehicles as well as newer or more expensive vehicles tending to have more negotiation room relative to their final sale prices than the more common or popular vehicles.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of July, 2021, in  Sarasota, FL                              .

Gregory Goebel

EXHIBIT 1

# GREG GOEBEL

118 N. Warbler Lane, Sarasota, FL  34236 | (941) 685-9629 | Greg@DealerStrong.com

**SUMMARY**

Highly experienced automotive retail and finance professional who has owned and operated businesses in the automotive sector since 1979. Experience includes owning franchise and independent automobile dealerships in multiple states, franchised automotive repair facilities, a multi-state mortgage brokerage operation, two business-to-business trade publications in the retail automotive industry and auto finance industry, and a training, consulting and marketing company supporting automotive dealers and auto finance companies.  Highly focused on sourcing, reconditioning, and retailing pre-owned vehicles.  Has served as a professional moderator of dealer-peer consulting groups (20-groups) for over 17 years, and has significant experience as a top level testifying-expert witness in automotive civil and criminal cases as it pertains to dealership sales, service, and finance operations, as well as dealer-controlled finance operations, also known as "Buy-Here Pay-Here."  His passion is data analysis and strategy, combined with sales and marketing.

**EDUCATION**

**Wharton School of Business**
        Post-Graduate Work                                                    1984
**Purdue University**
        BSIM: Finance and Marketing                                        1976

**EMPLOYMENT**

*Used Car University, LLC dba DealerStrong, Evansville, IN*        2002-Present

**President, CEO and Moderator**
Working with retail automotive dealers to provide training and consulting services with a focus on specialty finance, operations, and marketing in the auto dealership. Mr. Goebel also moderates dealer performance consulting groups. These groups consist of dealers with a high focus on pre-owned vehicles, involving virtual meetings ten times per year and two to three in-person meetings annually.

Mr. Goebel also consults with and trains many specialty auto finance companies and their personnel on a regular basis and has trained many industry vendors to understand the intricacies of specialty finance. He has created the largest proprietary database with transactional data and benchmarks for the specialty finance industry.

The company additionally provides services in:

- Used vehicle valuation, sourcing, reconditioning, marketing, and sales.
- Subprime auto finance.
- Dealership accounting and forensic analysis.
- Human resources and staffing.
- Leadership development.
- Variable operations management and internal training program development.
- Fixed operations management and internal training program development.
- Compliance with federal and state regulations for operations.

Clients include:

- Franchise auto dealership and automotive groups.
- Independent retail dealerships, including multi-store operations.
- Non-captive auto finance companies (not owned by auto manufacturers).
- Industry trade shows and conferences where Goebel has been featured as a key-note and presenter regularly since 2002.

*NCM   ssociates*                                                              2008-Present

**Contract    oderator**
Mr. Goebel moderates two 20 groups of high-volume retail auto dealers who meet three times a year in various locations as well as consulting with them throughout the year.

*  uto Dealer Monthly*                                                         2002-2012

**President and CEO**
Auto Dealer Monthly was created as an online based idea exchange platform for retail auto dealers and grew to include:
- Auto Dealer Monthly magazine, a publication serving more than 30,000 franchise and independent auto dealers in the United States and Canada, served as the publisher. Sold in 2012 to Bobit Business Media
- Special Finance Magazine, served as publisher
- Special Finance Conference/Convention, served as chairman. Sold to Bobit Business Media in 2013.
- AutoDealerPeople.com, served as creator and publisher

*Leedom and    ssociates*                                                     2002-2005

4

**oderator, Partner, and Vice-President**

hile serving as a moderator of multiple groups, Mr. Goebel was instrumental in developing several groups including high-line, specialty finance and service only groups and multiple independent dealer groups.

*uto Choice Hyundai, uto Choice merica, Top Techs uto Center, Greg Goebel Buick, Pontiac, GMC*

**Dealer Principal**                                                                                  1984-2002
Mr. Goebel oversaw the day to day operations of multiple full-service dealerships located in multiple states and a stand-alone service center. Developed the first specialty finance operation in his market area in 1990 and delivered more than 11,000 subprime auto deals. Stores have included franchise operations, independent dealerships and one buy-here pay-here operation.

*Mortgage merica*                                                                                  1997-2000

**Owner and CEO**
Oversaw the operations of a multi-state mortgage company focused on the financing of residential property, both acquisition and refinance.

*Precision Transmission*                                                                          1979-1986

**Owner**
Operated a chain of 6 services facilities in Southwest Indiana and Northwest Kentucky, eventually becoming an area franchisor covering three states.

**PUBLICATIONS AND PAPERS**

*"Complete Guide to Special Finance including the Ten Critical Components for Success"*
        Author of the only authoritative published book on Specialty Finance 2008

*Ward's Dealer Business Magazine*
        Contributing Special Finance expert

*World of Special Finance Magazine*
        Monthly contributing Special Finance expert

*Dealer Magazine*
        Contributing Special Finance expert

*Used Car Dealer Magazine*
        Contributing Special Finance expert

*uto Dealer Monthly Magazine*

5

Monthly contributing Special Finance expert

*Special Finance Magazine*
Monthly contributing Special Finance expert

**SPEAKING EXPERIENCE**

**Industry Summit (Ten Years)**
Industry Trends in Special Finance
Annual keynote speaker addressing shifts, trends, and forecast for the
Subprime/Special Finance market

**ASTN Network Trainer**
Subject: Special Finance

**Numerous guest speaker and panelist spots throughout industry conference and conventions events as well as a guest speaker for several NADA and NCM 20 groups, with a heavy emphasis on specialty finance.**

## OTHER RELATED EXPERIENCE

**Expert Witness**                                                    1986 - present
Provide expert data analysis, summaries and testimony

## BOARD POSITIONS & AWARDS

**National Independent Automobile Dealers Association – OFFICER**    1996-2000
Served on the Executive Committee of from 1996-2000, during that time developed the
20-group program for independent auto dealers.

## ADVISORY BOARD POSITIONS

Pontiac Motor Division
GMC Truck Division
Household Automotive Finance
Hyundai Motor America

## PAID BOARD POSITIONS

National Auto Credit
Universal Underwriters Acceptance Corporation
Dwell Green, LLC

## BUSINESS RECOGNITION

**Indiana Quality Dealer of the Year**                                1994
Awarded by the National Independent Auto Dealers Association

**Special Finance Hall of Fame**                                      2013
Awarded by Special Finance Magazine

**Dealers' Choice Awards**                                      2016 & 2017
Diamond Award – Top Special Finance Trainer in Auto Industry

## CO    UNITY INVOLVE   ENT

**Race Director**                                               2011 & 2012
        Marathon of Sarasota – founder and director of race

**Underprivileged Families Holidays Benefit**                    1979 - 2017
        Chair and co-chair of annual benefit for the needy

**Director/President/Chairman**
        Many charitable, local benefit or sporting organizations      1979 - 2013

7

PUBLICATIONS AUTHORED IN IN THE PREVIOUS TEN YEARS

The publications I have authored or contributed to in the previous ten years can be found at the following websites:

https://www.autodealertodaymagazine.com/search/?q=greg+goebel&page=24

https://www.autodealertodaymagazine.com/authors/307558/greg-goebel

http://www.dealerstrong.com/author/gregdealerstrong-com/

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 29 of 598

EXHIBIT 2





DJA0181

### ARTICLES

# SEVEN RULES TO RECONDITION USED VEHICLES "RIGHT" EVERY TIME

NEED SOME HELP?



REQUEST A DEMO

DJA0182

I like the way the Paul Lynch, general sales manager of DePaula Chevrolet in Albany, New York, thinks about used vehicle reconditioning.

"It's just as important in terms of gross profit as working the deal in the front of the store," Lynch said. "I know that may sound crazy, but I really believe it. The faster you can get those cars to the front line with the right amount of reconditioning, the more actual time you've got to make the biggest gross you can make."

This emphasis on the importance of reconditioning vehicles "right" has led Lynch to audit and re-examine the reconditioning processes at his dealership. This examination came even though Lynch and his team were anything but slouches when it comes to reconditioning and retailing used cars. In the past year, they've successfully trimmed the recon-to-front-line times to an average of three days, while doubling the dealership's monthly used vehicle sales volumes to 130 units a month.

Still, Lynch believes "there's more gross to be made" if he and his team can make used vehicle reconditioning even more cost-effective and efficient. The following are "Seven Rules For Used Vehicle Reconditioning" that Lynch and his team developed after a top-to-bottom review of what's working and isn't.

## Rule 1: Make Speed and Quality Your Chief Strategic Objectives

For Lynch, these dual objectives provide the basis for evaluating every aspect of his reconditioning processes and decision-making. "You ask yourself,

**RELATED**

WHOLESALE PRODUCTS



LEARN MORE

NEED SOME HELP?


## Rule 2: Show How Individuals Contribute to Your Key Objectives

The dealership has a dedicated reconditioning team that includes a writer, technicians, detailers and photographers. Team members excelled at their respective tasks, but the group lacked a broader understanding of how their work affects the outcome on every car. "I broke it down and showed them what it costs us in gross profit if we lose a day in recon on a single car," Lynch said. "Once you have that conversation, you can get them to see the light, and they have a greater amount of pride in their work because they're contributing to something bigger than their own paycheck."

## Rule 3: Change Payplans to Match Your Goals

Lynch has moved from a flat-rate pay plan to a team-style approach to help focus reconditioning technicians and detailers on the need for speed. The program pools all repair order (RO) hours and pays individuals based on their contribution to the total — a move Lynch believes will spur more collaboration and create a disincentive to load an RO with unnecessary items that only benefit an individual's compensation plan. "When everyone knows we all make more money by speeding things up, you'll see things like the tech taking a car right off the lift and driving it down to the detail bay," he said. "You can't be fast if you're putting fluff on the RO."

## Rule 4: Get Better Cars

NEED SOME HELP?


"marketready," unless there's a compelling reason for an exception. "It's tough," he said. "But you've got to be buying good cars — late model, low mileage and good condition — to offset the older cars with higher miles that will need more recon work."

## Rule 5: Scrutinize Estimated-to-Actual Recon Costs

Lynch and his managers meet daily to compare appraiser estimates of reconditioning costs to recommended work. "If we made a mistake with a purchased vehicle, and it needs significantly more than we expected or estimated, we must not make a second mistake and approve a much higher recon bill if the numbers don't leave us a desirable initial sale profit," he said. "When this happens, the car goes directly to wholesale and we must accept that we made the mistake and move on without it costing us more money." Here's a benchmark: If the actual reconditioning costs exceed the estimate by more than 20 percent, I recommend wholesaling the vehicle to apply the investment in another unit with better gross profit potential.

## Rule 6: Work to Lower Recon Costs Without Sacrificing Quality

The store currently averages about $1,110 in reconditioning costs, a figure Lynch wants to trim by 20 percent to 30 percent. To reach the goal, his team now questions whether factory replacement parts/ tires, body repairs, third-party dent/window/upholstery work is always necessary — and, if it is, to negotiate for the lowest-possible cost. He also monitors policy expense to make sure


## Rule 7: Reward the Higher Level of Collaboration and Trust Between Used Vehicles and Service

Lynch understands the "tug of war for gross profit" that often occurs between the service and used vehicle departments over reconditioning. To address this risk, he has created a monthly bonus plan, paid for by the used vehicle and service departments, to reward the reconditioning team when they meet their new benchmarks for reconditioning cost, speed and quality.

I think Lynch's rules are relevant for all dealers. In addition, his appetite for continuous improvement is a model other dealers would do well to emulate: "If you keep pushing the envelope in every single area," Lynch said, "you're going to get better results. You simply can't get better results if you keep doing what you're doing."



**About vAuto** | **News** | **Calendar of Events** | **Performance Management** | **Referral Bonus**

© 2020 vAuto Inc. All rights reserved. | Terms of Use | Privacy Policy | Payment Setup | W-9 |
AdChoices

COX AUTOMOTIVE

NEED SOME HELP?

EXHIBIT 3                                                     DJA0186

# Greg Goebel

| | |
|---|---|
| **From:** | email, economics <economics@NADA.org> |
| **Sent:** | Friday, April 23, 2021 14:45 |
| **To:** | Greg Goebel |
| **Subject:** | RE: Data to support reconditioning costs |

Hi Greg,

All is well and I hope the same for you.

For 2020, the average cost to recondition a car was $951 and the average cost to recondition a truck was $818. The overall average for reconditioning a used vehicle was $900.

Thanks,

**Patrick Manzi**
**Chief Economist**
**National Automobile Dealers Association**

*pmanzi@nada.org*
o 703.821.7293
8484 Westpark Drive
Suite 500
Tysons, VA 22102
nada.org



---

**From:** Greg Goebel <greg@dealerstrong.com>
**Sent:** Monday, April 19, 2021 4:14 PM
**To:** email, economics <economics@NADA.org>
**Subject:** RE: Data to support reconditioning costs

CAUTION: External email.
Hi, Patrick!

I hope all is well with you.  I am writing to see if you have the same data available yet for used auto and used truck reconditioning for 2020, yet?  If so, is it possible to share it with me again?  Thanks so much!

Best regards,
GG

Greg Goebel, CEO
**DEALERSTRONG**

CLICK HERE TO SCHEDULE TIME WITH ME

O – (877) 811-8107
F – (888) 386-2236
C – (941) 685-9629

**Commitment: Doing what you said when you meant it long after the feeling has gone away.**

---

**From:** email, economics <economics@NADA.org>
**Sent:** Wednesday, May 20, 2020 11:19 AM
**To:** Greg Goebel <greg@dealerstrong.com>
**Subject:** RE: Data to support reconditioning costs

Hi Greg,

I do have an average number for this. As of year-end 2019, the average cost to recondition a car was $1,060 and the average cost to recondition a truck was $1,280. The overall average for reconditioning a used vehicle was $1,127.

Thanks,

**Patrick Manzi**
**Chief Economist**
**National Automobile Dealers Association**

*pmanzi@nada.org*
o 703.821.7293
8484 Westpark Drive
Suite 500
Tysons, VA 22102
nada.org



---

**From:** Greg Goebel <greg@dealerstrong.com>
**Sent:** Tuesday, May 19, 2020 2:56 PM
**To:** email, economics <economics@NADA.org>
**Subject:** Data to support reconditioning costs

Patrick,

I have been referred to you by someone in your Dealership Operations office.  I have been retained as an expert witness in litigation where I am needing to support the fact that pre-owned vehicles being offered for sale by a dealer are, on average, in better condition than comparable vehicles being driven on the streets by private parties.

As an 18 year former dealer, a longtime member of a NADA 20 group, a frequent speaker at NADA 20 groups, and the leader in a continuing education project on Special Finance about a decade ago, I personally have all the data that I need to support this, however, my name and company does not carry the recognition or clout that the National Automobile Dealer Association would have to a person on a jury that has no inside knowledge of the industry.  My own company

2

indeed has all the transactional data from millions of transactions, and indeed the exact information I am need, but, to someone outside the industry, it would mean little for validation. Hence, I am looking to buy the info that I know NADA has.

It would not need to be identified by dealer or even state, just as an average cost of reconditioning by auto or truck. Is that something that you would be able to offer?  Thank you for your consideration.

Best regards,
GG

CLICK HERE TO SCHEDULE TIME WITH ME 





 

*Commitment:  "Doing what you said you would when you meant it, long after the feeling you had when you said it has gone away."*

3

coxautoinc.com/market-insights/2019-...

Apps Google Maps Income Comp. Google Sheets GreenRope :: Login iMemories Mitsubishi Dealer Li... Other bookmarks

COX AUTOMOTIVE

CAREERS INTERNATIONAL CONTACT

BRANDS / SOLUTIONS / LEARNING CENTER / ABOUT US / NEWSROOM /

RSS SUBSCRIBE 2 MIN READ

CAMIO

# CPO Beats Sales Forecast, Sets All-Time Record in 2019

Thursday January 16, 2020

*Share*

SHARE

TWEET

SHARE

EMAIL

Certified pre-owned (CPO) sales volume set another record in 2019 – marking the ninth consecutive year of record-breaking sales. CPO sales reached 2.80 million vehicles in 2019, up 4% from 2018, exceeding the Cox Automotive forecast of 2.75 million.

2019 was the last big year of growth in off-lease units as we reached a total of 4.1 million leased vehicles hitting the end of their lease term. That volume isn't changing for 2020. The high tide in off-lease units will continue to fuel strong sales of higher priced "gently used" vehicles and CPO units. Off-lease vehicles are very competitive products that returning to dealerships that are selling at a 30-50% discount compared to very similar high-contented brand-new counterparts that are in the market today.

## *Article Highlights*

1. Certified pre-owned (CPO) sales volume set another record in 2019 – marking the ninth consecutive year of record-breaking sales.
2. CPO sales reached 2.80 million vehicles in 2019, up 4% from 2018, exceeding the Cox Automotive forecast of 2.75 million.
3. Toyota, Honda and Chevy continue to be the biggest players in the CPO market, collectively representing almost a third of all CPO sales.

*Sign up here to receive bi-weekly updates on news and*

coxautoinc.com/market-insights/2019-...

Apps Google Maps Income Comp. Google Sheets GreenRope :: Login iMemories Mitsubishi Dealer Li... » Other bookmarks

Given their younger age, CPO vehicles are likely equipped with highly desired technology such as blind-spot monitors, Bluetooth, navigation and backup cameras. And because SUVs and crossovers have been popular with new-vehicle buyers for the past several years, there are more of them coming back off lease and available for certification.

The CPO market remains top-heavy with a few brands accounting for the majority of sales. Toyota, Honda and Chevy continue to be the biggest players in the CPO market, collectively representing almost a third of all CPO sales. Those three plus Ford and Nissan accounted for 47% of CPO sales in 2019, reflecting that more brands increased CPO sales. In 2018, Toyota, Honda, Chevy and Nissan accounted for 48% of the total industry CPO sales.

2019 CPO Share

In 2020, a headwind to CPO units will be incentives on new vehicles. Cox Automotive Rates & Incentives reported that 2019 was a **record year for new-vehicle incentives** – both in terms of volume and percentage of average transaction price. At the same time, favorable supply and demand for used retail units will continue to provide strong tailwinds to the CPO market. The Cox Automotive 2020 CPO sales forecast is 2.80 million units.

updates on news and trends dominating the automotive industry.

Type your Email

SUBSCRIBE ›

@CoxAutomotive

Used-vehicle sales continue to recover, but an analysis of used-vehicle inventory data from @vAutoInc tells the story. bit.ly/3fSNXAq

Retail Used-Vehicle Supply Slumps to Ne...
Strong demand for used vehicles has cause...
coxautoinc.com

Jul 22, 2020

Cox Automotive
@CoxAutomotive

FOLLOW US ON TWITTER ›

## Related Content



TAB 17



## Vehicle Information

| | |
|---|---|
| Vehicle: | 2004 Cadillac CTS Sedan 4D 3.6L V6 |
| Region: | Southeastern |
| Period: | October 7, 2016 |
| VIN: | 1G6DM577440177648 |
| Mileage: | 82,000 |
| Base MSRP: | $31,840 |
| Typically Equipped MSRP: | N/A |
| Weight: | 3,694 |



## NADA Used Cars/Trucks Values

| Auction* | Base | Mileage Adj. | Option Adj. | Adjusted Value |
|---|---|---|---|---|
| Low | N/A | N/A | N/A | **N/A** |
| Average | N/A | N/A | N/A | **N/A** |
| High | N/A | N/A | N/A | **N/A** |
| Trade-In | | | | |
| Rough | $1,450 | $1,650 | N/A | **$3,100** |
| Average | $2,450 | $1,650 | N/A | **$4,100** |
| Clean | $3,300 | $1,650 | N/A | **$4,950** |
| | | | | |
| Clean Loan | $2,975 | $1,650 | N/A | **$4,625** |
| Clean Retail | $5,300 | $1,650 | N/A | **$6,950** |

*The auction values displayed include typical eqiupment and adjustments for mileage and any of the following applicable accessories: engine size, drivetrain, and trim.

NADA Used Car Guide assumes no responsibility or liability for any errors or omissions or any revisions or additions made by anyone on this report.
NADA Used Car Guide and its logo are registered trademarks of National Automobile Dealers Association, used under license by J.D. Power.
©2019 J.D.Power


TAB 18
Kelley Blue Book
**KBB.COM**
The Trusted Resource

DJA0192

195 Technology Drive
Irvine, CA. 92618

Main: (800) 258-3266
Fax: (949) 727-3400

www.kbb.com

July 12, 2019

Steve Leface
1050 Connecticut Ave NW #1100
Washington, DC 20036

Thank you for your Kelley Blue Book Certified Value request.

Per your request, included is a certified copy of the relevant pages of the September – December 2016 Eastern Edition Kelley Blue Book Official Guide for Older Cars for a 2004 Cadillac CTS.

Please contact me with any questions you may have regarding this certified value.

Thank you.

Regards,

Chris Beckelman
(800) 258 - 2005



195 Technology Drive
Irvine, CA. 92618
Main: (800) 258-3266
Fax: (949) 727-3400
www.kbb.com

# Kelley Blue Book

KELLEY BLUE BOOK OFFICIAL GUIDE

## OLDER CAR GUIDE

### 1996 – 2009 Models

Vol. 90 September—December 2016 No. 14

LES KELLEY - - - - - - - - - - - - - - - - - - - - - - - - *Founder*
BRETT NANIGIAN - - - - *Sr. Product Director, Industry Solutions*
GREG HARGIS - - - - *Sr. Director, Vehicle Valuation Operations*
KELLY J. SALAZAR - - - - - - - - *Director, Product Management*
AJ SCHOONOVER - - - - - - - - - - *Director, Vehicle Valuations*
SEAN FOYIL - - - - - - - - - - - - - *Manager, Vehicle Valuations*
MARTIN C. SANCHEZ - - - - - - - - - - - - - - - - *Senior Analyst*
JANICE YOELL - - - - - - - - - - - - - - - - - - - *Senior Analyst*

Copyright © 2016 by Kelley Blue Book Co., all rights reserved. Printed in U.S.A. Any reproduction, transmission, or storage of the contents of this publication, in whole or in part, by any means, is strictly prohibited without the express written consent of the publisher.

Kelley Blue Book Auto Market Report (ISSN 0192-1800) is published monthly: except 3 issues in January, 2 issues in May, July and September and 1 issue in February, March, April, June, August, October, November and December. Total 17 issues per year for $228 per year (all issues), by Kelley Blue Book Co., 195 Technology Dr., Irvine, CA 92618. Periodicals Postage Paid at Irvine, CA, and at additional mailing offices. POSTMASTER: Send address changes to Kelley Blue Book Auto Market Report, P.O. Box 19691, Irvine, CA 92623.

*Published at:*

**195 Technology Dr., Irvine, California 92618**
**(949) 770-7704 or (800) BLUE-BOOK**
**b2b.kbb.com**

*We assume no responsibility for errors or omissions.*

**Official Guide Since 1926**

To Whom It May Concern:

I certify that this is a true and correct copy of the pages from the September – December 2016 Eastern Edition, *Kelley Blue Book Official Guide for Older Cars* for a 2004 Cadillac CTS, per your request.

Sincerely,
**Chris Beckelman**
KELLEY BLUE BOOK

Kelley Blue Book
KBB.COM
The Trusted Resource

DJA0194

195 Technology Drive
Irvine, CA. 92618

Main: (800) 258-3266
Fax: (949) 727-3400

www.kbb.com

## INFORMATION AND EXPLANATION

These values are the opinion of the staff and management of Kelley Blue Book and are arrived at after careful study of information we deem reliable. However, we assume no responsibility for errors or omissions.

**LIST PRICES** represent the original suggested retail price (including destination charges) for vehicles equipped as indicated on the equipment chart.

**AUCTION VALUE** is what a vehicle is expected to sell for at a wholesale auction. The Auction Value assumes the seller has properly disclosed the condition of the vehicle. It does not include buyer's fees or the buyer's transportation costs and assumes the vehicle has not yet been fully reconditioned, inspected and prepared for retail sale.

**LENDING VALUE** is a trusted benchmark value for wholesale and retail lenders. Based on Kelley Blue Book's Auction Value, the Lending Value assumes that the vehicle is in good to excellent condition, fully reconditioned, inspected and prepared for retail sale.

**SUGGESTED RETAIL VALUE** represents dealers' asking price and is the starting point for negotiation. This value assumes that the vehicle has been fully reconditioned and has a clean Title history.

**EQUIPMENT SCHEDULES** are provided for cars on pgs. 9 through 19 and for trucks/vans on pgs. 394 through 395. To the right of each model heading is the schedule that particular model should use. Base prices for all models include the equipment as indicated by asterisks on the equipment charts plus AM/FM. Any equipment following a model listing will supersede equipment listed on a chart.

Values to be deducted are enclosed in parenthesis.

Add or subtract for each item that is listed separately **even if it is part of a package** you have already added for or if it is **original standard equipment.**

**Premium Sound** refers to a complete upgraded sound system (i.e. Bose, JBL, Infinity) not simply speakers or an equalizer.

**Premium Wheels** are a special or upgraded set of wheels, not just a set of alloy wheels. This would be used for custom, designer or chromed alloy wheels. Add for either but not both.

**Navigation System** applies to a built-in dashboard or console-mounted global positioning system.

**Rear Spoiler** (factory type) bolt-on trunk-mounted spoilers. It does not apply to "Lip-Spoilers" that are merely a raised contour in the trunk lid.

4

To Whom It May Concern:

I certify that this is a true and correct copy of the pages from the September – December 2016 Eastern Edition, *Kelley Blue Book Official Guide for Older Cars* for a 2004 Cadillac CTS, per your request.

Sincerely,
**Chris Beckelman**
KELLEY BLUE BOOK

Kelley Blue Book
KBB.COM
The Trusted Resource

DJA0195   195 Technology Drive
Irvine, CA. 92618

Main: (800) 258-3266
Fax: (949) 727-3400

www.kbb.com

## INFORMATION AND EXPLANATION

**RETAIL MARK-UP FOR EQUIPMENT** is as follows:

| W/S | RTL | W/S | RTL | W/S | RTL | W/S | RTL | W/S | RTL |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 25 | 35 | 225 | 300 | 425 | 565 | 625 | 835 | 825 | 1100 |
| 50 | 65 | 250 | 335 | 450 | 600 | 650 | 865 | 850 | 1135 |
| 75 | 100 | 275 | 365 | 475 | 635 | 675 | 900 | 875 | 1165 |
| 100 | 135 | 300 | 400 | 500 | 665 | 700 | 935 | 900 | 1200 |
| 125 | 165 | 325 | 435 | 525 | 700 | 725 | 965 | 925 | 1235 |
| 150 | 200 | 350 | 465 | 550 | 735 | 750 | 1000 | 950 | 1265 |
| 175 | 235 | 375 | 500 | 575 | 765 | 775 | 1035 | 975 | 1300 |
| 200 | 265 | 400 | 535 | 600 | 800 | 800 | 1065 | 1000 | 1335 |

**MILEAGE ADJUSTMENT SCHEDULES** appear on pages 8 through 34. These give an amount to be added or deducted from the wholesale and retail values for what we consider to be low or excess mileage. The mileage charts are not established by average miles driven per year. Instead the charts reflect acceptable mileage as demonstrated by the market. **The mileage adjustment is the same for wholesale and suggested retail.**

Use the base lending value (excluding equipment) to determine which column on the chart to use. Disregard the rightmost three digits of the vehicle's mileage when determining the adjustment. The rightmost column gives percentages, instead of dollar amounts, for higher priced vehicles. The percentages should be applied to the base wholesale book value (excluding equipment). The result should be rounded to the nearest $25.

**Regardless of the amount of equipment or mileage adjustments, the wholesale and retail values should not be reduced below 50% of the base values.**

**CONDITION is of prime importance!** Remember the lending value in the guide refers to a clean vehicle ready for resale. Appropriate amounts should be deducted for any needed reconditioning. Likewise, appropriate amounts should be added for exceptionally clean vehicles, vehicles with extremely low miles and vehicles which are under warranty by the factory or dealer.

Vehicles that have been **completely restored** are worth a great deal more than the values shown in this guide. This publication makes no attempt to value these vehicles.

5

To Whom It May Concern:

I certify that this is a true and correct copy of the pages from the September – December 2016 Eastern Edition, *Kelley Blue Book Official Guide for Older Cars* for a 2004 Cadillac CTS, per your request.

Sincerely,
**Chris Beckelman**
KELLEY BLUE BOOK

Kelley Blue Book
KBB.COM
The Trusted Resource

195 Technology Drive
Irvine, CA. 92618

Main: (800) 258-3266
Fax: (949) 727-3400

www.kbb.com

## INFORMATION AND EXPLANATION

**VIN** is the Vehicle Identification Number. The VIN may vary depending on model, engine, transmission and option packages.

**W.B.** refers to the wheelbase which is the distance, center to center, from the front axle to rear axle.

**Weight** is the approximate curb weight of the vehicle.

**Liter** refers to engine displacement in liters.

**Cab & Chassis** is an incomplete vehicle, with completed occupant compartment that requires the addition of the cargo carrying components.

**DR** is an abbreviation for Dual Rear Wheels.

**Pickups** listed in this guide are Flareside, Stepside, Fleetside, or Styleside pickup trucks. Fleetside and Styleside trucks both have straight bed sides with the fender wells located inside the pickup bed. Flareside and Stepside trucks both have straight inner bed walls with the fenders located on the outside of the bed sides. Value adjustments to Stepside and Flareside trucks can be found on the truck equipment schedules.

**Custom Bumpers** (Truck Equipment Schedules): Bumpers are considered standard equipment on all trucks in this guide. The custom bumper add should be used only for an upgraded bumper such as a tubular or premium bumper.

**Video/DVD System:** This add refers to a video-cassette, DVD or game player that has TVs or monitors permanently mounted to the floor, ceiling or headrest.

**Asterisks (****)** may appear in place of values on certain vehicles where due to rarity in the marketplace or extreme special interest we can not yet provide accurate auction or lending values. Some of these vehicles may be limited production or rarely traded-in. We have included retail values for these vehicles but asterisks appear in place of the auction and lending values.

**Grey Market Cars** (cars imported through sources other than factory authorized distributors) may have substantially lower used values.

6

To Whom It May Concern:

I certify that this is a true and correct copy of the pages from the September – December 2016 Eastern Edition, *Kelley Blue Book Official Guide for Older Cars* for a 2004 Cadillac CTS, per your request.

Sincerely,
**Chris Beckelman**
KELLEY BLUE BOOK


**KELLEY BLUE BOOK**
**OLDER CAR GUIDE REGIONS**

**WESTERN EDITION**

| | | |
|---|---|---|
| Alaska | Hawaii | Oregon |
| Arizona | Idaho | Utah |
| California | Montana | Washington |
| Colorado | Nevada | Wyoming |
| Guam | New Mexico | |

**CENTRAL/EASTERN EDITION**

| | | |
|---|---|---|
| Alabama | Maryland | Oklahoma |
| Arkansas | Massachusetts | Pennsylvania |
| Connecticut | Michigan | Puerto Rico |
| Delaware | Minnesota | Rhode Island |
| District of Columbia | Mississippi | South Carolina |
| Florida | Missouri | South Dakota |
| Georgia | Nebraska | Tennessee |
| Illinois | New Hampshire | Texas |
| Indiana | New Jersey | Vermont |
| Iowa | New York | Virgin Islands |
| Kansas | North Carolina | Virginia |
| Kentucky | North Dakota | West Virginia |
| Louisiana | Ohio | Wisconsin |
| Maine | | |

7

To Whom It May Concern:

I certify that this is a true and correct copy of the pages from the September – December 2016 Eastern Edition, *Kelley Blue Book Official Guide for Older Cars* for a 2004 Cadillac CTS, per your request.

Sincerely,
**Chris Beckelman**
KELLEY BLUE BOOK

Kelley Blue Book
KBB.COM
The Trusted Resource

DJA0198   195 Technology Drive
Irvine, CA. 92618

Main: (800) 258-3266
Fax: (949) 727-3400

www.kbb.com

## 2003 CADILLAC

| Body Type | VIN | Wt. | List | Auction Good | Very Good | Lending | Sug. Retail |
|---|---|---|---|---|---|---|---|
| SLS Sedan 4D | KS54Y | 3969 | 45270 | 825 | 900 | 1125 | 2625 |
| STS Touring Sedan 4D | KY549 | 3992 | 51175 | 650 | 725 | 875 | 3125 |
| **DeVILLE—V8—Equipment Schedule 2** | | | | | | | |
| W.B. 115.3"; 4.6 Liter. | | | | | | | |
| Sedan 4D | KD54Y | 3978 | 43995 | 975 | 1100 | 1325 | 3050 |
| DHS Sedan 4D | KE54Y | 4049 | 48825 | 1075 | 1225 | 1450 | 3800 |
| DTS Sedan 4D | KF549 | 4047 | 48825 | 1000 | 1150 | 1375 | 4125 |

## 2004 CADILLAC — 1G6(DM57N)-4-#

| Body Type | VIN | Wt. | List | Auction Good | Very Good | Lending | Sug. Retail |
|---|---|---|---|---|---|---|---|
| **CTS—V6—Equipment Schedule 2** | | | | | | | |
| W.B. 113.4"; 3.2 Liter. | | | | | | | |
| Sedan 4D | DM57N | 3509 | 33155 | 1800 | 2000 | 2225 | 4750 |
| Luxury Sport Pkg | | | | 275 | 275 | 275 | 370 |
| V6, 3.6 Liter | 7 | | | 425 | 425 | 425 | 560 |
| **CTS-V—V8—Equipment Schedule 2** | | | | | | | |
| W.B. 113.4"; 5.7 Liter. | | | | | | | |
| Sedan 4D | DN57S | 3850 | 49995 | 8025 | 8850 | 9150 | 11900 |
| **SEVILLE—V8—Equipment Schedule 2** | | | | | | | |
| W.B. 112.2"; 4.6 Liter. | | | | | | | |
| SLS Sedan 4D | KS52Y | 3969 | 47955 | 1025 | 1125 | 1350 | 3800 |
| **DEVILLE—V8—Equipment Schedule 2** | | | | | | | |
| W.B. 115.3"; 4.6 Liter. | | | | | | | |
| Sedan 4D | KD54Y | 3978 | 45445 | 1125 | 1275 | 1500 | 3700 |
| DHS Sedan 4D | KE54Y | 4049 | 50595 | 1150 | 1300 | 1525 | 4050 |
| DTS Sedan 4D | KF549 | 4047 | 50595 | 1100 | 1250 | 1475 | 4200 |
| **XLR—V8—Equipment Schedule 1** | | | | | | | |
| W.B. 105.7"; 4.6 Liter. | | | | | | | |
| Hardtop Conv 2D | YV34A | 3647 | 76200 | 8450 | 8875 | 9275 | 13600 |

## 2005 CADILLAC — 1G6(DM56T)-5-#

| Body Type | VIN | Wt. | List | Auction Good | Very Good | Lending | Sug. Retail |
|---|---|---|---|---|---|---|---|
| **CTS—V6—Equipment Schedule 2** | | | | | | | |
| W.B. 113.4"; 2.8 Liter. | | | | | | | |
| Sedan 4D | DM56T | 3509 | 33595 | 2100 | 2350 | 2725 | 5300 |
| Luxury Pkg | | | | 300 | 300 | 300 | 400 |
| V6, 3.6 Liter | 7 | | | 450 | 450 | 450 | 595 |
| **CTS-V—V8—Equipment Schedule 2** | | | | | | | |
| W.B. 113.4"; 5.7 Liter. | | | | | | | |
| Sedan 4D | DN56S | 3850 | 49995 | 8650 | 9500 | 9950 | 12700 |
| **STS—V6—Equipment Schedule 2** | | | | | | | |
| W.B. 116.6"; 3.6 Liter. | | | | | | | |
| Sedan 4D | DW677 | 3960 | 40995 | 2300 | 2525 | 2900 | 5375 |
| Adaptive Cruise Control | | | | 275 | 275 | 275 | 355 |
| AWD | | | | 1250 | 1250 | 1250 | 1680 |
| V8, 4.6 Liter | A | | | 550 | 550 | 550 | 725 |
| **DEVILLE—V8—Equipment Schedule 2** | | | | | | | |
| W.B. 115.3"; 4.6 Liter. | | | | | | | |
| Sedan 4D | KD54Y | 3978 | 46490 | 1300 | 1475 | 1850 | 3875 |
| DHS Sedan 4D | KE54Y | 4049 | 52045 | 1325 | 1475 | 1850 | 4800 |
| DTS Sedan 4D | KF549 | 4047 | 52045 | 1775 | 1975 | 2350 | 5075 |
| **XLR—V8—Equipment Schedule 1** | | | | | | | |
| W.B. 105.7"; 4.6 Liter. | | | | | | | |
| Hardtop Conv 2D | YV34A | 3647 | 76650 | 11400 | 12000 | 12550 | 16950 |

## 2006 CADILLAC — 1G6(DM57T)-6-#

**CTS—V6—Equipment Schedule 2**
W.B. 113.4"; 2.8 Liter.

86   **See Pages 4-5 for Value Definitions**   0916B

---

To Whom It May Concern:

I certify that this is a true and correct copy of the pages from the September – December 2016 Eastern Edition, *Kelley Blue Book Official Guide for Older Cars* for a 2004 Cadillac CTS, per your request.

Sincerely,
**Chris Beckelman**
KELLEY BLUE BOOK

Kelley Blue Book
**KBB.COM**
The Trusted Resource

DJA0199   195 Technology Drive
Irvine, CA. 92618

Main: (800) 258-3266
Fax: (949) 727-3400

www.kbb.com

## 2004 MILEAGE CHART

### BASE LENDING BLUE BOOK DOLLAR VALUE

| Miles x 1000 | $0-1000 | 1001-1500 | 1501-2000 | 2001-2500 | 2501-3000 | 3001-3500 | 3501-4500 | 4501 & up |
|---|---|---|---|---|---|---|---|---|
| 63 | 675 | 1125 | 1575 | 2025 | 2475 | 2925 | 3600 | 89.9% |
| 73 | 575 | 975 | 1350 | 1750 | 2125 | 2525 | 3100 | 77.7% |
| 82 | 500 | 825 | 1175 | 1500 | 1825 | 2150 | 2650 | 66.5% |
| 90 | 425 | 700 | 1000 | 1275 | 1575 | 1850 | 2275 | 57.0% |
| 97 | 375 | 625 | 850 | 1100 | 1350 | 1600 | 1975 | 49.2% |
| 103 | 325 | 525 | 725 | 950 | 1150 | 1375 | 1675 | 41.9% |
| 108 | 275 | 450 | 650 | 825 | 1000 | 1175 | 1450 | 36.5% |
| 113 | 225 | 400 | 550 | 700 | 850 | 1000 | 1250 | 31.0% |
| 118 | 200 | 325 | 450 | 600 | 725 | 850 | 1050 | 26.4% |
| 122 | 175 | 275 | 400 | 500 | 625 | 725 | 900 | 22.4% |
| 126 | 150 | 225 | 325 | 425 | 525 | 600 | 750 | 18.7% |
| 129 | 125 | 200 | 275 | 350 | 450 | 525 | 650 | 15.9% |
| 132 | 75 | 150 | 200 | 250 | 325 | 375 | 450 | 11.5% |
| 134 | 75 | 100 | 150 | 200 | 250 | 275 | 350 | 8.7% |
| 136 | 50 | 75 | 100 | 150 | 175 | 200 | 250 | 6.1% |
| 137 | 25 | 50 | 75 | 100 | 125 | 150 | 200 | 4.9% |
| 138 | 25 | 50 | 75 | 75 | 100 | 125 | 150 | 3.7% |
| 139 | 25 | 25 | 50 | 50 | 75 | 75 | 100 | 2.7% |
| 140 | 25 | 25 | 25 | 50 | 50 | 50 | 75 | 1.8% |
| 141 | 0 | 25 | 25 | 25 | 25 | 25 | 50 | 1.1% |
| 143 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| 145 | 0 | 25 | 25 | 25 | 25 | 25 | 50 | 1.0% |
| 147 | 25 | 25 | 25 | 50 | 50 | 75 | 75 | 1.9% |
| 149 | 25 | 25 | 50 | 75 | 75 | 100 | 100 | 2.8% |
| 151 | 25 | 50 | 75 | 75 | 100 | 125 | 150 | 3.6% |
| 153 | 25 | 50 | 75 | 100 | 125 | 150 | 175 | 4.3% |
| 155 | 25 | 50 | 75 | 100 | 125 | 150 | 200 | 5.0% |
| 158 | 50 | 75 | 100 | 125 | 150 | 200 | 225 | 5.9% |
| 161 | 50 | 75 | 125 | 150 | 175 | 225 | 275 | 6.7% |
| 165 | 50 | 100 | 125 | 175 | 200 | 250 | 300 | 7.6% |
| 170 | 75 | 100 | 150 | 200 | 225 | 275 | 350 | 8.6% |
| 176 | 75 | 125 | 175 | 225 | 250 | 300 | 375 | 9.5% |
| 183 | 75 | 125 | 175 | 225 | 275 | 325 | 425 | 10.4% |
| 191 | 75 | 150 | 200 | 250 | 300 | 350 | 450 | 11.1% |
| 205 | 100 | 150 | 200 | 275 | 325 | 375 | 475 | 11.9% |

**24**   ADD figures in shaded areas. DEDUCT figures in white areas

To Whom It May Concern:

I certify that this is a true and correct copy of the pages from the September – December 2016 Eastern Edition, *Kelley Blue Book Official Guide for Older Cars* for a 2004 Cadillac CTS, per your request.

Sincerely,
**Chris Beckelman**
KELLEY BLUE BOOK

Kelley Blue Book
KBB.COM
The Trusted Resource

195 Technology Drive
Irvine, CA. 92618

Main: (800) 258-3266
Fax: (949) 727-3400

www.kbb.com

## 2004 LENDING FACTORY EQUIPMENT

| Equipment | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Premium Sound | 25 | 25 | 50 | 50 | 25 | 25 |
| Navigation System | 65 | 120 | 120 | 125 | 125 | 125 |
| Leather | ✳ | ✳ | 130 | 100 | 125 | 90 |
| Rear Spoiler | 25 | 25 | 25 | 25 | 25 | 25 |
| Parking Sensors | 90 | 65 | 55 | — | — | — |
| Alloy Wheels | ✳ | ✳ | 45 | 45 | 25 | 25 |
| Premium Wheels | 120 | 120 | 130 | 130 | 50 | 25 |
| Premium Whls 19"+ | 115 | 115 | 115 | 115 | 115 | 115 |
| Roof Rack (Wagon) | 25 | 25 | 25 | 25 | 25 | 25 |
| Third Seat (Wagon) | 140 | 65 | 65 | 65 | 50 | 50 |
| **DEDUCT FOR:** | | | | | | |
| w/o ABS | — | — | (50) | (50) | (25) | (25) |
| w/o Power Windows | — | — | — | — | (25) | (25) |
| w/o Power Locks | — | — | — | — | (25) | (25) |
| w/o Tilt Wheel | — | — | — | — | (25) | (25) |
| w/o Leather | (100) | (100) | — | — | — | — |

✳ — EQUIPMENT INCLUDED IN BASE PRICE

**SEE PAGE 5 FOR EQUIPMENT RETAIL          25**

To Whom It May Concern:

I certify that this is a true and correct copy of the pages from the September – December 2016 Eastern Edition, *Kelley Blue Book Official Guide for Older Cars* for a 2004 Cadillac CTS, per your request.

Sincerely,
**Chris Beckelman**
KELLEY BLUE BOOK

TAB 19                                                                DJA0201

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:19-cv-294-CCE-JLW

| | | |
|---|---|---|
| ELIZABETH V. FORTSON. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Catherine C. Eagles |
| | ) | Magistrate Judge Joe L. |
| GARRISON PROPERTY AND CASUALTY | ) | Webster |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S RESPONSES TO DEFENDANT GARRISON PROPERTY AND
CASUALTY INSURANCE COMPANY'S FIRST SET OF INTERROGATORIES,
REQUESTS FOR ADMISSION, AND REQUESTS FOR PRODUCTION OF
DOCUMENTS**

**GENERAL OBJECTIONS**

Plaintiff incorporates the following General Objections into each Answer below:

Plaintiff objects to the "Instructions" and "Definitions" contained in Garrison's

First Set of Interrogatories, Requests for Admission, and Requests for Production of

Documents to Plaintiff to the extent they attempt to impose on Plaintiff requirements

beyond those set forth in the Federal Rules of Civil Procedure. Plaintiff interpreted

Defendant's words and phrases in accordance with their usual definitions and usages

when responding to Defendant's requests. If Defendant intended any word or phrase

to have a different meaning other than the generally accepted one, Plaintiff objects on

the grounds that the request is vague and ambiguous.

Plaintiff's responses as set forth herein are based upon information presently

known. Plaintiff reserves the right to rely on facts, documents, or other evidence that

may develop or subsequently come to the attention of Plaintiff, in order to assert

additional objections or supplement responses if additional information or grounds for objections are discovered. Plaintiff reserves the right to supplement or amend these responses at any time in accordance with the applicable rules and orders of the Court.

Finally, Plaintiff reserves all objections to the admissibility at trial of any documents or information produced to Defendant.

## I.    REQUESTS FOR ADMISSIONS

**REQUEST FOR ADMISSION NO. 1**:  Admit that Garrison provided You with a copy of the CCC Report on October 17, 2016.

**ANSWER:**

**Admitted.**

**REQUEST FOR ADMISSION NO. 2**:  Admit that Garrison provided your father with a copy of the CCC Report on October 17, 2016.

**ANSWER:**

**Admitted.**

**REQUEST FOR ADMISSION NO. 3**:  Admit that a Garrison representative discussed the CCC Report with your father.

**ANSWER:**

**Plaintiff lacks sufficient information to admit or deny this Request, therefore, this Request is denied.**

**REQUEST FOR ADMISSION NO. 4**:  Admit that the CCC Report explained that the valuation for your Vehicle was calculated using comparable vehicles, which included applying a condition adjustment to those comparable vehicles.

2

**ANSWER:**

Plaintiff admits that the CCC Report reflects the use of "comparable" vehicles to value Plaintiff's loss Vehicle. Plaintiff further admits that the CCC Report reflects the application of a uniform and unitemized condition adjustment to each "comparable" vehicle. Plaintiff otherwise denies this Request.

**REQUEST FOR ADMISSION NO. 5**:  Admit that your father accepted the valuation contained in the CCC Report.

**ANSWER:**

Plaintiff objects to the word "accepted" as used in this Request. Plaintiff does not accept the valuation contained in the CCC Report as an accurate reflection of the value of Plaintiff's loss vehicle. For these reasons, the request is denied.

**REQUEST FOR ADMISSION NO. 6**:  Admit that your father requested payment for your total loss settlement to be made via FedEx.

**ANSWER:**

Plaintiff objects to the word "settlement" as used in Request for Admission No. 6. Plaintiff has not settled her claims against Defendant. This request is denied.

**REQUEST FOR ADMISSION NO. 7**:  Admit that your counsel, Michael Malone, spoke with Garrison, on your behalf, regarding the adjustment of your total loss vehicle claim.

**ANSWER:**

Admitted.

3

**REQUEST FOR ADMISSION NO. 8**:  Admit that your counsel, Michael Malone, accepted the settlement of the property damage to your total loss vehicle under Part D of the insurance policy.

    **ANSWER:**

    **Plaintiff objects to the word "settlement" as used in Request for Admission No. 8. Plaintiff has not settled her claims against Defendant. This request is denied.**

**REQUEST FOR ADMISSION NO. 9**:  Admit that as of October 17, 2016, the Vehicle had not been fully reconditioned.

    **ANSWER:**

    **Admitted.**

**REQUEST FOR ADMISSION NO. 10**:  Admit that as of October 17, 2016, the Vehicle's paint had fading and surface scratches.

    **ANSWER:**

    **Plaintiff admits that as of October 17, 2016, the Vehicle had severe scratches due to the collision on October 2, 2016. Plaintiff denies that the paint had faded**.

    **Plaintiff otherwise objects to this Request as compound. Plaintiff objects to the phrase "fading and surface scratches" as vague and ambiguous.**

**REQUEST FOR ADMISSION NO. 11**:  Admit that as of October 17, 2016, the Vehicle's interior had tearing and the leather was worn.

4

**ANSWER:**

Plaintiff admits that there was one small crack in one of the leather seats inside the Loss vehicle. Plaintiff denies that any of the leather was torn or that the leather was worn out.

Plaintiff objects to the phrases "tearing" and "worn" as vague and ambiguous.

**REQUEST FOR ADMISSION NO. 12**:  Admit that values offered by Kelley Blue Book are based on regional data.

**ANSWER:**

Plaintiff lacks sufficient information to admit or deny the manner by which Kelley Blue Book determines values of vehicles. Therefore, this Request is denied.

Plaintiff otherwise objects to this Request because it seeks information that is not relevant to any claim or defense in this litigation and is not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST FOR ADMISSION NO. 13**:  Admit that Kelley Blue Book defines "Typical Listing Price" (formerly known as "Suggested Retail Price") on its website as "representative of dealers' asking prices."  *See* https://www.kbb.com/company/faq/used-cars/

**ANSWER:**

Plaintiff admits that as of the date of this response, the current website for Kelley Blue Book states that the Kelley Blue Book Typical Listing Price is representative of dealers' asking prices.

5

Plaintiff otherwise objects to this Request because it seeks information that is not relevant to any claim or defense in this litigation and is not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST FOR ADMISSION NO. 14**:  Admit that Kelley Blue Book explains on its website that "Typical Listing Price" (formerly known as "Suggested Retail Price") "assumes that the vehicle has been fully reconditioned."  *See* https://www.kbb.com/company/faq/used-cars/

    **ANSWER:**

Plaintiff admits that as of the date of this response, the current website for Kelley Blue Book states that the Kelley Blue Book Typical Listing Price assumes that the vehicle has been fully reconditioned.

Plaintiff otherwise objects to this Request because it seeks information that is not relevant to any claim or defense in this litigation and is not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST FOR ADMISSION NO. 15**:  Admit that Kelley Blue Book explains on its website that for Typical Listing Price: "[t]he final sale price will likely be less depending on the vehicle's actual condition, popularity, type of warranty offered and local market conditions.  In other words, it's the price you should expect a dealer to ask – not the price you should pay." *See* https://www.kbb.com/company/faq/used-cars/

    **ANSWER:**

Plaintiff admits that as of the date of this response, the current website for Kelley Blue Book states for the Kelley Blue Book Typical Listing Price as follows: "This price also takes into account the dealer's profit, costs for advertising, sales commissions and other costs of doing business. The final sale price will likely be less depending on the vehicle's actual condition,

6

popularity, type of warranty offered and local market conditions. In other words, it's the price you should expect a dealer to ask - not always the price you should pay."

Plaintiff otherwise objects to this Request because it seeks information that is not relevant to any claim or defense in this litigation and is not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST FOR ADMISSION NO. 16**:  Admit that NADA defines "clean retail value" on its website as a price reflecting "a vehicle in clean condition".    See https://www.nadaguides.com/FAQ/values-and-pricing)

   **ANSWER:**

   Denied. As of the date of this Response, the definition from the NADA website provides the following definition of "clean retail": "Clean Retail values reflect a vehicle in clean condition. This means a vehicle with no mechanical defects and passes all necessary inspections with ease. Paint, body and wheels have minor surface scratching with a high gloss finish and shine. Interior reflects minimal soiling and wear with all equipment in complete working order. Vehicle has a clean title history. Because individual vehicle condition varies greatly, users of NADAguides.com may need to make independent adjustments for actual vehicle condition."

   Plaintiff otherwise objects to this Request because it seeks information that is not relevant to any claim or defense in this litigation.

**REQUEST FOR ADMISSION NO. 17**:  Admit that NADA does not perform a physical inspection of each vehicle prior to calculating its suggested price.

7

**ANSWER:**

Plaintiff lacks sufficient information to admit or deny this Request. Therefore, this Request is denied.

Plaintiff otherwise objects to this Request because it seeks information that is not relevant to any claim or defense in this litigation and is not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST FOR ADMISSION NO. 18**: Admit that Kelley Blue Book does not perform a physical inspection of each vehicle prior to calculating its suggested price.

**ANSWER:**

Plaintiff lacks sufficient information to admit or deny this Request. Therefore, this Request is denied.

Plaintiff otherwise objects to this Request because it seeks information that is not relevant to any claim or defense in this litigation and is not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST FOR ADMISSION NO. 19**: Admit that your Vehicle was not in "clean retail condition" as that term is used by NADA.

**ANSWER:**

Denied.

## II.    INTERROGATORIES

**INTERROGATORY NO. 1:** Identify all persons who provided information that was used in answering these Interrogatories, and for each person identified, briefly state the information provided.

8

**ANSWER:**

Plaintiff provided the information used in answering these interrogatories.

Plaintiff otherwise objects to this Interrogatory to the extent it seeks information protected by attorney-client or work product privilege.

**INTERROGATORY NO. 2:** Identify all persons who have knowledge or information pertaining to your claims in this case or to the matters alleged in the Amended Complaint, including but not limited to your claims for damages; and for each person identified, describe the nature of his or her knowledge or information.

**ANSWER:**

Plaintiff and her counsel have knowledge pertaining to her claim. Plaintiff otherwise asserts that representatives of Defendant who are readily ascertainable by Defendant but are presently unknown to Plaintiff have knowledge relating to Plaintiff's claim, as well as representatives of CCC who are presently unknown to Plaintiff who have knowledge of the use of condition adjustments as part of the valuation of total loss vehicles. Finally, Plaintiff incorporates all disclosure statements served in this case by any party as though fully set forth herein.

Plaintiff otherwise objects to this Interrogatory as a premature contention interrogatory that cannot be fully answered until discovery is complete. Plaintiff reserves the right to supplement her response in due course. Plaintiff further objects to this Interrogatory because it seeks information that is not relevant to any claim or defense in this litigation and is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects because this Interrogatory seeks information more readily available to Defendant. For example, Garrison knows which of its

9

representatives have knowledge of certain aspects of Plaintiff's claim. Plaintiff further objects to this Request as vague and ambiguous. Finally, Plaintiff objects to this Interrogatory as vague and overbroad and unduly burdensome as it is not limited in time or scope.

**INTERROGATORY NO. 3:** Identify all individuals, including attorneys but excluding members of the alleged class, who have a pecuniary interest in the outcome of this lawsuit or who have paid or agreed to pay a portion of your attorney fees and/or expenditures in connection with this lawsuit, including but not limited to the name and address of such individuals, the nature of the pecuniary interest, and the nature and amount of any payment.

   **ANSWER:**

   **Plaintiff, members of the putative class, and Defendant have a pecuniary interest in the outcome of this lawsuit. Plaintiff additionally incorporates Plaintiff's Rights and Responsibilities agreement produced at Bates No. FORTSON_000111-000114 as though fully set forth herein and as permitted under Rule of Federal Civil Procedure 33.**

   **Plaintiff otherwise objects to this Interrogatory as seeking information relating to attorney-client privilege. Plaintiff further objects to this Request as unduly burdensome and oppressive in that it seeks information that is not known or reasonably accessible to Plaintiff such as requiring Plaintiff to determine <u>every</u> individual who has a pecuniary interest in the outcome of this lawsuit without any limitation in scope. Finally, Plaintiff objects to this Interrogatory as compound.**

**INTERROGATORY NO. 4:** Identify any other lawsuits You have been or are a party to including (a) caption, style, and case number of the lawsuit, (b) the court in which the

10

lawsuit(s) was or is pending, (c) the nature of the claims made by or against You, (d) the date You either instituted the lawsuit(s) or were served with process in the lawsuit(s) or intervened in the lawsuit(s), and (e) the status of the lawsuit(s) at the present time.

**ANSWER:**

**Plaintiff has not been a party to any other lawsuits.**

**Plaintiff otherwise objects to this Interrogatory because it seeks information, in part, that is not relevant to any claim or defense in this litigation. Plaintiff objects to this Request as oppressive and unduly burdensome as it is not limited in time and seeks information that is available in the public record. Plaintiff further objects because this question is compound.**

**INTERROGATORY NO. 5:** Identify each expert witness whom You intend to call to testify at any class certification hearing or at the trial of this matter, or whose testimony You intend to submit via affidavit or declaration; and for each expert, identify the subjects upon which such expert will opine.

**ANSWER:**

**Plaintiff will disclose experts in accordance with the court's scheduling order and incorporates those disclosures as though fully set forth herein.**

**Plaintiff otherwise objects to this Interrogatory to the extent is seeks information that is protected by the attorney-client and/or work product privilege.**

**INTERROGATORY NO. 6:** Identify each non-expert witness whom You intend to call to testify at any class certification hearing or at the trial of this matter, or whose testimony You intend to submit via affidavit or declaration; and identify the subjects upon which such witness is expected to testify.

11

**ANSWER:**

Plaintiff incorporates all disclosure statements served in this case by any party as though fully set forth herein.

Plaintiff objects to this Request because it seeks information that is outside the scope of discoverable information pursuant to Rule 26 of the Federal Rules of Civil Procedure. Plaintiff further objects to this Request as premature and oppressive in that it requires Plaintiff to be able to identify every witness she plans to call, the method by which she intends to present each witness' testimony, and the scope of their testimony, well before the close of discovery. Furthermore, this Request seeks information relating to litigation strategy and thus are protected by attorney-client and attorney-work product privilege. Plaintiff further objects to this Request as vague and ambiguous. Plaintiff further Plaintiff reserves the right to supplement her response.

**INTERROGATORY NO. 7:** Describe your relationship with Your counsel prior to this case, including the name and case numbers of any other cases for which your counsel represented You.

**ANSWER:**

Hendren, Redwine, and Malone represented Plaintiff in association with insurance claims relating to her October 2, 2016 collision. Plaintiff had no relationship with Hagens Berman Sobol Shapiro LLP preceding the instant case.

Plaintiff otherwise objects to this Request as irrelevant to any claim or defense in this litigation.

**INTERROGATORY NO. 8:** Identify all forms of social media You used from April 2017 to the present, and include your user names.

    **ANSWER:**

    **Plaintiff has an Instagram account (username: Vail.Fortson), a Facebook account (username: Vail Fortson), a Snapchat account (username: evfortson) and a LinkedIn account (username: Vail Fortson).**

    **Plaintiff otherwise objects to this Interrogatory because it seeks information that is not relevant to any claim or defense in this litigation. Plaintiff further objects to this Request as overbroad. Seeking information to all social media which the Plaintiff broadly may have had access to over the past three years is patently overbroad.**

**INTERROGATORY NO. 9:** Identify any valuations, calculations or studies relating to the value of the Vehicle and when such valuations, calculations or studies were performed.

    **ANSWER:**

    **At the request of Defendant, CCC performed a market valuation report for Plaintiff's total loss Vehicle in or around October of 2016.**

    **Plaintiff otherwise objects to this Request as vague and ambiguous. The word "relating," for example, is facially overbroad, vague, and ambiguous. Plaintiff further objects to this Request as oppressive and unduly burdensome as it is not limited in time or scope and seeks information that is not known or reasonably accessible to Plaintiff or is otherwise more readily available to Defendant. For instance, Plaintiff cannot determine whether Defendant performed additional valuation studies pertaining to Plaintiff's total loss Vehicle without receiving discovery from Defendant. However, this information is readily available to Defendant. Plaintiff further objects to this**

13

Interrogatory because it seeks information protected by attorney-client privilege or the work-product doctrine.

**INTERROGATORY NO. 10:** Identify every vehicle (truck or automobile) You have purchased in the past 10 years. For each vehicle please include (a) make of vehicle; (b) model of vehicle; (c) year of vehicle; (d) who sold You the vehicle; (e) advertised price for the vehicle; (f) the original price offered for sale of the vehicle; (g) the date you purchased the vehicle, (h) the price ultimately paid for the vehicle; (i) any valuation sources You consulted in connection with the purchase of the vehicle; and (j) any documents relating to the purchase of such vehicle.

   **ANSWER:**

   **Plaintiff states that in approximately June or July of 2016, Plaintiff was gifted the loss Vehicle by her grandfather Robert Malcolm Fortson.**

   **In 2019, Plaintiff bought a 2019 Subaru Ascent from Hendrick Subaru located at Southpoint in Durham, North Carolina. Additionally Plaintiff expressly incorporates the vehicle sticker produced at FORTSON_000115-000117 as though fully set forth herein.**

   **Plaintiff will produce additional documents relating to the purchase of her replacement vehicle in her possession, custody, or control. Plaintiff expressly incorporates those documents herein by reference.**

   **Plaintiff otherwise objects to this Interrogatory because it seeks information that is not relevant to any claim or defense in this litigation. Plaintiff otherwise objects to this Request as vague and ambiguous.**

**INTERROGATORY NO. 11:** Identify all maintenance performed on the Vehicle, including (a) type of service performed; (b) who performed maintenance of the vehicle; (c) date of maintenance service.

14

**ANSWER:**

Plaintiff states that she had the loss Vehicle for about three months before the collision and that she does not recall any maintenance performed on the Vehicle during that time. Plaintiff states that prior to gifting her the loss Vehicle in the summer of 2016, her grandfather had the Vehicle fully serviced, and this service included installation of new tires at an auto repair shop in Jacksonville, Florida.

Plaintiff further objects to this Request as vague and overly broad as it is not limited in time or scope. Specifically, the request does not specify whether it seeks information for the period preceding or following the incident which caused the vehicle to become a total loss. Plaintiff reserves the right to supplement her response.

**INTERROGATORY NO. 12:** Identify whether you claim that Garrison acknowledged Plaintiff's right to recover the damage to Plaintiff's Vehicle under the uninsured motorists coverage, and if so, please identify all facts supporting this contention.

**ANSWER:**

Plaintiff does not contend that Garrison ever agreed to Plaintiff's request to recover for the total loss of her vehicle under the uninsured motorists coverage.

Plaintiff otherwise objects on the grounds that requiring her to identify "all facts supporting this contention" is overly burdensome. *See Steil v. Humana Kansas City, Inc.*, 1197 F.R.D. 445, 447 (D. Kan. 2000). Plaintiff further objects to Interrogatory No. 12 as a premature contention interrogatory that

15

cannot be answered until discovery is completed. Plaintiff reserves the right to supplement her response in due course.

**INTERROGATORY NO. 13:**  Identify all facts in Your possession that support or establish a good-faith basis for Your allegation in paragraph 44 of the Amended Complaint that "Garrison does not ever attempt to establish the condition of comparable vehicles identified in market valuation reports obtained from CCC."

 **ANSWER:**

 **Plaintiff has reviewed her claim file and there is no indication that Garrison inspected the condition of the comparable vehicles contained in the CCC report for her total loss vehicle. Plaintiff is informed and believes that Garrison does not ever attempt to establish the condition of comparable vehicles identified in the market valuation reports provided by CCC. Plaintiff otherwise objects to Interrogatory No. 13 on the grounds that requiring Plaintiff to identify "all facts" supporting her allegation as set forth in paragraph 44 of the Complaint is overly burdensome. *See Steil v. Humana Kansas City, Inc.*, 1197 F.R.D. 445, 447 (D. Kan. 2000). Plaintiff further objects because Interrogatory No. 13 seeks information protected by attorney-client privilege or work-product protections. Plaintiff further objects to Interrogatory No. 13 as a premature contention interrogatory that cannot be answered at this stage of the litigation. Plaintiff reserves the right to supplement her response.**

**INTERROGATORY NO. 14:**  Identify all facts in Your possession that support or establish a good-faith basis for Your allegation in paragraph 45 of the Amended Complaint that "Garrison bases its offers and payments for total losses on manipulated data and reports."

16

**ANSWER:**

Garrison based its payment for the total loss of Plaintiff's vehicle solely on the CCC market valuation report. The CCC market valuation report improperly reduced the estimated value of Plaintiff's loss vehicle by applying arbitrary and unexplained condition adjustments to each of the comparable vehicles listed therein. Plaintiff otherwise objects to Interrogatory No. 14 on the grounds that requiring Plaintiff to identify "all facts" supporting her allegation as set forth in paragraph 45 of the Complaint is overly burdensome. *See Steil v. Humana Kansas City, Inc.*, 1197 F.R.D. 445, 447 (D. Kan. 2000). Plaintiff further objects because Interrogatory No. 14 seeks information protected by attorney-client privilege or work-product protections. Plaintiff further objects to Interrogatory No. 14 as a premature contention interrogatory that cannot be answered at this stage of the litigation. Plaintiff reserves the right to supplement her response.

**INTERROGATORY NO. 15:** Identify all facts in Your possession that support or establish a good-faith basis for Your allegation in paragraph 45 of the Amended Complaint that the condition adjustments imposed on the values of comparable vehicles are "arbitrary and unexplained."

**ANSWER:**

Plaintiff has reviewed the CCC market valuation report valuing her loss vehicle. The valuation report applies uniform, unitemized condition adjustments to each of the comparable vehicles contained therein regardless of mileage or any other unique attributes of the comparable vehicles. Additionally, the CCC valuation report provides only a vague definition of the condition adjustment which does not include any specific details describing or explaining the basis for the amount of the purported condition adjustment.

17

Further, Defendant did not provide Plaintiff with an itemized explanation of the condition adjustment applied to comparable vehicles.

Plaintiff otherwise objects to Interrogatory No. 15 on the grounds that requiring Plaintiff to identify "all facts" supporting her allegation as set forth in paragraph 45 of the Complaint is overly burdensome. *See Steil v. Humana Kansas City, Inc.*, 1197 F.R.D. 445, 447 (D. Kan. 2000). Plaintiff further objects because Interrogatory No. 15 seeks information protected by attorney-client privilege or work-product protections. Plaintiff further objects to Interrogatory No. 15 as a premature contention interrogatory that cannot be answered at this stage of the litigation. Plaintiff reserves the right to supplement her response.

**INTERROGATORY NO. 16:**  Identify all facts in Your possession that support or establish a good-faith basis for Your allegation in paragraph 47 of the Amended Complaint that "Garrison [sic] methods are unfair, misleading, deliberately inconsistent, and calculated to confuse and deceive consumers and their advocates in the settlement process."

**ANSWER:**

Plaintiff states that Garrison based its payment for the total loss of her vehicle solely on the CCC Report which improperly reduced the payment to her through the application of a same dollar amount condition adjustment applied to the comparable vehicles, regardless of condition, and that the purported explanation of the condition adjustment within the CCC report does not explain the basis of the condition adjustment. Plaintiff otherwise objects to Interrogatory No. 16 on the grounds that requiring Plaintiff to identify "all facts" supporting her allegation as set forth in paragraph 47 of the Complaint is overly burdensome. *See Steil v. Humana Kansas City, Inc.*,

18

1197 F.R.D. 445, 447 (D. Kan. 2000). **Plaintiff further objects because Interrogatory No. 16 seeks information protected by attorney-client privilege or work-product protections. Plaintiff further objects to Interrogatory No. 16 as a premature contention interrogatory that cannot be answered at this stage of the litigation. Plaintiff reserves the right to supplement her response.**

**INTERROGATORY NO. 17:** Identify each and every time that You disputed the valuation of your vehicle as determined by Garrison, including the method and manner for which You disputed the valuation.

**ANSWER:**

**Plaintiff incorporates her claim file located at Bates Nos. Garrison P&C 0000001-0000441 as permitted by Rule 33 of the Federal Rules of Civil Procedure as record of her disputes with Garrison regarding the valuation of her loss vehicle including the method and manner for which she disputed the valuation. Plaintiff further states that she specifically disputed the use of the condition adjustment by letter faxed to Garrison on November 14, 2017. Additionally, Plaintiff disputed the valuation of her loss vehicle by filing the present action.**

**Plaintiff otherwise objects to Interrogatory No. 17 on the grounds that the information sought is equally available to Defendant who would have been party to such disputes. Plaintiff further objects to this Interrogatory as vague, ambiguous, and overbroad. For example, the term "disputed" is not defined and the request is not limited in scope. Plaintiff further objects to this Interrogatory because it seeks information unrelated to a claim or defense in this case.**

19

**INTERROGATORY NO. 18:** Identify all communications that You have had with the putative class members, including the name of the putative class member, the date of the communication, the method of the communication, and a brief description of the content of the communication.

**ANSWER:**

**Plaintiff states that she has not contacted any putative class members.**

**Plaintiff otherwise objects to this Request to the extent it seeks information that is protected by the attorney/client and/or work product privilege. Plaintiff further objects to this Request as overbroad and harassing. Plaintiff further objects to this Interrogatory because it seeks information unrelated to a claim or defense in this case.**

**INTERROGATORY NO. 19:** Identify and describe all non-privileged communications that your counsel, Michael Malone, had concerning the adjustment of your total loss vehicle claim that is the subject of the Amended Complaint.

**ANSWER:**

**Plaintiff incorporates her claim file located at Bates Nos. Garrison P&C 0000001-0000441 as permitted by Rule 33 of the Federal Rules of Civil Procedure as record of her counsel's non-privileged communications regarding the condition adjustment. Plaintiff further states that her attorney left a message for Alexandra Sammon on October 25, 2016; spoke with Alexandra Sammon on October 26, 2016; left a message for Alexandra Sammon on November 1, 2016; left a message for Alexandra Sammon on November 2, 2016; spoke with Jimmy Ficklin on November 4, 2016; left a message for Jimmy Ficklin on November 10, 2016; spoke with Jimmy Ficklin on November 14, 2016.Plaintiff otherwise objects to this Interrogatory because it seeks information that is not relevant to any claim or defense in this litigation and**

20

is not reasonably calculated to lead to the discovery of admissible evidence. **Plaintiff further objects to the extent this Interrogatory seeks information covered by the attorney/client privilege/work product doctrine. Plaintiff also objects to this Request because it seeks information more readily available to Defendant.**

**INTERROGATORY NO. 20**: If Your answer to any of Garrison's Requests for Admission is anything other than an unequivocal admission, state all facts upon which You base your response.

      **ANSWER:**

      **Plaintiff directs Defendant to the responses to the above requests for admission.**

      **Otherwise, Plaintiff object to this Interrogatory because it contains numerous subparts which exceed the number of interrogatories permitted under Rule 33(a)(1). Furthermore, Plaintiff objects because this is a premature contention interrogatory that cannot be fully answered until the close of discovery. Plaintiff reserves the right to supplement her Response.**

**INTERROGATORY NO. 21**: Identify and itemize all damages You seek to recover from Garrison in the Amended Complaint, including but not limited to the following:

      a.  The total amount of compensatory damages, including any separate categories or subcategories of damages;

      b.  An explanation of how such damages were calculated or determined; and

      c.  Identify all documents and sources of information used to calculate such damages.

**ANSWER:**

Plaintiff incorporates all disclosures and responses to discovery, by parties and non-parties, in this case as though fully set forth herein. Plaintiff, on behalf of herself and the putative class, seeks compensatory damages that include the amount of Garrison's illicit condition adjustments plus any out-of-pocket losses suffered by her or any class member in the course of contesting the unlawful valuation. Plaintiff also seeks treble damages as well as an award of attorney's fees and costs. In addition, and in the alternative to the damages described and other compensatory damages, Plaintiff seeks a declaration invalidating Garrison's valuation of her claim and the claims of the class, as well as an affirmative injunction requiring Garrison to determine the proper claim payment for all total loss vehicles using permissible methods.

Plaintiff otherwise objects to this Request to the extent it seeks the premature disclosure of expert opinions, or requires the Plaintiff to set forth analysis, opinions, or theories that may be the subject of expert testimony. Plaintiff will submit expert opinions in accordance with the Court's scheduling order, and incorporates those reports as though fully set forth herein.

**INTERROGATORY NO. 22:** Identify all persons who You have communicated with regarding Your claims in this case or to the matters alleged in the Amended Complaint, and for each person identified, described the nature of the communication and the date of the communication.

**ANSWER:**

Plaintiff incorporates her claim file located at Bates Nos. Garrison P&C 0000001-0000441 as though fully set forth herein as permitted by Rule 33 of the Federal Rules of Civil Procedure.

Plaintiff otherwise objects to Interrogatory No. 22 on the grounds that this information is equally available to Defendant who would have been party to such communications. Plaintiff further objects to this Interrogatory as overbroad, oppressive, and unduly burdensome as it is not limited in time or in scope. Plaintiff further objects to the extent this Request seeks information protected by attorney-client privilege and/or the work product doctrine. Plaintiff further objects to this Interrogatory because it seeks information unrelated to a claim or defense in this case.

### III.   REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUESTS FOR PRODUCTION NO. 1:**  Produce all documents in Your or Your attorneys' possession, custody, or control that refer, relate, or pertain in any way to Garrison's coverage of the loss of the Vehicle, including but not limited to all correspondence, email, and other communications between You and Garrison.

   **RESPONSE:**

   Plaintiff will produce non-privileged, responsive documents in her possession, custody, or control.

   Plaintiff otherwise objects to this Request as vague, ambiguous, and overbroad. Plaintiff further objects to this Request as this information is equally if not more readily available to Defendant.

**REQUESTS FOR PRODUCTION NO. 2:**  Produce all documents that relate to the claims or issues in this lawsuit, in Your or Your attorneys' possession, custody, or control, and that were created by or originally came from Garrison.

   **RESPONSE:**

   Plaintiff will produce non-privileged, responsive documents in her possession, custody, or control.

23

Plaintiff otherwise objects to this Request as vague, ambiguous, and overbroad. Plaintiff further objects to this Request as this information is equally if not more readily available to Defendant. Plaintiff also objects because this Request seeks documents protected by the attorney/client privilege and/or work product doctrine.

**REQUESTS FOR PRODUCTION NO. 3:** Produce all documents that constitute or that refer, relate, or pertain in any way to communications between You or Your attorneys and the North Carolina Department of Insurance, and any of its divisions and offices, regarding Garrison, the CCC System, or any of the matters alleged in the Amended Complaint.

 **RESPONSE:**

 Plaintiff has no responsive documents in her possession, custody, or control.

 Plaintiff otherwise objects to this Request as vague, ambiguous, and overbroad.

**REQUESTS FOR PRODUCTION NO. 4:** Produce all documents reflecting or constituting any agreement between You or Your attorneys and any other person referring, relating, or pertaining in any way to the matters alleged in the Amended Complaint.

 **RESPONSE:**

 Plaintiff will produce all non-privileged, responsive documents in her possession, custody or control.

 Plaintiff otherwise objects to this Request because it seeks information that is not relevant to any claim or defense in this litigation and is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff

24

further objects to the extent this Request seeks disclosure of privileged attorney-client communications or documents protected by the work product doctrine.

**REQUESTS FOR PRODUCTION NO. 5:** Produce all documents You relied upon in responding to Garrison's Interrogatories and Requests for Admission.

    **RESPONSE:**

    **Plaintiff will produce all responsive, non-privileged documents in her possession, custody, or control.**

    **Plaintiff otherwise objects to this Request to the extent it seeks information that is protected by attorney-client privilege and/or the work product doctrine Plaintiff further objects because this Request seeks information not relevant to a claim or defense in this case.**

**REQUESTS FOR PRODUCTION NO. 6:** Produce all documents You intend to introduce as evidence at trial.

    **RESPONSE:**

    **Plaintiff objects to this request because it seeks to ascertain all documents which Plaintiff intends to offer at trial and, as such, is violative of the attorney work product privilege. *See*, *e.g., IBP, Inc. v. Mercantile Bank of Topeka*, 179 F.R.D. 316, 322 (D. Kan. 1998).**

**REQUESTS FOR PRODUCTION NO. 7:** Produce all documents reflecting maintenance work performed on Your Vehicle.

    **RESPONSE:**

    **Plaintiff will produce all non-privileged, responsive documents in her possession, custody, or control.**

25

Plaintiff otherwise objects to this Request to the extent it seeks information that is not relevant to a claim or defense of this case. Plaintiff further objects to this Request as vague and overly broad as it is not limited in time or scope. Specifically, the request does not specify whether it seeks information for the period preceding or following the incident which caused the vehicle to become a total loss.

**REQUESTS FOR PRODUCTION NO. 8:** Produce all documents reflecting the advertised price of Your Vehicle.

    **RESPONSE:**

    Plaintiff has no responsive documents in her possession, custody, or control.

**REQUESTS FOR PRODUCTION NO. 9:** Produce all documents related to the purchase of Your Vehicle, including financing information.

    **RESPONSE:**

    Plaintiff has no responsive documents in her possession, custody, or control.

**REQUESTS FOR PRODUCTION NO. 10:** Produce all documents related to the valuation of the Vehicle and comparable vehicles.

    **RESPONSE:**

    Plaintiff will produce all non-privileged, responsive documents in her possession, custody, or control.

    Plaintiff otherwise objects to this Request as ambiguous and overbroad.

**REQUESTS FOR PRODUCTION NO. 11:** Produce all documents relating to any vehicle identified in Interrogatory No. 10, including documents relating to the purchase or sale of those vehicles.

    **RESPONSE:**

    **Plaintiff will produce all non-privileged, responsive documents in her possession, custody, or control**.

    **Plaintiff otherwise objects to this Request as ambiguous and overbroad. Plaintiff further objects to this Request because it seeks information that is not relevant to any claim or defense in this litigation.**

**REQUESTS FOR PRODUCTION NO. 12:** Produce all documents relating to maintenance suggested by a manufacturer for the Vehicle.

    **RESPONSE:**

    **Plaintiff will produce all non-privileged, responsive documents in her possession, custody, or control**.

    **Plaintiff otherwise objects to this Request as ambiguous and overbroad. Plaintiff further objects to this Request because it seeks information that is not relevant to any claim or defense in this litigation.**

**REQUESTS FOR PRODUCTION NO. 13:** Produce all documents and communications with any insurance company other than Garrison that relate to the October 17, 2016 accident involving the Vehicle, excluding all such communications relating to bodily injury.

    **RESPONSE:**

    **No such documents exist.**

27

Plaintiff otherwise objects to this Request as ambiguous and overbroad. Plaintiff further objects to this Request because it seeks information that is not relevant to any claim or defense in this litigation.

**REQUESTS FOR PRODUCTION NO. 14:** Produce all documents evidencing a valuation of Your Vehicle or a "comparable" vehicle, including, but not limited to, Kelley Blue Book reports, NADA reports, Edmunds reports, or other vehicle valuation guides or services.

**RESPONSE:**

Plaintiff will produce all non-privileged, responsive documents in her possession, custody or control.

Plaintiff otherwise objects to this Request because it seeks information that is not relevant to any claim or defense in this litigation. Plaintiff further objects to this Request to the extent it seeks premature expert opinions, analysis, or reports before the time set forth by the Court to exchange expert reports. Plaintiff may submit expert opinions in accordance with the Court's scheduling order, and incorporates those reports as though fully set forth herein

**REQUESTS FOR PRODUCTION NO. 15:** Produce all documents regarding the settlement of Your total loss claim, excluding those documents sent to, or received from, Garrison.

**RESPONSE:**

Plaintiff will produce all non-privileged, responsive documents in her possession, custody or control.

Plaintiff otherwise objects to the word "settlement" as used in Request for Production No. 15. Plaintiff has not settled her claims against Defendant.

28

Plaintiff further objects because this information is equally available to Defendant as Plaintiff. Plaintiff otherwise objects to this Request as vague and ambiguous. The request is also not proportional to the needs of the case, and many of the documents requested are not relevant to a claim or defense in this case and therefore beyond the scope of discovery.

**REQUESTS FOR PRODUCTION NO. 16:** Produce all communications between You and any putative class member relating to the allegations in your Amended Complaint.

    **RESPONSE:**

    **There are no documents responsive to this Request.**

    **Plaintiff otherwise objects to this Request to the extent it seeks information that is protected by the attorney-client and/or work product Privilege. The request is also not proportional to the needs of the case, and many of the documents requested are not relevant to a claim or defense in this case and therefore beyond the scope of discovery.**

**REQUESTS FOR PRODUCTION NO. 17:** Produce all communications between your counsel, Michael Malone, and Garrison regarding the adjustment of your total loss vehicle.

    **RESPONSE:**

    **Plaintiff will produce all non-privileged, responsive documents in her possession, custody or control.**

    **Plaintiff otherwise objects because this information is equally available to Defendant as Plaintiff. Plaintiff otherwise objects to this Request as vague and ambiguous. The request is also not proportional to the needs of the case, and many of the documents requested are not relevant to a claim or defense in this case and therefore beyond the scope of discovery.**

29

**REQUESTS FOR PRODUCTION NO. 18:** Produce all documents that support, relate to, or upon which You base the allegation that "Garrison does not ever attempt to establish the condition of comparable vehicles identified in market valuation reports obtained from CCC," as alleged in paragraph 44 of the Amended Complaint.

    **RESPONSE:**

    **Plaintiff will produce all non-privileged, responsive documents in her possession, custody or control.**

    **Plaintiff otherwise objects to Request for Production No. 18 on the grounds that requiring Plaintiff to produce all documents supporting her allegations is overly burdensome. Plaintiff further objects because this Request seeks information protected by attorney work-product and/or attorney-client privilege. Plaintiff further objects because the documents sought are more readily available to Defendant than to Plaintiff. Plaintiff further objects to this Request as a premature contention request that cannot be answered at this stage of the litigation. Plaintiff reserves the right to supplement her response.**

**REQUESTS FOR PRODUCTION NO. 19:** All documents that support, relate to, or upon which You base the allegation that the condition adjustments imposed on the values of comparable vehicles are "arbitrary and unexplained," as alleged in paragraph 45 of the Amended Complaint.

    **RESPONSE:**

    **Plaintiff will produce all non-privileged, responsive documents in her possession, custody or control.**

    **Plaintiff otherwise objects to Request for Production No. 19 on the grounds that requiring Plaintiff to produce all documents supporting her allegations is overly burdensome. Plaintiff further objects because this**

Request seeks information protected by attorney work-product and/or attorney-client privilege. Plaintiff further objects because the documents sought are more readily available to Defendant than to Plaintiff. Plaintiff further objects to this Request as a premature contention request that cannot be answered at this stage of the litigation. Plaintiff reserves the right to supplement her response.

**REQUESTS FOR PRODUCTION NO. 20:** Produce all documents that support, relate to, or upon which You base the allegation that "Garrison bases its offers and payments for total losses on manipulated data and reports," as alleged in paragraph 45 of the Amended Complaint.

     **RESPONSE:**

     Plaintiff will produce all non-privileged, responsive documents in her possession, custody or control.

     Plaintiff otherwise objects to Request for Production No. 20 on the grounds that requiring Plaintiff to produce all documents supporting her allegations is overly burdensome. Plaintiff further objects because this Request seeks information protected by attorney work-product and/or attorney-client privilege. Plaintiff further objects because the documents sought are more readily available to Defendant than to Plaintiff. Plaintiff further objects to this Request as a premature contention request that cannot be answered at this stage of the litigation. Plaintiff reserves the right to supplement her response.

**REQUESTS FOR PRODUCTION NO. 21:** All documents that support, relate to, or upon which You base the allegation that "Garrison [sic] methods are unfair, misleading, deliberately inconsistent, and calculated to confuse and deceive consumers and their

31

advocates in the settlement process," as alleged in paragraph 47 of the Amended Complaint.

**RESPONSE:**

**Plaintiff will produce all non-privileged, responsive documents in her possession, custody or control.**

**Plaintiff otherwise objects to Request for Production No. 19 on the grounds that requiring Plaintiff to produce all documents supporting her allegations is overly burdensome. Plaintiff further objects because this Request seeks information protected by attorney work-product and/or attorney-client privilege. Plaintiff further objects because the documents sought are more readily available to Defendant than to Plaintiff. Plaintiff further objects to this Request as a premature contention request that cannot be answered at this stage of the litigation. Plaintiff reserves the right to supplement her response.**

**REQUESTS FOR PRODUCTION NO. 22:** All documents not previously produced that refer or relate to Your claims or allegations against Garrison, or that You intend or expect to offer as evidence in support of class certification in this matter.

**RESPONSE:**

**Plaintiff will produce all non-privileged, responsive documents in her possession, custody or control.**

**Plaintiff objects to this Request because it seeks information that is outside the scope of discoverable information pursuant to Rule 26 of the Federal Rules of Civil Procedure. Plaintiff further objects to this Request as premature and oppressive in that it requires Plaintiff to be able to identify every document she intends to use as evidence in support of class certification during the infancy of discovery. Furthermore, this Request seeks documents**

32

and information relating to litigation strategy and thus are protected by attorney-client and attorney-work product privilege. Plaintiff further objects to this Request as vague and ambiguous. Plaintiff further Plaintiff reserves the right to supplement her response.

Dated this the 3rd day of January, 2020.

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ John M. DeStefano*
    Robert B. Carey (*pro hac vice*)
    John M. DeStefano (*pro hac vice*)
    11 West Jefferson Street, Suite 1000
    Phoenix, AZ 85003
    Telephone: (602) 224-2628
    Facsimile: (602) 840-3012
    Email: rob@hbsslaw.com
    Email: johnd@hbsslaw.com

HENDREN REDWINE & MALONE, PLLC

By: */s/ J. Michael Malone*
    J. Michael Malone, Esq.
    N.C. State Bar No.: 26512
    Hendren, Redwine & Malone, PLLC
    4600 Marriott Drive, Suite 150
    Raleigh, NC 27612
    mmalone@hendrenmalone.com
    Telephone: (919) 573-1423
    Facsimile: (919) 420-0475

*Counsel for Plaintiff*

33

## CERTIFICATE OF SERVICE

On January 3, 2020, I served the foregoing document described as
**PLAINTIFF'S RESPONSES TO DEFENDANT GARRISON PROPERTY AND
CASUALTY INSURANCE COMPANY'S FIRST SET OF INTERROGATORIES,
REQUESTS FOR ADMISSION, AND REQUESTS FOR PRODUCTION OF
DOCUMENTS** by email this day to the below parties and/or counsel of record:

> Matthew B. Tynan
> Kimberly M. Martson
> Reid L. Phillips
> **BROOKS PIERCE MCLENDON HUMPHREY & LEONARD**
> PO Box 26000
> Greensboro, NC 27420-6000
> mtynan@brookspierce.com
> kmarston@brookspierce.com
> rphillips@brookspierce.com

> Rodger L. Eckelberry
> Martina T. Ellerbe
> Matthew Drocton
> **BAKER HOSTETLER LLP**
> 200 Civic Center Dr., Ste. 2200
> Columbus, OH 43215
> Reckelberry@bakerlaw.com
> mellerbe@bakerlaw.com
> mdrocton@bakerlaw.com

> /s/ John M. DeStefano
> John M. DeStefano

34

TAB 20                                                                                                                      DJA0235



## STATE OF WEST VIRGINIA
## OFFICES OF THE INSURANCE COMMISSIONER

### <u>APPROVED LIST OF VALUATION PRODUCTS</u>

The following list comprises all companies which have received the Insurance Commissioner's approval for use as an Official Used Car Guide and identifies their respective valuation products.

1.    Audatex North America, Inc.
- Autosource
- Autosource Direct

2.    CARFAX, Inc.
- CARFAX Total Loss Valuation Service

3.    CCC Information Services, Inc.
- CCC Valuescope Claim Services

4.    Mitchell International, Inc.
- Mitchell WorkCenter Total Loss

5.    National Automobile Dealers Association (NADA)
- NADA Used Car Guide
- NADA Older Used Car Guide
- NADA Classic, Collectible and Special Interest Car Appraisal Guide
- NADA Manufactured Housing Appraisal Guide
- NADA Residual Guide
- NADA New Vehicle Invoice Guide
- NADA Motorcycle, Snowmobile, ATV, Personal Watercraft Appraisal Guide
- NADA Antique, Classic and Special Interest Motorcycle Appraisal Guide
- NADA Recreation Vehicle Appraisal Guide
- NADA Van, Truck Conversion and Limousine Appraisal Guide
- NADA Marine Appraisal Guide
- NADA Older Marine Appraisal Guide
- NADA Commercial Truck Guide

6.    National Auto Research (Black Book)
- Xpress for New Cars
- Xpress New Car Invoice
- UVC Xpress for Used Cars

- Xpress for Used Cars
- Autograph Xpress
- Xpress On-line
- Motorcycle Xpress
- Xpress Exotic and Older Cars
- New Car Invoice Guide
- Weekly Used Car Guide
- Monthly Used Care Guide
- Truck and Van Guide
- Old Car Market Guide.
- Motorcycle Value Guide
- Retail Used Car Market Guide
- Residual Value Guide
- Dollar Residual Value Guide
- CPI-Cars of Particular Interest
- Heavy Duty Truck Guide

7.   Primedia Price Digest (Red Book)
- The Automobile Red Book
- The Older Automobile Red Book
- Combination Automobile and Older Automobile Red Book
- The Truck Blue Book
- The Older Truck Blue Book
- Commercial Trailer Blue Book
- Truck Body Blue Book
- Truck Identification Book
- Clymer Powersport Vehicle Blue Book
- Recreational Vehicle Blue Book
- Horse Trailer Blue Book
- ABOS Marine Blue Book
- ABOS Combo Specials
- Electronic Auto Red Book
- Electronic Truck Blue Book
- Electronic ABOS Marine Blue Book
- Electronic ABOS Marine Blue Book - Assessor's Edition

8.   Vehicle Valuation Services, Inc.

9.   AutoBid

The above list supersedes any prior approved list. Should you have any questions regarding the above list, please contact the Consumer Services Division at OICConsumerServices@wv.gov or by calling 1-888-TRY-WVIC.

**Issued: October 15, 2020**



TAB 21

DJA0237



STATE OF WEST VIRGINIA
## Offices of the Insurance Commissioner

**James A. Dodrill**
**Insurance Commissioner**

June 16, 2021

Kevin P. Zimmerman, Esquire
Baker & Hostetler LLP
200 Civic Center Drive, Suite 1200
Columbus, Ohio 43215-4138

RE:   Certification of Copy of Public Record:
Insurance Commissioner of the State of
West Virginia's Order entered 9/27/2002

Mr. Zimmerman:

This correspondence is in response to your June 10, 2021 letter requesting completion of a Certification of Copies of Public Records.

Pursuant to your request, enclosed please find said Certification of Copies of Public Records.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Crisha Deyton
Paralegal II

/cdd

Enclosure

Legal Division
Post Office Box 50540
Charleston, West Virginia 25305-0540

We are an Equal Opportunity Employer

Telephone (304) 558-0401
Facsimile (304) 558-1362
www.wvinsurance.gov

## CERTIFICATION OF COPIES OF PUBLIC RECORDS PURSUANT TO
### FED. R. EVID. 902(4), FED. R. CIV. P. 44, AND FED. R. EVID. 803(8)

State of:          West Virginia

County of:      Kanawha

Pursuant to 28 U.S.C. § 1746, I, Victor A. Mullins, hereby certify as follows:

1.      I am over 21 years of age, of sound mind, and otherwise competent to make this Certification.  The evidence set forth in this Certification is based on my personal knowledge.

2.      I am an Associate Counsel for the West Virginia Offices of the Insurance Commissioner.

3.      I am the custodian of records for the West Virginia Offices of the Insurance Commissioner.

4.      Attached hereto as Exhibit 1 is a true and correct copy of the Insurance Commissioner of the State of West Virginia's Order entered on September 27, 2002 in *In re: CCC Information Services, Inc.*, Civil Action No. 02-AA-48.  I am the public officer, or a deputy of the public officer, with legal custody of the document attached at Exhibit 1.

5.      The document attached at Exhibit 1 is a public record.  It is a record or statement of a public office that sets out: (i) the office's activities, (ii) a matter observed while under a legal duty to report, or (iii) factual findings from a legally authorized investigation.

6.      I affix hereto the seal of the office of West Virginia Offices of the Insurance Commissioner.

1

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _6/16/2021_

Victor A. Mullins, Records Custodian

Offices of the WV Insurance Commissioner
900 Pennsylvania Avenue
Charleston, WV 26302
(304) 414-8026

2

# Exhibit 1

PROCEEDINGS BEFORE JANE L. CLINE
INSURANCE COMMISSIONER OF THE STATE OF WEST VIRGINIA

IN RE: CCC INFORMATION SERVICES, INC.

v.

JANE L. CLINE, INSURANCE COMMISSIONER
OF WEST VIRGINIA

CIVIL ACTION NO. 02-AA-48

This matter is again within the jurisdiction of the Insurance Commissioner as a result of an Agreed Circuit Court Order remanding the matter for entry of a new Administrative Order as a result of CCC and Nationwide's voluntary disclosure of the entire contract between CCC and Nationwide. Now having reviewed the same, the undersigned rescinds the Order of March 12, 2002, disapproving the use of CCC as a used car guide, and now finds as follows:

1. Nothing in the aforesaid contract, or the record otherwise created before the Insurance Commission, or on appeal, suggests any unfair method of competition or Unfair Claims Settlement Practice disqualifying it from use.

2. The evidence which is reflected in the record demonstrates that the methodology used by CCC is at least as fair as that used by NADA and other used car guides presently approved.

The undersigned therefore concludes that CCC should now be approved as an additional official used car guide subject to the terms also imposed on other approved guides.

Accordingly, it is hereby ORDERED that CCC is approved as an official used car guide in the State of West Virginia effective with the entry hereof; PROVIDED, HOWEVER, that the approval hereby given is subject to periodic review by the Insurance Commissioner and appropriate further action, which may include revocation of approval; it is further ORDERED, as

a condition of continued approval by the Insurance Commission, that CCC is required to provide to the Director of the Consumer Service Division, West Virginia Insurance Commission, a quarterly report of all total loss or total theft vehicles valued for West Virginia residents, no later than thirty (30) calendar days after the end of each quarter, which must include the following for each total loss valued: the valuation date; insurer name; zip code of consumer's residence; year, make, model, body style, engine, odometer reading, and VIN number of the total loss or total theft vehicle; the total loss valuation amount; confirmation that the total loss valuation amount represents the retail value of the subject vehicle; and any other information deemed necessary by the Commissioner.

Entered this 27th day of September, 2002.

Jane L. Cline
Insurance Commissioner

Prepared By:

Vincent J. King, General Counsel
West Virginia Insurance Commission
P.O. Box 50540
Charleston, WV 25305-0540

TAB 22                                                    DJA0242

# Consumer's Guide to Auto Insurance

**State of Wisconsin**
**Office of the Commissioner of Insurance**
**P.O. Box 7873**
**Madison, WI 53707-7873**
**oci.wi.gov**

PI-057 (R 02/2018)

## The mission of the Office of

## the Commissioner of Insurance . . .

## Leading the way in informing and protecting

## the public and responding to their insurance needs.

If you have a specific complaint about your insurance, refer it first to the insurance company or agent involved. If you do not receive satisfactory answers, contact the Office of the Commissioner of Insurance (OCI).

To file a complaint online or to print a complaint form:
OCI's Web Site
oci.wi.gov

Phone
(608) 266-0103 (In Madison)
or
(800) 236-8517 (Statewide)

Mailing Address
Office of the Commissioner of Insurance
P.O. Box 7873
Madison, WI 53707-7873

Electronic Mail
ocicomplaints@wisconsin.gov
Please indicate your name, phone number, and email address.

**Deaf, hearing, or speech impaired callers may
reach OCI through WI TRS**

This publication is not a legal analysis of your rights under any insurance policy or government program. Your insurance policy, program rules, Wisconsin law, federal law, and court decisions establish your rights. You may want to consult an attorney for legal guidance about your specific rights.

OCI does not represent the information in this publication is complete, accurate or timely in all instances. All information is subject to change on a regular basis, without notice.

Publications are updated annually unless otherwise stated. Publications are available on OCI's website **oci.wi.gov**. If you need a printed copy of a publication, use the online order form or call 1-800-236-8517.

One copy of this publication is available free of charge to the general public. All materials may be printed or copied without permission.

# Table of Contents

**Page**

Why Should You Buy Auto Insurance? .......................................................................... 4

Components of Auto Insurance............................................................................... 4

Underwriting and Rating ............................................................................................ 6

Credit Information ...................................................................................................... 7

Ways to Lower Your Premium.................................................................................... 7

Youthful Drivers .......................................................................................................... 9

What if You Have Trouble Finding Insurance?.............................................................. 9

Safety Responsibility Law ......................................................................................... 10

Comparative Negligence Law ................................................................................... 10

If You Are in an Accident .......................................................................................... 10

Filing an Insurance Claim .......................................................................................... 11

Repairing Your Car..................................................................................................... 11

If Your Vehicle is a Total Loss.................................................................................... 12

Lender Insurance Requirements................................................................................ 12

Vehicles in Storage ................................................................................................... 12

Extended Warranties.................................................................................................. 12

Collision Damage Waiver Coverage ......................................................................... 13

Insurance Marketing ................................................................................................. 13

For Your Protection .................................................................................................... 14

Consumer Tips........................................................................................................... 14

Terminations, Denials, and Cancellations ................................................................. 15

Problems With Your Insurance Company .................................................................. 16

Automobile Insurance Quotation Worksheet............................................................. 18

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 93 of 598

## Why Should You Buy Auto Insurance?

Insurance is based on the theory most drivers will not be involved in accidents. Premiums paid by all drivers during the year are used to pay for losses of the few drivers who have accidents. When you buy insurance, you receive financial protection in case you become involved in an accident. You also make sure a person injured through your fault will recover for losses you cause.

For example, if you are in an auto accident, you may be found responsible for losses of other people involved. A claim may be made or a lawsuit filed against you, and you may not only have to pay for property damage but also for medical expenses, lost wages, and pain and suffering of any injured person. The amount of money you may have to pay could be substantial.

If you do not have insurance, anything of value you own, including your home, savings, future wages, and other assets, may be taken to pay for those losses. Auto liability insurance can help protect you so this does not happen. Liability insurance also pays for an attorney to defend you against any claim or lawsuit that may be payable under the policy.

You can also buy insurance to cover damages to your auto. This optional coverage will help pay for your losses whether or not you were at fault.

## Components of Auto Insurance

There are many components of auto insurance including mandatory and optional coverage. Your policy must contain three major parts—liability insurance for bodily injury, liability insurance for property damage, and uninsured motorist coverage. Optional coverage includes underinsured motorist, medical expense coverage, collision and comprehensive coverage.

### *Mandatory Auto Insurance Requirements*

While many components of auto insurance have changed over the years, requiring *all drivers have motor vehicle liability insurance remains mandatory*. This requirement falls under the purview of the Department of Transportation, Division of Motor Vehicles (DMV).

Wisconsin drivers are required to have an automobile insurance policy in force or, in limited situations, other security which could be a surety bond, personal funds, or certificate of self-insurance. Details are available from the Department of Transportation (wisconsindot.gov/Pages/dmv/license-drvs/susp-or-rvkd/proof-of-insurance.aspx).

---

Your policy must provide at least the following minimum liability coverage:

- $25,000 for injury or death of one person;
- $50,000 for injury or death of two or more people; and
- $10,000 for property damage.

Uninsured motorist coverage of at least $25,000/$50,000 each for bodily injury only is also mandatory.

---

### *Liability Insurance*

When referring to liability limits, the designation of $50,000/$100,000/$15,000 (or 50/100/15) or similar designations refer to the maximum amounts an insurer will pay for three basic liability coverages. The first number ($50,000) refers to the limit on bodily injury payments coverage per person. The second number ($100,000) refers to the limit on bodily injury coverage per accident where two or more people have been injured. The third number ($15,000) refers to the limit on property damage coverage per accident.

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 94 of 598

**Bodily Injury Liability Coverage** does not protect you or your car directly. If you cause an accident injuring other people, it protects you against their claims up to the stated amounts for medical expenses, lost wages, pain and suffering, and other losses. It will also usually pay if the accident was caused by a member of your family living with you or a person using your auto with your consent.

**Property Damage Liability Coverage** pays for damage you cause to the property of others such as a crushed fender, broken glass, or a damaged wall or fence. Your insurance will pay for this damage if you were driving your auto or if it was being driven by another person with your consent. Property damage liability also pays if you damage government property like a light pole or signpost, up to the limit you choose.

### Uninsured Motorist Coverage (UM)

Uninsured motorist coverage applies to bodily injury you, your family, and other occupants of your vehicle incur when hit by an uninsured motorist or a hit-and-run driver. It also covers you and your family if injured as a pedestrian when struck by an uninsured motorist or a hit-and-run driver. It protects you by making sure money is available to pay for your injuries caused by someone else. The minimum amount of coverage required by law is $25,000/$50,000 for bodily injury only. These coverages are the *minimum* required by law; you may want to purchase more than minimum coverage required by law if you feel the need for more protection. Uninsured motorist coverage does not cover your property damage and does not protect the other driver. Your insurer may sue the other driver for any money your insurer pays you because of the other driver's negligence.

### Underinsured Motorist Coverage (UIM)

Underinsured motorists (UIM) coverage increases the bodily injury protection to you and the people in your car up to the amount of coverage you purchase if the at-fault party's bodily injury liability insurance limits are lower than your UIM coverage limits.

Underinsured motorist coverage is not mandatory. The insurer must notify you with the delivery of your policy that UIM coverage is available. You may reject buying UIM coverage. However, if purchased, coverage limits of at least $50,000 per person and $100,000 per accident are required.

You should carefully review your policy to determine exactly what coverage is provided by UIM.

### Medical Payments Coverage

This coverage pays medical or funeral expenses for you or others injured or killed in an accident while riding or driving in your auto. This includes all reasonable hospital, surgical, chiropractic, x-ray, dental, professional nursing, prosthetic, and rehabilitation expenses up to the limits of coverage.

Medical payments coverage usually covers only those expenses not covered by health insurance, such as copayments, deductibles, etc. It will also cover you or members of your family if you are struck by an auto while walking or while riding in another auto. This coverage will pay for your medical and funeral expenses even if you cause the accident. Usually, only expenses incurred within one year after the accident are included. As an example, this coverage will provide benefits for a friend or a neighbor's child injured in your car. Medical expense coverage is an optional coverage. **Note: Insurance companies must offer this coverage to you, but you do not have to buy it.** The minimum limit that can be purchased is $1,000.

### Physical Damage Coverage

If you borrow money from a bank or some other financial institution to buy your car, the lender will probably require you to purchase physical damage coverage to protect both of your interests in the car.

"Collision" and "Comprehensive" coverages, which are also known as physical damage coverages, pay for repair or the actual cash value of your auto regardless of who is at fault.

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 95 of 598

Comprehensive and collision premiums are based on the make, model, and year of your car. You should evaluate the current market value of your car and your ability to afford a similar car should it be destroyed before you purchase this coverage. You may not need this coverage if your car has decreased in value or if you can afford to replace it.

**Collision** coverage pays if your auto collides with an object, including another car or hit-and-run car, or if it overturns. Your own insurer will pay for such damage even if the collision is your fault.

**Comprehensive** coverage pays for damage to your auto from almost all other causes such as fire, vandalism, water, hail, glass breakage, wind, falling objects, civil commotion, or hitting an animal. Damage from striking a deer is a relatively frequent accident in Wisconsin. It is important to know most policies cover hitting an animal under comprehensive, not collision, insurance.

Comprehensive coverage also pays if your auto or parts of it, such as a battery or tires, are stolen. Flood damage to your car is also covered if your auto insurance policy includes comprehensive coverage. If you carry collision without comprehensive coverage, you are **not** covered for flood damage.

## Underwriting and Rating

Comparison shopping for car insurance is often beneficial. Premiums are based on a number of factors and may vary a great deal from one insurer to another for the same policy. The most important items in establishing your rate are:

**Your age, sex, and marital status.** For example, young, single male drivers generally pay more than any other group.

**Where you live.** Most insurance companies divide the state into territories for rating purposes. Generally, people in metropolitan areas pay more than those in less congested places.

**Your car.** The year, make, and model of your car influence your premium. The less it costs to repair or replace your vehicle, the lower the cost of your premium. Sports cars and cars with high powered engines cost more to insure than cars with smaller engines.

**How you use your car.** Generally the more you drive, the more you pay.

**Prior insurance coverage.** Insurers may ask you if you had insurance coverage previously. If you have previously been canceled for nonpayment of premiums, insurers may want to know. If you have had insurance, the prior company can tell the new insurer a little about your claims history.

When an insurance company considers your application for auto coverage, it will take into account a number of different factors about you and your driving record. Just because you apply with a certain company does not mean you will be provided coverage by the company.

After completion of underwriting, the insurance company will place you in one of the three basic categories of drivers listed below. Each company adopts its own rating system for deciding whether to insure a person. Those with the lowest risk factors (least likely to have a claim) will receive the lowest rates.

**Preferred.** This category is intended for drivers insurance companies consider being the best risks, which usually means the safest drivers. These insureds are usually ones with clean driving records over the past three to five years. These are given the lowest rates.

**Standard**. This category is intended for moderate risk drivers. The rates are higher than the preferred rates. These drivers are usually driving family-type cars and have a reasonably clean driving record.

**Nonstandard**. This category is intended for drivers insurance companies consider being high risk. Usually drivers in this category have the highest rates. These drivers may include drivers under age 25 with less driving experience, drivers with tickets or accidents, drivers with a poor premium payment history, and drivers with a reckless or drunk-driving history.

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 96 of 598

Your agent should be able to tell what classification you fit into. The dividing lines are not always consistent across insurers, but in general an applicant with chargeable accidents will be denied coverage by the lowest cost insurers in the above examples. These insurers are relatively low cost because their customers are better than average drivers. Since you generally cannot tell from the name or promotional ads of an insurer what its underwriting criteria are, seek help from a qualified agent to find which insurer might insure you.


## Credit Information

Consumer credit information may be requested by an insurer when writing new or renewal policies for both commercial and personal risks. Some insurance companies believe certain credit information may be an indicator of frequency and severity of future claims.

Insurance companies must use credit information in a way that is not unfairly discriminatory. If an insurer rejects your insurance application based on information contained in your credit report, you have the right to review the report information for accuracy, at *no charge.* You must request a copy of the report directly from the credit agency. Your insurance company will provide you with the credit agency's name, address, and telephone number.

Insurers may use credit information as one of the criteria they consider when underwriting personal lines insurance. However, it is the position of OCI that insurers should not use credit information, whether they use credit reports or credit scoring mechanisms, as the sole reason to refuse an application, cancel a new insurance policy in its first 60 days of coverage, or nonrenew an existing policy.

For more information on the Fair Credit Reporting Act (www.ftc.gov/os/statutes/fcrajump.shtm) contact the Federal Trade Commission at:

Federal Trade Commission (FTC)
600 Pennsylvania Avenue, NW
Washington, DC 20580
1-877-FTC-HELP (382-4357)
www.ftc.gov

OCI publishes a fact sheet answering questions about how insurance companies use credit history in their underwriting process. The publication *Understanding How Insurance Companies Use Credit Information* is available at oci.wi.gov/Documents/Consumers/PI-204.pdf or by calling 1-800-236-8517.


## Ways to Lower Your Premium

There are many actions you can take to lower the cost of your automobile insurance.

### *Safe Driving*

Your driving record is very important in determining your premiums. Most insurers charge more—often substantially more—for people who have a recent history of accidents and/or moving violations than for people with relatively clean records. Therefore, it is important to ask your agent to go over all facts concerning your driving record and check all other information for accuracy on your application for a policy. A mistake on your application could cost you money or result in cancellation of your insurance policy.

**Note: Wisconsin law allows insurers to rate based on all the members in a household including husband, wife, children, or nonrelative, and the law does not allow insurers to exclude drivers by endorsement.**

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 97 of 598

> **Your present insurer may charge a higher rate, a surcharge, if you are involved in a chargeable accident or were ticketed for a serious traffic violation. Surcharges must be applied in a uniform manner and are required to be filed with OCI. The insurer may also elect to nonrenew your policy as it expires if your accident record or moving violations exceed the insurer's standards.**

### Take Advantage of Discounts

Every auto insurance company has its own package of "special" discounts to attract particular types of customers. Below is a sample of discounts to ask your agent about.

- Package discount—up to 15% is offered to customers who insure both their home and automobile with the same insurer.

- Multiple automobile discount—insuring more than one automobile almost always qualifies an insured for a discount.

- Good student discount—typically a 10 to 20% discount is offered if a youthful driver maintains a "B" or better grade average in high school or college.

- Nonsmokers discount—a few insurers offer discounts of 5 to 10% for insureds who do not smoke.

- Passive restraints discount—several companies offer discounts of up to 40% on medical payments coverage for driver and/or passenger air bags, automatic seat belts, or anti-lock brakes.

- Accident/claim free discount—insurers commonly reduce premiums for each year you have been continuously insured by them without being involved in an accident or filing a claim.

- Pay in full discount—some companies offer a discount for paying your premium in one lump sum or by automatic electronic payments. You can also save service charges by paying your premiums in a lump sum rather than in installments.

In addition, you may avoid late fees by paying your bill on time. Also, many insurance companies use consumer credit information as a rating factor. Maintaining a good credit history may lower your rate.

A good agent will be sure to inquire about your particular circumstances to acquaint you with all applicable discount packages offered by the insurer he or she represents.

### Increase Deductibles

Many factors that go into determining your auto premium are relatively fixed by your household make-up and lifestyle. However, one thing you can easily change is your deductible amount (usually only applies to comprehensive or collision coverage).

A deductible is the dollar amount you must pay out-of-pocket for each covered claim. Deductibles on collision coverage can range from $100 to $1,000. On comprehensive coverage they can range from $100 to $500 or higher.

Before deciding the deductible level, you must consider your ability to absorb unexpected financial demands. For example, if a loss of $500 occurs and you have a deductible of $250, you pay $250 (your deductible) and you collect $250 from your insurer. If a loss of less than $250 occurs, you pay for all of it yourself.

If you increase your deductible and pay for small losses yourself, your insurer can charge you less. This way you can cut your insurance premium costs and still be protected against large losses.

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 98 of 598

## Youthful Drivers

The cost of automobile insurance varies from one group (classification) of drivers to another. On average, some groups have worse driving records, higher accident rates, and more costly accidents than others. Usually, the highest premiums are paid by a male driver under age 25, with his rate depending on his marital status and whether he owns, or is the principal driver, of the car being insured. Under the most widely used rating system, the cost of auto insurance for youthful drivers is scaled downward periodically. Rates for unmarried males who are owners of their cars are reduced periodically from age 17-29.

In most states, rates for unmarried males who are not owners of their cars, for married males, and for females are reduced each year from age 17-21. For these groups, "young driver" surcharges are eliminated at age 25.

### *Underage Drinking and Driving*

Auto insurance premiums may be tripled or the policy nonrenewed for parents whose underage children receive operating while intoxicated (OWI) citations.

OCI surveyed the 20 top writers of auto insurance in the state. Of the 20 insurance companies surveyed, 6 said parents' insurance rates would be affected if a minor received a citation for underage drinking when the minor has NOT been driving. The policy could be nonrenewed, canceled, be renewed with nonstandard rates, or be surcharged. The rate increases range from 90% to 260%.

Of the 20 insurance companies surveyed, 19 reported a rate increase or policy cancellation if a minor receives an OWI citation. The rate increases range from 47% to 300%.

If your child is cited for underage drinking where the violation involved operation or use of a motor vehicle, the insurer might nonrenew the parents' insurance policy or increase the premium, which would remain at the higher level for a number of years or until the child leaves the household. If a child is cited for underage drinking involving a motor vehicle, the parents' insurance rate may be affected for a minimum of three years, or until the minor is no longer a member of the household, or no longer on the policy. OCI recommends the insurance company investigate whether the violation is driving-related before using an underage drinking violation to underwrite or rate a policy. (Section Ins 6.54 (3) (a) 1., Wis. Adm. Code, prohibits using an insured's or applicant's criminal records.)

If a young driver in your household has received citations for driving-related violations, including an OWI, those violations can also affect other policies held by the parents. One of the companies reported a possible effect for umbrella policies, and for two other companies, a citation would affect insurance rates on other non-auto motor vehicles, such as boats, or snowmobiles.

The Department of Motor Vehicles will release any records related to drinking and driving, even for a minor, to insurance companies when requested. Wisconsin driver records that are not confidential can be accessed by anyone under open records law. Records that are not confidential include OWI and UAO (Underage Alcohol Operation).

> **If you add another vehicle to your policy or change your insurance coverage, ask your agent to issue a binder confirming the coverage. A binder is a temporary written agreement, issued in the name of the insurance company, taking the place of the policy or endorsement until the policy or endorsement is issued. Only a binder is evidence of immediate coverage.**

## What if You Have Trouble Finding Insurance?

If you try several insurers and cannot find coverage, you most likely can be insured through the Wisconsin Automobile Insurance Plan (WAIP). This is a plan created by Wisconsin law to provide automobile insurance to those who cannot secure coverage from usual market sources.

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 99 of 598

When you apply, you will be assigned to a licensed insurer who will issue you a policy. Since it is a last resort plan, rates charged will usually be somewhat higher than rates charged in the voluntary market. While you are in the plan, you should continue to shop for less expensive coverage. After four years, the company insuring you must accept you for regular coverage if you have had a clean driving record.

You may apply through any licensed property and casualty insurance agent. For general information on WAIP, you may call or visit www.wcrb.org/WAIP/WAIP_home.aspx.

<div align="center">
Wisconsin Auto Insurance Plan (WAIP)
20700 Swenson Drive, Suite 100
Waukesha, WI 53186
(262) 796-4540
</div>

## Safety Responsibility Law

Wisconsin has a Safety Responsibility Law to protect persons who suffer damages in accidents caused by uninsured motorists who do not pay for damages or injuries they cause.

The law requires any time a person is hurt or killed or property damage exceeds $1,000, the accident must be reported as soon as possible. You must file a Driver's Report of Accident within 10 days with the Division of Motor Vehicles (DMV). If a police agency investigates the accident, the police will file this report for you.

DMV checks accident reports to see if drivers have insurance coverage. If all drivers are insured, no action is taken. If DMV determines a driver is uninsured and appears to be at fault, the law allows DMV to suspend their driver license and vehicle registration if he/she does not pay for damages or injuries they caused.

For more information, contact the Wisconsin Division of Motor Vehicles, Traffic Accident Section, Room 804, P.O. Box 7919, Madison, Wisconsin 53707-7919, or at (608) 266-1249. Information about the Safety Responsibility Law is also available on the Wisconsin Department of Transportation's Web site at wisconsindot.gov/Pages/dmv/license-drvs/rcd-crsh-rpt/srlaw.aspx.

## Comparative Negligence Law

Wisconsin has a comparative negligence law, which means responsibility is frequently shared. The comparative negligence law is based on a percentage of negligence. This means you may recover damages from another party only if your negligence **is not greater than** the other party. Recovery for your damages will be reduced by the percent of negligence attributed to you. You are barred from recovery if your negligence is greater than another party's negligence.

## If You Are in an Accident

**Call the police**. A police report can help if you have an accident or if your car is stolen or damaged by vandals. What looks like a minor dent could be several hundred dollars' worth of damage.

**Obtain information.** The insurance company will need complete information. Exchange insurance information with the other driver. Write down names, addresses, telephone numbers, and license number of persons involved and of witnesses. Note the time, date, location, road conditions, year and make of vehicles involved, apparent damage and injuries, and your version of what happened. Make a diagram of the accident. Take pictures of the scene and damage with a cell phone or camera.

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 100 of 598

## Filing an Insurance Claim

**Call your agent or insurer.** Phone your agent or the insurer promptly, even if you are far from home. Ask what forms or documents will be needed to support your claim. The insurer may require a "proof of loss" form, as well as documents relating to your claim, such as medical and repair bills and a copy of the police report. If you have any questions, your agent should be able to assist you in filling out the forms.

**Cooperate and answer all questions fully.** The insurer may call you for more information or ask to examine your damaged vehicle. Supply the information the insurer needs. In order to determine the extent of damage, they must have access to the vehicle. Cooperate with the investigation and settlement of the claim. Cooperate with the defense of any claim and provide your insurer with copies of any legal papers you receive in connection with your accident. Your insurer will represent you if a claim is brought against you and defend you if you are sued for a claim covered by the policy.

**Keep receipts and records.** Keep receipts and records of expenses you incur as a result of the accident. Save copies of all documents you send or receive. You may need them later.

**Take notes.** Whenever you talk with insurance company employees, your agent, lawyers, police, or others, write down the date, times, names, and subjects you talked about. Include all decisions or promises made.

**Report worker's compensation claim.** If you are injured in a motor vehicle accident while conducting work-related activities for your employer, also file a worker's compensation claim with your employer. Your employer's worker's compensation policy will cover your medical expenses and loss of income.

If you travel frequently, you may want to check with your insurer or agent to find out how to file a claim when you are out of the area.

## Repairing Your Car

Coverage for your vehicle in a personal auto insurance policy is not based on replacement cost. The policy is based on "actual cash value" of the automobile. The actual cash value (ACV) of the automobile is based on the value of the vehicle at the time of loss, taking into account its current market value. Therefore, the insurer's obligation is to repair the car based upon its ACV not its replacement cost.

If your car is damaged in an accident, your insurer will request you to submit one or more written estimates for the cost of repairs. This permits you and your insurer to compare estimates and have your vehicle repaired at the lowest possible cost. Competitive body shop estimates reduce insurance claim costs, which help in maintaining or reducing auto insurance rates.

Your insurer may suggest, but cannot require, you to have your car repaired at a specific auto repair shop. If you choose to have repairs done at a facility not approved by your insurer, you are responsible for any repair costs exceeding the final claim settlement.

Auto repair shops may use aftermarket or used parts when repairing or replacing a damaged part (i.e., bumpers, bumper covers, and associated bumper parts). Aftermarket parts are produced by companies other than the original equipment manufacturers (known as OEM parts).

Auto insurance contracts do not generally specify what parts will be used. You may request aftermarket parts not be used to repair your vehicle, but you are responsible for any repair costs exceeding the final claim settlement negotiated with the insurer.

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 101 of 598

**If Your Vehicle is a Total Loss**

An insurance company will consider your vehicle a total loss if repairs would cost more than it is worth. An insurance company will use various sources to value your car including, *but not limited to*, the National Automobile Dealers Association Used Car Guide ("Blue Book") or the CCC Information Services, Inc., guide. The company's offer, therefore, might not recognize your car's condition, special features, or value on the local market. Companies must use a fair and reasonable method to determine the value of your car. You have the right to know how the value was determined and you should be sure to give the insurance company all information affecting the value of your car.

It may come down to negotiation between you and the insurance company to reach an agreement on the value of your car. A company is more likely to raise its offer if you can show your car would sell for a higher price in your area. Get several used car dealers' written price quotes for a similar automobile. Newspaper used-car ads can also help support your position.

Remember, an insurance company will not compensate you for the sentimental value of your car.

**Lender Insurance Requirements**

If you finance your car, the lender will require you to have car insurance. The terms of your loan will most likely require you to provide comprehensive and collision insurance. If your insurance policy lapses, the bank will force coverage (obtain a policy) and charge you for it. Forced coverage provides protection to the bank, not you, for their interest in the car and nothing else and can be costly.

***If a bank has forced insurance coverage on your car, it is in your best interest to obtain regular insurance immediately. The forced coverage provides no liability insurance.*** These policies can be as much as three times more expensive, compared to a regular policy, and the charges for these policies will be added on to your loan amount.

**Note: If your car is in an accident, your insurance company will pay for repairs or replacement only up to the car's ACV—the amount it would have sold for before the accident. The ACV is unrelated to the amount of your car loan and may be less than what you owe on your loan. Your insurance company is obligated to return your vehicle to the condition it was prior to the accident and you are responsible for what you owe on your car loan.**

**Vehicles in Storage**

If you plan to not use your car for an extended period of time and decide to place it in a garage, you may want to ask your agent to suspend some coverages so you will not have to pay the premium associated with these charges. However, your car might still be susceptible to physical damage so consider maintaining comprehensive and possibly collision coverage while your vehicle is in storage.

**Extended Warranties**

Some extended warranty plans (sometimes called service contracts) providing repair and replacement services beyond what the product manufacturer offers are regulated by OCI. If you want to know if a warranty plan is licensed in Wisconsin, see OCI's website at oci.wi.gov or call (608) 266-0103 or toll-free 1-800-236-8517.

If you have a problem with a vehicle manufacturer warranty plan, contact:

Department of Transportation
Dealer Regulation Unit, Room 806
P.O. Box 7909
Madison, WI 53707-7909
(608) 266-1425
wisconsindot.gov

## Collision Damage Waiver Coverage

Rental car companies often sell collision damage waiver (CDW) coverage. A CDW is a contract offered by rental car companies. A contract shifts liability for collision damage from the person renting the car to the car rental company. Collision damage to the rental car is any damage resulting from an accident. Most personal auto policies include coverage for damage to a rental car. Before renting a car, check with your agent to see if you have coverage under your personal auto policy. It is also important to note if there is a difference in value between your car and the rental car.

**Note: If you rent a car in an area where your regular insurance does not provide coverage (i.e., anywhere outside the United States and Canada), purchasing a CDW is probably worthwhile.**

If you are having problems with a car rental company, you should contact the agency handling consumer protection issues in the state in which you rented the car.

In Wisconsin, contact:

Department of Agriculture, Trade & Consumer Protection
2811 Agriculture Drive
P.O. Box 8911
Madison, WI 53708-8911
(800) 422-7128
datcp.wi.gov

## Insurance Marketing

When you begin to contact insurers, there are a few items you should know about how insurance companies operate.

Generally, insurance is sold directly through an insurance company or indirectly through an agent or broker. An independent agent may represent more than one, and sometimes several, insurance companies. An exclusive agent sells solely for one insurance company or group of related companies if the insurance company or group writes that type of insurance. Independent agents, as well as exclusive agents, may place business with another company if the company(s) he or she represents does not write the type of insurance needed. A broker represents you in dealings with an insurance company.

When you first talk to an agent, be sure he or she is willing and able to explain various policies and other insurance-related matters. An agent should look for ways to get you the most protection at an affordable cost. Make sure your agent agrees to review your coverage from time to time, advises you about other financial services, and assists you when problems develop.

Some agents are interested in selling package products or services to as many people as possible. While there is nothing wrong with low-cost, standardized products, they should fit your needs. If you are not convinced a particular agent understands your needs and will give you the service you want, seek another agent.

13

Agents and insurers differ. Consider recommendations from friends. All companies and agents doing business in Wisconsin are licensed by OCI. Licensing information may be found on OCI's Web site at oci.wi.gov or by calling 1-800-236-8517.

## For Your Protection

Information is available to consumers from a number of sources. These sources include Internet, public libraries, state insurance departments, consumer groups, and consumer publications. Financial strength and being able to meet financial obligations to policyholders is very important.

Independent organizations such as A.M. Best, Standard & Poor's, Moody's Investors Service, and others publish financial ratings. These rating organizations do not rate the quality of insurer's policies, practices, agents, or service. You should consider checking with at least two organizations to evaluate an insurance company's strength. If you want to check on an insurer's financial stability, you can check the reference section of your public library for published ratings, call OCI, or check with your insurance agent.

Every state has a safety net to protect insurance consumers from financial loss in the rare instance an insurer becomes insolvent. This safety net is called a "guaranty fund." Guaranty funds are established by state law and are composed of licensed insurers in the state. They pay the claims of policyholders and other claimants of an insolvent company. The money to pay claims against the insurance company comes from assessments made against all insurance companies that are members of the guaranty fund.

In Wisconsin, this fund is called the Wisconsin Insurance Security Fund (Fund). The Fund is created by state law and is funded by assessments of insurers licensed to do business in Wisconsin. In general, the Fund protects residents for most claims of licensed insurers in liquidation. The Fund should not be relied upon to eliminate all risks of loss to insureds due to insurer insolvency. Some types of policies may not be fully covered and significant delays could occur in settling obligations in cases of liquidation.

Questions about coverage and limitations of the Wisconsin Insurance Security Fund may be addressed to:

Wisconsin Insurance Security Fund
2820 Walton Commons Lane, Suite 135
Madison, WI 53718-6797
(608) 242-9473
www.wilifega.org/

## Consumer Tips

- **Read your policy.** An auto insurance policy is a legal contract. It is written so your rights and responsibilities, as well as those of the insurer, are clearly stated.

- **Know what your needs are and find an insurer meeting your needs.** Some insurers insure not only your car, but your home, life and health. Buy adequate coverage, but do not buy more than you need.

- **Comparison shop.** It pays to shop around. Prices for the same coverage can vary greatly. A couple of hours of research can save you hundreds of dollars a year.

- **Check insurance costs before you buy a new or used car.** Insurance costs are higher for makes and models that are expensive to repair or are frequently stolen. Your agent can assist you in getting the best value for your insurance dollar.

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 104 of 598

- **Take advantage of low mileage discounts.** Some insurance companies offer significant discounts to drivers who keep their annual mileage at or below certain levels. In general, the less you drive, the more you can save.

- **Do not pay cash.** Always pay the agent or insurer with a check, money order, debit card, or credit card. This will be proof of your payment.

- **Some insurers will allow for electronic funds transfer arrangements (EFT).** EFTs allow your insurer to automatically deduct your premiums from your checking account during certain time periods, be aware of your scheduled withdrawals if you choose to take advantage of this option.

- **In the long run, being a safe driver is the best advice on how to keep your premiums low.** Lower rates are generally paid by those who maintain a good driving record.

- **While the price you pay is important, buying the least expensive policy may not necessarily be a good idea.** Insurance sounding too good to be true probably is too good to be true. However, looking only at benefits could result in paying a higher than necessary premium. You should consider the following when choosing a company and a policy:

    Premium
    Benefits, including any coverage exclusions or limits
    Service (what is involved in making a claim?)
    Renewability (how easily can you be canceled?)
    Financial strength and reliability of the company
    Company management philosophy

## Termination, Denials, and Cancellations

### New Policies

When a policy first becomes effective, the insurer may cancel the policy any time within the first 59 days. Cancellation is not effective until at least 10 days after the insurance company mails or delivers to you a written notice of cancellation.

### Renewal on Altered Terms

Sometimes an insurer will renew a policy but will raise rates or make terms less favorable to the insured. An insurer may not alter terms of coverage until 60 days after a notice is mailed to you. To be effective, the notice must be mailed or delivered prior to the renewal date. If the notice is given less than 60 days before the renewal date, the new terms or premium increase will not become effective until 60 days have elapsed from the date the notice is given. These conditions do not apply if the only change is a rate increase of less than 25%. If the insurer fails to notify you of the new premiums or terms prior to your renewal date, the insurance company must continue your policy for an additional period of time equivalent to your expiring term and at the same premiums and terms of your expiring policy. [s. 631.36 (5), Wis. Stat.]

### Midterm Cancellation

A midterm cancellation is a cancellation occurring during the policy term and prior to the policy's expiration or renewal date. An insurance company can only cancel coverage during this period if the premium is not paid or if there is a substantial change in the risk assumed by the insurance company. The insurer must either mail or deliver to you a written cancellation notice. No cancellation is effective until at least 10 days after mailing or delivery of the notice, and it must state with reasonable precision the facts on which the insurer's cancellation decision is based. [s. 631.36 (2) (b) and (6), Wis. Stat.]

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 105 of 598

*State of Wisconsin, Office of the Commissioner of Insurance*
*Consumer's Guide to Auto Insurance*
DJA0257

**Nonrenewals**

Nonrenewal of a policy refers to the termination of a policy at the expiration date. If an insurer decides it does not want to renew your policy, *it must mail or deliver to you a nonrenewal notice at least 60 days before the policy's expiration date.* The nonrenewal notice must provide the reason for nonrenewal. The insurer must also provide information in the notice on how to apply to the Wisconsin Automobile Insurance Plan for coverage. Under certain conditions, these plans offer auto insurance to people who are unable to obtain it in the voluntary market. [s. 631.36 (4), (6), and (7), Wis. Stat.]

If an insurer fails to provide notice prior to the expiration date, it must continue your coverage under the terms and premium of your prior policy for the term of the policy or one year, whichever is less. [s. 631.36 (4) (a), Wis. Stat.]

**Anniversary Cancellations**

This refers to a policy written for an indefinite term or for more than one year. These policies may be canceled on any anniversary date if the policies contain cancellation provisions. If your insurer decides to cancel your policy on an anniversary date, it must mail or deliver to you a written notice at least 60 days prior to the anniversary date; this notice must state with reasonable precision the facts on which the insurer's cancellation decision is based. [s. 631.36 (3) and (6), Wis. Stat.]

**General Anti-Discrimination Laws**

There are statutes and rules protecting consumers from unfair discrimination in insurance policies.

- Insurers may not refuse to insure you or refuse to renew your policy on the basis of sex. [s. Ins 6.55, Wis. Adm. Code]

- Insurers may not refuse coverage to a class of risks solely on the basis of past criminal record, physical disability, past mental disability, age, marital status, sexual preference, "moral" character, or risk location. Insurers may not use these classifications to charge different rates without credible supporting information that must be filed with OCI.

- No insurer may cancel or refuse to issue or renew an automobile insurance policy wholly or partially because of one or more of the following characteristics of any person: age, sex, residence, race, color, creed, religion, national origin, ancestry, marital status, or occupation.

Some of these classifications may be used by an insurance company if its experience supports differences in losses from these classifications. [s. 632.35, Wis. Stat., and s. Ins 6.54, Wis. Adm. Code]

An insurer may not refuse, cancel, or deny coverage solely because of a past criminal record, physical or developmental disability, past mental disability, age, marital status, sexual preference, or "moral" character.

## Problems With Your Insurance Company

If you are having a problem with your insurer, you may want to first check with your agent or with the company. If you do not get satisfactory answers from the agent or company, contact OCI. An online complaint form is available at ociaccess.oci.wi.gov/complaints/public/.

The more complete and accurate information you provide, the more likely it is your problem can be resolved. Be sure you have included the correct name of the insurance company your complaint is about. Many companies have very similar names. Listing the wrong name may delay investigation of your complaint.

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 106 of 598

Before signing an application for any insurance coverage, verify the company and agent you are dealing with are licensed in Wisconsin. Licensing information about agents and companies can be found on OCI's website at oci.wi.gov or by calling 1-800-236-8517.

It is illegal for unlicensed insurers to sell insurance. Business cards are not proof of a licensed insurance agent or company. If you do business with an unlicensed agent or company, you have no guarantee the coverage you pay for will ever be honored. If you purchase insurance from companies not legally doing business in the state, you will not be protected by the Wisconsin Insurance Security Fund should the company fail.

If an unlicensed agent or company contacts you, call OCI immediately so regulatory action can be taken. By doing so, you may protect someone less knowledgeable than you from being victimized.

OCI investigates complaints to determine if any insurance laws or rules have been violated. If any laws or rules have been violated, OCI will proceed with disciplinary action. Penalties include suspension or revocation of licenses or fines. OCI usually cannot settle a factual dispute; disputes based on a question of fact may have to be pursued through small claims court or with an attorney.

If you are not satisfied with the service you receive, contact your insurer or agent. The following industry associations may also help:

Independent Insurance Agents of Wisconsin
725 John Nolen Drive
Madison, WI 53713
(608) 256-4429
www.iiaw.com

Professional Insurance Agents of Wisconsin
6401 Odana Road
Madison, WI 53719
(608) 274-8188
www.piaw.org

Community Insurance Information Center
600 West Virginia Street, Suite 101
Milwaukee, WI 53204
(414) 291-5360
insuranceinfo-ciic.org

## Automobile Insurance
## Quotation Worksheet

### Rating Information

|  | Age | Sex | Marital Status | % Use of Car |
|---|---|---|---|---|
| Principal Operator | _____ | _____ | _____ | _____ % |
| Other Driver(s) | _____ | _____ | _____ | _____ % |

Annual Mileage: _____

Number of Miles One Way if Driving to and from Work Every Day: _____

Number of Accidents or Moving Violations in the Last 3 Years: _____
List on separate sheet. Use date of conviction for violations.

Type of Auto(s)      Make          Model & Year

Auto 1          _____      _____
Auto 2          _____      _____

### Insurance Quotes - Semiannual Premiums

| Liability Limits: | | Company 1 | Company 2 | Company 3 |
|---|---|---|---|---|
| Bodily Injury: | _____ per person | | | |
| Bodily Injury: | _____ per accident | | | |
| Property Damage: | _____ per accident | | | |

Uninsured Motorist

| | | | | |
|---|---|---|---|---|
| Bodily Injury: | _____ per person | | | |
| Bodily Injury: | _____ per accident | | | |

Underinsured Motorist

| | | | | |
|---|---|---|---|---|
| Bodily Injury: | _____ per person | | | |
| Bodily Injury: | _____ per accident | | | |

Physical Damage to Insured Vehicle

| | | | | |
|---|---|---|---|---|
| Comprehensive: | _____ deductible | | | |
| Collision: | _____ deductible | | | |

Other Coverages:

**TOTAL SEMIANNUAL PREMIUM:**

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 108 of 598



STATE OF NEW JERSEY
DEPARTMENT OF BANKING & INSURANCE

Governor Phil Murphy • Lt. Governor Sheila Oliver

NJHome | Services | Departments/Agencies | FAQs

Search　　

Home > Consumer Information - Insurance > Ombudsman's Office > Filing an Auto Damage Claim with Your Own Insurer

## What You Should Know About…

### Filing an Auto Damage Claim with Your Own Insurance Company

When your vehicle is damaged or stolen, one of the first things you should do is file an insurance claim. If another driver caused the damage to your vehicle, you have the option to file the claim either with your own insurance company, if you have the appropriate coverages (a **"first party" claim**), or with the insurer for the owner of the other car (a **"third party claim"**).

In order for you to be able to file a "first party" claim, your policy must provide **Collision or Comprehensive coverage** (see right). These are often referred to as "Physical Damage" coverages.

> **Collision coverage** protects you from damage caused to your car by a collision with another vehicle, a fixed object, or an object lying in the roadway. Collision coverage also protects you from damage caused by the upset of your vehicle.
>
> **Comprehensive coverage** protects you if your car is stolen or vandalized or damaged by contact with an animal or falling objects (i.e., tree limbs, rocks, stones, debris). It also covers your vehicle for glass breakage, fire, wind, hail, and flood damage.

**If you file a first party claim,** your insurance company will either pay to repair the damages to your vehicle or pay you the value of your vehicle if the damages exceed the car's worth. First, though, the company will subtract the deductible amount you have chosen for that coverage.

**If you file a third party claim against another driver,** the other driver's insurance company will only pay for damages to your vehicle to the extent that their insured was legally responsible. In some instances, this may not be enough to reimburse you for the full amount of your loss. (More information on third party claims...)

### Frequently Asked Questions　　　　　　　　　　　　　Glossary of Insurance Terms

1. Can I collect under "no-fault" insurance for damages to my vehicle if I was at fault for an accident and I do not carry first party coverage?
2. What must I do after a loss?
3. What information must I give my insurance company?
4. When will my insurance company contact me and how long do they have to look at my vehicle?
5. How long does my insurance company have to settle my claim?
6. Will my insurer pay for me to rent a car?
7. What about storage fees?
8. Who decides whether or not my vehicle can be repaired?
9. Can I choose my own repair shop?
10. Can I ask my insurer to recommend a repair shop?
11. Does my insurance company have to use new parts to repair my car?
12. Do I have to accept non-OEM parts?
13. Do I have to pay a deductible?
14. How will the value of my vehicle be calculated to determine if it is a total loss?
15. Can my insurer deduct for any damage or rust to my vehicle which existed before the loss?
16. I found a car just like mine that costs more than what I got from the insurance company for my old car. What can I do?
17. Does my insurer have to give me the option to keep my car after they have declared it a total loss?

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 109 of 598

18. If the insurer settles my total loss and lets me keep the car, can I use the settlement money to fix it instead of selling it for salvage?

19. Does my insurance company have to pay off my car loan?

20. What if my company and I can't agree on the amount of my loss?

21. Must I conclude my claim within a certain time frame?

22. What else can I do if my insurance company and I can't agree, or if they deny my claim?

**1. Can I collect under "no-fault" insurance for damages to my vehicle if I was at fault for an accident and I do not carry first party coverage?**

> The answer is "NO". No-fault or Personal Injury Protection (PIP) insurance only pays for your own medical expenses if you are injured in an automobile accident, no matter who caused the accident. It does not pay for damage to a vehicle.

**2. What must I do after a loss?**

- Immediately report all losses to your insurance agent or company.
- Immediately report a loss to the police if your vehicle is stolen, vandalized, or damaged by a hit-and-run driver. Without a police report your company could deny your claim. In fact, under Division of Motor Vehicle law you are required to report any accident involving property damage in excess of $500.00 to the appropriate authorities.
- You must make the damaged vehicle available for inspection by the insurance company before you have it repaired.
- Protect your vehicle from further damage. If you don't do this, your insurer could refuse to pay for any subsequent damage. For example, if you don't cover a broken windshield and rain damages the upholstery, your company could refuse to pay for the damaged upholstery.
- Cooperate with the insurance company's investigator. If you don't cooperate, the company could deny your claim.
- When you file a first party claim, you have a direct contract with your insurer that requires the company to fulfill all the conditions stated in your policy. However, the contract also places duties and requirements on you, the insured, when filing a claim. Therefore, you need to review that section of your policy often called "Conditions" or "Insured's Duties After a Loss."

**3. What information must I give my insurance company?**

- A copy of any legal documents you receive as a result of an accident, such as a letter from an attorney or a summons and complaint.
- A proof of loss, as may be required by the insurance company, describing the date of the loss, how it happened, who was driving, and any other relevant information. If a proof of loss is required, your company could deny your claim if you fail to provide it.
- Your company may also ask for other documents related to the claim such as repair bills or estimates, a copy of the police report, or a copy of the vehicle's title or bill of sale.
- In some cases, your company can also require you to submit to an examination under oath and produce requested documents. You do have the right to have an attorney present during the examination under oath. If you do not submit to the examination under oath, your company could deny your claim.

**4. When will my insurance company contact me and how long do they have to look at my vehicle?**

> New Jersey insurance regulations require your insurance company to contact you within 10 working days after they have been notified of a loss, or if they intend to exercise their right to inspect the damaged vehicle, they must do so within 7 working days.

> Your insurer can only require your vehicle to be made available for inspection at a time and place which is reasonably convenient for you.

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 110 of 598

**5. How long does my insurance company have to settle my claim?**

Your insurance company is allowed 30 calendar days to settle your first party claim from the time they receive notice of the loss. However, this time may be extended if the company needs to conduct additional investigation or if you fail to cooperate with them.

The company must provide you with written notice explaining the reason for the delay if the claim settlement process takes longer than 30 days.

**6. Will my insurer pay for me to rent a car?**

It depends. If your car is stolen, most insurance policies will reimburse you for a stated amount towards the cost of a rental vehicle for a limited time starting 48 hours after the theft, as long as you report the theft to the police and to the insurance company. Check your policy for the exact wording.

For non-theft claims, most policies don't provide coverage for a rental vehicle unless you buy this additional coverage. If another party was responsible for the accident, that party's insurer may be responsible for rental charges. (For more information, see third party claims...)

▲ Top

**7. What about storage fees?**

If your vehicle is not drivable after an accident and is towed to a storage facility, the storage facility will charge you a daily storage fee. Your insurance company must give you 3 working days notice before they stop paying for storage charges in order to give you time to move the vehicle to someplace where you won't incur storage charges.

**8. Who decides whether or not my vehicle can be repaired?**

After evaluating the damages to your vehicle, your insurance company has the option of repairing your vehicle, replacing your vehicle, or reimbursing you for the vehicle's **actual cash value (ACV)**. Actual cash value is the amount your vehicle would have sold for on the date of the accident.

Your insurance will elect to replace your vehicle or reimburse you for the ACV in those instances where the vehicle is economically impractical to repair.

A vehicle is considered economically impractical to repair, or a total loss, if the cost to repair the vehicle equals or exceeds the vehicle's ACV on the date of the loss. In many instances an insurance company will total a vehicle if the appraised damages equal 80% of the vehicle's ACV because often, once repairs are begun, additional damages or "hidden damages" are found which would render the vehicle a total loss by definition. (This is sometimes referred to as a "constructive total" loss).

**9. Can I choose my own repair shop?**

Yes. Provided the repair shop is licensed, your insurer has to try to reach an agreed price with the shop of your choice. If your company cannot reach an "agreed price", they will provide you with the names of licensed shops who can do the repairs for the price the company has determined.

**10. Can I ask my insurer to recommend a repair shop?**

Yes. At your request, your company must recommend a qualified repair facility convenient to the

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 111 of 598

DJA0263

vehicle's location which will repair the vehicle at the price the company is willing to pay and whose
work is guaranteed. Your insurance company further stands behind the repair shop's guarantee.

**11. Does my insurance company have to use new parts to repair my car?**

No. The contract of insurance only obligates the insurance company to restore your vehicle to the
same condition it was in before the loss. Sometimes this requires the use of **original equipment
manufacturer (OEM)** parts and sometimes after-market parts can be used. After-market parts
are parts made by a manufacturer other than the original manufacturer.

If your vehicle is being repaired with newer parts, your company doesn't have to pay for this
"betterment". For example, if your vehicle's transmission is five years old and is damaged due to a
covered loss, your insurer would only have to replace it with a five year old transmission. If a five
year old transmission can't be found, the repair shop could use a new transmission but you'd have
to pay the difference between the value of a five-year-old transmission and a new transmission.

**12. Do I have to accept non-OEM parts?**

No. While New Jersey regulations do permit the use of after-market parts as long as they are
warranted by the manufacturer to be of like kind and quality as OEM parts, you don't have to
accept them. The final choice is yours but if the insurer wants to use non-OEM parts and you
decide to use more expensive OEM parts, you may have to pay the difference in cost.

The regulations also require the insurer to clearly indicate in writing on the appraisal which parts
are after-market parts and pay for any modifications necessary.

**13. Do I have to pay a deductible?**

When you bought your policy, you chose a deductible for your physical damage coverages. This is
the amount you are responsible for if a claim occurs. The higher your deductible, the lower the cost
of your physical damage coverage. Your insurer will deduct that amount from the settlement of
your claim.

Keep in mind that insurance companies consider it to be fraud if the repair shop inflates your repair
estimate to help you recover the cost of your deductible.

**14. How will the value of my vehicle be calculated to determine if it is a total loss?**

Each insurance company is required to select one of three prescribed methods for use in the
settlement of all their total loss claims.

The three methods which have been approved by the Commissioner of Banking and Insurance are:

> **1.** Taking the average of the retail values of substantially similar vehicles as listed in the current
> editions of the "Automobile Red Book" (or "Older Car Red Book") published by Penton Media and
> the "N.A.D.A. Official Used Car Guide" (or "N.A.D.A. Official Older Car Guide") published by the
> National Automobile Dealers Used Car Company.
>
> **2.** Using a quote obtained by the insurer for a substantially similar vehicle available for you to
> purchase from a dealership within 25 miles of where your car is normally garaged.
>
> **3.** Utilizing the services of an approved source, including computerized databases that produce
> fair market values of substantially similar vehicles. At this time Audatex, Mitchell International,
> CCC, Vehicle Valuation Services Inc and CARFAX are approved for use in determining fair
> market values.

If your vehicle cannot be valued using any of these three methods because they fail to represent a
true cross-section of the market to determine the fair market value of your car, the company is

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 112 of 598

DJA0264

then required to use the best available method and fully explain to you, in writing, how they calculated the amount they are offering you.

In addition to telling you which method is used to value your car, your insurance company must also provide you with an itemized list showing all additions, deductions, and sales tax applicable to your vehicle.

▲ Top

### 15. Can my insurer deduct for any damage or rust to my vehicle which existed before the loss?

Yes. However, deductions for previous damage or prior condition must be itemized with a specific dollar amount and are limited to the amount by which the resale value of the car is increased by the elimination of the previous damage or correction of the prior condition. In other words, if your car was damaged in a previous accident and you decided not to get it repaired, or if you neglected the condition of your car which resulted in the vehicle sustaining rust, your car would not be worth as much on the open market if you tried to sell it than it would be had you elected to repair the previous damage or maintain the car in good condition. The amount by which the resale value of your car increases by eliminating the previous damage, or correcting the prior condition, is the amount the insurance company can deduct from your total loss settlement.

As New Jersey does not have a law which specifies just how insurers can take deductions for previous damage or prior condition, the example below is provided solely for the purpose of giving you a better understanding of this concept to assist in your negotiations with the insurer.

> **Example -** A quarter panel damaged prior to the covered accident which the insurer estimates will cost $600 to replace may result in the following deductions:
>
> If the vehicle is 1 and 2 years old - $600 deduction for previous damage
> If the vehicle is 3 and 4 years old - $450 deduction for previous damage
> If the vehicle is 5 through 7 years old - $300 deduction for previous damage
> If the vehicle is over 7 years old - $150 deduction for previous damage.

### 16. I found a car just like mine that costs more than what I got from the insurance company for my old car. What can I do?

Provided you have located a substantially similar vehicle within 30 days from receiving the company's settlement check, your company will have to either:

- Pay you the difference between the cost of the car that you found and the amount of the claim settlement.
- Negotiate the purchase price of the car that you found.
- Locate a substantially similar vehicle within a 25 mile radius of your vehicle's principle place of garaging which you can purchase at the market value established by the company in their original offer of settlement.
- Invoke the Appraisal Clause of your policy. (See Question 20)

### 17. Does my insurer have to give me the option to keep my car after they have declared it a total loss?

No. Once they settle a total loss, your insurance company assumes the rights to your car and can dispose of it however they wish including selling it or its parts for salvage. They can, at their discretion, let you keep the car and let you try to salvage it yourself.

If the insurer lets you keep your car, they will deduct its salvage value from your total loss settlement before applying your deductible.

### 18. If the insurer settles my total loss and lets me keep the car, can I use the settlement money to fix it instead of selling it for salvage?

Yes. However, if your vehicle was manufactured 8 or fewer years from the current model year, you must first obtain a salvage certificate from the New Jersey Motor Vehicle Commission (MVC).

After the repairs are made, the vehicle must then be presented to the MVC for a special inspection before it can be driven on public roads.

**19. Does my insurance company have to pay off my car loan?**

No. The insurance policy only requires the company to pay the actual cash value of the vehicle less your deductible. If your car's value is less than the loan, you are still responsible for the difference.

Keep in mind that if your lender is listed as a loss payee on your policy (which is normally the case) the settlement check will be made out to them as well as to you.

**20. What if my company and I can't agree on the amount of my loss?**

If you and your insurer can't agree on the amount of your physical damage loss either one of you may request an appraisal as explained in your policy. Here is how the appraisal process usually works:

- You choose and pay for an appraiser to represent you.
- The company will choose and pay for an appraiser to represent them.
- The two appraisers will select a neutral third party umpire (for whom you and your company split the cost, if necessary).
- Both appraisers will give their estimates for the loss.
- If the appraisers can't agree, they will submit their differences to the umpire and a decision by any two of the three is binding.

**21. Must I conclude my claim within a certain time frame?**

Yes. You must either accept a final settlement or file a lawsuit within the time period specified by the appropriate statute of limitations.

If you fail to accept a final settlement offer or to file a suit before the statutory period runs out, you may jeopardize your right to receive any settlement at all.

**22. What else can I do if my insurance company and I can't agree, or if they deny my claim?**

You can file an appeal with the insurance company's internal appeals panel. If you are still unsatisfied after the company's internal appeals panel renders its decision, you can request a review of that decision by the Insurance Claims Ombudsman.

| You can file a written complaint with: | **The Office of the Insurance Ombudsman**<br>**NJ Department of Banking and Insurance**<br>**20 West State Street**<br>**PO Box 472**<br>**Trenton NJ 08625-0472**<br>**1-800-446-7467**<br>**E-mail: ombudsman@dobi.nj.gov** |
|---|---|

▲ Top

If you have any further questions or would like additional information, you can contact the Department of Banking and Insurance either through the **Office of the Insurance Claims Ombudsman** at **1-800-446-7467** or the Consumer Inquiry and Response Center (CIRC) at **609-292-7272.**

OPRA is a state law that was enacted to                    You will need to download the latest version of

 give the public greater access to
government records maintained by public
agencies in New Jersey.

 Adobe Acrobat Reader in order to view
and print PDF (Portable Document Format) files
from this web site.

DJA0266

NJHome | Services A to Z | Departments/Agencies | FAQs          Contact Us | Privacy Notice | Legal Statement | Accessibility Statement 

Copyright © 2011, State of New Jersey
New Jersey Department of Banking and Insurance

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 115 of 598

TAB 24                                                                 DJA0267

# Understanding your auto claim



**DIFP**
Department of Insurance
Financial Institutions &
Professional Registration

# Filing a claim

Immediately notify the police of an accident that damaged other's property or if you were the victim of a hit-and-run accident, uninsured motorist, vandalism or theft.

Report your accident or the circumstances that will cause you to file a claim with your insurance company or agent/producer. If you were not at fault, report the accident to the other driver's insurance company. Follow the company's instructions when making your claim. According to Missouri statute section 375.1007(4) RSMo and Missouri regulation 20 CSR 100-1.050, insurance companies are required to handle claims promptly and fairly.

If you are in an accident with an uninsured motorist, notify your own carrier, and a report should be made to the Missouri Department of Revenue if:

· The accident happened in Missouri
· One year has not passed since the accident happened
· Someone involved in the accident did not have liability insurance coverage
  **AND**
· There is damage to any one or more person's property in excess of $500; or there was personal inury or death

You may obtain a state "Uninsured Accident Report" form from any branch of the Missouri Department of Revenue or State Highway Patrol.

Missouri Department of Revenue
301 W. High St., Room 470
Jefferson City, MO 65101
(573) 751-7195

You can contact the State Highway Patrol General Headquarters by calling (573) 751-3313.

# Understanding your claim

**What is physical damage?**

Physical damage insurance typically is the comprehensive and collision coverage on your vehicle.

**Comprehensive insurance** pays for damages to your car from perils such as fi re, theft, explosion, windstorm, hail, vandalism, glass breakage, birds, and animals. Covered perils are listed in your policy under the insuring agreements section. This coverage may have no deductible, a $100 deductible, a $250 deductible, or more. The deductible is the amount of any loss you must pay before the insurance company will cover damages.

**Collision insurance** covers damage caused by the collision of your car, regardless of who is responsible for the accident. This type of insurance usually includes a deductible. Again, you pay the deductible amount when you have an accident, and the insurance company pays the rest, up to the limits of your policy.

## What is diminished value?

Diminished value is the difference in fair market value of the auto immediately before the accident and the auto immediately after the accident causing the damage. Diminished value may or may not be recoverable under an auto accident claim depending on the relationship between the injured party and the insurance company.

If you make a claim under your own policy (e.g. your auto was damaged because you hit a tree), Missouri law does not require insurers to pay for diminished value and there is case law that addresses this issue - Lupo v. Shelter Mutual Insurance Company, 70 S.W.3d 16. In this case, an insured brought action against his own insurance company to recover the diminished value of his adequately repaired car. The insured claimed that his car was worth less than it was before the accident even though the car had been properly and adequately repaired. The court ruled in favor of the insurance company, the insured appealed and the appeals court agreed the insured's auto policy **did not** require his insurance company to pay for the diminished value of an adequately repaired car. The law does not prohibit an insurer from offering this type of coverage, so it is always best to read your policy or ask your agent to find out whether your policy will pay you for diminished value claims.

If you make a claim under someone else's policy (e.g. your auto is damaged because someone else hit you), Missouri courts have included diminished value as recoverable damages - Rook V. John F. Oliver Trucking Company, 566 S.W.2d 200 (Mo. App. 1977). In this case, the court said the amount of damage should be measured from the fair market value immediately before the collision and the fair market value immediately after the collision. However, if repairs have been made to the auto as a result of the accident, the court said that the dimished value should be the difference between the fair market value immediately before the collision and the fair market value after the repairs.

## What is Actual Cash Value?

The insurance company is required to pay the fair market value of a vehicle. The fair market value of your vehicle can be found by surveying dealers in your area, receiving information from recognized groups such as "CCC", "ADP AutoSource", or one of the industry guides, such as "NADA" to determine the average retail price. When disputing the company's offer of settlement, it is up to you to prove that your vehicle is worth more than what the company is offering.

The insurance company will adjust the value based on physical wear and tear as well as any pre-existing damage. If the company determines some replacement items are better than the ones damaged, they may apply "betterment." Betterment is an improvement that increases the value of property and is more extensive than mere repairs. You would be responsible for those charges. For example, if the tires are damaged or the battery or mechanical parts must be replaced, the company may replace new for old. The betterment would depend on the age of the older item being replaced.

## What is Mitigation?

Mitigate means to minimize. Regardless of insurance, you have an obligation to mitigate the damages in a loss according to Missouri courts. As such, you have an obligation to keep your expenses to a minimum. For example, you may have to move your vehicle from storage to a neutral location, such as your home, until the insurance dispute is settled.

## New parts or after-market parts?

Missouri regulation 20 CSR 100-1.050(2)(D)2 allows companies to use aftermarket parts when completing an estimate for repairs on your damaged vehicle.

A company is not obligated to put new factory parts on damaged vehicles. After-market parts are typically defined as "parts not manufactured by the original equipment manufacturer that replace non-mechanical sheet metal parts or plastic parts that constitute part of the exterior of a motor vehicle, including, but not limited to, an inner or outer panel."[1] In accordance with the regulation, all after-market parts installed on the vehicle must be clearly identified on the repair estimate. Used parts, as well as after-market parts, are acceptable in the repair of vehicles if certain criteria are met.

## Estimates

The insurance company is obligated to pay for repairs "in an amount for which it may be reasonably expected the damages can be satisfactorily repaired."

It is common for insurance companies to review estimates submitted for repairs. However, you are the only one that can authorize repairs to your vehicle. Therefore, you can take your car to a body shop of your choosing, but if the insurance company has a lower estimate from another body shop, then the lower amount is all the insurance company is obligated to pay.

According to Missouri regulation 20 CSR 100-1.050 (2)(E), when the insurer elects to repair and designates a specific repair shop for automobile repairs, the insurer shall restore the vehicle to its condition prior to the loss at no additional cost to the claimant, other than as stated in the policy and within a reasonable period time.

## What about rental re-imbursement and/or loss of use?

Many companies offer an endorsement that you may purchase to cover rental re-imbursement costs that you may incur in the event your car was damaged. For **theft claims,** Missouri regulation 20 CSR 500-2.100 provides minimum standards for rental reimbursement under theft coverage. The maximum waiting period before coverage begins is forty-eight hours. The minimum payment is ten dollars per day or three hundred dollars per rental occurrence. The insurer may terminate these payments when they extend a reasonable settlement to the insured.

In the event another party was responsible for the accident (someone else hit your car), common liability language states that a company will pay for the damages in which their insured becomes legally liable, including the loss of use of your car. The insurance company will determine if you have actually suffered a loss. If a claimant does not rent a vehicle, some companies will offer a small amount per day to help absorb expenses

[1] www.asashop.org/legis/disclosure.htm

such as public transportation, getting rides from friends or family, etc.

**What is comparative fault?**

In 1983, the Missouri Supreme Court adopted the rules of pure comparative fault. This means that any parties involved in an accident may be partially responsible for the accident, and allows your damages to be reduced by the percentage you are at fault in the accident. Insurers are allowed to investigate an accident and make a decision as to the percentage of fault of all parties involved. They will make voluntary offers based on this opinion.

**What about salvage?**

Missouri statutes define "salvage vehicle" as any motor vehicle or semitrailer, which has been damaged to the extent that the total cost of repairs to rebuild the vehicle to its condition immediately before it was damaged exceeds 80% of the fair market value of the vehicle prior to the damage. (Fair market value is described on page 5 under Actual Cash Value) The total cost of repairs to rebuild or reconstruct the vehicle shall not include the cost of repairing, replacing, or reinstalling inflatable safety restraints, tires, sound systems or any sales tax for parts or materials to rebuild the vehicle.

**What is first-party liability?**

A first-party liability claim is when you make a claim against your own insurance policy. The claim payment is based on contractual agreements or provisions in your policy.

**What is third-party liability?**

A third-party liability claim is when you make a claim against someone else's policy.

Typical policy language states that the insurer will pay for damages for which the insured becomes legally liable. Some damages may include loss of use if the vehicle requires repair. Insurers will pay reasonable costs for vehicle rental, bus fares, etc., to the third-party claimants. The company will usually terminate these payments when a reasonable settlement offer is extended to the claimant.

**What are bodily injury considerations?**

Once a company has determined responsibility in an accident, they will gather information in order to extend a fair settlement offer.

Companies will take several factors into consideration when offering the settlement. They will review all reasonable medical expenses, lost wages, degree of injury and long-term effects. At this time there is no law to force companies to include pain and suffering in the settlement offer.

Although the Missouri Department of Insurance cannot force a company to pay a bodily injury claim, the department has the authority to ensure the company performs a thorough investigation.

Depending on the circumstances involved in the accident, it may take a while for the insurance companies to determine liability and settle the claims. If you seek medical attention, Missouri law allows you to file accident-

related medical claims under your health insurance coverage for benefits applicable to your policy. Once the automobile insurer determines liability, the bodily injury payment is paid in addition to any benefit received. The bodily injury settlement is based on reasonable medical expenses and is separate from health insurance payments. Missouri law does not allow automobile insurance companies to subrogate (recoup their payment) from your health carrier and vice versa. Only self-funded health benefit plans are allowed to subrogate in Missouri.

The medical payments portion of some auto policies also provides immediate coverage for health services due to an auto accident rendered regardless of who is at fault. You should review the medical payments portion of your policy for coverage that may extend to the medical treatment.

**How to contact the Missouri Department of Insurance, Financial Institutions & Professional Registration**

For additional information contact the Consumer Insurance Hotline toll free at 1-800-726-7390 or go to http://www.insurance.mo.gov.

# NOTICES

## List of Approved Guide Source Method Vendors; Notice 2017-03

**[47 Pa.B. 1254]**
**[Saturday, February 25, 2017]**

Under the authority of the Motor Vehicle Physical Damage Appraiser Act (63 P.S. §§ 851—863), the Insurance Commissioner lists guide source providers approved to calculate the replacement value of total loss or unrecovered vehicles under 31 Pa. Code § 62.3(e)(1)(i) (relating to applicable standards for appraisal).

A listing of approved guide source method providers will be published annually in the *Pennsylvania Bulletin*. In the interim, an updated listing will be available on the Insurance Department's web site at www.insurance.pa.gov. Requests for this information may also be submitted to the Insurance Department, Bureau of Consumer Services, (877) 881-6388, fax (717) 787-8585, ra-insresponse@pa.gov.

## Approved Guide Source Vendors

Accurate ACV, LLC
221 East 11th Street
Kansas City, MO 64106
(816) 291-4818
www.accuacv.com

Audatex (formerly ADP Claims Solution Group, Inc.)
15030 Avenue of Science, Suite 100
San Diego, CA 92128
(800) 237-4968
www.audatex.com

Autobid, Inc.
10965 Lowell, Suite 1007
Overland Park, KS 66210
(913)-825-4800
www.autobid.com

Automobile Red Book (including the Older Used Car
    Publication)
Price Digests
9800 Metcalf Avenue
Overland Park, KS 66212
(800) 654-6776
www.pricedigests.com

CCC Information Services, Inc.
222 Merchandise Mart Plaza, Suite 900
Chicago, IL 60654-1105
(800) 621-8070
www.cccis.com

Mitchell International, Inc.
6220 Greenwich Drive
San Diego, CA 92122
(900) 238-9111
www.mitchell.com

DJA0274

NADA Official Used Car Guide (including the Older Used
  Car Publication)
8400 Westpark Drive
McLean, VA 22102
(800) 544-6232
www.nada.com/b2b

Vehicle Valuation Services
1 South 450 Summit Avenue
Suite 185
Oakbrook Terrace, IL 60181
(888) 475-9975
www.vvsi.com

    This document supersedes the notice published at 46 Pa.B. 6734 (October 22, 2016) and shall remain in effect until a subsequent notice is published in the *Pennsylvania Bulletin*.

TERESA D. MILLER,
Insurance Commissioner

**[Pa.B. Doc. No. 17-352. Filed for public inspection February 24, 2017, 9:00 a.m.]**

---

No part of the information on this site may be reproduced for profit or sold for profit.

This material has been drawn directly from the official *Pennsylvania Bulletin* full text database. Due to the limitations of HTML or differences in display capabilities of different browsers, this version may differ slightly from the official printed version.

---

[ Top ] [ Bottom ]

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 123 of 598

TAB 26                                                    DJA0275



**State of New York**
**Department of Financial Services**

**It is hereby certified that the annexed copy of the letter dated October 24, 1995 from Christopher Maloney to Charles Jones at CCC Information Services Inc. re: New York State Insurance Department File No. C95001989 CCC Information Services has been compared with the original on file in this Department and that it is a correct transcript therefrom and of the whole of said original.**



**In Witness Whereof,** I have hereunto set my hand and affixed the official seal of this Department at the City of New York, this 14th day of June 2021.



**Martha A. Lees**
**Deputy Superintendent and**
**Senior Counsel for Insurance**



STATE OF NEW YORK
INSURANCE DEPARTMENT
160 WEST BROADWAY
NEW YORK, NEW YORK 10013

GEORGE E. PATAKI
Governor

EDWARD J. MUHL
Superintendent of Insurance

October 24, 1995

CCC Information Services Inc.
World Trade Center Chicago
444 Merchandise Mart
Chicago, Illinois 60654-1005
Att: Charles Jones, Group Vice President

> Re: New York State Insurance Department File # C95001989
> CCC Information Services Inc.

Dear Mr. Jones:

Based upon our review and representations by CCC Information Services Inc.(CCC), its computerized valuation system satisfies the criteria contained in Subdivision 216.7(c)(1)(iii) of the Fifth Amendment to Regulation 64. Therefore, CCC is approved as a computerized database that produces statistically valid fair market values for substantially similar automobiles.

CCC may begin providing such valuations on motor vehicle total losses to insurers for claims reported on and after November 8, 1995.

Very truly yours,

EDWARD J. MUHL
Superintendent of Insurance

By:

Christopher Maloney

Christopher Maloney
Senior Insurance Examiner
Property & Casualty Ins. Bureau

cc: Martin Minkowitz, Strook, Strook & Lavan
    Arthur J. Chartrand, Chartrand Law Office

EGENPL/1638/29

CONFIDENTIAL – SUBJECT TO JOINT DEFENSE

TAB 27                                                        DJA0277

# NOTICE

## NEW HAMPSHIRE INSURANCE DEPARTMENT

## List of Acceptable Valuation Guides and Methodologies
## In Accordance With
## <u>Ins 1002.15 Determining Amount of Motor Vehicle Total Loss Claims</u>

In accordance with Ins 1002.15 (a) (1) b. the following is a list of accepted valuation guides and methodologies, along with the name and address of the vendor or provider of each.  These valuation guides and methodologies have been accepted by the New Hampshire Insurance Department as the only such guides for insurers to use in determining total loss settlements based on a motor vehicle's fair market value [ Ins 1002.15 (a) (1) ].

### Accepted Guides and Methodologies

<u>Name of Product</u>                      <u>Vendor's Name, Address and Contact Information</u>

Autosource Valuation             Audatex North America
                                 15030 Avenue of Science, Suite 100
                                 San Diego, CA 92128
                                 (858) 946-1264
                                 www.audatex.com

BlackBook                        BlackBook
                                 PO Box 758
                                 Gainesville, GA 30503
                                 800-554-1026
                                 http://www.blackbook.com

CARFAX                           Total Loss Valuation Service
                                 5860 Trinity Parkway Suite 600
                                 Centreville, VA 20120
                                 800-789-6232
                                 www.carfaxbig.com

CCC ONE Valuation                CCC Information Services Inc.
                                 222 Merchandise Mart Plaza, Suite 900
                                 Chicago, IL 60654-1105
                                 (800) 621-8070
                                 (312) CCC-INFO (222-4636)
                                 www.cccis.com

NADA Guides                      NADA Analytical Services Group
                                 8400 Westpark Drive
                                 McLean, VA  22102
                                 (800) 544-6232
                                 www.nada.org

Edition No. 5
12.1.2020

WorkCenter Total Loss

Mitchell International, Inc
6220 Greenwich Dr
San Diego, CA 92122
(800) 238-9111
www.mitchell.com

Vehicle Valuation Services

Vehicle Valuation Services
1 South 450 Summit Avenue
Suite 380
Oakbrook Terrace, IL  60181
(888) 475-9975
www.v-v-s.com

While the following vendor products do not qualify as an acceptable guide or methodology under Ins 1002.15(a)(1), they do provide information on loss valuation in accordance with other sections of Ins 1002.15. As such, insurers may also rely on them in their determination of total loss settlements.

Name of Product

Vendor's Name, Address and Contact Information

AutoBid

AutoBid Services
10965 Lowell Suite 1007
Overland Park, KS 66210
(800) 875-2217
www.autobid.com

Valu-Rite

DCI Solution
PO Box 9186
Rapid City, SD 57709
(855) 324-5465
www.dcisolution.com

Edition No. 5
12.1.2020

TAB 28

# State of Connecticut
# Insurance Department

CT.gov Home  (/)   Insurance Department   (/CID)   Auto Insurance

Bulletins (/CID/Bulletins/Current-List-of-Bulletins)                                                >

Commissioner's Orders (/CID/Commissioner/Orders/Commissioners-Orders)                 >

Complaints and Questions (/CID/Consumer-Affairs/File-a-Complaint-or-Ask-a-Question)   >

Consumer Alerts and Notices (/CID/Lists/Consumer-Alerts-and-Notices)                  >

Dates and Deadlines (https://www.catalog.state.ct.us/cid/portalApps/importantDate.aspx)   >

Department Notices (/CID/Public-Notices/Department-Notices)                           >

Mission & Divisions (/CID/About-Us/Divisions)                                         >

Enforcement Actions
(https://www.catalog.state.ct.us/cid/portalApps/EnforcementAction.aspx)               >

Forms and Applications (/CID/Library/Forms-and-Applications)                          >

In The News (/CID/Commissioner/In-The-News)                                           >

Laws and Regulations (/CID/Legal-Division/Laws-and-Regulations)                       >

Reports (/CID/Reports/CID-Reports)                                                    >

Sign up for e-alert (https://confirmsubscription.com/h/j/3138A4711139BFC7)            >

**Search Insurance Department**

🔍

- What Is Auto Insurance (/CID/General-Consumer-Information/What-Is-Auto-Insurance)
- Common Terms (/CID/General-Consumer-Information/Auto-Insurance---Common-Terms)
- What Affects Premiums (/CID/General-Consumer-Information/Auto-Insurance---What-Affects-Premiums)

- **Teen Driving and Insurance (/CID/General-Consumer-Information/Teen-Driving-and-Insurance)**

- **Automobile Arbitration Program** 📄

- **General Auto Coverage Information (/CID/General-Consumer-Information/Automobile-Coverage-Information)**

- **Steer Clear of Deer (/CID/General-Consumer-Information/FAQs---Steer-Clear-of-Deer)**

- **FAQs - Regarding Repairs to Your Vehicle (/CID/General-Consumer-Information/FAQs-Regarding-Repairs-to-Your-Vehicle)**

- **Other Automobile Industry Sources Approved by the Insurance Commissioner:**

  1. **Automobile Red Book—Prism Business Media, Inc.**
     9800 Metcalf Avenue, Overland Park, KS 66282-2901
     (800) 654-6776
     **www.pricedigest.com (https://pricedigests.com/)**

  2. **Mitchell International, Inc.**
     9889 Willow Creek RoadSan Diego, CA 92131
     (800) 854-7030
     **www.mitchell.com (https://www.mitchell.com/)**

  3. **CCC Information Services, Inc.**
     222 Merchandise Mart, Suite 444Chicago, IL 60654-1005
     (800) 621-8070
     **www.cccis.com (https://www.cccis.com/)**

  4. **Audatex North America, Inc. (formerly ADP)**
     Bishop Ranch 1, 6111 Bollinger Canyon Road, Suite 200San Ramon, CA 94583
     (925) 866-1100
     **www.audatex.us (http://www.audatex.us/)**

  5. **AutoBid Services, LLC.**
     10955 Lowell suite 1007, Overland Park , KS 66210
     (800) 875-2217
     **www.autobid.com (https://autobid.com/)**

  6. **Vehicle Valuation Service** (specialty type only)
     450 Summit Avenue, Suite 185 Oakbrook Terrace, IL 60181
     (888) 475-9975
     **www.vvsi.com (http://www.vvsi.com/)**

  7. **DCI Solutions** (specialty type only)
     P.O Box 9186, Rapid City, SD 57709

TAB 29                                                                    DJA0282

THE STATE OF WYOMING

**Mark Gordon**
Governor



**Jeffrey P. Rude**
Commissioner

*Insurance Department*

106 East 6ᵗʰ Avenue · Cheyenne, Wyoming 82002

July 12, 2021

Kevin P. Zimmerman, Esquire
Baker Hostetler
200 Civic Center Drive, Suite 1200
Columbus, OH 43215-4138

      Re:    Certification of Copy of Public Record

Dear Mr. Zimmerman,

Per our discussion of today's date, enclosed please find the certified copy of a public record regarding the letter dated October 9, 2021 signed by Roy A. Lesh regarding CCC Information Services, Inc. (CCC).

If you have any questions regarding the enclosed information, please let me know.

                Sincerely,

                Becky S. McFarland
                Staff Attorney



THE STATE  OF WYOMING

JIM GERINGER
GOVERNOR

CERTIFIED TRUE COPIES
WY INSURANCE DEPARTMENT
DOCUMENTS

Becky S. McFarland    7/12/2021
SIGNATURE              DATE

## *Insurance Department*

HERSCHLER BUILDING - 122 WEST 25ᵀᴴ STREET - CHEYENNE, WYOMING 82002

October 9, 2001

Arthur J. Chartrand
Attorney at Law
Chartrand Law Office
130 North Cherry, Suite 202
Olathe, Kansas 66061

Re: CCC Information Services, Inc. (CCC)

Dear Mr. Chartrand:

Thank you for your September 19, 2001 correspondence regarding CCC's continued service and compliance in Wyoming.

As you are aware, WY HB 96( effective 1/02) reads in part: "the actual retail cash value of the motor vehicle, as set forth in the most current edition of any nationally recognized automobile appraisal guide or other source approved by the Wyoming insurance department." I would agree that the passage of HB 96 does not change CCC's status, but the language of the bill would seem to indicate that some type of acknowledgment of approval would be in order from our department.

This letter will serve as a positive response to CCC's continued use by insurers in determining a fair retail value for the consumers of Wyoming that may suffer a total loss to their vehicle. Our position as concerns total losses is that a single source may be used if the offer is accepted without dispute. If a dispute arises, an additional market survey in conjunction with a nationally recognized automobile guide may have to be researched in the geographical location of the insured or claimant. I only mention this point as claims people in Wyoming understand what we expect in reaching agreement with a consumer and that more than one source may be required in determining a fair actual retail cash value.

CCC may continue to service insurers in assessing vehicles relative to the market demands as indicated in the State of Wyoming.

Regards,

*Roy A. Lesh*

Roy A. Lesh
Insurance Standards Consultant

RAL/krv

cc:    Nancy Olson - Client Rights Representative
        Stephanie Bryant - Staff Attorney

# Frequently Asked Questions

New Car    **Used Car**    My Car's Value    Instant Cash Offer    Motorcycle    Other Pricing

## Used Car

What is the Kelley Blue Book® Fair Purchase Price for used cars?

What is Fair Market Range for used cars?

What is Typical Listing Price?

What is Kelley Blue Book Typical Listing Price (Certified Pre-Owned)?

How often do you update your used car values and pricing?

How does mileage affect a car's price or value?

Does your used car pricing account for my region?

Do you have Canadian pricing?

Do you have pricing for other countries?

Does Kelley Blue Book provide escrow services for vehicle purchases or guarantee online vehicle purchase transactions?

I'm not in the United States. Can I still get a Used Car Report?

Do you still sell the printed editions of Kelley Blue Book?

What do the abbreviations on your site mean?

DJA0285

## What Is The Kelley Blue Book® Fair Purchase Price For Used Cars?

This is the price that Kelley Blue Book has determined people like you are typically paying a dealer for a used car with typical mileage in good condition or better. This price is based on actual used-car transactions and adjusted regularly as market conditions happen to change.

## What Is Fair Market Range For Used Cars?

The Fair Market Range is Kelley Blue Book's estimate of what you can reasonably expect to pay this week for a vehicle with typical mileage and options (or with the miles and options you specify), excluding taxes, title and fees when purchasing from a dealer. Each dealer sets and controls its own pricing.

## What Is Typical Listing Price?

Formerly known as Suggested Retail Price, the Kelley Blue Book Typical Listing Price is representative of dealers' asking prices. It assumes that the vehicle has been fully reconditioned and has a clean title history. This price also takes into account the dealer's profit, costs for advertising, sales commissions and other costs of doing business. The final sale price will likely be less depending on the vehicle's actual condition, popularity, type of warranty offered and local market conditions. In other words, it's the price you should expect a dealer to ask – not always the price you should pay.

## What Is Kelley Blue Book Typical Listing Price (Certified Pre-Owned)?

Formerly known as the Certified Pre-Owned (CPO) Price, the Kelley Blue Book® Typical Listing Price (CPO) is representative of dealers' asking prices for a used car covered by the manufacturer's warranty in its CPO program. It assumes that the vehicle has been fully reconditioned and has a clear title history. The price also takes into account the dealers' profit, costs for advertising, sales commissions and other costs of doing business, while also factoring in any value associated with the CPO program.

For most vehicles, CPO coverage typically increases market value between $1,000 and $2,000. The final sale price may vary according to the vehicle's actual condition, popularity, type of warranty offered and local market conditions. In other words, it's the price you should expect a dealer to ask – not always the price you should pay.

## How Often Do You Update Your Used Car Values And Pricing?

We update or verify Trade-In Values, Private Party Values and the used car Fair Purchase Price at least once a week. However, an update doesn't necessarily mean that every vehicle will change in value. The values we provide are based on several factors including the current marketplace conditions and trends, which can vary widely.

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 134 of 598

## How Does Mileage Affect A Car's Price Or Value?

Kelley Blue Book employs a team of statisticians who analyze millions of transaction records to determine the typical mileage of a vehicle based on its age and time spent on the road. The typical mileage for a particular car changes regularly based on the data in our transaction records. If a vehicle's mileage is higher or lower than the typical mileage, we adjust its value up or down accordingly.

## Does Your Used Car Pricing Account For My Region?

Yes. Kelley Blue Book understands the importance of providing pricing that is geographically relevant to consumers and dealers. In order to better meet the needs of the industry, we produce values based on 134 geographic regions in the US. Each region is analyzed individually to reflect local pricing and local economic conditions.

## Do You Have Canadian Pricing?

Yes. Pricing and other info on KBB.com is specific to the U.S., but in 2020, Kelley Blue Book started providing data for the Canadian market. Canadian pricing will follow soon and will be adjusted for each province & territory to reflect local economic and market conditions. You can find KBB Canada at KBB.ca.

Remember that vehicles sold in Canada (and other countries) often differ from their U.S. counterparts in engine spec and optional equipment.

## Do You Have Pricing For Other Countries?

Pricing and other info on KBB.com is specific to the U.S., but Kelley Blue Book also operates websites specific to these other countries:

- Brazil – kbb.com.br
- Canada – kbb.ca

In addition, Kelley Blue Book data and valuations can be found on websites in these countries.

- Australia – kbb.com.au
- China – jingzhengu.com

Remember that vehicles sold in other countries may look the same as their U.S. counterparts, but often contain significant differences in engines, safety standards and optional equipment.

If you just want a general idea of pricing for a country where we don't offer values, you can look up a vehicle in our Western region – and, of course, convert from U.S. dollars to your country's currency. Use the ZIP code 92618. Keep in mind that since vehicles can vary significantly from country to country, it's tricky to

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 135 of 598

compare prices internationally.

As we continue to offer more global websites, we will pass the info on to you via KBB.com.

---

## Does Kelley Blue Book Provide Escrow Services For Vehicle Purchases Or Guarantee Online Vehicle Purchase Transactions?

No. Kelley Blue Book does not participate in new or used vehicle transactions. Read more about protecting yourself from online fraud. More

---

## I'm Not In The United States. Can I Still Get A Used Car Report?

Kelley Blue Book information is based on cars originally sold in the United States that are now being bought or sold in the United States. You can get a report, but you'll have to enter a U.S. ZIP code, since regional factors affect the values.

---

## Do You Still Sell The Printed Editions Of Kelley Blue Book?

No. For over 90 years, Kelley Blue Book published *Used Car Guides* providing values for used cars and trucks. For over 40 years, Kelley Blue Book published the *Motorcycle Guide,* but in 2017, we published our last printed book. These decisions are never easy.

The good news? If you need to get the value or your current car or are interested in what you should pay for your next car, you can still find 21 years of new and used car pricing right here on KBB.com.  In addition, we also offer values for motorcycles and ATVs.

If you would like to learn about other options to receive Kelley Blue Book® Values, or have any questions, please call KelleyKare at (800) 258-3266.

---

## What Do The Abbreviations On Your Site Mean?

(    ) – This bullet-symbol indicates the model(s) for which this line item is listed. Loosely, "Available for this price on…    LS, GS, etc."

( * ) – The asterisk is used as the wildcard symbol. It is a place holder to signify any missing character. For example, D*B means D(any letter here)B.

2D – Two Door

4D – Four Door

5D – Five Door

2WD – Two-Wheel Drive

4WD – Four-Wheel Drive

6-CYL – Six-Cylinder Engine

8-CYL – Eight-Cylinder Engine

ABS – Anti-lock Braking System

AWD – All-Wheel Drive

CID – Cubic Inches Displacement

CVT – Continuously Variable Transmission

DOHC – Dual Overhead Cam

DRW – Dual Rear Wheels

DSL – Diesel

EFI – Electronic Fuel Injection

FFV – Flexible Fuel Vehicles

GVWR – Gross Vehicle Weight Rating

HO – High Output Engine

HP Turbo – High Performance Turbo

LP – Low Pressure Engine

MFI – Mulitport Fuel Injection

MSRP – Manufacturer's Suggested Retail Price

N/A – listed in the description text means that the item is Not Available. There is usually text describing the circumstances.

N/A – listed in the pricing columns means that at this time the pricing information is Not Available.

N/C – means that there is No Charge for this item.

PFI – Port Fuel Injection

PIO – Port Installed Options

PZEV – Partial Zero Emissions Vehicle

SFI – Sequential Fuel Injection

SOHC – Single Overhead Cam

SPRCHG – Supercharged Engine

SRW – Single Rear Wheels

SULEV – Super Ultra-Low Emission Vehicle

TG – Turbo Gas (fuel type)

Turbo – Turbocharged Engine

ULEV – Ultra Low Emissions Vehicle

V – Valve

V6 – Six-Cylinder Engine

V8 – Eight-Cylinder Engine

VTEC – Variable Timing and lift Electronic Control system

## Contact Us

### Business Inquiries

b2b.kbb.com

**Mailing Address**

195 Technology, Irvine, CA 92618

Map

FAQ                                          Advertising

Contact Us                                   Media

Do Not Sell My Personal Information (CA Residents    Site Map
Only)

                                             KBB Brazil
About Us

                                             KBB Canada
Careers

Corporate

© 1995-2021 Kelley Blue Book Co.®, Inc. All rights reserved.

Copyrights & Trademarks   |   Terms of Service   |   Privacy Policy   |   Linking Policy   |   Ad Choices ▷

# Frequently Asked Questions

New Car     Used Car     **My Car's Value**     Instant Cash Offer     Motorcycle     Other Pricing

## My Car's Value

How can I get the value of my car on a past date?

How do I see the Blue Book® Value for my vehicle?

What are Trade-in Values?

What is the Trade-in Range?

What are Private Party Values?

What is the Kelley Blue Book® Instant Cash Offer?

How is an Instant Cash Offer different from Trade-in Range?

Is it better to trade in my car or sell it myself?

How do I determine what condition my current car is in?

My car has air conditioning, but it's broken; do I still check the box marked AC?

Can I sell my car on your site?

My car has a salvage title. How does that affect the value?

What about the value of equipment on my car that you don't have listed?

Why don't you value aftermarket equipment?

I purchased my car outside the US, but it is now registered here. What's the value of it?

I totaled my car. How will the insurance company determine what it was worth?

My car is more than 21 years old. How do I find its value?

Why doesn't Kelley Blue Book list trade-in values, private party values, or a used car Fair Purchase Price for Lotus, Ferrari, Bentley, etc.?

I bought a new car a few months ago and I would like to check its used value. When will it be listed?

What is the difference between the Trade-In Value I see on your site and the Blue Book® Lending Value?

## How Can I Get The Value Of My Car On A Past Date?

Occasionally we get a request for the value of a particular vehicle at a particular date in history. This request may be for litigation, estate planning, taxes, etc. The fee for a Valuation Certified Report is $35 per value. To request a Valuation Certified Report, please contact Customer Service at 1-800-258-2005, option 2. This service usually has a turnaround time of 3-5 business days. We usually send the Report via email, but we can also mail it if requested.

## How Do I See The Blue Book® Value For My Vehicle?

To get to the value for your car, navigate the path to the Blue Book Trade-In and Private Party Values:

- On the home page or under "Car Values" from the top navigation, select "My Car's Value".
- Tell us the year, make, model and mileage of the car you own (2015> Honda> Civic>30000 miles). Verify the ZIP code.
- Choose your car's category (sedan vs wagon) and style (DX, EX, LX). Note: Many vehicles only come in one category, but most vehicles are sold in more that one style, which some sites call "trim". Whatever you call it, these are pre-packaged levels of equipment – and they definitely affect the price or value of a car.
- Add any additional equipment or options (packages, alloy wheels, moon roof, premium sound, etc.)
- Choose what you're most likely to do – Trade In to a Dealer or Sell to a Private Party.
- Tell us the car's condition (Excellent, Very Good, Good, or Fair) or, if you're not sure, take the Condition Quiz. Most cars we see are in "Good" condition.
- View the Blue Book Value based on your ZIP code and your car's age, mileage, equipment, and condition.

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 140 of 598

## What Are Trade-In Values?

Trade-In Value is what you can expect to receive for your current car when trading it in at a dealer, assuming you've chosen the accurate condition. (Most people overestimate the condition of their car. As a reference, most of the cars we see are in "Good" Condition.) The Trade-in Value presupposes that you're buying another vehicle from the same dealership. The Trade-in Value will be less than the Private Party Value because the reselling dealer has to pay to recondition the car, perform safety inspections and incur other costs of doing business.

## What Is The Trade-In Range?

The Trade-in Range is an estimate of what you can reasonably expect to receive for a vehicle with the miles and options you specify, when trading in the car at a dealer. It generally presumes that you will buy another car from the same dealer.

## What Are Private Party Values?

Private Party Value is what a buyer can expect to pay when buying a used car from a private party. It may also represent the value you might expect to receive when selling your own used car to another private party. The Private Party Value assumes the vehicle is sold "As Is" and carries no warranty (other than the continuing factory warranty, if any). The final sale price may vary depending on the vehicle's actual condition and local market conditions. This value may also be used to derive the vehicle's value for insurance and vehicle donation purposes.

## What Is The Kelley Blue Book® Instant Cash Offer?

The Kelley Blue Book® Instant Cash Offer is a real offer for a specific amount to purchase a consumer's car or apply the amount toward another car. The Offer is valid for 3 days (not counting Sundays) and can be immediately redeemed during business hours at any Participating Dealer, pending inspection. It is based on specific elements of the consumer's car, like installed options, specific condition (such as dents and mechanical issues) and local market demand.

## How Is An Instant Cash Offer Different From Trade-In Range?

The Kelley Blue Book® Instant Cash Offer is:
● A fixed offer applied toward your next car purchase or used to sell your current car to a Participating Dealer (pending inspection)
● Valid for 3 days (not counting Sundays)
● Based on specific details related to the condition and features of your car, like installed options, dents, mechanical issues, and local market demand

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 141 of 598

DJA0293

The Kelley Blue Book® Trade-In Value is:

● An estimated trade-in value used toward the purchase of another car only

● Updated weekly

● Applied to similar cars of the same year, make, model, style and general condition

● The general value Kelley Blue Book estimates consumers can expect to negotiate this week based on the style, condition, mileage and options of the vehicle when they trade it in to a dealer, however every dealer is different and values are not guaranteed

## Is It Better To Trade In My Car Or Sell It Myself?

This is a question of personal preference. When you trade a car in, the dealer must then absorb the cost of making the vehicle ready for sale, reconditioning, advertising, sales commissions, arranging financing and insurance and standing behind the vehicle for any mechanical or safety problems. You may get more for your car if you sell it yourself, but you need to consider the value of your time, the aggravation of performing at least some of the above tasks to get the vehicle into a suitable resale condition and the liability of making appointments and giving a test drive. See more about Selling vs. Trading in our Advice Section.

## How Do I Determine What Condition My Current Car Is In?

We know you're not an expert, but you also know your car best. Just be as honest with yourself as possible. Most people tend to overestimate the condition of their car. To help out, we post the percentage of vehicles we value that match each condition. For example, if only 3% of the vehicles in the market are considered "Excellent" condition, chances are that your car isn't one of them. If you aren't sure, take our condition quiz.

## My Car Has Air Conditioning, But It's Broken; Do I Still Check The Box Marked AC?

Yes. But in fairness, you would need to deduct the cost to repair the broken equipment from the total vehicle price. There is one exception: when the cost of the repair is higher than the value of the broken item, it's best not to include that item in the list of optional equipment.

## Can I Sell My Car On Your Site?

Yes. As private party, you've got the same opportunity as a dealership: to reach millions of serious car shoppers with a listing on KBB.com and Autotrader. To create, purchase and post your car's classified ad, get started here.

## My Car Has A Salvage Title. How Does That Affect The Value?

A salvaged, reconstructed or otherwise "clouded" title has a permanent negative effect on the value of a

vehicle. The industry rule of thumb is to deduct 20% to 40% of the Blue Book® Value, but salvage title vehicles really should be privately appraised on a case-by-case basis in order to determine their market value.

## What About The Value Of Equipment On My Car That You Don't Have Listed?

There are some options (e.g., rims, alarm systems, heated seats, trip computers) that are not addressed on our site. Most of these are dealer-installed or aftermarket. These items don't have a consistent or reportable added value in the used marketplace. That is not to say that such options are worthless as they may make your vehicle more marketable against similar models; however we do not address options when there is not a consistent value to report.

## Why Don't You Value Aftermarket Equipment?

This can be confusing for a lot of people: "Why do you show a luggage rack as optional, but not the ski rack I installed myself?" We only value items which are either factory-installed or "factory quality." There is a tremendous variation in something like rims, so it would be impossible to list – and report values for – all the different options. Space does not allow us to identify the vast variety of aftermarket items.

## I Purchased My Car Outside The US, But It Is Now Registered Here. What's The Value Of It?

The values you see on KBB.com only apply to vehicles sold in the United States, but we do maintain sites in Canada and Brazil to supply the values for those markets. Cars imported through sources other than factory authorized distributors are considered gray market vehicles and may have substantially lower used car values because the conversion to U.S. specification is performed by aftermarket companies, not the factory. Kelley Blue Book does not address gray market vehicles; therefore yours may have to be privately appraised.

## I Totaled My Car. How Will The Insurance Company Determine What It Was Worth?

Policies vary quite a bit, but generally, insurance adjusters try to determine the value for a vehicle that has been totaled as somewhere between Wholesale and Retail. They may also research comparable vehicles that have sold in your area to help determine a fair price. You could average the Trade-In Value with the Typical Listing Price of your vehicle and use the resulting value as a reference point for determining the vehicle's value. Please note that insurance companies do not have any obligation to use Kelley Blue Book pricing to determine replacement values. Insurance companies use Kelley Blue Book as a reference but will set their own policies as to which values they use.

DJA0295

## My Car Is More Than 21 Years Old. How Do I Find Its Value?

Kelley Blue Book provides values for used vehicles up to 21 years old. Transactions for older vehicles are too rare, therefore we don't have enough data to analyze and are unable to report values for them. If you have questions, please contact our Customer Service Department at 1-800-258-2005, option 2.

## Why Doesn't Kelley Blue Book List Trade-In Values, Private Party Values, Or A Used Car Fair Purchase Price For Lotus, Ferrari, Bentley, Etc.?

Kelley Blue Book reports vehicle values by analyzing actual transactions in the market. We do not believe in using arbitrary formulas to predict prices because our promise is to report dependable values, not set prices. Kelley Blue Book does not currently offer certain values for these exotics or low-volume vehicles since they are seldom seen in the market and can vary widely in value. Low-volume and exotic vehicles should be privately appraised to establish a trade-in or private party value.

## I Bought A New Car A Few Months Ago And I Would Like To Check Its Used Value. When Will It Be Listed?

Kelley Blue Book reports vehicle values by analyzing actual transactions in the market. We do not believe in using arbitrary formulas to predict prices because our promise is to report dependable values, not set prices. It can be difficult to establish used values on newer vehicles if we have not seen enough transactions in the required amount of different markets to establish dependable values on these vehicles.

## What Is The Difference Between The Trade-In Value I See On Your Site And The Blue Book® Lending Value?

The Trade-In Value on our site supposes that the vehicle is in fair, good, very good or excellent condition and is taken in by the dealer AS IS. The Blue Book® Lending Value, which is intended for use by the wholesale industry, factors in the Trade-In Value of the vehicle plus the cost associated with reconditioning the vehicle to the manufacturer's specifications and performing all required safety checks to make it ready for sale. In other words, while Trade-In Values vary depending on the condition of the vehicle, Blue Book Lending Values

## Contact Us

**Business Inquiries**
b2b.kbb.com

**Mailing Address**
195 Technology, Irvine, CA 92618
Map

FAQ                                          Advertising

Contact Us                                   Media

Do Not Sell My Personal Information (CA Residents    Site Map
Only)

                                             KBB Brazil
About Us

                                             KBB Canada
Careers

Corporate

© 1995-2021 Kelley Blue Book Co.®, Inc. All rights reserved.

Copyrights & Trademarks   |   Terms of Service   |   Privacy Policy   |   Linking Policy   |   Ad Choices ▷

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 145 of 598

TAB 32     DJA0297

# J.D. POWER



Did you know J.D. Power's industry-leading valuations data drives NADAguides.com? Learn more

# NADAguides FAQ

Search NADAguides FAQ by keyword

**Search**

**Popular Topics**

JDP

Boats

Car Options

Certified Vehicles (CPO)

Classic Cars

CONNECT

Electric Vehicles

Finance and Insurance

Kelley Blue Book

Manufactured Home Value Reports

Mileage

NADA

NADAguides.com

Print Guidebooks/Priceguides

Private Party Sales

RVs

Technical Questions

  Values and Pricing

VIN Numbers

## NADAguides Frequently Asked Questions

### Values and Pricing

What is considered when appraising a vehicle?

Are the values shown in U.S. or Canadian funds?

Where can I find values for a vehicle that is being imported from another country?

How do I obtain an archive (historical) value from a previous month or year?

Do you provide values for Kit or Replica Cars?

When will NADAguides.com have 2021 used vehicle values?

Are the used car values on the website based on actual sales? And is the clean retail price a typical dealer asking price or a final selling price? Do the used car values on your website include sales tax and destination charges?

What exactly does wholesale value mean and does NADAguides provide this value for used vehicles?

What would cause the value of a vehicle to go up over time rather than decrease?

Why can't I find a value for my special edition vehicle that was imported to the United States?

If a dealer is using "auction" values as a trade-in value benchmark instead of NADAguides.com values online, how do I know what a fair price for my vehicle would be to trade-in to a dealer?

Does or will NADAguides provide any values for converted electric vehicles in the used car category?

Does NADAguides use a depreciation schedule to determine depreciation percentage rate per year?

Vehicle book value: Cars, Motorcycles, RVs & Boats -- what are the basics of values?

How do I value a salvage title?

What are the definitions for the valuations listed for Autos, RVs, Boats, Motorcycles and Classic Cars?

What is included within the price when adding the Snow Plow Pkg. /Plow option?

Does NADAguides provide values of vehicles that have been in a collision and repaired?

How does NADAguides value a vehicle?

<u>Is the clean retail value just the value of the car or does it include dealer fees?</u>

<u>Do all vehicles automatically drop in value when a new model year is released in September?</u>

<u>Why is my vehicle value on the site far below sale prices in my area?</u>

<u>Does NADAguides value rebuilt or replaced components?</u>

<u>Does the MSRP price of a vehicle include the listed cost of the vehicles engine?</u>

<u>I have extremely low mileage on my older model year vehicle. Why do your values seem so low?</u>

## What is considered when appraising a vehicle?

NADAguides collects data from more than 1.5 million vehicle transactions each month. That's more data than any other provider. Our longstanding alliances with a range of top industry sources, manufacturers and dealers make it possible.

The NADAguides database grows every day with these inputs, plus others:
- Auction transactions
- Retail sales data
- Asking prices from classified listing sites

NADAguides has a strong history of collecting the most comprehensive industry data whether it be automotive, RV, motorcycle, boats, etc. Because we've been gathering it for so long, we've built the industry's most robust data archive. This information forms the foundation for the NADAguides values. Our team leverages the latest technology, deep knowledge of each segment's market, statistics, analytics and econometrics to derive our values.

We continually build on our inputs, knowledge and process in order to provide the best insight - and the best value to your business.

## Are the values shown in U.S. or Canadian funds?

All values shown are in U.S. funds. Our analysts review sales transaction data for publishing U.S. values only. We do not have any relationships with any data sources in Canada and the support for valuing Canadian business transactions is minimal. The size of the country and the volume created in the country is fairly small.

## Where can I find values for a vehicle that is being imported from another country?

Countries outside of the United States do not collect vehicle sales data like we do which makes it difficult to provide values for these types of situations. Without data on transactions, values would not be accurate and merely just speculation. We DO export guidebooks to distributors but we are not aware of how they are being used on their end.

## How do I obtain an archive (historical) value from a previous month or year?

NADAguides has an extensive reference library, and it offers archive values for automobiles, classic cars, powersports (motorcycles, ATVs, personal watercraft, and snowmobiles), manufactured homes, boats, and recreation vehicles. The fee for this service is $100.00 per

DJA0300

archive value, and it must be prepaid.

Provided we have the necessary information in our reference library to complete your archive value request, processing time is within two business days. Archive values will be sent to you via email, fax, or mail.

If you are interested in obtaining an archive value, please email your request to information@nadaguides.com.

**Do you provide values for Kit or Replica Cars?**

No. Due to variations in building standards and quality, we do not list values on Kit or Replica Cars.

**When will NADAguides.com have 2021 used vehicle values?**

Vehicle values are developed by NADAguides market/data analysts, based on many sources of information including reports of actual transactions. In order to determine a value for any given vehicle, there must be enough used sales transactions in the marketplace. Vehicles and vehicle options are valued throughout the year, as information becomes available.

**Are the used car values on the website based on actual sales? And is the clean retail price a typical dealer asking price or a final selling price? Do the used car values on your website include sales tax and destination charges?**

The data is the guide value for the vehicle itself. The data sources used to determine the used car values are actual auction and retail sales transactions, asking price information, as well as numerous macro- and micro-economic factors. These sources are reviewed by our editors every month. No the prices do not include taxes because sales tax varies in each state. However, NADAguides publishes regional values for use by dealers, lenders, insurance companies and taxing authorities. We also provide these same values for consumers on the website without any regionalization. Keep in mind there could be a few hundred dollars difference between the National and Regional values. Also remember that when purchasing a vehicle there are origination and DOC fees with the lender. These costs refer to the cost involved for titling, registration, and all the paperwork filed on behalf of buyers in their particular state by a dealership. Most states regulate the DOC fees that a dealer is allowed to charge. There is usually a maximum amount, but dealers can charge anything up to that amount. The charge is uniform, meaning it is on all deals. In some states dealers have to post the amount charged, usually in their Finance Office where customers sign their paperwork. Destination Charges must be added to the Base Invoice and Base MSRP (Manufacturer's Suggested Retail Price) in order to get the final price; these are not included in our values.

**What exactly does wholesale value mean and does NADAguides provide this value for used vehicles?**

Wholesale refers to the price a dealer would pay for a vehicle at an auction or from another dealer who is selling a vehicle. NADAguides does not publish a wholesale value; we simply publish three trade-in values that reflect a number close to the referenced wholesale value. Wholesale value vehicles still need to be reconditioned and in most cases, transported to the purchasing dealer's location.

**What would cause the value of a vehicle to go up over time rather than decrease?**

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 149 of 598

DJA0301

When there is a significant decline in new vehicle sales, the market has far fewer trade-ins. Programs such as the Cash for Clunkers program can remove a large block of vehicles that possibly would have re-sold. Rental car companies may keep their fleets in service longer, which also causes a shortage in used car supply resulting in a strong demand. Until new car volume returns to about 14 million, you will continue to see some upward pressure on some segments. Another contributing factor could be that your state has a higher tax rate per $100.00 of value. With dealers and private parties looking to purchase used vehicles and the supply limited, prices in most segments have increased.

## Why can't I find a value for my special edition vehicle that was imported to the United States?

Vehicle values are determined by NADAguides analysts through careful review and analysis of vehicle auction and retail sales transactions. Special edition vehicles typically have limited production runs producing a small quantity of units which may limit the transactional data available to NADAguides. NADAguides will only value the most popular options, equipment, and vehicles and will not make any attempt to track or value the special edition option as a result of low production numbers and insufficient amounts of data. Another issue is that the editors review data by vehicle VIN and if the vehicle you are searching does not have a unique VIN, the results cannot be tracked. Without sufficient supporting data, an accurate value cannot be determined. If you do find a value for your vehicle, please keep in mind that this value is pure speculation.

## If a dealer is using "auction" values as a trade-in value benchmark instead of NADAguides.com values online, how do I know what a fair price for my vehicle would be to trade-in to a dealer?

Auction values are a tool that some dealers use when accessing their value of a particular vehicle. At times, dealers do send vehicles they have taken in on trade to auctions and some dealers may refer to auction values because of this. Regardless, we recommend using the trade-in and retail pricing found on NADAguides.com to guide your vehicle valuation. The values provided on NADAguides.com take into consideration the mileage, vehicle condition and optional equipment of your specific trade-in vehicle. If the trade-in vehicle has been well maintained, the NADAguides.com trade-in values will be close to those prices happening at auction. Market supply can also be a factor. If there is a low demand for your particular vehicle in your area, a dealer will have to debate holding this vehicle longer to sell if the supply is greater than the current market demand.

Auction values are a part of the evaluation equation and auction transactional data factors heavily into the values found on NADAguides.com. These values reflect averages, so vehicles will be both purchased and sold for more and less than the guide numbers.

There are also a great number of alternative dealers you may want to visit in your area when considering trading-in your vehicle.

## Does or will NADAguides provide any values for converted electric vehicles in the used car category?

At this point in time NADAguides has no plans on valuing converted electric vehicles. NADAguides analysts will value <u>electric vehicles</u> (Leaf, Focus, etc.) that are sold through traditional franchised dealers.

**Does NADAguides use a depreciation schedule to determine depreciation percentage rate per year?**

NADAguides does not use a depreciation schedule to determine the value of used vehicles. We use auction data, retail data, asking price data, as well as macro- and micro- economic factors and judgment among other things in an attempt to depict the used vehicle market. Used vehicles depreciate at different rates, which is why we do not use a standard depreciation percentage rate across all vehicles.

**Vehicle book value: Cars, Motorcycles, RVs & Boats -- what are the basics of values?**

No matter what type of vehicle you own, it can be pretty difficult knowing your vehicle's value. Vehicle values, especially car values, depreciate over time (with the exception of classic and vintage cars). Review and research your used car values on NADAguides.com for accurate data and pricing. You can find both new and used motorcycle prices and values in addition to boat values, and RV Values.

Whatever your vehicle type, owners should maintain the vehicle's condition to **retain as much value as possible**. Two different vehicles of the same model may have drastically varying prices depending on options, mileage, and overall condition. Generally speaking, the more miles a vehicle has the less it is worth. This is strictly because the more the vehicle has been used, the closer it is to the end of its life span. This theory applies to vehicle options as well.

The more optional equipment a vehicle has, the higher the net book value of that vehicle will be. It is important to note that these must be options installed by the manufacturer. To maximize resale value, make sure the exterior, interior, and mechanics of your vehicle are in excellent condition. Mechanically speaking, to ensure top dollar, all components should be fully functional. Additionally, the vehicle should be able to pass any and all state smog/vehicle inspection requirements. The vehicle should also be free of rust, which is a major catalyst of structural damage. Exterior elements should be free of scratches, dents, and other damage. Original paint and color that is not faded is also an exterior factor that should be taken under consideration. The vehicle's interior should be void of any smoke/water damage, stains, or other physical damage to interior materials. **Keeping your vehicle in tip-top shape will equate to a vehicle's higher resale value.**

**How do I value a salvage title?**

NADAguides' values assume a vehicle is clean. Appropriate deductions should be made for reconditioning costs incurred to put the vehicle in salable condition. NADAguides' editors have not attempted to determine what, if any, effect a salvage title may have on a vehicle's value.

**What are the definitions for the valuations listed for Autos, RVs, Boats, Motorcycles and Classic Cars?**

**Automotive pricing and values for new and used cars**

Invoice: The dealership's cost for a vehicle from the manufacturer including holdback and advertising costs. Invoice price does not include dealer installed equipment and destination charges.

MSRP: MSRP is the base Manufacturer's Suggested Retail Price at the time of introduction, including standard equipment only and excludes taxes, transportation and destination.

DJA0303

<u>Rough trade-in:</u> Rough Trade-In values reflect a vehicle in rough condition, meaning a vehicle with significant mechanical defects requiring repairs in order to restore reasonable running condition. Paint, body and wheel surfaces have considerable damage to their finish, which may include dull or faded (oxidized) paint, small to medium size dents, frame damage, rust or obvious signs of previous repairs. Interior reflects above average wear with inoperable equipment, damaged or missing trim and heavily soiled/permanent imperfections on the headliner, carpet, and upholstery. Vehicle may have a branded title and un-true mileage. Vehicle will need substantial reconditioning and repair to be made ready for resale. Some existing issues may be difficult to restore. Because individual vehicle condition varies greatly, users of NADAguides.com may need to make independent adjustments for actual vehicle condition.

<u>Average trade-in:</u> The Average Trade-In values on nadaguides.com are meant to reflect a vehicle in average condition. A vehicle that is mechanically sound but may require some repairs/servicing to pass all necessary inspections; Paint, body and wheel surfaces have moderate imperfections and an average finish and shine which can be improved with restorative repair; Interior reflects some soiling and wear in relation to vehicle age, with all equipment operable or requiring minimal effort to make operable; Clean title history; Vehicle will need a fair degree of reconditioning to be made ready for resale. Because individual vehicle condition varies greatly, users of nadaguides.com may need to make independent adjustments for actual vehicle condition.

<u>Clean trade-in:</u> Clean Trade-In values reflect a vehicle in clean condition. This means a vehicle with no mechanical defects and passes all necessary inspections with ease. Paint, body and wheels have minor surface scratching with a high gloss finish and shine. Interior reflects minimal soiling and wear with all equipment in complete working order. Vehicle has a clean title history. Vehicle will need minimal reconditioning to be made ready for resale. Because individual vehicle condition varies greatly, users of NADAguides.com may need to make independent adjustments for actual vehicle condition.

<u>Clean retail:</u> Clean Retail values reflect a vehicle in clean condition. This means a vehicle with no mechanical defects and passes all necessary inspections with ease. Paint, body and wheels have minor surface scratching with a high gloss finish and shine. Interior reflects minimal soiling and wear with all equipment in complete working order. Vehicle has a clean title history. Because individual vehicle condition varies greatly, users of NADAguides.com may need to make independent adjustments for actual vehicle condition.

**Note:** Vehicles with low mileage that are in exceptionally good condition and/or include a manufacturer certification can be worth a significantly higher value than the Clean Retail price shown.


**Boat pricing and values for new and used boats**

<u>MSRP:</u> MSRP is the base Manufacturer's Suggested Retail Price at the time of introduction, including standard equipment only and excludes taxes, transportation and destination.

<u>Suggested List Price:</u> We have included manufacturer's suggested retail pricing (MSRP) to assist in the financing, insuring and appraising of vessels. The MSRP is the manufacturer's and/or distributor's highest suggested retail price in the U.S.A. when the unit was new. The MSRP is refurbished by the manufacturer and/or distributor and are assumed to be correct. Unless indicated, the MSRP does not include destination charges, dealer set-up, state or local taxes, license tags or insurance.

DJA0304

<u>Low Retail:</u> A low retail valued boat will show excessive wear and tear either cosmetically and/or mechanically. This boat may or may not be in running order. The buyer can expect to invest in cosmetic and/or mechanical work. Low retail vessels are usually not found on a dealer's lot. **Low Retail is not a trade-in value.**

<u>Average Retail:</u> An average retail valued boat should be in a good condition with no visible damage or defects. This boat will show moderate wear and tear and will be in sound running condition. The buyer may need to invest in either minor cosmetic or mechanical work.

**Classic Car pricing and values for new and used classic cars**

<u>Original MSRP:</u> Manufacturer Suggested Retail Price

<u>Low Retail:</u> This vehicle would be in mechanically functional condition, needing only minor reconditioning. The exterior paint, trim and interior would show normal wear, needing only minor reconditioning. May also be a deteriorated restoration or a very poor amateur restoration. Mostly usable "as-is". This column does **not** represent a "parts car" or a non-running vehicle.

**Note: Some of the vehicles in this publication could be considered "Daily Drivers" and are not valued as a classic vehicle. When determining a value for a daily driver, it is recommended that the subscriber use the low retail value.**

<u>Average Retail:</u> This vehicle would be in good condition overall. It could be an older restoration or a well-maintained original vehicle. Completely operable. The exterior paint, trim and mechanics are presentable and serviceable inside and out. A "20-footer".

<u>High Retail:</u> This vehicle would be in excellent condition overall. It could be a completely restored or an extremely well-maintained original vehicle showing very minimal wear. The exterior paint, trim and mechanics are not in need of reconditioning. The interior would be in excellent condition. Some vehicles may be considered "matching numbers" vehicles.

**Note:** This column does **not** represent a "100 Point" or "# 1" vehicle*.

* A "100 Point" or "# 1" vehicle is not driven. It would generally be in a museum or transported in an enclosed trailer to concours judging and car shows. This type of car would be stored in a climate regulated facility.

**Motorcycle pricing and values for new and used motorcycles**

<u>MSRP:</u> MSRP is the base Manufacturer's Suggested Retail Price at the time of introduction, including standard equipment only and excludes taxes, transportation and destination.

<u>Suggested List Price:</u> The manufacturer's (distributors) highest suggested list price in the U.S.A. when the unit was new. Unless indicated, the suggested list price does not include destination charges, dealer set-up, state or local taxes, license tags or insurance.

<u>Low Retail:</u> A low retail unit may have extensive wear and tear. Body parts may have dents and blemishes. The buyer can expect to invest in cosmetic and/or mechanical work. This vehicle should be in safe running order. Low retail vehicles usually are not found on dealer lots. **Low Retail is not a trade-in value.**

<u>Average Retail:</u> An average retail unit should be clean without obvious defects. All rubber and cables should be in good condition. The paint should match and have a good finish. All lights and switches should work properly. The mileage should be within or slightly higher than the average range. This unit should also pass any emission inspection.

DJA0305

**RV pricing and values for new and used RVs**

<u>MSRP:</u> MSRP is the base Manufacturer's Suggested Retail Price at the time of introduction, including standard equipment only and excludes taxes, transportation and destination.

<u>Suggested List Price:</u> The value listed reflects the approximate price of the unit when it is brand new. The prices listed are furnished by the manufacturer and are assumed to be correct. The list price does not include freight charges.

<u>Low Retail:</u> A low retail unit may have extensive wear and tear. Body parts may have dents and blemishes. The buyer can expect to invest in cosmetic and/or mechanical work. This vehicle should be in safe running order. Low retail vehicles usually are not found on dealer lots. **Low Retail is not a trade-in value.**

<u>Average Retail:</u> An average retail vehicle should be clean and without glaring defects. Tires and glass should be in good condition. The pain should match and have a good finish. The interior should have wear in relation to the age of the vehicle. Carpet and seat upholstery should be clean, and all power options should work. The mileage should be within the acceptable range for the model year. An average Retail vehicle on a dealer lot may include a limited warranty or guarantee, and possibly a current safety and/or emission inspection (where applicable).

**What is included within the price when adding the Snow Plow Pkg. /Plow option?**

Our intent for this option is to value not only the preparation for the snow plow (the extra brackets, lights, controls, etc.) but the actual snow plow that would be capable of moving large amounts of snow.

**Does NADAguides provide values of vehicles that have been in a collision and repaired?**

It is very difficult, if not impossible, to determine diminished value from an accident and as a result, NADAguides makes no attempt to take a stand on diminished value. Any aspect of the vehicle's history can have an effect on the value of a vehicle; and, the vehicle's history and condition should be considered when determining a vehicle's value. Since the actual condition and history of an individual vehicles varies greatly, users of NADAguides values may need to make independent adjustments for a variety of reasons not specifically accounted for by NADAguides.

**How does NADAguides value a vehicle?**

When we attempt to value a used vehicle we use a number of data points. These data points include, but are not limited to, actual wholesale transactions (around 80% of the market with our relationship with NAAA) and retail transactions (through our relationship with J.D. Power and their PIN data which is obtained their actual Dealer Management Systems), as well as asking price information from www.autotrader.com. In addition, we have data from various OEMs and wholesalers and retailers of used vehicles that provide us the amounts for which they paid and sold their vehicles. We also take into consideration MSRP, invoice, equipment assumptions, as well as supply and demand and other macro- and micro-economic factors and the competitive landscape of vehicles. Our retail value is what a person could reasonably pay for a vehicle at a dealer's lot. Our values are designed and intended to assist users in performing their own valuation of a particular used vehicle. The process by which users of NADAguides determine valuation is inherently subjective. Individual vehicles may have an actual value that is higher or lower than the estimated values created by us. NADA has been around for over 80 years and is the premier valuation guide in the used vehicle industry. Customers include, but are not limited to: dealers, wholesalers, rental car companies, insurance companies, lending institutions, OEMs,

DJA0306

government agencies, as well as individual consumers. We attempt to create the most accurate, market-reflective, unbiased vehicle values and we believe we do so each and every time one of our products is presented to the outside world.

**Is the clean retail value just the value of the car or does it include dealer fees?**

Our retail value is what a person could reasonably pay for a vehicle at a dealer's lot. It does not include sales tax, and destination charges are only used for new vehicle purchases and would not come into play for a used value.

**Do all vehicles automatically drop in value when a new model year is released in September?**

September is historically the month when new models become available for sale, but it does not mean that a vehicle automatically drops in value. There are quite a few factors that begin at this time of year that put pressure on used vehicle values with the introduction of the new model year being one. For instance, many fleet companies sell their old vehicles in earnest at this time of year in preparation for the new model year vehicles and a decreased demand for their vehicles. This is especially true of rental car companies. Traditionally this is also the time of year when retail demand for used vehicles drops as many people are preparing for the fall and winter seasons. Some 4WD trucks may rise in value, but it is highly unlikely that a regular sedan would until the spring when retail demand rises quickly. Manufacturers also usually discount the old model year vehicles which often creates at least temporary pressure on used values. We assume a vehicle is constantly aging and gaining mileage, and historically September through December are the months when used values drop the most, but as stated, it isn't fully caused by the introduction of the new model year.

**Why is my vehicle value on the site far below sale prices in my area?**

Individual vehicles may have an actual value that is higher or lower than the estimated values created by NADAguides. We use sales from around the country and adjust our values on a regular basis.

**Does NADAguides value rebuilt or replaced components?**

NADAguides makes no attempt to distinguish between vehicles that have rebuilt and or replaced components and those that do not. Any aspect of the vehicle's history may have an effect on the value of a vehicle. Vehicle history and condition should be considered when determining a vehicle's value. Since the actual condition and history of individual vehicles varies greatly users of NADAguides values may need to make independent adjustments for a variety of reasons not specifically accounted for by NADAguides including mileage discrepancies with the odometer and the title.

**Does the MSRP price of a vehicle include the listed cost of the vehicles engine?**

The MSRP on a new vehicle includes the base engine for a vehicle and then allows for additional options, in this case a different engine, to be added.

**I have extremely low mileage on my older model year vehicle. Why do your values seem so low?**

The NADAguides value is an attempt to value the daily-driven vehicle, not the quasi-collectible you possess.

Back to Top

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 155 of 598

DJA0307

© 2021 J.D. Power. All rights reserved. ® A registered trademark of the National Automobile Dealers Association, under license to J.D. Power.

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 156 of 598

TAB 33

# J.D. POWER



Did you know J.D. Power's industry-leading valuations data drives NADAguides.com? Learn more

# NADAguides FAQ

Search NADAguides FAQ by keyword

**Search**

**Popular Topics**

JDP

Boats

Car Options

Certified Vehicles (CPO)

Classic Cars

CONNECT

Electric Vehicles

Finance and Insurance

Kelley Blue Book

Manufactured Home Value Reports

Mileage

NADA

NADAguides.com

Print Guidebooks/Priceguides

Private Party Sales

RVs

Technical Questions

Values and Pricing

VIN Numbers

## NADAguides Frequently Asked Questions

### Finance and Insurance

How does the insurance company use your values to value my car?

Are there any values that reflect a car's worth after being repaired from an accident?

Is there any way to figure out the value of a vehicle based upon a special circumstance such as having "theft recovery" on the title?

My new car has been totaled and I feel that the adjustor may have valued my vehicle too low, what can I do?

What is a clear title or record mean? If my car has been in an accident, does this mean my car is salvaged?

Where can I find a loan value for used cars?

Would the branding of "fleet" or "taxicab" negatively affect the pricing of a vehicle?

### How does the insurance company use your values to value my car?

Sometimes insurance companies will use an outside source to help determine a value of a used vehicle such as Mitchell International, CCC or Audatex. Some insurance companies will use NADAguides in a total loss process. In this instance, they typically start with the clean retail value and then deduct for the condition of your vehicle before the total loss. That value less any deductible and depreciation will be your settlement. They use our mileage tables and will give you added value for miles less than average for your vehicle.

### Are there any values that reflect a car's worth after being repaired from an accident?

There is no data to support a precise value loss for damage. Because those types of values are not available, NADAguides does not recognize a diminished value. The loss from damage depends on the severity of the damage repair, how good the repairs look, the age of the vehicle repaired and its class. Class means that a more expensive car when new will be affected more with damage than a lesser priced new vehicle. Damage on a Mercedes has a greater affect, than the same damage on a Chevrolet Lumina. It is always a good idea to take the car to a trusted body shop and ask their opinion, as well as your insurance company. Once you receive their input you can deduct an amount both agree on from an NADAguides value.

### Is there any way to figure out the value of a vehicle based upon a special circumstance such as having "theft recovery" on the title?

If you are able to run a vehicle history report, you might be able to learn a little more about the vehicle's history. Keep in mind that the newer the vehicle and the more expensive when new, the greater the effect of any damage. Make sure to ask the current owner to see the repair estimate or bill, that way you can see how the theft affects what had to be done.

### My new car has been totaled and I feel that the adjustor may have valued my vehicle too low, what can I do?

The best place to start would be the window sticker if you still have it; this is your best discussion point with your adjustor. If you did not purchase the car brand new, most

DJA0310

manufacturers can reproduce the original window label electronically. If you cannot obtain the window sticker at all, search for similar vehicles for sale. This can help you and the adjustor reach a fair settlement price.

## What is a clear title or record mean? If my car has been in an accident, does this mean my car is salvaged?

Clear title does not have anything to do with damage on a vehicle. Clear title means there are no liens against the vehicle and nothing is owed on it. When you finance a vehicle, you get what is called a memo title and your lender keeps the original title and files, with the court, and a lien on the vehicle allowing the lender the right to resell the vehicle if you default. When you make the final loan payment the lien is cancelled, you receive a clear title. A "total loss salvaged vehicle" is a vehicle that has been wrecked, destroyed or damaged to an extent that the registered owner, leasing company, financial institution or insurance company which insured the vehicle, considers it uneconomical to repair the vehicle and because of this, the vehicle is not repaired for the vehicle owner at the time of the event resulting in damage. Normally, this type of vehicle cannot be sold or transferred without first obtaining a Salvaged Title. Due to the many different ways a vehicle can be issued a salvaged title, we cannot determine an amount or percentage to deduct from a value. A vehicle can be stolen and recovered with no damage at all, but it would be given a salvaged title nonetheless. Because of this, questions should be directed to the registered owner, leasing company or financial institution. If you have questions, it's a good idea to check the history of a vehicle. A Vehicle History Report can confirm a clean history or reveal potentially hidden problems.

## Where can I find a loan value for used cars?

NADAguides.com does not provide vehicle Loan Values online. Lenders look at values and advances differently and they factor in the credit worthiness of the consumer as well. The loan value is an approximation of what a dealer might expect as an advance from a lender. This value is important in the secondary finance markets for customers with lower credit scores. The competitiveness of the market will also play a part in a lender's decision on floor plan.

## Would the branding of "fleet" or "taxicab" negatively affect the pricing of a vehicle?

It has been our experience that a brand of taxicab would negatively affect the value of a vehicle versus a non-taxicab. That dollar difference would depend on a number of issues including the type, age, and value of the vehicle population as a whole. For example, a ten year old Ford Crown Victoria taxicab would most likely not be as affected as a two year old Mercedes-Benz R Class versus their cohorts in the vehicle population. This would be despite the fact that both are used in taxicab fleets. That being said, we do not make an attempt to quantify that difference as a general rule. We could isolate all factors for each vehicle to determine what the impact would be, but the market for that kind of intelligence is just not cost-worthy for us to do. However, vehicle condition and history should be considered when determining a vehicle's value. Since the actual condition of individual vehicles varies greatly, users of NADAguides may need to make independent adjustments for a variety of condition-based factors not specifically accounted for by NADAguides.

Back to Top

© 2021 J.D. Power. All rights reserved. ® A registered trademark of the National Automobile Dealers Association, under license to J.D. Power.

TAB 34
Report on Market Conduct Examination of the USAA..., 2011 WL 2470920...

DJA0311

2011 WL 2470920

State of North Carolina

**\*1**  Report on Market Conduct Examination of the

USAA Casualty Insurance Company

San Antonio, Texas

January 14, 2011

MARKET CONDUCT REPORTS

North Carolina Department of Insurance

 Image 1 within document in PDF format.

Report

<u>TABLE OF CONTENTS</u>

SALUTATION
FOREWORD
SCOPE OF EXAMINATION
EXECUTIVE SUMMARY
COMPANY OVERVIEW
History and Profile
Company Operations and Management
Certificates of Authority
Disaster Recovery Procedures
Rate Evasion Procedures
POLICYHOLDER TREATMENT
Consumer Complaints
Privacy of Financial and Health Information
MARKETING
Policy Forms and Filings
Sales and Advertising
Producer Licensing
Agency Management
UNDERWRITING PRACTICES
Overview
Private Passenger Automobile
Homeowners/Renters
Dwelling Fire
Personal Inland Marine (Valuable Personal Property)
TERMINATIONS
Overview
Private Passenger Automobile Cancellations

Report on Market Conduct Examination of the USAA..., 2011 WL 2470920...

DJA0312

Homeowners/Renters Cancellations

Dwelling Fire Cancellations

Personal Inland Marine (Valuable Personal Property) Cancellations

Private Passenger Automobile Nonrenewals

Homeowners/Renters Nonrenewals

Dwelling Fire Nonrenewals

Personal Inland Marine (Valuable Personal Property) Nonrenewals

Declinations/Rejections

CLAIMS PRACTICES

Overview

Paid Claims

Automobile Medical Payment Claims

First and Third Party Bodily Injury Claims

Closed Without Payment Claims

Subrogated Claims

Total Loss Settlement Claims

Litigated Claims

SUMMARY

TABLE OF STATUTES AND RULES

CONCLUSION

Raleigh, North Carolina

January 14, 2011

Honorable Wayne Goodwin

Commissioner of Insurance

Department of Insurance

State of North Carolina

Dobbs Building

430 N. Salisbury Street

 **\*2** Raleigh, North Carolina 27603

Honorable Mike Geeslin

Commissioner of Insurance

Texas Department of Insurance

333 Guadalupe Street

Austin, Texas 78701

Honorable Commissioners:

Pursuant to your instructions and in accordance with the provisions of North Carolina General Statute (NCGS) 58-2-131, a general examination has been made of the market conduct activities of

**USAA CASUALTY INSURANCE COMPANY (NAIC #25968)**

NAIC Exam Tracking System Exam Number: NC170-M63

San Antonio, Texas

hereinafter generally referred to as the Company, at the North Carolina Department of Insurance (Department) office located at 11 S. Boylan Avenue, Raleigh, North Carolina. A report thereon is respectfully submitted.

FOREWORD

Report on Market Conduct Examination of the USAA..., 2011 WL 2470920...

DJA0313

This examination reflects the North Carolina insurance activities of USAA Casualty Insurance Company. The examination is, in general, a report by exception. Therefore, much of the material reviewed will not be contained in this written report, as reference to any practices, procedures, or files that manifested no improprieties were omitted.

## SCOPE OF EXAMINATION

This examination commenced on March 29, 2010 and covered the period of January 1, 2006 through December 31, 2008 with analyses of certain operations of the Company being conducted through January 12, 2011. All comments made in this report reflect conditions observed during the period of the examination.

The examination was arranged and conducted by the Department. It was made in accordance with Market Regulation standards established by the Department and procedures established by the National Association of Insurance Commissioners (NAIC) and accordingly included tests of policyholder treatment, marketing, underwriting practices, terminations, and claims practices.

It is the Department's practice to cite companies in apparent violation of a statute or rule when the results of a sample show errors/noncompliance at or above the following levels: 0 percent for consumer complaints, sales and advertising, producers who were not appointed and/or licensed, and the use of forms and rates/rules that were neither filed with nor approved by the Department; 7 percent for claims; and 10 percent for all other areas reviewed. When errors are detected in a sample, but the error rate is below the applicable threshold for citing an apparent violation, the Department issues a reminder to the company.

## EXECUTIVE SUMMARY

This market conduct examination revealed concerns with Company procedures and practices in the following areas:

*Consumer Complaints* - Complaints not listed on the Company's complaint register.

*Policy Forms and Filings* - Unable to provide a copy of the approved filing for the adverse underwriting decision notice for property coverage.

*Termination of Producers* - Unable to provide a copy of the termination letter sent to producers.

**\*3** *Underwriting and Rating* - Private Passenger Automobile: producers not appointed and incorrect recoupment/ allocation surcharge. Homeowners: producers not appointed and/or licensed in North Carolina. Dwelling Fire: incorrect rating.

*Terminations* - Dwelling Fire Cancellations: improper file documentation. Private Passenger Automobile Nonrenewals: ineligible reason used and ceded liability not offered.

Specific violations related to each area of concern are noted in the appropriate section of this report. All North Carolina General Statutes and rules of the North Carolina Administrative Code cited in this report may be viewed on the North Carolina Department of Insurance Web site www.ncdoi.com by clicking "NCDOI DIVISIONS" then "Legislative Services".

This examination identified various non-compliant practices, some of which may extend to other jurisdictions. The Company is directed to take immediate corrective action to demonstrate its ability and intention to conduct business in North Carolina according to its insurance laws and regulations. When applicable, corrective action for other jurisdictions should be addressed.

All unacceptable or non-compliant practices may not have been discovered or noted in this report. Failure to identify or criticize improper or non-compliant business practices in North Carolina or in other jurisdictions does not constitute acceptance

Report on Market Conduct Examination of the USAA..., 2011 WL 2470920...

DJA0314

of such practices. Examination report findings that do not reference specific insurance laws, regulations, or bulletins are presented to improve the Company's practices and ensure consumer protection.

COMPANY OVERVIEW

## History and Profile

USAA Casualty Insurance Company (CIC) is a stock property and casualty insurer specializing in personal lines property and casualty insurance for family members of USAA members. CIC was originally incorporated in Texas on September 6, 1968, under the laws of Texas and began business on December 1, 1969. The Company operated under the title United Services Casualty Insurance Company until December 2, 1970, when the current title was adopted. Effective July 16, 1990, the Company merged with and into the USAA Casualty Insurance Company of Florida and redomesticated from San Antonio, Texas, to Tampa, Florida. Effective January 1, 2000, the Company redomesticated from Florida back to Texas. Simultaneously, the name was changed back to USAA Casualty Insurance Company.

## Company Operations and Management

The Company is a writer of personal lines insurance coverages and is licensed in all 50 states, the District of Columbia, Guam and the US Virgin Islands.

Direct written premium for the Company's 2008 countrywide property and casualty operations was $3,138,694,249. North Carolina's production for the same period was $99,360,848. Premiums written in North Carolina between 2006 and 2008 increased approximately 4.0 percent. The charts below outline the Company's mix of business for selected lines in 2008 and loss ratios in North Carolina for the examination period.

| Line of Business | Written Premium | Percentage |
|---|---|---|
| Private Passenger Automobile | 67,075,774 | 67.5 |
| Homeowners | 25,931,383 | 26.1 |
| Inland Marine | 3,003,021 | 3.0 |
| Fire and Allied Lines | 2,188,900 | 2.2 |
| Other Liability | 896,987 | .9 |
| Ocean Marine | 175,238 | .2 |
| Earthquake | 89,545 | .1 |
| **Total** | **$99,360,848** | **100.0** |

| Year | Written Premium | Earned Premium | Incurred Losses [a1] | Loss Ratio |
|---|---|---|---|---|
| 2006 | $95,550,156 | $94,364,344 | $53,276,399 | 56.5 |
| 2007 | $94,219,439 | $93,499,283 | $62,299,103 | 66.6 |
| 2008 | $99,360,848 | $97,769,154 | $62,950,833 | 64.4 |

Report on Market Conduct Examination of the USAA..., 2011 WL 2470920...

DJA0315

a1    **Does not include IBNRs**

## Certificates of Authority

**\*4**  The Certificates of Authority issued to the Company were reviewed for the period under examination. These certificates were reviewed to determine compliance with the provisions of NCGS 58-7-15. The Company's writings in North Carolina were deemed to be in compliance with the authority granted.

## Disaster Recovery Procedures

The Company has a detailed business continuation plan established to increase its chances of preventing disasters, as well as providing continuing operations following natural or man-made disasters. The mission of business continuation is to implement crisis management best practices by appropriately identifying the risks and ensuring adequate risk mitigation strategies to ensure continuation of business with minimal impact on consumers. The Company conducts exercises to validate emergency response and recovery strategies and capabilities. USAA has geographically separated regional offices in Arizona, California, Colorado, Florida and Virginia in the event the home office in San Antonia, Texas is unavailable. The Company has an offsite data center available in the event the home office data center is impacted. Technical teams are in place to begin system recovery efforts until a third data center is up and running. The data center architecture is a three geographically dispersed data center redundancy model that provides effective recovery for critical applications. USAA records and documents are maintained electronically and are systematically managed through a document retentions schedule. USAA has contracted with several third party call centers to provide additional call center support should any facility or call center become impacted. Each USAA division has a Situation Management Team that is activated by the Situation Manager in an emergency or disaster situation. The teams are responsible for identifying the impact to business operations and coordinating responses to minimize impact and to restore business operations effectively and efficiently.

## Rate Evasion Procedures

The Company has established procedures to address nonfleet private passenger automobile insurance rate evasion fraud by identifying any ineligible risk as defined in NCGS 58-37-1(4a) and verifying residency of the policyholder who owns a motor vehicle registered or principally garaged in North Carolina. The Company was found to be in compliance with the provisions of NCGS 58-2-164.

## POLICYHOLDER TREATMENT

## Consumer Complaints

The Company's complaint handling procedures were reviewed to determine compliance with applicable North Carolina statutes and rules.

The Company was deemed to be in apparent violation of the provisions of Title 11 of the North Carolina Administrative Code, (NCAC), Chapter 19, Section 0103 as 8 complaints (16.0 percent error ratio) were not listed on the Company's complaint register.

**\*5**  The Company's complaint register was reconciled with a listing furnished by the Consumer Services Division of the Department. Fifty of the 107 complaints contained in the Department's listing were randomly selected and received for review. The distribution of complaints requiring a response to the Department is shown in the chart below.

Report on Market Conduct Examination of the USAA..., 2011 WL 2470920...

DJA0316

| Type of Complaint | Total |
|---|---|
| Claims | 41 |
| Underwriting | 8 |
| Administrative | 1 |
| **Total** | **50** |

The Company's response to each complaint was deemed to be appropriate to the circumstances. The average service time to respond to a Departmental complaint was 5 calendar days. A chart of the Company's response time follows:

| Service Days | Number of Files | Percentage of Total |
|---|---|---|
| 1 - 7 | 48 | 96.0 |
| 8 - 14 | 1 | 2.0 |
| 22 - 30 | 1 | 2.0 |
| **Total** | **50** | **100.0** |

Privacy of Financial and Health Information

The Company provided privacy of financial and health information documentation for the examiners' review. The Company exhibited policies and procedures in place so that nonpublic personal financial or health information is not disclosed unless the customer or consumer has authorized the disclosure. The Company was found to be compliant with the provisions of NCGS 58-39-25, 58-39-26, and 58-39-27.

MARKETING

Policy Forms and Filings

Policy forms and filings for the Company were reviewed to determine compliance with appropriate North Carolina statutes and rules. Emphasis of the review was placed on the following lines of business:

1. Private Passenger Automobile

2. Homeowners/Renters

3. Dwelling Fire

4. Personal Inland Marine (Valuable Personal Property)

Filings for the private passenger automobile, homeowners and dwelling fire lines of business were made by the North Carolina Rate Bureau on behalf of the Company. Deviations for these lines of business were made to the Department by the Company. The Company's personal inland marine coverages were written utilizing independently filed rates.

Report on Market Conduct Examination of the USAA..., 2011 WL 2470920...

DJA0317

The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a) and 19.0106(a)(4)(h) as it was unable to provide a copy of the approved filing for the adverse underwriting decision notice for property coverage.

## Sales and Advertising

Sales and advertising practices of the Company were reviewed to determine compliance with the provisions of NCGS 58-63-15.

As a direct writer, the Company markets directly to insureds or prospective insureds. The Company also provides information about its products through its website at www.usaa.com . The advertising objective statement was reviewed along with the Company website and sales brochures.

No unfair or deceptive trade practices were noted in this segment of the examination.

## Producer Licensing

  *6  The Company's procedures for appointment and termination of its producers were reviewed to determine compliance with the appropriate North Carolina statutes and rules. Fifty appointed and 50 terminated producer files were randomly selected and received for review from populations of 2,786 and 1,792, respectively.

All appointment and termination files reviewed contained evidence that notification was submitted to the Department in accordance with the timetables stipulated under the provisions of NCGS 58-33-40 and NCGS 58-33-56.

The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a) and 19.0106(a)(3)(h) as 20 of the terminated producer files reviewed (40.0 percent error ratio) did not contain a copy of the notification of termination that was sent to the producer.

## Agency Management

The Company is a direct writer based in San Antonio, Texas and does not have a marketing effort specifically directed for North Carolina. A phone sales and service team is maintained and led by the Executive Director of Policy Service.

Approximately 3,900 representatives are licensed and appointed to handle transactions for North Carolina. Appointments, terminations, and licensing for service representatives are handled by the Licensing Department.

## UNDERWRITING PRACTICES

## Overview

The Company's marketing philosophy in North Carolina focuses on personal lines. The Company provided the examiners with listings of the following types of active policies for the period under examination:

1. Private Passenger Automobile

2. Homeowners/Renters

3. Dwelling Fire

Report on Market Conduct Examination of the USAA..., 2011 WL 2470920...

DJA0318

4. Personal Inland Marine (Valuable Personal Property)

A random selection of 300 policies was made from a total population of 39,673. Each policy was reviewed for adherence to underwriting guidelines, file documentation and premium determination. Additionally, the policies were examined to determine compliance with the appropriate North Carolina statutes and rules, policy provisions and the applicable policy manual rules.

## Private Passenger Automobile

The Company provided a listing of 14,432 active private passenger automobile policies issued during the period under examination. One hundred policies were randomly selected and received for review.

The Company's private passenger automobile coverages were written utilizing manual and deviated rates. Policies were written on a 6-month basis. Risk placement was determined by the Company's underwriting guidelines and the underwriter. No discrepancies were noted in the Company's use of its underwriting guidelines. All policy files contained sufficient documentation to support the Company's classification of the risk.

The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-40(h) as 3 policies reviewed (3.0 percent error ratio) were quoted/issued by a producer who was not appointed.

**\*7** The Company was deemed to be in apparent violation of the provisions of NCGS 58-37-35(l) and 58-37-40(f) as an incorrect recoupment/allocation surcharge was applied on 12 policies reviewed (12.0 percent error ratio).

The Company was reminded of the provisions of NCGS 58-36-30(a) and Rule 5 of the Personal Auto Manual as 5 policies reviewed (5.0 percent error ratio) were rated incorrectly. The rating errors consisted of the following:

• Incorrectly applied Safe Driver Incentive Plan (SDIP) points on 3 policies.

• Incorrectly applied a deviation to bodily injury and property damage liability premium prior to computing the SDIP surcharge on 2 policies.

The Company was reminded of the provisions of NCGS 58-37-40(e) and the North Carolina Reinsurance Facility Standard Practices Manual, Section 4, Rule 10 as it failed to utilize standard undeviated liability premiums in determining the recoupment/ allocation surcharge on 2 policies reviewed (2.0 percent error ratio). The rating errors resulted in 16 premium undercharges and 3 premium overcharges to the insureds. At the request of the examiners, refunds in the amount of $102.60 were issued by the Company for the overcharges. The remaining 81 premiums charged were deemed correct.

## Homeowners/Renters

The Company provided a listing of 19,756 active homeowners/renters policies issued during the period under examination. One hundred policies were randomly selected and received for review.

The Company's homeowners coverages were written utilizing manual and deviated rates. Policies were written on an annual basis. Risk placement was determined by the Company's underwriting guidelines and the underwriter. The Company's renters coverage is an independently filed program. No discrepancies were noted in the Company's use of its underwriting guidelines. All policy files contained sufficient documentation to support the Company's classification of the risk.

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 167 of 598

Report on Market Conduct Examination of the USAA..., 2011 WL 2470920...

DJA0319

The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-5 and 58-33-26(a) as 3 policies reviewed (3.0 percent error ratio) were quoted/issued by a producer who was not licensed in North Carolina. The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-40(h) as 6 policies reviewed (6.0 percent error ratio) were quoted/issued by a producer who was not appointed.

The Company was reminded of the provisions of NCGS 58-36-30(a) as 4 policies reviewed (4.0 percent error ratio) were rated incorrectly. The rating errors consisted of the following:

   • The North Carolina Rate Bureau premium for Coverage A was calculated incorrectly on 2 policies.

   • Incorrect territory was used to calculate the premium on 1 policy.

   • Territory deviation was not applied on 1 policy.

 The rating errors resulted in 2 premium undercharges and 2 premium overcharges to the insureds. At the request of the examiners, refunds in the amount of $40.00 were issued by the Company for the overcharges. The remaining 46 premiums charged were deemed correct.

   **\*8** The Company was reminded of the provisions of NCGS 58-63-15(1) as the declaration page for 2 policies reviewed (2.0 percent error ratio) inaccurately stated that the premium included an Academy Residence credit.

## Dwelling Fire

   The Company provided a listing of 832 active dwelling fire policies issued during the period under examination. Fifty policies were randomly selected and received for review.

   The Company's dwelling fire coverages were written utilizing manual and deviated rates. Policies were written on an annual basis. Risk placement was determined by the Company's underwriting guidelines and the underwriter. No discrepancies were noted in the Company's use of its underwriting guidelines. All policy files contained sufficient documentation to support the Company's classification of the risk.

   The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-30(a) as 9 policies reviewed (18.0 percent error ratio) were rated incorrectly. The rating errors consisted of the following:

   • Incorrect rounding procedures were used to calculate the premium on 4 policies.

   • A 5% deductible debit for a $100 all perils deductible was not applied to the Coverage B premium on 2 policies when Coverage A was not present on the policy.

   • The premium for increased limits of Coverage B was not calculated using Rule 500 - Miscellaneous Rates on 1 policy when Coverage A was present on the policy.

   • The premium credit for a 2% Wind and Hail deductible was incorrectly applied to only a portion of the Special Form premium on 1 policy.

   • The $25 minimum deductible credit was not applied for a $100 all perils deductible on 1 policy.

 The rating errors resulted in 4 premium undercharges and 5 premium overcharges to the insureds. At the request of the examiners, refunds in the amount of $185.00 were issued by the Company for the overcharges. The remaining 41 premiums charged were deemed correct.

Report on Market Conduct Examination of the USAA..., 2011 WL 2470920...

DJA0320

As a result of the incorrect rounding procedures, the incorrect premium calculation for increased limits of Coverage B when Coverage A was present on the policy and the incorrect application of the premium credit for the 2% Wind and Hail deductible, the Department requested the Company to conduct a self audit in those areas. The Company identified an additional 5,216 policy terms affected (excluding those that were reviewed by the examiners as noted above) that resulted in refunds being made in the amount of $118,808.64. All refund checks were mailed to the insureds by November 22, 2010.

## Personal Inland Marine (Valuable Personal Property)

The Company provided a listing of 4,653 active personal inland marine policies issued during the period under examination. Fifty policies were randomly selected and received for review.

The Company's personal inland marine coverages were written utilizing independently filed rates. Policies were written on an annual basis. Risk placement was determined by the Company's underwriting guidelines and the underwriter. No discrepancies were noted in the Company's use of its underwriting guidelines.

**\*9** All policy files contained sufficient documentation to support the Company's classification of the risk. All premiums charged were deemed correct.

## TERMINATIONS

### Overview

The Company's termination procedures were reviewed to determine compliance with the appropriate North Carolina statutes and rules, policy provisions, and the applicable policy manual rules. The review focused on the following lines of business:

1. Private Passenger Automobile

2. Homeowners/Renters

3. Dwelling Fire

4. Personal Inland Marine (Valuable Personal Property)

Special attention was placed on the validity and reason for termination, timeliness in issuance of the termination notice, policy refund (where applicable) and documentation of the policy file. A total of 51,170 policies were terminated during the period under examination. The examiners randomly selected 380 terminations for review.

### Private Passenger Automobile Cancellations

One hundred cancelled private passenger automobile policies were randomly selected and received for review from a population of 25,464.

The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
| --- | --- | --- |
| Coverage rewritten | 56 | 56.0 |

Report on Market Conduct Examination of the USAA..., 2011 WL 2470920...

DJA0321

| | | |
|---|---|---|
| Insured's request | 22 | 22.0 |
| Nonpayment of premium | 22 | 22.0 |
| **Total** | **100** | **100.0** |

The Company was not required to issue cancellation notices for 78 of the cancellations reviewed as these policies were cancelled at the request of the insured or the coverage was rewritten. Cancellation notices for the remaining 22 policies stated the specific reason for cancellation. All insureds and loss payees were given proper and timely notification of cancellation.

All premium refunds were deemed correct. The Company issued the refunds in a timely manner.

The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 1 file reviewed (1.0 percent error ratio) did not contain accounting records that documented the cancellation return premium.

The remaining policy files reviewed contained sufficient documentation to support the action taken by the Company. The Company sent the North Carolina Notice of Termination Form (FS-4) to the North Carolina Division of Motor Vehicles (DMV) when liability coverages were cancelled. The Company was deemed to be in compliance with the provisions of NCGS 20-309(e).

Homeowners/Renters Cancellations

One hundred cancelled homeowners/renters policies were randomly selected and received for review from a population of 22,399 policies.

The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| **Reason for Cancellation** | **Number of Policies** | **Percentage** |
|---|---|---|
| Coverage rewritten | 64 | 64.0 |
| Insured's request | 25 | 25.0 |
| Nonpayment of premium | 10 | 10.0 |
| Underwriting reasons | 1 | 1.0 |
| **Total** | **100** | **100.0** |

**\*10** The Company was not required to issue cancellation notices for 89 of the cancellations reviewed as these policies were cancelled at the request of the insured, nonpayment of premium, or the coverage was rewritten.

The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 3 documents (3.0 percent error ratio) were not provided for review.

• One file did not contain a copy of the notice of cancellation to the insured.

• One file did not contain proof of mailing of the notice of cancellation.

Report on Market Conduct Examination of the USAA..., 2011 WL 2470920...

DJA0322

• One file did not contain accounting information.

All premium refunds were deemed correct. The Company issued the refunds in a timely manner.

The final area of this review encompassed documentation of the policy file. All policy files reviewed contained sufficient documentation to support the action taken by the Company.

## Dwelling Fire Cancellations

Fifty cancelled dwelling fire policies were randomly selected and received for review from a population of 1,839.

The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
|---|---|---|
| Insured's request | 30 | 60.0 |
| Coverage rewritten | 19 | 38.0 |
| Underwriting reasons | 1 | 2.0 |
| **Total** | **50** | **100.0** |

The Company was not required to issue cancellation notices for 49 of the cancellations reviewed as these policies were cancelled at the request of the insured or the coverage was rewritten.

All premium refunds were deemed correct. The Company issued the refunds in a timely manner.

The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 11 files reviewed (22.0 percent error ratio) did not contain proper documentation of the cancellation:

• Six files did not contain documentation of the insured's request to cancel.

• Five files did not contain any documentation referencing the cancellation.

The 5 files not containing any documentation were electronic files provided by the Company that did not provide the detail needed to determine the validity and reason for termination.
The remaining policy files reviewed contained sufficient documentation to support the action taken by the Company.

## Personal Inland Marine (Valuable Personal Property) Cancellations

Fifty cancelled personal inland marine policies were randomly selected and received for review from a population of 1,334 policies.

The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

Report on Market Conduct Examination of the USAA..., 2011 WL 2470920...

DJA0323

| Reason for Cancellation | Number of Policies | Percentage |
|---|:---:|:---:|
| Insured's request | 30 | 60.0 |
| Coverage rewritten | 19 | 38.0 |
| Underwriting reasons | 1 | 2.0 |
| **Total** | **50** | **100.0** |

**\*11**  The Company was not required to issue cancellation notices for 49 of the cancellations reviewed as these policies were cancelled at the request of the insured or the coverage was rewritten. The Company was reminded of the provisions of NCGS 58-39-55(a) as they failed to provide notice of cancellation to the insured for 1 file reviewed (2.0 percent error ratio).

All premium refunds were deemed correct. The Company issued the refunds in a timely manner.

The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 1 file reviewed (2.0 percent error ratio) did not contain documentation of the insured's request to cancel the policy. The remaining files reviewed contained sufficient documentation to support the action taken by the Company.

## Private Passenger Automobile Nonrenewals

The entire population of 9 nonrenewed private passenger automobile policies was selected and received for review.

The review revealed the following reason for nonrenewal:

| Reason for Nonrenewal | Number of Policies | Percentage |
|---|:---:|:---:|
| Underwriting reasons | 9 | 100.0 |
| **Total** | **9** | **100.0** |

The nonrenewal notices for the policies reviewed stated the specific reason for nonrenewal. The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-85(b) as an ineligible reason for nonrenewal was used to terminate 4 policies (44.4 percent error ratio). The Company was deemed to be in apparent violation of the provisions of NCGS 58-37-50 as they did not offer liability coverage ceded to the North Carolina Reinsurance Facility when terminating 4 policies (44.4 percent error ratio) for reasons other than those specified in the statute.

The final area of this review encompassed documentation of the policy file. All policy files contained sufficient documentation to support the action taken by the Company.

## Homeowners/Renters Nonrenewals

The entire population of 10 nonrenewed homeowners/renters policies was selected and received for review.

Report on Market Conduct Examination of the USAA..., 2011 WL 2470920...

DJA0324

The reason for nonrenewal was deemed valid for all policies reviewed. The review revealed the following reason for nonrenewal:

| Reason for Nonrenewal | Number of Policies | Percentage |
|---|---|---|
| Underwriting reasons | 10 | 100.0 |
| **Total** | **10** | **100.0** |

The nonrenewal notices for the policies reviewed stated the specific reason for nonrenewal. All insureds and mortgagees were given proper and timely notification of nonrenewal.

The final area of this review encompassed documentation of the policy file. All policy files contained sufficient documentation to support the action taken by the Company.

### Dwelling Fire Nonrenewals

The entire population of 10 nonrenewed dwelling fire policies was selected and received for review.

**\*12** The reason for nonrenewal was deemed valid for all policies reviewed. The review revealed the following reason for nonrenewal:

| Reason for Nonrenewal | Number of Policies | Percentage |
|---|---|---|
| Underwriting reasons | 10 | 100.0 |
| **Total** | **10** | **100.0** |

The nonrenewal notices for the policies reviewed stated the specific reason for nonrenewal. All insureds and mortgagees were given proper and timely notification of nonrenewal.

The final area of this review encompassed documentation of the policy file. All policy files contained sufficient documentation to support the action taken by the Company.

### Personal Inland Marine (Valuable Personal Property) Nonrenewals

The entire population of 1 nonrenewed personal inland marine policy was selected and received for review.

The reason for nonrenewal was deemed valid for all policies reviewed. The review revealed the following reason for nonrenewal:

| Reason for Nonrenewal | Number of Policies | Percentage |
|---|---|---|
| Underwriting reasons | 1 | 100.0 |
| **Total** | **1** | **100.0** |

Report on Market Conduct Examination of the USAA..., 2011 WL 2470920...

DJA0325

The nonrenewal notice for the policy reviewed stated the specific reason for nonrenewal. The insured was given proper and timely notification of nonrenewal.

The final area of this review encompassed documentation of the policy file. All policy files contained sufficient documentation to support the action taken by the Company.

## Declinations/Rejections

Fifty declined/rejected applications were randomly selected and received for review from a population of 104. The reason for declination/rejection was deemed valid for all applications reviewed. The survey revealed the following reason for declination/rejection.

| Reason for Declination/Rejection | Number of Declinations/Rejections |
|---|---|
| Underwriting reasons | 50 |
| **Total** | **50** |

The Company was reminded of the provisions of NCGS 58-37-25(a) as 3 applicants for personal automobile coverage (6.0 percent error ratio) were not offered liability coverage ceded to the North Carolina Reinsurance Facility when they did not meet the Company's voluntary guidelines.

## CLAIMS PRACTICES

### Overview

The Company's claims practices were reviewed to determine compliance with the appropriate North Carolina statutes, rules and policy provisions. The review encompassed paid, automobile medical payment, first and third party bodily injury liability, closed without payment, subrogated, total loss settlement and litigated claims.

Claims service in North Carolina is under the direction of the Assistant Vice-President and is provided from the home office in San Antonio, Texas and by field claims personnel located in North Carolina. Claims supporting offices are located in Tampa, Florida, Norfolk, Virginia, Colorado Springs, Colorado and Phoenix, Arizona. The staff is comprised of 2 claims service directors, 15 claims service managers and 135 claims service representatives. Company adjusters provide the claim service with some assistance, at times, from independent adjusters. Independent adjusters have no check or draft authority. Claims are adjusted and managed exclusively by the Company's claims department. The salvage log is maintained and managed by the executive management of each respective claim handling location.

**\*13** Five hundred fifty claims were randomly selected for review from a population of 38,925.

### Paid Claims

The examiners randomly selected and received 250 of the 29,165 first party automobile physical damage, first party property damage and third party property damage claims paid during the period under examination. The claim files were reviewed for timeliness of payment, supporting documentation and accuracy of payment.

Report on Market Conduct Examination of the USAA..., 2011 WL 2470920...

DJA0326

The following types of claims were reviewed and the average payment time is noted in calendar days:

| Type of Claim | Payment Time |
| --- | --- |
| Automobile physical damage | 11.0 |
| First party (excluding automobile physical damage) | 15.0 |
| Third party property damage | 21.0 |

All payments issued by the Company were deemed to be accurate. Deductibles were correctly applied and depreciation taken was reasonable.

All claim files reviewed contained documentation to support the Company's payments. The documentation consisted of appraisals, estimates, repair bills and inventory listings.

Claims were not paid in a timely manner for 4 claims (1.6 percent error ratio). This matter could result in an apparent violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice.

Automobile Medical Payment Claims

Fifty automobile medical payment claims were randomly selected and received for review from a population of 1,146. The claim files were reviewed to determine if the Company had engaged in any unfair claims practices. The review of automobile medical payment claims disclosed no apparent violations of the provisions of NCGS 58-63-15.

First and Third Party Bodily Injury Claims

Fifty first and third party bodily injury claims were randomly selected and received for review from a population of 1,911. The claim files were reviewed to determine whether the Company had engaged in any unfair claims practices. The review of first and third party bodily injury claims disclosed no apparent violations of the provisions of NCGS 58-63-15.

Closed Without Payment Claims

Fifty closed without payment claims were randomly selected and received for review from a population of 439. The claim files were reviewed to determine if the Company's reasons for closing the claims without payment were valid.

The claim files reviewed contained documentation that supported the Company's reasons for closing the claims without payment. All reasons for denial or closing the files without payment were deemed valid. Claims were denied on an average of 14 calendar days for the 3-year period. The review of closed without payment claims disclosed no apparent violations of the provisions of NCGS 58-63-15.

Subrogated Claims

**\*14**  Fifty subrogated claims were randomly selected and received for review from a population of 1,958. The claim files were reviewed to determine if the insured's deductible was properly reimbursed by the Company when subrogation was successful.

Deductible reimbursements were not paid in a timely manner for 1 claim (2.0 percent error ratio). This matter could result in an apparent violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice. All reimbursements were deemed to be correct and were issued on a 3-year average of 3 calendar days from the date the Company collected the monies.

## Total Loss Settlement Claims

Fifty total loss settlement claims were randomly selected and received for review from a population of 4,025. The claim files were reviewed to determine if the settlements were equitable and timely.

The Company primarily used CCC Information Services, Inc. to establish the actual cash value of totaled vehicles. All settlements were deemed equitable. Claims were not paid in a timely manner for 1 claim (2.0 percent error ratio). This matter could result in an apparent violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice. The payments were issued on a 3-year average of 21 calendar days. No apparent violations of the provisions of NCGS 58-63-15(11)(h), 11 NCAC 4.0418, or 4.0421 were noted during this review.

## Litigated Claims

Fifty litigated claims were randomly selected and received for review from a population of 281. The claim files were reviewed to determine if the Company had engaged in any unfair claims practices. The review of litigated claims disclosed no apparent violation of the provisions of NCGS 58-63-15.

## SUMMARY

The Market Conduct examination revealed the following:

1. Policyholder Treatment

a. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0103 as 16.0 percent of the consumer complaints were not listed on the Company's complaint register.

2. Marketing

a. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a) and 19.0106(a)(4)(h) as it was unable to provide a copy of the approved filing for the adverse underwriting decision notice for property coverage.

b. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a) and 19.0106(a)(3)(h) as 40.0 percent of the terminated producer files reviewed did not contain a copy of the notification of termination that was sent to the producer.

3. Underwriting and Rating

Report on Market Conduct Examination of the USAA..., 2011 WL 2470920...

DJA0328

a. The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-40(h) as 3.0 percent of the active private passenger automobile policies reviewed were quoted/issued by a producer who was not appointed.

**\*15** b. The Company was deemed to be in apparent violation of the provisions of NCGS 58-37-35(l) and 58-37-40(f) as an incorrect recoupment/allocation surcharge was applied on 12.0 percent of the active private passenger automobile policies reviewed.

c. The Company was reminded of the provisions of NCGS 58-36-30(a) and Rule 5 of the Personal Auto Manual as 5.0 percent of the active private passenger automobile policies reviewed were rated incorrectly.

d. The Company was reminded of the provisions of NCGS 58-37-40(e) and the North Carolina Reinsurance Facility Standard Practices Manual, Section 4, Rule 10 as it failed to utilize standard undeviated liability premiums in determining the recoupment/allocation surcharge on 2.0 percent of the active private passenger automobile policies reviewed.

e. The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-5 and 58-33-26(a) as 3.0 percent of the active homeowners/renters policies reviewed were quoted/issued by a producer who was not licensed in North Carolina.

f. The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-40(h) as 6.0 percent of the active homeowners/renters policies reviewed were quoted/issued by a producer who was not appointed.

g. The Company was reminded of the provisions of NCGS 58-36-30(a) as 4.0 percent of the active homeowner/renters policies reviewed were rated incorrectly.

h. The Company was reminded of the provisions of NCGS 58-63-15(1) as the declaration page for 2.0 percent of the active homeowners/renters policies reviewed inaccurately stated that the premium included an Academy Residence credit.

i. The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-30(a) as 18.0 percent of the active dwelling fire policies reviewed were rated incorrectly.

4. Terminations

a. The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 1.0 percent of the cancelled private passenger automobile files reviewed did not contain accounting records that documented the cancellation return premium.

b. The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104 and 19.0106(a)(4)(h) as 3.0 percent of the documents were not provided for review.

c. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(4)(h) as 22.0 percent of the cancelled dwelling fire files reviewed did not contain proper documentation.

d. The Company was reminded of the provisions of NCGS 58-39-55(a) as they failed to provide notice of cancellation to the policyholder for 2.0 percent of the cancelled personal inland marine policies reviewed.

e. The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 2.0 percent of the cancelled personal inland marine files reviewed did not contain documentation of the insured's request to cancel the policy.

**\*16** f. The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-85(b) as an ineligible reason for nonrenewal was used to terminate 44.4 percent of the nonrenewed private passenger automobile files reviewed.

Report on Market Conduct Examination of the USAA..., 2011 WL 2470920...

DJA0329

g. The Company was deemed to be in apparent violation of the provisions of NCGS 58-37-50 as they did not offer liability coverage ceded to the North Carolina Reinsurance Facility when terminating 44.4 percent of the nonrenewed private passenger automobile policies reviewed.

h. The Company was reminded of the provisions of NCGS 58-37-25(a) as 6.0 percent of the applicants for personal automobile coverage were not offered liability coverage ceded to the North Carolina Reinsurance Facility when they did not meet the Company's voluntary guidelines.

## TABLE OF STATUTES AND RULES

| Statute/Rule | Title |
|---|---|
| NCGS 58-2-131 | Examinations to be made; authority, scope, scheduling, and conduct of examinations. |
| NCGS 58-2-164 | Rate evasion fraud; prevention programs. |
| NCGS 58-7-15 | Kinds of insurance authorized. |
| NCGS 58-33-5 | License required. |
| NCGS 58-33-26 | General license requirements. |
| NCGS 58-33-40 | Appointment of agents. |
| NCGS 58-33-56 | Notification to Commissioner of termination. |
| NCGS 58-36-30 | Deviations. |
| NCGS 58-36-85 | Termination of a nonfleet private passenger motor vehicle insurance policy. |
| NCGS 58-37-1 | Definitions. |
| NCGS 58-37-25 | General obligations of insurers. |
| NCGS 58-37-35 | The Facility; functions; administration. |
| NCGS 58-37-40 | Plan of operation. |

Report on Market Conduct Examination of the USAA..., 2011 WL 2470920...

DJA0330

| NCGS 58-37-50 | Termination of insurance. |
| NCGS 58-39-25 | Notice of insurance information practices. |
| NCGS 58-39-26 | Federal privacy disclosure notice requirements. |
| NCGS 58-39-27 | Privacy notice and disclosure requirement exceptions. |
| NCGS 58-39-55 | Reasons for adverse underwriting decisions. |
| NCGS 58-63-15 | Unfair methods of competition and unfair or deceptive acts or practices defined. |
| NCGS 20-309 | Motor vehicle registration. |
| 11 NCAC 4.0418 | Total Losses on Motor Vehicles. |
| 11 NCAC 4.0421 | Handling of Loss and Claim Payments. |
| 11 NCAC 19.0102 | Maintenance of Records. |
| 11 NCAC 19.0103 | Complaint Records. |
| 11 NCAC 19.0104 | Policy Records. |
| 11 NCAC 19.0106 | Records Required for Examination. |

CONCLUSION

An examination has been conducted on the market conduct affairs of USAA Casualty Insurance Company for the period January 1, 2006 through December 31, 2008 with analyses of certain operations of the Company being conducted through January 12, 2011. The Company's response to this report, if any, is available upon request.

**\*17** This examination was conducted in accordance with the North Carolina Department of Insurance and the National Association of Insurance Commissioners Market Regulation Handbook procedures, including analyses of Company operations in the areas of policyholder treatment, marketing, underwriting practices, terminations and claims practices.

In addition to the undersigned, James P. McQuillan, CPCU, AIT and Letha Lombardi, North Carolina Market Conduct Examiners, participated in this examination.

Respectfully submitted,
/s/ Norma M. Rafter

Norma M. Rafter, CPCU
Examiner-In-Charge
Market Regulation Division
State of North Carolina

 I have reviewed this examination report and it meets the provisions for such reports prescribed by this Division and the North Carolina Department of Insurance.

/s/ Tracy M. Biehn
Tracy M. Biehn, LPCS, MBA
Deputy Commissioner
Market Regulation Division
State of North Carolina

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 35
Report on Market Conduct Examination State Farm Mutual..., 2014 WL 4680709...

DJA0332

2014 WL 4680709

State of North Carolina

**\*1**  Report on Market Conduct Examination

State Farm Mutual Automobile Insurance Company

State Farm Fire and Casualty Company

Bloomington, Illinois

May 2, 2014

MARKET CONDUCT REPORT

North Carolina Department of Insurance

 Image 1 within document in PDF format.

Report

<u>TABLE OF CONTENTS</u>

SALUTATION
FOREWORD
SCOPE OF EXAMINATION
EXECUTIVE SUMMARY
COMPANY OPERATIONS AND MANAGEMENT
POLICYHOLDER TREATMENT
Consumer Complaints
MARKETING
Policy Forms and Filings
Producer Licensing
UNDERWRITING PRACTICES
Overview
Private Passenger Automobile
Homeowners
Rental Dwelling
Commercial Automobile
TERMINATIONS
Overview
Private Passenger Automobile Cancellations
Homeowners Cancellations
Rental Dwelling Cancellations
Commercial Automobile Cancellations
Private Passenger Automobile Nonrenewals
Homeowners Nonrenewals
Rental Dwelling Nonrenewals
Commercial Automobile Nonrenewals

Report on Market Conduct Examination State Farm Mutual..., 2014 WL 4680709...

DJA0333

Declined/Rejected
CLAIMS PRACTICES
Overview
Paid Claims
Automobile Medical Payment Claims
Bodily Injury Claims
Closed Without Payment Claims
Subrogated Claims
Total Loss Settlement Claims
Litigated Claims
CONCLUSION

Raleigh, North Carolina

May 2, 2014

Honorable Wayne Goodwin

Commissioner of Insurance

Department of Insurance

State of North Carolina

Dobbs Building

430 N. Salisbury Street

Raleigh, North Carolina 27603

Honorable Andrew Boron

Director of Insurance

Illinois Department of Insurance

State of Illinois

320 W. Washington Street

Springfield, Illinois 62767-0001

Honorable Commissioner and Honorable Director:

Pursuant to your instructions and in accordance with the provisions of North Carolina General Statute (NCGS) 58-2-131 through 58-2-134, a general examination has been made of the market conduct activities of

**State Farm Mutual Automobile Insurance Company (NAIC #25178)**

**State Farm Fire and Casualty Company (NAIC #25143)**

**\*2** NAIC Exam Tracking System Exam Number: NC299-M32

Bloomington, Illinois

hereinafter generally referred to as the Companies, at their claims office located at 4140 Parklake Avenue, Suite 400, Raleigh, North Carolina and at the North Carolina Department of Insurance (Department) office located at 11 S. Boylan Avenue, Raleigh, North Carolina. A report thereon is respectfully submitted.

FOREWORD

This examination reflects the North Carolina insurance activities of State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company. The examination is, in general, a report by exception. Therefore, much of the material reviewed will not be contained in this written report, as reference to any practices, procedures, or files that revealed no concerns were omitted.

Report on Market Conduct Examination State Farm Mutual..., 2014 WL 4680709...

DJA0334

## SCOPE OF EXAMINATION

This examination commenced on September 30, 2013, and covered the period of January 1, 2009, through December 31, 2012, with analyses of certain operations of the Companies being conducted through May 2, 2014. All comments made in this report reflect conditions observed during the period of the examination.

The examination was arranged and conducted by the Department. It was made in accordance with Market Regulation standards established by the Department and procedures established by the National Association of Insurance Commissioners (NAIC) and accordingly included tests of policyholder treatment, marketing, underwriting practices, terminations, and claims practices.

It is the Department's practice to cite companies in violation of a statute or rule when the results of a sample show errors/ noncompliance at or above the following levels: 0 percent for consumer complaints, producers who were not appointed and/ or licensed, and the use of forms and rates/rules that were neither filed with nor approved by the Department; 7 percent for claims; and 10 percent for all other areas reviewed.

## EXECUTIVE SUMMARY

This market conduct examination revealed concerns with the Companies' procedures and practices in the following areas:

*Consumer Complaints* - Response time to Departmental inquiries in excess of seven calendar days and NAIC code was not included on the Companies' response.

*Policy Forms and Filings* - Private Passenger Automobile and Homeowners: Use of unfiled consent to rate form and unfiled Adverse Underwriting Decision notice; Homeowners: Use of unfiled new business application and declaration page; Rental Dwelling: Use of unfiled new business application.

*Termination of Producers* - Incomplete file documentation.

*Underwriting Practices* - Private Passenger Automobile, Homeowners, and Commercial Automobile: Producers not properly appointed; Homeowners: Rating errors.

*Terminations* - Private Passenger Automobile Nonrenewals and Commercial Automobile Nonrenewals: Insufficient notice sent and incomplete file documentation.

**\*3** Specific violations related to each area of concern are noted in the appropriate section of this report. All North Carolina General Statutes and rules of the North Carolina Administrative Code cited in this report may be viewed on the North Carolina Department of Insurance Web site www.ncdoi.com, by clicking "INSURANCE DIVISIONS" then "Legislative Services".

This examination identified various non-compliant practices, some of which may extend to other jurisdictions. The Companies are directed to take immediate corrective action to demonstrate their ability and intention to conduct business in North Carolina according to its insurance laws and regulations. When applicable, corrective action for other jurisdictions should be addressed.

All statutory violations may not have been discovered or noted in this report. Failure to identify statutory violations in North Carolina or in other jurisdictions does not constitute acceptance of such violations.

Report on Market Conduct Examination State Farm Mutual..., 2014 WL 4680709...

DJA0335

## COMPANY OPERATIONS AND MANAGEMENT

The Companies write a full array of commercial and personal lines property and casualty insurance coverages. They are licensed in 50 states, the District of Columbia, and Canada.

Direct written premium for the Companies' 2012 countrywide operations was $47,957,081,943. North Carolina's property and casualty production for the same period was $1,066,792,650. Premiums written in North Carolina between 2009 and 2012 increased approximately 0.6 percent. The charts below outline the Companies' mix of business for selected lines in 2012 and loss ratios in North Carolina for the examination period.

| Line of Business | Written Premium | Percentage |
|---|---|---|
| Private Passenger Automobile | $ 629,470,878 | 59.0 |
| Homeowners | 364,370,408 | 34.1 |
| Commercial Multi-Peril | 25,466,894 | 2.4 |
| Inland Marine | 14,605,422 | 1.4 |
| Commercial Automobile | 11616166 | 1.1 |
| Other P&C | 21,262,882 | 2.0 |
| **Total** | **$1,066,792,650** | **100.0** |

| Year | Written Premium | Earned Premium | Incurred Losses | Loss Ratio |
|---|---|---|---|---|
| 2009 | $1,060,039,820 | 1,038,531,220 | 580,730,925 | 55.9 |
| 2010 | $1,074,996,571 | 1,066,203,942 | 655,186,206 | 61.5 |
| 2011 | $1,065.396.468 | 1,070,468,550 | 856,264,656 | 80.0 |
| 2012 | $1,066,792,650 | 1,053,784,810 | ,,639,437,109 | 60.7 |

## POLICYHOLDER TREATMENT

### Consumer Complaints

The Companies' complaint handling procedures were reviewed to determine compliance with applicable North Carolina statutes and rules. The Companies' complaint register was reconciled with a listing furnished by the Consumer Services Division of the Department. The Companies' complaint register was in compliance with the provisions of Title 11 of the North Carolina Administrative Code, (NCAC), Chapter 19, Section 0103.

**\*4** Fifty of the 1,852 complaints from the Department's listing were randomly selected for review. The distribution of complaints requiring a response to the Department is shown in the chart below.

| Type of Complaint | Total |
|---|---|

Report on Market Conduct Examination State Farm Mutual..., 2014 WL 4680709...

DJA0336

| | |
|---|---|
| Underwriting | 25 |
| Claims | 25 |
| **Total** | **50** |

The Companies' response to each complaint was deemed to be appropriate to the circumstances. Nine complaints were responded to in excess of seven calendar days; however, extensions were requested and granted for three of the complaints. The Companies were deemed to be in violation of the provisions of 11 NCAC 1.0602 as six of the complaints reviewed (12.0 percent error ratio) were responded to in excess of the seven calendar day requirement of this rule.

The Companies were deemed to be in violation of the provisions of 11 NCAC 4.0123 as three responses to Departmental inquiries (6.0 percent error ratio) did not include the Companies' NAIC codes.

The average service time to respond to a Departmental complaint was six calendar calendar days. A chart of the Companies' response time follows:

| Service Days | Number of Files | Percentage of Total |
|---|---|---|
| 1 - 7 | 41 | 82.0 |
| 8 - 14 | 9 | 18.0 |
| **Total** | **50** | **100.0** |

<div align="center">MARKETING</div>

## Policy Forms and Filings

Policy forms and filings for the Companies were reviewed to determine compliance with appropriate North Carolina statutes and rules. We reviewed the following lines of business:

1. Private Passenger Automobile

2. Homeowners

3. Rental Dwelling

4. Commercial Automobile

Filings for the private passenger automobile and homeowners lines of business were made by the North Carolina Rate Bureau on behalf of the Companies. Deviations for these lines of business were made to the Department by the Companies. Filings for the commercial automobile line of business were made by the Insurance Services Office. Deviations were made to the Department by the Companies. The rental dwelling line of business is an independently filed program.

The Companies were deemed to be in violation of the provisions of NCGS 58-3-150(a) and 11 NCAC 10.0602 as the private passenger automobile policy consent to rate form had not been filed with and approved by the Department.

The Companies were deemed to be in violation of the provisions of NCGS 58-3-150(a) and 11 NCAC 10.0602 as the homeowners consent to rate form had not been filed with and approved by the Department.

The Companies were deemed to be in violation of the provisions of NCGS 58-3-150(a) and 58-39-55(a) as the Adverse Underwriting Decision notice used for private passenger automobile terminations had not been filed with and approved by the Department.

The Companies were deemed to be in violation of the provisions of NCGS 58-3-150(a) and 58-39-55(a) as the Adverse Underwriting Decision notice used for homeowners terminations had not been filed with and approved by the Department.

 **\*5** The Companies were deemed to be in violation of the provisions of NCGS 58-3-150(a) and 11 NCAC 10.1201(c) as the homeowners new business application and declaration page had not been filed with and approved by the Department.

The Companies were deemed to be in violation of the provisions of NCGS 58-3-150(a) and 11 NCAC 10.1201(c) as the rental dwelling policy new business application had not been filed with and approved by the Department.


## Producer Licensing

The Companies' procedures for appointment and termination of their producers were reviewed to determine compliance with the appropriate North Carolina statutes and rules. Fifty appointed and 50 terminated producer files were randomly selected for review from populations of 773 and 330, respectively.

The appointment forms reviewed were submitted to the Department in accordance with the timetables stipulated under the provisions of NCGS 58-33-40.

Four terminated producer files were not terminated producers and were deemed invalid receipts. The review was based on the remaining 46 files. The Companies were deemed to be in violation of the provisions of 11 NCAC 19.0102(a) and 19.0106(a) (3), (g) as file documentation was incomplete for seven of the terminated producer files reviewed (15.2 percent error ratio). One file did not contain a copy of the confirmation of notification to the Commissioner within 30 days of the effective date of termination. Six files did not contain a copy of the termination letter sent to the producer.


## UNDERWRITING PRACTICES

## Overview

The Companies' marketing philosophy in North Carolina is directed to personal and commercial lines of business. The Companies provided the examiners with listings of the following types of active policies for the period under examination:

1. Private Passenger Automobile

2. Homeowners

3. Rental Dwelling

4. Commercial Automobile

A random selection of 400 policies was made from a total population of 763,469. Each policy was reviewed for adherence to underwriting guidelines, file documentation, and premium determination. Additionally, the policies were examined to determine compliance with the appropriate North Carolina statutes and rules, policy provisions, and the applicable policy manual rules.

Report on Market Conduct Examination State Farm Mutual..., 2014 WL 4680709...

DJA0338

## Private Passenger Automobile

The Companies provided a listing of 432,907 active private passenger automobile policies issued during the period under examination. One hundred policies were randomly selected for review.

The Companies' private passenger automobile policies were written on a six-month basis. Liability coverages were written utilizing manual and deviated rates. Physical damage coverages were written using manual, deviated, or on a consent to rate basis. Risk placement was determined by the Companies' underwriting guidelines and the underwriter. No discrepancies were noted in the Companies' use of their underwriting guidelines. All policy files contained sufficient documentation to support the Companies' classification of the risk. The premium for all policies reviewed was deemed to be correct.

**\*6** The Companies were deemed to be in violation of the provisions of NCGS 58-33-26 and 58-33-40 as the producer was not properly appointed by the Companies for one of the active private passenger automobile files reviewed (1.0 percent error ratio).

## Homeowners

The Companies provided a listing of 284,750 active homeowners policies issued during the period under examination. One hundred policies were randomly selected for review.

The Companies' homeowners coverages were written on an annual basis. The coverages were written utilizing manual, deviated, or on a consent to rate basis. Risk placement was determined by the Companies' underwriting guidelines and the underwriter. No discrepancies were noted in the Companies' use of their underwriting guidelines. All policy files contained sufficient documentation to support the Companies' classification of the risk.

The Companies were deemed to be in violation of the provisions of NCGS 58-36-30(a) as 59 policies reviewed (59.0 percent error ratio) contained a total of 66 rating errors. The rating errors consisted of the following:

- Personal property replacement cost was calculated incorrectly on 42 policies.

- An incorrect protective device credit was applied on 15 policies.

- An incorrect deductible factor was applied on five policies.

- The protective device credit applied on two policies was in excess of the maximum allowed.

- An incorrect base rate was applied on two policies.

The rating errors resulted in five premium overcharges and 53 premium undercharges to the insureds. One policy's premium was not affected due to equally offsetting errors. At the request of the examiners, refunds in the amount of $12.06 were issued by the Companies for the overcharges. The remaining premiums were deemed correct.

The Companies were deemed to be in violation of the provisions of NCGS 58-33-26 and 58-33-40 as the producer was not properly appointed by the Companies for one of the active files reviewed (1.0 percent error ratio).

## Rental Dwelling

Report on Market Conduct Examination State Farm Mutual..., 2014 WL 4680709...

DJA0339

The Companies provided a listing of 33,685 active rental dwelling policies issued during the period under examination. One hundred policies were randomly selected for review.

The Companies' rental dwelling policies were written on an annual basis. Coverages were written utilizing independent rates. Risk placement was determined by the Companies' underwriting guidelines and the underwriter. No discrepancies were noted in the Companies' use of their underwriting guidelines. All policy files reviewed contained sufficient documentation to support the Companies' classification of the risk. The premium for all policy files reviewed was deemed to be correct.

### Commercial Automobile

The Companies provided a listing of 12,127 active commercial automobile policies issued during the period under examination. One hundred policies were randomly selected for review.

**\*7** The Companies' commercial automobile coverages were written utilizing manual and deviated rates. Policies were written on a six-month basis. Risk placement was determined by the Companies' underwriting guidelines and the underwriter. No discrepancies were noted in the Companies' use of their underwriting guidelines. All policy files contained sufficient documentation to support the Companies' application of their rates and premiums charged.

The Companies were deemed to be in violation of the provisions of NCGS 58-33-26 and 58-33-40 as the producer was not properly appointed by the Companies for one of the active files reviewed (1.0 percent error ratio).

## TERMINATIONS

### Overview

The Companies' termination procedures were reviewed to determine compliance with the appropriate North Carolina statutes and rules, policy provisions, and the applicable policy manual rules. We reviewed the following lines of business:

1. Private Passenger Automobile

2. Homeowners

3. Rental Dwelling

4. Commercial Automobile

Special attention was placed on the validity and reason for termination, timeliness in issuance of the termination notice, policy refund (where applicable), and documentation of the policy file. A total of 511,648 policies were terminated during the period under examination. The examiners randomly selected 658 terminations for review.

### Private Passenger Automobile Cancellations

One hundred cancelled private passenger automobile policies were randomly selected for review from a population of 219,581.

The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
|---|---|---|

Report on Market Conduct Examination State Farm Mutual..., 2014 WL 4680709...

DJA0340

| | | |
|---|---|---|
| Insured's request | 64 | 64.0 |
| Nonpayment of premium | 36 | 36.0 |
| **Total** | **100** | **100.0** |

The Companies were not required to issue cancellation notices for 64 of the cancellations reviewed as these policies were cancelled at the request of the insured. Cancellation notices for the remaining 36 policies stated the specific reason for cancellation. The Companies issued the refunds in a timely manner. The final area of this review encompassed documentation of the policy file. All policy files reviewed contained sufficient documentation to support the action taken by the Companies. The Companies sent the North Carolina Notice of Termination form (FS-4) to the North Carolina Division of Motor Vehicles (DMV) when liability coverage was cancelled.

## Homeowners Cancellations

One hundred cancelled homeowners policies were randomly selected for review from a population of 218,833.

The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| **Reason for Cancellation** | **Number of Policies** | **Percentage** |
|---|---|---|
| Insured's request | 55 | 55.0 |
| Nonpayment of premium | 28 | 28.0 |
| Coverage rewritten | 14 | 14.0 |
| Underwriting reasons | 3 | 3.0 |
| **Total** | **100** | **100.0** |

**\*8** The Companies were not required to issue cancellation notices for 69 of the cancellations reviewed as these policies were cancelled at the request of the insured or the coverage was rewritten. Cancellation notices for the remaining 31 policies stated the specific reason for cancellation. All insureds and mortgagees were given proper and timely notification of cancellation. All refunds were deemed correct.

The final area of this review encompassed documentation of the policy file. All policy files reviewed contained sufficient documentation to support the action taken by the Companies.

## Rental Dwelling Cancellations

One hundred cancelled rental dwelling policies were randomly selected for review from a population of 40,458.

The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
|---|---|---|
| Insured's request | 73 | 73.0 |
| Nonpayment of premium | 21 | 21.0 |
| Coverage rewritten | 5 | 5.0 |
| Underwriting reasons | 1 | 1.0 |
| **Total** | **100** | **100.0** |

The Companies were not required to issue cancellation notices for 78 of the cancellations reviewed as these policies were cancelled at the request of the insured, or the coverage was rewritten. Cancellation notices for the remaining 22 policies stated the specific reason for cancellation.

All premium refunds were deemed correct. The Companies issued the refunds in a timely manner.

The final area of this review encompassed documentation of the policy file. All policy files reviewed contained sufficient documentation to support the action taken by the Companies.

## Commercial Automobile Cancellations

One hundred cancelled commercial automobile policies were randomly selected for review from a population of 7,897.

The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
|---|---|---|
| Insured's request | 81 | 81.0 |
| Nonpayment of premium | 19 | 19.0 |
| **Total** | **100** | **100.0** |

The Companies were not required to issue cancellation notices for 81 of the cancellations reviewed as these policies were cancelled at the request of the insured. Cancellation notices for the remaining 19 policies stated the specific reason for cancellation.

All premium refunds were deemed correct. The Companies issued the refunds in a timely manner.

The final area of this review encompassed documentation of the policy file. All policy files reviewed contained sufficient documentation to support the action taken by the Companies. The Companies sent the FS-4 to the DMV when liability coverage was cancelled.

## Private Passenger Automobile Nonrenewals

**\*9**  Fifty nonrenewed private passenger automobile policies were randomly selected for review from a population of 409.

The reason for nonrenewal was deemed valid for all policies reviewed. The review revealed the following reasons for nonrenewal:

| Reason for Nonrenewal | Number of Policies | Percentage |
|---|---|---|
| Underwriting reasons | 49 | 98.0 |
| Producer no longer represents company | 1 | 2.0 |
| **Total** | **50** | **100.0** |

The nonrenewal notices for the policies reviewed stated the specific reason for nonrenewal. The Companies were deemed to be in violation of the provisions of NCGS 58-36-85(c) as the notice of nonrenewal was not sent at least 60 days prior to the termination date for six policies reviewed (12.0 percent error ratio).

The final area of this review encompassed documentation of the policy file. The Companies were deemed to be in violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as six files did not contain a copy of the insured's notice of termination or proof of mailing of cancellation (12.0 percent error ratio). The remaining files reviewed contained sufficient documentation to support the action taken by the Companies. The Companies sent the FS-4 to the DMV when liability coverage was cancelled.

Homeowners Nonrenewals

One hundred nonrenewed homeowners policies were randomly selected for review from a population of 21,140. One file was not a nonrenewal and was deemed an invalid receipt. We reviewed the remaining 99 files.

The reason for nonrenewal was deemed valid for all policies reviewed. The review revealed the following reasons for nonrenewal:

| Reason for Nonrenewal | Number of Policies | Percentage |
|---|---|---|
| Underwriting reasons | 96 | 96.0 |
| Risk no longer eligible | 3 | 3.0 |
| **Total** | **99** | **100.0** |

The nonrenewal notices reviewed stated the specific reason for nonrenewal. The insureds and mortgagees were given proper and timely notification of nonrenewal.

The final area of this review encompassed documentation of the policy file. All policy files reviewed contained sufficient documentation to support the action taken by the Companies.

Rental Dwelling Nonrenewals

Report on Market Conduct Examination State Farm Mutual..., 2014 WL 4680709...

DJA0343

Fifty nonrenewed rental dwelling policies were randomly selected for review from a population of 2,581.

The reason for nonrenewal was deemed valid for all policies reviewed. The review revealed the following reason for nonrenewal:

| Reason for Nonrenewal | Number of Policies | Percentage |
|---|---|---|
| Underwriting reasons | 50 | 100.0 |
| **Total** | **50** | **100.0** |

The nonrenewal notices for the policies reviewed stated the specific reason for nonrenewal.

**\*10** The final area of this review encompassed documentation of the policy file. All policy files reviewed contained sufficient documentation to support the action taken by the Companies.

Commercial Automobile Nonrenewals

All nonrenewed commercial automobile policies were selected for review from a population of eight.

The reason for nonrenewal was deemed valid for all policies reviewed. The review revealed the following reason for nonrenewal:

| Reason for Nonrenewal | Number of Policies | Percentage |
|---|---|---|
| Underwriting reasons | 8 | 100.0 |
| **Total** | **8** | **100.0** |

The nonrenewal notices for the policies reviewed stated the specific reason for nonrenewal.

The Companies were deemed to be in violation of the provisions of NCGS 58-41-20(b) as the nonrenewal notice was not sent at least 45 days prior to the termination date for one policy reviewed (12.5 percent error ratio).

The final area of this review encompassed documentation of the policy file. The Companies were deemed to be in violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4), (g) as one file reviewed did not contain a copy of the nonrenewal notice and proof of mailing (12.5 percent error ratio). The remaining files reviewed contained sufficient documentation to support the action taken by the Companies. The Companies sent the FS-4 to the DMV when liability coverage was cancelled.

Declined/Rejected

Fifty declined/rejected applications were randomly selected for review from a population of 741. The reason for declination/rejection was deemed valid for all the applications reviewed. The review revealed the following reason for declination/rejection.

| Reason for Declination/Rejection | Number of Declinations/Rejections |
|---|---|

Report on Market Conduct Examination State Farm Mutual..., 2014 WL 4680709...

DJA0344

| | |
|---|---|
| Underwriting reasons | 50 |
| **Total** | **50** |

## CLAIMS PRACTICES

### Overview

The Companies' claims practices were reviewed to determine compliance with the appropriate North Carolina statutes and rules and policy provisions. The review encompassed paid, automobile medical payment, bodily injury, closed without payment, subrogated, total loss settlement, and litigated claims.

Eight hundred fifty claims were randomly selected for review from a population of 744,675.

### Paid Claims

Three hundred paid first party automobile physical damage, first party property damage, and third party property damage claims were randomly selected for review from a population of 458,753. The claim files were reviewed to determine compliance with the provisions of NCGS 58-63-15(11) for timeliness of payment, supporting documentation and accuracy of payment.

**\*11** The following types of claims were reviewed and the average payment time is noted in calendar days:

| Type of Claim | Payment Time |
|---|---|
| Automobile physical damage | 10.0 |
| First party (excluding automobile physical damage) | 12.0 |
| Third party property damage | 15.0 |

All payments issued by the Companies were deemed to be accurate. Deductibles were correctly applied and depreciation taken was reasonable. All claim files reviewed contained documentation to support the Companies' payments. The documentation consisted of appraisals, estimates, repair bills, or inventory listings.

### Automobile Medical Payment Claims

One hundred automobile medical payment claims were randomly selected for review from a population of 33,977. The claim files were reviewed to determine compliance with the provisions of NCGS 58-63-15(11) and to see if the Companies had engaged in any unfair claims practices. The review of automobile medical payment claims disclosed no violations of the provisions of NCGS 58-63-15(11).

### Bodily Injury Claims

One hundred bodily injury claims were randomly selected for review from a population of 44,022. The claim files were reviewed to determine compliance with the provisions of NCGS 58-63-15(11) to see if the Companies had engaged in any unfair claims practices. The review of bodily injury claims disclosed no violations of the provisions of NCGS 58-63-15(11).

Report on Market Conduct Examination State Farm Mutual..., 2014 WL 4680709...

DJA0345

## Closed Without Payment Claims

One hundred closed without payment claims were randomly selected for review from a population of 102,822. The claim files were reviewed to determine compliance with the provisions of NCGS 58-63-15(11) to see if the Companies' reasons for closing the claims without payment were valid.

The claim files reviewed contained documentation that supported the Companies' reasons for closing the claims without payment. All reasons for denial or closing the files without payment were deemed valid. Claims were denied on an average of 14.5 calendar days for the four-year period. The review of the closed without payment claims disclosed no violations of the provisions of NCGS 58-63-15(11).

## Subrogated Claims

One hundred subrogated claims were randomly selected for review from a population of 43,484. The claim files were reviewed to determine compliance with the provisions of NCGS 58-63-15(11) to see if the insured's deductible was properly reimbursed by the Companies when subrogation was successful. All reimbursements were deemed to be correct and were issued on a four-year average of three calendar days from the date the Companies collected the monies. The review of subrogated claims disclosed no violations of the provisions of NCGS 58-63-15(11).

## Total Loss Settlement Claims

One hundred total loss settlement claims were randomly selected for review from a population of 57,557. The claim files were reviewed to determine compliance with the provisions of NCGS 58-63-15(11) to see if the settlements were equitable and timely.

**\*12**  The Companies primarily used CCC Information Services, Inc. in addition to on-site independent adjusters to establish the actual cash value of totaled vehicles. All settlements were deemed equitable.

The Companies settled all of the claims reviewed in a timely manner. The payments were issued on a four-year average of 12 calendar days. The review of total loss settlement claims disclosed no violations of the provisions of NCGS 58-63-15(11), 11 NCAC 4.0418, or 4.0421.

## Litigated Claims

Fifty litigated claims were randomly selected for review from a population of 4,060. The claim files were reviewed to determine compliance with the provisions of NCGS 58-63-15(11) and whether the Companies had engaged in any unfair claims practices. The review of litigated claims disclosed no violation of the provisions of NCGS 58-63-15(11).

## CONCLUSION

An examination has been conducted on the market conduct affairs of State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company for the period January 1, 2009, through December 31, 2012, with analyses of certain operations of the Companies being conducted through May 2, 2014.

This examination was conducted in accordance with the North Carolina Department of Insurance and the National Association of Insurance Commissioners Market Regulation Handbook procedures, including analyses of the Companies' operations in the areas of policyholder treatment, marketing, underwriting practices, terminations, and claims practices.

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Report on Market Conduct Examination State Farm Mutual..., 2014 WL 4680709...

DJA0346

In addition to the undersigned, Kelvin A. Owens and Sharon O'Quinn, North Carolina Market Conduct Examiners, participated in this examination.

Respectfully submitted,
/s/ Norma M. Rafter
Norma M. Rafter, CPCU
Examiner-In-Charge
Market Regulation Division
State of North Carolina

I have reviewed this examination report and it meets the provisions for such reports prescribed by this Division and the North Carolina Department of Insurance.

/s/ Tracy M. Biehn
Tracy M. Biehn, LPCS, MBA
Deputy Commissioner
Market Regulation Division
State of North Carolina

**End of Document**                                          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 36

Report on Market Conduct Examination of the Allstate..., 2011 WL 7143955...

DJA0347

2011 WL 7143955

State of North Carolina

**\*1**  Report on Market Conduct Examination of the

Allstate Property and Casualty Insurance Company

Northbrook, Illinois

July 25, 2011

MARKET CONDUCT REPORTS

North Carolina Department of Insurance

 Image 1 within document in PDF format.

Report

<u>TABLE OF CONTENTS</u>

SALUTATION
FOREWORD
SCOPE OF EXAMINATION
EXECUTIVE SUMMARY
COMPANY OVERVIEW
History and Profile
Company Operations and Management
Certificates of Authority
Disaster Recovery Procedures
Rate Evasion Procedures
POLICYHOLDER TREATMENT
Consumer Complaints
Privacy of Financial and Health Information
MARKETING
Policy Forms and Filings
Sales and Advertising
Producer Licensing
Agency Management
UNDERWRITING PRACTICES
Overview
Private Passenger Automobile
TERMINATIONS
Overview
Private Passenger Automobile Cancellations
Private Passenger Automobile Nonrenewals
Declinations/Rejections
CLAIMS PRACTICES

Report on Market Conduct Examination of the Allstate..., 2011 WL 7143955...

DJA0348

Overview

Paid Claims

Automobile Medical Payment Claims

First and Third Party Bodily Injury Claims

Closed Without Payment Claims

Subrogated Claims

Total Loss Settlement Claims

Litigated Claims

SUMMARY

TABLE OF STATUTES AND RULES

CONCLUSION

Raleigh, North Carolina

July 25, 2011

Honorable Jack Messmore

Acting Director of Insurance

Illinois Department of Insurance

State of Illinois

320 W. Washington St.

Springfield, Illinois 62767-0001

Honorable Wayne Goodwin

Commissioner of Insurance

Department of Insurance

State of North Carolina

Dobbs Building

430 N. Salisbury Street

Raleigh, North Carolina 27603

Honorable Commissioners:

Pursuant to your instructions and in accordance with the provisions of North Carolina General Statute (NCGS) 58-2-131, a general examination has been made of the market conduct activities of

**ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY (NAIC #17230)**

NAIC Exam Tracking System Exam Number: NC170-M75

**\*2** Springfield, Illinois

hereinafter generally referred to as the Company, located at the Company's claims office located at 3150 Spring Forest Road, Raleigh, North Carolina and at the North Carolina Department of Insurance (Department) office located at 11 S. Boylan Avenue, Raleigh, North Carolina. A report thereon is respectfully submitted.

FOREWORD

This examination reflects the North Carolina insurance activities of Allstate Property and Casualty Insurance Company. The examination is, in general, a report by exception. Therefore, much of the material reviewed will not be contained in this written report, as reference to any practices, procedures, or files that manifested no improprieties were omitted.

SCOPE OF EXAMINATION

This examination commenced on April 4, 2011 and covered the period of January 1, 2007 through December 31, 2009 with analyses of certain operations of the Company being conducted through July 25, 2011. All comments made in this report reflect conditions observed during the period of the examination.

The examination was arranged and conducted by the Department. It was made in accordance with Market Regulation standards established by the Department and procedures established by the National Association of Insurance Commissioners (NAIC) and accordingly included tests of policyholder treatment, marketing, underwriting practices, terminations and claims practices.

It is the Department's practice to cite companies in apparent violation of a statute or rule when the results of a sample show errors/noncompliance at or above the following levels: 0 percent for consumer complaints, sales and advertising, producers who were not appointed and/or licensed and the use of forms and rates/rules that were neither filed with nor approved by the Department; 7 percent for claims; and 10 percent for all other areas reviewed. When errors are detected in a sample, but the error rate is below the applicable threshold for citing an apparent violation, the Department issues a reminder to the company.

## EXECUTIVE SUMMARY

This market conduct examination revealed concerns with Company procedures and practices in the following areas:

*Consumer Complaints* - complaints not listed on the company's complaint register, response time to Departmental inquiries, NAIC company code was not included on Company response.

*Policy Forms and Filings* - unfiled application, consent to rate form and termination notice.

*Underwriting and Rating* - applications accepted from a producer who was not appointed, signed consent to rate forms not in file and rating errors for private passenger automobile.

*Terminations* - proper notification not given.

Specific violations related to each area of concern are noted in the appropriate section of this report. All North Carolina General Statutes and rules of the North Carolina Administrative Code cited in this report may be viewed on the North Carolina Department of Insurance Web site www.ncdoi.com by clicking "NCDOI DIVISIONS" then "Legislative Services".

**\*3** This examination identified various non-compliant practices, some of which may extend to other jurisdictions. The Company is directed to take immediate corrective action to demonstrate its ability and intention to conduct business in North Carolina according to its insurance laws and regulations. When applicable, corrective action for other jurisdictions should be addressed.

All unacceptable or non-compliant practices may not have been discovered or noted in this report. Failure to identify or criticize improper or non-compliant business practices in North Carolina or in other jurisdictions does not constitute acceptance of such practices. Examination report findings that do not reference specific insurance laws, regulations, or bulletins are presented to improve the Company's practices and ensure consumer protection.

## COMPANY OVERVIEW

History and Profile

Report on Market Conduct Examination of the Allstate..., 2011 WL 7143955...

DJA0350

Allstate Property and Casualty Insurance Company was incorporated on February 14, 1985 under the laws of Illinois and commenced business on April 1, 1985. The Company is a wholly owned subsidiary of Allstate Insurance Company, which in turn is owned by Allstate Insurance Holdings, LLC, a Delaware limited liability company.

## Company Operations and Management

The Company is a writer of private passenger automobile insurance and opened for new business in North Carolina in January 2007. The Company is licensed in the District of Columbia and all states except Hawaii, Massachusetts and New Jersey.

Direct written premium for the Company's 2009 countrywide property and casualty operations was $4,936,409,391. North Carolina's production for the same period was $117,581,300. Premiums written in North Carolina between 2007 and 2009 increased approximately 235.2 percent. The charts below outline the Company's mix of business for selected lines in 2009 and loss ratios in North Carolina for the examination period.

| Line of Business | Written Premium | Percentage |
|---|---|---|
| Private Passenger Automobile Liability | $67,440,642 | 57.4 |
| Private Passenger Automobile Physical Damage | $50,140,658 | 42.6 |
| **Total** | **$117,581,300** | **100.0** |

| Year | Written Premium | Earned Premium | Incurred Losses* | Loss Ratio |
|---|---|---|---|---|
| 2007 | $ 35,081,352 | $ 22,963,889 | $17,611,556 | 76.7 |
| 2008 | $ 77,410,097 | $ 67,905,707 | $48,725,298 | 71.8 |
| 2009 | $117,581,300 | $107,720,110 | $71,616,460 | 66.5 |

\* Does not include IBNRs

## Certificates of Authority

The Certificates of Authority issued to the Company were reviewed for the period under examination. These certificates were reviewed to determine compliance with the provisions of NCGS 58-7-15. The Company's writings in North Carolina were deemed to be in compliance with the authority granted.

## Disaster Recovery Procedures

**\*4** The Company's Business Continuity Planning Team has developed comprehensive standards to ensure that consistent and thorough plans are developed for the recoverability of the business unit's work-areas as well as the technology which supports critical business processes in the event of disaster. The standards cover all portions of disaster recovery planning and related environments within Allstate or operated or contracted with a third party by Allstate.

Report on Market Conduct Examination of the Allstate..., 2011 WL 7143955...

DJA0351

The backup and storage of electronic media, tapes, disks, etc. in a secure off-site location ensures that critical information is available and recoverable in the event of the unavailability of an Allstate data processing facility. All disaster recovery plans must be reviewed, at a minimum, annually. Updates must be performed sooner if technology components, personnel, or recovery strategies have changed.

## Rate Evasion Procedures

The Company has established procedures to address nonfleet private passenger automobile insurance rate evasion fraud by identifying any ineligible risk as defined in NCGS 58-37-1(4a) and verifying residency of the policyholder who owns a motor vehicle registered or principally garaged in North Carolina. The Company was found to be in compliance with the provisions of NCGS 58-2-164.

## POLICYHOLDER TREATMENT

## Consumer Complaints

The Company's complaint handling procedures were reviewed to determine compliance with applicable North Carolina statutes and rules.

The Company's complaint register was reconciled with a listing furnished by the Consumer Services Division of the Department. The Company was deemed to be in apparent violation of the provisions of Title 11 of the North Carolina Administrative Code, (NCAC), Chapter 19, Section 0103 as 1 complaint (2.0 percent error ratio) was not listed on the Company's complaint register.

Fifty of the 92 complaints from the Department's listing were randomly selected and received for review. The distribution of complaints requiring a response to the Department is shown in the chart below.

| Type of Complaint | Total |
|---|---|
| Underwriting | 33 |
| Administrative | 10 |
| Claims | 7 |
| **Total** | **50** |

The Company's response to each complaint was deemed to be appropriate to the circumstances. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 1.0602 as 9 of the complaints reviewed (18.0 percent error ratio) were responded to in excess of the 7 calendar day requirement of this rule.

The Company was deemed to be in apparent violation of the provisions of 11 NCAC 4.0123 as 3 responses to Departmental inquiries (6.0 percent error ratio) did not contain the Company's NAIC company code.

The average service time to respond to a Departmental complaint was 8 calendar days. A chart of the Company's response time follows:

| Service Days | Number of Files | Percentage of Total |
|---|---|---|

Report on Market Conduct Examination of the Allstate..., 2011 WL 7143955...

DJA0352

| | | |
|---|---|---|
| 1 - 7 | 27 | 54.0 |
| 8 - 14 | 19 | 38.0 |
| 15 - 21 | 4 | 8.0 |
| **Total** | **50** | **100.0** |

## Privacy of Financial and Health Information

**\*5**  The Company provided privacy of financial and health information documentation for the examiners' review. The Company exhibited policies and procedures in place so that nonpublic personal financial or health information is not disclosed unless the customer or consumer has authorized the disclosure. The Company was found to be compliant with the provisions of NCGS 58-39-25, 58-39-26, and 58-39-27.

## MARKETING

## Policy Forms and Filings

Policy forms and filings for the Company were reviewed to determine compliance with appropriate North Carolina statutes and rules. Filings for the private passenger automobile line of business were made by the North Carolina Rate Bureau on behalf of the Company. Deviations for this line of business were made to the Department by the Company.

The Company was deemed to be in apparent violation of the provisions of NCGS 58-3-150 and 11 NCAC 10.1201(c) as the private passenger automobile application being used was not the application that was filed with and approved by the Commissioner. The Company was deemed to be in apparent violation of the provisions of NCGS 58-3-150 and 11 NCAC 10.0602 as the private passenger automobile consent to rate form being used was not the form that was filed with and approved by the Commissioner. The Company was deemed to be in apparent violation of the provisions of NCGS 58-3-150 and 58-36-85(c) as the Notice of Termination had not been filed with and approved by the Commissioner.

## Sales and Advertising

Sales and advertising practices of the Company were reviewed to determine compliance with the provisions of NCGS 58-63-15.

The Company creates a range of advertising material that it makes available to its agents to order through a repository of all ads for print and broadcast media called Co-op Build an Ad Site. Agents go to the site, select the product line, ad message (headline and body copy) and customize their own ads using the Allstate brand. Agents are not allowed to create their own ads using the Allstate brand. Agents must use the Allstate approved materials.

The examiners reviewed advertisements, producer marketing solicitation kits, telemarketing scripts, bulletins and brochures that are provided for promotional use. The Company also maintains an internet site: www.allstate.com. The website provides background information relative to its operations, as well as products and services offered.

No unfair or deceptive trade practices were noted in this segment of the examination.

## Producer Licensing

The Company's procedures for appointment and termination of its producers were reviewed to determine compliance with the appropriate North Carolina statutes and rules. Fifty appointed and 50 terminated producer files were randomly selected and received for review from populations of 2,520 and 1,102, respectively.

All appointment forms reviewed were submitted to the Department in accordance with the timetables stipulated under the provisions of NCGS 58-33-40. The Company was reminded of the provisions of 11 NCAC 19.0102 (a) and 19.0106(a)(3)(h) as confirmation of termination was not provided for 1 producer reviewed (2 percent error ratio). The Company was reminded of the provisions of NCGS 58-33-56(d) as the notification of termination letter was not sent to 2 producers reviewed (4 percent error ratio).

## Agency Management

**\*6** The marketing effort in North Carolina is under the direction of the Regional Marketing Senior Manager located at the regional office in Atlanta, Georgia. The Company has 342 active agencies with approximately 987 producers appointed in North Carolina as well as 1 full time marketing representative.

The Territorial Sales Leader, located at the Allstate office in Greensboro, North Carolina, is responsible for the activities of the agency force as well as agent appointments, terminations and licensing. Formal agency reviews are conducted annually by the Field Sales Leaders.

## UNDERWRITING PRACTICES

### Overview

The Company's marketing philosophy in North Carolina focuses on the private passenger automobile line of business. The Company's private passenger automobile policies were reviewed for adherence to underwriting guidelines, file documentation and premium determination. Additionally, the policies were examined to determine compliance with the appropriate North Carolina statutes and rules, policy provisions and the applicable policy manual rules.

### Private Passenger Automobile

The Company provided a listing of 94,726 active private passenger automobile policies issued during the period under examination. One hundred policies were randomly selected and received for review.

The Company's private passenger automobile policies were written on a 6 or 12 month basis. Liability coverages were written utilizing manual rates. Physical damage coverages were written using both manual rates and on a consent to rate basis. Risk placement was determined by the Company's underwriting guidelines and the underwriter. No discrepancies were noted in the Company's use of its underwriting guidelines.

The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-40 as 3 applications reviewed (3.0 percent error ratio) were accepted from a producer who was not appointed.

The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-30(a) and 58-37-35(l) as 28 policies reviewed (28.0 percent error ratio) contained multiple rating errors. The rating errors consisted of the following:

• Incorrect company deviations were applied on 14 policies.

• Incorrect territory was used to rate 9 policies.

Report on Market Conduct Examination of the Allstate..., 2011 WL 7143955...

DJA0354

• Combined Uninsured/Underinsured Motorist coverage was provided on 3 policies that were not eligible.

• Incorrect Safe Driver Incentive Plan Points were applied on 3 policies.

• Vehicles were classified incorrectly on 1 policy.

• Multi-car discount was applied on 1 policy that was not eligible.

• Inexperienced Operator Surcharge was not applied on 1 policy.

• Comprehensive premium was calculated incorrectly on 1 policy.

• Disability Income Protection coverage was calculated incorrectly on 1 policy.

The rating errors resulted in 15 premium undercharges and 9 premium overcharges to the insureds. At the request of the examiners, refunds in the amount of $368.94 were issued by the Company for the overcharges. The remaining premiums charged were deemed correct.

**\*7** The Company was deemed to be in apparent violation of the provisions of 11 NCAC 10.0602(a) as 10 files reviewed (10.0 percent error ratio) did not contain a copy of the signed consent to rate form for physical damage coverages. The Company was reminded of the provisions of 11 NCAC 19.0102(a)(b), 19.0104 and 19.0106 (a)(4)(g) as 4 files reviewed (4.0 percent error ratio) did not contain proper file documentation.

## TERMINATIONS

### Overview

The Company's termination procedures for its private passenger automobile policies were reviewed to determine compliance with the appropriate North Carolina statutes and rules, policy provisions and the applicable policy manual rules. Special attention was placed on the validity and reason for termination, timeliness in issuance of the termination notice, policy refund (where applicable) and documentation of the policy file. A total of 41,319 policies were terminated during the period under examination. The examiners randomly selected 128 terminations for review.

### Private Passenger Automobile Cancellations

One hundred cancelled private passenger automobile policies were randomly selected and received for review from a population of 41,291.

The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
|---|---|---|
| Nonpayment of premium | 48 | 48.0 |
| Insured's request | 42 | 42.0 |
| Finance company request | 9 | 9.0 |

Report on Market Conduct Examination of the Allstate..., 2011 WL 7143955...

DJA0355

| | | |
|---|---|---|
| Rewritten | 1 | 1.0 |
| **Total** | **100** | **100.0** |

The Company was not required to issue cancellation notices for 43 of the cancellations reviewed as these policies were cancelled at the request of the insured or coverage was rewritten.

The Company was reminded of the provisions of NCGS 58-36-30(a) and Rule 10 of the North Carolina Personal Automobile Manual as 3 policies reviewed (3.0 percent error ratio) were cancelled using an incorrect cancellation method. Two of the errors resulted in overstatement of refund and 1 error resulted in an understatement of refund to the insureds. At the request of the examiners, the Company issued an additional refund in the amount of $9.43. The remaining premium refunds were deemed correct. The Company issued refunds in a timely manner.

The Company was reminded of the provisions of NCGS 58-35-85(1)(2) as 8 policies reviewed (8.0 percent error ratio) contained no documentation verifying that the premium finance company notified the insured not less than 10 days prior to cancellation of coverage or sent the insurer a request for cancellation.

The Company was reminded of the provisions of NCGS 58-36-85(b)(3) as 6 policies reviewed (6.0 percent error ratio) contained no documentation verifying that the insured requested cancellation of the policy.

**\*8** The Company was reminded of the provisions of NCGS 20-309 as the North Carolina Notice of Termination form (FS-4) was not submitted to the North Carolina Division of Motor Vehicles (DMV) when liability coverages were cancelled for 7 policies reviewed (7.0 percent error ratio).

The remaining policy files reviewed contained sufficient documentation to support action taken by the Company.

Private Passenger Automobile Nonrenewals

The entire population of 28 nonrenewed private passenger automobile policies was selected and received for review.

The reason for nonrenewal was deemed valid for all policies reviewed. The review revealed the following reasons for nonrenewal:

| **Reason for Nonrenewal** | **Number of Policies** | **Percentage** |
|---|---|---|
| Underwriting reasons | 24 | 85.7 |
| Risk no longer eligible | 4 | 14.3 |
| **Total** | **28** | **100.0** |

The nonrenewal notices for the policies reviewed stated the specific reason for nonrenewal. The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-85(c) as the notice of nonrenewal was not issued at least 60 days prior to the termination date for 3 policies reviewed (10.7 percent error ratio). The Company was reminded of the provisions of NCGS 58-36-85(b) as the notice of nonrenewal was not issued in writing for 1 policy reviewed (3.6 percent error ratio).

The final area of this review encompassed documentation of the policy file. The Company sent the FS-4 to the DMV when liability coverages were nonrenewed. The Company was deemed to be in compliance with the provisions of NCGS 20-309.

Report on Market Conduct Examination of the Allstate..., 2011 WL 7143955...

DJA0356

## Declinations/Rejections

The Company reported coverage is bound at point of sale so they do not decline or reject.

## CLAIMS PRACTICES

### Overview

The Company's claims practices were reviewed to determine compliance with the appropriate North Carolina statutes and rules and policy provisions. The review encompassed paid, automobile medical payment, first and third party bodily injury, closed without payment, subrogated, total loss settlement and litigated claims.

Claims service in North Carolina is under the direction of the Claim Field Director located in Atlanta, Georgia and is provided from four Market Claims Offices (MCO) in North Carolina. The combined staff for the four offices is comprised of the 4 market claim managers, 9 team leaders, 32 claim managers, 253 claim adjusters, 278 claim processors and 36 clerical/administrative personnel.

Company adjusters and independent adjusters (Auto Field Inspections) provide the claims service. Independent adjusters have no check or draft authority. The Company agency force does not adjust any claims and does not have claims draft authority. With regard to total losses, a salvage log is maintained by the Carolina Auto MCO leadership.

 **\*9** Five hundred thirty-seven claims were randomly selected for review from a population of 68,504.

### Paid Claims

The examiners randomly selected and received 200 of the 29,130 first party automobile physical damage and third party property damage claims paid during the period under examination. The claim files were reviewed for timeliness of payment, supporting documentation and accuracy of payment.

The following types of claims were reviewed and the average payment time is noted in calendar days:

| Type of Claim | Payment Time |
|---|---|
| Automobile physical damage | 20.0 |
| Third party property damage | 24.0 |

All payments issued by the Company were deemed to be accurate. Deductibles were correctly applied and depreciation taken was reasonable.

All claim files reviewed contained documentation to support the Company's payments. The documentation consisted of appraisals, estimates, repair bills, or inventory listings.

First party claims were not investigated in a timely manner for 2 claims (2.0 percent error ratio). First party claims were not appraised in a timely manner for 1 claim (1.0 percent error ratio). First party claims were not paid in a timely manner for

Report on Market Conduct Examination of the Allstate..., 2011 WL 7143955...

DJA0357

3 claims (3.0 percent error ratio). Third party claims were not investigated in a timely manner for 2 claims (2.0 percent error ratio). Third party claims were not appraised in a timely manner for 1 claim (1.0 percent error ratio). Third party claims were not paid in a timely manner for 1 claim (1.0 percent error ratio). This matter could result in an apparent violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice.

### Automobile Medical Payment Claims

Fifty automobile medical payment claims were randomly selected and received for review from a population of 2,644. The claim files were reviewed to determine if the Company had engaged in any unfair claims practices. An emergency room bill was not paid for 1 claim (2.0 percent error ratio). At the request of the examiners, the medical provider was issued payment in the amount of $205.00. This matter could result in an apparent violation of the provisions of NCGS 58-63-15(11) and 11 NCAC 4.0421(1) if the occurrence is of such frequency as to be considered a general business practice.

### First and Third Party Bodily Injury Claims

Fifty first and third party bodily injury claims were randomly selected and received for review from a population of 4,908. The claim files were reviewed to determine whether the Company had engaged in any unfair claims practices. The review of first and third party bodily injury claims disclosed no apparent violations of the provisions of NCGS 58-63-15.

### Closed Without Payment Claims

One hundred closed without payment claims were randomly selected and received for review from a population of 27,329. The claim files were reviewed to determine if the Company's reasons for closing the claims without payment were valid.

**\*10** The claim files reviewed contained documentation that supported the Company's reasons for closing the claims without payment. All reasons for denial or closing the files without payment were deemed valid. Claims were denied on an average of 14 calendar days for the 3-year period. The review of closed without payment claims disclosed no apparent violations of the provisions of NCGS 58-63-15.

### Subrogated Claims

Fifty subrogated claims were randomly selected and received for review from a population of 548. The claim files were reviewed to determine if the insured's deductible was properly reimbursed by the Company when subrogation was successful.

The insureds deductible was not reimbursed in a timely manner for 1 claim (2.0 percent error ratio). This matter could result in an apparent violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice.

The remaining reimbursements were deemed to be correct and were issued on an average of 1 calendar day from the date the Company collected the monies.

### Total Loss Settlement Claims

Fifty total loss settlement claims were randomly selected and received for review from a population of 3,908. The claim files were reviewed to determine if the settlements were equitable and timely.

Report on Market Conduct Examination of the Allstate..., 2011 WL 7143955...

DJA0358

The Company primarily used CCC Information Services, Inc. in addition to independent adjusters to establish the actual cash value of totaled vehicles. All settlements were deemed equitable.

Claims were not investigated in a timely manner for 1 claim (2.0 percent error ratio). Claims were not appraised in a timely manner for 1 claim (2.0 percent error ratio). This matter could result in an apparent violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice.

The Company settled all remaining claims in a timely manner. The payments were issued on a 3-year average of 29 calendar days. No apparent violations of the provisions of 11 NCAC 4.0418 or 4.0421 were noted during the review.

## Litigated Claims

The entire population of 37 litigated claims was selected and received for review. The claim files were reviewed to determine if the Company had engaged in any unfair claims practices. Claims were not investigated in a timely manner for 1 claim (2.7 percent error ratio). This matter could result in an apparent violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice.

## SUMMARY

The Market Conduct examination revealed the following:

1. <u>Policyholder Treatment</u>

a. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0103 as 2.0 percent of the consumer complaints were not listed on the Company's complaint register.

*11 b. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 1.0602 as the responses to 18.0 percent of the Departmental inquiries reviewed were in excess of the 7 calendar day requirement of this rule.

c. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 4.0123 as the responses to 6.0 percent of the Departmental inquiries reviewed did not include its National Association of Insurance Commissioners code.

2. <u>Marketing</u>

a. The Company was deemed to be in apparent violation of the provisions of NCGS 58-3-150 and 11 NCAC 10.1201(c) as the private passenger automobile application being used was not the application that was filed with and approved by the Commissioner.

b. The Company was deemed to be in apparent violation of the provisions of NCGS 58-3-150 and 11 NCAC 10.0602 as the private passenger automobile consent to rate form being used was not the form that was filed with and approved by the Commissioner.

c. The Company was deemed to be in apparent violation of the provisions of NCGS 58-3-150 and 58-36-85(c) as the Notice of Termination had not been filed with and approved by the Commissioner.

d. The Company was reminded of the provisions of 11 NCAC 19.0102(a) and 19.0106(a)(3)(h) as confirmation of termination was not provided to the Department for 2.0 percent of terminated producers reviewed.

Report on Market Conduct Examination of the Allstate..., 2011 WL 7143955...

DJA0359

e. The Company was reminded of the provisions of NCGS 58-33-56(d) as notification of termination was not sent to 4.0 percent of the terminated producers reviewed.

### 3. Underwriting and Rating

a. The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-40 as 3.0 percent of the private passenger automobile applications reviewed were accepted from a producer who was not appointed.

b. The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-30(a) and 58-37-35(l) as 28.0 percent of the active private passenger automobile policies reviewed were rated incorrectly.

c. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 10.0602(a) as 10.0 percent of the active private passenger automobile files reviewed did not contain a copy of the signed consent to rate form for physical damage coverages.

d. The Company was reminded of the provisions of 11 NCAC 19.0102(a)(b), 19.0104, and 19.0106(a)(4)(h) as 4.0 percent of the active private passenger automobile files reviewed did not contain proper file documentation.

### 4. Terminations

a. The Company was reminded of the provisions of NCGS 58-36-30(a) and Rule 10 of the North Carolina Personal Automobile Manual as 3.0 percent of the cancelled private passenger automobile policies reviewed were cancelled using an incorrect cancellation method.

b. The Company was reminded of the provisions of NCGS 58-35-85(1)(2) as 8.0 percent of the cancelled private passenger automobile files reviewed contained no documentation verifying that the premium finance company notified the insured not less than 10 days prior to cancellation of coverage or sent the insurer a request for cancellation.

*12 c. The Company was reminded of the provisions of NCGS 58-36-85(b)(3) as 6.0 percent of the cancelled private passenger automobile files reviewed contained no documentation verifying that the insured requested cancellation of the policy.

d. The Company was reminded of the provisions of NCGS 20-309 as the North Carolina Notice of Termination form was not submitted to the North Carolina Division of Motor Vehicles when liability coverages were cancelled for 7.0 percent of the cancelled private passenger automobile policies reviewed.

e. The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-85(c) as the notice of nonrenewal was not issued at least 60 days prior to the termination date for 10.7 percent of the nonrenewed private passenger automobile policies reviewed.

f. The Company was reminded of the provisions of NCGS 58-36-85(b) as the notice of nonrenewal was not issued in writing for 3.6 percent of the nonrenewed private passenger automobile policies reviewed.

## TABLE OF STATUTES AND RULES

| Statute/Rule | Title |
| --- | --- |
| NCGS 58-2-131 | Examinations to be made; authority, scope, scheduling, and conduct of examinations. |

Report on Market Conduct Examination of the Allstate..., 2011 WL 7143955...

DJA0360

| | |
|---|---|
| NCGS 58-2-164 | Rate evasion fraud; prevention programs. |
| NCGS 58-3-150 | Forms to be approved by the Commissioner. |
| NCGS 58-7-15 | Kinds of insurance authorized. |
| NCGS 58-33-40 | Appointment of agents. |
| NCGS 58-33-56 | Notification to Commissioner of termination. |
| NCGS 58-35-85 | Procedure for cancellation of insurance contract upon default; return of unearned premiums; collection of cash surrender value. |
| NCGS 58-36-30 | Deviations. |
| NCGS 58-36-85 | Termination of a nonfleet private passenger motor vehicle insurance policy. |
| NCGS 58-37-1 | Definitions. |
| NCGS 58-37-35 | The Facility; functions; administration. |
| NCGS 58-39-25 | Notice of insurance information practices. |
| NCGS 58-39-26 | Federal privacy disclosure notice requirements. |
| NCGS 58-39-27 | Privacy notice and disclosure requirement exceptions. |
| NCGS 58-63-15 | Unfair methods of competition and unfair or deceptive acts or practices defined. |
| NCGS 20-309 | Motor vehicle registration. |
| 11 NCAC 1.0602 | Insurance Companies' Response to Departmental Inquiries. |
| 11 NCAC 4.0123 | Use of Specific Company Name in Responses. |
| 11 NCAC 4.0418 | Total Losses on Motor Vehicles. |
| 11 NCAC 4.0421 | Handling of Loss and Claim Payments. |

Report on Market Conduct Examination of the Allstate..., 2011 WL 7143955...

DJA0361

| 11 NCAC 10.0602 | Consent to Rate Procedures: Rate Bureau Coverages. |
|---|---|
| 11 NCAC 10.1201 | General Requirements. |
| 11 NCAC 19.0102 | Maintenance of Records. |
| 11 NCAC 19.0103 | Complaint Records. |
| 11 NCAC 19.0104 | Policy Records. |
| 11 NCAC 19.0106 | Records Required for Examination. |

## CONCLUSION

**\*13** An examination has been conducted on the market conduct affairs of Allstate Property and Casualty Insurance Company for the period January 1, 2007 through December 31, 2009 with analyses of certain operations of the Company being conducted through July 25, 2011. The Company's response to this report, if any, is available upon request.

This examination was conducted in accordance with the North Carolina Department of Insurance and the National Association of Insurance Commissioners Market Regulation Handbook procedures, including analyses of Company operations in the areas of policyholder treatment, marketing, underwriting and rating, terminations and claims practices.

In addition to the undersigned, James P. McQuillan, CPCU and Dana Eaves, North Carolina Market Conduct Examiners, participated in this examination.

Respectfully submitted,
/s/ Norma M. Rafter
Norma M. Rafter, CPCU
Examiner-In-Charge
Market Regulation Division
State of North Carolina

I have reviewed this examination report and it meets the provisions for such reports prescribed by this Division and the North Carolina Department of Insurance.

/s/ Tracy M. Biehn
Tracy M. Biehn, LPCS, MBA
Deputy Commissioner
Market Regulation Division
State of North Carolina

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 37

Report on Market Conduct Examination of the Titan..., 2011 WL 4387728...

DJA0362

2011 WL 4387728

State of North Carolina

**\*1** Report on Market Conduct Examination of the

Titan Indemnity Company

San Antonio, Texas

April 14, 2011

MARKET CONDUCT REPORTS

North Carolina Department of Insurance

 Image 1 within document in PDF format.

Report

<u>TABLE OF CONTENTS</u>

SALUTATION
FOREWORD
SCOPE OF EXAMINATION
EXECUTIVE SUMMARY
COMPANY OVERVIEW
History and Profile
Company Operations and Management
Certificates of Authority
Disaster Recovery Procedures
Rate Evasion Procedures
POLICYHOLDER TREATMENT
Consumer Complaints
Privacy of Financial and Health Information
MARKETING
Policy Forms and Filings
Sales and Advertising
Producer Licensing
Agency Management
UNDERWRITING PRACTICES
Overview
Private Passenger Automobile
TERMINATIONS
Overview
Private Passenger Automobile Cancellations
Private Passenger Automobile Nonrenewals
Declinations/Rejections
CLAIMS PRACTICES

Report on Market Conduct Examination of the Titan..., 2011 WL 4387728...

DJA0363

Overview
Paid Claims
Automobile Medical Payment Claims
First and Third Party Bodily Injury Claims
Closed Without Payment Claims
Subrogated Claims
Total Loss Settlement Claims
Litigated Claims
SUMMARY
TABLE OF STATUTES AND RULES
CONCLUSION

Raleigh, North Carolina

April 14, 2011

Honorable Mike Geeslin

Commissioner of Insurance

Texas Department of Insurance

333 Guadalupe Street

Austin, Texas 78701

Honorable Mary Taylor

Director of Insurance

Ohio Department of Insurance

50 West Town Street, Suite 300

Columbus, OH 43215

Honorable Wayne Goodwin

Commissioner of Insurance

Department of Insurance

State of North Carolina

Dobbs Building

430 N. Salisbury Street

Raleigh, North Carolina 27603

Honorable Commissioners:

Pursuant to your instructions and in accordance with the provisions of North Carolina General Statute (NCGS) 58-2-131, a general examination has been made of the market conduct activities of

**TITAN INDEMNITY COMPANY (NAIC #13242)**

**\*2** NAIC Exam Tracking System Exam Number: NC170-M86

San Antonio, Texas

hereinafter generally referred to as the Company, at the North Carolina Department of Insurance (Department) office located at 11 S. Boylan Avenue, Raleigh, North Carolina. A report thereon is respectfully submitted.

FOREWORD

This examination reflects the North Carolina insurance activities of Titan Indemnity Company. The examination is, in general, a report by exception. Therefore, much of the material reviewed will not be contained in this written report, as reference to any practices, procedures, or files that manifested no improprieties were omitted.

Report on Market Conduct Examination of the Titan..., 2011 WL 4387728...

DJA0364

SCOPE OF EXAMINATION

This examination commenced on August 16, 2010 and covered the period of January 1, 2007 through December 31, 2009 with analyses of certain operations of the Company being conducted through April 14, 2011. All comments made in this report reflect conditions observed during the period of the examination.

The examination was arranged and conducted by the Department. It was made in accordance with Market Regulation standards established by the Department and procedures established by the National Association of Insurance Commissioners (NAIC) and accordingly included tests of policyholder treatment, marketing, underwriting practices, terminations and claims practices.

It is the Department's practice to cite companies in apparent violation of a statute or rule when the results of a sample show errors/noncompliance at or above the following levels: 0 percent for consumer complaints, sales and advertising, producers who were not appointed and/or licensed and the use of forms and rates/rules that were neither filed with nor approved by the Department; 7 percent for claims; and 10 percent for all other areas reviewed. When errors are detected in a sample, but the error rate is below the applicable threshold for citing an apparent violation, the Department issues a reminder to the company.

EXECUTIVE SUMMARY

This market conduct examination revealed concerns with Company procedures and practices in the following areas:

*Consumer Complaints* - complaints not listed on the company's complaint register, response time to Departmental inquiries, Company mailing address not included on response, Department not notified of change in contact information.

*Appointment and Termination of Producers* - failure to perform background checks on appointed producers, termination of appointment letter not provided to the producer in accordance with the statute.

*Underwriting Practices* - Private passenger automobile: applications accepted from a producer who was not appointed, deviations and coverage incorrectly stated on the declarations page, rating errors.

*Terminations* - Private passenger automobile cancellations: proper notification not given.

Specific violations related to each area of concern are noted in the appropriate section of this report. All North Carolina General Statutes and rules of the North Carolina Administrative Code cited in this report may be viewed on the North Carolina Department of Insurance Web site www.ncdoi.com by clicking "NCDOI DIVISIONS" then "Legislative Services".

**\*3** This examination identified various non-compliant practices, some of which may extend to other jurisdictions. The Company is directed to take immediate corrective action to demonstrate its ability and intention to conduct business in North Carolina according to its insurance laws and regulations. When applicable, corrective action for other jurisdictions should be addressed.

All unacceptable or non-compliant practices may not have been discovered or noted in this report. Failure to identify or criticize improper or non-compliant business practices in North Carolina or in other jurisdictions does not constitute acceptance of such practices. Examination report findings that do not reference specific insurance laws, regulations, or bulletins are presented to improve the Company's practices and ensure consumer protection.

COMPANY OVERVIEW

Report on Market Conduct Examination of the Titan..., 2011 WL 4387728...

DJA0365

## History and Profile

Titan Indemnity Company was incorporated on January 18, 1984 in the State of Texas. The company changed its name from Technology Insurance Company to Titan Indemnity Company in 1986. Titan Indemnity Company is one of seven insurance companies owned by THI Holdings (Delaware), Inc., a Delaware holding company. On August 1, 2003, Nationwide Mutual Insurance Company acquired 100% of the outstanding capital shares of THI Holdings (Delaware), Inc., and the seven THI insurance companies became affiliates of Nationwide Insurance.

## Company Operations and Management

The Company is a writer of non-standard private passenger automobile insurance in North Carolina. The Company is licensed in the District of Columbia and all states with the exception of Rhode Island.

Direct written premium for the Company's 2009 countrywide property and casualty operations was $167,737,173. North Carolina's production for the same period was $14,951,318. Premiums written in North Carolina between 2007 and 2009 increased approximately 713.7 percent. The charts below outline the Company's mix of business for selected lines in 2009 and loss ratios in North Carolina for the examination period.

| Line of Business | Written Premium | Percentage |
|---|---|---|
| Private Passenger Automobile Liability | $9,328,677 | 62.4 |
| Private Passenger Automobile Physical Damage | $5,622,641 | 37.6 |
| **Total** | **$14,951,318** | **100.0** |

| Year | Written Premium | Earned Premium | Incurred Losses [a1] | Loss Ratio |
|---|---|---|---|---|
| 2007 | $ 1,837,524 | $ 931,913 | $ 753,646 | 80.0 |
| 2008 | $ 8,061,433 | $ 6,188,288 | $ 5,211,305 | 84.2 |
| 2009 | $14,951,318 | $14,836,431 | $12,354,322 | 83.3 |

[a1]    **Does not include IBNRs**

## Certificates of Authority

The Certificates of Authority issued to the Company were reviewed for the period under examination. These certificates were reviewed to determine compliance with the provisions of NCGS 58-7-15. The Company's writings in North Carolina were deemed to be in compliance with the authority granted.

## Disaster Recovery Procedures

Report on Market Conduct Examination of the Titan..., 2011 WL 4387728...

DJA0366

 **\*4**  The Company has developed a comprehensive business continuity program to increase its chances of preventing disasters, as well as providing continuing operations following natural or man-made disasters. The plans address individual business functions, applications and systems architectures throughout the organization. These plans are reviewed, updated and exercised on a regular basis. Should an event occur that hinders the Company's ability to conduct normal business operations, the plan encompasses multiple business recovery strategies that allow resumption of critical business operations within a reasonable period of time. The plan includes the relocation of work and employees to other business locations or to remotely secured locations. Data processing systems, critical files and data, backed and stored at alternate data centers are utilized to enable the resumption of business operations. Business functions and system applications have pre-assigned recovery windows to ensure resources are appropriately allocated. In addition, the Company utilizes external vendors to deliver a high level of service to their customers. Should an event occur that hinders the ability to conduct vendor transactions, the Company will appropriately re-direct those vital operations elsewhere in order to maintain continued service to customers.

### Rate Evasion Procedures

The Company has established procedures to address nonfleet private passenger automobile insurance rate evasion fraud by identifying any ineligible risk as defined in NCGS 58-37-1(4a) and verifying residency of the policyholder who owns a motor vehicle registered or principally garaged in North Carolina. The Company was found to be in compliance with the provisions of NCGS 58-2-164.

### POLICYHOLDER TREATMENT

### Consumer Complaints

The Company's complaint handling procedures were reviewed to determine compliance with applicable North Carolina statutes and rules.

The Company's complaint register was reconciled with a listing furnished by the Consumer Services Division of the Department. The Company was deemed to be in apparent violation of the provisions of Title 11 of the North Carolina Administrative Code, (NCAC), Chapter 19, Section 0103 as 3 complaints (15.8 percent error ratio) were not listed on the Company's complaint register.

All complaints from the Department's listing of 19 were selected and received for review. The distribution of complaints requiring a response to the Department is shown in the chart below.

| Type of Complaint | Total |
|---|---|
| Claims | 11 |
| Underwriting | 4 |
| Administrative | 4 |
| **Total** | **19** |

The Company's response to each complaint was deemed to be appropriate to the circumstances. Fourteen complaints were responded to in excess of seven calendar days; however, extensions were requested and granted for 9 of the complaints. Of the 9 extensions granted, 3 responses were received after the extension date. The Company was deemed to be in apparent violation

Report on Market Conduct Examination of the Titan..., 2011 WL 4387728...

DJA0367

of the provisions of 11 NCAC 1.0602 as 8 complaints reviewed (42.1 percent error ratio) were responded to in excess of the 7 calendar day requirement of this rule or the extension date.

**\*5** The Company was deemed to be in apparent violation of the provisions of 11 NCAC 4.0123 as 1 response to a Departmental inquiry (5.3 percent error ratio) did not include the Company's mailing address. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 4.0124 as it failed to notify the Department of a change in contact information.

The average service time to respond to a Departmental complaint was 18 calendar days. A chart of the Company's response time follows:

| Service Days | Number of Files | Percentage of Total |
| --- | --- | --- |
| 1 - 7 | 5 | 26.3 |
| 8 - 14 | 6 | 31.6 |
| 15 - 21 | 2 | 10.5 |
| 22 - 30 | 4 | 21.0 |
| 31 - 60 | 1 | 5.3 |
| Over 60 | 1 | 5.3 |
| **Total** | **19** | **100.0** |

### Privacy of Financial and Health Information

The Company provided privacy of financial and health information documentation for the examiners' review. The Company exhibited policies and procedures in place so that nonpublic personal financial or health information is not disclosed unless the customer or consumer has authorized the disclosure. The Company was found to be compliant with the provisions of NCGS 58-39-25, 58-39-26, and 58-39-27.

## MARKETING

### Policy Forms and Filings

Policy forms and filings for the Company were reviewed to determine compliance with appropriate North Carolina statutes and rules. Filings for the private passenger automobile line of business were made by the North Carolina Rate Bureau on behalf of the Company. Deviations for this line of business were made to the Department by the Company.

### Sales and Advertising

Sales and advertising practices of the Company were reviewed to determine compliance with the provisions of NCGS 58-63-15.

All advertising materials referencing the Company or using the logo must be approved by the Sales Manager and Regional Sales Director. The Company notifies producers of new products and changes in insurance statutes and rules via email and blast fax in the form of a memo/flyer. Product Management maintains a copy of Company communications regarding new products and regulations. The examiners reviewed advertisements, bulletins and brochures that are provided to producers for promotional

Report on Market Conduct Examination of the Titan..., 2011 WL 4387728...

DJA0368

use. The Company also maintains an internet site: http:// www.nationwide.com/. The website provides background information relative to its operations, as well as products and services offered.

No unfair or deceptive trade practices were noted in this segment of the examination.

## Producer Licensing

The Company's procedures for appointment and termination of its producers were reviewed to determine compliance with the appropriate North Carolina statutes and rules. Fifty appointed and 50 terminated producer files were randomly selected and received for review from populations of 2,338 and 870, respectively.

 **\*6**  All appointment forms reviewed were submitted to the Department in accordance with the timetables stipulated under the provisions of NCGS 58-33-40. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 6A.0412(2) as background checks were not performed on 21 appointed producers reviewed (42.0 percent error ratio).

The Company was reminded of the provisions of 11 NCAC 19.0102(a) and 19.0106(a)(3)(h) as confirmation of termination was not provided for 1 producer reviewed (2.0 percent error ratio). The remaining 49 terminated appointment forms were submitted to the Department in accordance with the timetables stipulated under the provisions of NCGS 58-33-56(b).

The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-56(d) as notification of termination to the producer was not provided in accordance with the statute for 5 terminated producers reviewed (10.0 percent error ratio).

  • The letter was not sent to 3 producers.

  • The letter was not mailed to the last known address for 1 producer.

  • The letter was sent in excess of the 15 day requirement for 1 producer.

## Agency Management

The Company has 2,999 active producers appointed in North Carolina. The marketing efforts are driven at both the corporate and regional levels. Corporate marketing is handled out of the home office in Columbus, Ohio and regional marketing is handled out of the regional office in Raleigh, North Carolina.

Regional sales managers are primarily responsible for the agency force. The sales managers are split out by distribution channel. Eighteen sales managers are assigned to the North Carolina exclusive agency force and 1 sales manager is assigned to the North Carolina independent agency force. Reviews are normally conducted annually.

Regional sales managers, working in conjunction with the corporate licensing division, are responsible for appointment, terminations and licensing.

## UNDERWRITING PRACTICES

## Overview

The Company's marketing philosophy in North Carolina focuses on the private passenger automobile line of business. The Company's private passenger automobile policies were reviewed for adherence to underwriting guidelines, file documentation

and premium determination. Additionally, the policies were examined to determine compliance with the appropriate North Carolina statutes and rules, policy provisions and the applicable policy manual rules.

## Private Passenger Automobile

The Company provided a listing of 9,036 active private passenger automobile policies issued during the period under examination. One hundred policies were randomly selected and received for review.

The Company's private passenger automobile policies were written on a 6 or 12 month basis. Liability coverages were written utilizing manual and deviated rates. Physical damage coverages were written on a consent to rate basis. Risk placement was determined by the Company's underwriting guidelines and the underwriter. No discrepancies were noted in the Company's use of its underwriting guidelines.

**\*7**  The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-40(h) as 4 applications reviewed (4.0 percent error ratio) were accepted from a producer who was not appointed. The Company was deemed to be in apparent violation of the provisions of NCGS 58-63-15(1) as the declarations page for 52 policies reviewed (52.0 percent error ratio) incorrectly stated policy terms.

　• 37 declarations pages incorrectly stated the policy received a deviation when it was not applied.

　• 15 declarations pages incorrectly stated Rental Reimbursement coverage was in effect, in lieu of Coverage for Rented Vehicles.

The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-30(a), 58-37-35(l), and Rules 3 and 5 of the North Carolina Personal Automobile Manual as 18 policies reviewed (18.0 percent error ratio) were rated incorrectly. The rating errors consisted of the following:

　• Deviation incorrectly applied to Uninsured/Underinsured Motorist (UM/UIM) coverage on 8 policies.

　• Minimum aggregate deviation was not adjusted to 35% of North Carolina Rate Bureau premium on 4 policies.

　• Incorrect Safe Driver Incentive Plan points applied on 3 policies.

　• Incorrect territory was used to rate 2 policies.

　• Incorrect UM/UIM base premium applied on 1 policy.

The rating errors resulted in 14 premium undercharges and 3 premium overcharges to the insureds. Refunds for the overcharges, covering multiple terms, were issued by the Company in the amount of $613.70. The remaining 83 premiums charged were deemed correct.

## TERMINATIONS

## Overview

The Company's termination procedures for its private passenger automobile policies were reviewed to determine compliance with the appropriate North Carolina statutes and rules, policy provisions and the applicable policy manual rules. Special attention was placed on the validity and reason for termination, timeliness in issuance of the termination notice, policy refund (where

applicable) and documentation of the policy file. A total of 17,563 policies were terminated during the period under examination. The examiners randomly selected 105 terminations for review.

### Private Passenger Automobile Cancellations

One hundred cancelled private passenger automobile policies were randomly selected and received for review from a population of 17,558.

The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
|---|---|---|
| Nonpayment of premium | 87 | 87.0 |
| Insured's request | 10 | 10.0 |
| Underwriting reasons | 2 | 2.0 |
| No longer eligible | 1 | 1.0 |
| **Total** | **100** | **100.0** |

The Company was not required to issue cancellation notices for 10 of the cancellations reviewed as these policies were cancelled at the request of the insured. Cancellation notices for the remaining 90 policies stated the specific reason for cancellation.

**\*8** The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-85(c) as 27 cancellation notices for nonpayment of premium (27.0 percent error ratio) were not issued at least 15 days prior to the cancellation of the policy.

The Company was reminded of the provisions of NCGS 58-37-50 as 1 insured (1.0 percent error ratio) was not offered liability coverage ceded to the North Carolina Reinsurance Facility when the policy did not meet the Company's voluntary guidelines.

The Company was reminded of the provisions of NCGS 58-36-30(a) and Rule 10 of the North Carolina Personal Automobile Manual as the return premium was calculated incorrectly on 2 policies reviewed (2.0 percent error ratio). The errors resulted in overstatement of refund to the insured.

As a result of the incorrect return premium calculation, the Department requested the Company to conduct a self audit in this area. The Company identified an additional 695 policies affected (excluding those that were reviewed by the examiners as noted above) that resulted in refunds being made in the amount of $7,547.65. All refund checks were mailed to the insureds on January 19, 2011.

The final area of this review encompassed documentation of the policy file. All policy files reviewed contained sufficient documentation to support the action taken by the Company. The Company sent the North Carolina Notice of Termination Form (FS-4) to the North Carolina Division of Motor Vehicles (DMV) when liability coverages were cancelled. The Company was deemed to be in compliance with the provisions of NCGS 20-309.

Report on Market Conduct Examination of the Titan..., 2011 WL 4387728...

DJA0371

## Private Passenger Automobile Nonrenewals

The entire population of 5 nonrenewed private passenger automobile policies was selected and received for review.

The reason for nonrenewal was deemed valid for all policies reviewed. The review revealed the following reason for nonrenewal:

| Reason for Nonrenewal | Number of Policies | Percentage |
|---|---|---|
| No longer eligible | 5 | 100.0 |
| **Total** | **5** | **100.0** |

The nonrenewal notices for the policies reviewed stated the specific reason for nonrenewal. All insureds and loss payees were given proper and timely notification of nonrenewal.

The final area of this review encompassed documentation of the policy file. All policy files reviewed contained sufficient documentation to support the action taken by the Company. The Company sent the FS-4 to the DMV when liability coverages were cancelled. The Company was deemed to be in compliance with the provisions of NCGS 20-309.

## Declinations/Rejections

Coverage was bound at point of sale so there were no declinations or rejections.

## CLAIMS PRACTICES

### Overview

The Company's claims practices were reviewed to determine compliance with the appropriate North Carolina statutes and rules and policy provisions. The review encompassed paid, automobile medical payment, first and third party bodily injury, closed without payment, subrogated, total loss settlement and litigated claims.

**\*9** Claims service in North Carolina is under the direction of the Field Claims Director and is provided from the branch offices located in Raleigh, North Carolina and in Columbia, South Carolina. The staff is comprised of the claims director, 6 claims managers, 36 claims associates and 3 clerical personnel. Claims service is provided by company adjusters only. The Company agency force does not adjust any claims and does not have claims draft authority. The Company's salvage log is maintained by the Total Loss Unit based in Des Moines, Iowa.

Three hundred fifty-two claims were randomly selected for review from a population of 9,482.

### Paid Claims

The examiners randomly selected and received 100 of the 4,658 first party automobile physical damage and third party property damage claims paid during the period under examination. The claim files were reviewed for timeliness of payment, supporting documentation and accuracy of payment.

The following types of claims were reviewed and the average payment time is noted in calendar days:

Report on Market Conduct Examination of the Titan..., 2011 WL 4387728...

DJA0372

| Type of Claim | Payment Time |
|---|---|
| Automobile physical damage | 12.0 |
| Third party property damage | 11.0 |

All payments issued by the Company were deemed to be accurate. Deductibles were correctly applied and depreciation taken was reasonable.

All claim files reviewed contained documentation to support the Company's payments. The documentation consisted of appraisals, estimates, repair bills, or inventory listings.

## Automobile Medical Payment Claims

Fifty automobile medical payment claims were randomly selected and received for review from a population of 594. The claim files were reviewed to determine if the Company had engaged in any unfair claims practices. The review of automobile medical payment claims disclosed no apparent violations of the provisions of NCGS 58-63-15(11).

## First and Third Party Bodily Injury Claims

Fifty first and third party bodily injury claims were randomly selected and received for review from a population of 1,102. The claim files were reviewed to determine whether the Company had engaged in any unfair claims practices. The review of first and third party bodily injury claims disclosed no apparent violations of the provisions of NCGS 58-63-15(11).

## Closed Without Payment Claims

Fifty closed without payment claims were randomly selected and received for review from a population of 2,317. The claim files were reviewed to determine if the Company's reasons for closing the claims without payment were valid.

The claim files reviewed contained documentation that supported the Company's reasons for closing the claims without payment. All reasons for denial or closing the files without payment were deemed valid. Claims were denied on an average of 6 calendar days for the 3-year period. The review of closed without payment claims disclosed no apparent violations of the provisions of NCGS 58-63-15(11).

## Subrogated Claims

**\*10** Fifty subrogated claims were randomly selected and received for review from a population of 113. The claim files were reviewed to determine if the insured's deductible was properly reimbursed by the Company when subrogation was successful.

One claim (2.0 percent error ratio) was not paid in a timely manner. This matter could result in an apparent violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice.

All reimbursements were deemed to be correct and were issued on a 3-year average of 1 calendar day from the date the Company collected the monies.

## Total Loss Settlement Claims

Fifty total loss settlement claims were randomly selected and received for review from a population of 696. The claim files were reviewed to determine if the settlements were equitable and timely.

Two claims (4.0 percent error ratio) were not appraised in a timely manner. This matter could result in an apparent violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice.

The Company primarily used CCC Information Services, Inc. in addition to on-site independent adjusters to establish the actual cash value of totaled vehicles. All settlements were deemed equitable. The Company settled all claims in a timely manner. The payments were issued on a 3-year average of 26 calendar days. No apparent violations of the provisions of NCGS 58-63-15(11)(h), 11 NCAC 4.0418, or 4.0421 were noted during this review.

## Litigated Claims

The entire population of 2 litigated claims was selected and received for review. The claim files were reviewed to determine if the Company had engaged in any unfair claims practices. The review of litigated claims disclosed no apparent violation of the provisions of NCGS 58-63-15.

SUMMARY

The Market Conduct examination revealed the following:

1. Policyholder Treatment

a. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0103 as 15.8 percent of the consumer complaints reviewed were not listed on the Company's complaint register.

b. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 1.0602 as the responses to 42.1 percent of the Departmental inquiries reviewed were in excess of the 7 calendar day requirement of this rule.

c. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 4.0123 as the responses to 5.3 percent of the Departmental inquiries reviewed did not include its mailing address.

d. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 4.0124 as it failed to notify the Department of a change in contact information.

2. Marketing

a. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 6A.0412(2) as background checks were not performed on 42.0 percent of the appointed producers reviewed.

**11**  b. The Company was reminded of the provisions of 11 NCAC 19.0102(a) and 19.0106(a)(3)(h) as confirmation of termination was not provided for 2.0 percent of the terminated producers reviewed.

Report on Market Conduct Examination of the Titan..., 2011 WL 4387728...

DJA0374

c. The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-56(d) as notification of termination was not provided in accordance with the statute for 10.0 percent of the terminated producers reviewed.

3. Underwriting and Rating

   a. The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-40(h) as 4.0 percent of the private passenger automobile applications reviewed were accepted from a producer who was not appointed.

   b. The Company was deemed to be in apparent violation of the provisions of NCGS 58-63-15(1) as the declarations page of 52.0 percent of the active private passenger automobile policies reviewed incorrectly stated policy terms.

   c. The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-30(a), 58-37-35(l), and Rules 3 and 5 of the North Carolina Personal Automobile Manual as 18.0 percent of the active private passenger automobile policies reviewed were rated incorrectly.

4. Terminations

   a. The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-85(c) as 27.0 percent of the private passenger automobile cancellation notices for nonpayment of premium were not issued at least 15 days prior to the cancellation of the policy.

   b. The Company was reminded of the provisions of NCGS 58-37-50 as 1.0 percent of the insureds were not offered liability coverage ceded to the North Carolina Reinsurance Facility when the private passenger automobile policy did not meet the Company's voluntary guidelines.

   c. The Company was reminded of the provisions of NCGS 58-36-30(a) and Rule 10 of the North Carolina Personal Automobile Manual as the return premium was calculated incorrectly on 2.0 percent of the cancelled private passenger automobile policies reviewed.

TABLE OF STATUTES AND RULES

| Statute/Rule | Title |
| --- | --- |
| NCGS 58-2-131 | Examinations to be made; authority, scope, scheduling, and conduct of examinations. |
| NCGS 58-2-164 | Rate evasion fraud; prevention programs. |
| NCGS 58-7-15 | Kinds of insurance authorized. |
| NCGS 58-33-40 | Appointment of agents. |
| NCGS 58-33-56 | Notification to Commissioner of termination. |
| NCGS 58-36-30 | Deviations. |

Report on Market Conduct Examination of the Titan..., 2011 WL 4387728...

DJA0375

| | |
|---|---|
| NCGS 58-36-85 | Termination of a nonfleet private passenger motor vehicle insurance policy. |
| NCGS 58-37-1 | Definitions. |
| NCGS 58-37-35 | The Facility; functions; administration. |
| NCGS 58-37-50 | Termination of insurance. |
| NCGS 58-39-25 | Notice of insurance information practices. |
| NCGS 58-39-26 | Federal privacy disclosure notice requirements. |
| NCGS 58-39-27 | Privacy notice and disclosure requirement exceptions. |
| NCGS 58-63-15 | Unfair methods of competition and unfair or deceptive acts or practices defined. |
| NCGS 20-309 | Motor vehicle registration. |
| 11 NCAC 1.0602 | Insurance Companies' Response to Departmental Inquiries. |
| 11 NCAC 4.0123 | Use of Specific Company Name in Responses. |
| 11 NCAC 4.0124 | Insurance Company Contact Persons. |
| 11 NCAC 4.0418 | Total Losses on Motor Vehicles. |
| 11 NCAC 4.0421 | Handling of Loss and Claim Payments. |
| 11 NCAC 6A.0412 | Appointment of Agent: Responsibility of Company. |
| 11 NCAC 19.0102 | Maintenance of Records. |
| 11 NCAC 19.0103 | Complaint Records. |
| 11 NCAC 19.0106 | Records Required for Examination. |

## CONCLUSION

**\*12**  An examination has been conducted on the market conduct affairs of Titan Indemnity Company for the period January 1, 2007 through December 31, 2009 with analyses of certain operations of the Company being conducted through April 14, 2011. The Company's response to this report, if any, is available upon request.

This examination was conducted in accordance with the North Carolina Department of Insurance and the National Association of Insurance Commissioners Market Regulation Handbook procedures, including analyses of Company operations in the areas of policyholder treatment, marketing, underwriting practices, terminations and claims practices.

In addition to the undersigned, James P. McQuillan, CPCU, AIT and Letha Lombardi, North Carolina Market Conduct Examiners, participated in this examination.

Respectfully submitted,
/s/ Norma M. Rafter
Norma M. Rafter, CPCU
Examiner-In-Charge
Market Regulation Division
State of North Carolina

I have reviewed this examination report and it meets the provisions for such reports prescribed by this Division and the North Carolina Department of Insurance.

/s/ Tracy M. Biehn
Tracy M. Biehn, LPCS, MBA
Deputy Commissioner
Market Regulation Division
State of North Carolina

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 38
Report on Market Conduct Examination of the Victoria Fire..., 2011 WL 4387736...

DJA0377

2011 WL 4387736

State of North Carolina

**\*1** Report on Market Conduct Examination of the

Victoria Fire & Casualty Company

Mayfield Heights, Ohio

April 14, 2011


MARKET CONDUCT REPORTS

North Carolina Department of Insurance

 Image 1 within document in PDF format.

Report

## TABLE OF CONTENTS

SALUTATION
FOREWORD
SCOPE OF EXAMINATION
EXECUTIVE SUMMARY
COMPANY OVERVIEW
History and Profile
Company Operations and Management
Certificates of Authority
Disaster Recovery Procedures
Rate Evasion Procedures
POLICYHOLDER TREATMENT
Consumer Complaints
Privacy of Financial and Health Information
MARKETING
Policy Forms and Filings
Sales and Advertising
Producer Licensing
Agency Management
UNDERWRITING PRACTICES
Overview
Private Passenger Automobile
TERMINATIONS
Overview
Private Passenger Automobile Cancellations
Private Passenger Automobile Nonrenewals
Declinations/Rejections
CLAIMS PRACTICES

Overview

Paid Claims

Automobile Medical Payment Claims

First and Third Party Bodily Injury Claims

Closed Without Payment Claims

Subrogated Claims

Total Loss Settlement Claims

Litigated Claims

SUMMARY

TABLE OF STATUTES AND RULES

CONCLUSION

Raleigh, North Carolina

April 14, 2011

Honorable Mary Taylor

Director of Insurance

Ohio Department of Insurance

50 West Town Street, Suite 300

Columbus, OH 43215

Honorable Wayne Goodwin

Commissioner of Insurance

Department of Insurance

State of North Carolina

Dobbs Building

430 N. Salisbury Street

Raleigh, North Carolina 27603

Honorable Commissioners:

Pursuant to your instructions and in accordance with the provisions of North Carolina General Statute (NCGS) 58-2-131, a general examination has been made of the market conduct activities of

**VICTORIA FIRE & CASUALTY COMPANY (NAIC #42889)**

NAIC Exam Tracking System Exam Number: NC170-M80

Mayfield Heights, Ohio

hereinafter generally referred to as the Company, at the North Carolina Department of Insurance (Department) office located at 11 S. Boylan Avenue, Raleigh, North Carolina. A report thereon is respectfully submitted.

FOREWORD

**\*2** This examination reflects the North Carolina insurance activities of Victoria Fire & Casualty Company. The examination is, in general, a report by exception. Therefore, much of the material reviewed will not be contained in this written report, as reference to any practices, procedures, or files that manifested no improprieties were omitted.

SCOPE OF EXAMINATION

This examination commenced on August 16, 2010 and covered the period of April 1, 2008 through December 31, 2009 with analyses of certain operations of the Company being conducted through April 14, 2011. All comments made in this report reflect conditions observed during the period of the examination.

Report on Market Conduct Examination of the Victoria Fire..., 2011 WL 4387736...

DJA0379

The examination was arranged and conducted by the Department. It was made in accordance with Market Regulation standards established by the Department and procedures established by the National Association of Insurance Commissioners (NAIC) and accordingly included tests of policyholder treatment, marketing, underwriting practices, terminations and claims practices.

It is the Department's practice to cite companies in apparent violation of a statute or rule when the results of a sample show errors/noncompliance at or above the following levels: 0 percent for consumer complaints, sales and advertising, producers who were not appointed and/or licensed, and the use of forms and rates/rules that were neither filed with nor approved by the Department; 7 percent for claims; and 10 percent for all other areas reviewed. When errors are detected in a sample, but the error rate is below the applicable threshold for citing an apparent violation, the Department issues a reminder to the company.

## EXECUTIVE SUMMARY

This market conduct examination revealed concerns with Company procedures and practices in the following areas:

*Consumer Complaints* - complaints not listed on the company's complaint register and response time to Departmental inquiries.

*Appointment and Termination of Producers* - failure to perform background checks on appointed producers and termination of appointment letter not provided to the producer in accordance with the statute.

*Underwriting Practices* - Private passenger automobile: applications accepted from a producer who was not appointed, deviations and coverage incorrectly stated on the declarations page, rating errors.

*Terminations* - Private passenger automobile cancellations: proper notification not given.

Specific violations related to each area of concern are noted in the appropriate section of this report. All North Carolina General Statutes and rules of the North Carolina Administrative Code cited in this report may be viewed on the North Carolina Department of Insurance Web site www.ncdoi.com by clicking "NCDOI DIVISIONS" then "Legislative Services".

This examination identified various non-compliant practices, some of which may extend to other jurisdictions. The Company is directed to take immediate corrective action to demonstrate its ability and intention to conduct business in North Carolina according to its insurance laws and regulations. When applicable, corrective action for other jurisdictions should be addressed.

**\*3** All unacceptable or non-compliant practices may not have been discovered or noted in this report. Failure to identify or criticize improper or non-compliant business practices in North Carolina or in other jurisdictions does not constitute acceptance of such practices. Examination report findings that do not reference specific insurance laws, regulations, or bulletins are presented to improve the Company's practices and ensure consumer protection.

## COMPANY OVERVIEW

### History and Profile

Victoria Fire and Casualty Company was incorporated under the laws of Ohio on July 11, 1983 as a stock company and commenced business on August 9, 1983. Nationwide Mutual Insurance Company, the ultimate parent, acquired THI Holdings Delaware, Inc., which owns Victoria Fire and Casualty Company on August 1, 2003.

Report on Market Conduct Examination of the Victoria Fire..., 2011 WL 4387736...

DJA0380

## Company Operations and Management

The Company is a writer of non-standard private passenger automobile coverages. The Company is currently licensed in 40 states and the District of Columbia.

Direct written premium for the Company's 2009 countrywide property and casualty operations was $335,692,084. North Carolina's production for the same period was $13,485,343. Premiums written in North Carolina between 2008 and 2009 increased approximately 81.0 percent. The charts below outline the Company's mix of business for selected lines in 2009 and loss ratios in North Carolina for the examination period.

| Line of Business | Written Premium | Percentage |
|---|---|---|
| Private Passenger Automobile Liability | $8,198,920 | 60.8 |
| Private Passenger Automobile Physical Damage | 5,286,423 | 39.2 |
| **Total** | **$13,485,343** | **100.0** |

| Year | Written Premium | Earned Premium | Incurred Losses [a1] | Loss Ratio |
|---|---|---|---|---|
| 2008 | $7,448,511 | $4,263,978 | $3,826,439 | 89.7 |
| 2009 | $13,485,343 | $14,099,647 | $13,148,068 | 93.3 |

[a1] **Does not include IBNRs**

## Certificates of Authority

The Certificates of Authority issued to the Company were reviewed for the period under examination. These certificates were reviewed to determine compliance with the provisions of NCGS 58-7-15. The Company's writings in North Carolina were deemed to be in compliance with the authority granted.

## Disaster Recovery Procedures

The Company has developed a comprehensive business continuity program to increase its chances of preventing disasters, as well as providing continuing operations following natural or man-made disasters. The plans address individual business functions, applications and systems architectures throughout the organization. These plans are reviewed, updated and exercised on a regular basis. Should an event occur that hinders the Company's ability to conduct normal business operations, the plan encompasses multiple business recovery strategies that allow resumption of critical business operations within a reasonable period of time. The plan includes the relocation of work and employees to other business locations or to remotely secured locations. Data processing systems, critical files and data, backed and stored at alternate data centers are utilized to enable the resumption of business operations. Business functions and system applications have pre-assigned recovery windows to ensure resources are appropriately allocated. In addition, the Company utilizes external vendors to deliver a high level of service to their customers. Should an event occur that hinders the ability to conduct vendor transactions, the Company will appropriately re-direct those vital operations elsewhere in order to maintain continued service to customers.

Report on Market Conduct Examination of the Victoria Fire..., 2011 WL 4387736...

DJA0381

## Rate Evasion Procedures

**\*4** The Company has established procedures to address nonfleet private passenger automobile insurance rate evasion fraud by identifying any ineligible risk as defined in NCGS 58-37-1(4a) and verifying residency of the policyholder who owns a motor vehicle registered or principally garaged in North Carolina. The Company was found to be in compliance with the provisions of NCGS 58-2-164.

## POLICYHOLDER TREATMENT

## Consumer Complaints

The Company's complaint handling procedures were reviewed to determine compliance with applicable North Carolina statutes and rules.

The Company's complaint register was reconciled with a listing furnished by the Consumer Services Division of the Department. The Company was deemed to be in apparent violation of the provisions of Title 11 of the North Carolina Administrative Code, (NCAC), Chapter 19, Section 0103 as 2 complaints (10.5 percent error ratio) were not listed on the Company's complaint register.

All complaints from the Department's listing of 19 were selected and received for review. The distribution of complaints requiring a response to the Department is shown in the chart below.

| Type of Complaint | Total |
| --- | --- |
| Claims | 15 |
| Underwriting | 3 |
| Administrative | 1 |
| **Total** | **19** |

The Company's response to each complaint was deemed to be appropriate to the circumstances. Nine complaints were responded to in excess of seven calendar days; however, extensions were requested and granted for 5 of the complaints. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 1.0602 as 4 complaints reviewed (21.1 percent error ratio) were responded to in excess of the 7 calendar day requirement of this rule or the extension date.

The average service time to respond to a Departmental complaint was 11 calendar days. A chart of the Company's response time follows:

| Service Days | Number of Files | Percentage of Total |
| --- | --- | --- |
| 1 - 7 | 10 | 52.6 |
| 8 - 14 | 4 | 21.1 |
| 15 - 21 | 3 | 15.8 |

Report on Market Conduct Examination of the Victoria Fire..., 2011 WL 4387736...

DJA0382

| 22 - 30 | 2 | 10.5 |
|---|---|---|
| **Total** | **19** | **100.0** |

## Privacy of Financial and Health Information

The Company provided privacy of financial and health information documentation for the examiners' review. The Company exhibited policies and procedures in place so that nonpublic personal financial or health information is not disclosed unless the customer or consumer has authorized the disclosure. The Company was found to be compliant with the provisions of NCGS 58-39-25, 58-39-26, and 58-39-27.

## MARKETING

## Policy Forms and Filings

Policy forms and filings for the Company were reviewed to determine compliance with appropriate North Carolina statutes and rules. Filings for the private passenger automobile line of business were made by the North Carolina Rate Bureau on behalf of the Company. Deviations for this line of business were made to the Department by the Company.

## Sales and Advertising

**\*5** Sales and advertising practices of the Company were reviewed to determine compliance with the provisions of NCGS 58-63-15.

All advertising materials referencing the Company or using the logo must be approved by the Sales Manager and Regional Sales Director. The Company notifies producers of new products and changes in insurance statutes and rules via email and blast fax in the form of a memo/flyer. Product Management maintains a copy of Company communications regarding new products and regulations. The examiners reviewed advertisements, bulletins and brochures that are provided to producers for promotional use. The Company also maintains an internet site: http:// www.nationwide.com/. The website provides background information relative to its operations, as well as products and services offered.

No unfair or deceptive trade practices were noted in this segment of the examination.

## Producer Licensing

The Company's procedures for appointment and termination of its producers were reviewed to determine compliance with the appropriate North Carolina statutes and rules. Fifty appointed and 50 terminated producer files were randomly selected and received for review from populations of 551 and 85, respectively.

All appointment forms reviewed were submitted to the Department in accordance with the timetables stipulated under the provisions of NCGS 58-33-40. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 6A.0412(2) as background checks were not performed on any of the 50 appointed producers reviewed (100 percent error ratio).

The Company was reminded of the provisions of 11 NCAC 19.0102(a) and 19.0106(a)(3)(h) as confirmation of termination was not provided for 3 producers reviewed (6.0 percent error ratio). The remaining 47 terminated appointment forms were submitted to the Department in accordance with the timetables stipulated under the provisions of NCGS 58-33-56(b).

The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-56(d) as notification of termination to the producer was not provided in accordance with the statute for 6 terminated producers reviewed (12.0 percent error ratio).

• The letter was not sent to 3 producers.

• The letter was sent in excess of the 15 day requirement for 3 producers.

Agency Management

The Company has 928 active producers appointed in North Carolina. The marketing efforts are driven at both the corporate and regional levels. Corporate marketing is handled out of the home office in Columbus, Ohio and regional marketing is handled out of the regional office in Raleigh, North Carolina.

Regional sales managers are primarily responsible for the agency force. The sales managers are split out by distribution channel. Eighteen sales managers are assigned to the North Carolina exclusive agency force and 1 sales manager is assigned to the North Carolina independent agency force. Reviews are normally conducted annually.

*6 Regional sales managers, working in conjunction with the corporate licensing division, are responsible for appointment, terminations and licensing.

UNDERWRITING PRACTICES

Overview

The Company's marketing philosophy in North Carolina focuses on the private passenger automobile line of business. The Company's private passenger automobile policies were reviewed for adherence to underwriting guidelines, file documentation and premium determination. Additionally, the policies were examined to determine compliance with the appropriate North Carolina statutes and rules, policy provisions and the applicable policy manual rules.

Private Passenger Automobile

The Company provided a listing of 6,791 active private passenger automobile policies issued during the period under examination. One hundred policies were randomly selected and received for review.

The Company's private passenger automobile policies were written on a 6 or 12 month basis. Liability coverages were written utilizing manual and deviated rates. Physical damage coverages were written on a consent to rate basis. Risk placement was determined by the Company's underwriting guidelines and the underwriter. No discrepancies were noted in the Company's use of its underwriting guidelines.

The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-40 as 19 applications reviewed (19.0 percent error ratio) were accepted from a producer who was not appointed. The Company was deemed to be in apparent violation of the provisions of NCGS 58-63-15(1) as the declarations page for 86 policies reviewed (86.0 percent error ratio) incorrectly stated policy terms.

• 64 declarations pages incorrectly stated the policy received a deviation when it was not applied.

• 22 declarations pages incorrectly stated Rental Reimbursement coverage was in effect, in lieu of Coverage for Rented Vehicles.

Report on Market Conduct Examination of the Victoria Fire..., 2011 WL 4387736...

DJA0384

The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-30(a), 58-37-35(l), and Rules 4 and 5 of the North Carolina Personal Automobile Manual as 17 policies reviewed (17.0 percent error ratio) were rated incorrectly. The rating errors consisted of the following:

• Deviation incorrectly applied to Uninsured/Underinsured Motorist coverage on 7 policies.

• Incorrect Safe Driver Incentive Plan points applied on 6 policies.

• Minimum aggregate deviation was not adjusted to 35% of North Carolina Rate Bureau premium on 2 policies.

• Accident free discount was applied when an insured had an unverifiable driving history on 1 policy.

• Operator was incorrectly classified on 1 policy.

The rating errors resulted in 12 premium undercharges and 5 premium overcharges to the insureds. Refunds for the overcharges, covering multiple terms, were issued by the Company in the amount of $1,427.32. The remaining 82 premiums charged were deemed correct.

**\*7** The Company was reminded of the provisions of 11 NCAC 10.0602(a) as 1 file reviewed (1.0 percent error ratio) did not contain a signed consent to rate form.

## TERMINATIONS

### Overview

The Company's termination procedures for its private passenger automobile policies were reviewed to determine compliance with the appropriate North Carolina statutes and rules, policy provisions and the applicable policy manual rules. Special attention was placed on the validity and reason for termination, timeliness in issuance of the termination notice, policy refund (where applicable) and documentation of the policy file. A total of 14,683 policies were terminated during the period under examination. The examiners randomly selected 135 terminations for review.

### Private Passenger Automobile Cancellations

One hundred cancelled private passenger automobile policies were randomly selected and received for review from a population of 14,648.

The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
|---|---|---|
| Nonpayment of premium | 89 | 89.0 |
| Insured's request | 7 | 7.0 |
| Underwriting reasons | 2 | 2.0 |
| Finance company request | 1 | 1.0 |

Report on Market Conduct Examination of the Victoria Fire..., 2011 WL 4387736...

DJA0385

| | | |
|---|---|---|
| No longer eligible | 1 | 1.0 |
| **Total** | **100** | **100.0** |

The Company was not required to issue cancellation notices for 7 of the cancellations reviewed as these policies were cancelled at the request of the insured. Cancellation notices for the remaining 93 policies stated the specific reason for cancellation.

The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-85(c) as 23 cancellation notices for nonpayment of premium (23.0 percent error ratio) were not issued at least 15 days prior to the cancellation of the policy.

The Company was reminded of the provisions of NCGS 58-36-30(a) and Rule 10 of the North Carolina Rate Bureau Manual as the return premium was calculated incorrectly on 1 policy reviewed (1.0 percent error ratio). The error resulted in understatement of refund to the insured. At the request of the examiners, a refund in the amount of $18.39 was issued by the Company for the understatement of refund. The remaining premium refunds were deemed correct. The Company issued the refunds in a timely manner.

As a result of the incorrect return premium calculation, the Department requested the Company to conduct a self audit in this area. The Company identified an additional 602 policies affected (excluding those that were reviewed by the examiners as noted above) that resulted in refunds being made in the amount of $6,503.90. All refund checks were mailed to the insureds on January 19, 2011.

The final area of this review encompassed documentation of the policy file. All policy files reviewed contained sufficient documentation to support the action taken by the Company. The Company sent the North Carolina Notice of Termination Form (FS-4) to the North Carolina Division of Motor Vehicles (DMV) when liability coverages were cancelled. The Company was deemed to be in compliance with the provisions of NCGS 20-309.

Private Passenger Automobile Nonrenewals

**\*8** The entire population of 35 nonrenewed private passenger automobile policies was selected and received for review.

The reason for nonrenewal was deemed valid for all policies reviewed. The review revealed the following reasons for nonrenewal:

| **Reason for Nonrenewal** | **Number of Policies** | **Percentage** |
|---|---|---|
| Producer no longer appointed | 25 | 71.4 |
| No longer eligible | 10 | 28.6 |
| **Total** | **35** | **100.0** |

The nonrenewal notices for the policies reviewed stated the specific reason for nonrenewal. All insureds and loss payees were given proper and timely notification of nonrenewal.

The final area of this review encompassed documentation of the policy file. All policy files reviewed contained sufficient documentation to support the action taken by the Company. The Company was reminded of the provisions of NCGS 20-309.2 as the FS-4 was not submitted to the DMV when liability coverages were cancelled for 2 policies reviewed (5.7 percent error ratio).

Report on Market Conduct Examination of the Victoria Fire..., 2011 WL 4387736...

DJA0386

## Declinations/Rejections

Coverage was bound at point of sale so there were no declinations or rejections.

## CLAIMS PRACTICES

## Overview

The Company's claims practices were reviewed to determine compliance with the appropriate North Carolina statutes and rules and policy provisions. The review encompassed paid, automobile medical payment, first and third party bodily injury, closed without payment, subrogated and total loss settlement claims.

Claims service in North Carolina is under the direction of the Field Claims Director and is provided from the branch offices located in Raleigh, North Carolina and in Columbia, South Carolina. The staff is comprised of the claims director, 6 claims managers, 36 claims associates and 3 clerical personnel. Claims service is provided by company adjusters only. The Company agency force does not adjust any claims and does not have claims draft authority. The Company's salvage log is maintained by the Total Loss Unit based in Des Moines, Iowa. Three hundred fifty claims were randomly selected for review from a population of 9,011.

## Paid Claims

The examiners randomly selected and received 100 of the 4,410 first party automobile physical damage and third party property damage claims paid during the period under examination. The claim files were reviewed for timeliness of payment, supporting documentation and accuracy of payment.

The following types of claims were reviewed and the average payment time is noted in calendar days:

| Type of Claim | Payment Time |
| --- | --- |
| Automobile physical damage | 25.0 |
| Third party property damage | 16.0 |

A policy deductible was not applied to 1 claim reviewed (2.0 percent error ratio). This resulted in an overpayment of $250.00 to the policyholder. This matter could result in an apparent violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice. All other deductibles were correctly applied and depreciation taken was reasonable.

**\*9**  All claim files reviewed contained documentation to support the Company's payments. The documentation consisted of appraisals, estimates, repair bills, or inventory listings.

Two claims (4.0 percent error ratio) were not appraised in a timely manner. This matter could result in an apparent violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice.

Report on Market Conduct Examination of the Victoria Fire..., 2011 WL 4387736...

DJA0387

## Automobile Medical Payment Claims

Fifty automobile medical payment claims were randomly selected and received for review from a population of 306. The claim files were reviewed to determine if the Company had engaged in any unfair claims practices. The review of automobile medical payment claims disclosed no apparent violations of the provisions of NCGS 58-63-15(11).

## First and Third Party Bodily Injury Claims

Fifty first and third party bodily injury claims were randomly selected and received for review from a population of 1,099. The claim files were reviewed to determine whether the Company had engaged in any unfair claims practices. The review of first and third party bodily injury claims disclosed no apparent violations of the provisions of NCGS 58-63-15(11).

## Closed Without Payment Claims

Fifty closed without payment claims were randomly selected and received for review from a population of 2,320. The claim files were reviewed to determine if the Company's reasons for closing the claims without payment were valid.

The claim files reviewed contained documentation that supported the Company's reasons for closing the claims without payment. All reasons for denial or closing the files without payment were deemed valid. Claims were denied on an average of 8 calendar days for the 3-year period. The review of closed without payment claims disclosed no apparent violations of the provisions of NCGS 58-63-15(11).

## Subrogated Claims

Fifty subrogated claims were randomly selected and received for review from a population of 103. The claim files were reviewed to determine if the insured's deductible was properly reimbursed by the Company when subrogation was successful.

All reimbursements were deemed to be correct and were issued on a 3-year average of 1 calendar day from the date the Company collected the monies.

## Total Loss Settlement Claims

Fifty total loss settlement claims were randomly selected and received for review from a population of 773. The claim files were reviewed to determine if the settlements were equitable and timely.

The Company primarily used CCC Information Services, Inc. in addition to on-site independent adjusters to establish the actual cash value of totaled vehicles. All settlements were deemed equitable. Claims were not paid or appraised in a timely manner for 2 claims (4.0 percent error ratio). This matter could result in an apparent violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice. The payments were issued on a 3-year average of 26 calendar days. No apparent violations of the provisions of NCGS 58-63-15(11)(h), 11 NCAC 4.0418, or 4.0421 were noted during this review.

## Litigated Claims

**\*10** The Company reported that they did not have any litigated claims during the examination period under review.

<div align="center">SUMMARY</div>

The Market Conduct examination revealed the following:

1. <u>Policyholder Treatment</u>

    a. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0103 as 10.5 percent of the consumer complaints reviewed were not listed on the Company's complaint register.

    b. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 1.0602 as the responses to 21.1 percent of the Departmental inquiries reviewed were in excess of the 7 calendar day requirement of this rule.

2. <u>Marketing</u>

    a. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 6A.0412(2) as background checks were not performed on 100 percent of the appointed producers reviewed.

    b. The Company was reminded of the provisions of 11 NCAC 19.0102(a) and 19.0106(a)(3)(h) as confirmation of termination was not provided for 6.0 percent of the terminated producers reviewed.

    c. The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-56(d) as notification of termination was not provided in accordance with the statute for 12.0 percent of the terminated producers reviewed.

3. <u>Underwriting and Rating</u>

    a. The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-40(h) as 19.0 percent of the private passenger automobile applications reviewed were accepted from a producer who was not appointed.

    b. The Company was deemed to be in apparent violation of the provisions of NCGS 58-63-15(1) as the declarations page of 86.0 percent of the active private passenger automobile policies reviewed incorrectly stated policy terms.

    c. The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-30(a), 58-37-35(l), and Rules 4 and 5 of the North Carolina Personal Automobile Manual as 17.0 percent of the active private passenger automobile policies reviewed were rated incorrectly.

    d. The Company was reminded of the provisions of 11 NCAC 10.0602(a) as a signed consent to rate form was not contained in 1.0 percent of the active private passenger automobile files reviewed.

4. <u>Terminations</u>

    a. The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-85(c) as 23.0 percent of the private passenger automobile cancellation notices for nonpayment of premium were not issued at least 15 days prior to the cancellation of the policy.

    b. The Company was reminded of the provisions of NCGS 58-36-30(a) and Rule 10 of the North Carolina Personal Automobile Manual as the return premium was calculated incorrectly on 1.0 percent of the cancelled private passenger automobile policies reviewed.

Report on Market Conduct Examination of the Victoria Fire..., 2011 WL 4387736...

DJA0389

c. The Company was reminded of the provisions of NCGS 20-309.2 as the North Carolina Notice of Termination Form was not submitted to the North Carolina Division of Motor Vehicles for 5.7 percent of the nonrenewed private passenger automobile policies reviewed.

<p style="text-align:center">TABLE OF STATUTES AND RULES</p>

| Statute/Rule | Title |
| --- | --- |
| NCGS 58-2-131 | Examinations to be made; authority, scope, scheduling, and conduct of examinations. |
| NCGS 58-2-164 | Rate evasion fraud; prevention programs. |
| NCGS 58-7-15 | Kinds of insurance authorized. |
| NCGS 58-33-40 | Appointment of agents. |
| NCGS 58-33-56 | Notification to Commissioner of termination. |
| NCGS 58-36-30 | Deviations. |
| NCGS 58-36-85 | Termination of a nonfleet private passenger motor vehicle insurance policy. |
| NCGS 58-37-1 | Definitions. |
| NCGS 58-37-35 | The Facility; functions; administration. |
| NCGS 58-39-25 | Notice of insurance information practices. |
| NCGS 58-39-26 | Federal privacy disclosure notice requirements. |
| NCGS 58-39-27 | Privacy notice and disclosure requirement exceptions. |
| NCGS 58-63-15 | Unfair methods of competition and unfair or deceptive acts or practices defined. |
| NCGS 20-309 | Motor vehicle registration. |
| 11 NCAC 1.0602 | Insurance Companies' Response to Departmental Inquiries. |

Report on Market Conduct Examination of the Victoria Fire..., 2011 WL 4387736...

DJA0390

| 11 NCAC 4.0418 | Total Losses on Motor Vehicles. |
| 11 NCAC 4.0421 | Handling of Loss and Claim Payments. |
| 11 NCAC 6A.0412 | Appointment of Agent: Responsibility of Company. |
| 11 NCAC 10.0602 | Consent to Rate Procedures: Rate Bureau Coverages. |
| 11 NCAC 19.0102 | Maintenance of Records. |
| 11 NCAC 19.0103 | Complaint Records. |
| 11 NCAC 19.0106 | Records Required for Examination. |

## CONCLUSION

**\*11** An examination has been conducted on the market conduct affairs of Victoria Fire & Casualty Company for the period April 1, 2008 through December 31, 2009 with analyses of certain operations of the Company being conducted through April 14, 2011. The Company's response to this report, if any, is available upon request.

This examination was conducted in accordance with the North Carolina Department of Insurance and the National Association of Insurance Commissioners Market Regulation Handbook procedures, including analyses of Company operations in the areas of policyholder treatment, marketing, underwriting practices, terminations, and claims practices.

In addition to the undersigned, James P. McQuillan, CPCU, AIT and Letha Lombardi, North Carolina Market Conduct Examiners, participated in this examination.

Respectfully submitted,
/s/ Norma M. Rafter
Norma M. Rafter, CPCU
Examiner-In-Charge
Market Regulation Division
State of North Carolina

I have reviewed this examination report and it meets the provisions for such reports prescribed by this Division and the North Carolina Department of Insurance.

/s/ Tracy M. Biehn
Tracy M. Biehn, LPCS, MBA
Deputy Commissioner
Market Regulation Division
State of North Carolina

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 39
Report on Market Conduct Examination of the Discovery..., 2010 WL 2866924...

DJA0391

2010 WL 2866924

State of North Carolina

**\*1** Report on Market Conduct Examination of the

Discovery Insurance Company

Kinston, North Carolina

February 19, 2010

MARKET CONDUCT REPORTS

North Carolina Department of Insurance

 Image 1 within document in PDF format.

Report

<u>TABLE OF CONTENTS</u>

SALUTATION
FOREWORD
SCOPE OF EXAMINATION
EXECUTIVE SUMMARY
COMPANY OVERVIEW
History and Profile
Company Operations and Management
Certificates of Authority
Disaster Recovery Procedures
POLICYHOLDER TREATMENT
Consumer Complaints
Privacy of Financial and Health Information
MARKETING
Policy Forms and Filings
Sales and Advertising
Producer Licensing
Agency Management
UNDERWRITING AND RATING
Overview
Private Passenger Automobile
TERMINATIONS
Overview
Private Passenger Automobile Cancellations
Workers' Compensation Cancellations
Private Passenger Automobile Nonrenewals
Workers' Compensation Nonrenewals
CLAIMS PRACTICES

Report on Market Conduct Examination of the Discovery..., 2010 WL 2866924...

DJA0392

Overview
Paid Claims
Automobile Medical Payment Claims
First and Third Party Bodily Injury Claims
Closed Without Payment Claims
Subrogated Claims
Total Loss Settlement Claims
Litigated Claims
SUMMARY
TABLE OF STATUTES AND RULES
CONCLUSION

Raleigh, North Carolina

February 19, 2010

Honorable Wayne Goodwin

Commissioner of Insurance

Department of Insurance

State of North Carolina

Dobbs Building

430 N. Salisbury Street

Raleigh, North Carolina 27603

Honorable Commissioner:

Pursuant to your instructions and in accordance with the provisions of North Carolina General Statute (NCGS) 58-2-131, a general examination has been made of the market conduct activities of

### DISCOVERY INSURANCE COMPANY (NAIC #22635)

NAIC Exam Tracking System Exam Number: NC170-M60

Kinston, North Carolina

hereinafter generally referred to as the Company, at the North Carolina Department of Insurance (Department) office located at 11 S. Boylan Avenue, Raleigh, North Carolina. A report thereon is respectfully submitted.

### FOREWORD

**\*2** This examination reflects the North Carolina insurance activities of Discovery Insurance Company. The examination is, in general, a report by exception. Therefore, much of the material reviewed will not be contained in this written report, as reference to any practices, procedures, or files that manifested no improprieties were omitted.

### SCOPE OF EXAMINATION

This examination commenced on January 4, 2010 and covered the period of January 1, 2006 through December 31, 2008 with analyses of certain operations of the Company being conducted through February 15, 2010. All comments made in this report reflect conditions observed during the period of the examination.

The examination was arranged and conducted by the Department. It was made in accordance with Market Regulation standards established by the Department and procedures established by the National Association of Insurance Commissioners (NAIC) and accordingly included tests of policyholder treatment, marketing, underwriting and rating, terminations, and claims practices.

Report on Market Conduct Examination of the Discovery..., 2010 WL 2866924...

DJA0393

It is the Department's practice to cite companies in apparent violation of a statute or rule when the results of a sample show errors/noncompliance at or above the following levels: 0 percent for consumer complaints, sales and advertising, producers who were not appointed and/or licensed, and the use of forms and rates/rules that were neither filed with nor approved by the Department; 7 percent for claims; and 10 percent for all other areas reviewed. When errors are detected in a sample, but the error rate is below the applicable threshold for citing an apparent violation, the Department issues a reminder to the company.

### EXECUTIVE SUMMARY

This market conduct examination revealed concerns with Company procedures and practices in the following areas:

*Consumer Complaints* - incomplete complaint log, response time to Departmental inquiries, NAIC company code not included on Company response.

*Policy Forms and Filings* - use of unfiled policy declarations page for private passenger automobile.

*Appointment and Termination of Producers* - failure to perform background checks on appointed producers and failure to notify producers of termination.

*Underwriting and Rating* - applications accepted from a producer who was not appointed and failure to comply with proper consent to rate procedures for private passenger automobile.

*Terminations* - Private passenger automobile cancellations: failure to issue the North Carolina Notice of Termination form (FS-4) to the Division of Motor Vehicles (DMV). Workers' compensation cancellations: return premium calculated incorrectly. Workers' Compensation nonrenewals: proper notification not given.

Specific violations related to each area of concern are noted in the appropriate section of this report. All North Carolina General Statutes and rules of the North Carolina Administrative Code cited in this report may be viewed on the North Carolina Department of Insurance Web site www.ncdoi.com, by clicking "Helpful Links."

**\*3** This examination identified various non-compliant practices, some of which may extend to other jurisdictions. The Company is directed to take immediate corrective action to demonstrate its ability and intention to conduct business in North Carolina according to its insurance laws and regulations. When applicable, corrective action for other jurisdictions should be addressed.

All unacceptable or non-compliant practices may not have been discovered or noted in this report. Failure to identify or criticize improper or non-compliant business practices in North Carolina or in other jurisdictions does not constitute acceptance of such practices. Examination report findings that do not reference specific insurance laws, regulations, or bulletins are presented to improve the Company's practices and ensure consumer protection.

### COMPANY OVERVIEW

#### History and Profile

Discovery Insurance Company is a stock company. As of March 2008, the Company was majority owned by Stephen B. Hill. The Company was incorporated on October 20, 1993 under the laws of North Carolina and began business operations effective November 1, 1993. The Company is domiciled in Kinston, North Carolina.

Report on Market Conduct Examination of the Discovery..., 2010 WL 2866924...

DJA0394

## Company Operations and Management

The Company is a writer of non-standard private passenger automobile and workers' compensation coverages. Effective January 2006, the Company discontinued writing unaffiliated workers' compensation business. The Company is currently licensed only in the State of North Carolina.

Direct written premium for the Company's 2008 property and casualty operations was $25,719,390. Premiums written in North Carolina between 2006 and 2008 decreased approximately 5.0 percent. The charts below outline the Company's mix of business for selected lines in 2008 and loss ratios in North Carolina for the examination period.

| Line of Business | Written Premium | Percentage |
|---|---|---|
| Private Passenger Automobile | $20,443,653 | 79.5 |
| Workers' Compensation | 5,275,737 | 20.5 |
| **Total** | **$25,719,390** | **100.0** |

| Year | Written Premium | Earned Premium | Incurred Losses* | Loss Ratio |
|---|---|---|---|---|
| 2006 | $27,067,140 | $24,501,809 | $20,907,424 | 85.3 |
| 2007 | $30,111,080 | $30,047,785 | $28,800,706 | 95.8 |
| 2008 | $25,719,390 | $27,265,942 | $23,697,392 | 86.9 |

**\* Does not include IBNRs**

## Certificates of Authority

The Certificates of Authority issued to the Company were reviewed for the period under examination. These certificates were reviewed to determine compliance with the provisions of NCGS 58-7-15. The Company's writings in North Carolina were deemed to be in compliance with the authority granted.

## Disaster Recovery Procedures

The Company has a detailed business continuation plan established to increase its chances of preventing disasters, as well as providing continuing operations following natural or man-made disasters. Each day key software databases, user files, and all electronically stored files are backed up. On a weekly basis, backed up files are placed inside a fire resistant safe and then placed in a separate physical building from the servers. In the event of a catastrophic loss to the Company's server room, the Company has two sister companies located at separate physical locations in Kinston, North Carolina which can host the Company's personnel, computer systems, and telecommunications systems allowing continued Company operations.

## POLICYHOLDER TREATMENT

## Consumer Complaints

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Report on Market Conduct Examination of the Discovery..., 2010 WL 2866924...

DJA0395

**\*4**  The Company's complaint handling procedures were reviewed to determine compliance with applicable North Carolina statutes and rules.

The Company was deemed to be in apparent violation of the provisions of Title 11 of the North Carolina Administrative Code, (NCAC), Chapter 19, Section 0103 as 2 complaints (4.0 percent error ratio) were not listed on the Company's complaint register.

The Company's complaint register was reconciled with a listing furnished by the Consumer Services Division of the Department. Fifty complaints from the Department's listing of 81 were randomly selected and received for review. The distribution of complaints requiring a response to the Department is shown in the chart below.

| Type of Complaint | Total |
|---|---|
| Claims | 42 |
| Underwriting | 8 |
| **Total** | **50** |

The Company's response to each complaint was deemed to be appropriate to the circumstances. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 1.0602 as 1 of the complaints reviewed (2.0 percent error ratio) was responded to in excess of the 7 calendar day requirement of this rule.

The Company was deemed to be in apparent violation of the provisions of 11 NCAC 4.0123 as 13 responses to Departmental inquiries (26.0 percent error ratio) did not contain the Company's NAIC company code.

The average service time to respond to a Departmental complaint was 2 calendar days. A chart of the Company's response time follows:

| Service Days | Number of Files | Percentage of Total |
|---|---|---|
| 1 - 7 | 49 | 98 |
| 15 - 21 | 1 | 2 |
| **Total** | **50** | **100.0** |

Privacy of Financial and Health Information

The Company provided privacy of financial and health information documentation for the examiners' review. The Company exhibited policies and procedures in place so that nonpublic personal financial or health information is not disclosed unless the customer or consumer has authorized the disclosure. The Company was found to be compliant with the provisions of NCGS 58-39-25, 58-39-26, and 58-39-27.

MARKETING

Policy Forms and Filings

Policy forms and filings for the Company were reviewed to determine compliance with appropriate North Carolina statutes and rules. Filings for the private passenger automobile line of business were made by the North Carolina Rate Bureau on behalf of the Company. Deviations for this line of business were made to the Department by the Company.

The Company was deemed to be in apparent violation of the provisions of 11 NCAC 10.1201(c) as the Private Passenger Automobile Policy Declarations page had not been filed with and approved by the Department.

## Sales and Advertising

Sales and advertising practices of the Company were reviewed to determine compliance with the provisions of NCGS 58-63-15.

**\*5** The Company does not market directly to insureds or prospective insureds. It distributes its products through North Carolina independent agents only. The Company's marketing objective is to partner with professional and compliant North Carolina independent agents who sell profitable non-standard automobile physical damage and ceded liability coverage. The Company does not participate in any media advertisement or telemarketing services of its product.

No unfair or deceptive trade practices were noted in this segment of the examination.

## Producer Licensing

The Company's procedures for appointment and termination of its producers were reviewed to determine compliance with the appropriate North Carolina statutes and rules. Fifty appointed and 50 terminated producer files were randomly selected and received for review from populations of 359 and 368, respectively.

All appointment and termination forms reviewed were submitted to the Department in accordance with the timetables stipulated under the provisions of NCGS 58-33-40 and 58-33-56. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 6A.0412(2) as background checks were not performed on any of the 50 appointed producers reviewed (100 percent error ratio). The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-56(d) as notification of termination was not sent to 46 of the terminated producers reviewed (92.0 percent error ratio).

## Agency Management

The Company has 125 active agencies with approximately 1,058 producers appointed in North Carolina as well as 2 full time marketing representatives. The President, located in the home office in Kinston, North Carolina, is responsible for the activities of the agency force. Formal agency reviews are conducted twice annually and include the participation of the following: President, Executive Vice President, Vice President of Auto Operations, Chief Financial Officer, Personal Auto Manager, Assistant Vice President of Auto Claims, and Eastern/Western Marketing Representatives. Agent appointments, terminations and licensing are handled by Eastern and Western Marketing Representatives and Executive Administrative Assistant to the President.

## UNDERWRITING AND RATING

## Overview

The Company's marketing philosophy in North Carolina focuses on the private passenger automobile line of business. The Company's private passenger automobile policies were reviewed for adherence to underwriting guidelines, file documentation,

Report on Market Conduct Examination of the Discovery..., 2010 WL 2866924...

DJA0397

and premium determination. Additionally, the policies were examined to determine compliance with the appropriate North Carolina statutes and rules, policy provisions, and the applicable policy manual rules.

## Private Passenger Automobile

The Company provided a listing of 18,524 active private passenger automobile policies issued during the period under examination. One hundred policies were randomly selected and received for review.

**\*6** The Company's private passenger automobile policies were written on a 6 or 12 month basis. Liability coverages were written utilizing manual rates. Physical damage coverages were written on a consent to rate basis. Risk placement was determined by the Company's underwriting guidelines and the underwriter. No discrepancies were noted in the Company's use of its underwriting guidelines.

The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-40(h) as 18 applications reviewed (18.0 percent error ratio) were accepted from a producer who was not appointed. The Company was reminded of the provisions of NCGS 58-37-35(l) and Rules 3 and 5 of the North Carolina Personal Automobile Manual as 6 policies reviewed (6.0 percent error ratio) were rated incorrectly. The rating errors consisted of the following:

• Incorrect rating symbol applied to 4 policies.

• Incorrect Safe Driver Incentive Plan points applied on 1 policy.

• Incorrect territory was used to rate 1 policy.

The rating errors resulted in 3 premium undercharges and 3 premium overcharges to the insureds. At the request of the examiners, refunds in the amount of $257.12 were issued by the Company for the overcharges.

The Company was deemed to be in apparent violation of the provisions of 11 NCAC 10.0602(a)(2) as it did not comply with consent to rate procedures on 44 policies reviewed (44.0 percent error ratio) because the standard rate that would be charged for physical damage and/or extended transportation coverage, without application of consent to rate, was not indicated on the application.

The Company was reminded of the provisions of NCGS 58-2-185 as the policy declarations page for 9 policies reviewed (9.0 percent error ratio) incorrectly stated no premium was charged for Uninsured/Underinsured Motorist coverage.

The Company was reminded of the provisions of 11 NCAC 19.0102(a)(b), 19.0104, and 19.0106(a)(4)(h) as 1 file reviewed (1.0 percent error ratio) did not contain a signed consent to rate form.

## TERMINATIONS

## Overview

The Company's termination procedures were reviewed to determine compliance with the appropriate North Carolina statutes and rules, policy provisions, and the applicable policy manual rules. The review focused on the following lines of business:

1. Private Passenger Automobile

2. Workers' Compensation

Report on Market Conduct Examination of the Discovery..., 2010 WL 2866924...

DJA0398

Special attention was placed on the validity and reason for termination, timeliness in issuance of the termination notice, policy refund (where applicable), and documentation of the policy file. A total of 30,566 policies were terminated during the period under examination. The examiners randomly selected 109 terminations for review.

### Private Passenger Automobile Cancellations

One hundred cancelled private passenger automobile policies were randomly selected and received for review from a population of 30,557.

**\*7** The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
|---|---|---|
| Finance company request | 62 | 62.0 |
| Nonpayment of premium | 22 | 22.0 |
| Insured's request | 15 | 15.0 |
| Underwriting reasons | 1 | 1.0 |
| **Total** | **100** | **100.0** |

The Company was not required to issue cancellation notices for 15 of the cancellations reviewed as these policies were cancelled at the request of the insured. Cancellation notices for the remaining 85 policies stated the specific reason for cancellation. All insureds and loss payees were given proper and timely notification of cancellation.

All premium refunds were deemed correct. The Company issued the refunds in a timely manner.

The final area of this review encompassed documentation of the policy file. All policy files reviewed contained sufficient documentation to support the action taken by the Company. The Company was deemed to be in apparent violation of the provisions of NCGS 20-309(e) (repealed effective July 2008) and NCGS 20-309.2 (effective July 2008) as the FS-4 was not submitted to the DMV when liability coverages were cancelled for 12 policies reviewed (12.0 percent error ratio).

### Workers' Compensation Cancellations

The entire population of 3 workers' compensation policies cancelled during the period under examination was reviewed.

The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
|---|---|---|
| Insured's request | 1 | 33.4 |
| Nonpayment of premium | 1 | 33.3 |
| Underwriting reasons | 1 | 33.3 |

Report on Market Conduct Examination of the Discovery..., 2010 WL 2866924...

DJA0399

| | | |
|---|---|---|
| **Total** | **3** | **100.0** |

The Company was not required to issue a cancellation notice for 1 of the cancellations reviewed as this policy was cancelled at the request of the insured.

The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-100 as the return premium was calculated incorrectly on 1 policy reviewed (33.3 percent error ratio). The error resulted in understatement of refund to the insured. At the request of the examiners, a refund in the amount of $2,582 was issued by the Company. The remaining premium refunds were deemed correct. The Company issued the refunds in a timely manner.

The final area of this review encompassed documentation of the policy file. All policy files reviewed contained sufficient documentation to support the action taken by the Company.

## Private Passenger Automobile Nonrenewals

The Company reported no private passenger automobile policies were nonrenewed during the period under examination.

## Workers' Compensation Nonrenewals

**\*8**  The entire population of 6 workers' compensation policies nonrenewed during the period under examination was reviewed.

The reason for nonrenewal was deemed valid for all policies reviewed. The review revealed the following reason for nonrenewal:

| Reason for Nonrenewal | Number of Policies | Percentage |
|---|---|---|
| Underwriting reasons | 6 | 100.0 |
| **Total** | **6** | **100.0** |

The nonrenewal notices for the policies reviewed stated the specific reason for nonrenewal. The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-110(b) as 1 insured (16.7 percent error ratio) was not provided at least 45 days notice of nonrenewal.

The final area of this review encompassed documentation of the policy file. All policy files contained sufficient documentation to support the action taken by the Company.

## CLAIMS PRACTICES

### Overview

The Company's claims practices were reviewed to determine compliance with the appropriate North Carolina statutes and rules and policy provisions. The review encompassed paid, automobile medical payment, first and third party bodily injury, closed without payment, subrogated, total loss settlement, and litigated claims.

Report on Market Conduct Examination of the Discovery..., 2010 WL 2866924...

DJA0400

Claims service in North Carolina is under the direction of the Vice President of Auto Operations and is provided from the home office located in Kinston, North Carolina. The staff is comprised of the Assistant Vice President of Claims, 4 company telephone adjusters, and 3 claim assistants. Company adjusters provide the claim service with assistance, at times, from independent adjusters. Independent adjusters have no check or draft authority. The Company agency force does not adjust any claims and does not have claims draft authority. With regard to total losses, a salvage log is maintained by a claim assistant and overseen by the Assistant Vice President of Claims.

Five hundred claims were randomly selected for review from a population of 27,466.

## Paid Claims

The examiners randomly selected and received 200 of the 15,982 first party automobile physical damage and third party property damage claims paid during the period under examination. The claim files were reviewed for timeliness of payment, supporting documentation and accuracy of payment.

The following types of claims were reviewed and the average payment time is noted in calendar days:

| Type of Claim | Payment Time |
| --- | --- |
| Automobile physical damage | 14.0 |
| Third party property damage | 13.0 |

All payments issued by the Company were deemed to be accurate. Deductibles were correctly applied and depreciation taken was reasonable.

The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0105, and 19.0106(a)(5)(h) as one file (0.5 percent error ratio) did not contain payment or appraisal information. The remainder of the files reviewed contained documentation to support the Company's payments. The documentation consisted of appraisals, estimates, repair bills, or inventory listings.

**\*9** Claims were not paid in a timely manner for 8 claims (4.0 percent error ratio) and not appraised in a timely manner for 3 claims (1.5 percent error ratio). This matter could result in an apparent violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice.

## Automobile Medical Payment Claims

Fifty automobile medical payment claims were randomly selected and received for review from a population of 1,453. The claim files were reviewed to determine if the Company had engaged in any unfair claims practices. The review of automobile medical payment claims disclosed no apparent violations of the provisions of NCGS 58-63-15(f).

## First and Third Party Bodily Injury Claims

Fifty first and third party bodily injury claims were randomly selected and received for review from a population of 3,016. The claim files were reviewed to determine whether the Company had engaged in any unfair claims practices. The review of first and third party bodily injury claims disclosed no apparent violations of the provisions of NCGS 58-63-15(f).

Report on Market Conduct Examination of the Discovery..., 2010 WL 2866924...

DJA0401

## Closed Without Payment Claims

Fifty closed without payment claims were randomly selected and received for review from a population of 3,258. The claim files were reviewed to determine if the Company's reasons for closing the claims without payment were valid.

The claim files reviewed contained documentation that supported the Company's reasons for closing the claims without payment. All reasons for denial or closing the files without payment were deemed valid. Claims were denied on an average of 14 calendar days for the 3-year period. The review of closed without payment claims disclosed no apparent violations of the provisions of NCGS 58-63-15(f).

## Subrogated Claims

Fifty subrogated claims were randomly selected and received for review from a population of 232. The claim files were reviewed to determine if the insured's deductible was properly reimbursed by the Company when subrogation was successful.

All reimbursements were deemed to be correct and were issued on a 3-year average of 1 calendar day from the date the Company collected the monies.

## Total Loss Settlement Claims

Fifty total loss settlement claims were randomly selected and received for review from a population of 3,213. The claim files were reviewed to determine if the settlements were equitable and timely.

The Company primarily used CCC Information Services, Inc. in addition to on-site independent adjusters to establish the actual cash value of totaled vehicles. All settlements were deemed equitable. The Company settled all claims in a timely manner. The payments were issued on a 3-year average of 15 calendar days. No apparent violations of the provisions of NCGS 58-63-15(11)(h), 11 NCAC 4.0418, or 4.0421 were noted during this review.

## Litigated Claims

*10 Fifty litigated claims were randomly selected and received for review from a population of 312. The claim files were reviewed to determine if the Company had engaged in any unfair claims practices. The review of litigated claims disclosed no apparent violation of the provisions of NCGS 58-63-15.

## SUMMARY

The Market Conduct examination revealed the following:

1. Policyholder Treatment

a. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0103 as 4.0 percent of the consumer complaints were not listed on the Company's complaint register.

b. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 1.0602 as the responses to 2.0 percent of the Departmental inquiries reviewed were in excess of the 7 calendar day requirement of this rule.

Report on Market Conduct Examination of the Discovery..., 2010 WL 2866924...

DJA0402

c. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 4.0123 as the responses to 26.0 percent of the Departmental inquiries reviewed did not include its National Association of Insurance Commissioners code.

2. Marketing

a. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 10.1201(c) as its private passenger automobile declarations page had not been filed with and approved by the Department.

b. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 6A.0412(2) as background checks were not performed on 100 percent of the producers reviewed.

c. The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-56(d) as notification of termination was not sent to 92.0 percent of the terminated producers reviewed.

3. Underwriting and Rating

a. The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-40(h) as 18.0 percent of the private passenger automobile applications reviewed were accepted from a producer who was not appointed.

b. The Company was reminded of the provisions of NCGS 58-37-35(l) and Rules 3 and 5 of the North Carolina Personal Automobile Manual as 6.0 percent of the active private passenger automobile policies reviewed were rated incorrectly.

c. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 10.0602(a)(2) as proper consent to rate procedures were not followed on 44.0 percent of the active private passenger automobile files reviewed.

d. The Company was reminded of the provisions of NCGS 58-2-185 as 9.0 percent of the active private passenger automobile policies reviewed displayed an incorrect Uninsured/Underinsured Motorist coverage premium on the policy declarations page.

e. The Company was reminded of the provisions of 11 NCAC 19.0102(a)(b), 19.0104, and 19.0106(a)(4)(h) as 1.0 percent of the active private passenger automobile files reviewed did not contain proper file documentation.

4. Terminations

a. The Company was deemed to be in apparent violation of the provisions of NCGS 20-309(e) and 20-309.2 as the North Carolina Notice of Termination Form was not submitted to the North Carolina Division of Motor Vehicles for 12.0 percent of the cancelled private passenger automobile policies reviewed.

*11 b. The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-100 as the return premium was calculated incorrectly on 33.3 percent of the cancelled workers' compensation policies reviewed.

c. The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-110(b) as the nonrenewal notice for 16.7 percent of the nonrenewed workers' compensation policies reviewed was not issued at least 45 days prior to the termination date.

5. Claims

Report on Market Conduct Examination of the Discovery..., 2010 WL 2866924...

DJA0403

a. The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0105, and 19.0106(a)(5)(h) as 0.5 percent of the paid claims reviewed did not contain payment or appraisal information.

### TABLE OF STATUTES AND RULES

| Statute/Rule | Title |
| --- | --- |
| NCGS 58-2-131 | Examinations to be made; authority, scope, scheduling, and conduct of examinations. |
| NCGS 58-2-185 | Record of business kept by companies and agents; Commissioner may inspect. |
| NCGS 58-7-15 | Kinds of insurance authorized. |
| NCGS 58-33-40 | Appointment of agents. |
| NCGS 58-33-56 | Notification to Commissioner of termination. |
| NCGS 58-36-100 | Prospective loss costs filings and final rate filings for workers' compensation and employers' liability insurance. |
| NCGS 58-36-110 | Notice of nonrenewal, premium rate increase, or change in workers' compensation insurance coverage required. |
| NCGS 58-37-35 | The Facility; functions; administration. |
| NCGS 58-39-25 | Notice of insurance information practices. |
| NCGS 58-39-26 | Federal privacy disclosure notice requirements. |
| NCGS 58-39-27 | Privacy notice and disclosure requirement exceptions. |
| NCGS 58-63-15 | Unfair methods of competition and unfair or deceptive acts or practices defined. |
| NCGS 20-309 | Motor vehicle registration. |
| 11 NCAC 1.0602 | Insurance Companies' Response to Departmental Inquiries. |
| 11 NCAC 4.0123 | Use of Specific Company Name in Responses. |

Report on Market Conduct Examination of the Discovery..., 2010 WL 2866924...

DJA0404

| | |
|---|---|
| 11 NCAC 4.0418 | Total Losses on Motor Vehicles. |
| 11 NCAC 4.0421 | Handling of Loss and Claim Payments. |
| 11 NCAC 6A.0412 | Appointment of Agent: Responsibility of Company. |
| 11 NCAC 10.0602 | Consent to Rate Procedures: Rate Bureau Coverages. |
| 11 NCAC 10.1201 | General Requirements. |
| 11 NCAC 19.0102 | Maintenance of Records. |
| 11 NCAC 19.0103 | Complaint Records. |
| 11 NCAC 19.0104 | Policy Records. |
| 11 NCAC 19.0105 | Claim Records. |
| 11 NCAC 19.0106 | Records Required for Examination. |

CONCLUSION

An examination has been conducted on the market conduct affairs of Discovery Insurance Company for the period January 1, 2006 through December 31, 2008 with analyses of certain operations of the Company being conducted through February 15, 2010. The Company's response to this report, if any, is available upon request.

**\*12** This examination was conducted in accordance with the North Carolina Department of Insurance and the National Association of Insurance Commissioners Market Regulation Handbook procedures, including analyses of Company operations in the areas of policyholder treatment, marketing, underwriting and rating, terminations, and claims practices.

In addition to the undersigned, James P. McQuillan, CPCU and Letha Lombardi, North Carolina Market Conduct Examiners, participated in this examination.

Respectfully submitted,
/s/ Norma M. Rafter
Norma M. Rafter, CPCU
Examiner-In-Charge
Market Regulation Division
State of North Carolina

I have reviewed this examination report and it meets the provisions for such reports prescribed by this Division and the North Carolina Department of Insurance.

Report on Market Conduct Examination of the Discovery..., 2010 WL 2866924...

DJA0405

/s/ Tracy M. Biehn
Tracy M. Biehn, LPCS, MBA
Deputy Commissioner
Market Regulation Division
State of North Carolina

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.                                    15

TAB 40
Report on Market Conduct Examination of the Selective..., 2008 WL 5794432...

DJA0406

2008 WL 5794432

State of North Carolina

**\*1**  Report on Market Conduct Examination of the

Selective Insurance Company of the Southeast

Branchville, New Jersey

February 14, 2008

MARKET CONDUCT REPORTS

North Carolina Department of Insurance

 Image 1 within document in PDF format.

Report

<u>TABLE OF CONTENTS</u>

SALUTATION
FOREWORD
SCOPE OF EXAMINATION
EXECUTIVE SUMMARY
COMPANY OVERVIEW
History and Profile
Company Operations and Management
Certificates of Authority
Disaster Recovery Procedures
POLICYHOLDER TREATMENT
Consumer Complaints
Privacy of Financial and Health Information
MARKETING
Policy Forms and Filings
Sales and Advertising
Producer Licensing
Agency Management
UNDERWRITING AND RATING
Overview
Commercial Automobile
Workers' Compensation
Businessowners
General Liability
Commercial Inland Marine
TERMINATIONS
Overview
Commercial Automobile Cancellations

Report on Market Conduct Examination of the Selective..., 2008 WL 5794432...

DJA0407

Workers' Compensation Cancellations
Businessowners Cancellations
General Liability Cancellations
Commercial Inland Marine Cancellations
Commercial Automobile Nonrenewals
Workers' Compensation Nonrenewals
Businessowners Nonrenewals
General Liability Nonrenewals
Commercial Inland Marine Nonrenewals
CLAIMS PRACTICES
Overview
Paid Claims
Automobile Medical Payment Claims
First and Third Party Bodily Injury Claims
Closed Without Payment Claims
Subrogated Claims
Total Loss Settlement Claims
Litigated Claims
SUMMARY
TABLE OF STATUTES AND RULES
CONCLUSION

Raleigh, North Carolina

February 14, 2008

Honorable Jim Long

Commissioner of Insurance

Department of Insurance

State of North Carolina

Dobbs Building

 **\*2** 430 N. Salisbury Street

Raleigh, North Carolina 27603

Honorable Steven M. Goldman

Commissioner of Insurance

Department of Banking and Insurance

State of New Jersey

20 West State Street

Trenton, New Jersey 08625-0325

Honorable Commissioner:

Pursuant to your instructions and in accordance with the provisions of North Carolina General Statute (NCGS) 58-2-131, a general examination has been made of the market conduct activities of

**SELECTIVE INSURANCE COMPANY OF THE SOUTHEAST**

**(NAIC #39926)**

NAIC Exam Tracking System Exam Number: NC094-M42

Branchville, New Jersey

hereinafter generally referred to as the Company, at the North Carolina Department of Insurance (Department) office located at 11 S. Boylan Avenue, Raleigh, North Carolina. A report thereon is respectfully submitted.

Report on Market Conduct Examination of the Selective..., 2008 WL 5794432...

DJA0408

<div align="center">FOREWORD</div>

This examination reflects the North Carolina insurance activities of Selective Insurance Company of the Southeast. The examination is, in general, a report by exception. Therefore, much of the material reviewed will not be contained in this written report, as reference to any practices, procedures, or files that manifested no improprieties were omitted.

<div align="center">SCOPE OF EXAMINATION</div>

This examination commenced on November 12, 2007 and covered the period of January 1, 2004 through December 31, 2006 with analyses of certain operations of the Company being conducted through February 11, 2008. All comments made in this report reflect conditions observed during the period of the examination.

The examination was arranged and conducted by the Department. It was made in accordance with Market Regulation standards established by the Department and procedures established by the National Association of Insurance Commissioners (NAIC) and accordingly included tests of policyholder treatment, marketing, underwriting and rating, terminations, and claims practices.

It is the Department's practice to cite companies in apparent violation of a statute or rule when the results of a sample show errors/noncompliance at or above the following levels: 0 percent for consumer complaints, sales and advertising, producers who were not appointed and/or licensed, and the use of forms and rates/rules that were neither filed with nor approved by the Department; 7 percent for claims; and 10 percent for all other areas reviewed. When errors are detected in a sample, but the error rate is below the applicable threshold for citing an apparent violation, the Department issues a reminder to the company.

<div align="center">EXECUTIVE SUMMARY</div>

This market conduct examination revealed concerns with Company procedures and practices in the following areas:

*Underwriting and Rating* - Commercial automobile: applications accepted from non-appointed producers, use of unfiled rates, incomplete file documentation. Workers' compensation: applications accepted from non-appointed producers, incomplete file documentation. Businessowners: applications accepted from non-appointed producers, incomplete file documentation, rating errors. General liability: applications accepted from non-appointed producers. Commercial inland marine: applications accepted from non-appointed and/or non-licensed producers.

**\*3** *Terminations* - Commercial automobile cancellations: failure to provide cancellation notice and/or proof of mailing. Workers' compensation cancellations: failure to provide cancellation notice. Commercial automobile nonrenewals: files not provided for review. Workers' compensation nonrenewals: files not provided for review. Businessowners nonrenewals: file not provided for review. Commercial inland marine nonrenewals: files not provided for review.

Specific violations related to each area of concern are noted in the appropriate section of this report. All North Carolina General Statutes and rules of the North Carolina Administrative Code cited in this report may be viewed on the North Carolina Department of Insurance Web Site www.ncdoi.com, by clicking "Helpful Links."

This examination identified various non-compliant practices, some of which may extend to other jurisdictions. The Company is directed to take immediate corrective action to demonstrate its ability and intention to conduct business in North Carolina according to its insurance laws and regulations. When applicable, corrective action for other jurisdictions should be addressed.

All unacceptable or non-compliant practices may not have been discovered or noted in this report. Failure to identify or criticize improper or non-compliant business practices in North Carolina or in other jurisdictions does not constitute acceptance

Report on Market Conduct Examination of the Selective..., 2008 WL 5794432...

DJA0409

of such practices. Examination report findings that do not reference specific insurance laws, regulations, or bulletins are presented to improve the Company's practices and ensure consumer protection.

## COMPANY OVERVIEW

### History and Profile

Selective Insurance Company of the Southeast is a stock corporation. The Company was incorporated as Southeast Insurance Company (SIC) under the laws of North Carolina on September 26, 1980, to serve as the vehicle for an internal change in ownership of Southeastern Fire Insurance Company (SFIC), which was acquired by Selective Insurance Company of America on July 1, 1980, from Barclays American Corporation, Charlotte, North Carolina. SIC merged with the former SFIC on March 2, 1981 and changed its name to Southeastern Fire Insurance Company. The predecessor company was incorporated under the laws of South Carolina in October 1940 and changed its state of domicile from South Carolina to North Carolina on January 1, 1969. The Company absorbed by merger, on June 30, 1971, a former companion carrier, Twins States Insurance Company, Charlotte, North Carolina. The present name was adopted January 2, 1986.

### Company Operations and Management

The Company is a writer of commercial and personal lines insurance coverages, specializing in small and medium sized businesses. The Company is licensed in Alabama, Connecticut, Delaware, District of Columbia, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Virginia, West Virginia, and Wisconsin.

**\*4** Direct written premium for the Company's 2006 countrywide property and casualty operations was $269,187,691. North Carolina's production for the same period was $22,151,973. Premiums written in North Carolina between 2004 and 2006 increased approximately 27.0 percent. The charts below outline the Company's mix of business for selected lines in 2006 and loss ratios in North Carolina for the examination period.

| Line of Business | Written Premium | Percentage |
|---|---|---|
| Workers' Compensation | $9,912,307 | 44.8 |
| Federal Flood | 7,508,768 | 33.9 |
| Commercial Automobile | 1,812,520 | 8.2 |
| Commercial Multiple Peril | 805,864 | 3.6 |
| Other Liability | 793,681 | 3.6 |
| Fire and Allied Lines | 515,264 | 2.3 |
| Inland Marine | 363,215 | 1.6 |
| Products Liability | 350,010 | 1.6 |
| Other | 90,344 | .4 |
| **Total** | **$22,151,973** | **100.0** |

Report on Market Conduct Examination of the Selective..., 2008 WL 5794432...

DJA0410

| Year | Written Premium | Earned Premium | Incurred Losses [a1] | Loss Ratio |
|------|----------------|----------------|---------------------|------------|
| 2004 | $17,436,365 | $16,025,701 | $ 9,055,592 | 56.5 |
| 2005 | $21,171,162 | $19,680,968 | $ 8,415,071 | 42.8 |
| 2006 | $22,151,973 | $21,307,405 | $11,074,279 | 52.0 |

[a1]    **Does not include IBNRs**

### Certificates of Authority

**\*5**  The Certificates of Authority issued to the Company were reviewed for the period under examination. These certificates were reviewed to determine compliance with the provisions of NCGS 58-7-15. The Company's writings in North Carolina were deemed to be in compliance with the authority granted.

### Disaster Recovery Procedures

The Company has a detailed business continuation plan established to increase its chances of preventing disasters, as well as providing continuing operations following natural or man-made disasters. In addition, the Company has a comprehensive disaster recovery IT Business Continuity Plan in place that includes procedures to be implemented by designated staff in the event of an emergency that impacts the Company's operations and computer operations facilities. The plan includes a contract with IBM Business Continuity and Recovery Services for IBM to provide equipment, office space, and power generation for the Companies' headquarters location in Branchville, New Jersey. This three year contract includes availability at an IBM recovery center either in Sterling Forest, New York; Gaithersburg, Maryland or Boulder, Colorado. The contract includes all network WAN/LAN, server, mainframe, Storage and Reduced Instruction Set Computer (RISC) hardware that Selective would need to recover all of its systems and connectivity. The Company utilizes their headquarters location in Branchville, New Jersey as a recovery site for all remote locations, including the Southern regional office in Charlotte, North Carolina. Included within the contract are two annual 40 hour tests. In the past, Selective has normally tested in both the first and third quarters of each year.

Additionally, the Company utilizes Tivoli Storage Management with a 3584 Automated Tape Library for nightly back-ups and recovery. Tapes are stored off-site at Vital Records located in Mount Olive, New Jersey and are available within four hours of a request.

## POLICYHOLDER TREATMENT

### Consumer Complaints

The Company's complaint handling procedures were reviewed to determine compliance with applicable North Carolina statutes and rules. There were no consumer complaints for the period under examination.

### Privacy of Financial and Health Information

Privacy of financial and health information applies to transactions involving insurance primarily for personal, family, or household needs rather than business or professional needs, which is what this review consisted of.

Report on Market Conduct Examination of the Selective..., 2008 WL 5794432...

DJA0411

# MARKETING

## Policy Forms and Filings

Policy forms and filings for the Company were reviewed to determine compliance with appropriate North Carolina statutes and rules. Emphasis of the review was placed on the following lines of business:

  1. Commercial Automobile

  2. Workers' Compensation

  3. Businessowners

  **\*6**  4. General Liability

  5. Commercial Inland Marine

Filings for the workers' compensation line of business were made by the North Carolina Rate Bureau on behalf of the Company. Filings for the commercial automobile, businessowners, general liability, and commercial inland marine lines of business were made by the Insurance Services Office on behalf of the Company. Deviations for these lines of business were made to the Department by the Company. The Company's commercial inland marine coverages were written utilizing independently filed rates.

## Sales and Advertising

Sales and advertising practices of the Company were reviewed to determine compliance with the provisions of NCGS 58-63-15.

The Company does not distribute sales material directly to insureds or prospective insureds, because it distributes its products through the independent agency system. Written procedures for the approval of advertising material are maintained. Advertising requests must be processed through and approved by Corporate Communications Department. Advertising information is maintained in the home office in Branchville, New Jersey.

No unfair or deceptive trade practices were noted in this segment of the examination.

## Producer Licensing

The Company's procedures for appointment and termination of its producers were reviewed to determine compliance with the appropriate North Carolina statutes and rules. Fifty appointed and 50 terminated producer files were randomly selected and received for review from populations of 368 and 215, respectively.

All appointment and termination forms reviewed were submitted to the Department in accordance with the timetables stipulated under the provisions of NCGS 58-33-40 and 58-33-56.

## Agency Management

The Company currently has approximately 1,167 producers appointed in North Carolina. The Assistant Vice-President, Field Operations Manager located in the Regional Office in Charlotte, North Carolina, is responsible for the activities of the agency

force. Formal agency reviews are conducted by regional management and field representatives on an annual basis. The Assistant Vice-President, Field Operations Manager is also responsible for agent appointments, terminations, and licensing.

<div align="center">UNDERWRITING AND RATING</div>

## Overview

The Company's marketing philosophy in North Carolina focuses primarily on commercial lines. The Company provided the examiners with listings of the following types of active policies for the period under examination:

1. Commercial Automobile

2. Workers' Compensation

3. Businessowners

4. General Liability

5. Commercial Inland Marine

A random selection of 250 policies was made from a total population of 1,892. Each policy was reviewed for adherence to underwriting guidelines, file documentation, and premium determination. Additionally, the policies were examined to determine compliance with the appropriate North Carolina statutes and rules, policy provisions, and the applicable policy manual rules.

## Commercial Automobile

**\*7** The Company provided a listing of 103 active commercial automobile policies issued during the period under examination. Fifty policies were randomly selected and received for review.

The Company's commercial automobile coverages were written utilizing manual and deviated rates. Policies were written on an annual basis. Risk placement was determined by the Company's underwriting guidelines and the underwriter. No discrepancies were noted in the Company's use of its underwriting guidelines. All policy files contained sufficient documentation to support the Company's classification of the risk.

The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-40(h) as 9 applications reviewed (18.0 percent error ratio) were signed by non-appointed producers. The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-30(a) and 11 NCAC 10.1102(4) as the non-fleet private passenger type vehicles on 12 policies reviewed (24.0 percent error ratio) were rated using an unfiled private passenger automobile rate deviation. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 8 files reviewed (16.0 percent error ratio) did not contain documentation to justify the schedule credit applied. The Company was reminded of the provisions of NCGS 58-41-50(f) as 1 policy reviewed (2.0 percent error ratio) was rated incorrectly. An incorrect territory code and an incorrect secondary factor were used in the rating of the policy. The rating error resulted in a premium undercharge to the insured. The remaining 49 premiums charged were deemed correct.

## Workers' Compensation

The Company provided a listing of 946 active workers' compensation policies issued during the period under examination. Fifty policies were randomly selected and received for review.

Report on Market Conduct Examination of the Selective..., 2008 WL 5794432...

DJA0413

The Company's workers' compensation coverages were written utilizing manual and deviated rates. Policies were written on an annual basis. Risk placement was determined by the Company's underwriting guidelines and the underwriter. No discrepancies were noted in the Company's use of its underwriting guidelines. All policy files contained sufficient documentation to support the Company's classification of the risk.

The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-40(h) as 3 applications reviewed (6.0 percent error ratio) were signed by non-appointed producers. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 13 files reviewed (26.0 percent error ratio) did not include documentation to justify the schedule debit/credit applied. All premiums charged were deemed correct.

## Businessowners

The Company provided a listing of 651 active businessowners policies issued during the period under examination. Fifty policies were randomly selected and received for review.

**\*8** The Company's businessowners coverages were written utilizing manual and deviated rates. Policies were written on an annual basis. Risk placement was determined by the Company's underwriting guidelines and the underwriter. No discrepancies were noted in the Company's use of its underwriting guidelines. All policy files contained sufficient documentation to support the Company's classification of the risk.

The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-40(h) as 3 applications reviewed (6.0 percent error ratio) were signed by non-appointed producers. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 16 files reviewed (32.0 percent error ratio) did not contain documentation to justify the Individual Risk Premium Modification debit/credit applied. The Company was deemed to be in apparent violation of the provisions of NCGS 58-41-50(f) as 13 policies reviewed (26.0 percent error ratio) were rated using an incorrect special increment. The 13 rating errors resulted in premium undercharges to the insureds. The remaining 37 premiums charged were deemed correct.

## General Liability

The Company provided a listing of 89 active commercial general liability policies issued during the period under examination. Fifty policies were randomly selected and received for review.

The Company's general liability coverages were written utilizing manual and deviated rates. Policies were written on an annual basis. Risk placement was determined by the Company's underwriting guidelines and the underwriter. No discrepancies were noted in the Company's use of its underwriting guidelines. All policy files contained sufficient documentation to support the Company's classification of the risk.

The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-40(h) as 9 applications reviewed (18.0 percent error ratio) were signed by non-appointed producers. The Company was reminded of the provisions of NCGS 58-41-50(f)) as 4 policies reviewed (8.0 percent error ratio) were rated incorrectly. The rating errors consisted of the following:

• Incorrect increased limit factor was used on 1 policy.

• Incorrect minimum premium was charged on 1 policy.

• Incorrect loss cost multiplier was used on 2 policies.

Report on Market Conduct Examination of the Selective..., 2008 WL 5794432...

DJA0414

The rating errors resulted in 3 premium undercharges and 1 premium overcharge to the insureds. At the request of the examiners, a refund in the amount of $292.00 was issued by the Company for the overcharge. The remaining 46 premiums charged were deemed correct.

### Commercial Inland Marine

The Company provided a listing of 103 active commercial inland marine policies issued during the period under examination. Fifty policies were randomly selected and received for review.

The Company's commercial inland marine coverages were written utilizing independently filed rates. Policies were written on an annual basis. Coverage may be written on a mono-line basis or as part of a package policy with other commercial exposures. Risk placement was determined by the Company's underwriting guidelines and the underwriter. No discrepancies were noted in the Company's use of its underwriting guidelines. All policy files contained sufficient documentation to support the Company's classification of the risk. All premiums charged were deemed correct.

**\*9** The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-40(h) as 10 applications reviewed (20.0 percent error ratio) were signed by non-appointed producers. The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-26(a)(b) as 1 application (2.0 percent error ratio) was accepted from a non-licensed out of state producer.

### TERMINATIONS

### Overview

The Company's termination procedures were reviewed to determine compliance with the appropriate North Carolina statutes and rules, policy provisions, and the applicable policy manual rules. The review focused on the following lines of business:

1. Commercial Automobile

2. Workers' Compensation

3. Businessowners

4. General Liability

5. Commercial Inland Marine

Special attention was placed on the validity and reason for termination, timeliness in issuance of the termination notice, policy refund (where applicable), and documentation of the policy file. A total of 808 policies were terminated during the period under examination. The examiners randomly selected 335 terminations for review.

### Commercial Automobile Cancellations

Fifty cancelled commercial automobile policies were randomly selected and received for review from a population of 64.

The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
|---|---|---|
| Insured's request | 22 | 44.0 |
| Nonpayment of premium | 18 | 36.0 |
| Coverage rewritten | 8 | 16.0 |
| Underwriting reasons | 2 | 4.0 |
| **Total** | **50** | **100.0** |

The Company was not required to issue cancellation notices for 30 of the cancellations reviewed as these policies were cancelled at the request of the insured or the coverage was rewritten.

**\*10**  The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 7 files (14.0 percent error ratio) did not contain proper file documentation. Six files did not contain a copy of the cancellation notice and 1 file did not contain proof of mailing. The Company was reminded of the provisions of NCGS 58-41-15(b) and the policy termination provisions as 2 insureds (4.0 percent error ratio) were not provided at least 15 days notice of cancellation.

The Company was reminded of Rule 11 of the Commercial Automobile Manual as 2 policies (4.0 percent error ratio) were cancelled incorrectly. One policy was cancelled using an incorrect cancellation date, and the return premium for 1 policy was calculated using the short rate method of cancellation in lieu of the pro-rata method. The errors resulted in understatement of refunds to the insureds. At the request of the examiners, the Company issued additional refunds in the amount of $1,374.00. The remaining premium refunds were deemed correct. The Company issued the refunds in a timely manner.

The final area of this review encompassed documentation of the policy file. All policy files reviewed contained sufficient documentation to support the action taken by the Company. The Company sent the North Carolina Notice of Termination Form (FS-4) to the North Carolina Division of Motor Vehicles (DMV) when liability coverages were cancelled. The Company was deemed to be in compliance with the provisions of NCGS 20-309(e).

Workers' Compensation Cancellations

Fifty cancelled workers' compensation policies were randomly selected for review from a population of 360 policies. The Company was unable to provide 1 of the files requested (2.0 percent error ratio) and was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h). The review was based on the remaining 49 files.

The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
|---|---|---|
| Insured's request | 20 | 40.8 |
| Nonpayment of premium | 20 | 40.8 |

Report on Market Conduct Examination of the Selective..., 2008 WL 5794432...

DJA0416

| | | |
|---|---|---|
| Coverage rewritten | 7 | 14.3 |
| Underwriting reasons | 2 | 4.1 |
| **Total** | **49** | **100.0** |

**\*11**  The Company was not required to issue cancellation notices for 27 of the cancellations reviewed as these policies were cancelled at the request of the insured or the coverage was rewritten.

The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 5 files (10.2 percent error ratio) did not contain a copy of the cancellation notice to the insured. The Company was reminded of the provisions of NCGS 58-36-105(b) as 3 files (6.1 percent error ratio) did not contain proof of mailing.

The Company was reminded of Rule X of the National Council on Compensation Insurance Manual as 3 policies (6.1 percent error ratio) were cancelled pro-rata rather than short rate when the policy was cancelled at the request of the insured. The errors resulted in overstatement of refunds to the insureds. The remaining premium refunds were deemed correct. The Company issued the refunds in a timely manner.

The final area of this review encompassed documentation of the policy file. All policy files reviewed contained sufficient documentation to support the action taken by the Company.

## Businessowners Cancellations

Fifty cancelled businessowners policies were randomly selected and received for review from a population of 116 policies.

The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
|---|---|---|
| Nonpayment of premium | 27 | 54.0 |
| Insured's request | 14 | 28.0 |
| Coverage rewritten | 7 | 14.0 |
| Underwriting reasons | 2 | 4.0 |
| **Total** | **50** | **100.0** |

The Company was not required to issue cancellation notices for 21 of the cancellations reviewed as these policies were cancelled at the request of the insured or the coverage was rewritten.

The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 2 files reviewed (4.0 percent error ratio) did not contain proper file documentation. One file did not contain a copy of the policy release and 1 file did not contain a copy of the cancellation notice to the insured.

**\*12**  All premium refunds were deemed correct. The Company issued the refunds in a timely manner.

Report on Market Conduct Examination of the Selective..., 2008 WL 5794432...

DJA0417

The final area of this review encompassed documentation of the policy file. All policy files reviewed contained sufficient documentation to support the action taken by the Company.

## General Liability Cancellations

Fifty cancelled general liability policies were randomly selected and received for review from a population of 68.

The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
|---|---|---|
| Nonpayment of premium | 29 | 58.0 |
| Insured's request | 13 | 26.0 |
| Coverage rewritten | 7 | 14.0 |
| Underwriting reasons | 1 | 2.0 |
| **Total** | **50** | **100.0** |

The Company was not required to issue cancellation notices for 20 of the cancellations reviewed as these policies were cancelled at the request of the insured or the coverage was rewritten.

The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 2 files reviewed (4.0 percent error ratio) did not contain a copy of the cancellation notice to the insured. The Company was reminded of the provisions of NCGS 58-41-15(b) as 1 insured (2.0 percent error ratio) was not provided at least 15 days notice of cancellation for non-payment of policy premium.

The Company was reminded of Rule 11 of the Commercial Lines Manual as the return premium for 2 policies, cancelled at the request of the insured (4.0 percent error ratio), were incorrectly calculated on a pro-rata basis in lieu of .90 of the pro-rata unearned premium. The errors resulted in overstatement of refunds to the insureds. The Company issued the refunds in a timely manner.

The final area of this review encompassed documentation of the policy file. All policy files reviewed contained sufficient documentation to support the action taken by the Company.

## Commercial Inland Marine Cancellations

Fifty cancelled inland marine policies were randomly selected and received for review from a population of 66.

**\*13** The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
|---|---|---|
| Nonpayment of premium | 23 | 46.0 |

Report on Market Conduct Examination of the Selective..., 2008 WL 5794432...

DJA0418

| | | |
|---|---|---|
| Insured's request | 22 | 44.0 |
| Underwriting reasons | 3 | 6.0 |
| Coverage rewritten | 2 | 4.0 |
| **Total** | **50** | **100.0** |

The Company was not required to issue cancellation notices for 24 of the cancellations reviewed as these policies were cancelled at the request of the insured or the coverage was rewritten.

The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 4 files reviewed (8.0 percent error ratio) did not contain a copy of the cancellation notice to the insured.

All premium refunds were deemed correct. The Company issued the refunds in a timely manner.

The final area of this review encompassed documentation of the policy file. All policy files reviewed contained sufficient documentation to support the action taken by the Company.

## Commercial Automobile Nonrenewals

One commercial automobile policy was nonrenewed during the period under examination. The Company was unable to provide the 1 file (100 percent error ratio) and was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h).

## Workers' Compensation Nonrenewals

Fifty nonrenewed workers' compensation policies were randomly selected for review from a population of 99. The Company was unable to provide 13 of the files requested (26.0 percent error ratio) and was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h). The review was based on the remaining 37 files.

The reason for nonrenewal was deemed valid for all policies reviewed. The review revealed the following reasons for nonrenewal:

| **Reason for Cancellation** | **Number of Policies** | **Percentage** |
|---|---|---|
| Agent no longer represents the Company | 19 | 51.4 |
| Underwriting reasons | 18 | 48.6 |
| **Total** | **37** | **100.0** |

**\*14** The nonrenewal notices for the policies reviewed stated the specific reason for nonrenewal. The Company was reminded of the provisions of NCGS 58-36-110(b) as 3 insureds (8.1 percent error ratio) were not provided at least 45 days notice of nonrenewal.

Report on Market Conduct Examination of the Selective..., 2008 WL 5794432...

DJA0419

The final area of this review encompassed documentation of the policy file. All policy files contained sufficient documentation to support the action taken by the Company.

## Businessowners Nonrenewals

One businessowners policy was nonrenewed during the period under examination. The Company was unable to provide the 1 file (100 percent error ratio) and was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h).

## General Liability Nonrenewals

The Company reported there were no commercial general liability nonrenewals during the period under examination.

## Commercial Inland Marine Nonrenewals

All nonrenewed commercial inland marine policies were selected for review from a population of 33. The Company was unable to provide 8 of the files requested (24.2 percent error ratio) and was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.106(a)(4)(h). The review was based on the remaining 25 files.

The reason for nonrenewal was deemed valid for all policies reviewed. The review revealed the following reasons for nonrenewal:

| Reason for Cancellation | Number of Policies | Percentage |
|---|:---:|:---:|
| Agent no longer represents the Company | 16 | 64.0 |
| Underwriting reasons | 9 | 36.0 |
| **Total** | **25** | **100.0** |

The nonrenewal notices for the policies reviewed stated the specific reason for nonrenewal. The Company was reminded of the provisions of NCGS 58-41-20(c) as 1 insured (4.0 percent error ratio) was not provided at least 45 days notice of nonrenewal.

The final area of this review encompassed documentation of the policy file. All policy files reviewed contained sufficient documentation to support the action taken by the Company.

## CLAIMS PRACTICES

## Overview

**\*15** The Company's claims practices were reviewed to determine compliance with the appropriate North Carolina statutes and rules and policy provisions. The review encompassed paid, automobile medical payment, first and third party bodily injury, closed without payment, subrogated, total loss settlement, and litigated claims.

Claims service in North Carolina is under the direction of the Southern Regional Claim Manager and is provided from the home office, regional office, claim service center, and field based claim staff. The staff is comprised of 3 claim supervisors and

12 claim handlers. Company adjusters provide the claim service with some assistance, at times, from independent adjusters. Independent adjusters have no check or draft authority. The Company agency force adjusts first party claims and has draft and check authority.

Three hundred sixty-one claims were randomly selected for review from a population of 1,165.

## Paid Claims

The examiners randomly selected and received 150 of the 657 first party automobile physical damage, first party property damage, and third party property damage claims paid during the period under examination. The claim files were reviewed for timeliness of payment, supporting documentation and accuracy of payment.

The following types of claims were reviewed and the average payment time is noted in calendar days:

| Type of Claim | Payment Time |
| --- | --- |
| Automobile physical damage | 17.0 |
| First party (excluding automobile physical damage) | 15.0 |
| Third party property damage | 11.0 |

All payments issued by the Company were deemed to be accurate. Deductibles were correctly applied and depreciation taken was reasonable.

All claim files reviewed contained documentation to support the Company's payments. The documentation consisted of appraisals, estimates, repair bills, or inventory listings.

The Company took an excessive amount of time (78 days) to pay 1 claim (2.0 percent error ratio). This matter could result in an apparent violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice.

## Automobile Medical Payment Claims

**\*16** Fifty automobile medical payment claims were randomly selected and received for review from a population of 57. The claim files were reviewed to determine if the Company had engaged in any unfair claims practices. The review of automobile medical payment claims disclosed no apparent violations of the provisions of NCGS 58-63-15.

## First and Third Party Bodily Injury Claims

Fifty first and third party bodily injury claims were randomly selected and received for review from a population of 59. The claim files were reviewed to determine whether the Company had engaged in any unfair claims practices. The review of first and third party bodily injury claims disclosed no apparent violations of the provisions of NCGS 58-63-15.

Report on Market Conduct Examination of the Selective..., 2008 WL 5794432...

DJA0421

## Closed Without Payment Claims

Fifty closed without payment claims were randomly selected and received for review from a population of 308. The claim files were reviewed to determine if the Company's reasons for closing the claims without payment were valid.

The claim files reviewed contained documentation that supported the Company's reasons for closing the claims without payment. All reasons for denial or closing the files without payment were deemed valid. Claims were denied on an average of 5 calendar days for the 3-year period. The review of closed without payment claims disclosed no apparent violations of the provisions of NCGS 58-63-15.

## Subrogated Claims

The entire population of 7 subrogated claims for the period under examination was reviewed. The claim files were reviewed to determine if the insured's deductible was properly reimbursed by the Company when subrogation was successful.

All reimbursements were deemed to be correct and were issued on a 3-year average of 1 calendar day from the date the Company collected the monies.

## Total Loss Settlement Claims

Fifty total loss settlement claims were randomly selected and received for review from a population of 73. The claim files were reviewed to determine if the settlements were equitable and timely.

The Company primarily used CCC Information Services, Inc. in addition to on-site independent adjusters to establish the actual cash value of totaled vehicles. All settlements were deemed equitable. The Company settled all claims in a timely manner. The payments were issued on a 3-year average of 15 calendar days. No apparent violations of the provisions of NCGS 58-63-15(11)(h), 11 NCAC 4.0418, or 4.0421 were noted during this review.

## Litigated Claims

The entire population of 4 litigated claims for the period under examination was reviewed. The claim files were reviewed to determine if the Company had engaged in any unfair claims practices. The review of litigated claims disclosed no apparent violation of the provisions of NCGS 58-63-15.

<div align="center">

SUMMARY

</div>

**\*17** The Market Conduct examination revealed the following:

1. Underwriting and Rating

   a. The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-40(h) as 18.0 percent of the commercial automobile applications reviewed were signed by non-appointed producers.

   b. The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-30(a) and 11 NCAC 10.1102(4) as the non-fleet private passenger type vehicles on 24.0 percent of the active commercial automobile policies reviewed were rated using an unfiled private passenger automobile rate deviation.

Report on Market Conduct Examination of the Selective..., 2008 WL 5794432...

DJA0422

c. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 16.0 percent of the active commercial automobile files reviewed did not contain documentation to justify the schedule credit applied.

d. The Company was reminded of the provisions of NCGS 58-41-50(f) as 2.0 percent of the active commercial automobile policies reviewed were rated incorrectly.

e. The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-40(h) as 6.0 percent of the workers' compensation applications reviewed were signed by non-appointed producers.

f. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 26.0 percent of the active workers' compensation files reviewed did not contain documentation to justify the schedule debit/credit applied.

g. The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-40(h) as 6.0 percent of the businessowners applications reviewed were signed by non-appointed producers.

h. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 32.0 percent of the active businessowners files reviewed did not contain documentation to justify the Individual Risk Premium Modification debit/credit applied.

i. The Company was deemed to be in apparent violation of the provisions of NCGS 58-41-50(f) as 26.0 percent of the active businessowners policies reviewed were rated using an incorrect special increment.

j. The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-40(h) as 18.0 percent of the general liability applications reviewed were signed by non-appointed producers.

k. The Company was reminded of the provisions of NCGS 58-41-50(f) as 8.0 percent of the active general liability policies reviewed were rated incorrectly.

l. The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-40(h) as 20.0 percent of the commercial inland marine applications reviewed were signed by non-appointed producers.

m. The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-26(a)(b) as 2.0 percent of the commercial inland marine applications reviewed were accepted from a non-licensed out of state producer.

2. <u>Terminations</u>

*18 a. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 14.0 percent of the cancelled commercial automobile files reviewed did not contain proper file documentation.

b. The Company was reminded of the provisions of NCGS 58-41-15(b) and the policy termination provisions as the cancellation notice for 4.0 percent of the cancelled commercial automobile policies reviewed was not issued at least 15 days prior to the termination date.

c. The Company was reminded of Rule 11 of the Commercial Automobile Manual as the return premium was calculated incorrectly on 4.0 percent of the cancelled commercial automobile policies reviewed.

d. The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 2.0 percent of the cancelled workers' compensation files requested were not provided for review.

e. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 10.2 percent of the cancelled workers' compensation files reviewed did not contain a copy of the cancellation notice to the insured.

f. The Company was reminded of the provisions of NCGS 58-36-105(b) as 6.1 percent of the cancelled workers' compensation files reviewed did not contain proof of mailing.

g. The Company was reminded of Rule X of the National Council on Compensation Insurance Manual as the return premium was calculated incorrectly on 6.1 percent of the cancelled workers' compensation policies reviewed.

h. The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 4.0 percent of the cancelled businessowners files reviewed did not contain proper file documentation.

i. The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 4.0 percent of the cancelled general liability files reviewed did not contain a copy of the cancellation notice to the insured.

j. The Company was reminded of the provisions of NCGS 58-41-15(b) as the cancellation notice for 2.0 percent of the cancelled general liability policies reviewed was not issued at least 15 days prior to the termination date when the policy was cancelled for nonpayment of premium.

k. The Company was reminded of Rule 11 of the Commercial Lines Manual as the return premium was calculated incorrectly on 4.0 percent of the cancelled general liability policies reviewed.

l. The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 8.0 percent of the cancelled commercial inland marine files reviewed did not contain of a copy of the cancellation notice to the insured.

m. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 100 percent of the nonrenewed commercial automobile files requested were not provided for review.

n. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 26.0 percent of the nonrenewed workers' compensation files requested were not provided for review.

**\*19** o. The Company was reminded of the provisions of NCGS 58-36-110(b) as the nonrenewal notice for 8.1 percent of the nonrenewed workers' compensation policies reviewed was not issued at least 45 days prior to the termination date.

p. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 100 percent of the nonrenewed businessowners files requested were not provided for review.

q. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(h) as 24.2 percent of the nonrenewed commercial inland marine files requested were not provided for review.

r. The Company was reminded of the provisions of NCGS 58-41-20(c) as the nonrenewal notice for 4.0 percent of the nonrenewed commercial inland marine policies reviewed was not issued at least 45 days prior to the termination date.

TABLE OF STATUTES AND RULES

Report on Market Conduct Examination of the Selective..., 2008 WL 5794432...

DJA0424

| Statute/Rule | Title |
| --- | --- |
| NCGS 58-2-131 | Examinations to be made; authority, scope, scheduling, and conduct of examinations. |

| Statute/Rule | Title |
| --- | --- |
| NCGS 58-7-15 | Kinds of insurance authorized. |
| NCGS 58-33-26 | General license requirements. |
| NCGS 58-33-40 | Appointment of agents. |
| NCGS 58-33-56 | Notification to Commissioner of termination. |
| NCGS 58-36-30 | Deviations. |
| NCGS 58-36-105 | Certain workers' compensation insurance policy cancellations prohibited. |
| NCGS 58-36-110 | Notice of nonrenewal, premium rate increase, or change in workers' compensation insurance coverage required. |
| NCGS 58-41-15 | Certain policy cancellations prohibited. |
| NCGS 58-41-20 | Notice of nonrenewal, premium rate increase, or change in coverage required. |
| NCGS 58-41-50 | Policy form and rate filings; punitive damages; data required to support filings. |
| NCGS 58-63-15 | Unfair methods of competition and unfair or deceptive acts or practices defined. |
| NCGS 20-309 | Motor vehicle registration. |
| 11 NCAC 4.0418 | Total Losses on Motor Vehicles. |
| 11 NCAC 4.0421 | Handling of Loss and Claim Payments. |

Report on Market Conduct Examination of the Selective..., 2008 WL 5794432...

DJA0425

| | |
|---|---|
| 11 NCAC 10.1102 | Rate Filings: Applicability. |
| 11 NCAC 19.0102 | Maintenance of Records. |
| 11 NCAC 19.0104 | Policy Records. |
| 11 NCAC 19.0106 | Records Required for Examination. |

CONCLUSION

**\*20** An examination has been conducted on the market conduct affairs of Selective Insurance Company of the Southeast for the period January 1, 2004 through December 31, 2006 with analyses of certain operations of the Company being conducted through February 11, 2008. The Company's response to this report, if any, is available upon request.

This examination was conducted in accordance with the North Carolina Department of Insurance and the National Association of Insurance Commissioners Market Regulation Handbook procedures, including analyses of Company operations in the areas of policyholder treatment, marketing, underwriting and rating, terminations, and claims practices.

In addition to the undersigned, James P. McQuillan, CPCU and Letha Lombardi, North Carolina Market Conduct Examiners, participated in this examination.

Respectfully submitted,
/s/ Norma M. Rafter
Norma M. Rafter, CPCU
Examiner-In-Charge
Market Regulation Division
State of North Carolina

I have reviewed this examination report and it meets the provisions for such reports prescribed by this Division and the North Carolina Department of Insurance.

/s/ Ernest L. Nickerson
Ernest L. Nickerson, FLMI, ACS, AIRC, ARM, RHU
Deputy Commissioner
Market Regulation Division
State of North Carolina

---

**End of Document**                                        © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 41
Report on Market Conduct Examination of the Geico..., 2010 WL 2866925...

DJA0426

2010 WL 2866925

State of North Carolina

**\*1** Report on Market Conduct Examination of the

Geico Indemnity Company

Government Employees Insurance Company

Chevy Chase, Maryland

January 26, 2010

MARKET CONDUCT REPORTS

North Carolina Department of Insurance

 Image 1 within document in PDF format.

Report

**TABLE OF CONTENTS**

SALUTATION
FOREWORD
SCOPE OF EXAMINATION
EXECUTIVE SUMMARY
POLICYHOLDER TREATMENT
Privacy of Financial and Health Information
UNDERWRITING AND RATING
Overview
Private Passenger Automobile
TERMINATIONS
Overview
Private Passenger Automobile Cancellations
Private Passenger Automobile Nonrenewals
CLAIMS PRACTICES
Overview
Paid Claims
Automobile Medical Payment Claims
First and Third Party Bodily Injury Claims
Closed Without Payment Claims
Subrogated Claims
Total Loss Settlement Claims
Litigated Claims
SUMMARY
TABLE OF STATUTES AND RULES
CONCLUSION
Raleigh, North Carolina

Report on Market Conduct Examination of the Geico..., 2010 WL 2866925...

DJA0427

January 26, 2010
Honorable Wayne Goodwin
Commissioner of Insurance
Department of Insurance
State of North Carolina
Dobbs Building
430 N. Salisbury Street
Raleigh, North Carolina 27603
Honorable Elizabeth Sammis
Commissioner of Insurance
Maryland Insurance Administration
200 St. Paul Place, Suite 2700
Baltimore, MD 21202
Honorable Commissioners:

Pursuant to your instructions and in accordance with the provisions of North Carolina General Statute (NCGS) 58-2-131, a target examination has been made of the market conduct activities of

## GEICO INDEMNITY COMPANY (NAIC #22055)

## GOVERNMENT EMPLOYEES INSURANCE COMPANY (NAIC #22063)

NAIC Exam Tracking System Exam Number: NC170-M59

Chevy Chase, Maryland

hereinafter generally referred to as the Company, at the North Carolina Department of Insurance (Department) Office located at 11 S. Boylan Avenue, Raleigh, North Carolina. A report thereon is respectfully submitted.

### FOREWORD

This examination reflects the North Carolina insurance activities of GEICO Indemnity Company and Government Employees Insurance Company. The examination is, in general, a report by exception. Therefore, much of the material reviewed will not be contained in this written report, as reference to any practices, procedures, or files that manifested no improprieties were omitted.

### SCOPE OF EXAMINATION

**\*2**  This examination commenced on November 9, 2009 and covered the period of January 1, 2006 through December 31, 2008 with analyses of certain operations of the Company being conducted through January 25, 2010. All comments made in this report reflect conditions observed during the period of the examination.

The examination was arranged and conducted by the Department. It was made in accordance with Market Regulation standards established by the Department and procedures established by the National Association of Insurance Commissioners (NAIC) and accordingly included tests of policyholder treatment, underwriting and rating, terminations, and claims practices.

It is the Department's practice to cite companies in apparent violation of a statute or rule when the results of a sample show errors/noncompliance at or above the following levels: 0 percent for consumer complaints, sales and advertising, producers who were not appointed and/or licensed, and the use of forms and rates/rules that were neither filed with nor approved by the Department; 7 percent for claims; and 10 percent for all other areas reviewed. When errors are detected in a sample, but the error rate is below the applicable threshold for citing an apparent violation, the Department issues a reminder to the company.

Report on Market Conduct Examination of the Geico..., 2010 WL 2866925...

DJA0428

## EXECUTIVE SUMMARY

This market conduct examination revealed concerns with Company procedures and practices in the following area:

*Terminations* - failure to issue termination notices for private passenger automobile.

Specific violations related to each area of concern are noted in the appropriate section of this report. All North Carolina General Statutes and rules of the North Carolina Administrative Code cited in this report may be viewed on the North Carolina Department of Insurance Web site www.ncdoi.com, by clicking "Helpful Links."

This examination identified a single non-compliant practice, which may extend to other jurisdictions. The Company is directed to take immediate corrective action to demonstrate its ability and intention to conduct business in North Carolina according to its insurance laws and regulations. When applicable, corrective action for other jurisdictions should be addressed.

All unacceptable or non-compliant practices may not have been discovered or noted in this report. Failure to identify or criticize improper or non-compliant business practices in North Carolina or in other jurisdictions does not constitute acceptance of such practices. Examination report findings that do not reference specific insurance laws, regulations, or bulletins are presented to improve the Company's practices and ensure consumer protection.

## POLICYHOLDER TREATMENT

### Privacy of Financial and Health Information

The Company provided privacy of financial and health information documentation for the examiners' review. The Company exhibited policies and procedures in place so that nonpublic personal financial or health information is not disclosed unless the customer or consumer has authorized the disclosure. The Company was found to be compliant with the provisions of NCGS 58-39-25, 58-39-26, and 58-39-27.

## UNDERWRITING AND RATING

### Overview

 **\*3**  The Company's marketing philosophy in North Carolina focuses on the private passenger automobile line of business. The Company's private passenger automobile policies were reviewed for adherence to underwriting guidelines, file documentation, and premium determination. Additionally, the policies were examined to determine compliance with the appropriate North Carolina statutes and rules, policy provisions, and the applicable policy manual rules.

### Private Passenger Automobile

The Company provided a listing of 121,840 active private passenger automobile policies issued during the period under examination. One hundred policies were randomly selected and received for review.

The Company's private passenger automobile coverages were written utilizing manual and deviated rates. Policies were written on a 6-month basis. Risk placement was determined by the Company's underwriting guidelines and the underwriter. No discrepancies were noted in the Company's use of its underwriting guidelines. All policy files contained sufficient documentation to support the Company's classification of the risk.

Report on Market Conduct Examination of the Geico..., 2010 WL 2866925...

DJA0429

The Company was reminded of the provisions of Title 11 of the North Carolina Administrative Code (NCAC), Chapter 10, Section 0602(b) as 1 file reviewed (1.0 percent error ratio) did not contain a consent to rate form signed by the insured.

All premiums charged were deemed correct.

## TERMINATIONS

### Overview

The Company's termination procedures for private passenger automobile policies were reviewed to determine compliance with the appropriate North Carolina statutes and rules, policy provisions, and the applicable policy manual rules. Special attention was placed on the validity and reason for termination, timeliness in issuance of the termination notice, policy refund (where applicable), and documentation of the policy file. A total of 179,823 policies were terminated during the period under examination. The examiners randomly selected 150 terminations for review.

### Private Passenger Automobile Cancellations

One hundred cancelled private passenger automobile policies were randomly selected and received for review from a population of 179,711.

The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
|---|:---:|:---:|
| Nonpayment of premium | 63 | 63.0 |
| Insured's request | 27 | 27.0 |
| Coverage rewritten | 5 | 5.0 |
| Risk no longer eligible | 4 | 4.0 |
| Underwriting reasons | 1 | 1.0 |
| **Total** | **100** | **100.0** |

The Company was not required to issue cancellation notices for 32 of the cancellations reviewed as these policies were cancelled at the request of the insured or the coverage was rewritten. Cancellation notices for the remaining 68 policies stated the specific reason for cancellation. All insureds and loss payees were given proper and timely notification of cancellation.

**\*4** All premium refunds were deemed correct. The Company issued the refunds in a timely manner.

The final area of this review encompassed documentation of the policy file. All policy files reviewed contained sufficient documentation to support the action taken by the Company. The Company was reminded of the provisions of NCGS 20-309.2 as the North Carolina Notice of Termination Form (FS-4) was not submitted to the North Carolina Division of Motor Vehicles (DMV) when liability coverages were cancelled for 1 policy reviewed (1.0 percent error ratio).

Report on Market Conduct Examination of the Geico..., 2010 WL 2866925...

DJA0430

Private Passenger Automobile Nonrenewals

Fifty nonrenewed private passenger automobile policies were randomly selected and received for review from a population of 112. The Company was reminded of the provisions of NCGS 58-2-131(a), 58-2-185, and 11 NCAC 19.0106(a)(4)(h) as 1 file (2.0 percent error ratio) was an invalid receipt as there was no indication the policy was nonrenewed by the Company. The review was based on the remaining 49 files.

The reason for nonrenewal was deemed valid for all policies reviewed. The review revealed the following reasons for nonrenewal.

| Reason for Nonrenewal | Number of Policies | Percentage |
|---|---|---|
| Risk no longer eligible | 41 | 83.7 |
| Underwriting reasons | 8 | 16.3 |
| **Total** | **49** | **100.0** |

The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-85(b) as 6 files reviewed (12.2 percent error ratio) contained no indication a nonrenewal notice had been sent to the insured. The Company was reminded of the provisions of NCGS 58-36-85(c) as the termination date on 4 nonrenewal notices reviewed (8.2 percent error ratio) was invalid. The Company was reminded of the provisions of NCGS 58-36-85(c) as the nonrenewal notice for 1 insured (2.0 percent error ratio) was not issued at least 60 days prior to the termination date.

The Company was reminded of the provisions of NCGS 58-37-25(b) as 2 insureds (4.1 percent error ratio) were not offered renewal coverage in the North Carolina Reinsurance Facility when they were no longer eligible for voluntary coverage.

The final area of this review encompassed documentation of the policy file. All files reviewed contained sufficient documentation to support the action taken by the Company. The Company is reminded of the provisions of NCGS 20-309.2 as 1 file reviewed (2.0 percent error ratio) provided no evidence an FS-4 was submitted to the DMV when liability coverage's were cancelled.

CLAIMS PRACTICES

Overview

The Company's claims practices were reviewed to determine compliance with the appropriate North Carolina statutes and rules and policy provisions. The review encompassed paid, automobile medical payment, first and third party bodily injury, closed without payment, subrogated, total loss settlement, and litigated claims.

**\*5** Claims service in North Carolina is provided from the regional office in Virginia Beach, Virginia under the direction of the Assistant Vice President of Claims. Company adjusters handle all claims. With respect to total losses, salvage logs are maintained electronically as part of the claims handling system. The adjuster handling the claim is ultimately responsible for maintenance. Seven hundred claims were randomly selected for review from a population of 140,930.

Paid Claims

Report on Market Conduct Examination of the Geico..., 2010 WL 2866925...

DJA0431

Two hundred third party property damage and first party automobile physical damage paid claims were randomly selected and received for review from a population of 88,437. The claim files were reviewed for timeliness of payment, supporting documentation, and accuracy of payment.

The following types of claims were reviewed and the average payment time is noted in calendar days:

| Type of Claim | Payment Time |
|---|---|
| Third party property damage | 9.0 |
| Automobile physical damage | 6.0 |

All payments issued by the Company were deemed to be accurate. Deductibles were correctly applied and depreciation taken was reasonable.

All claim files reviewed contained documentation to support the Company's payments. The documentation consisted of appraisals, estimates, or repair bills. Claims were not appraised in a timely manner for 4 claims (2.0 percent error ratio). This matter could result in an apparent violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice.


Automobile Medical Payment Claims

One hundred automobile medical payment claims were randomly selected and received for review from a population of 8,086. The claim files were reviewed to determine if the Company had engaged in any unfair claim practices. The review of the automobile medical payment claims disclosed no apparent violations of the provisions of NCGS 58-63-15.


First and Third Party Bodily Injury Claims

One hundred first and third party bodily injury claims were randomly selected and received for review from a population of 15,640. The claim files were reviewed to determine whether the Company had engaged in any unfair claim practices. The review of first and third party bodily injury claims disclosed no apparent violations of the provisions of NCGS 58-63-15.


Closed Without Payment Claims

Fifty closed without payment claims were randomly selected and received for review from a population of 1,083. The claim files were reviewed to determine if the Company's reasons for closing the claims without payment were valid.

The claim files reviewed contained documentation that supported the Company's reasons for closing the claims without payment. All reasons for denial or closing the files without payment were deemed valid. Claims were denied on an average of 12.5 calendar days for the 3-year period. The review of closed without payment claims disclosed no apparent violations of the provisions of NCGS 58-63-15.


Subrogated Claims

*6 One hundred subrogated claims were randomly selected and received for review from a population of 10,176. The claim files were reviewed to determine if the insured's deductible was properly reimbursed by the Company when subrogation was successful.

Report on Market Conduct Examination of the Geico..., 2010 WL 2866925...

DJA0432

All reimbursements were deemed to be correct and were issued on a 3-year average of 1.0 calendar day from the date the Company collected the monies.

## Total Loss Settlement Claims

One hundred total loss settlement claims were randomly selected and received for review from a population of 17,118. The claim files were reviewed to determine if the settlements were equitable and timely.

The Company primarily used CCC Valuescope to establish the actual cash value of totaled vehicles. All settlements were deemed equitable. Claims were not paid in a timely manner for 3 claims (3.0 percent error ratio). This matter could result in an apparent violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice. The Company settled all remaining claims in a timely manner. The payments were issued on a 3-year average of 25.5 calendar days. No apparent violations of the provisions of 11 NCAC 4.0418, or 4.0421 were noted during this review.

## Litigated Claims

Fifty litigated claims were randomly selected and received for review from a population of 390. The claim files were reviewed to determine if the Company had engaged in any unfair claims practices. The review of litigated claims disclosed no apparent violation of the provisions of NCGS 58-63-15.

SUMMARY

The Market Conduct examination revealed the following:

1. Underwriting and Rating

    a. The Company was reminded of the provisions of 11 NCAC 10.0602(b) as 1.0 percent of the active private passenger automobile files reviewed did not contain a consent to rate form signed by the insured.

2. Terminations

    a. The Company was reminded of the provisions of NCGS 20-309.2 as the North Carolina Notice of Termination Form was not submitted to the North Carolina Division of Motor Vehicles for 1.0 percent of the cancelled private passenger automobile policies reviewed.

    b. The Company was reminded of the provisions of NCGS 58-2-131(a), 58-2-185, and 11 NCAC 19.0106(a)(4)(h) as 2.0 percent of the nonrenewed private passenger automobile files received were invalid receipts as there was no indication the policy was nonrenewed by the Company.

    c. The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-85(b) as they failed to issue termination notices for 12.2 percent of the nonrenewed private passenger automobile policies reviewed.

    d. The Company was reminded of the provisions of NCGS 58-36-85(c) as the termination date on 8.2 percent of the private passenger automobile nonrenewal notices reviewed was invalid.

    e. The Company was reminded of the provisions of NCGS 58-36-85(c) as the nonrenewal notice for 2.0 percent of the nonrenewed private passenger automobile policies reviewed was not issued at least 60 days prior to the nonrenewal date.

    *7 f. The Company was reminded of the provisions of NCGS 58-37-25(b) as 4.1 percent of the insureds, whose private passenger automobile policies were nonrenewed when they were no longer eligible for voluntary coverage, were not offered renewal coverage in the North Carolina Reinsurance Facility.

Report on Market Conduct Examination of the Geico..., 2010 WL 2866925...

DJA0433

g. The Company was reminded of the provisions of NCGS 20-309.2 as the North Carolina Notice of Termination Form was not submitted to the North Carolina Division of Motor Vehicles for 2.0 percent of the nonrenewed private passenger automobile policies reviewed.

## TABLE OF STATUTES AND RULES

| Statute/Rule | Title |
| --- | --- |
| NCGS 58-2-131 | Examinations to be made; authority, scope, scheduling, and conduct of examinations. |
| NCGS 58-2-185 | Record of business kept by companies and agents; Commissioner may inspect. |
| NCGS 58-36-85 | Termination of a nonfleet private passenger motor vehicle insurance policy. |
| NCGS 58-37-25 | General obligations of insurers. |
| NCGS 58-39-25 | Notice of insurance information practices. |
| NCGS 58-39-26 | Federal privacy disclosure notice requirements. |
| NCGS 58-39-27 | Privacy notice and disclosure requirement exceptions. |
| NCGS 58-63-15 | Unfair methods of competition and unfair or deceptive acts or practices defined. |
| NCGS 20-309 | Motor vehicle registration. |
| 11 NCAC 4.0418 | Total Losses on Motor Vehicles. |
| 11 NCAC 4.0421 | Handling of Loss and Claim Payments. |
| 11 NCAC 10.0602 | Consent to Rate Procedures: Rate Bureau Coverages. |
| 11 NCAC 19.0106 | Records Required for Examination. |

## CONCLUSION

An examination has been conducted on the market conduct affairs of GEICO Indemnity Company and Government Employees Insurance Company for the period January 1, 2006 through December 31, 2008 with analyses of certain operations

of the Company being conducted through January 25, 2010. The Company's response to this report, if any, is available upon request.

This examination was conducted in accordance with the North Carolina Department of Insurance and the National Association of Insurance Commissioners Market Regulation Handbook procedures, including analyses of Company operations in the areas of policyholder treatment, underwriting and rating, terminations, and claims practices.

In addition to the undersigned, James P. McQuillan, CPCU and Letha Lombardi, North Carolina Market Conduct Examiners, participated in this examination.

Respectfully submitted,
/s/ Norma M. Rafter
Norma M. Rafter
Examiner-In-Charge
Market Regulation Division
State of North Carolina

I have reviewed this examination report and it meets the provisions for such reports prescribed by this Division and the North Carolina Department of Insurance.

 **\*8**  /s/ Tracy M. Biehn
Tracy M. Biehn, LPCS, MBA
Deputy Commissioner
Market Regulation Division
State of North Carolina

---

                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 42
Report on Market Conduct Examination Peak Property and..., 2013 WL 6921728...

DJA0435

2013 WL 6921728

State of North Carolina

**\*1**  Report on Market Conduct Examination

Peak Property and Casualty Insurance Corporation

Stevens Point, Wisconsin

September 13, 2013

MARKET CONDUCT REPORTS

North Carolina Department of Insurance

 Image 1 within document in PDF format.

Report

<u>TABLE OF CONTENTS</u>

SALUTATION
FOREWORD
SCOPE OF EXAMINATION
EXECUTIVE SUMMARY
COMPANY OVERVIEW
History and Profile
Company Operations and Management
Certificate of Authority
Disaster Recovery Procedures
Rate Evasion Procedures
POLICYHOLDER TREATMENT
Consumer Complaints
Privacy of Financial and Health Information
MARKETING
Policy Forms and Filings
Sales and Advertising
Social Media
Producer Licensing
Agency Management
UNDERWRITING PRACTICES
Overview
Private Passenger Automobile
TERMINATIONS
Overview
Private Passenger Automobile Cancellations
Private Passenger Automobile Nonrenewals
Declinations/Rejections

Report on Market Conduct Examination Peak Property and..., 2013 WL 6921728...

DJA0436

CLAIMS PRACTICES
Overview
Paid Claims
Automobile Medical Payment Claims
First and Third Party Bodily Injury Claims
Closed Without Payment Claims
Subrogated Claims
Total Loss Settlement Claims
Litigated Claims
SUMMARY
TABLE OF STATUTES AND RULES
CONCLUSION

Raleigh, North Carolina

September 13, 2013

Honorable Wayne Goodwin

Commissioner of Insurance

Department of Insurance

State of North Carolina

Dobbs Building

430 N. Salisbury Street

Raleigh, North Carolina 27603

Honorable Ted Nickel

Commissioner of Insurance

Office of the Commissioner of Insurance

State of Wisconsin

125 South Webster Street

Madison, Wisconsin 53703-3474

Honorable Commissioners:

   Pursuant to your instructions and in accordance with the provisions of North Carolina General Statute (NCGS) 58-2-131 through 58-2-134, a general examination has been made of the market conduct activities of

**Peak Property and Casualty Insurance Corporation (NAIC #18139)**

**\*2** NAIC Exam Tracking System Exam Number: NC299-M22

Stevens Point, Wisconsin

hereinafter generally referred to as the Company, at the North Carolina Department of Insurance (Department) office located at 11 S. Boylan Avenue, Raleigh, North Carolina. A report thereon is respectfully submitted.

FOREWORD

   This examination reflects the North Carolina insurance activities of Peak Property and Casualty Insurance Corporation. The examination is, in general, a report by exception. Therefore, much of the material reviewed will not be contained in this written report, as reference to any practices, procedures, or files that manifested no concerns were omitted.

SCOPE OF EXAMINATION

Report on Market Conduct Examination Peak Property and..., 2013 WL 6921728...

DJA0437

This examination commenced on December 31, 2012, and covered the period of January 1, 2007, through December 31, 2011, with analyses of certain operations of the Company being conducted through August 14, 2013. All comments made in this report reflect conditions observed during the period of the examination.

The examination was arranged and conducted by the Department. It was made in accordance with Market Regulation standards established by the Department and procedures established by the National Association of Insurance Commissioners (NAIC) and accordingly included tests of policyholder treatment, marketing, underwriting practices, terminations, and claims practices.

It is the Department's practice to cite companies in violation of a statute or rule when the results of a sample show errors/ noncompliance at or above the following levels: 0 percent for consumer complaints, sales and advertising, producers who were not appointed and/or licensed and the use of forms and rates/rules that were neither filed with nor approved by the Department; 7 percent for claims; and 10 percent for all other areas reviewed. When errors are detected in a sample, but the error rate is below the applicable threshold for citing a violation, the Department issues a reminder to the company.

## EXECUTIVE SUMMARY

This market conduct examination revealed concerns with Company procedures and practices in the following area:

*Consumer Complaints* – response time to Departmental inquiries.

Specific violations related to each area of concern are noted in the appropriate section of this report. All North Carolina General Statutes and rules of the North Carolina Administrative Code cited in this report may be viewed on the North Carolina Department of Insurance Web site www.ncdoi.com by clicking "INSURANCE DIVISIONS" then "Legislative Services".

This examination identified various non-compliant practices, some of which may extend to other jurisdictions. The Company is directed to take immediate corrective action to demonstrate its ability and intention to conduct business in North Carolina according to its insurance laws and regulations. When applicable, corrective action for other jurisdictions should be addressed.

**\*3** All unacceptable or non-compliant practices may not have been discovered or noted in this report. Failure to identify improper or non-compliant business practices in North Carolina or in other jurisdictions does not constitute acceptance of such practices. Examination report findings that do not reference specific insurance laws, regulations, or bulletins are presented to improve the Company's practices and ensure consumer protection.

## COMPANY OVERVIEW

### History and Profile

The Company was incorporated in North Carolina on August 16, 1985, as General Electric Residential Mortgage Corporation and commenced business on August 29, 1985. The Company's name was changed to Peak Property and Casualty Insurance Corporation (Peak) on July 10, 1991. On November 16, 1993, the Company was acquired from GE Capital Mortgage Corporation by Guaranty National Insurance Company (GNIC) and was redomiciled in the state of Colorado. On November 16, 1999, Royal & Sun Alliance Insurance Group (RSA) purchased Orion Auto, Inc. and all of its subsidiaries, including GNIC and its subsidiaries. In March 2005, RSA transferred the direct ownership of Peak from GNIC to Viking Insurance Company of Wisconsin (Viking).

On November 1, 2005, Sentry Insurance, a Mutual Company (Sentry), acquired 100% indirect ownership of Peak in connection with an acquisition of Viking from Royal & Sun Alliance USA, Inc. On December 15, 2006, Peak redomesticated from the state of Colorado to the state of Wisconsin.

Report on Market Conduct Examination Peak Property and..., 2013 WL 6921728...

DJA0438

Under an administrative services agreement, Sentry furnishes the Company underwriting, policy issuance, financial reporting, tax compliance, customer service, agent support, marketing, legal, claims, actuarial, and other services. The Company's home office is located at 1800 North Point Drive, Stevens Point, Wisconsin.

## Company Operations and Management

The Company writes private passenger automobile insurance. It is licensed in 39 states and the District of Columbia, and distributes its products through an independent agency force using standard contract forms and commission schedules.

Direct written premium for the Company's 2011 countrywide property and casualty operations was $229,802,466. North Carolina's production for the same period was $46,054,716. Premiums written in North Carolina between 2007 and 2011 increased approximately 35.6 percent. The charts below outline the Company's mix of business for selected lines in 2011 and loss ratios in North Carolina for the examination period.

| Line of Business | Written Premium | Percentage |
|---|---|---|
| Private Passenger Automobile Liability | $28,171,598 | 61.2 |
| Private Passenger Automobile Physical Damage | $17,883,118 | 38.8 |
| **Total** | **$46,054,716** | **100.0** |

| Year | Written Premium | Earned Premium | Incurred Losses | Loss Ratio |
|---|---|---|---|---|
| 2007 | $ 33,960,452 | $ 34,519,625 | $ 29,941,673 | 86.7 |
| 2008 | $ 32,830,935 | $ 33,144,274 | $ 28,830,833 | 87.0 |
| 2009 | $ 38,104,287 | $ 36,579,031 | $ 36,811,477 | 100.6 |
| 2010 | $ 44,268,087 | $ 43,157,227 | $ 42,742,132 | 99.0 |
| 2011 | $ 46,054,716 | $ 45,464,159 | $ 39,087,262 | 86.0 |

## Certificate of Authority

**\*4** The Certificate of Authority issued to the Company was reviewed for the period under examination. The certificate was reviewed to determine compliance with the provisions of NCGS 58-7-15. The Company's writings in North Carolina were deemed to be in compliance with the authority granted.

## Disaster Recovery Procedures

The purpose of business continuity/disaster recovery is to enable the business to continue providing critical services to their customers in the event of a disaster and to recover from any interruption to their information systems.

Report on Market Conduct Examination Peak Property and..., 2013 WL 6921728...

DJA0439

The overall disaster recovery goal at Sentry is to minimize system downtime and loss of data by maintaining a disaster recovery site and print-to-mail recovery site. These sites can be fully configured and ready to operate in a minimal amount of time. They provide redundancy for all hardware platforms, data storage, network, telecommunications infrastructure, and print operations.

In addition to recovery of critical technical operations, a business continuity strategy is in place that includes development and maintenance of business and technical plans to ensure the continuance of critical business functions at the time of disaster.

### Rate Evasion Procedures

The Company has established procedures to address nonfleet private passenger automobile insurance rate evasion fraud by identifying any ineligible risk as defined in NCGS 58-37-1(4a) and verifying residency of the policyholder who owns a motor vehicle registered or principally garaged in North Carolina. The Company was found to be in compliance with the provisions of NCGS 58-2-164.

### POLICYHOLDER TREATMENT

### Consumer Complaints

The Company's complaint handling procedures were reviewed to determine compliance with applicable North Carolina statutes and rules.

The Company's complaint register was reconciled with a listing provided by the Consumer Services Division of the Department. The Company's complaint register was in compliance with provisions of Title 11 of the North Carolina Administrative Code, (NCAC), Chapter 19, Section 0103.

Fifty of the 263 complaints from the Department's listing were randomly selected for review. The distribution of complaints requiring a response to the Department is shown in the chart below.

| Type of Complaint | Total |
|---|---|
| Claims | 41 |
| Underwriting | 6 |
| Administrative | 3 |
| **Total** | **50** |

The Company's response to each complaint was deemed to be appropriate to the circumstances. The Company was deemed to be in violation of the provisions of 11 NCAC 1.0602 as two of the complaints reviewed (4.0 percent error ratio) were responded to in excess of the seven calendar day requirement of this rule.

The average service time to respond to a Departmental complaint was seven calendar days. A chart of the Company's response time follows:

| Service Days | Number of Files | Percentage of Total |
|---|---|---|

Report on Market Conduct Examination Peak Property and..., 2013 WL 6921728...

DJA0440

| | | |
|---|---|---|
| 1 - 7 | 48 | 96.0 |
| 8 - 14 | 1 | 2.0 |
| 15 - 28 | 1 | 2.0 |
| **Total** | **50** | **100.0** |

## Privacy of Financial and Health Information

**\*5** The Company provided privacy of financial and health information documentation for the examiners' review. The Company exhibited policies and procedures in place so that nonpublic personal financial or health information is not disclosed unless the customer or consumer has authorized the disclosure. The Company was found to be compliant with the provisions of NCGS 58-39-25, 58-39-26, and 58-39-27.

## MARKETING

### Policy Forms and Filings

Policy forms and filings for the Company were reviewed to determine compliance with appropriate North Carolina statutes and rules. Filings for the private passenger automobile line of business were made by the Insurance Services Office (ISO) on the Company's behalf. Deviations for this line of business were made to the Department by the Company.

### Sales and Advertising

The Company's sales and advertising practices were reviewed to determine compliance with the provisions of NCGS 58-63-15.

The examiners reviewed bulletins and brochures that are provided to producers for their own informational purposes. The Company reported it does not actively advertise in North Carolina.

No unfair or deceptive trade practices were noted in this segment of the examination.

### Social Media

The Company reported it does not currently use social media outlets for marketing or advertising purposes. However, the parent Company, Sentry, utilizes Facebook, WordPress Blog, Twitter, LinkedIn, and GooglePlus to promote the corporate name and brands. The Company does not specifically advertise products via social media. In addition, the Company's producer agreement prohibits the agent from using the Company's name or logo in any advertisement or advertising without advance written permission.

### Producer Licensing

The Company's procedures for appointment and termination of its producers were reviewed to determine compliance with the appropriate North Carolina statutes and rules. Fifty appointed and 50 terminated producer files were randomly selected for review from populations of 2,219 and 2,925, respectively.

Report on Market Conduct Examination Peak Property and..., 2013 WL 6921728...

DJA0441

All appointment and termination forms reviewed were submitted to the Department in accordance with the timetables stipulated under the provisions of NCGS 58-33-40 and 58-33-56.

## Agency Management

The marketing effort in North Carolina is under the direction of the Regional Agency Sales Manager located at the regional office in Virginia. The Company has 694 active agencies with approximately 4,098 appointed producers in North Carolina.

There are three Agency Sales Managers in North Carolina that are responsible for discussing agency performance with producers. Formal agency reviews are not conducted annually by the Agency Sales Managers, but agency performance is discussed on a regular basis.

## UNDERWRITING PRACTICES

### Overview

**\*6** The Company's marketing philosophy in North Carolina is directed to the private passenger automobile line of business. The Company's private passenger automobile policies were reviewed for adherence to underwriting guidelines, file documentation, and premium determination. Additionally, the policies were examined to determine compliance with the appropriate North Carolina statutes and rules, policy provisions, and the applicable policy manual rules.

### Private Passenger Automobile

The Company provided a listing of 173,472 active private passenger automobile policies issued during the period under examination. One hundred policies were randomly selected for review.

The Company's private passenger automobile policies were written on a six or twelve month basis. Liability coverages were written utilizing manual rates. Physical damage coverages were written using both manual rates and on a consent to rate basis. Risk placement was determined by the Company's underwriting guidelines and the underwriter. No discrepancies were noted in the Company's use of its underwriting guidelines.

The Company was reminded of the provisions of 11 NCAC 19.0102(a) and 19.0106(a)(3)(g) as the Company was not able to identify the producer for two policy files reviewed (2.0 percent error ratio).

The Company was reminded of the provisions of NCGS 58-36-30(a), 58-37-35(l), and 58-41-50(f) as the premiums on five policy files reviewed were calculated incorrectly (5.0 percent error ratio). The rating errors consisted of the following:

• Inexperienced Operator Surcharge was not correctly applied on three policies.

• Liability premiums were calculated incorrectly on two policies.

The rating errors resulted in four premium undercharges and one premium overcharge to the insureds. A refund in the amount of $32.00 was issued by the Company for the overcharge. The remaining premiums charged were deemed correct.

## TERMINATIONS

### Overview

The Company's termination procedures for its private passenger automobile policies were reviewed to determine compliance with the appropriate North Carolina statutes and rules, policy provisions, and the applicable policy manual rules. Special attention was placed on the validity and reason for termination, timeliness in issuance of the termination notice, policy refund (where applicable), and documentation of the policy file. A total of 132,590 policies were terminated during the period under examination. The examiners randomly selected 150 terminations for review.

## Private Passenger Automobile Cancellations

One hundred cancelled private passenger automobile policies were randomly selected for review from a population of 131,314.

The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
|---|---|---|
| Nonpayment of premium | 82 | 82.0 |
| Finance company request | 8 | 8.0 |
| Insured's request | 7 | 7.0 |
| Rewritten | 2 | 2.0 |
| Underwriting reasons | 1 | 1.0 |
| **Total** | **100** | **100.0** |

*7  The Company was not required to issue cancellation notices for 17 of the cancellations reviewed as these policies were cancelled at the request of the insured or finance company, or coverage was rewritten.

All premium refunds were deemed correct. The Company issued refunds in a timely manner.

The final area of this review encompassed documentation of the policy file. All policy files reviewed contained sufficient documentation to support the action taken by the Company. The Company sent the North Carolina Notice of Termination Form (FS-4) to the North Carolina Division of Motor Vehicles (DMV) when liability coverages were cancelled. The Company was deemed to be in compliance with the provisions of NCGS 20-309.

## Private Passenger Automobile Nonrenewals

Fifty nonrenewed private passenger automobile policies were randomly selected for review from a population of 1,276. The reason for nonrenewal was deemed valid for all policies reviewed. The review revealed the following reasons for nonrenewal:

| Reason for Nonrenewal | Number of Policies | Percentage |
|---|---|---|
| Agent no longer appointed | 44 | 88.0 |
| Underwriting reasons | 5 | 10.0 |

*Report on Market Conduct Examination Peak Property and...*, 2013 WL 6921728...

DJA0443

| | | |
|---|---|---|
| Risk no longer eligible | 1 | 2.0 |
| **Total** | 50 | **100.0** |

The nonrenewal notices for the policies reviewed stated the specific reason for nonrenewal.

The final area of this review encompassed documentation of the policy file. The Company sent the FS-4 to the DMV when liability coverage was nonrenewed. The Company was deemed to be in compliance with the provisions of NCGS 20-309.

### Declinations/Rejections

The Company reported that no applications were declined/rejected during the period under examination.

### CLAIMS PRACTICES

### Overview

The Company's claims practices were reviewed to determine compliance with the appropriate North Carolina statutes and rules and policy provisions. The review encompassed paid, automobile medical payment, first and third party bodily injury, closed without payment, subrogated, total loss settlement, and litigated claims.

Claims service in North Carolina is under the direction of the Senior Director - Claims located in Stevens Point, Wisconsin. Claims services are provided by Company adjusters located in the Goldsboro, North Carolina branch office.

Company and independent adjusters provide the claims service. Independent adjusters have no check or draft authority. The Company agency force does not adjust any claims and does not have claims draft authority.

Seven hundred claims were randomly selected for review from a population of 65,087.

### Paid Claims

The examiners randomly selected 200 of the 35,344 first party automobile physical damage and third party property damage claims paid during the period under examination. The claim files were reviewed for timeliness of payment, supporting documentation, and accuracy of payment.

 **\*8** The following types of claims were reviewed and the average payment time is noted in calendar days:

| Type of Claim | Payment Time |
|---|---|
| Automobile physical damage | 20.0 |
| Third party property damage | 23.0 |

All payments issued by the Company were deemed to be accurate. Deductibles were correctly applied and depreciation taken was reasonable.

All claim files reviewed contained documentation to support the Company's payments. The documentation consisted of appraisals, estimates, repair bills, or inventory listings.

First party claims were not investigated in a timely manner for two claims (2.0 percent error ratio). First party claims were not appraised in a timely manner for one claim (1.0 percent error ratio). First party claims were not paid in a timely manner for three claims (3.0 percent error ratio). Third party claims were not acknowledged in a timely manner for one claim (1.0 percent error ratio). Third party claims were not appraised in a timely manner for one claim (1.0 percent error ratio). This matter could result in a violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice.

## Automobile Medical Payment Claims

One hundred automobile medical payment claims were randomly selected for review from a population of 5,669. The claim files were reviewed to determine if the Company had engaged in any unfair claims practices. Automobile medical payment claims were not investigated in a timely manner for one claim (1.0 percent error ratio). This matter could result in a violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice.

## First and Third Party Bodily Injury Claims

One hundred first and third party bodily injury claims were randomly selected for review from a population of 8,548. The claim files were reviewed to determine whether the Company had engaged in any unfair claims practices. First and third party bodily injury claims were not investigated in a timely manner for seven claims (7.0 percent error ratio). This matter could result in a violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice.

## Closed Without Payment Claims

One hundred closed without payment claims were randomly selected for review from a population of 5,339. The claim files were reviewed to determine if the Company's reasons for closing the claims without payment were valid.

The claim files reviewed contained documentation that supported the Company's reasons for closing the claims without payment. All reasons for denial or closing the files without payment were deemed valid. Claims were denied on an average of 19 calendar days for the 5-year period. The review of closed without payment claims disclosed no violations of the provisions of NCGS 58-63-15.

## Subrogated Claims

 **\*9** Fifty subrogated claims were randomly selected for review from a population of 2,104. The claim files were reviewed to determine if the insured's deductible was properly reimbursed by the Company when subrogation was successful.

All reimbursements were deemed to be correct and were issued on a 5-year average of one calendar day from the date the Company collected the monies. The review of subrogated claims disclosed no violations of the provisions of NCGS 58-63-15(11).

## Total Loss Settlement Claims

Report on Market Conduct Examination Peak Property and..., 2013 WL 6921728...

DJA0445

One hundred total loss settlement claims were randomly selected for review from a population of 7,657. The claim files were reviewed to determine if the settlements were equitable and timely.

The Company primarily used CCC Information Services, Inc. in addition to on-site independent adjusters to establish the actual cash value of totaled vehicles. All settlements were deemed equitable. The Company settled all claims in a timely manner. The payments were issued on a 5-year average of 21 calendar days. No violations of the provisions of NCGS 58-63-15(11)(h), 11 NCAC 4.0418 or 4.0421 were noted during this review.

## Litigated Claims

Fifty litigated claims were randomly selected for review from a population of 426. The claim files were reviewed to determine if the Company had engaged in any unfair claims practices. The review of litigated claims disclosed no violations of the provisions of NCGS 58-63-15(11).

## SUMMARY

The Market Conduct examination revealed the following:

1. Policyholder Treatment

a. The Company was deemed to be in violation of the provisions of 11 NCAC 1.0602 as the responses to 4.0 percent of the Departmental inquiries reviewed were in excess of the seven calendar day requirement of this rule.

2. Underwriting Practices

a. The Company was reminded of the provisions of 11 NCAC 19.0102(a) and 19.0106(a)(3)(g) as the Company was unable to identify the producer for 2.0 percent of the active private passenger automobile files reviewed.

b. The Company was reminded of the provisions of NCGS 58-36-30(a), 58-37-35(l), and 58-41-50(f) as 5.0 percent of the active private passenger automobile policies reviewed were rated incorrectly.

## TABLE OF STATUTES AND RULES

| Statute/Rule | Title |
|---|---|
| NCGS 58-2-131 | Examinations to be made; authority, scope, scheduling, and conduct of examinations. |
| NCGS 58-2-132 | Examination reports. |
| NCGS 58-2-133 | Conflict of interest; cost of examinations; immunity from liability. |
| NCGS 58-2-134 | Cost of certain examinations. |
| NCGS 58-2-164 | Rate evasion fraud; prevention programs |
| NCGS 58-7-15 | Kinds of insurance authorized. |
| NCGS 58-33-40 | Appointment of agents. |

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

| NCGS 58-33-56 | Notification to Commissioner of termination. |
| NCGS 58-36-30 | Deviations. |
| NCGS 58-37-1 | Definitions. |
| NCGS 58-37-35 | The Facility; functions; administration. |
| NCGS 58-39-25 | Notice of insurance information practices. |
| NCGS 58-39-26 | Federal privacy disclosure notice requirements. |
| NCGS 58-39-27 | Privacy notice and disclosure requirement exceptions. |
| NCGS 58-41-50 | Policy form and rate filings; punitive damages; data required to support filings. |
| NCGS 58-63-15 | Unfair methods of competition and unfair or deceptive acts or practices defined. |
| NCGS 20-309 | Motor vehicle registration. |
| 11 NCAC 1.0602 | Insurance Companies' Response to Departmental Inquiries. |
| 11 NCAC 4.0418 | Total Losses on Motor Vehicles. |
| 11 NCAC 4.0421 | Handling of Loss and Claim Payments. |
| 11 NCAC 19.0102 | Maintenance of Records. |
| 11 NCAC 19.0103 | Complaint Records. |
| 11 NCAC 19.0106 | Records Required for Examination. |

## CONCLUSION

**\*10**  An examination has been conducted on the market conduct affairs of Peak Property and Casualty Insurance Corporation for the period January 1, 2007, through December 31, 2011, with analyses of certain operations of the Company being conducted through August 14, 2013.

This examination was conducted in accordance with the North Carolina Department of Insurance and the National Association of Insurance Commissioners Market Regulation Handbook procedures, including analyses of Company operations in the areas of policyholder treatment, marketing, underwriting practices, terminations, and claims practices.

In addition to the undersigned, Gina Abate, North Carolina Market Conduct Examiner, participated in this examination and in the preparation of this report.

Respectfully submitted,
/s/ James P. McQuillan
James P. McQuillan, CPCU, AIT
Examiner-In-Charge
Market Regulation Division
State of North Carolina

I have reviewed this examination report and it meets the provisions for such reports prescribed by this Division and the North Carolina Department of Insurance.

/s/ Tracy M. Biehn
Tracy Biehn, LPCS, MBA
Deputy Commissioner
Market Regulation Division
State of North Carolina

TAB 43

Report on Market Conduct Examination The Members..., 2013 WL 3148649...

DJA0448

2013 WL 3148649

State of North Carolina

**\*1** Report on Market Conduct Examination

The Members Insurance Company

Charlotte, North Carolina

January 28, 2013

MARKET CONDUCT REPORTS

North Carolina Department of Insurance

 Image 1 within document in PDF format.

Report

<u>TABLE OF CONTENTS</u>

SALUTATION
FOREWORD
SCOPE OF EXAMINATION
EXECUTIVE SUMMARY
COMPANY OVERVIEW
History and Profile
Company Operations and Management
Certificates of Authority
Disaster Recovery Procedures
POLICYHOLDER TREATMENT
Consumer Complaints
Privacy of Financial and Health Information
MARKETING
Policy Forms and Filings
Sales and Advertising
Producer Licensing
Agency Management
UNDERWRITING PRACTICES
Overview
Private Passenger Automobile
Homeowners
TERMINATIONS
Overview
Private Passenger Automobile Cancellations
Homeowners Cancellations
Private Passenger Automobile Nonrenewals
Homeowners Nonrenewals

Report on Market Conduct Examination The Members..., 2013 WL 3148649...

DJA0449

Rejected/Declined
CLAIMS PRACTICES
Overview
Paid Claims
Automobile Medical Payment Claims
First and Third Party Bodily Injury Claims
Closed Without Payment Claims
Subrogated Claims
Total Loss Settlement Claims
Litigated Claims
SUMMARY
TABLE OF STATUTES AND RULES
CONCLUSION
Raleigh, North Carolina

January 28, 2013

Honorable Wayne Goodwin

Commissioner of Insurance

Department of Insurance

State of North Carolina

Dobbs Building

430 N. Salisbury Street

Raleigh, North Carolina 27603

Honorable Commissioner:

Pursuant to your instructions and in accordance with the provisions of North Carolina General Statute (NCGS) 58-2-131 through 58-2-134, a general examination has been made of the market conduct activities of

### THE MEMBERS INSURANCE COMPANY (NAIC #12617)

NAIC Exam Tracking System Exam Number: NC170-M111

Charlotte, North Carolina

hereinafter generally referred to as the Company, at the North Carolina Department of Insurance (Department) office located at 11 S. Boylan Avenue, Raleigh, North Carolina. A report thereon is respectfully submitted.

### FOREWORD

**\*2** This examination reflects the North Carolina insurance activities of The Members Insurance Company. The examination is, in general, a report by exception. Therefore, much of the material reviewed will not be contained in this written report, as reference to any practices, procedures, or files that manifested no improprieties were omitted.

### SCOPE OF EXAMINATION

This examination commenced on June 20, 2011 and covered the period of January 1, 2008 through December 31, 2010 with analyses of certain operations of the Company being conducted through January 28, 2013. All comments made in this report reflect conditions observed during the period of the examination.

The examination was arranged and conducted by the Department. It was made in accordance with Market Regulation standards established by the Department and procedures established by the National Association of Insurance Commissioners

Report on Market Conduct Examination The Members..., 2013 WL 3148649...

DJA0450

(NAIC) and accordingly included tests of policyholder treatment, marketing, underwriting practices, terminations, and claims practices.

It is the Department's practice to cite companies in apparent violation of a statute or rule when the results of a sample show errors/noncompliance at or above the following levels: 0 percent for consumer complaints, sales and advertising, producers who were not appointed and/or licensed, and the use of forms and rates/rules that were neither filed with nor approved by the Department; 7 percent for claims; and 10 percent for all other areas reviewed. When errors are detected in a sample, but the error rate is below the applicable threshold for citing an apparent violation, the Department issues a reminder to the company.

## EXECUTIVE SUMMARY

This market conduct examination revealed concerns with Company procedures and practices in the following areas:

*Consumer Complaints* – incomplete complaint log, files not provided for review, response time to Departmental inquiries, NAIC company code not included on Company response, and incomplete file documentation.

*Policy Forms and Filings* – use of unfiled new business application, declarations page, and consent-to-rate form for private passenger automobile. Use of unfiled declarations page and notice of adverse underwriting decision for homeowners.

*Appointment and Termination of Producers* – failure to perform background checks on appointed producers, failure to notify the Department of termination, failure to provide confirmation of termination, and failure to notify the producers of termination.

*Underwriting Practices* – Private Passenger Automobile: use of unfiled premium payment installment charge, rating errors, and applications accepted from producers who were not appointed. Homeowners: applications accepted from producers who were not licensed in North Carolina and rating errors.

*Terminations* – Homeowners cancellations: proof of mailing was not provided. Private passenger automobile nonrenewals: insufficient notice sent and failure to issue the North Carolina Notice of Termination form (FS-4) to the Division of Motor Vehicles (DMV).

**\*3** Specific violations related to each area of concern are noted in the appropriate section of this report. All North Carolina General Statutes and rules of the North Carolina Administrative Code cited in this report may be viewed on the North Carolina Department of Insurance Web site www.ncdoi.com, by clicking "INSURANCE DIVISIONS" then "Legislative Services".

This examination identified various non-compliant practices, some of which may extend to other jurisdictions. The Company is directed to take immediate corrective action to demonstrate its ability and intention to conduct business in North Carolina according to its insurance laws and regulations. When applicable, corrective action for other jurisdictions should be addressed.

All unacceptable or non-compliant practices may not have been discovered or noted in this report. Failure to identify or criticize improper or non-compliant business practices in North Carolina or in other jurisdictions does not constitute acceptance of such practices. Examination report findings that do not reference specific insurance laws, regulations, or bulletins are presented to improve the Company's practices and ensure consumer protection.

## COMPANY OVERVIEW

### History and Profile

The Members Insurance Company (TMIC) was incorporated on June 9, 2006 in the State of North Carolina and commenced business on October 1, 2006. TMIC is a stock casualty insurance company created by Carolina Motor Club, Inc. (AAA

Report on Market Conduct Examination The Members..., 2013 WL 3148649...

DJA0451

Carolinas). The stock is held 100 percent by TMIC Holding Company, LLC which is managed by the ultimate parent, Carolina Motor Club, Inc.

## Company Operations and Management

The Company is a writer of private passenger automobile insurance and homeowners insurance and is licensed in North Carolina only.

Direct written premium for the Company's 2010 property and casualty operations was $9,235,037. Premiums written in North Carolina between 2008 and 2010 increased approximately 152.7 percent. The charts below outline the Company's mix of business for selected lines in 2010 and loss ratios in North Carolina for the examination period.

| Line of Business | Written Premium | Percentage |
|---|---|---|
| Private Passenger Automobile | $8,719,966 | 94.4 |
| Homeowners | $ 515,071 | 5.6 |
| **Total** | **$9,235,037** | **100.0** |

| Year | Written Premium | Earned Premium | Incurred Losses [a] | Loss Ratio |
|---|---|---|---|---|
| 2008 | $3,654,076 | $3,444,812 | $2,278,390 | 66.1 |
| 2009 | $5,189,565 | $4,788,912 | $3,657,013 | 76.4 |
| 2010 | $9,235,037 | $8,126,263 | $5,439,249 | 66.9 |

[a] Does not include IBNRs

## Certificates of Authority

The Certificates of Authority issued to the Company were reviewed for the period under examination. These certificates were reviewed to determine compliance with the provisions of NCGS 58-7-15. The Company's writings in North Carolina were deemed to be in compliance with the authority granted.

## Disaster Recovery Procedures

**\*4** AAA Carolinas uses a disaster recovery (DR) site in Providence, Rhode Island. Insurance data is replicated in near real time to redundant servers in the DR location. All servers are virtual servers for fast recovery and high availability. The hardware platforms are fully redundant for processor, memory and power for high availability. All circuits and network infrastructure is fully redundant. Data is backed up daily with weekly backups stored offsite. Backup data is restored on a regular basis into a test environment. All branch offices can access the disaster recovery site via virtual private network connections.

POLICYHOLDER TREATMENT

Report on Market Conduct Examination The Members..., 2013 WL 3148649...

DJA0452

## Consumer Complaints

The Company's complaint handling procedures were reviewed to determine compliance with applicable North Carolina statutes and rules.

The Company's complaint register was reconciled with a listing furnished by the Consumer Services Division of the Department. All complaints from the Department's listing of 22 were selected for review.

The Company was deemed to be in apparent violation of the provisions of Title 11 of the North Carolina Administrative Code, (NCAC), Chapter 19, Section 0103 as 1 complaint (4.5 percent error ratio) was not listed on the Company's complaint register.

The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0103, and 19.0106(a)(2) as 4 complaint files (18.2 percent error ratio) were not provided for review.

The distribution of complaints requiring a response to the Department is shown in the chart below.

| Type of Complaint | Total |
|---|---|
| Underwriting | 11 |
| Claims | 9 |
| Administrative | 2 |
| **Total** | **22** |

The Company's response to each complaint was deemed to be appropriate to the circumstances. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 1.0602 as 4 of the complaints reviewed (18.2 percent error ratio) were responded to in excess of the 7 calendar day requirement of this rule.

The Company was deemed to be in apparent violation of the provisions of 11 NCAC 4.0123 as 2 responses to Departmental inquiries (9.1 percent error ratio) did not contain the Company's NAIC company code. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0103, and 19.0106(a)(2) as 4 complaint files (18.2 percent error ratio) did not contain a copy of the inquiry letter from the Department and/or a copy of the consumer complaint.

The average service time to respond to a Departmental complaint was 8 calendar days. A chart of the Company's response time follows:

| Service Days | Number of Files | Percentage of Total |
|---|---|---|
| 1 - 7 | 18 | 81.9 |
| 8 - 14 | 1 | 4.5 |
| 15 - 21 | 0 | 0.0 |
| 22 - 30 | 1 | 4.5 |

Report on Market Conduct Examination The Members..., 2013 WL 3148649...

DJA0453

| | | |
|---|---|---|
| 31 - 60 | 2 | 9.1 |
| **Total** | **22** | **100.0** |

## Privacy of Financial and Health Information

**\*5**   The Company provided privacy of financial and health information documentation for the examiners' review. The Company exhibited policies and procedures in place so that nonpublic personal financial or health information is not disclosed unless the customer or consumer has authorized the disclosure. The Company was found to be compliant with the provisions of NCGS 58-39-25, 58-39-26, and 58-39-27.

## MARKETING

## Policy Forms and Filings

Policy forms and filings for the Company were reviewed to determine compliance with appropriate North Carolina statutes and rules. Emphasis of the review was placed on the following lines of business:

1. Private Passenger Automobile

2. Homeowners

Filings for the private passenger automobile and homeowners lines of business were made by the North Carolina Rate Bureau on behalf of the Company. Deviations for these lines of business were made to the Department by the Company.

The Company was deemed to be in apparent violation of the provisions of NCGS 58-3-150 and 11 NCAC 10.1201(c) as the Private Passenger Automobile Policy new business application, declarations page, and consent-to-rate form had not been filed with and approved by the Department.

The Company was deemed to be in apparent violation of the provisions of NCGS 58-3-150 and 11 NCAC 10.1201(c) as the Homeowners Policy Declarations page had not been filed with and approved by the Department.

The Company was deemed to be in apparent violation of the provisions of NCGS 58-3-150 and 58-39-55(a) as the notice of adverse underwriting decision used for homeowners terminations had not been filed with and approved by the Department.

## Sales and Advertising

Sales and advertising practices of the Company were reviewed to determine compliance with the provisions of NCGS 58-63-15.

The Company sells its products through independent insurance agents. Advertising materials are approved by the President and the material is maintained in the headquarters in Charlotte, North Carolina. No unfair or deceptive trade practices were noted in this segment of the examination.

## Producer Licensing

Report on Market Conduct Examination The Members..., 2013 WL 3148649...

DJA0454

The Company's procedures for appointment and termination of its producers were reviewed to determine compliance with the appropriate North Carolina statutes and rules. Fifty appointed and 50 terminated producer files were randomly selected and received for review from populations of 150 and 99, respectively.

The Company was reminded of the provisions of 11 NCAC 19.0102(a), and 19.0106 (a)(3) as it was unable to provide confirmation of appointment for 1 appointed producer reviewed (2.0 percent error ratio). The Company was deemed to be in apparent violation of the provisions of 11 NCAC 6A.0412(2) as background checks were not performed on 31 of the appointed producers reviewed (62.0 percent error ratio).

  *6  The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-56(b) as it failed to notify the Department of the termination within 30 days for 24 terminated producers reviewed (48.0 percent error ratio). The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a) and 19.0106(a)(3) as it was unable to provide confirmation of termination for 10 terminated producers reviewed (20.0 percent error ratio). The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-56(d) as notification of termination was not sent to any of the 50 terminated producers reviewed (100 percent error ratio).

## Agency Management

The marketing effort is under the direction of the President, located in the home office in Charlotte, North Carolina. The Company has 26 active agencies with approximately 153 producers appointed in North Carolina as well as 1 field marketing representative. The president, marketing representative and underwriting and claim managers are responsible for the activities of the agency force and licensing. Meetings are conducted monthly for the largest agency and every 2 to 3 months for smaller agencies/agents.

## UNDERWRITING PRACTICES

### Overview

The Company's marketing philosophy in North Carolina focuses on personal lines coverages. The Company provided the examiners with listings of the following types of active policies for the period under examination:

  1. Private Passenger Automobile

  2. Homeowners

A random selection of 150 policies was made from a total population of 16,419. Each policy was reviewed for adherence to underwriting guidelines, file documentation, and premium determination. Additionally, the policies were examined to determine compliance with the appropriate North Carolina statutes and rules, policy provisions, and the applicable policy manual rules.

### Private Passenger Automobile

The Company provided a listing of 15,336 active private passenger automobile policies issued during the period under examination. One hundred policies were randomly selected and received for review.

The Company's private passenger automobile policies were written on a 6 month basis. Liability coverages were written utilizing manual and deviated rates. Physical damage coverages were written using manual, deviated, or on a consent to rate basis. Risk placement was determined by the Company's underwriting guidelines and the underwriter. No discrepancies were noted in the Company's use of its underwriting guidelines.

The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-30(a) and Rule 22 of the North Carolina Rate Bureau Personal Automobile Manual for a $2.00 installment fee charge or the waiver of installment fee for premiums paid by electronic funds transfer without being filed with and approved by the Department.

**\*7** The Company was deemed to be in apparent violation of the provisions of NCGS 58-37-40(f) as it did not include agent compensation in the calculation of the recoupment surcharge for 21 policies (21.0 percent error ratio) resulting in an undercharge of the recoupment surcharge.

The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-40 as the producer was not properly appointed by the Company for 7 of the private passenger automobile active files reviewed (7.0 percent error ratio).

The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as 2 files reviewed (2.0 percent error ratio) did not contain a signed consent to rate form.

The Company was reminded of the provisions of 11 NCAC 10.0602(a)(2) as it did not comply with consent to rate procedures on 4 policies reviewed (4.0 percent error ratio) because the standard rate that would be charged for towing and labor and/or extended transportation coverage, without application of consent to rate, was not indicated on the application.

The Company was deemed to be in apparent violation of the provisions of NCGS 58-37-35(l) and NCGS 58-36-30(a) as 26 policies reviewed (26.0 percent error ratio) contained a total of 32 rating errors. The rating errors consisted of the following:

• Incorrect base rate for motorcycle applied on 1 policy.

• Incorrect inexperienced operator surcharge on 2 policies.

• Incorrect deviations applied on 7 policies.

• Airbag discount not applied to med pay coverage on 1 policy.

• Incorrect physical damage base rates for 15 policies.

• Incorrect Safe Driver Incentive Plan points applied on 5 policies.

• Incorrect territory was used to rate 1 policy.

The rating errors resulted in 21 premium overcharges and 5 premium undercharges to the insureds. At the request of the examiners, refunds in the amount of $1,892.71 were issued by the Company for the overcharges. The remaining 74 premiums charged were deemed correct.

As a result of the incorrect physical damage base rates, the examiners requested the Company conduct a self audit. The Company identified 3,383 policies resulting in overcharges in the amount of $171,875.98. All overcharges were returned to the policyholders prior to the conclusion of the examination.

## Homeowners

The Company provided a listing of 1,083 active homeowners policies issued during the period under examination. Fifty policies were randomly selected and received for review.

The Company's homeowners coverages were written utilizing manual and deviated rates. Policies were written on an annual basis. Risk placement was determined by the Company's underwriting guidelines and the underwriter. No discrepancies were noted in the Company's use of its underwriting guidelines. All policy files contained sufficient documentation to support the Company's classification of the risk.

**\*8** The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-5 and 58-33-26 as 2 of the applications reviewed (4.0 percent error ratio) were accepted from a producer who was not licensed in North Carolina.

The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as 3 files reviewed (6.0 percent error ratio) did not contain proper file documentation.

The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-30(a) as 29 policies reviewed (58.0 percent error ratio) contained a total of 42 rating errors. The rating errors consisted of the following:

• The Company failed to charge for Refrigerated Property coverage on 22 policies.

• Various company filed deviations were applied incorrectly on 11 policies.

• Four policies were rated using an incorrect construction factor.

• Incorrect premiums were charged for Water Back-Up coverage on 3 policies.

• An incorrect territory was used to rate 2 policies.

The rating errors resulted in 26 premium undercharges and 2 premium overcharges to the insureds. At the request of the examiners, refunds in the amount of $103.00 were issued by the Company for the overcharges. The remaining 22 premiums charged were deemed correct.

## TERMINATIONS

### Overview

The Company's termination procedures were reviewed to determine compliance with the appropriate North Carolina statutes and rules, policy provisions, and the applicable policy manual rules. The review focused on the following lines of business:

1. Private Passenger Automobile

2. Homeowners

Special attention was placed on the validity and reason for termination, timeliness in issuance of the termination notice, policy refund (where applicable), and documentation of the policy file. A total of 11,474 policies were terminated during the period under examination. The examiners randomly selected 158 terminations for review.

### Private Passenger Automobile Cancellations

One hundred cancelled private passenger automobile policies were randomly selected and received for review from a population of 11,306.

The review revealed the following reasons for cancellation:

Report on Market Conduct Examination The Members..., 2013 WL 3148649...

DJA0457

| Reason for Cancellation | Number of Policies | Percentage |
|---|---|---|
| Nonpayment of premium | 69 | 69.0 |
| Insured's request | 25 | 25.0 |
| Rewritten | 3 | 3.0 |
| Underwriting reasons | 2 | 2.0 |
| Risk no longer eligible | 1 | 1.0 |
| **Total** | **100** | **100.0** |

The Company was not required to issue cancellation notices for 28 of the cancellations reviewed as these policies were cancelled at the request of the insured or coverage was rewritten. Cancellation notices for the remaining 72 policies stated the specific reason for cancellation. The Company was reminded of the provisions of NCGS 58-36-85(b) and 11 NCAC 4.0422 as an ineligible reason for cancellation was used to terminate 2 policies reviewed (2.0 percent error ratio). The Company was reminded of the provisions of NCGS 58-36-85(c) as it failed to provide sufficient notice of cancellation for 7 policies reviewed (7.0 percent error ratio).

   *9  The Company was reminded of the provisions of NCGS 58-36-30(a) and Rule 10 of the Personal Auto Manual as the return premium was calculated incorrectly for 8 policies reviewed (8.0 percent error ratio). One of the errors resulted in an understatement of refund to the insured. At the request of the examiners, an additional refund was issued in the amount of $3.94. The remaining premium refunds were deemed correct. The Company issued the refunds in a timely manner.

   The Company was reminded of the provisions of NCGS 58-36-85(b)(3) as it did not send a written termination notice for 2 files reviewed (2.0 percent error ratio) for which there was no written request from the insured to terminate the policy. The Company was reminded of the provisions of NCGS 20-309.2 as the FS-4 was not submitted to the DMV when liability coverages were cancelled for 3 policies reviewed (3.0 percent error ratio).

   The final area of this review encompassed documentation of the policy file. The remaining files reviewed contained sufficient documentation to support the action taken by the Company.

Homeowners Cancellations

   Fifty cancelled homeowners policies were randomly selected and received for review from a population of 160.

   The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
|---|---|---|
| Insured's request | 24 | 48.0 |
| Nonpayment of premium | 18 | 36.0 |
| Underwriting reasons | 5 | 10.0 |

| | | |
|---|---|---|
| Coverage rewritten | 3 | 6.0 |
| **Total** | **50** | **100.0** |

The Company was not required to issue cancellation notices for 27 of the cancellations reviewed as these policies were cancelled at the request of the insured or the coverage was rewritten. Cancellation notices for the remaining 23 policies stated the specific reason for cancellation. All insureds and mortgagees were given proper and timely notification of cancellation.

The Company was reminded of the policy conditions as the return premium was calculated incorrectly for 2 policies reviewed (4.0 percent error ratio) resulting in understatement of refund to the insureds. At the request of the examiners, the Company issued additional refunds in the amount of $67.40. The remaining premium refunds were deemed correct. The Company issued the refunds in a timely manner.

The final area of this review encompassed documentation of the policy file. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as 18 files did not contain proof of mailing of the cancellation notice (36.0 percent error ratio).

Private Passenger Automobile Nonrenewals

All nonrenewed private passenger automobile policies were selected and received for review from a population of 7.

   *10   The reason for nonrenewal was deemed valid for all policies reviewed. The review revealed the following reasons for nonrenewal:

| Reason for Nonrenewal | Number of Policies | Percentage |
|---|---|---|
| Risk no longer eligible | 6 | 85.7 |
| Producer no longer represents company | 1 | 14.3 |
| **Total** | **7** | **100.0** |

The nonrenewal notices for the policies reviewed stated the specific reason for nonrenewal. The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-85(c) as the notice of nonrenewal was not sent at least 60 days prior to the termination date for 2 policies reviewed (28.6 percent error ratio).

The Company was deemed to be in apparent violation of the provisions of NCGS 20-309.2 as the FS-4 was not submitted to the DMV when liability coverages were nonrenewed for 7 policies reviewed (100 percent error ratio).

The final area of this review encompassed documentation of the policy file. The remaining files reviewed contained sufficient documentation to support the action taken by the Company.

Homeowners Nonrenewals

All nonrenewed homeowners policies were selected and received for review from a population of 1.

Report on Market Conduct Examination The Members..., 2013 WL 3148649...

DJA0459

The reason for nonrenewal was deemed valid for the policy reviewed. The review revealed the following reason for nonrenewal:

| Reason for Nonrenewal | Number of Policies | Percentage |
|---|---|---|
| Underwriting reasons | 1 | 100.0 |
| **Total** | **1** | **100.0** |

The nonrenewal notice for the policy reviewed stated the specific reason for nonrenewal. The insured and mortgagee were given proper and timely notification of nonrenewal.

The final area of this review encompassed documentation of the policy file. The policy file contained sufficient documentation to support the action taken by the Company.

## Rejected/Declined

The Company reported there were no rejected or declined applications as coverage was bound at point of sale.

## CLAIMS PRACTICES

### Overview

The Company's claims practices were reviewed to determine compliance with the appropriate North Carolina statutes and rules and policy provisions. The review encompassed paid, automobile medical payment, first and third party bodily injury, closed without payment, subrogated, total loss settlement, and litigated claims.

Claims service in North Carolina is under the direction of the Claim Manager and is provided from the corporate office located in Charlotte, North Carolina. The staff is comprised of the Claim Manager, 1 Team Leader/Claim Adjuster, 4 Liability Claim Adjusters and 1 Material Damage Claim Adjuster. The Company has 6 staff adjusters for claim investigation and settlement. Independent appraisers are used for automobile and homeowners appraisals. Independent adjusters have no check or draft authority. With regard to total losses, a salvage log is maintained and managed on a daily basis by a claim assistant. The Company also uses their salvage vendor website to help with salvage inventory.

**\*11** Three hundred sixty-three claims were randomly selected for review from a population of 4,028.

### Paid Claims

The examiners randomly selected and received 127 of the 1,839 first party automobile physical damage, first party property damage, and third party property damage claims paid during the period under examination. The claim files were reviewed for timeliness of payment, supporting documentation and accuracy of payment.

The following types of claims were reviewed and the average payment time is noted in calendar days:

| Type of Claim | Payment Time |
|---|---|
| Automobile physical damage | 9.0 |

| | |
|---|---|
| First party (excluding automobile physical damage) | 15.0 |
| Third party property damage | 11.0 |

All payments issued by the Company were deemed to be accurate. Deductibles were correctly applied and depreciation taken was reasonable.

All claim files reviewed contained documentation to support the Company's payments. The documentation consisted of appraisals, estimates, repair bills, or inventory listings.

First party automobile physical damage claims were not acknowledged in a timely manner for 1 claim (2.0 percent error ratio) and were not appraised in a timely manner for 1 claim (2.0 percent error ratio).

First party property damage claims were not acknowledged in a timely manner for 4 claims (14.8 percent error ratio), were not investigated in a timely manner for 1 claim (3.7 percent error ratio) and were not paid in a timely manner for 1 claim (3.7 percent error ratio).

Third party property damage claims were not acknowledged in a timely manner for 1 claim (2.0 percent error ratio), were not appraised in a timely manner for 2 claims (4.0 percent error ratio) and were not investigated in a timely manner for 1 claim (2.0 percent error ratio). These matters could result in an apparent violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice.

### Automobile Medical Payment Claims

Fifty automobile medical payment claims were randomly selected and received for review from a population of 332. The claim files were reviewed to determine if the Company had engaged in any unfair claims practices. The review of automobile medical payment claims disclosed no apparent violations of the provisions of NCGS 58-63-15(11).

### First and Third Party Bodily Injury Claims

Fifty first and third party bodily injury claims were randomly selected and received for review from a population of 291. The claim files were reviewed to determine whether the Company had engaged in any unfair claims practices.

Claims were not investigated in a timely manner for 3 claims (6.0 percent error ratio). This matter could result in an apparent violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice.

### Closed Without Payment Claims

**\*12** Fifty closed without payment claims were randomly selected and received for review from a population of 1,261. The claim files were reviewed to determine if the Company's reasons for closing the claims without payment were valid.

Claims were not denied in a timely manner for 1 claim (2.0 percent error ratio). This matter could result in an apparent violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice.

Report on Market Conduct Examination The Members..., 2013 WL 3148649...

DJA0461

The claim files reviewed contained documentation that supported the Company's reasons for closing the claims without payment. All reasons for denial or closing the files without payment were deemed valid. Claims were denied on an average of 14 calendar days for the 3-year period.

## Subrogated Claims

All subrogated claims were selected and received for review from a population of 32. The claim files were reviewed to determine if the insured's deductible was properly reimbursed by the Company when subrogation was successful.

The insured's deductible was not reimbursed for 3 claims (9.4 percent error ratio). This matter could result in an apparent violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice. At the request of the examiners, the Company issued checks totaling $709.75 to the insureds for their deductibles. The remaining reimbursements were deemed to be correct and were issued on a 3-year average of 1 calendar day from the date the Company collected the monies.

## Total Loss Settlement Claims

Fifty total loss settlement claims were randomly selected and received for review from a population of 269. The claim files were reviewed to determine if the settlements were equitable and timely.

The Company primarily used CCC Information Services, Inc. in addition to on-site independent adjusters to establish the actual cash value of totaled vehicles. All settlements were deemed equitable.

Claims were not appraised in a timely manner for 5 claims (10.0 percent error ratio). This matter could result in an apparent violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice.

The Company settled the remaining claims in a timely manner. The payments were issued on a 3-year average of 17 calendar days. No apparent violations of the provisions of NCGS 58-63-15(11), 11 NCAC 4.0418, or 4.0421 were noted during this review.

## Litigated Claims

All litigated claims were selected and received for review from a population of 4. The claim files were reviewed to determine if the Company had engaged in any unfair claims practices. The review of litigated claims disclosed no apparent violation of the provisions of NCGS 58-63-15.

## SUMMARY

The Market Conduct examination revealed the following:

1. Policyholder Treatment

*13  a. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0103 as 4.5 percent of the consumer complaints reviewed were not listed on the Company's complaint register.

b. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0103, and 19.0106(a)(2) as 18.2 percent of the consumer complaints requested were not provided for review.

c. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 1.0602 as the responses to 18.2 percent of the Departmental inquiries reviewed were in excess of the 7 calendar day requirement of this rule.

d. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 4.0123 as 9.1 percent of the responses to a Departmental inquiry did not include its National Association of Insurance Commissioners code.

e. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0103, and 19.0106(a)(2) as 18.2 percent of the consumer complaints reviewed did not contain a copy of the inquiry letter from the Department and/or a copy of the consumer's complaint.

2. Marketing

a. The Company was deemed to be in apparent violation of the provisions of NCGS 58-3-150 and 11 NCAC 10.1201(c) as the Private Passenger Automobile Policy new business application, declarations page, and consent-to-rate form had not been filed with and approved by the Department.

b. The Company was deemed to be in apparent violation of the provisions of NCGS 58-3-150 and 11 NCAC 10.1201(c) as its homeowners declarations page had not been filed with and approved by the Department.

c. The Company was deemed to be in apparent violation of the provisions of NCGS 58-3-150 and 58-39-55(a) as its notice of Adverse Underwriting Decision used for homeowners terminations had not been filed with and approved by the Department.

d. The Company was reminded of the provisions of 11 NCAC 19.0102(a), and 19.0106(a)(3) as confirmation of appointment was not provided for 2.0 percent of the appointed producers reviewed.

e. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 6A.0412(2) as background checks were not performed on 62.0 percent of the producers reviewed.

f. The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-56(b) as it failed to notify the Department of termination within 30 days for 48.0 percent of the terminated producers reviewed.

g. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), and 19.0106(a)(3) as confirmation of termination was not provided for 20.0 percent of the terminated producers reviewed.

h. The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-56(d) as notification of termination was not sent to 100 percent of the terminated producers reviewed.

3. Underwriting Practices

a. The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-30(a) and Rule 22 of the North Carolina Rate Bureau Personal Automobile Manual for a $2.00 installment fee charge or the waiver of installment fee for premiums paid by electronic funds transfer without being filed with and approved by the Department.

*14 b. The Company was deemed to be in apparent violation of the provisions of NCGS 58-37-40(f) as it did not include agent compensation in the calculation of the recoupment surcharge for 21.0 percent of the active private passenger automobile policies resulting in an undercharge of the recoupment surcharge.

c. The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-40 as the producer was not properly appointed by the Company for 7.0 percent of the active private passenger automobile files reviewed.

d. The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as 2.0 percent of the active private passenger automobile files reviewed did not contain a signed consent to rate form.

e. The Company was reminded of the provisions of 11 NCAC 10.0602(a)(2) as it did not comply with consent to rate procedures on 4.0 percent of the active private passenger automobile files reviewed because the standard rate that would be charged for towing and labor and/or extended transportation coverage, without application of consent to rate, was not indicated on the application.

f. The Company was deemed to be in apparent violation of the provisions of NCGS 58-37-35(I) and NCGS 58-36-30(a) as 26.0 percent of the active private passenger automobile policies reviewed were rated incorrectly.

g. The Company was deemed to be in apparent violation of the provisions of NCGS 58-33-5 and 58-33-26 as 4.0 percent of the homeowners applications reviewed were accepted from a producer who was not licensed in North Carolina.

h. The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as 6.0 percent of the active homeowners files reviewed did not contain proper file documentation.

i. The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-30(a) as 58.0 percent of the active homeowners policies reviewed were rated incorrectly.


4.Terminations

a. The Company was reminded of the provisions of NCGS 58-36-85(b) and 11 NCAC 4.0422 as an ineligible reason was used to terminate 2.0 percent of the cancelled private passenger automobile policies reviewed.

b. The Company was reminded of the provisions of NCGS 58-36-85(c) as it failed to provide sufficient notice of cancellation for 7.0 percent of the cancelled private passenger automobile policies reviewed.

c. The Company was reminded of the provisions of NCGS 58-36-30(a) and Rule 10 of the Personal Auto Manual as the return premium was calculated incorrectly for 8.0 percent of the cancelled private passenger automobile policies reviewed.

d. The Company was reminded of the provisions of NCGS 58-36-85(b)(3) as it did not send a written termination notice for 2.0 percent of the cancelled private passenger automobile files reviewed for which there was no written request from the insured to terminate the policy.

e. The Company was reminded of the provisions of NCGS 20-309.2 as 3.0 percent of the cancelled private passenger automobile files reviewed contained no evidence that the North Carolina Notice of Termination Form was submitted to the Division of Motor Vehicles when liability coverages were cancelled.

*15 f. The Company was reminded of the policy conditions as the return premium was calculated incorrectly for 4.0 percent of the cancelled homeowners policies reviewed.

Report on Market Conduct Examination The Members..., 2013 WL 3148649...

DJA0464

g. The Company was deemed to be in apparent violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as proof of mailing of the cancellation notice was not provided for 36.0 percent of the cancelled homeowners policies reviewed.

h. The Company was deemed to be in apparent violation of the provisions of NCGS 58-36-85(c) as the notice of nonrenewal was not sent at least 60 days prior to the termination date for 28.6 percent of the nonrenewed private passenger automobile policies reviewed.

i. The Company was deemed to be in apparent violation of the provisions of NCGS 20-309.2 as the North Carolina Notice of Termination Form was not submitted to the North Carolina Division of Motor Vehicles for 100 percent of the nonrenewed private passenger automobile policies reviewed.

## TABLE OF STATUTES AND RULES

| Statute/Rule | Title |
| --- | --- |
| NCGS 58-2-131 | Examinations to be made; authority, scope, scheduling, and conduct of examinations. |
| NCGS 58-2-132 | Examination reports. |
| NCGS 58-2-133 | Conflict of interest; cost of examinations; immunity from liability. |
| NCGS 58-2-134 | Cost of certain examinations. |
| NCGS 58-3-150 | Forms to be approved by the Commissioner. |
| NCGS 58-7-15 | Kinds of insurance authorized. |
| NCGS 58-33-5 | License required. |
| NCGS 58-33-26 | General license requirements. |
| NCGS 58-33-40 | Appointment of agents. |
| NCGS 58-33-56 | Notification to Commissioner of termination. |
| NCGS 58-36-30 | Deviations. |
| NCGS 58-36-85 | Termination of a nonfleet private passenger motor vehicle insurance policy. |
| NCGS 58-37-35 | The Facility; functions; administration. |
| NCGS 58-37-40 | Plan of operation. |
| NCGS 58-39-25 | Notice of insurance information practices. |
| NCGS 58-39-26 | Federal privacy disclosure notice requirements. |
| NCGS 58-39-27 | Privacy notice and disclosure requirement exceptions. |
| NCGS 58-39-55 | Reasons for adverse underwriting decisions. |

Report on Market Conduct Examination The Members..., 2013 WL 3148649...

DJA0465

| NCGS 58-63-15 | Unfair methods of competition and unfair or deceptive acts or practices defined. |
| NCGS 20-309.2 | Insurer shall notify Division of actions on insurance policies. |
| 11 NCAC 1.0602 | Insurance Companies' Response to Departmental Inquiries. |
| 11 NCAC 4.0123 | Use of Specific Company Name in Responses. |
| 11 NCAC 4.0418 | Total Losses on Motor Vehicles. |
| 11 NCAC 4.0421 | Handling of Loss and Claim Payments. |
| 11 NCAC 4.0422 | Cancellation of Insurance. |
| 11 NCAC 6A.0412 | Appointment of Agent: Responsibility of Company. |
| 11 NCAC 10.0602 | Consent to Rate Procedures: Rate Bureau Coverages. |
| 11 NCAC 10.1201 11 NCAC 19.0102 | General Requirements. Maintenance of Records. |
| 11 NCAC 19.0103 | Complaint Records. |
| 11 NCAC 19.0104 | Policy Records. |
| 11 NCAC 19.0106 | Records Required for Examination. |

## CONCLUSION

An examination has been conducted on the market conduct affairs of The Members Insurance Company for the period January 1, 2008 through December 31, 2010 with analyses of certain operations of the Company being conducted through January 28, 2013.

**\*16** This examination was conducted in accordance with the North Carolina Department of Insurance and the National Association of Insurance Commissioners Market Regulation Handbook procedures, including analyses of Company operations in the areas of policyholder treatment, marketing, underwriting practices, terminations, and claims practices.

In addition to the undersigned, James P. McQuillan, CPCU, AIT, North Carolina Market Conduct Examiner, and Bill George, CPCU, AIS, North Carolina Market Conduct Assistant Chief Property & Casualty Examiner, participated in this examination.

Respectfully submitted,
/s/ Norma M. Rafter
Norma M. Rafter, CPCU
Examiner-In-Charge
Market Regulation Division
State of North Carolina

I have reviewed this examination report and it meets the provisions for such reports prescribed by this Division and the North Carolina Department of Insurance.

/s/ Tracy M. Biehn
Tracy M. Biehn, LPCS, MBA

**Report on Market Conduct Examination The Members...**, 2013 WL 3148649...

DJA0466

Deputy Commissioner
Market Regulation Division
State of North Carolina

**End of Document**                                  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 44
Report on Market Conduct Examination Nationwide Mutual..., 2014 WL 2803588...

DJA0467

2014 WL 2803588

State of North Carolina

**\*1** Report on Market Conduct Examination

Nationwide Mutual Insurance Company

Columbus, Ohio

April 2, 2014

MARKET CONDUCT REPORTS

North Carolina Department of Insurance

Image 1 within document in PDF format.

Report

<u>TABLE OF CONTENTS</u>

SALUTATION
FOREWORD
SCOPE OF EXAMINATION
EXECUTIVE SUMMARY
COMPANY OPERATIONS AND MANAGEMENT
POLICYHOLDER TREATMENT
Consumer Complaints
MARKETING
Policy Forms and Filings
Producer Licensing
UNDERWRITING PRACTICES
Overview
Private Passenger Automobile
Homeowners
Commercial Automobile
Businessowners
TERMINATIONS
Overview
Private Passenger Automobile Cancellations
Homeowners Cancellations
Commercial Automobile Cancellations
Businessowners Cancellations
Private Passenger Automobile Nonrenewals
Homeowners Nonrenewals
Commercial Automobile Nonrenewals
Businessowners Nonrenewals
CLAIMS PRACTICES

Report on Market Conduct Examination Nationwide Mutual..., 2014 WL 2803588...

DJA0468

Overview
Paid Claims
Automobile Medical Payment Claims
First and Third Party Bodily Injury Claims
Closed Without Payment Claims
Subrogated Claims
Total Loss Settlement Claims
Litigated Claims
SUMMARY
CONCLUSION

Raleigh, North Carolina

April 2, 2014

Honorable Mary Taylor

Lieutenant Governor/Director

Department of Insurance

State of Ohio

50 West Town Street

Third Floor, Suite 300

Columbus, Ohio 43215

Honorable Wayne Goodwin

Commissioner of Insurance

Department of Insurance

State of North Carolina

Dobbs Building

430 N. Salisbury Street

Raleigh, North Carolina 27603

Honorable Director and Honorable Commissioner:

Pursuant to your instructions and in accordance with the provisions of North Carolina General Statute (NCGS) 58-2-131 through 58-2-134, a general examination has been made of the market conduct activities of

**Nationwide Mutual Insurance Company (NAIC #23787)**

NAIC Exam Tracking System Exam Number: NC299-M26

Columbus, Ohio

hereinafter generally referred to as the Company, at the North Carolina Department of Insurance (Department) office located at 11 S. Boylan Avenue, Raleigh, North Carolina. A report thereon is respectfully submitted.

FOREWORD

**\*2** This examination reflects the North Carolina insurance activities of Nationwide Mutual Insurance Company. The examination is, in general, a report by exception. Therefore, much of the material reviewed will not be contained in this written report, as reference to any practices, procedures, or files that revealed no concerns were omitted.

SCOPE OF EXAMINATION

This examination commenced on May 20, 2013, and covered the period of January 1, 2008, through December 31, 2011, with analyses of certain operations of the Company being conducted through March 26, 2014. All comments made in this report reflect conditions observed during the period of the examination.

The examination was arranged and conducted by the Department. It was made in accordance with Market Regulation standards established by the Department and procedures established by the National Association of Insurance Commissioners (NAIC) and accordingly included tests of policyholder treatment, marketing, underwriting practices, terminations, and claims practices.

It is the Department's practice to cite companies in violation of a statute or rule when the results of a sample show errors/noncompliance at or above the following levels: 0 percent for consumer complaints, producers who were not appointed and/or licensed, and the use of forms and rates/rules that were neither filed with nor approved by the Department; 7 percent for claims; and 10 percent for all other areas reviewed. When errors are detected in a sample, but the error rate is below the applicable threshold for citing a violation, the Department issues a reminder to the company.

## EXECUTIVE SUMMARY

This market conduct examination revealed concerns with Company procedures and practices in the following areas:

*Policy Forms and Filings* - Unfiled homeowners consent to rate form, unfiled homeowners adverse underwriting decision (AUD) notice, unfiled homeowners installment waiver deviation for electronic funds transfer, and unfiled installment waiver deviation for account billed policies.

*Terminations* - Private Passenger Automobile Cancellations: Missing North Carolina Notice of Termination form (FS-4) sent to the Division of Motor Vehicles (DMV). Homeowners Cancellations: Missing documentation to support cancellation. Commercial Automobile Cancellations: Missing FS-4 sent to DMV. Businessowners Cancellations: Missing documentation to support cancellation. Private Passenger Automobile Nonrenewals: Missing documentation to support nonrenewal. Commercial Automobile Nonrenewals: Missing FS-4 sent to DMV.

Specific violations related to each area of concern are noted in the appropriate section of this report. All North Carolina General Statutes and rules of the North Carolina Administrative Code cited in this report may be viewed on the North Carolina Department of Insurance Web site **www.ncdoi.com** by clicking "INSURANCE DIVISIONS" then "Legislative Services".

 **\*3** This examination identified various non-compliant practices, some of which may extend to other jurisdictions. The Company is directed to take immediate corrective action to demonstrate its ability and intention to conduct business in North Carolina according to its insurance laws and regulations. When applicable, corrective action for other jurisdictions should be addressed.

All unacceptable or non-compliant practices may not have been discovered or noted in this report. Failure to identify improper or non-compliant business practices in North Carolina or in other jurisdictions does not constitute acceptance of such practices. Examination report findings that do not reference specific insurance laws, regulations, or bulletins are presented to improve the Company's practices and ensure consumer protection.

## COMPANY OPERATIONS AND MANAGEMENT

The Company is a writer of a wide variety of insurance coverages, but the majority of business written is personal lines. The Company opened for new business in North Carolina in 1928 and is licensed in the District of Columbia, U.S. Virgin Islands and all states except New Jersey, where it operates on a non-admitted basis.

Report on Market Conduct Examination Nationwide Mutual..., 2014 WL 2803588...

DJA0470

Direct written premium for the Company's 2011 countrywide property and casualty operations was $3,408,088,111. North Carolina's production for the same period was $486,909,106. Premiums written in North Carolina between 2008 and 2011 decreased approximately 16.4 percent. The charts below outline the Company's mix of business for selected lines in 2011 and loss ratios in North Carolina for the examination period.

| Line of Business | Written Premium | Percentage |
|---|---|---|
| Private Passenger Automobile Liability | $174,207,068 | 35.8 |
| Homeowners | $131,486,063 | 27.0 |
| Private Passenger Automobile Physical Damage | $121,701,730 | 25.0 |
| Commercial Multiple Peril Fire | $ 20,796,357 | 4.3 |
| Other Liability | $ 9,884,419 | 2.0 |
| Commercial Multiple Peril Liability | $ 7,909,686 | 1.6 |
| Commercial Automobile Liability | $ 6,894,522 | 1.4 |
| Workers' Compensation | $ 5,793,714 | 1.2 |
| Inland Marine | $ 3,948,312 | 0.8 |
| Commercial Automobile Physical Damage | $ 2,029,470 | 0.4 |
| Other | $ 2,257,765 | 0.5 |
| **Total** | **$486,909,106** | **100.0** |

| Year | Written Premium | Earned Premium | Incurred Losses | Loss Ratio |
|---|---|---|---|---|
| 2008 | $ 582,698,815 | $ 578,148,544 | $ 307,437,025 | 53.2 |
| 2009 | $ 548,022,552 | $ 551,205,129 | $ 288,226,549 | 52.3 |
| 2010 | $ 519,780,485 | $ 529,003,115 | $ 233,564,037 | 44.2 |
| 2011 | $ 486,909,106 | $ 493,278,978 | $ 332,202,622 | 67.3 |

POLICYHOLDER TREATMENT

Consumer Complaints

The Company's complaint handling procedures were reviewed to determine compliance with applicable North Carolina statutes and rules.

Report on Market Conduct Examination Nationwide Mutual..., 2014 WL 2803588...

DJA0471

**\*4** The Company's complaint register was reconciled with a listing furnished by the Consumer Services Division of the Department. The Company's complaint register was in compliance with provisions of Title 11 of the North Carolina Administrative Code, (NCAC), Chapter 19, Section 0103.

Fifty of the 990 complaints from the Department's listing were randomly selected for review. The distribution of complaints requiring a response to the Department is shown in the chart below.

| Type of Complaint | Total |
| --- | --- |
| Claims | 26 |
| Underwritin | 21 |
| Administrative | 3 |
| **Total** | **50** |

The Company's response to each complaint was deemed to be appropriate to the circumstances. Six complaints were responded to in excess of seven calendar days. However, extensions were requested and granted for those complaints.

The average service time to respond to a Departmental complaint was five calendar days. A chart of the Company's response time follows:

| Service Days | Number of Files | Percentage of Total |
| --- | --- | --- |
| 1 - 7 | 44 | 88.0 |
| 8 - 14 | 4 | 8.0 |
| 15 - 21 | 2 | 4.0 |
| **Total** | **50** | **100.0** |

MARKETING

Policy Forms and Filings

Policy forms and filings for the Company were reviewed to determine compliance with appropriate North Carolina statutes and rules. The review was based on the following lines of business:

1. Private Passenger Automobile

2. Homeowners

3. Commercial Automobile

4. Businessowners

Filings for the private passenger automobile and homeowners lines of business were made by the North Carolina Rate Bureau on behalf of the Company. Filings for the commercial automobile line of business were made by the Insurance Services Office on behalf of the Company. Deviations for the private passenger automobile, homeowners, and commercial automobile lines of business were made to the Department by the Company. The Company's businessowner coverages were written utilizing independently filed rates.

The Company was deemed to be in violation of the provisions of NCGS 58-36-55 as the homeowners consent to rate form was not filed with and approved by the Commissioner. The Company was deemed to be in violation of the provisions of NCGS 58-39-55 as the homeowners AUD notice was not filed with and approved by the Commissioner. The Company was deemed to be in violation of the provisions of NCGS 58-36-30(a) and Rule A2 of the Homeowners Policy Program Manual as an installment waiver deviation for electronic funds transfer was not filed with and approved by the Commissioner. The Company was deemed to be in violation of the provisions of NCGS 58-36-30(a), Rule A2 of the Homeowners Policy Program Manual, and Rule 22 of the Personal Auto Manual as an installment waiver deviation for account billed policies was not filed with and approved by the Commissioner. The manual rules cited apply to each policy issued, not to each account, unless a deviation to the rules is filed with and approved by the Commissioner.

## Producer Licensing

**\*5**  The Company's procedures for appointment and termination of its producers were reviewed to determine compliance with the appropriate North Carolina statutes and rules. Fifty appointed and 50 terminated producer files were randomly selected for review from populations of 1,404 and 2,561, respectively.

All appointment forms reviewed were submitted to the Department in accordance with the timetables stipulated under the provisions of NCGS 58-33-40. The Company was reminded of the provisions of NCGS 58-33-56(b) as it failed to notify the Department of the termination within 30 days for four terminated producers reviewed (8.0 percent error ratio). The Company was reminded of the provisions of NCGS 58-33-56(b) as it failed to notify the producer within 15 days of notification to the Department for three terminated producers (6.0 percent error ratio). The Company was reminded of the provisions of 11 NCAC 19.0102(a) and 19.0106(a)(3) as the notification of termination letter was not included in the file for two producers reviewed (4.0 percent error ratio).

## UNDERWRITING PRACTICES

### Overview

The Company's marketing philosophy in North Carolina is directed to personal and commercial lines. The Company provided the examiners with listings of the following types of active policies for the period under examination:

1. Private Passenger Automobile

2. Homeowners

3. Commercial Automobile

4. Businessowners

A random selection of 350 policies was made from a total population of 217,491. Each policy was reviewed for adherence to underwriting guidelines, file documentation, and premium determination. Additionally, the policies were examined to determine compliance with the appropriate North Carolina statutes and rules, policy provisions, and the applicable policy manual rules.

Private Passenger Automobile

The Company provided a listing of 5,791 active private passenger automobile policies issued during the period under examination. One hundred policies were randomly selected for review.

The Company's private passenger automobile policies were written on a 6 or 12-month basis. Liability coverages were written utilizing manual rates. Physical damage coverages were written using both manual rates and on a consent to rate basis. Risk placement was determined by the Company's underwriting guidelines and the underwriter. No discrepancies were noted in the Company's use of its underwriting guidelines.

All policy files contained sufficient documentation to support the Company's classification of the risk. All premiums charged were deemed correct.

Homeowners

The Company provided a listing of 190,819 active homeowners policies issued during the period under examination. One hundred policies were randomly selected for review.

The Company's homeowners coverages were written utilizing manual and deviated rates. Policies were written on an annual basis. Risk placement was determined by the Company's underwriting guidelines and the underwriter. No discrepancies were noted in the Company's use of its underwriting guidelines.

  *6  The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as five files did not contain applications, and one file did not contain a Wind or Hail Rejection Form signed by the insured (6.0 percent error ratio).

The Company was reminded of the provisions of NCGS 58-36-30(a) as four policies reviewed (4.0 percent error ratio) were rated incorrectly. The rating errors consisted of the following:

  ● The home purchase discount was not applied on two policies.

  ● The personal status deviation was improperly applied on one policy.

  ● An endorsement premium was not charged on one policy.

The rating errors resulted in two premium undercharges and two premium overcharges to the insureds. At the request of the examiners, refunds covering multiple terms in the amount of $126.79 were issued by the Company for the overcharges. The remaining 96 premiums charged were deemed correct.

Commercial Automobile

The Company provided a listing of 2,534 active commercial automobile policies issued during the period under examination. Fifty policies were randomly selected for review.

The Company's commercial automobile coverages were written utilizing manual and deviated rates. Policies were written on an annual basis. Risk placement was determined by the Company's underwriting guidelines and the underwriter. No discrepancies were noted in the Company's use of its underwriting guidelines.

All policy files contained sufficient documentation to support the Company's classification of the risk. All policy premiums were deemed correct.

### Businessowners

The Company provided a listing of 18,347 active businessowners policies issued during the period under examination. One hundred policies were randomly selected for review.

The Company's businessowners coverages were written utilizing manual and deviated rates. Policies were written on an annual basis. Risk placement was determined by the Company's underwriting guidelines and the underwriter. All files contained sufficient documentation to support the Company's classification of the risk. No discrepancies were noted in the Company's use of its underwriting guidelines.

The Company was reminded of the provisions of NCGS 58-41-50(f) as six policies reviewed (6.0 percent error ratio) had multiple rating errors. The rating errors consisted of the following:

● Territorial factor was incorrectly applied to business income coverage on three policies.

● Incorrect territory was used on one policy.

● Incorrect protection class was used on one policy.

● Incorrect building class was used on one policy.

● Incorrect town group factor was applied on one policy.

● Incorrect class modifier was applied on one policy.

● Incorrect liability exposure factor was applied on one policy.

● Incorrect business personal property special increment modifier was applied on one policy.

**\*7** The rating errors resulted in two premium undercharges and four premium overcharges to the insureds. At the request of the examiners, refunds covering multiple terms were issued by the Company in the amount of $342.36. The remaining 94 premiums were deemed correct.

As a result of the premium calculation errors, the Company, on its own initiative, started an expanded self-audit prior to a formal request by the Department. The Company reviewed 193,168 policies, identifying 237 policies in error. All 237 policies in error resulted in overcharges. Overcharges for the self-audit totaling $13,253.19 were reimbursed to the policyholders prior to the conclusion of the examination.

### TERMINATIONS

### Overview

The Company's termination procedures were reviewed to determine compliance with the appropriate North Carolina statutes and rules, policy provisions, and the applicable policy manual rules. The review was based on the following lines of business:

1. Private Passenger Automobile

Report on Market Conduct Examination Nationwide Mutual..., 2014 WL 2803588...

DJA0475

2. Homeowners

3. Commercial Automobile

4. Businessowners

Special attention was placed on the validity and reason for termination, timeliness in issuance of the termination notice, policy refund (where applicable), and documentation of the policy file. A total of 290,841 policies were terminated during the period of time subject to this examination. The examiners randomly selected 632 terminations for review.

### Private Passenger Automobile Cancellations

One hundred cancelled private passenger automobile policies were randomly selected for review from a population of 121,823.

The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
| --- | --- | --- |
| Insured's request | 45 | 45.0 |
| Nonpayment of premium | 37 | 37.0 |
| Coverage rewritten | 18 | 18.0 |
| **Total** | **100** | **100.0** |

The Company was not required to issue cancellation notices for 63 of the cancellations reviewed as these policies were cancelled at the request of the insured or the coverage was rewritten.

The Company was reminded of the provisions of NCGS 58-36-30(a) and Rule 10 of the North Carolina Personal Automobile Manual as one policy reviewed (1.0 percent error ratio) was cancelled using an incorrect cancellation method. The error resulted in an understatement of refund to the insured. At the request of the examiners, the Company issued an additional refund in the amount of $452.85. The remaining premium refunds were deemed correct. The Company issued the refunds in a timely manner.

The final area of this review encompassed documentation of the policy file. The Company was reminded of the provisions of NCGS 58-36-85(b)(3) as it did not send a written termination notice for eight files reviewed (8.0 percent error ratio) for which there was no written request from the insured to terminate the policy.

**\*8** The Company was deemed to be in violation of the provisions of 11 NCAC 19.0102, 19.0104, and 19.0106(a)(4) as it was unable to provide documentation to support the FS-4 submitted to the DMV when liability coverage was cancelled for 15 policies reviewed (15.0 percent error ratio).

The remaining policy files reviewed contained sufficient documentation to support action taken by the Company.

## Homeowners Cancellations

One hundred cancelled homeowners policies were randomly selected for review from a population of 129,741.

The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
|---|---|---|
| Insured's request | 53 | 53.0 |
| Nonpayment of premium | 35 | 35.0 |
| Coverage rewritten | 9 | 9.0 |
| Underwriting reasons | 3 | 3.0 |
| **Total** | **100** | **100.0** |

The Company was not required to issue cancellation notices for 62 of the cancellations reviewed as these policies were cancelled at the request of the insured or the coverage was rewritten. Cancellation notices for the remaining 38 policies stated the specific reason for cancellation. All insureds and mortgagees were given proper and timely notification of cancellation.

The Company was reminded of the policy provisions as one policy was not cancelled on the date requested by the insured (1.0 percent error ratio). This error resulted in a $7.40 refund due the insured, which was issued at the request of the examiners.

The final area of this review encompassed documentation of the policy file. The Company was deemed to be in violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as it was unable to provide documentation to support cancellation for 15 policies reviewed (15.0 percent error ratio).

## Commercial Automobile Cancellations

One hundred cancelled commercial automobile policies were randomly selected for review from a population of 10,666.

The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
|---|---|---|
| Insured's request | 49 | 49.0 |
| Nonpayment of premium | 45 | 45.0 |
| Underwriting reasons | 4 | 4.0 |
| Coverage rewritten | 2 | 2.0 |
| **Total** | **100** | **100.0** |

Report on Market Conduct Examination Nationwide Mutual..., 2014 WL 2803588...

DJA0477

The Company was not required to issue cancellation notices for 51 of the cancellations reviewed as these policies were cancelled at the request of the insured or the coverage was rewritten.

The Company was reminded of the provisions of Rule 11 of the Commercial Automobile Manual as two policies (2.0 percent error ratio) were cancelled pro-rata rather than .90 of the pro-rata unearned premium when the policy was cancelled at the request of the insured. The errors resulted in overstatement of refund to the insureds. The remaining premium refund calculations were deemed correct. The Company issued the refunds in a timely manner.

 **\*9**  The Company was reminded of the policy provisions as one policy was cancelled on the renewal date in lieu of the date requested by the insured (1.0 percent error ratio). This error resulted in a $12.96 refund due the insured, which was issued at the request of the examiners.

The final area of this review encompassed documentation of the policy file. The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as it was unable to provide documentation to support the refund issued to the insured for one policy reviewed (1.0 percent error ratio). The Company issued a refund of $8.64 to the insured at the request of the examiners. The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as it was unable to provide documentation to support cancellation for five policies reviewed (5.0 percent error ratio).

The Company was deemed to be in violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as it was unable to provide documentation to support the FS-4 submitted to the DMV when liability coverage was cancelled for all policies reviewed (100 percent error ratio).

## Businessowners Cancellations

One hundred cancelled businessowners policies were randomly selected for review from a population of 6,915.

The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
| --- | --- | --- |
| Insured's request | 67 | 67.0 |
| Nonpayment of premium | 24 | 24.0 |
| Underwriting reasons | 5 | 5.0 |
| Coverage rewritten | 4 | 4.0 |
| **Total** | **100** | **100.0** |

The Company was not required to issue cancellation notices for 71 of the cancellations reviewed as these policies were cancelled at the request of the insured or the coverage was rewritten. Cancellation notices for the remaining 29 policies stated the specific reason for cancellation.

The Company was reminded of the provisions of Rule 11 of the Businessowners Manual as seven policies (7.0 percent error ratio) were cancelled pro-rata rather than .90 of the pro-rata unearned premium when the policy was cancelled at the request of the insured. The remaining premium refund calculations were deemed correct. The Company issued the refunds in a timely manner.

Report on Market Conduct Examination Nationwide Mutual..., 2014 WL 2803588...

DJA0478

The Company was reminded of the provisions of NCGS 58-41-15(b) as the notice of cancellation was not sent at least 15 days prior to the termination date for one cancelled policy reviewed (1.0 percent error ratio).

The final area of this review encompassed documentation of the policy file. The Company was deemed to be in violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as it was unable to provide documentation to support cancellation for 12 cancelled policies reviewed (12.0 percent error ratio). The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as it was unable to provide the proof of mailing for one cancelled policy reviewed (1.0 percent error ratio).

## Private Passenger Automobile Nonrenewals

**\*10** The entire population of thirty-two nonrenewed private passenger automobile policies was selected for review.

The reason for nonrenewal was deemed valid for all policies reviewed. The review revealed the following reason for nonrenewal:

| Reason for Nonrenewal | Number of Policies | Percentage |
|---|---|---|
| Underwriting reasons | 32 | 100.0 |
| **Total** | **32** | **100.0** |

The nonrenewal notices for the policies reviewed stated the specific reason for nonrenewal. The insureds and lienholders were given proper and timely notification of nonrenewal.

The final area of this review encompassed documentation of the policy file. The Company was deemed to be in violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as the Company was unable to provide documentation supporting nonrenewal for 11 of the policies reviewed (34.4 percent error ratio).

The Company sent the FS-4 to the DMV when liability coverages were nonrenewed. The Company was deemed to be in compliance with the provisions of NCGS 20-309.2.

## Homeowners Nonrenewals

One hundred nonrenewed homeowners policies were randomly selected for review from a population of 21,113.

The reason for nonrenewal was deemed valid for all policies reviewed. The review revealed the following reason for nonrenewal.

| Reason for Nonrenewal | Number of Policies | Percentage |
|---|---|---|
| Underwriting reasons | 100 | 100.0 |
| **Total** | **100** | **100.0** |

Report on Market Conduct Examination Nationwide Mutual..., 2014 WL 2803588...

DJA0479

The nonrenewal notices for the policies reviewed stated the specific reason for nonrenewal. The Company was reminded of the policy provisions as the notice of nonrenewal was not sent at least 30 days prior to the termination date for five policies reviewed (5.0 percent error ratio).

The final area of this review encompassed documentation of the policy file. The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as it was unable to provide the nonrenewal notice for one policy file reviewed (1.0 percent error ratio).

## Commercial Automobile Nonrenewals

Fifty nonrenewed commercial automobile policies were randomly selected for review from a population of 217.

The reason for nonrenewal was deemed valid for all files reviewed. The review revealed the following reason for nonrenewal:

| Reason for Nonrenewal | Number of Policies | Percentage |
|---|---|---|
| Underwriting reasons | 50 | 100.0 |
| **Total** | **50** | **100.0** |

The nonrenewal notices for the policies reviewed stated the specific reason for nonrenewal.

The final area of this review encompassed file documentation. The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as it was unable to provide the nonrenewal notice for two policies reviewed (4.0 percent error ratio).

**\*11** The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4), (g) as it was unable to provide the proof of mailing for one policy reviewed (2.0 percent error ratio).

The Company was deemed to be in violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as it was unable to provide documentation to support the FS-4 submitted to the DMV when liability coverage was nonrenewed for all policies reviewed (100.0 percent error ratio).

## Businessowners Nonrenewals

Fifty nonrenewed businessowners policies were randomly selected for review from a population of 334.

The reason for nonrenewal was deemed valid for all policies reviewed. The review revealed the following reason for nonrenewal:

| Reason for Nonrenewal | Number of Policies | Percentage |
|---|---|---|
| Underwriting reasons | 50 | 100.0 |
| **Total** | **50** | **100.0** |

The Company was reminded of the provisions of NCGS 58-41-20(c) as the nonrenewal notice was not sent at least 45 days prior to the termination date for three policies reviewed (6.0 percent error ratio).

The final area of this review encompassed file documentation. The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as it was unable to provide the nonrenewal notice for one policy file reviewed (2.0 percent error ratio).

<p style="text-align:center">CLAIMS PRACTICES</p>

## Overview

The Company's claims practices were reviewed to determine compliance with the appropriate North Carolina statutes and rules and policy provisions. The review encompassed paid, automobile medical payments, first and third party bodily injury, closed without payment, subrogated, total loss settlement, and litigated claims.

Eight hundred fifty claims were randomly selected for review from a population of 382,923.

## Paid Claims

The examiners randomly selected 300 of the 212,916 first party automobile physical damage, first party property damage, and third party property damage claims paid during the period under examination. The claim files were reviewed for timeliness of payment, supporting documentation, and accuracy of payment.

The following types of claims were reviewed and the average payment time is noted in calendar days:

| Type of Claim | Payment Time |
| --- | --- |
| Automobile physical damage | 14.0 |
| First party (excluding automobile physical damage) | 10.0 |
| Third party property damage | 12.0 |

All payments issued by the Company were deemed to be accurate. Deductibles were correctly applied and depreciation taken was reasonable.

All claim files reviewed contained documentation to support the Company's payments. The documentation consisted of appraisals, estimates, repair bills, or inventory listings.

**\*12** First party property damage claims were not investigated in a timely manner for one claim (1.0 percent error ratio) and were not paid in a timely manner for one claim (1.0 percent error ratio). This matter could result in a violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice.

## Automobile Medical Payment Claims

One hundred automobile medical payment claims were randomly selected for review from a population of 19,012. The claim files were reviewed to determine if the Company had engaged in any unfair claims practices. The review of automobile medical payment claims disclosed no violations of the provisions of NCGS 58-63-15.

Report on Market Conduct Examination Nationwide Mutual..., 2014 WL 2803588...

DJA0481

### First and Third Party Bodily Injury Claims

One hundred first and third party bodily injury claims were randomly selected for review from a population of 27,654. The claim files were reviewed to determine whether the Company had engaged in any unfair claims practices. The review of first and third party bodily injury claims disclosed no violations of the provisions of NCGS 58-63-15.

### Closed Without Payment Claims

One hundred closed without payment claims were randomly selected for review from a population of 81,713. The claim files were reviewed to determine if the Company's reasons for closing the claims without payment were valid.

The claim files reviewed contained documentation that supported the Company's reasons for closing the claims without payment. All reasons for denial or closing the files without payment were deemed valid. Claims were denied on an average of six calendar days for the 3-year period. The review of closed without payment claims disclosed no violations of the provisions of NCGS 58-63-15.

### Subrogated Claims

One hundred subrogated claims were randomly selected for review from a population of 8,609. The claim files were reviewed to determine if the insured's deductible was properly reimbursed by the Company when subrogation was successful.

The insured's deductible was not reimbursed in a timely manner for one claim (1.0 percent error ratio). This matter could result in a violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice. The remaining reimbursements were deemed to be correct and were issued on an average of one calendar day from the date the Company collected the monies.

### Total Loss Settlement Claims

One hundred total loss settlement claims were randomly selected for review from a population of 30,798. The claim files were reviewed to determine if the settlements were equitable and timely.

The Company primarily used CCC Information Services, Inc. in addition to on-site independent adjusters to establish the actual cash value of totaled vehicles. All settlements were deemed equitable. The Company settled all claims in a timely manner. The payments were issued on a 3-year average of 22 calendar days. No violations of the provisions of NCGS 58-63-15(11)(h), 11 NCAC 4.0418, or 11 NCAC 4.0421 were noted during this review.

### Litigated Claims

*13 Fifty litigated claims were selected for review from a population of 2,221. The claim files were reviewed to determine if the Company had engaged in any unfair claims practices. The review of litigated claims disclosed no violations of the provisions of NCGS 58-63-15.

### SUMMARY

The Market Conduct examination revealed the following:

Report on Market Conduct Examination Nationwide Mutual..., 2014 WL 2803588...

DJA0482

1. Marketing

a. The Company was deemed to be in violation of the provisions of NCGS 58-63-55 as the homeowners consent to rate form was not filed with and approved by the Commissioner.

b. The Company was deemed to be in violation of the provisions of NCGS 58-39-55 as the homeowners AUD notice had not been filed with and approved by the Commissioner.

c. The Company was deemed to be in violation of the provisions of NCGS 58-36-30(a) and Rule A2 of the Homeowners Policy Program Manual as an installment waiver deviation for electronic funds transfer was not filed with and approved by the Commissioner.

d. The Company was deemed to be in violation of the provisions of NCGS 58-36-30(a), Rule A2 of the Homeowners Policy Program Manual, and Rule 22 of the Personal Auto Manual as an installment waiver deviation for account billed policies was not filed with and approved by the Commissioner.

e. The Company was reminded of the provisions of NCGS 58-33-56(b) as it failed to notify the Department of the termination within 30 days for 8.0 percent of the terminated producers reviewed.

f. The Company was reminded of the provisions of NCGS 58-33-56(d) as it failed to notify the producer within 15 days of notification to the Department for 6.0 percent of the terminated producers reviewed.

g. The Company was reminded of the provisions of 11 NCAC 19.0102(a), and 19.0106(a)(3) as the notification of termination letter was not included in the file for 4.0 percent of the terminated producers reviewed.

2. Underwriting Practices

a. The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as 6.0 percent of the active homeowners files reviewed did not contain proper file documentation.

b. The Company was reminded of the provisions of NCGS 58-36-30(a) as 4.0 percent of the active homeowners policies reviewed were rated incorrectly.

c. The Company was reminded of the provisions of NCGS 58-41-50(f) as 6.0 percent of the active businessowners policies reviewed were rated incorrectly.

3. Terminations

a. The Company was reminded of the provisions of NCGS 58-36-30(a) and Rule 10 of the North Carolina Personal Automobile Manual as 1.0 percent of the cancelled private passenger automobile policies reviewed were cancelled using an incorrect cancellation method.

b. The Company was reminded of the provisions of NCGS 58-36-85(b) as it did not send a written termination notice for 8.0 percent of the cancelled private passenger automobile files reviewed for which there was no written request from the insured to terminate the policy.

Report on Market Conduct Examination Nationwide Mutual..., 2014 WL 2803588...

DJA0483

**\*14**  c. The Company was deemed to be in violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as it was unable to provide documentation to support the North Carolina Notice of Termination form submitted to the Division of Motor Vehicles for 15.0 percent of the cancelled private passenger automobile files reviewed.

d. The Company was reminded of the policy provisions as 1.0 percent of the cancelled homeowners files reviewed were not cancelled on the date requested by the insured.

e. The Company was deemed to be in violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as it was unable to provide documentation to support cancellation for 15.0 percent of the cancelled homeowners files reviewed.

f. The Company was reminded of the provisions of Rule 11 of the Commercial Automobile Manual as 2.0 percent of the cancelled commercial automobile policies reviewed were cancelled pro-rata rather than .90 percent of the pro-rata unearned premium when the policy was cancelled per the insured's request.

g. The Company was reminded of the policy provisions as 1.0 percent of the cancelled commercial automobile files reviewed were cancelled on the renewal date in lieu of the date requested by the insured.

h. The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as it was unable to provide documentation to support the refund issued to the insured for 1.0 percent of the cancelled commercial automobile policies reviewed.

i. The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as it was unable to provide documentation to support cancellation for 5.0 percent of the cancelled commercial automobile files reviewed.

j. The Company was deemed to be in violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as it was unable to provide documentation to support the North Carolina Notice of Termination form sent to the Division of Motor Vehicles for 100 percent of the cancelled commercial automobile files reviewed.

k. The Company was reminded of the provisions of Rule 11 of the Businessowners Manual as 7.0 percent of the cancelled businessowners files reviewed were cancelled pro-rata rather than .90 percent of the pro-rata unearned premium when the policy was cancelled at the request of the insured.

l. The Company was reminded of the provisions of NCGS 58-41-15(b) as the notice of cancellation was not sent at least 15 days before the effective date of cancellation for 1.0 percent of the cancelled businessowners files reviewed.

m. The Company was deemed to be in violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as it was unable to provide documentation to support cancellation for 12.0 percent of the cancelled businessowners files reviewed.

n. The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as it was unable to provide proof of mailing for 1.0 percent of the cancelled businessowners files reviewed.

**\*15**  o. The Company was deemed to be in violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as it was unable to provide documentation to support nonrenewal for 34.4 percent of the nonrenewed private passenger automobile files reviewed.

p. The Company was reminded of the policy provisions as the notice of nonrenewal was not sent at least 30 days prior to the termination date for 5.0 percent of the nonrenewed homeowners files reviewed.

q. The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as it was unable to provide the nonrenewal notice for 1.0 percent of the nonrenewed homeowners files reviewed.

r. The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as it was unable to provide the nonrenewal notice for 4.0 percent of the nonrenewed commercial automobile files reviewed.

s. The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as it was unable to provide the proof of mailing for 2.0 percent of the nonrenewed commercial automobile files reviewed.

t. The Company was deemed to be in violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as it was unable to provide documentation to support the North Carolina Notice of Termination form was sent to the Division of Motor Vehicles for 100 percent of the nonrenewed commercial automobile files reviewed.

u. The Company was reminded of the provisions of NCGS 58-41-20(c) as the nonrenewal notice for 6.0 percent of the nonrenewed businessowner files reviewed was not sent at least 45 days prior to the nonrenewal date.

v. The Company was reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4) as it was unable to provide the nonrenewal notice for 2.0 percent of the nonrenewed businessowner files reviewed.

CONCLUSION

An examination has been conducted on the market conduct affairs of Nationwide Mutual Insurance Company for the period January 1, 2008, through December 31, 2011, with analyses of certain operations of the Company being conducted through March 26, 2014.

This examination was conducted in accordance with the North Carolina Department of Insurance and the National Association of Insurance Commissioners Market Regulation Handbook procedures, including analyses of Company operations in the areas of policyholder treatment, marketing, underwriting practices, terminations, and claims practices.

In addition to the undersigned, Gina Abate, North Carolina Market Conduct Examiner, and Bill George, CPCU, AIS, North Carolina Market Conduct Assistant Chief Property & Casualty Examiner, participated in this examination.

Respectfully submitted,
/s/ James P. McQuillan
James P. McQuillan, CPCU, AIT
Examiner-In-Charge
Market Regulation Division
State of North Carolina

I have reviewed this examination report and it meets the provisions for such reports prescribed by this Division and the North Carolina Department of Insurance.

**\*16** /s/ Tracy M. Biehn
Tracy M. Biehn, LPCS, MBA
Deputy Commissioner
Market Regulation Division
State of North Carolina

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TAB 45
Report on Market Conduct Examination Builders Mutual..., 2013 WL 6921724...

DJA0485

2013 WL 6921724

State of North Carolina

**\*1** Report on Market Conduct Examination

Builders Mutual Insurance Company

Builders Premier Insurance Company

Raleigh, North Carolina

October 3, 2013

MARKET CONDUCT REPORTS

North Carolina Department of Insurance

 Image 1 within document in PDF format.

Report

<u>TABLE OF CONTENTS</u>

SALUTATION
FOREWORD
SCOPE OF EXAMINATION
EXECUTIVE SUMMARY
COMPANY OVERVIEW
History and Profile
Company Operations and Management
Certificates of Authority
Disaster Recovery Procedures
POLICYHOLDER TREATMENT
Consumer Complaints
MARKETING
Policy Forms and Filings
Sales and Advertising
Social Media
Producer Licensing
Agency Management
UNDERWRITING PRACTICES
Overview
Commercial General Liability
Workers' Compensation
Commercial Automobile
TERMINATIONS
Overview
Commercial General Liability Cancellations
Workers' Compensation Cancellations

Report on Market Conduct Examination Builders Mutual..., 2013 WL 6921724...

DJA0486

Commercial Automobile Cancellations
Commercial General Liability Nonrenewals
Workers' Compensation Nonrenewals
Commercial Automobile Nonrenewals
CLAIMS PRACTICES
Overview
Paid Claims
Automobile Medical Payment Claims
First and Third Party Bodily Injury Claims
Closed Without Payment Claims
Subrogated Claims
Total Loss Settlement Claims
Litigated Claims
SUMMARY
TABLE OF STATUTES AND RULES
CONCLUSION

Raleigh, North Carolina

October 3, 2013

Honorable Wayne Goodwin

Commissioner of Insurance

Department of Insurance

State of North Carolina

Dobbs Building

430 N. Salisbury Street

Raleigh, North Carolina 27603

Honorable Commissioner:

Pursuant to your instructions and in accordance with the provisions of North Carolina General Statute (NCGS) 58-2-131 through 58-2-134, a general examination has been made of the market conduct activities of

**Builders Mutual Insurance Company (NAIC #10844)**

**\*2  Builders Premier Insurance Company (NAIC #13036)**

NAIC Exam Tracking System Exam Number: NC299-M28

Raleigh, North Carolina

hereinafter generally referred to as the Companies, located at the North Carolina Department of Insurance (Department) office located at 11 S. Boylan Avenue, Raleigh, North Carolina. A report thereon is respectfully submitted.

FOREWORD

This examination reflects the North Carolina insurance activities of Builders Mutual Insurance Company and Builders Premier Insurance Company. The examination is, in general, a report by exception. Therefore, much of the material reviewed will not be contained in this written report, as reference to any practices, procedures, or files that manifested no concerns were omitted.

SCOPE OF EXAMINATION

Report on Market Conduct Examination Builders Mutual..., 2013 WL 6921724...

DJA0487

This examination commenced on June 3, 2013, and covered the period of January 1, 2008, through December 31, 2012, with analyses of certain operations of the Companies being conducted through September 23, 2013. All comments made in this report reflect conditions observed during the period of the examination.

The examination was arranged and conducted by the Department. It was made in accordance with Market Regulation standards established by the Department and procedures established by the National Association of Insurance Commissioners (NAIC) and accordingly included tests of policyholder treatment, marketing, underwriting practices, terminations, and claims practices.

It is the Department's practice to cite companies in violation of a statute or rule when the results of a sample show errors/ noncompliance at or above the following levels: 0 percent for consumer complaints, sales and advertising, producers who were not appointed and/or licensed, and the use of forms and rates/rules that were neither filed with nor approved by the Department; 7 percent for claims; and 10 percent for all other areas reviewed. When errors are detected in a sample, but the error rate is below the applicable threshold for citing a violation, the Department issues a reminder to the company.

## EXECUTIVE SUMMARY

This market conduct examination revealed concerns with Company procedures and practices in the following areas:

*Consumer Complaints* – NAIC company code was not included on Company response.

*Appointment and Termination of Producers* - failure to perform background checks on appointed producers, notification of termination sent in excess of the 15-day requirement, and incomplete file documentation.

*Underwriting Practices* – Commercial General Liability: use of unfiled new business application and applications accepted from producers who were not appointed. Workers' Compensation: use of unfiled new business application, applications accepted from producers who were not appointed, files did not contain a copy of the schedule rating worksheet, and incorrect rate used to calculate the terrorism premium. Commercial Automobile: applications accepted from producers who were not appointed and rating errors.

**\*3** *Terminations* – Commercial General Liability cancellations: proof of mailing was not provided. Workers' Compensation cancellations: proof of mailing was not provided. Commercial Automobile cancellations: incomplete file documentation. Commercial General Liability nonrenewals: notice did not state the specific reason for termination. Workers' Compensation nonrenewals: notice did not state the specific reason for termination and proof of mailing was not provided.

*Claims* – Total Loss: incomplete file documentation.

Specific violations related to each area of concern are noted in the appropriate section of this report. All North Carolina General Statutes and rules of the North Carolina Administrative Code cited in this report may be viewed on the North Carolina Department of Insurance Web site www.ncdoi.com by clicking "INSURANCE DIVISIONS" then "Legislative Services".

This examination identified various non-compliant practices, some of which may extend to other jurisdictions. The Companies are directed to take immediate corrective action to demonstrate their ability and intention to conduct business in North Carolina according to its insurance laws and regulations. When applicable, corrective action for other jurisdictions should be addressed.

All unacceptable or non-compliant practices may not have been discovered or noted in this report. Failure to identify improper or non-compliant business practices in North Carolina or in other jurisdictions does not constitute acceptance of such

Report on Market Conduct Examination Builders Mutual..., 2013 WL 6921724...

DJA0488

practices. Examination report findings that do not reference specific insurance laws, regulations, or bulletins are presented to improve the Companies' practices and ensure consumer protection.

## COMPANY OVERVIEW

### History and Profile

The North Carolina Home Builders Self Insurers Fund, Inc. (NCHBSIF) was first formed as a business trust in 1984 to meet the workers' compensation insurance needs of the members of the North Carolina Home Builders Association. It was converted to a North Carolina nonprofit corporation on January 1, 1995. The NCHBSIF merged into a mutual insurance company effective January 1, 1998, and changed the name to Builders Mutual Insurance Company (BMIC). All assets and liabilities were transferred on that date.

The Company was incorporated on September 4, 1997. The conversion to a mutual insurance company was approved by the North Carolina Department of Insurance effective October 28, 1997. Effective January 1, 1998, the company was authorized to transact business in North Carolina for fire, extended property coverage, personal injury liability, property damage liability, workers' compensation, and inland marine coverage. Effective April 15, 1999, authorization was expanded to include 19 additional lines of business.

In June 2000, the Company submitted license applications to the insurance departments in South Carolina, Tennessee, and Virginia and began writing business in those states in 2001. More recently, the Company sought admission in the neighboring jurisdictions of Georgia, Maryland, the District of Columbia, and Mississippi. BMIC received an approved Georgia license on September 30, 2008, and began writing business there in January, 2009. Licenses were approved for the District of Columbia and Mississippi on December 1, 2008, and in Maryland on March 12, 2009. The Company sought admission in the state of Florida, and its Certificate of Authority in Florida was approved on July 27, 2011.

**\*4** In 2007, BMIC established Builders Premier Insurance Company (BPIC) which is positioned as a preferred risk company to work in unison with BMIC.

### Company Operations and Management

The Companies primarily write commercial lines insurance coverages. The Companies are licensed in the District of Columbia, Florida, Georgia, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, and Virginia.

Direct written premium for the Companies' 2012 countrywide property and casualty operations was $164,421,985. North Carolina's production for the same period was $94,311,866. Premiums written in North Carolina between 2008 and 2012 decreased approximately 5.9 percent. The charts below outline the Companies' mix of business for selected lines in 2012 and loss ratios in North Carolina for the examination period.

| Line of Business | Written Premium | Percentage |
|---|---|---|
| Workers' Compensation | $67,788,530 | 71.9 |
| Commercial Multiple Peril | $14,735,092 | 15.6 |
| Commercial Automobile | $ 5,994,591 | 6.3 |
| Products Liability | $ 3,637,451 | 3.9 |

Report on Market Conduct Examination Builders Mutual..., 2013 WL 6921724...

DJA0489

| | | | |
|---|---|---|---|
| Other | $ 2,156,202 | | 2.3 |
| **Total** | **$94,311,866** | | **100.0** |

| Year | Written Premium | Earned Premium | Incurred Losses | Loss Ratio |
|------|-----------------|----------------|-----------------|------------|
| 2008 | $100,221,242 | $101,798,270 | $ 29,895,173 | 29.4 |
| 2009 | $ 65,904,701 | $ 68,795,224 | $ 19,974,045 | 29.0 |
| 2010 | $ 68,990,397 | $ 67,400,029 | $ 34,292,881 | 50.9 |
| 2011 | $ 80,361,319 | $ 76,583,832 | $ 39,654,853 | 51.8 |
| 2012 | $ 94,311,866 | $ 91,162,099 | $ 43,422,590 | 47.6 |

---

## Certificates of Authority

The Certificates of Authority issued to the Companies were reviewed for the period under examination. These certificates were reviewed to determine compliance with the provisions of NCGS 58-7-15. The Companies' writings in North Carolina were deemed to be in compliance with the authority granted.

## Disaster Recovery Procedures

The Companies have developed a business recovery plan to ensure swift recovery of its business in the event of a disaster by utilizing widely available commercial products, which they would be able to purchase from any source and restore from backup tapes to get their systems back online. The Companies are also developing additional plans to expand their current disaster recovery capabilities to include hot-site functionality (recovery at an alternate location).

All media that contains policy information, images or data is stored on enterprise class SAS (Serial Attached Storage) hard drives, which may be stored on individual servers or SAN's. All paper records that are received in the mail or through various other transportation methods are scanned directly into their ImageRight system and stored on their SAN's for an indefinite amount of time. The procedures for backing up the windows servers are as followed:

  **\*5**  • File Servers – Selected files are backed up incrementally every night (Monday – Thursday) to disks on a backup server. On Friday evening, a full backup is performed for all of the same files as the incremental backup job. This backup is stored on the disks of the backup server and a duplicate job is run to copy the full back-up series onto LTO-4 tapes. These tapes are transported to a safety deposit box and kept for one month. The month end tapes are stored indefinitely off-site at the same safety deposit box location at the bank.

  • Database Servers – Full back ups to LTO-4 tapes of selected databases are taken Monday – Friday with the prior week's tapes stored in a fire proof safe in the server room. Month End is the actual last day of the month and those LTO-4 tapes are placed in the safety deposit box at the bank and kept there indefinitely.

  • ImageRight Device – The images directory is backed up incrementally every night Monday – Friday to the disks on the backup server. A month end job is run on the 21st of every month. That job backs up all files on the images drive to LTO-5 tapes which are stored in the Service Desk indefinitely.

## POLICYHOLDER TREATMENT

### Consumer Complaints

The Companies' complaint handling procedures were reviewed to determine compliance with applicable North Carolina statutes and rules.

The Companies' complaint register was reconciled with a listing provided by the Consumer Services Division of the Department. The Companies' complaint register was in compliance with provisions of Title 11 of the North Carolina Administrative Code, (NCAC), Chapter 19, Section 0103. All complaints from the Department's listing of 31 were selected for review. The distribution of complaints requiring a response to the Department is shown in the chart below.

| Type of Complaint | Total |
| --- | --- |
| Claims | 17 |
| Underwriting | 12 |
| Administrative | 2 |
| Total | 31 |

The Companies' response to each complaint was deemed to be appropriate to the circumstances. One complaint was responded to in excess of seven calendar days; however, an extension was requested and granted for the complaint. The Companies were deemed to be in violation of the provisions of 11 NCAC 4.0123 as four responses to Departmental inquiries (12.9 percent error ratio) did not contain the Company's NAIC company code.

The average service time to respond to a Departmental complaint was three calendar days. A chart of the Companies' response time follows:

| Service Days | Number of Files | Percentage of Total |
| --- | --- | --- |
| 1 - 7 | 30 | 96.8 |
| 8 - 14 | 1 | 3.2 |
| **Total** | **31** | **100.0** |

## MARKETING

### Policy Forms and Filings

**\*6** Policy forms and filings for the Companies were reviewed to determine compliance with appropriate North Carolina statutes and rules. The review was based on the following lines of business:

1. Commercial General Liability

2. Workers' Compensation

3. Commercial Automobile

Filings for the workers' compensation line of business were made by the North Carolina Rate Bureau on behalf of the Companies. Filings for the commercial automobile and commercial general liability lines of business were made by the Insurance Services Office on behalf of the Companies. The Companies filed deviations with the Department for these lines of business

## Sales and Advertising

The Companies' sales and advertising practices were reviewed to determine compliance with the provisions of NCGS 58-63-15.

The Companies utilize Independent producers, and as such do not review their agency advertising materials. The Companies have a Co-op program, where producers can receive funds to share qualifying advertising expenses which must be pre-approved. The form is maintained in the marketing department and shared with all territory managers. There are also pre-approved flyers and brochures on the Companies' website for producers to download and use for prospecting new clients.

The examiners reviewed advertisements, bulletins, and brochures that are provided for promotional use. The Companies also maintain an internet website: www.buildersmutual.com. The website provides background information relative to their operations, as well as products and services offered.

No unfair or deceptive trade practices were noted in this segment of the examination.

## Social Media

BMIC is actively involved on Facebook and YouTube and uses social media to promote local community involvement, safety resources, and free-value added resources like Builders University classes.

The Companies' Social Media Acceptable-Use Policy is designed to outline the guidelines BMIC will use to determine what appropriate online conduct is and to avoid the misuse of social media. Two employees in the marketing department monitor all activity on Facebook.

## Producer Licensing

The Companies' procedures for appointment and termination of their producers were reviewed to determine compliance with the appropriate North Carolina statutes and rules. Fifty appointed and 50 terminated producer files were randomly selected for review from populations of 3,266 and 1,054, respectively.

All appointment forms reviewed were submitted to the Department in accordance with the timetables stipulated under the provisions of NCGS 58-33-40. The Companies were deemed to be in violation of the provisions of 11 NCAC 6A.0412(2) as background checks were not performed on seven of the appointed producers reviewed (14.0 percent error ratio).

The Companies were deemed to be in violation of the provisions of NCGS 58-33-56(d) as notification of termination was sent in excess of the 15-day requirement for 31 of the terminated producers reviewed (62.0 percent error ratio). The Companies were deemed to be in violation of the provisions of 11 NCAC 19.0102(a) and 19.0106(a)(3)(g) as nine terminated producer files reviewed (18.0 percent error ratio) did not contain proper file documentation. The missing documentation consisted of:

Report on Market Conduct Examination Builders Mutual..., 2013 WL 6921724...

DJA0492

**\*7**  • Seven files did not contain a copy of the termination letter to the producer.

• Two files did not contain confirmation of the producer termination.

## Agency Management

The marketing effort in North Carolina is under the direction of the Director of Marketing and the AVP of Business Development, located at the home office in Raleigh, North Carolina. The Companies have 362 active agencies with approximately 2,239 producers appointed in North Carolina as well as three territory managers that work with the producers. The AVP of Business Development and the three territory managers are responsible for the activities of the agency force in North Carolina. The Agency Relations Department processes all appointments, terminations, and licensing information, and reports to the Director of Marketing.

## UNDERWRITING PRACTICES

## Overview

The Companies' marketing philosophy in North Carolina is directed to commercial lines of coverage. The Companies provided the examiners with listings of the following types of active policies for the period under examination:

1. Commercial General Liability

2. Workers' Compensation

3. Commercial Automobile

A random selection of 200 policies was made from a population of 12,695. Each policy was reviewed for adherence to underwriting guidelines, file documentation, and premium determination. Additionally, the policies were examined to determine compliance with the appropriate North Carolina statutes and rules, policy provisions, and the applicable policy manual rules.

## Commercial General Liability

The Companies provided a listing of 4,413 active commercial general liability policies issued during the period under examination. Fifty policies were randomly selected for review.

The Companies' commercial general liability coverages were written utilizing manual and deviated rates. Policies were written on an annual basis. Risk placement was determined by the Companies' underwriting guidelines and the underwriter. No discrepancies were noted in the Companies' use of their underwriting guidelines. All policy files contained sufficient documentation to support the Companies' classification of the risk.

The Companies were deemed to be in violation of the provisions of NCGS 58-41-50(a) and 11 NCAC 10.1201(c) as the new business application used for ten policies reviewed (20.0 percent error ratio) was not filed with and approved by the Department.

The Companies were deemed to be in violation of the provisions of NCGS 58-33-26 and 58-33-40 as the producer was not properly appointed by the Company for one of the active files reviewed (2.0 percent error ratio).

The Companies were reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(g) as two files reviewed (4.0 percent error ratio) did not contain a copy of the schedule rating worksheet.

Report on Market Conduct Examination Builders Mutual..., 2013 WL 6921724...

DJA0493

**\*8** The Companies were reminded of the provisions of NCGS 58-41-50(f) as three policies reviewed (6.0 percent error ratio) were rated with the incorrect loss cost multiplier.

The rating errors resulted in three premium undercharges to the insureds. The remaining premiums charged were deemed correct.

## Workers' Compensation

The Companies provided a listing of 7,459 active workers' compensation policies issued during the period under examination. One hundred policies were randomly selected for review.

The Companies' workers' compensation coverages were written utilizing manual and deviated rates. Policies were written on an annual basis. Risk placement was determined by the Companies' underwriting guidelines and the underwriter. No discrepancies were noted in the Companies' use of their underwriting guidelines. All policy files contained sufficient documentation to support the Companies' classification of the risk.

The Companies were deemed to be in violation of the provisions of NCGS 58-3-150 and 11 NCAC 10.1201(c) as the new business application used for 28 policies reviewed (28.0 percent error ratio) was not filed with and approved by the Department.

The Companies were deemed to be in violation of the provisions of NCGS 58-33-26 and 58-33-40 as the producers were not properly appointed by the Company for 11 of the active files reviewed (11.0 percent error ratio).

The Companies were deemed to be in violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(g) as 14 files reviewed (14.0 percent error ratio) did not contain a copy of the schedule rating worksheet.

The Companies were deemed to be in violation of the provisions of NCGS 58-36-100 as an incorrect rate was used to calculate the terrorism premium on 26 policies reviewed (26.0 percent error ratio).

The errors resulted in premium undercharges to the insureds. The remaining premiums charged were deemed correct.

## Commercial Automobile

The Companies provided a listing of 823 active commercial automobile policies issued during the period under examination. Fifty policies were randomly selected for review.

The Companies' commercial automobile coverages were written utilizing manual and deviated rates. Policies were written on an annual basis. Risk placement was determined by the Companies' underwriting guidelines and the underwriter. No discrepancies were noted in the Companies' use of their underwriting guidelines.

The Companies were deemed to be in violation of the provisions of NCGS 58-33-26 and 58-33-40 as the producers were not properly appointed by the Company for two of the active files reviewed (4.0 percent error ratio).

The Companies were reminded of the provisions of 11 NCAC 19.0102(a) and 19.0106(a)(3)(g) as they were unable to provide the individual producer information for one file reviewed (2.0 percent error ratio).

The Companies were deemed to be in violation of the provisions of NCGS 58-41-50(f) as six policies reviewed (12.0 percent error ratio) were rated incorrectly. The rating errors consisted of the following:

**\*9**  • Four policies were rated with an incorrect territory.

• Fleet rates were applied in error to one policy reviewed.

• An incorrect territory was used to rate Drive Other Car Coverage on one policy reviewed.

The rating errors resulted in two premium overcharges and four premium undercharges to the insureds. At the request of the examiners, refunds in the amount of $117.00 were issued by the Companies for the overcharges. The remaining premiums charged were deemed correct.

## TERMINATIONS

### Overview

The Companies' termination procedures were reviewed to determine compliance with the appropriate North Carolina statutes and rules, policy provisions, and the applicable policy manual rules. The review was based on the following lines of business:

1. Commercial General Liability

2. Workers' Compensation

3. Commercial Automobile

Special attention was placed on the validity and reason for termination, timeliness in issuance of the termination notice, policy refund (where applicable), and documentation of the policy file. A total of 9,364 policies were terminated during the period under examination. The examiners randomly selected 300 terminations for review.

### Commercial General Liability Cancellations

Fifty cancelled commercial general liability policies were randomly selected for review from a population of 3,923.

The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
|---|---|---|
| Nonpayment of premium | 36 | 72.0 |
| Insured's request | 10 | 20.0 |
| Underwriting reasons | 3 | 6.0 |
| Rewritten | 1 | 2.0 |
| **Total** | **50** | **100.0** |

Report on Market Conduct Examination Builders Mutual..., 2013 WL 6921724...

DJA0495

The Companies were not required to issue cancellation notices for 11 of the cancellations reviewed as these policies were cancelled at the request of the insured or coverage was rewritten. Cancellation notices for the remaining 39 policies stated the specific reason for cancellation.

The Companies were reminded of the provisions of NCGS 58-41-50(f) and Rule 11 of the Commercial Lines Manual as the return premium was calculated incorrectly for one policy reviewed (2.0 percent error ratio). The error resulted in an overstatement of refund to the insured. The remaining premium refunds were deemed correct. The Companies issued the refunds in a timely manner.

The final area of this review encompassed documentation of the policy file. The Companies were deemed to be in violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(g) as 12 files reviewed (24.0 percent error ratio) did not contain proof of mailing of the cancellation notice. The remaining files reviewed contained sufficient documentation to support the action taken by the Companies.

## Workers' Compensation Cancellations

**\*10**  Fifty cancelled workers' compensation policies were randomly selected for review from a population of 4,464.

The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
| --- | --- | --- |
| Nonpayment of premium | 35 | 70.0 |
| Insured's request | 10 | 20.0 |
| Underwriting reasons | 4 | 8.0 |
| Rewritten | 1 | 2.0 |
| **Total** | **50** | **100.0** |

The Companies were not required to issue cancellation notices for 11 of the cancellations reviewed as these policies were cancelled at the request of the insured or coverage was rewritten. Cancellation notices for the remaining 39 policies stated the specific reason for cancellation. The Companies were reminded of the provisions of NCGS 58-36-105(b) as the notice of cancellation was not sent at least 15 days prior to the termination date for three policies reviewed (6.0 percent error ratio).

The Companies were reminded of the provisions of NCGS 58-36-100 and Rule 3 of the National Council on Compensation Insurance Manual as the return premium was calculated incorrectly for one policy reviewed (2.0 percent error ratio). The error resulted in overstatement of refund to the insured. The remaining premium refunds were deemed correct. The Companies issued the refunds in a timely manner.

The final area of this review encompassed documentation of the policy file. The Companies were deemed to be in violation of the provisions of NCGS 58-36-105(b) as eight files reviewed (16.0 percent error ratio) did not contain proof of mailing of the cancellation notice. The remaining files reviewed contained sufficient documentation to support the action taken by the Companies.

Report on Market Conduct Examination Builders Mutual..., 2013 WL 6921724...

DJA0496

## Commercial Automobile Cancellations

Fifty cancelled commercial automobile policies were randomly selected for review from a population of 637.

The reason for cancellation was deemed valid for all policies reviewed. The review revealed the following reasons for cancellation:

| Reason for Cancellation | Number of Policies | Percentage |
| --- | --- | --- |
| Nonpayment of premium | 29 | 58.0 |
| Insured's request | 15 | 30.0 |
| Underwriting Reasons | 5 | 10.0 |
| Rewritten | 1 | 2.0 |
| **Total** | 50 | **100.0** |

The Companies were not required to issue cancellation notices for 16 of the cancellations reviewed as these policies were cancelled at the request of the insured or coverage was rewritten. The Companies were reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(g) as two files reviewed (4.0 percent error ratio) did not contain a copy of the cancellation notice. Cancellation notices for the remaining 32 policies stated the specific reason for cancellation.

The Companies were reminded of the provisions of NCGS 58-41-50(f) and Rule 11 of the Commercial Automobile Manual as the return premium was calculated incorrectly for two policies reviewed (4.0 percent error ratio). The errors resulted in overstatement of refund to the insureds. The remaining premium refunds were deemed correct. The Companies issued the refunds in a timely manner.

*11 The Companies were reminded of the provisions of NCGS 20-309.2 as the North Carolina Notice of Termination form (FS-4) was not submitted to the Division of Motor Vehicles (DMV) when liability coverage was cancelled on four policies reviewed (8.0 percent error ratio). The Companies were reminded of the provisions of NCGS 20-309.2(b) as the FS-4 was submitted to the DMV in excess of the required 20 days when liability coverage was cancelled on one file reviewed (2.0 percent error ratio).

The final area of this review encompassed documentation of the policy file. The Companies were deemed to be in violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(g) as 16 files reviewed (32.0 percent error ratio) did not contain proof of mailing of the cancellation notice. The remaining files reviewed contained sufficient documentation to support the action taken by the Companies.

## Commercial General Liability Nonrenewals

Fifty nonrenewed commercial general liability policies were randomly selected for review from a population of 77.

The reason for nonrenewal was deemed valid for all policies reviewed. The review revealed the following reasons for nonrenewal:

| Reason for Nonrenewal | Number of Policies | Percentage |
| --- | --- | --- |

| | | |
|---|---|---|
| Underwriting reasons | 44 | 88.0 |
| Agent no longer represents company | 6 | 12.0 |
| **Total** | **50** | **100.0** |

The Companies were deemed to be in violation of the provisions of NCGS 58-41-20(e) as the notice of nonrenewal did not state the specific reason for termination for five policies reviewed (10.0 percent error ratio). The Companies were reminded of the provisions of NCGS 58-41-20(b) as the notice of nonrenewal was not sent at least 45 days prior to the termination date for two policies reviewed (4.0 percent error ratio).

The final area of this review encompassed documentation of the policy file. The Companies were reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(g) as four files reviewed (8.0 percent error ratio) did not contain proof of mailing of the nonrenewal notice. The remaining files reviewed contained sufficient documentation to support the action taken by the Companies.

### Workers' Compensation Nonrenewals

Fifty nonrenewed workers' compensation policies were randomly selected for review from a population of 171.

The reason for nonrenewal was deemed valid for all policies reviewed. The review revealed the following reasons for nonrenewal:

| **Reason for Nonrenewal** | **Number of Policies** | **Percentage** |
|---|---|---|
| Underwriting reasons | 45 | 90.0 |
| Producer no longer represents company | 5 | 10.0 |
| **Total** | **50** | **100.0** |

The Companies were deemed to be in violation of the provisions of NCGS 58-36-110(e) as the notice of nonrenewal did not state the specific reason for termination for six policies reviewed (12.0 percent error ratio). The Companies were reminded of the provisions of NCGS 58-36-110(b) as the notice of nonrenewal was not sent at least 45 days prior to the termination date for two policies reviewed (4.0 percent error ratio).

**\*12** The final area of this review encompassed documentation of the policy file. The Companies were deemed to be in violation of the provisions of NCGS 58-36-110(g) as 17 files reviewed (34.0 percent error ratio) did not contain proof of mailing of the nonrenewal notice.

The remaining files reviewed contained sufficient documentation to support the action taken by the Companies.

### Commercial Automobile Nonrenewals

Fifty nonrenewed commercial automobile policies were randomly selected for review from a population of 92.

Report on Market Conduct Examination Builders Mutual..., 2013 WL 6921724...

DJA0498

The Companies were reminded of the provisions of NCGS 58-41-20(e) as the notice of nonrenewal did not state the specific reason for termination for three policies reviewed (6.0 percent error ratio). The review revealed the following reasons for nonrenewal:

| Reason for Nonrenewal | Number of Policies | Percentage |
|---|---|---|
| Underwriting reasons | 47 | 94.0 |
| No reason stated | 3 | 6.0 |
| **Total** | **50** | **100.0** |

The nonrenewal notices for the remaining 47 policies reviewed stated the specific reason for nonrenewal. The Companies were reminded of the provisions of NCGS 58-41-20(b) as the notice of nonrenewal was not sent at least 45 days prior to the termination date for four polices reviewed (8.0 percent error ratio).

The Companies were reminded of the provisions of NCGS 20-309.2 as the FS-4 was not submitted to the DMV when liability coverage was nonrenewed for two policies reviewed (4.0 percent error ratio).

The final area of this review encompassed documentation of the policy file. The Companies were reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(g) as four files reviewed (8.0 percent error ratio) did not contain proof of mailing of the nonrenewal notice. The remaining files reviewed contained sufficient documentation to support the action taken by the Companies.

## CLAIMS PRACTICES

### Overview

The Companies' claims practices were reviewed to determine compliance with the appropriate North Carolina statutes and rules and policy provisions. The review encompassed paid, automobile medical payment, first and third party bodily injury, closed without payment, subrogated, total loss settlement, and litigated claims.

Claims are handled by a Third Party Administrator, Aegis Administrative Services. Aegis employees are located in the Companies' home office in Raleigh, North Carolina and are under the direction of the Claim Manager. The staff is comprised of the Claim Manager, two Supervisors, eight Adjusters, and two Clerical Personnel. Company adjusters provide the claim service with some assistance, at times, from independent adjusters. Independent adjusters have no check or draft authority. The Companies' agency force does not adjust any claims and does not have claims draft authority. With regard to total losses, a salvage log is maintained and managed by the claim supervisor.

 **\*13** Three hundred thirty-nine claims were randomly selected for review from a population of 2,208.

### Paid Claims

The examiners randomly selected 100 of the 1,718 first party automobile physical damage and third party property damage claims paid during the period under examination. The claim files were reviewed for timeliness of payment, supporting documentation, and accuracy of payment.

Report on Market Conduct Examination Builders Mutual..., 2013 WL 6921724...

DJA0499

The following types of claims were reviewed and the average payment time is noted in calendar days:

| Type of Claim | Payment Time |
| --- | --- |
| Automobile physical damage | 11.5 |
| Third party property damage | 14.0 |

All payments issued by the Companies were deemed to be accurate. Deductibles were correctly applied and depreciation taken was reasonable.

All claim files reviewed contained documentation to support the Companies' payments. The documentation consisted of appraisals, estimates, repair bills, or inventory listings. The review of paid claims disclosed no violations of the provisions of NCGS 58-63-15(11).

## Automobile Medical Payment Claims

All medical payment claims were selected for review from a population of 13. The claim files were reviewed to determine if the Companies had engaged in any unfair claims practices. The review of the medical payment claims disclosed no violations of the provisions of NCGS 58-63-15(11).

## First and Third Party Bodily Injury Claims

Fifty first and third party bodily injury claims were randomly selected for review from a population of 127. The claim files were reviewed to determine whether the Companies had engaged in any unfair claims practices. The review of the first and third party bodily injury claims disclosed no violations of the provisions of NCGS 58-63-15(11).

## Closed Without Payment Claims

Fifty closed without payment claims were randomly selected for review from a population of 140. The claim files were reviewed to determine if the Companies' reasons for closing the claims without payment were valid.

The claim files reviewed contained documentation that supported the Companies' reasons for closing the claims without payment. All reasons for denial or closing the files without payment were deemed valid. The Companies were reminded of the provisions of 11 NCAC 19.0102(a), 19.0105, and 19.0106(a)(5)(g) as the file documentation was incomplete for one file reviewed (2.0 percent error ratio).

Claims were denied on an average of nine calendar days for the 5-year period. The review of closed without payment claims disclosed no violations of the provisions of NCGS 5863-15(11).

## Subrogated Claims

All subrogated claims were selected for review from a population of 26. The claim files were reviewed to determine if the insured's deductible was properly reimbursed by the Companies when subrogation was successful.

Report on Market Conduct Examination Builders Mutual..., 2013 WL 6921724...

DJA0500

**\*14**  The insured's deductible was not reimbursed in a timely manner for one claim reviewed (3.8 percent error ratio). The insured's deductible was not reimbursed for one claim (3.8 percent error ratio) reviewed. These matters could result in a violation of the provisions of NCGS 58-63-15(11) if the occurrence is of such frequency as to be considered a general business practice. At the request of the examiners, the Companies issued a check in the amount of $500.00 to the insured for the deductible. The remaining reimbursements were deemed to be correct and were issued on a 5-year average of five calendar days from the date the Companies collected monies.

## Total Loss Settlement Claims

Fifty total loss settlement claims were randomly selected for review from a population of 57. The claim files were reviewed to determine if the settlements were equitable and timely.

The Companies primarily used CCC Information Services, Inc. in addition to on-site independent adjusters to establish the actual cash value of totaled vehicles. All settlements were deemed equitable. The Companies were deemed to be in violation of the provisions of 11 NCAC 19.0102(a), 19.0105, and 19.0106(a)(5)(g) as the file documentation was incomplete for six files reviewed (12.0 percent error ratio).

The Companies settled all claims in a timely manner. The payments were issued on a 5-year average of 19 calendar days. No violations of the provisions of NCGS 58-63-15(11), 11 NCAC 4.0418 or 4.0421 were noted during this review.

## Litigated Claims

Fifty litigated claims were randomly selected for review from a population of 127. The claim files were reviewed to determine if the Companies had engaged in any unfair claims practices.

The Companies were reminded of the provisions of 11 NCAC 19.0102(a), 19.0105, and 19.0106(a)(5)(g) as the file documentation was incomplete for two files reviewed (4.0 percent error ratio).

The review of litigated claims disclosed no violations of the provisions of NCGS 58-63-15(11).

## SUMMARY

The Market Conduct examination revealed the following:

1. Policyholder Treatment

a. The Companies were deemed to be in violation of the provisions of 11 NCAC 4.0123 as 12.9 percent of the responses to a Departmental inquiry did not include their NAIC company code.

2. Marketing

a. The Companies were deemed to be in violation of the provisions of 11 NCAC 6A.0412(2) as background checks were not performed on 14.0 percent of the appointed producers reviewed.

b. The Companies were deemed to be in violation of the provisions of NCGS 58-33-56(d) as notification of termination was sent in excess of the 15-day requirement for 62.0 percent of the terminated producers reviewed.

Report on Market Conduct Examination Builders Mutual..., 2013 WL 6921724...

DJA0501

c. The Companies were deemed to be in violation of the provisions of 11 NCAC 19.0102(a) and 19.0106(a)(3)(g) as 18.0 percent of the terminated producer files reviewed did not contain proper file documentation.

3. Underwriting Practices

   **\*15** a. The Companies were deemed to be in violation of the provisions of NCGS 58-41-50(a) and 11 NCAC 10.1201(c) as the new business application used for 20.0 percent of the active commercial general liability policies reviewed had not been filed with and approved by the Department.

   b. The Companies were deemed to be in violation of the provisions of NCGS 58-33-26 and 58-33-40 as the producer was not properly appointed by the Company for 2.0 percent of the active commercial general liability files reviewed.

   c. The Companies were reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(g) as 4.0 percent of the active commercial general liability files reviewed did not contain a copy of the schedule rating worksheet.

   d. The Companies were reminded of the provisions of NCGS 58-41-50(f) as 6.0 percent of the active commercial general liability policies reviewed were rated incorrectly.

   e. The Companies were deemed to be in violation of the provisions of NCGS 58-3-150 and 11 NCAC 10.1201(c) as the new business application used for 28.0 percent of the active workers' compensation policies reviewed had not been filed with and approved by the Department.

   f. The Companies were deemed to be in violation of the provisions of NCGS 58-33-26 and 58-33-40 as the producers were not properly appointed by the Company for 11.0 percent of the active workers' compensation files reviewed.

   g. The Companies were deemed to be in violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(g) as 14.0 percent of the active workers' compensation files reviewed did not contain a copy of the schedule rating worksheet.

   h. The Companies were deemed to be in violation of the provisions of NCGS 58-36-100 as an incorrect rate was used to calculate the terrorism premium on 26.0 percent of the active workers' compensation policies reviewed.

   i. The Companies were deemed to be in violation of the provisions of NCGS 58-33-26 and 58-33-40 as the producers were not properly appointed by the Company for 4.0 percent of the active commercial automobile files reviewed.

   j. The Companies were reminded of the provisions of 11 NCAC 19.0102(a) and 19.0106(a)(3)(g) as they were unable to provide the individual producer information for 2.0 percent of the active commercial automobile files reviewed.

   k. The Companies were deemed to be in violation of the provisions of NCGS 58-41-50(f) as 12.0 percent of the active commercial automobile policies reviewed were rated incorrectly.

4. Terminations

   a. The Companies were reminded of the provisions of NCGS 58-41-50(f) and Rule 11 of the Commercial Lines Manual as the return premium was calculated incorrectly for 2.0 percent of the cancelled commercial general liability policies reviewed.

   b. The Companies were deemed to be in violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(g) as 24.0 percent of the cancelled commercial general liability files reviewed did not contain proof of mailing of the cancellation notice.

Report on Market Conduct Examination Builders Mutual..., 2013 WL 6921724...

DJA0502

**\*16** c. The Companies were reminded of the provisions of NCGS 58-36-105(b) as the notice of cancellation was not sent at least 15 days prior to the termination date for 6.0 percent of the cancelled workers' compensation policies reviewed.

d. The Companies were reminded of the provisions of NCGS 58-36-100 and Rule 3 of the National Council on Compensation Insurance Manual as the return premium was calculated incorrectly for 2.0 percent of the cancelled workers' compensation policies reviewed.

e. The Companies were deemed to be in violation of the provisions of NCGS 58-36-105(b) as 16.0 percent of the cancelled workers' compensation files reviewed did not contain proof of mailing of the cancellation notice.

f. The Companies were reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(g) as 4.0 percent of the cancelled commercial automobile files reviewed did not contain a copy of the cancellation notice.

g. The Companies were reminded of the provisions of NCGS 58-41-50(f) and Rule 11 of the Commercial Automobile Manual as the return premium was calculated incorrectly for 4.0 percent of the cancelled commercial automobile policies reviewed.

h. The Companies were reminded of the provisions of NCGS 20-309.2 as the North Carolina Notice of Termination form was not submitted to the North Carolina Division of Motor Vehicles when liability coverage was cancelled for 8.0 percent of the cancelled commercial automobile files reviewed.

i. The Companies were reminded of the provisions of NCGS 20-309.2(b) as the North Carolina Notice of Termination form was submitted to the North Carolina Division of Motor Vehicles in excess of the required 20 days when liability coverage was cancelled for 2.0 percent of the cancelled commercial automobile policies reviewed.

j. The Companies were deemed to be in violation of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(g) as 32.0 percent of the cancelled commercial automobile files reviewed did not contain proof of mailing of the cancellation notice.

k. The Companies were deemed to be in violation of the provisions of NCGS 58-41-20(e) as the notice of nonrenewal did not state the specific reason for termination for 10.0 percent of the nonrenewed commercial general liability policies reviewed.

l. The Companies were reminded of the provisions of NCGS 58-41-20(b) as the notice of nonrenewal was not sent at least 45 days prior to the termination date for 4.0 percent of the nonrenewed commercial general liability policies reviewed.

m. The Companies were reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(g) as 8.0 percent of the nonrenewed commercial general liability files reviewed did not contain proof of mailing of the nonrenewal notice.

n. The Companies were deemed to be in violation of the provisions of NCGS 58-36-110(e) as the notice of nonrenewal did not state the specific reason for termination for 12.0 percent of the nonrenewed workers' compensation policies reviewed.

**\*17** o. The Companies were reminded of the provisions of NCGS 58-36-110(b) as the notice of nonrenewal was not sent at least 45 days prior to the termination date for 4.0 percent of the nonrenewed workers' compensation policies reviewed.

p. The Companies were deemed to be in violation of the provisions of NCGS 58-36-110(g) as 34.0 percent of the nonrenewed workers' compensation files reviewed did not contain proof of mailing of the nonrenewal notice.

q. The Companies were reminded of the provisions of NCGS 58-41-20(e) as the notice of nonrenewal did not state the specific reason for termination for 6.0 percent of the nonrenewed commercial automobile files reviewed.

r. The Companies were reminded of the provisions of NCGS 58-41-20(b) as the notice of nonrenewal was not sent at least 45 days prior to the termination date for 8.0 percent of the nonrenewed commercial automobile policies reviewed.

s. The Companies were reminded of the provisions of NCGS 20-309.2 as the North Carolina Notice of Termination form was not submitted to the North Carolina Division of Motor Vehicles when liability coverage was terminated for 4.0 percent of the nonrenewed commercial automobile policies reviewed.

t. The Companies were reminded of the provisions of 11 NCAC 19.0102(a), 19.0104, and 19.0106(a)(4)(g) as 8.0 percent of the nonrenewed commercial automobile files reviewed did not contain proof of mailing of the nonrenewal notice.

5. Claims Practices

a. The Companies were reminded of the provisions of 11 NCAC 19.0102(a), 19.0105, and 19.0106(a)(5)(g) as the file documentation was incomplete for 2.0 percent of the closed without payment claim files reviewed.

b. The Companies were deemed to be in violation of the provisions of 11 NCAC 19.0102(a), 19.0105, and 19.0106(a)(5)(g) as the file documentation was incomplete for 12.0 percent of the total loss claim files reviewed.

c. The Companies were reminded of the provisions of 11 NCAC 19.0102(a), 19.0105, and 19.0106(a)(5)(g) as the file documentation was incomplete for 4.0 percent of the litigated claim files reviewed.

## TABLE OF STATUTES AND RULES

| Statute/Rule | Title |
| --- | --- |
| NCGS 58-2-131 | Examinations to be made; authority, scope, scheduling, and conduct of examinations. |
| NCGS 58-2-132 | Examination reports. |
| NCGS 58-2-133 | Conflict of interest; cost of examinations; immunity from liability. |
| NCGS 58-2-134 | Cost of certain examinations. |
| NCGS 58-3-150 | Forms to be approved by the Commissioner. |
| NCGS 58-7-15 | Kinds of insurance authorized. |
| NCGS 58-33-26 | General license requirements. |
| NCGS 58-33-40 | Appointment of producers. |
| NCGS 58-33-56 | Notification to Commissioner of termination. |
| NCGS 58-36-100 | Prospective loss costs filings and final rate filings for workers' compensation and employers' liability insurance. |
| NCGS 58-36-105 | Certain workers' compensation insurance policy cancellations prohibited. |
| NCGS 58-36-110 | Notice of nonrenewal, premium rate increase, or change in workers' compensation insurance coverage required. |

Report on Market Conduct Examination Builders Mutual..., 2013 WL 6921724...

DJA0504

| | |
|---|---|
| NCGS 58-41-20 | Notice of nonrenewal, premium rate increase, or change in coverage required. |
| NCGS 58-41-50 | Policy form and rate filings; punitive damages; data required to support filings. |
| NCGS 58-63-15 | Unfair methods of competition and unfair or deceptive acts or practices defined. |
| NCGS 20-309.2 | Insurer shall notify Division of actions on insurance policies. |
| 11 NCAC 4.0123 | Use of Specific Company Name in Responses. |
| 11 NCAC 4.0418 | Total Losses on Motor Vehicles. |
| 11 NCAC 4.0421 | Handling of Loss and Claim Payments. |
| 11 NCAC 6A.0412 | Appointment of Agent: Responsibility of Company. |
| 11 NCAC 10.1201 | General Requirements. |
| 11 NCAC 19.0102 | Maintenance of Records. |
| 11 NCAC 19.0103 | Complaint Records. |
| 11 NCAC 19.0104 | Policy Records. |
| 11 NCAC 19.0105 | Claim Records. |
| 11 NCAC 19.0106 | Records Required for Examination. |

CONCLUSION

**\*18**  An examination has been conducted on the market conduct affairs of Builders Mutual Insurance Company and Builders Premier Insurance Company for the period January 1, 2008, through December 31, 2012, with analyses of certain operations of the Companies being conducted through September 23, 2013.

This examination was conducted in accordance with the North Carolina Department of Insurance and the National Association of Insurance Commissioners Market Regulation Handbook procedures, including analyses of Company operations in the areas of policyholder treatment, marketing, underwriting practices, terminations, and claims practices.

In addition to the undersigned, Kelvin A. Owens and Sharon O'Quinn, North Carolina Market Conduct Examiners, participated in this examination.

Respectfully submitted,
/s/ Norma M. Rafter
Norma M. Rafter, CPCU
Examiner-In-Charge
Market Regulation Division
State of North Carolina
I have reviewed this examination report and it meets the provisions for such reports prescribed by this Division and the North Carolina Department of Insurance.

/s/ Tracy M. Biehn
Tracy M. Biehn, LPCS, MBA
Deputy Commissioner
Market Regulation Division
State of North Carolina

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

## *CERTIFICATION OF AUTHENTICITY*

I, Bill George, do hereby certify that the attached pages from the Market Regulations Division's files concerning:

A. *Report On Market Conduct Examination State Farm Mutual Automobile Insurance Company State Farm Fire and Casualty Company Bloomington, Illinois*, May 2, 2014

B. *Report On Market Conduct Examination Nationwide Mutual Insurance Company Columbus, Ohio*, April 2, 2014;

C. *Report On Market Conduct Examination Builders Mutual Insurance Company Builders Premier Insurance Company Raleigh, North Carolina*, October 3, 2013;

D. *Report On Market Conduct Examination Peak Property and Casualty Insurance Corporation Stevens Point, Wisconsin*, September 13, 2013;

E. *Report On Market Conduct Examination the Members Insurance Company Charlotte, North Carolina*, January 28, 2013;

F. *Report On Market Conduct Examination of the USAA Casualty Insurance Company San Antonio, Texas*, January 14, 2011;

G. *Report On Market Conduct Examination of the Allstate Property and Casualty Insurance Company Northbrook, Illinois*, July 25, 2011;

H. *Report On Market Conduct Examination of the Titan Indemnity Company San Antonio, Texas*, April 14, 2011;

I. *Report On Market Conduct Examination of the Victoria Fire & Casualty Company Mayfield Heights, Ohio*, April 14, 2011;

J. *Report On Market Conduct Examination of the Discovery Insurance Company Kinston, North Carolina*, February 19, 2010;

K. *Report On Market Conduct Examination of the Geico Indemnity Company Government Employees Insurance Company Chevy Chase, Maryland*, January 26, 2010;

L. *Report On Market Conduct Examination of the Selective Insurance Company of the Southeast Branchville, New Jersey*, February 14, 2008,

are true and accurate copies of records maintained by the North Carolina Department of Insurance in the course of its official regulatory activities.

Bill George, CPCU, AIS, MCM
Assistant Chief Examiner
North Carolina Department of Insurance

STATE OF NORTH CAROLINA

COUNTY OF WAKE

Sworn to and subscribed before me this the 27th day of July, 2021.

Notary Public Ondiade B. Muhau

My commission expires: 9/28/22 .

TAB 47                                                        DJA0508

Page 1

1                UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2             Civil Action No. 1:19-cv-00294-CCE-JLW

3

   ELIZABETH V. FORTSON,                    )
4                                           )
                 Plaintiff,                 )
5                                           )
   vs.                                      )
6                                           )
   GARRISON PROPERTY AND CASUALTY           )
7   INSURANCE COMPANY,                      )
                                            )
8                Defendant.                 )
                                            )
9

10

11

12            Videotaped Remote Deposition of
13               DR. LANCE DARSHANA KAUFMAN
14                 (Taken by Defendant)
15                  Corvallis, Oregon
16               Tuesday, August 24, 2021
17

18

19

20

21

22

23

24              Reported in Stenotype by
              Lauren M. McIntee, RPR, CRR
25      Transcript produced by computer-aided transcription

DJA0509

1          APPEARANCES
2     ON BEHALF OF THE PLAINTIFF:
3               Tory Beardsley, Esquire (via Zoom)
                Hagens Berman Sobol Shapiro, LLP
4               11 West Jefferson Street, Suite 1000
                Phoenix, Arizona 85003
5               (602) 840-5900
                Toryb@hbsslaw.com
6
7     ON BEHALF OF THE DEFENDANT:
8               Rodger L. Eckelberry, Esquire (via Zoom)
                Mathew Drocton, Esquire (via Zoom)
9               Baker Hostetler, LLP
                200 Civic Center Drive, Suite 2200
10              Columbus, Ohio 43215
                (614) 462-5189
11              Reckelberry@bakerlaw.com
                Mdrocton@bakerlaw.com
12
13    ALSO PRESENT:
14    Michael Kirby, Videographer (via Zoom)
15
16
17
18
19
20          VIDEOTAPED REMOTE DEPOSITION OF DR. LANCE DARSHANA
21    KAUFMAN, a witness called on behalf of Defendant, before
22    Lauren M. McIntee, Registered Professional Reporter,
23    Certified Realtime Reporter, and Notary Public, in and
24    for the State of North Carolina, in Corvallis, Oregon,
25    on Tuesday, August 24, 2021, commencing at 7:33 a.m. PST

1                   INDEX OF EXAMINATIONS
2   By Mr. Eckelberry............................... Page 4
3
4

                    INDEX OF EXHIBITS
5
6   NUMBER        EXHIBIT                            MARKED
7   Exhibit 1   Dr. Kaufman's Report and               35
                Curriculum Vitae
8
    Exhibit 2   Dr. Kaufman's LinkedIn Profile         36
9
    Exhibit 3   North Carolina Total Loss             124
10              Regulation
11  Exhibit 4   Report Summary, Reference             124
                Number 88957510
12              (Garrison P&C 00035559 to 35575)
                (CTRL 8379)
13
    Exhibit 5   Report Summary, Reference             124
14              Number 82275931
                (CCCIS027199 to 027216)
15              (CCCIS027199)
16  Exhibit 6   Sample Claim Activity Log             158
                (Garrison P&C 00039938 to 39958)
17
    Exhibit 7   Overton Body Shop/Sanford Estimate    172
18              of Record
                (Garrison P&C 00039898 to 39904)
19              (CTRL 8966)
20  Exhibit 8   Umpire Report                         172
21  Exhibit 9   Report Summary, Reference             173
                Number 82424586
22              (Garrison P&C 00000206 to 226)
                (Fortson_CCC_Report)
23
24
25

1      Q.    The insurance industry.

2      A.    For which -- no.

3      Q.    Are you familiar with any North Carolina

4   statutes or regulations that set forth any degree of

5   itemization that is required?

6          MS. BEARDSLEY:  Objection, scope.

7      A.    The -- the rules that I reviewed and that I

8   mentioned earlier do have a component of itemization in

9   them, but it doesn't provide detail or specificity.

10  BY MR. ECKELBERRY:

11     Q.    So you are not aware of any statute or

12  regulation that provides a level of detail or

13  specificity required for itemization in total loss

14  valuations, correct?

15          MS. BEARDSLEY:  Same objection.

16     A.    Can you say that question again?

17          MR. ECKELBERRY:  Madam Court Reporter, would

18      you read it back, please?

19          (Whereupon, the following question was read:

20          So you are not aware of any statute or

21      regulation that provides a level of detail or

22      specificity required for itemization in total loss

23      valuations, correct?)

24     A.    That's correct.

25  BY MR. ECKELBERRY:

1    into account when determining value?

2         A.    Well, as I mentioned before, I would defer

3    legal conclusions about statutes to attorneys or other

4    statute experts.

5         Q.    Okay.

6         A.    This specific statute that you're referring

7    to became effective October 1, 2020, which is pretty

8    short section of the time period that we're looking at.

9         Q.    Okay.

10        A.    The Item B states, "If the insurance company

11   and the claimants are unable to make an agreement," then

12   there's a process that follows.  And that suggests to me

13   that D is not applicable to cases where the insurance

14   company and the claimant do reach an agreement as to the

15   cash value.

16        Q.    Okay.

17        A.    And so that kind of renders the Subsection D

18   irrelevant to -- to the claims that were reviewed.

19        Q.    Okay.  So under Subsection D, as you say, if

20   the insurance company and the claimant are able to reach

21   an agreement, then there's no particular valuation

22   method required, right?

23             MS. BEARDSLEY:  Foundation, scope.

24        A.    Well, as I said, I'm not an -- not an expert.

25   And I would expect that there are methodologies that

TAB 48                                          DJA0513

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2        FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 3          Civil Action No. 1:19-cv-00294-CCE-JLW
 4
    ELIZABETH V. FORTSON,          )
 5                                 )
                                   )
 6  Plaintiff,                     )
                                   )
 7                                 )
    v.                             )
 8                                 )
    GARRISON PROPERTY AND          )
 9  CASUALTY INSURANCE COMPANY,    )
                                   )
10  Defendant.                     )
11
12
13       Zoom Video Deposition of WILLIAM BERGLUND
14             (Taken by the Defendant)
15              Oak Brook, Illinois
16           Thursday, September 2, 2021
17
18
19
20
21  Reported by:    Marisa Munoz-Vourakis -
                    RMR, CRR and Notary Public
22
23
24
25
```

1    APPEARANCE OF COUNSEL BY ZOOM:

2    For the Plaintiff:

3              JOHN M. DeSTEFANO, ESQ.

4              Hagens Berman Sobol Shapiro LLP

5              11 West Jefferson Street, Suite 1000

6              Phoenix, AZ 85003

7              602-840-5900

8              johnd@hbsslaw.com

9

10   For the Defendant:

11             KEVIN P. ZIMMERMAN, ESQ.

12             Baker & Hostetler LLP

13             200 Civic Center Drive, Suite 2200

14             Columbus, OH 43215

15             kzimmerman@bakerlaw.com

16

17   Also Present:  MICHAEL KIRBY, Videographer

18                          o0o

19

20             Zoom Video Deposition of WILLIAM BERGLUND,

21   taken by the Defendant, at Oak Brook, Illinois, on the 2nd

22   day of September, 2021 at 10:07 a.m. (Eastern Standard

23   Time), before Marisa Munoz-Vourakis, Registered Merit

24   Reporter, Certified Realtime Reporter and Notary Public.

25

```
 1                  I N D E X
 2  Examination of:                          Page
 3     WILLIAM BERGLUND
 4          EXAMINATION BY MR. ZIMMERMAN . . . . . . . 4
 5          EXAMINATION BY MR. DESTEFANO . . . . . . 302
 6          FURTHER EXAMINATION BY MR. . . . . . . . 311
 7          ZIMMERMAN
 8                  DEPOSITION EXHIBITS
 9  EXHIBIT NUMBER          DESCRIPTION           PAGE
10  Exhibit 1   Expert Report                     12
11  Exhibit 2   Bates numbers DJA277 to 278       78
12  Exhibit 3   Ms. Fortson's CCC report          99
13  Exhibit 4   201911NCAC4.0418 document        116
14  Exhibit 5   4-15-20 Revised Statute          124
15  Exhibit 6   FAQs Total Loss document         150
16  Exhibit 7   6-23-21 John Gintvaines          185
                deposition transcript
17
    Exhibit 8   Vehicle Condition Market Value   231
18              Impact Study
19  Exhibit 9   Bates number Garrison PNC14373   234
20  Exhibit 10  Zeavin vs. Ray Westlaw case      270
21  Exhibit 11  1-14-11 Report on Market         289
                Conduct Examination
22
    Exhibit 12  Declaration of Randall           309
23              McCathren
24
25
```

1    A.    My opinions are articulated in the report,
2    and I stand by the report.
3    Q.    Fair enough.  Let's go down to paragraph
4    six then, please.  Do you see there that you say:  The
5    CCC valuation report listed four different comparable
6    vehicles applying negative uniform condition
7    adjustments of $722 to each of the four comparable
8    vehicles without itemizing or explaining the basis of
9    the adjustment.  Do you see that?
10   A.    I do.
11   Q.    Okay.  In your kind of understanding, what
12   do you understand the basis for the condition
13   adjustment to be?
14   A.    I have no idea, because it's not, you know,
15   indicated in the CCC report.  From my recollection, the
16   adjuster did not, you know -- the Garrison adjuster did
17   not know what the basis for the adjustments were.
18   Q.    Do you have an understanding of what the
19   basis for the condition adjustment was?
20   A.    Do I?
21   Q.    Yes.
22   A.    No, I do not.
23   Q.    Do you have an understanding of why CCC
24   applied a condition adjustment?
25   A.    I can see why they would want to make the

1   vehicles comparable, but they didn't explain how they

2   arrived at their numbers.

3       Q.      So I guess separating the number from the

4   actual kind of use of a condition adjustment generally,

5   do you understand why CCC used a condition adjustment

6   generally?

7       A.      Yes.

8       Q.      And why is that?

9       A.      To try to put all the vehicles on the same

10  platform.

11      Q.      Can you explain what you mean by put the

12  vehicles on the same platform?

13      A.      So you can adjust vehicles such that they

14  come out with the same valuation across the platform of

15  the comparable vehicles with Ms. Garrison's vehicle --

16  I'm sorry, Ms. Fortson's vehicle.

17      Q.      Do you think it was appropriate for CCC to

18  make such an adjustment?

19      A.      I don't disagree with the need for them to

20  make the adjustment.  I just don't understand how they

21  arrived at the adjustment, and they didn't provide any

22  explanation.

23      Q.      Okay.  Can you please take out document

24  number four in the list of documents I gave you.  It

25  should be Ms. Fortson's CCC report, and this document

1    Q.    What specifics would it depend on?

2    A.    Well, what the, you know, the variances are

3    among the, you know, vehicles when you're comparing

4    them to the policyholder.  Say the policyholder had a

5    vehicle with 75,000 miles, and one of the comparable

6    vehicles had a value of 78,000 miles, is that a

7    sufficient difference to apply any kind of an

8    adjustment?  Perhaps not.

9    Q.    Okay.  So if there were kind of differences

10   between the comparable vehicle and the loss vehicle,

11   condition differences, then it would be appropriate to

12   apply a condition adjustment, right?

13   A.    Correct, either up or down, depending on

14   the vehicles themselves.

15   Q.    Okay.  Okay.  So I guess what I'm trying to

16   get at is how did the failure to explain the $722 harm

17   Mrs. Fortson -- Ms. Fortson?

18   A.    Well, she needed transparency of the

19   process.  She doesn't know whether or not she's being

20   offered a fair value, since she doesn't understand how

21   they arrived at that value.  So I think she's being

22   harmed as a result of that.

23   Q.    How was she financially harmed by that?

24   A.    By the amount of the condition adjustment

25   being applied without explaining it to her.  So she has

1              BY MR. ZIMMERMAN:

2        Q.      Let me ask you this, Mr. Berglund, what is

3    your opinion as to whether or not $722 was the right

4    condition adjustment for Ms. Fortson?

5              MR. DeSTEFANO:  Form and foundation.

6        A.      I don't know if it's the right condition

7    adjustment, since it was never clearly explained on how

8    they arrived at it.  I'm very suspicious and suggest it

9    probably is not, since the exact same condition

10   adjustment was applied to each of the four vehicles

11   which I find extremely difficult to accept.

12       Q.      So if each of the four vehicles were

13   individually inspected and conditioned, the appropriate

14   condition adjustment might have been higher, right?

15       A.      It could have been higher.  It could have

16   been lower.  There's no way to tell.

17       Q.      There's no way to tell.  How would you be

18   able to tell?

19       A.      If they had an itemization, you know,

20   identifying how they arrived at the amount of the

21   company adjustment for each of the four vehicles.

22       Q.      So you just said it might have been higher,

23   it might have been lower, right?

24       A.      Correct.

25       Q.      So we don't know for a fact whether

1    Ms. Fortson was paid more or less than she should have

2    been paid, right?

3              MR. DeSTEFANO:  Form and foundation.

4        A.    That is correct.

5        Q.    How would we determine whether Ms. Fortson

6    was paid more or less than she should have been paid?

7              MR. DeSTEFANO:  Form and foundation.

8        A.    Again, I'm answering the same question

9    repeatedly.  If they would itemize the condition

10   adjustment for each of the four vehicles and indicated

11   how they applied them, then Ms. Fortson could look and

12   make a determination of whether or not she would accept

13   those figures.  Without that type of break down, she's

14   got no way of knowing.

15       Q.    Okay.  Now, in your expert report, you

16   don't mention the options adjustment as being

17   insufficiently itemized, the options adjustment we see

18   on page eight and nine, right?

19       A.    I don't believe so.  Let me take a look at

20   the option adjustments.

21       Q.    Yeah, go ahead.

22             (Pause.)

23       A.    Yeah, I don't believe I rendered an opinion

24   on the basis for the option adjustments.

25       Q.    Why not?

1          Q.     And Mr. Berglund, just to be sure, are you

2     looking at a document at the very top it says

3     201911NCAC4.0418?

4          A.     I am.

5          Q.     Okay.  Have you seen this document before?

6          A.     I've looked at thousands of documents in

7     this.  I've looked at some state documents.  I might

8     have.  I can't honestly say.

9          Q.     Well, let me --

10         A.     It just, it all looks the same.

11         Q.     If you turn to page six of your expert

12    report, and you see you quote 11NCAC4.0418.  Is this

13    the regulation you're quoting there?

14         A.     It's in my report -- this looks like it,

15    assuming this is the one effective until September 30.

16               Is there a date on this?

17         Q.     Yeah, so this is the one you can see at the

18    top, it's 201911NCAC.  So it's the version that was in

19    effect in 2019.

20         A.     Okay.

21         Q.     As you mentioned, you cited two different

22    versions of the regulation in your report, right?

23         A.     Yeah, there was a change on September 30, I

24    believe, of 2020.

25         Q.     Okay.  Which version was in effect when

1    Ms. Fortson's total loss claim was adjusted?

2         A.     Well, the loss was in 2016, so it would

3    have been the earlier one, which is the one we are

4    looking at right now, I believe.

5         Q.     So this is the one that would have governed

6    Ms. Fortson's total loss claim?

7         A.     I don't know, it's kind of a legal term, so

8    I stay out of those things.  I think this is the one

9    that would have been used at that time, if that's what

10   you're asking.

11        Q.     Yes, that is what I was asking.

12               As you mentioned, you're not a lawyer

13   right?

14        A.     That is correct.

15        Q.     So you're not offering any opinions about

16   the interpretation of this regulation, right?

17               MR. DeSTEFANO:  Form.

18        A.     No legal interpretation.

19        Q.     What do you mean by that?

20        A.     Well, I'm not going to give a legal

21   interpretation of any of the provisions within, you

22   know, this.  If I was an adjuster that reviewed this, I

23   think an adjuster would look at it from a certain

24   perspective.  If I was an attorney, I would look at it

25   from a different perspective.

1      Q.     Are you offering any opinions as to whether
2   the regulation was or was not violated by Garrison?
3      A.     Well, I don't think they complied with
4   the -- with the, you know, the statute, in a general
5   sense.
6      Q.     Is that a legal opinion?
7      A.     No, it is not.  I do not give legal
8   opinions.
9      Q.     Okay.  Can you point me to where in this
10  regulation that it uses the word itemize?
11     A.     Without doing -- I can do a word search on
12  it, if that's what you want me to do?
13     Q.     Go ahead.
14     A.     If it's a searchable document.
15            Okay.  If this is a searchable document, I
16  don't know whether it is, I typed in itemized and
17  nothing came up.
18     Q.     Let me ask it differently.
19            Are you offering an opinion as to whether
20  or not this regulation requires adjustments to
21  comparable vehicles to be itemized?
22     A.     Well, again, I'd have to read the entire
23  document over again and refer to what I indicated in my
24  report.
25     Q.     Well, go ahead and identify any portions of

1 this regulation that you mention in your report that

2 require the condition adjustments to be itemized.

3          A.     I don't know if the word itemized

4 specifically is used.  Again, I don't know if this is

5 searchable from a word standpoint.

6          Q.     But even if it doesn't use the word

7 itemized, are you opining that this regulation requires

8 an insurer to itemize the condition adjustments?

9          A.     Well, I think this is kind of small.  I

10 don't know if my eyesight is -- let me increase the

11 value of it.

12               Paragraph two says:  Where the insurer has

13 the right to select, to replace the vehicle and does so

14 select a replacement vehicle, shall be available

15 without delay similar to the loss vehicle and paid for

16 by the insured, subject only to the deduction and to

17 the value of any enhancements acceptable to the

18 insured.  There's no mention in that paragraph about a

19 condition adjustment, if in fact the vehicle is being

20 replaced.

21          Q.     So does paragraph two require an insurer to

22 itemize -- let me ask it differently.

23               Does paragraph two require Garrison to

24 itemize the condition adjustments applied to comparable

25 vehicles?

1       A.      Paragraph two makes no reference to even

2   utilizing the condition adjustments.

3       Q.      But you told me that you think it's

4   appropriate to apply a condition adjustment, right?

5       A.      On a case-by-case basis with regard to the

6   vehicle.  From my understanding, some states don't

7   allow you to utilize condition adjustments.

8       Q.      That's your understanding of North

9   Carolina?

10      A.      My understanding in North Carolina that if

11  you utilize a condition adjustment, it should be

12  itemized.

13      Q.      And what is that understanding based on?

14      A.      Well, what I just read to you right now.

15  If the insurer has the right to select to replace the

16  vehicle, now this is for vehicle replacement, she'd

17  only apply the deductible and any enhancements to the

18  vehicle.  There's no discussion there about a condition

19  adjustment.

20      Q.      Was Ms. Fortson's vehicle replaced?

21      A.      No, it was not.

22      Q.      She was given a cash settlement, right?

23      A.      That is correct, based on the replacement

24  cost of the vehicle.

25      Q.      So your view is that paragraph two of this

1    regulation is what creates the obligation for Garrison

2    to itemize a condition adjustment?

3         A.    Well, paragraph two doesn't even say the

4    condition adjustment should be utilized, if in fact the

5    vehicle is replaced.

6         Q.    So is that a yes or a no, that paragraph

7    two creates the obligation for Garrison to itemize the

8    condition adjustment in the CCC reports?

9         A.    It doesn't address condition adjustments at

10   all.

11        Q.    So it doesn't address the itemization of

12   condition adjustments, does it?

13        A.    It doesn't even make a mention that the

14   condition adjustments should be applied.

15        Q.    And it doesn't -- oh, go ahead.

16        A.    I'm sorry, it just refers to application of

17   the deductible and the value of any enhancements,

18   except for those for the insured that's for replacing

19   the vehicle.

20        Q.    Is it your view that this regulation

21   prohibits an insurer from making a condition

22   adjustment?

23        A.    No, not necessarily, but it doesn't give

24   them the authority to utilize the condition adjustment.

25   So I'm just thinking from a common sense standpoint if

1  you're going to apply some kind of condition

2  adjustment, you should explain it to the policyholder

3  and give them a detailed explanation for how it's

4  applied.  And that would be across each of the

5  individual vehicles that you're utilizing on a

6  comparable basis.

7       Q.    Okay.  So the common sense basis -- you

8  said there's a common sense reason why Garrison should

9  itemize the condition adjustment, right?

10      A.    Within the context of this statute, that

11 would be my opinion.

12      Q.    Are there any other portions of this

13 statute that require Garrison to itemize the condition

14 adjustment?

15      A.    I'm looking at my report.  That's why you

16 see me turning my head.

17      Q.    That's fine.

18      A.    That is correct.

19            MR. ZIMMERMAN:  Okay.  Mr. Berglund,

20       can we go off the record for one moment?

21            THE VIDEOGRAPHER:  We are off the

22       record at 11:46 a.m.

23            (Recess.)

24            THE VIDEOGRAPHER:  We are back on the

25       record at 11:53 a.m.

1             MR. ZIMMERMAN:  Thank you.  Ms. Munoz,

2       can you please read back the last question

3       and answer, please, before we broke?

4             (Record read.)

5       Q.    So Mr. Berglund, when you say that is

6  correct, you mean there are not any other portions of

7  this regulation that require Garrison to itemize the

8  condition adjustment besides subsection two?

9             MR. DeSTEFANO:  Objection, foundation.

10      A.    Nothing comes to mind.

11      Q.    So does your report identify any other

12  portions of this regulation that require Garrison to

13  itemize or explain the condition adjustment?

14      A.    Nothing comes to mind.

15      Q.    I'm asking about your expert report that

16  you offered here.

17            Did you identify any other portions in your

18  expert report?

19      A.    I don't believe so.

20      Q.    And can you review your report and tell me?

21      A.    Well, I didn't memorize the report, so.

22            It does make a reference on page six under

23  one towards the section that if the claimant represents

24  that a vehicle actually owned by him was in better than

25  average condition, the insurer should give due

1 consideration, compensation, the condition of the

2 insure's vehicle prior to the accident.

3     Q.    Does that portion of the regulation require

4 Garrison to itemize or explain the condition adjustment

5 applied to the comparable vehicles?

6     A.    It does not.

7     Q.    Okay.

8     A.    I don't believe there's any other reference

9 to that statute in my report.

10     Q.    So you don't offer any opinions as to

11 whether any other portion of the statute requires

12 Garrison to itemize or explain the condition adjustment

13 to comparable vehicles?

14     A.    That's correct.

15     MR. ZIMMERMAN:  Okay.  Could we turn

16     to tab three, which is the next document,

17     please.  This will be marked as Berglund

18     Exhibit 5.

19     (The document referred to was marked

20     Defendant's Exhibit Number 5  for

21     identification.)

22     Q.    And Mr. Berglund just let me know when you

23 have that, and by tab three, I mean document number

24 three in the list of documents.

25     A.    This is 4.18?

Veritext Legal Solutions
www.veritext.com      888-391-3376
Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 378 of 598

1      Q.    Correct, sir.

2      A.    I think this is probably the revision that

3  was made in 2020 --

4      Q.    You're correct about that.

5      A.    -- I believe.

6            MR. ZIMMERMAN:  Before we get into it,

7       counsel, Mr. DeStefano, do you have that

8        document available?

9            MR. DeSTEFANO:  Yes.

10            MR. ZIMMERMAN:  Okay.  Thank you.

11      Q.    So I assume have you seen this document

12  before, Mr. Berglund?

13      A.    I have.

14      Q.    Okay.  And what is this?

15      A.    This looks like the revised statute.  This

16  is dated April 15, 2020.

17      Q.    This is the version that went into effect

18  in October 1, 2020, right?

19      A.    Yes, that is correct.

20      Q.    Would a regulation of job fit in October 1,

21  2020 apply to total loss settlements made before that

22  date?

23            MR. DeSTEFANO:  Form and foundation.

24      A.    That would be a -- I'm sorry.

25            The answer is that I'm not an attorney, and

1   that would be a legal conclusion.  I can't really
2   address that.
3        Q.    So based on your experience adjusting
4   claims, would you apply a regulation adopted October 1,
5   2020 to settlements, total loss settlements before that
6   date?
7        A.    I would not.
8        Q.    Now, subsection E of this regulation,
9   looking down on it says that:  A settlement offer "may
10  be adjusted for condition."  Do you see that?
11       A.    Just, I have to expand this, because it's
12  so small.
13       Q.    Very bottom of the first page.
14       A.    I do see that section E, subsection E.
15       Q.    So in your view, because of that, is it
16  consistent with the usual and customary practices of
17  North Carolina for settlement offers to be adjusted for
18  the condition of the loss vehicle?
19       A.    That would be consistent with the statute.
20       Q.    Is it consistent with the usual and
21  customary practices in North Carolina as well?
22       A.    I would say yes.
23       Q.    Does any portion of this statute require
24  adjustments to comparable vehicles to be itemized or
25  explained?

1      A.    Okay.  Let me do the same thing that I did

2  with the other one and do a name search or a word

3  search.  Hello?

4      Q.    Yeah, I'm here.

5      A.    I think may ear buds may have gone off.

6  Hold on for a second.  My ear buds are dead.

7            Can you hear me directly?

8      Q.    I can hear you, yes.

9            MR. ZIMMERMAN:  Ms. Munoz, can you

10     hear okay?

11            THE WITNESS:  Can everybody hear me?

12     I was using my ear buds.

13            THE VIDEOGRAPHER:  Just maybe move

14     your microphone a little more away from you.

15            THE WITNESS:  I can turn the volume

16     down.

17            MR. ZIMMERMAN:  I think that's better.

18            THE WITNESS:  I turned the volume down

19     a little bit, and I will try to speak less

20     loudly.

21            BY MR. ZIMMERMAN:

22     Q.    Mr. Berglund, I will reask the question.

23            Does any portion of this regulation require

24  the adjustments to the comparable vehicles, the

25  condition adjustments to comparable vehicles to be

1    explained or itemized?

2        A.      I'm reviewing the statute as we're talking.

3                Okay.  I'm going to reference subsection M

4    which is similar to what was in the earlier statute

5    regarding the decision to replace the total loss

6    vehicle.  And, again, it's subject to only the

7    deductible and the value of any additional options or

8    equipment chosen by the claimant.

9                There's no mention of a condition

10   adjustment in that paragraph.

11               Other than that, I do not see any reference

12   to a condition adjustments, other than what you had

13   identified in paragraph subsection E, that the

14   settlement offer may be adjusted for condition options,

15   equipment, and mileage, plus the cost of the unrepaired

16   portion that preexisted the accident.

17       Q.      Now, subsection M we were looking at, that

18   you mentioned, could that apply to the replacement of

19   total loss vehicle, right?

20       A.      Kevin, can you turn your speaker up?  I can

21   barely hear you.

22       Q.      Oh, yeah.

23               THE VIDEOGRAPHER:  You're coming

24        through very clear on my end.

25               MR. DeSTEFANO:  It's good here, Bill.

1          You might need to adjust volume on your

2     unit.

3               THE VIDEOGRAPHER:  You turned your

4     speaker volume down, but that has nothing to

5     do with your microphone.  Should we go off

6     the record get this figured?

7               MR. ZIMMERMAN:  Sure.  Let's go off

8     the record.

9               THE VIDEOGRAPHER:  We are off the

10    record at 12:02 p.m.

11         (Recess.)

12              THE VIDEOGRAPHER:  We are back on the

13    record at 12:03 p.m.

14              BY MR. ZIMMERMAN:

15    Q.     Mr. Berglund, before we broke, we were

16  talking about subsection M of the statute, right?

17    A.     Correct, subsection M, and I drew back to

18  subsection E.

19    Q.     Now, subsection M relates to an insurer

20  electing to replace a total loss vehicle, right?

21    A.     That is correct.

22    Q.     Okay.  It doesn't refer to cash settlements

23  for total loss vehicles?

24    A.     That is correct.

25    Q.     Okay.  So besides subsection M, can you

1   identify any other part of this regulation that would

2   require Garrison or CCC to itemize or explain the

3   condition adjustments to comparable vehicles?

4           MR. DeSTEFANO:  Form and foundation.

5       A.    I did not see any other subsection that

6   applies.

7       Q.    Okay.  Turn back to your report at page

8   five, paragraph six, please.

9       A.    Okay.  That's the one that starts off on

10  page four?

11      Q.    Yeah, yeah, I'm looking at the language on

12  pages six -- page five, but, of course, feel free to

13  review the language on page four.

14      A.    Okay.

15      Q.    I want to ask you about the sentence that

16  begins at the top of page five there.  You say:  The

17  application of the condition adjustment was applied

18  regardless of individual differences in the conditions

19  of these vehicles.  Do you see that?

20      A.    I do.

21      Q.    Okay.  Can you explain what you mean by

22  that, please?

23      A.    Well, the vehicles, they all had different

24  options.  They had different mileage.  They're in

25  different physical condition.  But there's no reference

DJA0536

1    to that when CCC applied the condition adjustment to

2    them.

3          Q.     So in your view, there should be a

4    different condition adjustment for each of the

5    comparable vehicles?

6          A.     That is correct.

7          Q.     Oh, sorry, sir.

8          A.     That is my opinion.

9          Q.     Okay.  And that would be based on the

10   individual condition of each of those vehicles, right?

11         A.     Correct.

12         Q.     And how would you determine the individual

13   condition of each of those vehicles?

14                MR. DeSTEFANO:  Form and foundation?

15         A.     ....the vehicles --

16         Q.     By doing what, sir?

17                THE WITNESS:  Do you have an

18          objection?  I guess not.

19         A.     By inspecting each of the vehicles.

20         Q.     Okay.  Is there any way to determine --

21                MR. DeSTEFANO:  Excuse me, can you

22          hear me?

23                MR. ZIMMERMAN:  Yeah, I can hear you.

24                MR. DeSTEFANO:  I did object.  I think

25          the witness said I did not, but we were

1       speaking over each other.

2              MR. ZIMMERMAN:  I heard it, yeah.

3              MR. DeSTEFANO:  Well, did the court

4       reporter note it?  She said okay.

5              BY MR. ZIMMERMAN:

6       Q.     So is there any way to determine the

7  appropriate condition adjustment that should be applied

8  to each of the comparable vehicles without inspecting

9  each of those vehicles?

10      A.     Well, either inspecting the vehicles or

11 during a visual inspection perhaps, but the vehicles

12 should have been looked at so that individual

13 adjustments could be applied.

14      Q.     So there's no other way to determine the

15 appropriate condition adjustment without inspecting

16 each of those vehicles?

17             MR. DeSTEFANO:  Form and foundation.

18      A.     Not with any certainty.

19      Q.     Okay.  What do you mean not with any

20 certainty?

21      A.     Well, you've got to evaluate the vehicles

22 based on the individual vehicle's characteristics, and

23 if you don't inspect them, I don't know how you can

24 arrive at that.

25      Q.     Look at paragraph seven of your report, the

1      A.     But the condition adjustment was explained.

2  The condition adjustment was not explained for the four

3  comp. vehicles.

4      Q.     Okay.  But the adjustment to

5  Ms. Garrison's, just, so it's clear for the record, was

6  a positive adjustment, right, Ms. Fortson's vehicle?

7      A.     Yes.  I don't recall the number, but it was

8  a positive number.

9      Q.     Okay.  Okay.  Let's look at paragraph six

10 please here.  You say:  Garrison's application of the

11 negative amounts adjustment to the values of comparable

12 motor vehicles reduces the claim payments made to their

13 policyholders, right?

14     A.     Yes.

15     Q.     Reduces compared to what?

16            MR. DeSTEFANO:  Form and foundation.

17     A.     As compared to a baseline.

18     Q.     What do you mean by a baseline?

19            MR. DeSTEFANO:  Form and foundation.

20     A.     The baseline upon which the valuating to

21 the insured vehicle would be.  Whatever that number

22 was, you're subtracting $722 from it.

23     Q.     So you're just saying there was a reduction

24 compared to if no condition adjustment was applied?

25     A.     That is correct.

1      Q.      Okay.  But you agree that Garrison can make

2    some adjustments to the condition of a loss vehicle,

3    right?

4            MR. DeSTEFANO:  Objection.

5      A.      If they explained to the policyholder what

6    the basis for it is, I would agree with that.

7      Q.      Okay.  So you're not opining that the

8    adjustment kind of reduced the settlement payments

9    compared to what Garrison could have paid, right?

10           MR. DeSTEFANO:  Form and foundation.

11     A.      Well, I'm saying that they do reduce the

12   payment, because there's an automatic reduction in the

13   potential payment based on this condition adjustment,

14   which is unexplained and in my opinion arbitrary.

15     Q.      I understand that.  So you're saying -- but

16   we talked about earlier the $722.  You're not opining

17   whether that's too high or too low, right?

18     A.      There's no way to determine that, so, yes,

19   I'm not opining, because there's no way to determine

20   it.

21     Q.      And in fact, the proper condition

22   adjustment we don't know, it might have been higher,

23   right?

24           MR. DeSTEFANO:  Form and foundation.

25     A.      It could be higher, or it could be lower.

1    Since we don't know how they arrived at the number,

2    there's no way to tell.

3        Q.    So if it was supposed to be higher, then

4    Ms. Garrison actually should have been paid less,

5    right?

6            MR. DeSTEFANO:  Form and foundation.

7        A.    Yes, but I don't know if there should have

8    been any condition adjustment applied at all, since we

9    don't know the basis for it.

10       Q.    Okay.  But if it was supposed to be higher,

11   that would mean Ms. Fortson was paid enough, right?

12           MR. DeSTEFANO:  Form and foundation.

13           BY MR. ZIMMERMAN:

14       Q.    You don't know one way or another?

15           MR. DeSTEFANO:  Form and foundation.

16       A.    That's speculation.  The fact that they

17   applied it across the board puts Ms. Fortson in a hole

18   before they even start evaluating her car.

19       Q.    What do you mean by that?

20       A.    Well, there's no automatic deduction of

21   $722 before anything else is done.

22       Q.    Okay.  So if the appropriate condition

23   adjustment was made, it might have been higher than

24   722?  It might have been lower than 722, right?

25           MR. DeSTEFANO:  Form and foundation.

1    A.    That is correct.

2    Q.    Okay.  And we don't know, we have no way of

3 determining whether it should be higher or lower than

4 722 without individually inspecting the comparable

5 vehicles, right?

6         MR. DeSTEFANO:  Form and foundation.

7    A.    CCC would know that, but I could not

8 determine what it was.  It was not identified in their

9 report.

10    Q.    And the only way for CCC to know that would

11 be to go and inspect the comparable vehicles?

12         MR. DeSTEFANO:  Form and foundation.

13    A.    That would be a reasonable approach.

14    Q.    What other reasonable approaches would

15 there be?

16         MR. DeSTEFANO:  Same objection.

17    A.    I can't think of any.

18    Q.    Okay.  So are you opining that any class

19 member was paid more or less than what they should have

20 been paid?

21         MR. DeSTEFANO:  Form and foundation.

22    A.    I didn't hear the first couple of words you

23 used there, counselor.

24    Q.    Apologies.  Are you opining whether any

25 class member was paid more or less than the actual cash

1    value of their vehicle?

2            MR. DeSTEFANO:  Form and foundation.

3            THE WITNESS:  John?

4            MR. DeSTEFANO:  I said form and

5        foundation.

6        A.    I'm opining on Ms. Fortson's vehicle.

7        Q.    Are you opining that Ms. Fortson was paid

8    more -- so to be clear, you're not opining as to other

9    class members' vehicles, right?

10       A.    I only --

11           MR. DeSTEFANO:  Form and foundation.

12        Excuse me, form and foundation.

13            Bill, just please pause, I'm sorry,

14        but I got to, I got to, I got to speak my

15        objections.

16       A.    Okay.  I'm opining on what transpired with

17   regard to the claim involving Ms. Fortson.

18       Q.    Okay.  You're not opining as to whether

19   other class members were paid more or less than the

20   actual cash value of their vehicle?

21           MR. DeSTEFANO:  Form and foundation.

22       A.    Unless they applied a similar condition

23   adjustment, no, I'm not.

24       Q.    What do you mean unless they applied a

25   similar condition adjustment?

1      A.     If the same practice of applying a

2    condition adjustment, without explanation, applies to

3    all of the other vehicles in the class, then I don't

4    think they were dealt with fairly either.

5      Q.     I guess are you opining that Ms. Fortson

6    was paid more or less than the actual cash value of her

7    vehicle?

8      A.     I don't know, since I don't know the

9    amount -- or, I'm sorry, I don't know the basis for the

10   condition adjustment that was applied.  So I can't

11   really give an answer to that.

12     Q.     So you can't provide an opinion about that,

13   right?

14     A.     I cannot provide opinion, other than the

15   fact that they applied a condition adjustment without

16   explaining the basis for it to Ms. Fortson.

17     Q.     Okay.  Are you providing any opinions as to

18   the proper dollar value, which should have been used as

19   the actual cash value of Ms. Fortson's vehicle?

20            MR. DeSTEFANO:  Form and foundation.

21     A.     No.

22     Q.     Go ahead, Mr. Berglund.

23     A.     I already said no.  No.

24     Q.     So looking at paragraph eight here, you

25   say:  Garrison's standard practice is to present the

1          A F T E R N O O N   S E S S I O N

2               THE VIDEOGRAPHER:  We are back on the

3          record at 1:19 p.m.

4               BY MR. ZIMMERMAN:

5          Q.    Thank you, okay, Mr. Berglund, I'm going to

6     take you back to your expert report, Exhibit 1, and

7     we're looking at page eight now.  Just let me know when

8     you're there.

9          A.    I'm there.

10         Q.    So looking at paragraph seven of the

11    report, you quote the North Carolina regulation there

12    that we were looking at earlier, right?

13         A.    Yes.

14         Q.    And the portion you quoted requires the

15    claimant to represent the vehicle within better than

16    average condition, right?

17         A.    Yes.

18         Q.    And then it says:  If the claimant does

19    that, then it says:  The insurer shall give due

20    consideration to the condition of the claimant's

21    vehicle prior to the accident, right?

22         A.    Yes.

23         Q.    Okay.  Is it your opinion that Garrison did

24    not comply with this portion of the regulation?

25         A.    Yeah, they did give consideration for an

1   adjustment upward, as I recall.

2        Q.    So why did you quote this portion of the

3   regulation?

4        A.    It seemed like the right thing to do at the

5   time.

6        Q.    Can you tell me what you mean by that?

7        A.    No, just pointing out that that section

8   does require that due consideration be given to the

9   policyholder's vehicle.

10       Q.    But you're not saying that Garrison didn't

11  comply with this provision?

12       A.    No, I'm not.

13       Q.    Okay.  Do you know how many of Garrison's

14  insureds or claimants represented to Garrison that

15  their vehicle was in better than average condition?

16       A.    I didn't see any documentation of that.

17       Q.    So you're not offering an opinion as to

18  whether X number of insureds did or X percentage of

19  insureds did?

20       A.    No, I have no opinion on that.

21       Q.    Okay.  Look at paragraph 9, the next

22  paragraph, please.  There you say:  Garrison's standard

23  practice of utilizing an arbitrary negative condition

24  adjustment is inconsistent with the minimum standards

25  of conduct for the insurance industry, including those

1    up your microphone at all, I don't know if others are

2    having trouble hearing, but if not, I can live.

3         A.    I'm sorry.  I just got to find out where

4    that control is.  That's this.  That's this.  It might

5    be on my phone.  It shouldn't be on my phone.

6         Q.    If you're not able to, I'll live.

7         A.    Hold on for a second.

8              THE VIDEOGRAPHER:  I'm hearing him

9       okay on my end.

10             BY MR. ZIMMERMAN:

11        Q.    We'll continue on, Mr. Berglund, that's all

12   right.

13        A.    Okay.  I'm looking at my controls here,

14   whoops.  I don't see a way of turning the volume up.  I

15   can knock off the ear buds if you would prefer so I can

16   hear you better.

17        Q.    No, that's fine.  It's okay.  It's okay.

18   We'll power through.

19             So Mr. DeStefano, do you have tab three in

20   front of you?  This was Berglund Exhibit 5.  This is

21   the regulation that went into effect October 1, 2020,

22   right?

23        A.    I have it, yes, that is it.

24        Q.    Okay.  And so Mr. Berglund, you didn't

25   identify it earlier, but now you're saying there's

1    another verse in this regulation that you identified

2    over the lunch break that requires USAA to explain its

3    condition adjustment, right?

4         A.    That is my impression of it, it's

5    subparagraph H.

6         Q.    Subparagraph H?

7         A.    That's correct.

8         Q.    Okay.  And my last question asked for USAA,

9    but it should have asked for Garrison.  Same

10   subsection?

11        A.    I'm sorry, yes.

12        Q.    Okay, that's my apologies.

13              So subsection H says:  When a motor

14   vehicle's total loss is settled on a basis which

15   deviates from this rule, the deviation must be

16   supported by documentation within the claim file

17   detailing the total loss, motor vehicle's condition,

18   and the reason for the deviation.  Do you see that?

19        A.    I do.

20        Q.    Okay.  Is that the portion that you say

21   requires Garrison to itemize or explain the condition

22   adjustment?

23        A.    I think further in that same paragraph it

24   says:  Any deduction from the actual cash value of the

25   total motor vehicle, including deductions for salvage

1  or prior damage, be itemized and contain the amount of

2  the deduction.  The documentation that supports the

3  basis for this settlement shall be shared with the

4  claimant or the policyholder.

5      Q.    Okay.  So this only applies when the motor

6  vehicle's total loss is settled on a basis which

7  deviates from the other portions of the rule, right?

8           MR. DeSTEFANO:  Form and foundation.

9      A.    That's what it says.

10      Q.    Okay.  That's your understanding of how the

11  statute would operate, as with your experience as a

12  claims adjuster?

13           MR. DeSTEFANO:  Form and foundation.

14           BY MR. ZIMMERMAN:

15      Q.    Sorry.  What was your answer, Mr. Berglund?

16      A.    Yes.

17      Q.    So there has to be some kind of ex-ante

18  deviation from the rule before the requirements of

19  subsection H come into effect?

20           MR. DeSTEFANO:  Form and foundation.

21      A.    It's a little confusing, because it says:

22  Which deviates from this rule, but then it doesn't

23  really stip -- identify what "this rule is."

24      Q.    You don't understand this rule to be this

25  regulation?

1           MR. DeSTEFANO:  Form and foundation.

2      A.     Well, it says this rule.  Then this rule is

3  a number of paragraphs, you know, a number of

4  paragraphs long.

5      Q.     Okay.  Well, let me ask you this, can you

6  point me to any other paragraph of this regulation that

7  you think Garrison violated while handling total loss

8  claims?

9      A.     Let me read the balance of it.

10      Q.     Go ahead.

11      A.     I got that one, and I looked at and says it

12  doesn't seem to apply to our case in point.

13           (Pause.)

14      A.     Well, really the next one, that would be

15  (i) if requested by the claimant, total loss payment by

16  the insurance company shall be accompanied by the

17  written statement listing the estimates, valuations,

18  and any deductions used in calculating payment, and the

19  source of these values.

20           I think that would also be applicable.

21      Q.     Okay.  And the preface to that one says:

22  If requested by the claimant, right?

23      A.     Correct.

24      Q.     So for subsection i to be applicable, the

25  claimant has to request, make a request to Garrison,

1     Q.     Okay.  So subsection i you think is another

2  portion of this regulation that requires Garrison to

3  itemize or explain the condition adjustment?

4     A.     Yes.  I think this document is really the

5  minimum required of an insurance company who's dealing

6  in good faith.

7     Q.     Okay.  Now, did Ms. Fortson make a request

8  to Garrison pursuant to subsection i, or that would

9  qualify under subsection i?

10    A.     I don't believe so, at least not to my

11 recollection.  But, again, that would just be the

12 minimum standard, I think, for dealing in good faith.

13    Q.     Okay.  So nothing in this -- so subsection

14 i of this regulation would not apply to Ms. Fortson's

15 claim then?

16        MR. DeSTEFANO:  Form and foundation.

17    A.     Again, it would not, inasmuch as this is a

18 minimum requirement, I think the insurance company

19 should exceed the minimum requirement under the

20 statute.

21    Q.     Okay.  Is there any other portions you

22 talked about subsection h and subsection i.  Are there

23 any other portions of this regulation that you say

24 Garrison violated?

25    A.     As you're talking, I'm reading.

1          MR. DeSTEFANO:  Form and foundation.

2      A.     We discussed paragraph m.  I think it looks

3  like it's almost identical wording to the older

4  statute, in that if the insurance company has the right

5  to elect to replace the vehicle, and if they do, the

6  only deductions should be for additional options and

7  equipment.  There's no mention of any deduction for a

8  condition adjustment.  But, again, that applies to only

9  if they decide to replace the car.  Again, this is a

10 minimum standard.  I don't see anything else here that

11 would apply, in my opinion.

12     Q.     Okay.  So subsection m we talked about

13 applies to the replacement of a total loss vehicle,

14 right?

15     A.     Correct.

16     Q.     Okay.  But Ms. Fortson was offered a cash

17 settlement.  She wasn't offered a replacement, right?

18     A.     That is correct.

19     Q.     Okay.  And subsection i is premised on if

20 the claimant requests a written statement, right?

21     A.     Correct.

22     Q.     And Ms. Fortson did not request --

23          MR. DeSTEFANO:  Form and foundation.

24          BY MR. ZIMMERMAN:

25     Q.     And Ms. Fortson did not request such a

1  written statement, right?

2      A.      That is correct.

3      Q.      And then subsection h only applies when a

4  motor vehicle's total loss is settled on a basis which

5  deviates from this rule, right?

6              MR. DeSTEFANO:  Form and foundation.

7      A.      Right.

8      Q.      So is there any other portion of this rule

9  that you believe Garrison's settlement of Ms. Fortson's

10 claims deviated from?

11     A.      I don't believe so.

12     Q.      Okay.  Okay.  How many other class

13 members -- and I apologize if I asked you this.  How

14 many other class members requested a written statement

15 from Garrison?

16     A.      I have no idea.

17     Q.      Okay.  So you don't offer any opinion as to

18 whether a certain percentage of the class did?

19     A.      I do not.

20     Q.      Okay.  How would we know whether any

21 individual class member did or did not make a request

22 to Garrison for a written statement?

23     A.      It's outside the scope of my testimony.

24     Q.      I mean, what would -- with your experience

25 adjusting claims, what would you have to look at to

1  4.

2       A.     Do we need the deposition still?

3       Q.     Yeah, we might.  You can close out of it

4  for now.  Actually, leave it open.

5       A.     Page 14, did you say, counselor?

6       Q.     Page 14, paragraph 4, please.

7       A.     Okay.  Okay.

8       Q.     So I'm reading from your paragraph 4 here.

9  You mention deducting an amount declared to be a

10  condition adjustment from the values of comparable

11  vehicles without conducting an inspection of those

12  vehicles or relying (in a small fraction of cases) on

13  inspections performed to rate the dealers, not the

14  vehicles.  Do you see that?

15       A.     Yes.

16       Q.     What do you mean by performed to rate the

17  dealers not the vehicles?

18       A.     CCC's process is not to look at all

19  dealers, only to look at dealers that reach -- that

20  meet a certain threshold of compliance with them.  So

21  they're not looking at all the dealers in general.

22  They're only looking at certain dealers and those

23  dealers --

24       Q.     Go ahead, I'm sorry.

25



25          Q.      But doesn't that work to the benefit of the

insured, if the comparable vehicles are in better condition?

A. Not when they use unexplained condition adjustments it isn't.

Q. Okay. But the condition adjustment would have to be applied whether or not irrespective of what type of comparable vehicle CCC uses, right?

A. It depends on the basis for the condition adjustment, and that we don't know.

[redacted]

Q. Okay. Okay. I guess I'm just trying to understand, what do you mean when you say performed to rate the dealers, not the vehicles?

A. Well, they're two separate things. One is you're rating a class of dealers that you're going to

1    I think that's placing the insurance company,

2    Garrison's interests, ahead of the interests of the

3    policyholder.

4         Q.    But you told me that we don't know for a

5    fact whether the 722 was too high or too low, right?

6         A.    That is correct.

7         Q.    So how do we know that it was placing

8    Garrison's interests over the insured?

9              MR. DeSTEFANO:  Form and foundation.

10        A.    The insured accept it as true, even though

11   they didn't know it.

12        Q.    But it might have been -- go ahead, I'm

13   sorry.

14        A.    It wouldn't matter whether it was higher or

15   lower.  The fact that they accepted it without knowing

16   the basis for it and pushed down their policyholder I

17   think is unfair, and I don't think it's dealing in good

18   faith.

19        Q.    Okay.  Are you offering any opinions about

20   Garrison's motivation for using CCC valuation products?

21        A.    I can only assume they're using it to save

22   money, cut down on the cost of claims, but I'm not

23   going to be testifying to that.

24        Q.    So you don't have any expert opinion about

25   Garrison's motivations for using the CCC product?

1      A.      I'd have to go into their mind.  I can't do
2  that.
3      Q.      Now, you said you assumed they are doing it
4  to save money though, right?
5      A.      That would be apparent to me, based on my
6  observations.
7      Q.      That's kind of your lay view of it?
8      A.      That is correct, and based on my 50 years
9  of experience handling claims.
10     Q.      What's that view based on?
11     A.      My 50 years of experience handling claims.
12     Q.      I guess what documents, testimony, or
13  evidence is that based on?
14     A.      That the insurance companies, accepting as
15  accurate, calculations providing them -- provided to
16  them by CCC, which are not supported by an explanation
17  or documentation, and using those numbers as a
18  settlement platform to deal with their policyholders,
19  which I think is inherently inappropriate, and I do not
20  think it's dealing in good faith.
21     Q.      Yeah, but what impact does that have -- I
22  guess how does that relate to USAA's motivation for
23  using CCC?
24     A.      I didn't say it did.
25     Q.      Oh, okay.  That's what I'm asking about.

1    A.    I don't know what their motivation is,
2  other than attempting to save money on the cost of
3  claims.
4    Q.    And that's what I'm asking about.  Why do
5  you think it was Garrison's motivation to use CCC to
6  save money?
7    A.    Otherwise why would they use them?
8    Q.    Did you see any documents, testimony or
9  evidence supporting your assumption that Garrison used
10  CCC to save money?
11    A.    No, I did not.
12    Q.    Now, two sentences later, we're still on
13  page 16, paragraph 10, do you see the sentence
14  beginning Garrison assumes that all?
15    A.    What starts off by adopting this basic
16  premise, Garrison assumes that all?
17    Q.    Right.  Right.  By adopting this basic
18  premise, yeah, do you see that?
19    A.    I do.
20    Q.    So it says:  By adopting this basic
21  premise, Garrison assumes that all of its insureds'
22  vehicles are in less than good or dealer ready
23  condition, giving Garrison the upper hand when
24  evaluating total loss claim, because assuming this
25  premise, the total value of every car would be reduced

1    regardless of the vehicle's actual condition.

2           Do you see that?

3       A.    I do.

4       Q.    Now, when you say less than good, I assume

5    you mean less than very good, right?

6       A.    It depends on the matrix, and I don't have

7    the matrix in front of me, so I'm not positive on what

8    the individual categories are.

9       Q.    You can pull back open document number 8,

10   what we marked as Berglund Exhibit 9?

11      A.    Okay, I'm there.

12      Q.    And actually if it helps you, sir, I'll

13   point you to footnote 14 of your report, and if you

14   look at that, you'll see the Bates number there is the

15   same Bates number we're looking at here.

16          Do you see that?

17      A.    No, but I understand what you're saying.  I

18   think you're right.

19      Q.    Okay.  So do you understand this to be the

20   conditioning matrix, the Garrison conditioning matrix?

21      A.    Seeing it, it seems like it is.

22      Q.    Okay.  So when you say here -- we're back

23   on page 16, paragraph 10, you say:  Garrison assumes

24   that all of their insureds' vehicles are in less than

25   good condition.  Do you see that?

1      A.      I do.

2      Q.      Is that supposed to say very good instead

3  of good?

4      A.      I think you're right.  I think it should be

5  very good.

6      Q.      Okay.  Now, Garrison inspects every loss

7  vehicle to determine its condition, right, pre-accident

8  condition?

9      A.      Yeah, every vehicle that the policyholder

10  or third-party claim adjusts.  Let me say, I'm assuming

11  they do.  I don't know if they look at every single

12  one.  They may have some dealerships they'll accept the

13  dealership's -- not the dealership, the body shop will

14  accept the body shop's valuation, and a Garrison

15  adjuster may not look at them, and that would be

16  standard protocol.  They don't necessarily look at

17  every single one by a staff employee.

18      Q.      But it's your understanding that Garrison

19  assesses the condition, whether themselves or through

20  an agent, of every loss vehicle, right?

21      A.      Correct.

22      Q.      All right, that makes sense.

23              So how was Garrison assuming that vehicles

24  are in less than very good condition if it's actually

25  inspecting each and every loss vehicle?

1     A.     I don't know if I can answer that.  I mean,
2  there are a lot of vehicles on the road that are not in
3  good condition.  There are a lot of vehicles on the
4  lots that are not in good condition, but many of those
5  have been excluded from the fold, based on CCC's
6  analysis.
7     Q.     What do you mean that many of those have
8  been excluded based on CCC's analysis?

20     Q.     Okay.  So is the average vehicle in the CCC
21  dealer ready database in better condition than the
22  average vehicle on the road?
23     A.     I can't answer that, because I don't know.
24     Q.     You don't have any expert opinions on that?
25     A.     I don't have an expert opinion.  I can

Veritext Legal Solutions
www.veritext.com                                              888-391-3376
Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 410 of 598

1  legal, and, you know, someone else may disagree with

2  that, right?

3       A.     And I disagree, yeah.

4       Q.     So I'm asking you did you review any

5  documents where Garrison -- showing that Garrison knew

6  that CCC would not comply with the standard in the

7  industry in North Carolina?

8       A.     No, I don't believe I did.

9       Q.     Okay.  So you didn't review any evidence or

10  testimony or documents showing that Garrison believed

11  it was in violation of industry standards in North

12  Carolina, did you?

13            MR. DeSTEFANO:  Form and foundation.

14       A.     No, I did not.

15       Q.     Okay.  Did you ever review any documents,

16  testimony or evidence where Garrison ever recognized

17  the use of CCC reports to be illegal?

18            MR. DeSTEFANO:  Form and foundation.

19       A.     No.

20            THE WITNESS:  John, you have to talk

21       faster.

22       A.     No.

23       Q.     No was your answer?

24       A.     My answer was no.

25            MR. DeSTEFANO:  It's hard to keep up

DJA0563

1          foundation.

2          A.     I honestly can't say.  You know, I'm not

3     certain.

4                 MR. DeSTEFANO:  Just one moment.

5                 (Pause.)

6                 MR. DeSTEFANO:  That's all I have.

7                 FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT

8                 BY MR. ZIMMERMAN:

9          Q.     Counsel, just a couple of follow up.

10                Now, Mr. Berglund, I'm going to ask you a

11    couple of additional questions, only a couple of

12    minutes, just following off of what Mr. DeStefano just

13    asked of you.

14         A.     Yes.

15         Q.     Mr. DeStefano can advise you not to answer

16    any portion of this question, but to the extent he

17    doesn't advise you, I want you to kind of tell me

18    everything.

19                Tell me, did you discuss the total loss

20    regulation with Mr. DeStefano during the lunch break?

21         A.     We did not discuss the regulation, no.  We

22    discussed that there was a regulation, and I mentioned

23    to him that I wanted to look at it.

24         Q.     And what did he say in response to that?

25         A.     Okay.

1     Q.     Did he encourage you to go look at it?

2     A.     I would not say he encouraged me, no.

3     Q.     What were the words used in response?

4     A.     He might have said that might be a good

5  idea.

6     Q.     Did you have any other conversations about

7  your testimony during the lunch break with

8  Mr. DeStefano?

9     A.     I did not.

10    Q.     Just quickly, Mr. DeStefano asked you about

11 whether the post October 2020 version of the regulation

12 had an itemization requirement, right?

13    A.     I'm sorry, would you repeat that, please?

14    Q.     Just in the set of questions Mr. DeStefano

15 just asked you, he asked you whether the post

16 October 2020 version of the regulation contained an

17 itemization requirement?

18    A.     Yes.

19    Q.     Okay.  And we discussed previously all the

20 portions of the regulation that might contain that

21 requirement?

22    A.     We just discussed regulation.  We didn't go

23 down paragraph by paragraph.  I think you asked me a

24 general question if I had any other provisions that I

25 thought came into play, and I recall answering no, I

1  didn't; but I really didn't read the entire statute at
2  that time.
3      Q.    Okay.  Go back to tab three then, which is
4  Berglund Exhibit 5, the 2020 version of the regulation.
5      A.    Hold on, I've got to size this up.
6            Okay.  Number three, I don't know what
7  exhibit number it's identified as.
8      Q.    It should be Exhibit number Berglund
9  Exhibit 5, but, yeah, it's number three for your
10  purposes.
11           Now, besides lunch break, did you discuss
12  this regulation with Mr. DeStefano at any other time
13  today?
14      A.    No, I did not.
15      Q.    Okay.  Can you identify what portion of
16  this regulation you say contains an itemization
17  requirement?
18      A.    Paragraph H:  Any deduction from the actual
19  cash value of the total loss vehicle, including
20  deductions or salvage -- deductions for salvage or
21  prior damage shall be itemized and contain the amount
22  of the deduction.  The documentation that supports the
23  basis of the settlement shall be shared with the
24  claimant.
25      Q.    Any other portion of this statute besides

1  subparagraph H that contains an itemization

2  requirement?

3       A.    No, I have nothing else underlined, so I'm

4  going to say no.

5       Q.    When did you do that underlining?

6       A.    When I looked at it earlier today.

7             You have to realize when John and I stopped

8  talking, then I came back in here and I opened it up on

9  my computer and looked at it and I underlined it, and I

10 highlight things to refresh my memory.

11            MR. ZIMMERMAN:  Okay.  Okay.  That's

12       all the additional questions that I have.

13            Mr. Berglund, I do want to say thank

14       you for your time today.  I appreciate it.

15       I know this can be a long process sometimes.

16       I really appreciate your time today.

17            THE WITNESS:  I enjoyed it.  It's a

18       pleasure chatting with you.

19            THE VIDEOGRAPHER:  Any more questions,

20       counselors?  Anything further?

21            MR. DeSTEFANO:  No.  Thank you.

22            THE VIDEOGRAPHER:  This concludes the

23       deposition.  We're off the record at

24       5:05 p.m.

25            (Whereupon the deposition was

TAB 49                                          DJA0567

1           UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

3  _____

4  ELIZABETH V. FORTSON,

5           Plaintiffs,

6      v.                           Civil Action No.

7  GARRISON PROPERTY AND CASUALTY      1:19-cv-00294-

8  INSURANCE COMPANY,                  CCE-JLW

9           Defendant.

10 _____

11       VIDEOTAPED DEPOSITION OF RANDALL MCCATHREN

12 DATE:           Tuesday, August 17, 2021

13 TIME:           10:08 a.m.

14 LOCATION:       Remote Proceeding

15                 Greensboro, North Carolina 27420

16 REPORTED BY:    Joshua Seagondollar, Notary Public

17 JOB No.:        4765452

18

19

20

21

22

23

24

25

Veritext Legal Solutions
www.veritext.com                                888-391-3376
Case 1:19-cv-00294-CCE-JLW  Document 96  Filed 11/01/21  Page 416 of 598

1               A P P E A R A N C E S

2    ON BEHALF OF PLAINTIFF, ELIZABETH V. FORTSON:

3         MICHAEL MALONE, ESQUIRE (by videoconference)

4         Hendren Redwine & Malone PLLC

5         4600 Marriott Drive, Suite 150

6         Raleigh, North Carolina 27612

7         mmalone@hendrenmalone.com

8         (919) 420-7867

9

10   ON BEHALF OF DEFENDANT, GARRISON PROPERTY AND CASUALTY

11   INSURANCE COMPANY:

12        KEVIN ZIMMERMAN, ESQUIRE (by videoconference)

13        Baker Hostetler LLP

14        200 Civic Center Drive, Suite 1200

15        Columbus, Ohio 43215

16        kzimmerman@bakerlaw.com

17        (614) 228-1541

18

19        RODGER ECKELBERRY, ESQUIRE (by videoconference)

20        Baker Hostetler LLP

21        200 Civic Center Drive, Suite 1200

22        Columbus, Ohio 43215

23        reckelberry@bakerlaw.com

24        (614) 228-1541

25

1              A P P E A R A N C E S (Cont'd)

2    ALSO PRESENT:

3         DeAndrae Shivers, Videographer

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2   EXAMINATION:                                    PAGE

3        By Mr. Zimmerman                           6

4

5                  E X H I B I T S

6   NO.              DESCRIPTION                     PAGE

7   Exhibit 1        Expert Report                   14

8   Exhibit 2        Inspection Guidelines, Vehicle  102

9                    Condition

10  Exhibit 3        Market Valuation Report         105

11  Exhibit 4        NADA Guides FAQ                 146

12  Exhibit 5        Kelley Blue Book Condition Quiz 156

13  Exhibit 6        Deposition of John Gintvainis   168

14  Exhibit 7        Field Industry Representative    176

15                   Training Manual

16  Exhibit 8        Vehicle Condition Market Value  190

17                   Impact Study

18  Exhibit 9        Email, 4/23/2021                213

19  Exhibit 10       N.C. Gen. Stat. 20-183.4C       223

20  Exhibit 11       N.C. Gen. Stat. 20-183.3        223

21

22

23               (*Exhibits attached.)

24

25

1  know, test it against data before I gave you a

2  definitive answer.  But I think the idea of developing

3  comparable vehicles is adequate and correct.  They

4  need to be conditioned.  They need to be -- they need

5  to be inspected so that a complete condition of any

6  comps is known.  I would include some variables, like

7  color, that affect the price of the vehicle.

8       Q    So you're --

9       A    -- look further as to whether, you know,

10  only sale prices should be included.  What the

11  geographic, you know, spread and time -- time limits

12  should be before -- and certainly, I would have the

13  same criteria that is used to evaluate the condition

14  of the comp vehicles as being used for the total loss

15  vehicles.

16      Q    So generally speaking, if you're trying to

17  determine the condition of a total -- or I'm sorry.

18  Let me start that over.

19           Generally speaking, if you want to determine

20  the value of a total loss vehicle, one way you could

21  do that would be to compare it to comparable vehicles

22  in the market?

23      A    Yes.

24      Q    Okay.  But your opinion is that each of

25  those comparable vehicles has to be individually

1   inspected to determine the actual value of the total

2   loss vehicle?

3       A    Yes.

4       Q    There's no way to estimate the value of a

5   total loss vehicle without individually inspecting

6   each of those comparable vehicles?

7       A    I mean, correct.  I would qualify by saying,

8   yeah, you can get, you know, a kind of broad estimate,

9   but it may not be very accurate because you don't know

10  the specific condition to which you're comparing the

11  total loss vehicles.

12      Q    Okay.  So you won't be able to determine

13  whether or not the insured was actually paid more or

14  less than the value of their vehicle without

15  performing those inspections?

16      A    Yeah.  I would say that given any individual

17  vehicle, if you don't know the condition and the time

18  period and the color of the comp vehicle to which it's

19  -- or group of comp vehicles to which it's being

20  compared, then you don't know whether, you know, it

21  would be more or less than this other average that

22  you're coming up with.

23      Q    Prior to you working this case, did you know

24  about the company CCC Information Services?

25      A    I think I had heard of it some place, but I

1  See, I described how I think the process, you know,

2  might work, but I haven't really thought through would

3  -- would it actually -- would it work in the real

4  world to get even more accurate.  I -- I'd have to

5  think about that.

6  BY MR. ZIMMERMAN:

7      Q    So I guess for purposes of your expert

8  report, you didn't provide any opinions or you're not

9  offering any opinions that Garrison shouldn't have

10  used conditioning standards, right?

11      A    Right.

12      Q    Okay.  You're saying they should have used

13  different conditioning standards?

14      A    Yes.

15      Q    Okay.  And you don't point to any specific

16  conditioning standards they should have used instead

17  though, right?

18      A    Right.

19      Q    Okay.  So looking at page seven of your

20  report, again, we're at the third sentence of the top

21  paragraph.  You say, "The standards are so ambiguous

22  and overlapping that different adjusters will

23  undoubtedly apply them differently to the same

24  components, and it is likely that the same adjuster

25  will apply them differently on different vehicles."

1    Do you see that?

2        A    Yes.

3        Q    Okay.  So some adjusters using these

4    standards are going to undervalue components, right?

5        A    When you say undervalue --

6        Q    Under condition.

7        A    -- undervalue?

8        Q    Going to assign the condition of the

9    component lower than it's supposed to be, right?

10       A    Yes.

11       Q    And then some adjusters will overvalue

12   components, right?

13       A    Yeah.  Probably so.

14       Q    Okay.  Now just to be clear, you didn't

15   actually review any claim files from class members in

16   this litigation, right?

17       A    Any claim files?  Right.

18       Q    Okay.  And you didn't actually inspect any

19   of the CCC vehicles used as comparables, right?

20       A    Right.

21       Q    So you're not pointing to specific examples

22   of adjusters applying these standards differently,

23   right?

24       A    Right.

25       Q    You're just saying theoretically, it could

1    testimony did you see that supports that point?

2         A    Well, the description -- I forget the name

3    of the guy who was the CCC 30(b)(6) representative at

4    this moment.

5         Q    Mr. Cervantes [ph]?

6         A    I just don't remember his name.  But his

7    description of what the field representatives do in

8    looking at the manual that's given to the field

9    representatives as to what they're supposed to do,

10   yes, that's my belief from both of those -- from the

11   testimony and from the training manual that cars that

12   are reasonably good and ready to sell should be

13   proofed into the comp database.

14        Q    Okay.  Any other documents or testimony

15   that's the basis of that belief?

16        A    Not that I recall.

17        Q    Okay.  Do you offer any opinions that CCC

18   inspectors are intentionally overvaluing vehicles by

19   assigning better condition ratings than appropriate?

20        A    No.  I don't -- I think it's just part of

21   the methodology.

22        Q    Okay.  Do you offer any opinions that

23   Garrison's inspectors are intentionally undervaluing

24   vehicles based on condition inspections?

25        A    No.

1      Q    No?   Okay.   So I assume I know the answer to

2   this question.   Are you offering any opinions that

3   Garrison used CCC so as to pay less to the -- to

4   insureds?

5      A    No, I don't have any evidence of that.

6      Q    Okay.   Can we jump ahead to page 15 of your

7   report, please?

8      A    Okay.   Got it.

9      Q    Okay.   So in this top paragraph here, you're

10  describing the work of CCC's field representatives,

11  right?

12     A    Right.

13     Q    And you're talking about the pay they

14  receive?

15     A    Yeah.

16     Q    And four lines down, you say, "They are paid

17  on a piecemeal basis at a very low rate."   Do you see

18  that?

19     A    Yes.

20     Q    Okay.   Why do you say a very low rate?

21     A    Because if you take a reasonable amount of

22  time, I mean, even five minutes a car, you would make

23  something like $9, $10 an hour, which is not a living

24  wage.

25          And to make $20, which if you have a family

1  BY MR. ZIMMERMAN:

2      Q    Okay, okay.  So your opinions don't relate

3  to whether CCC's adjustments are too big or too small.

4  You're just saying that they shouldn't be uniform?

5      A    I'm saying they don't have a basis to make a

6  judgment without a different and much more specific

7  comparison of the dealer comp vehicle components in

8  their condition, compared to the loss vehicle

9  component in its condition.

10     Q    Okay, okay.  I think I understand.  You're

11 not offering an opinion on the number.  You're not

12 saying --

13     A    No.

14     Q    -- CCC's condition adjustment is too high,

15 right?  Or too low?

16     A    No.  Once -- once we're -- once we're

17 assuming that there's -- one's a good condition and

18 one's a very good condition, I -- I'm not making any

19 judgment at all whether they're doing, you know --

20 whether what they're using is too high, too low, just

21 right.  I haven't examined that issue at all.

22     Q    Okay.

23     A    I don't know.

24     Q    No, that makes sense.  You didn't discuss

25 this report -- this Exhibit 8 in your report, did you?

1    My opinion is they -- they would have more
2 accuracy if they add a inspection process identical to
3 the total loss inspection process.  They could have a
4 lot fewer vehicles and be more accurate.
5    Q    So in your view, if they had fewer vehicles,
6 but all of those vehicles were inspected, it would be
7 more accurate?
8    A    Yes.  Inspected to the consistency and
9 equivalency to the total loss vehicles.
10    Q    Okay.  And what's the kind of statistical or
11 econometric reason for that opinion?  How'd you come
12 to that conclusion?
13    A    I think it's a logical conclusion that if
14 you add equivalent inspection of components, you could
15 make one to one comparisons with some accuracy.  If
16 you don't have inspections that deliver the same
17 information about each components, then you will have
18 less accuracy in trying to make comparisons.
19    Q    There's a tradeoff there you recognize,
20 right?  So CCC doesn't have the possibility to inspect
21 every vehicle in its database, right?
22    Let me ask it this way.  Is it logistically
23 possible for CCC to inspect every vehicle in its
24 database?
25    A    No.

1        Q    Okay.  Because there's millions and millions
2    of vehicles, right?
3        A    Right.
4        Q    So if CCC was going to individually inspect
5    every vehicle in its database, it would have to be a
6    much smaller database, right?
7        A    Yes.
8        Q    And your opinion is that would be a more
9    accurate database, even though they are sacrificing
10   size and quantity?
11       A    Yes.  As I described, if they did the
12   inspection with equivalency to the total loss
13   inspection, it would be much more accurate even if
14   they had fewer cars to choose from.
15       Q    So it'd be more accurate on the conditioning
16   side, but it might be less accurate on the pure
17   valuation side, right?  Because there would be less
18   comparable vehicles to select from?
19       A    Well, I guess to the extent that they're
20   using all these advertised prices, I have some concern
21   about the accuracy of using all those as opposed to
22   dealer actual -- actual sale prices.
23            So I think it could be, but I'm not certain
24   of that because of some real unknowns to me about what
25   these advertised prices represent and how close they

1  the -- that's when the vehicle arrives back at the

2  dealership, right?

3      A    Right.

4      Q    That's not what is turned around for sale to

5  resale to a consumer, right?

6      A    Right.

7      Q    So the vehicle may be in a different

8  condition when it's turned around for resale to a

9  consumer, right?

10     A    Yes.

11     Q    And that's because dealers do conduct

12 reconditioning and repairs, right?

13     A    Yes.

14     Q    And they do so because they think it's going

15 to raise the value of the vehicle?

16     A    Yes.

17     Q    I mean, they wouldn't spend the money

18 reconditioning it if they didn't think they could turn

19 a profit off of it, right?

20     A    Right.

21     Q    Okay.  So generally, dealer vehicles that

22 are listed for sale are in better condition than when

23 the dealer received that vehicle, right?

24     A    Yeah.  No, I'd say generally, that's true.

25 I'm not 100 percent, but generally true.

1   two or $300 for every 100 they spend because these
2   indirect costs, you've got to include in the analysis.
3       Q    Okay.  So some of the vehicle components,
4   when they're reconditioned by the dealer, will put
5   them in like-new condition though, right?
6       A    Yeah.  Maybe.
7       Q    So for example, changing the tires on a car.
8       A    Right.
9       Q    If you replace the tires, you're generally
10  going to put new tires on?
11      A    Right.
12      Q    Okay.  But CCC doesn't account for that in
13  its condition adjustments, right?  It assumes all the
14  components are very good condition?
15      A    Right.
16      Q    Okay.  So that component there would be a
17  benefit to the insured?
18      A    Yes.  That'd be a good example of that.
19      Q    Okay, okay.  So looking at your expert
20  report, this is the first full paragraph on page 18.
21  You say, "Dealer vehicles aren't necessarily in better
22  condition than total loss vehicles," right?
23      A    Yes.
24      Q    But you agree that generally, they are in
25  better condition, right?

1          MR. MALONE:  Objection.

2          THE WITNESS:  Yeah.  I think if you

3  just took the -- you know, the bell-shape curve of

4  both, the, you know, highest point of dealer vehicles

5  would be higher than, you know, most populate point of

6  the total loss vehicles.

7  BY MR. ZIMMERMAN:

8     Q    Okay.  That makes sense.  Yeah.

9          Now when CCC is determining the value of a

10  total loss vehicle, if a particular component is in

11  very good condition as determined by Garrison's

12  inspector, CCC gives the loss vehicle credit for that,

13  right?

14     A    Well, in the sense that they don't do a

15  deduction, yes.

16     Q    They actually give a positive adjustment to

17  the lost vehicle, right?

18     A    No.  Not if it's in very good -- comparing

19  to very good.

20     Q    So for a particular -- so compared to good

21  though, it would give a positive adjustment?

22     A    Oh, oh, yes.  I'm sorry.

23     Q    Okay, okay.  And then I think we're on the

24  same page here.  If all the components are listed as

25  very good, it would be equal to the condition

1    vehicles with the total loss vehicles, you should make

2    some adjustment for whatever amount the dealer spent

3    to recondition that vehicle, right?

4                    MR. MALONE:  Objection.

5                    THE WITNESS:  Some adjustment?  Well, I

6    don't think you just take a reconditioning cost or

7    something and make some adjustment.  I mean, you

8    should be comparing the actual condition of the total

9    loss vehicle and using the same criteria, the same

10   inspection process, the same effort to get comparable

11   condition -- on the comp vehicle.

12   BY MR. ZIMMERMAN:

13        Q    Okay.

14        A    And yes.  You know, if you've asked -- I

15   think you've asked are many of these or are most of

16   these dealer vehicles going to be in better condition?

17   I said yes because -- get some kind of reconditioning.

18        Q    Okay.  I think we're on the same page, but

19   just to be clear, so these vehicles on dealer lots

20   that are -- the comparable vehicles that are in better

21   condition than the total loss vehicle should receive

22   some kind of condition adjustment, right?  You're just

23   opining as to whether or not it should be the same

24   condition adjustment for every vehicle.

25        A    Yeah.  I guess -- yeah.  If there's some --

1   if on average, there are some components of the total

2   loss vehicle that on average don't meet the very good

3   standard, while on average some of the dealer -- most

4   of the dealer vehicles -- do, then you know, on

5   average, you would have an adjustment for that

6   component.

7       Q     Okay.  Okay.  I think I understand.

8             Okay.  I'm going to have you open tab 10 and

9   11 of the set of documents I provided.  This is going

10  to be Exhibit 10.  It's going to be North Carolina

11  Statute 20-183.4C.

12                  (Exhibit 10 was marked for

13                  identification.)

14      A     Yeah.

15      Q     And then Exhibit 11 is conveniently going to

16  be tab 11.  It's going to be North Carolina General

17  Statute 20-183.3.  Do you have both those documents?

18                  (Exhibit 11 was marked for

19                  identification.)

20      A     I have them both.  I'm not sure I can have

21  them side by side.  I'm not sure --

22      Q     I can ask about one at a time.  They're --

23      A     I can -- okay.  So I'm looking at the first

24  one.

25      Q     Let's start -- yeah.  Starting with tab 10,

TAB 50                                                    DJA0585

Page 1

1                UNITED STATES DISTRICT COURT
2            FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
3             Civil Action No. 1:19-cv-00294-CCE-JLW
4

   ELIZABETH V. FORTSON,            )
5                                   )
                                    )
6    Plaintiff,                     )
                                    )
7                                   )
     v.                             )
8                                   )
     GARRISON PROPERTY AND          )
9    CASUALTY INSURANCE COMPANY,    )
                                    )
10   Defendant.                     )
11
12
13
14        Zoom Video Deposition of DAVID SCHWICKERATH
15             (Taken by the Defendant)
16                  Phoenix, Arizona
17             Thursday, September 9, 2021
18
19
20
21
22   Reported by:    Marisa Munoz-Vourakis -
                     RMR, CRR and Notary Public
23
24
25

1    APPEARANCE OF COUNSEL BY ZOOM:

2    For the Plaintiff:

3            JOHN M. DeSTEFANO, ESQ.

4            Hagens Berman Sobol Shapiro LLP

5            11 West Jefferson Street, Suite 1000

6            Phoenix, AZ 85003

7            602-840-5900

8            johnd@hbsslaw.com

9

10   For the Defendant:

11           MATTHEW G. DROCTON, ESQ.

12           Baker & Hostetler LLP

13           200 Civic Center Drive, Suite 2200

14           Columbus, OH 43215

15           mdrocton@bakerlaw.com

16

17   Also Present:  MICHAEL KIRBY, Videographer

18                        o0o

19

20           Zoom Video Deposition of DAVID SCHWICKERATH,

21   taken by the Defendant, at Phoenix, Arizona, on the 9th

22   day of September, 2021 at 10:39 a.m., before Marisa

23   Munoz-Vourakis, Registered Merit Reporter, Certified

24   Realtime Reporter and Notary Public.

25

1                       I N D E X
2    Examination of:                               Page
3      DAVID SCHWICKERATH
4           EXAMINATION By Mr. Drocton . . . . . . . . 4
5           EXAMINATION By Mr. DeStefano . . . . . . 188
6           FURTHER EXAMINATION By Mr. Drocton . . . 191
7                   DEPOSITION EXHIBITS

8    EXHIBIT NUMBER          DESCRIPTION              PAGE
     Exhibit 1    Expert Report of Mr.                14
9                 Schwickerath
10   Exhibit 2    2020 USAA Annual Report             19
11   Exhibit 3    2019 USAA Annual Report             20
12   Exhibit 4    Intermediate Accounting,            25
                  Chapter 1
13
     Exhibit 5    Intermediate Accounting Chapter     32
14                2
15   Exhibit 6    Bates number                        81
                  CCC_Fortson000109694
16
     Exhibit 7    Bates stamp                         82
17                CCC_Fortson000109679
18   Exhibit 8    Bates number Garrison PC8045        84
19   Exhibit 9    Fortson CCC Report                  100
20   Exhibit 10   Insurance Regulation 11             100
                  NCAC4.0418
21
     Exhibit 11   11 NCAC4.0418 (prior version)       138
22
     Exhibit 12   Umpire Report                       139
23
     Exhibit 13   Bates number CCCIS027199            157
24
     Exhibit 14   1-14-11 USAA MCE                    183
25
     Exhibit 15   Allstate MCE                        188

1   any of the opinions in your report?

2              MR. DeSTEFANO:  Foundation.

3        A.    No, it would not.

4        Q.    Please turn back to PJA275.  The last

5   document listed there is Intermediate Accounting,

6   Chasteen, Flaherty and O'Connor, right?

7        A.    That's correct.

8        Q.    And I take it you relied on that textbook

9   in forming your opinions in the report, is that right?

10       A.    I believe so.  I footnoted it to the

11  discussion of the accounting principles in my report,

12  that's correct.

13       Q.    Why did you rely on this specific textbook?

14       A.    That's the textbook that I've relied on, I

15  think, for most, if not all, of my career.

16       Q.    Understood.  This case doesn't involve

17  financial and accounting principles, does it?

18             MR. DeSTEFANO:  Form and foundation.

19             THE WITNESS:  My apologies.

20       A.    I guess, but I was using accounting

21  principles as a basis for that section of the report,

22  for what those terms that I had identified and what

23  those impacts would be from an accounting principle

24  standpoint.

25       Q.    I understand that, Mr. Schwickerath, and

1    that wasn't the question I was asking.

2                Is it your understanding that this case is

3    about total loss claims handling processes?

4                MR. DeSTEFANO:  Form and foundation.

5         A.    That would be the determination of the

6    total loss amount paid to a claimant, yes.

7         Q.    For an insurance claim?

8         A.    That's correct.

9         Q.    And I guess what I'm trying to understand

10   is this textbook is about financial accounting

11   principles, right?

12        A.    I believe that's fair, accounting

13   principles, correct.

14        Q.    Okay.  So why did you use a textbook about

15   accounting principles in creating your report about

16   valuation of automobiles?

17        A.    It was in the context of how things

18   should -- could be or should be presented, and using

19   those accounting principles as a basis so that the end

20   user would have confidence in that calculation

21   determination.

22        Q.    And you would agree, though, that this case

23   though is not about financial accounting, right?

24        A.    No.  The determination is not about

25   financial accounting.  Those principles are an analogy

1    that I used as a basis for how it should or could be

2    presented so that the end user would be able to rely

3    and verify and test reasonableness of what's being

4    presented.

5        Q.    What portions of your opinion rely on the

6    textbook?

7        A.    I believe it's just toward the very end of

8    the report underneath the conclusions regarding those

9    items.

10       Q.    And your report mentions definitions from

11   that textbook, is that right?

12       A.    That's correct.

13       Q.    And you use those definitions contained in

14   the textbook in your report, right?

15       A.    That's correct.

16       Q.    Did you use the textbook in any other

17   manner to form your opinions?

18       A.    No, I don't believe so.

19       Q.    Does any part of that textbook that you

20   relied upon discuss insurance claims?

21       A.    Not that I recall.  I don't believe so.

22       Q.    Does any part of that textbook discuss

23   valuing automobiles?

24       A.    I don't believe so.

25       Q.    Mr. Schwickerath, I want us to now look at

1  another document in that folder, it's titled

2  Intermediate Accounting, Chapter 1.  Please let me know

3  when you have it open.

4      A.    I have it open.

5      Q.    Do you recognize this to be Chapter 1 of

6  the textbook we were just mentioning?

7      A.    I believe that's correct.

8      Q.    Just so it's clear, that's Chapter 1 of the

9  Intermediate Accounting textbook by Chasteen, Flaherty

10  and O'Connor, right?

11      A.    That is correct.

12          MR. DROCTON:  We'll go ahead and mark

13      this as Exhibit 4.

14              (The document referred to was marked

15          Deposition Exhibit Number 4 for

16          identification.)

17      Q.    I want you to take your time, but my

18  questions will be relatively brief, okay?

19      A.    Okay.

20      Q.    This Chapter 1 relates to financial

21  accounting and reporting, right?

22      A.    I believe so, if memory serves me correct.

23      Q.    And you don't have to rely on your memory.

24  You have the Chapter 1 in front of you.  You can read

25  through it, if you need to.

1     A.     Okay.

2     Q.     After taking a look at it, is that your

3  understanding that this chapter is regarding financial

4  accounting and reporting?

5     A.     That's correct.

6     Q.     You mentioned moments ago that you're using

7  financial and accounting to sort of analogize it to the

8  insurance claims handling, sort of area that we're

9  dealing with here, is that right?

10    A.     That's correct.

11    Q.     Why did you seek to or why did you

12  analogize financial accounting to the total loss claims

13  handling process for motor vehicles?

14    A.     Well, I think it's right there, if we look

15  at, I believe it's page two, and it's the second full

16  paragraph, and it says:  The term financial accounting

17  and recording encompasses the dual role of the

18  financial account.  One, measuring and recording an

19  entity's economic activities; and two, communicating

20  the recorded data to external users.

21          So I thought that's, in essence, the

22  analogy here.  The economic activities, which is the

23  calculation of the total loss claim; and then second,

24  communicating the recorded data, which is, in essence,

25  the calculation and the items that go into providing

1    that numerical outcome to the external users, which

2    would be the claimants or the policyholders.

3                   So I think that that there sets the reason

4    for the analogy of financial accounting and recording.

5        Q.    Mr. Schwickerath, that sentence doesn't

6    talk about insurance claims handling, does it?

7        A.    It does not.  But, again, as I said in my

8    report, I'm using it on an analogy basis.

9        Q.    I understand that.  And, again, you know,

10   anything in this chapter, Mr. Schwickerath, that leads

11   you to believe that these financial accounting

12   principles are applicable to insurance claims handling

13   practices?

14       A.    Specifically insurance claims practices, I

15   don't believe so.  But, again, I thought it was

16   appropriate, given that you're talking about the

17   measuring and recording an entity's economic

18   activities; and two, communicating that data to

19   external users.

20       Q.    So is it your opinion that any time you're

21   trying to measure economic activities, you would apply

22   these same principles?

23       A.    I think it depends on the situation.

24       Q.    So what about the insurance claims handling

25   sort of process separates it from other processes that

1   those economic activity that went into determining that

2   outcome.

3        Q.    There's nothing in the regulation, the

4   regulation that you looked at, that discusses applying

5   financial accounting principles to insurance claims

6   handling, correct?

7              MR. DeSTEFANO:  Form and foundation.

8        A.    The regulations itself, no, there was not.

9        Q.    Thank you.  And there's nothing in this

10  chapter that specifically discusses insurance claims

11  handling, right?

12       A.    Specifically insurance claims handling, no,

13  it does not.

14       Q.    We're on page two of the textbook, which is

15  three of the PDF, right?

16       A.    I believe that's correct.

17       Q.    You were just moments ago talking about

18  sort of the top section.  I want to direct your

19  attention to the bottom where it talks about GAAP,

20  generally accepted accounting principles.

21             Do you see that?

22       A.    Yes, I do.

23       Q.    Can you please explain what GAAP is?

24       A.    Generally accepted accounting principles

25  are those accounting principles that dictate and are

1    standards for the reporting of finance performance of
2    companies, predominantly publicly traded companies to
3    the external market.  It's also the basis for audited
4    financial statements, which again are a very key
5    component for publicly traded companies.
6         Q.     Thank you for that.
7                What role does GAAP have in insurance
8    claims handling?
9                MR. DeSTEFANO:  Form and foundation.
10        A.     I don't believe that GAAP has any basis in
11   insurance claims for automobiles.
12        Q.     And the North Carolina insurance regulation
13   that we're discussing, you don't believe that discusses
14   applying GAAP to insurance claims handling, right?
15        A.     I don't believe so, no.
16        Q.     You moments ago directed our attention to
17   one sentence on this document.  What in this exhibit
18   did you rely upon in forming the opinions on the case?
19                MR. DeSTEFANO:  I'm sorry, counsel,
20           which document are we looking at now?  Are
21           we still in the chapter?
22                MR. DROCTON:  We're still on Exhibit
23           4, Chapter 1, of the intermediate accounting
24           textbook.
25                MR. DeSTEFANO:  Thank you.

1          Okay.  And this may be -- this is also from

2    the edition six of that intermediate accounting

3    textbook.  Do you see that?

4          A.     I do.

5          Q.     Does this appear to be, perhaps not the

6    edition that you used in preparing your report?

7          A.     I don't believe that this is the edition

8    that I've used.

9          Q.     Which edition did you use?

10         A.     I believe it's a second; first or second

11   edition.  This is not the edition that I used.

12         Q.     So first or second edition.

13                Do you recall when that edition was

14   published?

15         A.     1985, 1986, roughly.

16         Q.     Did you review any of these subsequent

17   editions?

18         A.     Not that I recall.  As I said, I relied on

19   that textbook for most, if not all, of my career.

20         Q.     But you wouldn't know if there was any

21   significant updates in the textbook since the first or

22   second edition?

23         A.     With regards to those principles, I don't

24   believe that there would be any significant or

25   substantial updates or changes.  Those are guiding

1    Q.    Is it your understanding that this was the

2    regulation that was in effect at the time Ms. Fortson's

3    loss was adjusted?

4    A.    That's my understanding, yes.

5    Q.    The language in this regulation is a little

6    bit different than the language in the current version

7    that we just previously looked at, right?

8    A.    That's correct.

9    Q.    Can you please explain what portions --

10   well, I guess, first, is it your opinion that this

11   regulation requires insurance carriers to itemize

12   portions of a total loss report?

13           MR. DeSTEFANO:  Foundation.

14   A.    I believe as outlined in the report, that

15   would be under number four, which I believe is very

16   similar language to the 2020 version that when a

17   written statement is requested by a claimant, the total

18   loss payment by insurer shall be accompanied by a

19   written statement listing estimates, valuation, and

20   deductions used in calculating the payment, if any, and

21   the source of these values.

22   Q.    I'm sorry, I missed that.  Where are you

23   reading from, Mr. Schwickerath?

24   A.    Number four.

25   Q.    Number four, got it.

1           And if I got that correct, it's your

2  opinion that subpart four requires insurance carriers

3  to itemize total loss valuations?

4           MR. DeSTEFANO:  Foundation.

5      A.   Within a written statement, that would be

6  correct.

7      Q.   This is the total loss regulation that you

8  relied upon in preparing your report, right?

9      A.   That's correct.

10     Q.   Besides subsection four, is there anything

11 else in this regulation that requires Garrison to

12 itemize their total loss valuations?

13          MR. DeSTEFANO:  Foundation.

14     A.   I don't believe so, from a layperson.

15     Q.   Okay.  So it's your understanding that only

16 subpart 4 applies and requires itemization?

17          MR. DeSTEFANO:  Foundation.

18     A.   Again, from a layperson's perspective, I

19 believe that's correct.

20     Q.   And subpart four begins:  If a written

21 statement is requested by the claimant, do you see

22 that?

23     A.   Yes, I do.

24     Q.   And I know we previously talked about how

25 you're not a lawyer, and you're not going to opine on

1    whether this, at least the prior regulation applies

2    only when a written statement is requested.  Does the

3    same go for this regulation as well?

4                MR. DeSTEFANO:  Foundation.

5         A.    Yes, it would.

6         Q.    Okay.  So assuming that a court determines

7    that this regulation does not apply, subpart four,

8    unless a written statement is requested by the

9    claimant, do you have any other basis for opining that

10   Garrison must itemize their valuations?

11               MR. DeSTEFANO:  Foundation.

12        A.    As I mentioned earlier, I would defer to

13   legal counsel.

14        Q.    And I'm not asking you to opine on the

15   legal part of whether this provision actually applies

16   or not.  I understand that.  I'm saying assuming this

17   does not apply, is there anything else, in your

18   opinion, that would require Garrison to itemize

19   valuations?

20               MR. DeSTEFANO:  Foundation.

21        A.    Again, from a lay perspective, I don't

22   believe so.

23        Q.    So your opinion that Garrison did not

24   properly itemize the condition adjustment for

25   Ms. Fortson's total loss is based solely on subpart

1    four of this regulation, is that right?

2             MR. DeSTEFANO:   Foundation.

3        A.    Based on my lay understanding, that's

4    correct.

5        Q.    Okay.  I think you previously stated you're

6    not sure if Ms. Fortson actually made a request under

7    this regulation, are you?

8        A.    No, I'm not.

9        Q.    Based on your understanding, if a written

10   statement is not requested by a claimant, are you aware

11   of any other obligation for Garrison to perform any

12   sort of itemization on the condition adjustment?

13            MR. DeSTEFANO:   Foundation.

14       A.    As I believe I just mentioned, not as a

15   layperson, in my review.

16       Q.    Mr. Schwickerath, so you're not an expert

17   on insurance practices or policies, are you?

18       A.    No, I'm not.

19       Q.    And you're not an expert on insurance

20   claims handling processes for setting methods, are you?

21       A.    No, I'm not.

22       Q.    And nor are you an expert on total loss

23   valuations, are you?

24       A.    No, I'm not.

25       Q.    You're not an expert on North Carolina

1      insurance regulations either, right?

2           A.     No, I'm not.

3           Q.     And before this case, you had no experience

4      with the North Carolina's insurance regulations, right?

5           A.     I don't believe so.

6           Q.     So Mr. Schwickerath, if a court should rely

7      on you to provide an opinion as to the meaning of 11

8      NCAC4.0418, right?

9                  MR. DeSTEFANO:  Form and foundation.

10          A.     No, I don't believe so.

11          Q.     Are you aware of anywhere in the North

12     Carolina total loss claims handling laws and

13     regulations that says financial accounting standards

14     and principles apply?

15                 MR. DeSTEFANO:  Foundation.

16          A.     No, I'm not.

17          Q.     On what basis then do you believe that

18     financial accounting principles apply to 11 NCAC4.0418?

19          A.     Well, as I testified earlier this morning,

20     that goes to an analogy of the accounting principles

21     for providing the information to the end users, in this

22     case, the claimants.  That's about as far as the

23     process and how those calculations of the economic

24     outcomes are determined.

25          Q.     Okay.  So you mentioned that you worked on

1    some insurance claims handling matters in your prior

2    experience as a litigation consultant, right?

3          A.    That's correct.

4          Q.    But you don't have any prior experience in

5    insurance claims handling in North Carolina, right?

6          A.    No, I do not.

7          Q.    There's nothing in your background that

8    would lead you to believe that financial accounting

9    principles specifically apply to North Carolina's

10   insurance claims handling regulations, right?

11         A.    No.  Again, I was using it as an analogy

12   for the presentation information.

13         Q.    Are you aware of any courts supplying

14   financial an accounting principles to insurance claims

15   handling regulations?

16         A.    Not as I sit here.

17         Q.    Mr. Schwickerath, can you please turn back

18   to Exhibit 1, your report, and direct your attention to

19   PJA251?

20         A.    Okay.

21         Q.    Do you see under subheading five there

22   where it says:  CCC's condition adjustment for

23   comparable vehicles relied upon by Garrison does not

24   meet the standards to provide verifiable information,

25   explanations of additions or deductions from the actual

1     Q.    What standards are you referring to?

2     A.    That would be the standards that we just

3 discussed in the regulations for North Carolina.

4     Q.    Okay.  And there's quotations in that

5 sentence.  Are you quoting to a source?

6     A.    I believe that I was.  There's not a

7 footnote, my apologies.  I certainly was looking at

8 something, but I didn't footnote it, so that's my

9 omission.

10     Q.    No worries.  Do you recall what you were

11 citing to?

12     A.    Not as I sit here.  I'd have to go look.

13     Q.    That's fine.  Mr. Schwickerath, you're not

14 offering any opinions today on whether a condition

15 adjustment may be made to a comparable vehicle, right?

16     A.    No, I'm not.

17     Q.    And you have no opinions on whether the

18 dollar amount of any condition adjustment was

19 appropriate, right?

20     A.    No, I do not.

21     Q.    And you've reviewed 11 NCAC4.0418.  Is it

22 your understanding that that regulation actually

23 contemplates condition adjustments?

24     MR. DeSTEFANO:  Form and foundation.

25     A.    Could you repeat that?  I'm not sure I

1  understanding when we used the NADA, that it was an
2  amount for the base vehicle, and then certain dollar
3  amounts were options and then plus or minus for
4  mileage.  So under your assumption, I'd have to go back
5  and look.
6       Q.    And what you just described, is that not
7  what CCC does?
8            MR. DeSTEFANO:  Form and foundation.
9       A.    It does, but then it also adds a condition
10 adjustment.  That's the same, for each of the
11 comparable vehicles, based on a calculation that uses
12 either surveys for six different components, multiplies
13 them all together and then applies that outcome to a
14 hypothetical typical vehicle.
15      Q.    Do you understand that NADA has multiple
16 values, such as retail and wholesale?
17      A.    I believe that's correct.
18      Q.    Do you understand that NADA does not
19 disclose how it calculates the difference between
20 retail and wholesale value for an individual vehicle?
21           MR. DeSTEFANO:  Foundation.
22      A.    I don't recall.  I'd have to look.  I'm
23 sorry, it's been some time.  I just don't recall.
24      Q.    Mr. Schwickerath, is it your understanding
25 that under North Carolina's regulation, insureds are

1    entitled to the actual cash value of their loss

2    vehicle?

3                    MR. DeSTEFANO:   Foundation.

4        A.     Yes, I believe that's correct.

5        Q.     And is it also your understanding that

6    Ms. Fortson's policy entitles her to actual cash value

7    for loss vehicle?

8                    MR. DeSTEFANO:   Foundation.

9        A.     I believe that's correct.  I don't recall

10   that's specifically her policy, but I believe that's

11   correct.

12       Q.     You're not aware of anything that entitles

13   an insured like Ms. Fortson to some value above actual

14   cash value, right?

15                   MR. DeSTEFANO:   Form and foundation.

16       A.     No, I believe it's actual cash value for

17   the vehicle.

18       Q.     If the comparable vehicle condition

19   adjustment is removed, what effect would that have on

20   the actual cash value of the vehicle?

21       A.     The actual cash value of the vehicle would

22   increase by the removal of said condition adjustment.

23       Q.     And I think, as you previously said, you're

24   not actually taking issue with the dollar amount of the

25   condition adjustment for the comparable vehicles,

1    right?

2              MR. DeSTEFANO:  Form and foundation.

3         A.    That's correct.

4         Q.    You have no opinion whether the $722

5    condition adjustment for the comparables for

6    Ms. Fortson's CCC report were too high or too low,

7    right?

8              MR. DeSTEFANO:  Form and foundation.

9         A.    No, I can't -- there's no information to

10   test accuracy or the reasonableness.

11        Q.    That wasn't my question, Mr. Schwickerath.

12             I am asking you, you have no opinion on

13   whether the dollar amount, 722, is too high or too low

14   for the comp vehicles in Ms. Fortson's CCC report,

15   right?

16        A.    Correct.

17             MR. DeSTEFANO:  Form and foundation.

18        A.    I have no opinion.  I can't see how that

19   calculation is determined, so no, I don't have an

20   opinion.

21        Q.    Thank you.  So how can you testify that

22   removing the comparable vehicle condition adjustment

23   positively increases the amount of actual cash value?

24        A.    Because that deduction is not itemized or

25   verifiable to test reasonableness and the accuracy of

1    that adjustment for the specific total loss vehicle.

2          Q.    Mr. Schwickerath, what kind of car do you

3    drive?

4          A.    I have a Hyundai Equus.

5          Q.    Did you say a Hyundai?

6          A.    Equus.

7          Q.    I'm not familiar with that.

8                Is that a sedan or an SUV?

9          A.    It's a sedan.

10         Q.    What year is it?

11         A.    2016.

12         Q.    And about how many miles?

13         A.    Under 15,000.

14         Q.    Okay.  Suppose you received a CCC report

15    with a value of $100,000 for your vehicle, okay?

16         A.    Okay.

17         Q.    Would you agree that your vehicle is not

18    worth $100,000?

19         A.    I think it would be unlikely that my

20    vehicle is worth $100,000.

21         Q.    You would be pretty happy if you received

22    $100,000 for your vehicle, right?

23         A.    Yes, I would be happy if I received

24    $100,000 for my vehicle.

25         Q.    And you would be happy to accept $100,000

1    in exchange for your vehicle?

2        A.    Yes, I would.

3        Q.    Suppose the CCC report had a thousand

4    dollar comparable vehicle condition adjustment, okay?

5        A.    Okay.

6        Q.    So that results in -- scratch that.

7              Suppose you received a CCC report, like

8    Ms. Fortson's, with a comparable vehicle condition

9    adjustment of $1,000, okay?

10       A.    You said comparable vehicle adjustment?  I

11   just wanted to make sure and clarify.

12       Q.    My apologies, I meant to say comparable

13   vehicle condition adjustment.

14       A.    Okay.

15       Q.    And it is in the same format as presented

16   in Ms. Fortson's CCC report, okay?

17       A.    Okay.

18       Q.    Is it your opinion that that thousand

19   dollar condition adjustment would cause you damages?

20       A.    Yes, I have no way to verify or check the

21   reasonableness or test that amount.  There's no

22   support.  It's a deduction that is unsupported.

23       Q.    Even though you agree that your vehicle is

24   not actually worth $100,000, you still think you

25   incurred damages?

1    A.    Well, I'm sorry, are we talking still about
2    the $100,000 value, or are you just talking that I got
3    a report, and there was a condition adjustment of
4    $1,000 on my report?
5        Q.    You received a CCC report with a total
6    value of $100,000 for your Hyundai, and in the CCC
7    report, there's a condition adjustment to the
8    comparable vehicles used to calculate value in the
9    amount of $1,000.  Do you follow?
10       A.    I do now.
11       Q.    And that comparable vehicle condition
12   adjustment is listed in the same format as listed in
13   Ms. Fortson's CCC report, okay?
14       A.    Okay.
15       Q.    Is it your opinion that you would be
16   damaged in the amount of $1,000 by that condition
17   adjustment to the comparable vehicles?
18       A.    I'm not sure.  Given that the valuation of
19   my vehicle was $100,000, which is certainly worth more
20   than my car itself, I don't, I don't know that I'd be
21   damaged, because I'm still receiving $100,000 instead
22   of $101,000.
23       Q.    Okay.  And so I take it that financial
24   accounting principles wouldn't entitle you then to
25   another $1,000, right?

1    of Mr. Hausman-Cohen's declaration, is that right?

2         A.    That's correct.

3         Q.    Okay.  Besides those two sources, does your

4    knowledge of Garrison's claims handle practices come

5    from anywhere else?

6         A.    I guess it would be the deposition by

7    Mr. Lopez, which is referenced in my report, and to the

8    extent that the CCC is part of that process, then those

9    documents from that presentation and other items that

10   are referenced in my report will also be sources.

11        Q.    Okay.  Mr. Schwickerath, is it your opinion

12   that CCC -- that the CCC report is intended to mislead

13   consumers?

14        A.    I don't have an opinion on that.

15        Q.    Okay.  You testified earlier that you have

16   experience in valuing businesses, right?

17        A.    That's correct.

18        Q.    Is it your belief that you have specialized

19   knowledge and experience in valuing businesses?

20        A.    Well, I believe I do.  I've qualified as an

21   expert on many occasions.

22        Q.    And do your clients sometimes not have that

23   same skill to value a business?

24        A.    Various clients have various skills

25   relating to the value of a business.

# TAB 51
# DJA0611 - DJA0672

# FILED UNDER SEAL

# TAB 52
# DJA0673 - DJA0744

# FILED UNDER
# SEAL

TAB 53

Page 1

1          UNITED STATES DISTRICT COURT
2       FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
3         Civil Action No. 1:19-cv-00294-CCE-JLW
4

ELIZABETH V. FORTSON,              )
5                                    )
                                     )
6   Plaintiff,                       )
                                     )
7                                    )
    v.                               )
8                                    )
    GARRISON PROPERTY AND            )
9   CASUALTY INSURANCE COMPANY,      )
                                     )
10  Defendant.                       )
11
12
13        Zoom Video Deposition of WILLIAM BERGLUND
14             (Taken by the Defendant)
15               Oak Brook, Illinois
16           Thursday, September 2, 2021
17
18
19
20
21  Reported by:      Marisa Munoz-Vourakis -
                      RMR, CRR and Notary Public
22
23
24
25

Page 2

1    APPEARANCE OF COUNSEL BY ZOOM:

2    For the Plaintiff:

3              JOHN M. DeSTEFANO, ES .

4              Hagens Berman Sobol Shapiro LLP

5              11 West Jefferson Street, Suite 1000

6              Phoenix, AZ 85003

7              602-840-5900

8               ohnd hbssla .com

9

10   For the Defendant:

11             KEVIN P. ZIMMERMAN, ES .

12             Baker   Hostetler LLP

13             200 Civic Center Drive, Suite 2200

14             Columbus, OH 43215

15             kzimmerman bakerla .com

16

17   Also Present:  MICHAEL KIRBY, Videographer

18                      o0o

19

20             Zoom Video Deposition of WILLIAM BERGLUND,

21   taken by the Defendant, at Oak Brook, Illinois, on the 2nd

22   day of September, 2021 at 10:07 a.m. (Eastern Standard

23   Time), before Marisa Munoz-Vourakis, Registered Merit

24   Reporter, Certified Realtime Reporter and Notary Public.

25

1                    I N D E

2   Examination of:                              Page

3     WILLIAM BERGLUND

4         E AMINATION BY MR. ZIMMERMAN . . . . . . . 4

5         E AMINATION BY MR. DESTEFANO . . . . . . 302

6         FURTHER E AMINATION BY MR. . . . . . . . 311

7         ZIMMERMAN

8                    DEPOSITION E HIBITS

9   E HIBIT NUMBER         DESCRIPTION              PAGE

10  Exhibit 1    Expert Report                      12

11  Exhibit 2    Bates numbers DJA277 to 278        78

12  Exhibit 3    Ms. Fortson s CCC report           99

13  Exhibit 4    201911NCAC4.0418 document         116

14  Exhibit 5    4-15-20 Revised Statute           124

15  Exhibit 6    FA s Total Loss document          150

16  Exhibit 7    6-23-21 John Gintvaines           185
                 deposition transcript
17

    Exhibit 8    Vehicle Condition Market Value    231
18               Impact Study

19  Exhibit 9    Bates number Garrison PNC14373    234

20  Exhibit 10   Zeavin vs. Ray Westla  case       270

21  Exhibit 11   1-14-11 Report on Market          289
                 Conduct Examination
22

    Exhibit 12   Declaration of Randall            309
23               McCathren

24

25

DJA0748

1  Ms. Fortson  as paid more or less than she should have
2  been paid, right

3              MR. DeSTEFANO:   Form and foundation.
4      A.      That is correct.
5        .      Ho   ould  e determine   hether Ms. Fortson
6   as paid more or less than she should have been paid
7              MR. DeSTEFANO:   Form and foundation.
8      A.      Again, I m ans ering the same  uestion
9  repeatedly.  If they  ould itemize the condition
10 ad ustment for each of the four vehicles and indicated
11 ho  they applied them, then Ms. Fortson could look and
12 make a determination of  hether or not she  ould accept
13 those figures.  Without that type of break do n, she s
14 got no  ay of kno ing.
15        .      Okay.  No , in your expert report, you
16 don t mention the options ad ustment as being
17 insufficiently itemized, the options ad ustment  e see
18 on page eight and nine, right
19     A.      I don t believe so.  Let me take a look at
20 the option ad ustments.
21        .      Yeah, go ahead.
22              (Pause.)
23     A.      Yeah, I don t believe I rendered an opinion
24 on the basis for the option ad ustments.
25        .      Why not

Page 112

1      A.      Because there s no specificity as to  hat

2   the ad ustments applied to.  There  as not.  There  as

3   notice  ith regard to the condition ad ustment.  It s

4    ust a blanket number.

5          .      So you don t mention the mileage ad ustment

6   as being improperly itemized either, right

7      A.      That is correct.

8          .      Okay.  And  hy not

9      A.      Same reason.

10         .      That s  ust a single number that s listed

11  there, right

12     A.      That is correct.

13         .      And the condition ad ustment is  ust a

14  single number, right

15     A.      But the condition ad ustment applies to

16  more than  ust one item.  It applies to the overall

17  condition of the vehicle.  I think there s a

18  significant difference bet een them.

19         .      So you don t think any additional

20  information  as re uired for the mileage ad ustment

21  though, am I right about that

22     A.      That s correct.

23              MR. DeSTEFANO:  Foundation.

24              BY MR. ZIMMERMAN:

25         .      Would it have been appropriately itemized

DJA0750

1    if CCC broke out the condition ad ustment based on the

2    kind of components of each vehicle

3        A.        Again, if it provided a detailed listing of

4    ho  they arrived at the numbers, I think that  ould

5    have been appropriate.

6        .        Was it appropriate for Garrison and CCC to

7    make an option ad ustment, as they did here

8        A.        Okay.   What do you mean by option

9    ad ustment

10       .        The options ad ustment  e re looking at on

11   page eight.  Do you see that, 229 for the comp. one

12   minus 90 for comp. t o.  Do you see  here I m looking

13       A.        Oh, okay, yes, I see that.

14       .        Okay.  Do you have any opinions as to

15    hether or not it  as appropriate for CCC to make that

16   options ad ustment

17       A.        I have no opinion.

18       .        Okay.  Was it appropriate for CCC to make

19   the ad ustment for mileage

20       A.        It seems reasonable.

21       .        Was it appropriate for CCC to make the

22   condition for options -- condition ad ustment for

23   options

24       A.        Okay.  When you say condition ad ustment,

25   it refers to something specific.

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 467 of 598

DJA0751

1          .        You re right, yeah, you re right.

2                   Was it appropriate for CCC to make the

3     options ad ustment that  e re looking at here

4          A.      Yes.

5          .        No , can you look through this CCC One

6     report and identify any portions of it that you think

7     make it represented to be authoritative

8          A.      We ve got a multiple page report here.  I

9     don t kno  ho  much time you  ant me to spend on this.

10    I don t kno  if the  ord authoritative is used any here

11    on this report or not, but I have to revie  the entire

12    report to give a response to that.  Do you  ant me to

13         .        Let me ask you slightly differently.

14                  You did revie  this report  hen putting

15    together your opinions for the expert report, right

16         A.      Yes.

17         .        And is it your opinion that the CCC report

18    self-identifies as or represents itself to be

19    authoritative

20         A.      I don t kno  if the report represents

21    itself.  I think the impression from the Garrison s

22    ad uster standpoint is that it is an authoritative

23    report, and that is ho  it  as presented to the

24    policyholder.

25         .        Okay.  So the report itself isn t saying

Page 1

1          UNITED STATES DISTRICT COURT
       FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2          Civil Action No. 1:19-cv-00294-CCE-JLW
3

ELIZABETH V. FORTSON,                    )
4                                        )
              Plaintiff,                 )
5                                        )
vs.                                      )
6                                        )
GARRISON PROPERTY AND CASUALTY           )
7    INSURANCE COMPANY,                   )
                                         )
8              Defendant.                 )
                                         )
9
10
11
12          Videotaped Remote Deposition of
13          DR. LANCE DARSHANA KAUFMAN
14             (Taken by Defendant)
15              Corvallis, Oregon
16          Tuesday, August 24, 2021
17
18
19
20
21
22
23
24          Reported in Stenotype by
          Lauren M. McIntee, RPR, CRR
25    Transcript produced by computer-aided transcription

Page 2

```
 1                    APPEARANCES
 2      ON BEHALF OF THE PLAINTIFF:
 3              Tory Beardsley, Esuire (via Zoom)
                Hagens Berman Sobol Shapiro, LLP
 4              11 West Jefferson Street, Suite 1000
                Phoenix, Arizona 85003
 5              (602) 840-5900
                Toryb hbssla .com
 6
 7      ON BEHALF OF THE DEFENDANT:
 8              Rodger L. Eckelberry, Esuire (via Zoom)
                Mathe  Drocton, Esuire (via Zoom)
 9              Baker Hostetler, LLP
                200 Civic Center Drive, Suite 2200
10              Columbus, Ohio 43215
                (614) 462-5189
11              Reckelberry bakerla .com
                Mdrocton bakerla .com
12
13      ALSO PRESENT:
14      Michael Kirby, Videographer (via Zoom)
15
16
17
18
19
20          VIDEOTAPED REMOTE DEPOSITION OF DR. LANCE DARSHANA
21      KAUFMAN, a  itness called on behalf of Defendant, before
22      Lauren M. McIntee, Registered Professional Reporter,
23      Certified Realtime Reporter, and Notary Public, in and
24      for the State of North Carolina, in Corvallis, Oregon,
25      on Tuesday, August 24, 2021, commencing at 7:33 a.m. PST
```

1                    INDE  OF E AMINATIONS

2   By Mr. Eckelberry................................  Page 4

3

4

                        INDE  OF E HIBITS

5

6   NUMBER        E HIBIT                              MARKED

7   Exhibit 1    Dr. Kaufman s Report and                 35
                 Curriculum Vitae

8

    Exhibit 2    Dr. Kaufman s LinkedIn Profile           36

9

    Exhibit 3    North Carolina Total Loss               124

10               Regulation

11  Exhibit 4    Report Summary, Reference               124
                 Number 88957510

12               (Garrison P C 00035559 to 35575)
                 (CTRL 8379)

13

    Exhibit 5    Report Summary, Reference               124

14               Number 82275931
                 (CCCIS027199 to 027216)

15               (CCCIS027199)

16  Exhibit 6    Sample Claim Activity Log               158
                 (Garrison P C 00039938 to 39958)

17

    Exhibit 7    Overton Body Shop Sanford Estimate      172

18               of Record
                 (Garrison P C 00039898 to 39904)

19               (CTRL 8966)

20  Exhibit 8    Umpire Report                           172

21  Exhibit 9    Report Summary, Reference               173
                 Number 82424586

22               (Garrison P C 00000206 to 226)
                 (Fortson CCC Report)

23

24

25

Page 45

1    the mileage deduction is itemized, correct

2                MS. BEARDSLEY:  Ob ection, form.  Outside the

3        scope of the report.

4        A.      Not in the context that s used in my report.

5    BY MR. ECKELBERRY:

6        .      Okay.  And  hat context do you use itemized

7        A.      Well, I  ould use it to refer to a breakdo n

8    of the factors leading to the size of the condition

9    ad ustment.

10       .      Okay.  So if I understood  hat you said

11   earlier, there are varying degrees of deductions.  So

12   it s -- is it fair to say that the deductions to the

13   comparable vehicles are itemized, but you feel they

14   should be itemized to a more specific degree

15       A.      Not should.

16              MS. BEARDSLEY:  Scope.

17       A.      I don t intend to -- to present or have an

18   opinion about  hat should have been done.  I -- in my --

19   my opinion in this case rests on the premise that the --

20   the ad ustment is an illegal ad ustment and -- and that

21   opinion is -- that -- that s an assumption that my

22   understanding is other experts and the counsel in this

23   case  ill be making that argument.  I can offer an

24   opinion about  hat seems reasonable to me as a method --

25   a level of itemization, but it s not necessarily  hat

DJA0756

1    should have been done because that s outside the scope

2    of -- of my analysis and my expertise.

3            So -- so  hat seems reasonable, a reasonable

4    level of itemization to me  ould be to have, for each

5    comparable vehicle, to have a list of the components,

6    the ad ustment for each component, and the basis for

7    classifying that component in the condition that it s

8    classified.  And, you kno , that provides a level of

9    detail that  ould allo  a claimant to revie  -- revie

10   the comparable vehicles.  If they  ant to, they could go

11   and confirm the condition of the vehicles and validate

12   the report.  But I don t necessarily have an opinion

13   that s  hat should have been done.  That s  ust  hat

14   seems reasonable to me.

15   BY MR. ECKELBERRY:

16        .    Reasonable to you in your personal opinion,

17   not as an expert  am I right

18        A.    Both.

19        .    Okay.  Are you familiar  ith the industry

20   custom and standard as far as  hat level of itemization

21   is used

22            MS. BEARDSLEY:  Ob ection.  Outside the scope

23       of the report.

24        A.    For  hich industry

25   BY MR. ECKELBERRY:

Case 1:19-cv-00294-CCE-JLW  Document 96  Filed 11/01/21  Page 473 of 598

DJA0757

1          9:32 a.m.

2                    (Recess taken 9:32 a.m. to 9:51 a.m. PST)

3                    THE VIDEOGRAPHER:   We are back on the record

4          at 9:51 a.m.

5     BY MR. ECKELBERRY:

6          .     Dr. Kaufman, Section 3 of your report begins

7     on Page PJA0476.  The last sentence states,  Thus,

8     plaintiff asserts and this report assumes the condition

9     ad ustment is improper and unla ful.

10         A.     Yes.

11         .     I believe you testified earlier that you

12    profess no legal expertise  is that correct

13         A.     That s correct.

14         .     So you have no opinion on the legality or

15    illegality of the condition ad ustments to the

16    comparable vehicles  is that right

17         A.     That s correct.

18         .     Do you have any expert opinion on  hether the

19    condition ad ustment complies  ith the terms of

20    plaintiff s insurance policy

21         A.     No.

22         .     Do you have any evidence that the comparable

23    vehicle condition ad ustments  ere excessive given the

24    condition of the comparable vehicles

25                    MS. BEARDSLEY:   Ob ection, outside the scope.

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 474 of 598

DJA0758

1    testified to, 5 to 10 percent  ould be many, correct

2    Or more.  5 to 10 percent or more, correct

3        A.    Correct.

4        .    Okay.  If 90 percent of the 90 percent that

5    aren t inspected  ere in very good condition,  hat  ould

6    that percentage be of the total of comparable vehicles

7    I apologize.  I m bad at math.  What s 90 percent of

8    90 percent

9        A.    That s .9 times .9, so 81.  .81 percent.

10       .    So if -- I m sorry.  Go ahead.

11       A.    I -- I didn t have anything to add.

12       .    If 90 percent of the 90 percent that aren t

13   inspected are in very good condition, that  ould be, did

14   you say 81 percent of the total

15       A.    Yes.

16       .    So if 81 percent of the total comparable

17   vehicles  ere in very good condition, your methodology

18   for calculating damages  ould overstate harm to the

19   class,  ouldn t it

20       A.    No.

21            MS. BEARDSLEY:  Ob ection.  Form, foundation.

22   BY MR. ECKELBERRY:

23       .    Why not

24       A.    Well, the methodology is not -- the

25   methodology is -- is a result of the condition

Case 1:19-cv-00294-CCE-JLW  Document 96  Filed 11/01/21  Page 475 of 598

DJA0759

1   ad ustment being improper and unla ful.  And it s not a

2   methodology that -- it s not a methodology that is

3   applying a revaluation after the fact.  So -- so  hat

4   the methodology does is it -- it -- it simply takes the

5   condition ad ustment of the -- of the comparable vehicle

6   out of the vehicle valuation.

7        .    Okay.  So your methodology --

8             (Phone ringing.)

9        .    Strike that.

10            For purposes of your methodology, it doesn t

11  matter if a given insured  as paid  hat their vehicle

12   as  orth or more, does it

13            MS. BEARDSLEY:  Ob ection, form.

14       A.    Well, there s a lot of information kind of

15  loaded in that  uestion.  So there is a process that the

16  insurer established for valuing vehicles, and that

17  process has several components, one of  hich  as

18  illegal.  And my methodology removes the illegal

19  component  hile maintaining the insurer s valuation

20  process.  And that -- that doesn t -- that results in a

21  valuation for the vehicle.

22            No ,  hat you re asking for is a number of,

23  you kno , is it overvaluing or undervaluing  But it s

24  -- it is valuing.  I mean, that s -- that s the -- there

25  is no over or undervaluing in that scenario.

1    could -- they  ould certainly -- if -- if I  ere engaged

2    to distribute damage payments, I  ould distribute it

3    proportionately to the actual loss.  And in this case,

4    there s no loss, so I  ouldn t ascribe any -- any

5    payment to the individual.

6              And finally, again, I defer to Larry,

7    Mr. Hausman-Cohen on specifics, but my understanding is

8    that the hypothetical that you re coming up  ith is a

9    very, very small number.  I  ould be surprised if it s

10   more than -- more than 10 or 20 class members.

11        .    You  ould be surprised, but you don t kno

12   for a fact, do you

13        A.    Right.

14        .    You re not expressing opinion on the

15   propriety of mileage or option ad ustments, are you

16        A.    No.

17        .    In the -- strike that.

18              Are you a are that some of the punitive class

19   members received settlement payments based on CCC

20   reports that rely on earlier valuations and not the last

21   valuation

22        A.    Yes.

23        .    And did you take that into account in your

24   report

25        A.    What do you mean by  take it into account

TAB 55

Page 1

1     UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

3

4  ELIZABETH V. FORTSON,

5      Plaintiffs,

6    v.        Civil Action No.

7  GARRISON PROPERTY AND CASUALTY  1:19-cv-00294-

8  INSURANCE COMPANY,     CCE-JLW

9      Defendant.

10

11    VIDEOTAPED DEPOSITION OF RANDALL MCCATHREN

12  DATE:     Tuesday, August 17, 2021

13  TIME:     10:08 a.m.

14  LOCATION:   Remote Proceeding

15        Greensboro, North Carolina 27420

16  REPORTED BY:  Joshua Seagondollar, Notary Public

17  JOB No.:   4765452

18

19

20

21

22

23

24

25

Veritext Legal Solutions

www.veritext.com                  888-391-3376

Case 1:19-cv-00294-CCE-JLW  Document 96  Filed 11/01/21  Page 478 of 598

1          A P P E A R A N C E S

2    ON BEHALF OF PLAINTIFF, ELIZABETH V. FORTSON:

3          MICHAEL MALONE, ES UIRE (by videoconference)

4          Hendren Red ine  Malone PLLC

5          4600 Marriott Drive, Suite 150

6          Raleigh, North Carolina 27612

7          mmalone hendrenmalone.com

8          (919) 420-7867

9

10   ON BEHALF OF DEFENDANT, GARRISON PROPERTY AND CASUALTY

11   INSURANCE COMPANY:

12         KEVIN ZIMMERMAN, ES UIRE (by videoconference)

13         Baker Hostetler LLP

14         200 Civic Center Drive, Suite 1200

15         Columbus, Ohio 43215

16         kzimmerman bakerla .com

17         (614) 228-1541

18

19         RODGER ECKELBERRY, ES UIRE (by videoconference)

20         Baker Hostetler LLP

21         200 Civic Center Drive, Suite 1200

22         Columbus, Ohio 43215

23         reckelberry bakerla .com

24         (614) 228-1541

25

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 479 of 598

1          A P P E A R A N C E S (Cont d)

2    ALSO PRESENT:

3         DeAndrae Shivers, Videographer

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    I N D E

 2    E AMINATION:                                    PAGE

 3         By Mr. Zimmerman                           6

 4

 5                    E   H I B I T S

 6    NO.              DESCRIPTION                     PAGE

 7    Exhibit 1        Expert Report                   14

 8    Exhibit 2        Inspection Guidelines, Vehicle  102

 9                     Condition

10    Exhibit 3        Market Valuation Report         105

11    Exhibit 4        NADA Guides FA                  146

12    Exhibit 5        Kelley Blue Book Condition  uiz 156

13    Exhibit 6        Deposition of John Gintvainis   168

14    Exhibit 7        Field Industry Representative   176

15                     Training Manual

16    Exhibit 8        Vehicle Condition Market Value  190

17                     Impact Study

18    Exhibit 9        Email, 4 23 2021               213

19    Exhibit 10       N.C. Gen. Stat. 20-183.4C      223

20    Exhibit 11       N.C. Gen. Stat. 20-183.3       223

21

22

23               ( Exhibits attached.)

24

25
```

DJA0765

1      A      In my experience, there s a significant

2   number particularly of vehicles more than five years

3   old that may not meet the very good standard on one or

4   more of their components.

5           No  you mentioned five years old there, but

6   you re using the kind of condition standards for five-

7   year-old vehicles, right

8      A      Yes.  Yeah.

9           Okay.  So  hy does it matter the age of the

10  vehicle  Don t the standards kind of ad ust for that

11     A      They do.

12          So it s still your opinion that a

13  significant number of vehicles for sale on used dealer

14  lots are actually in good condition, not very good

15  condition

16     A      I said one or more of the components are in

17  the good versus very good condition.

18          Okay.  Does CCC ever classify vehicles on

19  dealer lots as exceptional or like-ne

20     A      I -- not that I sa .

21          But some vehicles on dealer lots actually

22  are in like-ne  condition, right

23     A      Yes.  Probably so.

24          And some vehicles on dealer lots -- some

25  used vehicles on dealer lots might have components in

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 482 of 598

Page 183

1    like-ne  condition, right

2         A      Yes.

3              So that s actually a benefit to the insurer,

4    right

5         A     To the extent they get used as comps, yes.

6              Okay.  Because they  ere only being

7    classified as very good,  hen in reality, they re

8    priced according to their like-ne  condition, right

9         A     Yes.  Without kno ing, like, is it t o

10   percent   Five percent   Ten percent   You kno , it s

11   going to be a small number.  The older the vehicle --

12   you re not going to find a lot of eight, nine, ten,

13   eleven-year-old cars for  hich any of the components

14   are in pristine or exceptional or  hatever the first,

15   you kno , category specification is.  The ne er the

16   car, the more likely one or more components might be

17   in there.

18              Okay.  That makes sense.  That makes sense.

19   And I m not asking you to -- this time, I m not asking

20   you to offer a percentage of ho  many are like-ne .

21        A     Good.

22              So for these kind of vehicles, the CCC

23   should actually make a larger condition ad ustment

24   than they do, right

25        A     Well, you re probably talking about one of

DJA0767

1    the comps.  There might be three, four, five comps, so

2    you kno , you  ould end up making an ad ustment  ust

3    for that comp, not for all the comps if they all

4    didn t have that component in exceptional condition.

5              Yeah.  No, that makes sense.  But for any of

6    the comparable vehicles that are in like-ne

7    condition, CCC should make a larger ad ustment than

8    they do to properly price that, right

9         A    They could.

10             Okay.  And that  ould be a more accurate

11   valuation

12        A    Yeah.  That -- of that component in overall

13   comparison.  Yeah.  Assuming that they -- they made

14   the proper comparisons on the other ten components.

15             Okay.

16             MR. ZIMMERMAN:  And I kno   e haven t

17    uite been going for an hour here, but I actually have

18   to take a  uick break.  Can  e go off the record

19             THE WITNESS:  Sure.

20             VIDEOGRAPHER:  All right.  The time is

21   3:22 p.m.  We re off the record.

22                  (Off the record.)

23             VIDEOGRAPHER:  The time is 3:35 p.m.

24   We re back on the record.

25

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 484 of 598

1    are to meaningful ACV.

2            So  uickly here, you mention it  ould be

3    more accurate of they used actual sale prices, right

4        A    Yes.

5            But they actually use list prices, right

6        A    Yeah.  I think they use list prices until

7    there s a sale, but they also use  real take  or

8     hatever that terminology is, prices.

9            That s a benefit to the insured, right

10   Because the list price is generally going to be higher

11   than the actual sale price

12       A    Yes.  But if there s a  ill-take price, they

13   advertise it for 10, but they  ill take 9,200 --

14   9,200, you kno , that -- that s a lo er number and it

15   may be that some customer  ould pay 96, and they end

16   up selling it for more than the  ill-take price.

17           So there s customers  ho purchase vehicles

18   for more than the  ill-take price out there

19       A    Sure.  Because they re starting to negotiate

20   at ten.

21           Oh, so does CCC use the  ill-take price or

22   do they use the list price of the vehicles

23       A    I think they use the  ill-take price.

24           Okay.  And  here does that understanding

25   come from

1          A     Some here -- some here in all these

2     documents and or depositions.

3               Fair enough.  To the extent that they do use

4     the list price, that provides a benefit to the

5     insured, right   Because there s a negotiation

6     do n ard

7          A     Yes.

8               Okay.  Let s turn to page 17 of your expert

9     report, please.

10         A     Got it.

11              Okay.  In the second sentence of the first

12    full paragraph, you say,  CCC includes the consumer

13    offered vehicles as  ell as the dealer offered

14    vehicles in its valuations.   Do you see that

15         A     Yes.

16              Okay.  But  hen a consumer offered vehicle

17    is used as a comparable, CCC doesn t apply a condition

18    ad ustment, right

19         A     Right.  Right.  No, I remember that.  Yes.

20              Okay.  So  hat s the problem  ith using

21    consumer offered vehicles then

22         A     Really  ust that you have no idea  hat the

23    condition is.

24              What do you mean by that

25         A     I mean, the consumer can offer a vehicle

TAB 56

1              UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

3            Civil Action No. 1:19-cv-00294-CCE-JLW

4

     ELIZABETH V. FORTSON,          )

5                                   )

                                    )

6     Plaintiff,                    )

                                    )

7                                   )

     v.                             )

8                                   )

     GARRISON PROPERTY AND          )

9     CASUALTY INSURANCE COMPANY,   )

                                    )

10    Defendant.                    )

11

12

13

14        Zoom Video Deposition of DAVID SCHWICKERATH

15             (Taken by the Defendant)

16                 Phoenix, Arizona

17           Thursday, September 9, 2021

18

19

20

21

22    Reported by:    Marisa Munoz-Vourakis -

                      RMR, CRR and Notary Public

23

24

25

DJA0771

Page 2

1    APPEARANCE OF COUNSEL BY ZOOM:

2    For the Plaintiff:

3              JOHN M. DeSTEFANO, ES .

4              Hagens Berman Sobol Shapiro LLP

5              11 West Jefferson Street, Suite 1000

6              Phoenix, AZ 85003

7              602-840-5900

8              ohnd hbssla .com

9

10   For the Defendant:

11             MATTHEW G. DROCTON, ES .

12             Baker   Hostetler LLP

13             200 Civic Center Drive, Suite 2200

14             Columbus, OH 43215

15             mdrocton bakerla .com

16

17   Also Present:  MICHAEL KIRBY, Videographer

18                       o0o

19

20             Zoom Video Deposition of DAVID SCHWICKERATH,

21   taken by the Defendant, at Phoenix, Arizona, on the 9th

22   day of September, 2021 at 10:39 a.m., before Marisa

23   Munoz-Vourakis, Registered Merit Reporter, Certified

24   Realtime Reporter and Notary Public.

25

1                    I N D E

2    Examination of:                           Page

3      DAVID SCHWICKERATH

4         E AMINATION By Mr. Drocton . . . . . . . . 4

5         E AMINATION By Mr. DeStefano . . . . . . 188

6         FURTHER E AMINATION By Mr. Drocton . . . 191

7                    DEPOSITION E HIBITS

8    E HIBIT NUMBER           DESCRIPTION        PAGE

     Exhibit 1    Expert Report of Mr.           14

9                 Schickerath

10   Exhibit 2    2020 USAA Annual Report        19

11   Exhibit 3    2019 USAA Annual Report        20

12   Exhibit 4    Intermediate Accounting,       25
                  Chapter 1

13

     Exhibit 5    Intermediate Accounting Chapter 32

14                2

15   Exhibit 6    Bates number                   81
                  CCC Fortson000109694

16

     Exhibit 7    Bates stamp                    82

17                CCC Fortson000109679

18   Exhibit 8    Bates number Garrison PC8045   84

19   Exhibit 9    Fortson CCC Report             100

20   Exhibit 10   Insurance Regulation 11        100
                  NCAC4.0418

21

     Exhibit 11   11 NCAC4.0418 (prior version)  138

22

     Exhibit 12   Umpire Report                  139

23

     Exhibit 13   Bates number CCCIS027199       157

24

     Exhibit 14   1-14-11 USAA MCE               183

25

     Exhibit 15   Allstate MCE                   188

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 489 of 598

1   vehicles has the same, I guess, formula used for the

2   loss vehicle

3        A.      I m not sure that that s the case.

4        .      Is it not your understanding if the loss

5   vehicle is in very good condition in each of the

6   categories, the positive condition ad ustment for the

7   loss vehicle  ould cancel out the negative ad ustment

8   for the comp vehicles on dealer lots

9            MR. DeSTEFANO:  Form and foundation.

10       A.      I believe that s ho  the math is intended

11  to  ork, so that if you have a very good condition

12  automobile, that s the total loss  and a very good

13  comparable vehicle, there  ould be no ad ustment

14  necessary.

15       .      Okay.  So ho  is it that --  ell, let me

16  ask one more  uestion.  If Ms. Fortson s vehicle  as in

17  very good condition in each of the categories, is it

18  your understanding that there  ould be a positive  720

19  condition ad ustment

20            MR. DeSTEFANO:  Form and foundation.

21       A.      I mean, it s possible.  I m not exactly

22  sure that it  ould be the 722, since the 722 represents

23  an average of all of those vehicles, all of those

24  comparables.

25            So you  ould have different amounts through

1    each of those six -- I m sorry, each of those four

2    comparable vehicles for those six components, you  ould

3    then potentially have differences, and I don t think

4    that that math necessarily  orks, unless someho  that

5    722 represents exactly the same as the vehicle for

6    Ms. Fortson, but I m not sure that that s possible,

7    given that you have these six comparable vehicles  ith

8    all different aspects and it s an average.

9            So I m not sure that that fits.

10       .    Have you ever seen a CCC report  here the

11   loss vehicle is rated very good in each condition

12       A.   No, I have not.

13       .    All right.  Can you please open in your

14   folder CCC IS027199.

15       A.   Okay.

16       .    I take it you ve not seen this report

17   before, is that right

18       A.   No, I have not.

19       .    Okay.  You can see from the bottom left,

20   there s a Fortson vs. Garrison Property and Casualty

21   case title and our case number here.  Do you see that

22       A.   I do.

23       .    And in the bottom right-hand corner

24   CCCIS027199.  Do you see that

25       A.   Yes, I do.

Page 157

1           MR. DROCTON:   We ll mark this one as
2       Exhibit 13.
3                   (The document referred to  as marked
4            Deposition Exhibit Number 13 for
5            identification.)
6       .       And please turn to page CCCIS027204.
7       A.      Okay.
8       .       Do you see the vehicle condition table for
9   the loss vehicle
10      A.      I do.
11      .       And do you see  here the condition is very
12  good for each of the six condition categories
13      A.      I do.
14      .       And on the right-hand corner -- or
15  right-hand column, there s a value impact of zero
16  dollars for each of those categories, right
17      A.      That s correct.
18      .       And if you could please turn ahead to
19  CCCIS027026.
20      A.      Okay.
21      .       Let me kno   hen you re there.
22      A.      I am.
23      .       Please take a look at the, roughly the
24  middle of the page,  here it sho s ad ustments.  You ll
25  see options and mileage.  Let me kno   hen you re

DJA0776

1      there.

2           A.      I m there.

3           .      Do you see any ad ustment for condition

4           A.      No, I do not.

5           .      Based on your revie  of the loss vehicles

6      condition and the ad ustments share for the comp

7      vehicles, is it your understanding that there s a zero

8      dollar condition ad ustment  hen the loss vehicle is in

9      very good condition

10          A.      Yes, I think that  e had talked about that

11     earlier in my testimony, that if the total loss vehicle

12     is very good, there  ould be no condition ad ustment.

13          .      Great.  I must have missed that.  I thought

14      e  ere talking the same thing, but one of my  uestions

15     regarding Ms. Fortson s report, if  e can flip back to

16     that.

17          A.      Okay.

18          .      Are you there

19          A.      Yes.

20          .      And, again, this is Exhibit 9  e re looking

21     at

22          A.      Correct.

23          .      If Ms. Fortson on Garrison PC211, if her

24     vehicle  as assessed very good condition in each of the

25     condition categories, is it your understanding that

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 493 of 598

TAB 57

DJA0777

Confidential

1          ROBERT LOPEZ

2      IN THE UNITED STATES DISTRICT COURT

3     FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

4       Civil Action No. 1:19-cv-00294-CCE-JLW

5

6  ELIZABETH V. FORTSON, et al.

7              Plaintiff,

8  vs.

9  GARRISON PROPERTY AND CASUALTY

10 INSURANCE COMPANY,

11             Defendant.

12

13              CONFIDENTIAL

14    Remote ZOOM Deposition of ROBERT LOPEZ

15              May 21, 2021

16           9:30 a.m. - 4:47 p.m.

17

18

19

20

21

22

23 REPORTED BY:

24 Steven Poulakos, RPR

25 JOB NO. 194290

1                    ROBERT LOPEZ

2

3

4

5

6

7

8

9          The deposition of ROBERT LOPEZ  as held via

10   Zoom videoconference on Friday, May 21, 2021,

11   commencing at 9:30 a.m., before Steven Poulakos, Notary

12   Public.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    ROBERT LOPEZ

2   APPEARANCES:

3        ON BEHALF OF THE PLAINTIFFS:

4        JOHN DeSTEFANO, ESQUIRE

5             Hagens Berman Sobol Shapiro

6             11 West Jefferson

7             Phoenix, Arizona  85003

8

9

10

11        ON BEHALF OF THE DEFENDANT:

12        ALBERT LIN, ESQUIRE

13             Baker   Hostetler

14             200 Civic Center Drive

15             Columbus, Ohio  43215

16

17

18

19

20

21

22

23

24

25
```

Confidential

1                    ROBERT LOPEZ

2                         INDE

3            Deposition of ROBERT LOPEZ

4                    May 21, 2021

5    Examination by:                              Page

6    Mr. DeStefano                                   6

7

8    Exhibit No.                                Marked

9    Exhibit 1      Notice of deposition           19

10   Exhibit 2      A conditioning matrix          103

11   Exhibit 3      A conditioning matrix          104

12   Exhibit 4      A conditioning matrix          107

13   Exhibit 5      The top of the document says USAA   119

14                  total loss

15   Exhibit 6      CCC market valuation report    124

16   Exhibit 7      An orientation packet for ne  total  164

17                  loss reps

18   Exhibit 8      A survey                       175

19   Exhibit 9      A consistency document         178

20   Exhibit 10     CCC training document          178

21   Exhibit 11     A re uest for proposal         186

22   Exhibit 12     A CCC printed document dated   188

23                  November 2018 that is analyzing

24                  potentially USAA data and providing

25                  an analysis

1              ROBERT LOPEZ

2           Exhibit Index (Continued)

3    Exhibit No.                              Marked

4    Exhibit 13    A spreadsheet                192

5    Exhibit 14    North Carolina guidance on ho    206

6                  insurance companies should value

7                  total loss claims

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    ROBERT LOPEZ
2    ould say around the 2011 to  12 or  13 timeframe.
3              Is that a nation ide rule or  ust in North
4    Carolina
5       A     I imagine it  ould be nation ide, but I
6    don t kno  for certain.
7              On the front page underneath the base
8    vehicle value, do you see  here it says condition
9    ad ustment
10      A     I do.
11             What does that reflect
12      A     That reflects that this vehicle received a
13   very good rating on a component.  I don t kno   hich
14   component.  It doesn t have it, but it  ould sho  that
15   this vehicle did receive a very good rating at least on
16   one category sho ing that this vehicle  as rated in
17   better than good condition in some  ay.
18             Paging through the document, can you sho
19   me  here that ad ustment is reflected
20      A     Yes, sir.  Page 6 of 18.
21             Explain to me  hat s sho n on page 6.
22      A     Yes, sir.  On page 6 is the breakdo n of
23   the appraiser s assessment of the condition of this
24   particular car.  So example or I ll talk through it.
25   The mechanical is rated very good because the
```

1                     ROBERT LOPEZ

2    inspection notes reflect minor seepage.  Belts and

3    hoses sho  some  ear.  Method -- the classification of

4    that to be rated very good.  So  hen the appraiser

5    notes that to be very good, CCC s market research and

6    dealer survey e uates that impact to be a  130

7    positive.

8              The tires  ere rated good and the notes

9    reflect a six tread average  hich e uates to a zero

10   dollar impact because it s the e uivalent to an every

11   day on the road vehicle meaning that the tires do have

12   some  ear.  Ho ever, they re not in fair or very good

13   condition.  They re  ust in good condition.

14             If you  ant me to keep going, I can break

15   do n each one of these.

16             Just at a high level.  Are these

17   ad ustments explained to the consumer in the report

18        A     Absolutely.  If the consumer  ould like an

19   explanation,  e  ould have that explanation.  If the

20   customer receives a report and fully understands it,

21   they may not ask for clarification of these.  It  ust

22   depends as to  hether the customer has  uestions or

23   needs to be advised of ho  the value  as arrived at.

24             Does USAA al ays provide the valuation

25   report to consumers in North Carolina  hen there s a

Confidential

1                     ROBERT LOPEZ

2    total loss claim

3        A       Yes.

4                And  here in this report does it explain

5    the nature of these condition ad ustments

6        A       I felt like page 6 does that.  I might be

7    missing the  uestion, though.

8                Any here else   You can look through it.

9        A       (Revie ing document.)

10               So page 6 in its entirety.  There s a note

11   on the right-hand side  hich reads USAA uses condition

12   inspection guidelines to determine the condition of key

13   components of the loss vehicle prior to the loss.  The

14   guidelines describe physical characteristics for these

15   key components for the condition selected based upon

16   age.

17               Inspection notes reflect observations from

18   the appraiser regarding the loss vehicle s condition.

19   CCC makes dollar ad ustments that reflect the impact

20   the reported condition has on the value of the loss

21   vehicle as compared to good condition.  These dollar

22   ad ustments are based upon intervie s  ith dealerships

23   across the United States.  Page 6 has notes on this

24   vehicle and explains ho  those values are reflected.

25               Stand by as I flip through the rest of the

Confidential

1                    ROBERT LOPEZ

2   document, please.  Page 1 of 18 under the ad usted

3   vehicle value subsection reads this is determined by

4   ad usting the base vehicle value to account for the

5   actual condition of the loss vehicle and certain other

6   reported attributes, if any, such as refurbishments and

7   after factory e uipment.

8              So that is directly correlating the base

9   vehicle value plus the condition ad ustment as the base

10  vehicle value plus condition ad ustment e ates to the

11   6,690 figure.

12             Page 2 of 18, claim inspection.  USAA --

13  stand by one second.  Page 2 of 18, claim inspection.

14  USAA has provided CCC  ith the ZIP code  here the loss

15  vehicle is garaged, loss vehicle VIN, mileage,

16  e uipment, as  ell as loss vehicle condition  hich is

17  used to assist in determining the value of the vehicle.

18  So it appears that those three sections.

19             Looking at the front page, page 1 again,

20  does this page reflect any information about condition

21  ad ustments to the comparable vehicles

22      A     No, sir, not on this page.

23             Where  ould I find information about the

24  condition ad ustments to the comparable vehicles

25      A     Yes, sir, please stand by.  Page 7 of 18.

Confidential

1                    ROBERT LOPEZ

2  Last section on the blue side bar, the condition

3  ad ustment sets that comparable vehicle to good

4  condition  hich is loss vehicle is also compared to in

5  the vehicle condition section.

6           What is your understanding of  hat that

7  language represents

8      A     That language represents that a vehicle

9  that s available for sale at a dealer facility  ould be

10  rated in very good condition rating as a dealership

11   ould take effort, monetary resources, as  ell as labor

12  to get that vehicle to be more appealing for the next

13  consumer that s looking to purchase that used car.

14  That vehicle is also not an every day use vehicle.

15           It s sitting at the dealer lot dealer ready

16   ith some refurbishments done to it to make it more

17  appealing for the next consumer.  Therefore, a vehicle

18  at a dealer facility is in better than good condition

19   hich  ould then be reflected  ith an ad ustment to get

20  it -- to make it comparable to the loss vehicle in

21   uestion.

22           Beyond  hat you ve already read from this

23  page, is there anything else in the valuation report

24  that explains the nature of the condition ad ustment

25      A     Stand by.  Yes.  So the other reference

1                         ROBERT LOPEZ

2    is -- the precursor to that section is preceded by a

3    one.  And so that one also is reflected on the

4    comparable vehicles.  So example if  e flip to page 8

5    of 18 in the middle section of the report right next to

6    condition also reflects that one.  So it s driving the

7    consumer to see here is the definition of condition

8    ad ustment.  Here is condition  ith a one calling it to

9    the member s attention, that that reflects a minus 722

10   ad ustment.

11              Is there any here else in the report  here

12   it explains  hat the nature of the condition ad ustment

13   to comparable vehicles

14        A     Based on my revie  right no ,  ust those

15   t o sections.

16              You gave a number of reasons  hy USAA vie s

17   the deduction as appropriate based on the  ay that

18   dealers prepare and maintain cars for sale on their

19   lots, right

20        A     Yes.  John, I  ant to add one more thing to

21   your previous  uestion, please.  If I can amend my

22   previous statement.

23              What is it

24        A     Page 2 of 18 also calls that out under

25   calculate base vehicle value and it reads ad ustments

1                    ROBERT LOPEZ

2    to the price of the selected comparable vehicle are

3    made to reflect differences in vehicle attributes e ual

4    in mileage and options.  Dollar ad ustments are based

5    upon market research.

6              Finally the base vehicle value is a

7    straight average of the ad usted values of the

8    comparable vehicles.  So that s also giving insight to

9    the vehicle o ner or consumer that ad ustments are made

10   to make it comparable.

11             And going back to my previous  uestion,

12   though, you agree that you gave a number of reasons  hy

13   USAA vie s the ad ustment as appropriate because of the

14    ay dealers prepare and maintain their vehicles for

15   sale, right

16        A      Yes.

17             Are any of those reasons explained any here

18   in this report

19             MR. LIN:  Ob ect to form.

20             Go ahead.

21             THE WITNESS:  Beyond  hat I outlined in my

22   previous ans er

23   BY MR. DeSTEFANO:

24             Yes.

25        A      Beyond those three sections, no, sir.

1                     ROBERT LOPEZ

2    ad ustment to them, right

3              MR. LIN:  Ob ect to form.

4              THE WITNESS:  I m still a little confused.

5    Can you restate the  uestion a different  ay

6    BY MR. DeSTEFANO:

7              Going do n to the condition ad ustment on

8    page 8, you highlight that negative  722.

9         A    Yes, sir.

10             That s the ad ustment made reflecting the

11   condition of the comparable vehicles, right

12        A    That is the ad ustment made to the loss

13   vehicle because the comparable is in better condition

14   than the loss vehicle.  Therefore, it s a negative

15   ad ustment.

16             So the ad ustment reduces the valuation of

17   the loss vehicle, correct

18        A    Not necessarily.  In this particular

19   example, it does because these vehicles are dealer

20   ready  hereas the loss vehicle is in good condition

21    ith the exception of the mechanical components.

22             But if this  722 deduction  ere removed,

23   then the valuation  ould be  722 higher, right

24        A    If this section  as removed,  e  ould be

25   overpaying the member and not paying them  hat the

1                    ROBERT LOPEZ

2  actual cash value of their loss vehicle is.

3            That  asn t my  uestion.  My  uestion is:

4  If the   722 is removed from this step of the process,

5  then the ultimate valuation  ould be  722 higher,

6  right

7       A      No.

8              MR. LIN:  Ob ection.

9              THE WITNESS:   That s not correct.

10  BY MR. DeSTEFANO:

11             Why isn t it correct

12      A      I ll refer to page 1.  On page 1, there  as

13  a positive condition ad ustment up of 130.  So it  ould

14  be 722 minus 130.

15             I m not saying anything about the 130.

16  We re talking about the condition ad ustment to the

17  loss vehicle on page 6  is that correct

18      A      That s correct.

19             So if the 130 is still included and the 722

20  is removed, the valuation amount  ould increase by 722,

21  right

22             MR. LIN:  Ob ect to form.

23             THE WITNESS:   No.

24  BY MR. DeSTEFANO:

25             Why not

1               ROBERT LOPEZ

2        A       It  ould be approximately 590.

3                Are you subtracting 130 from 722

4        A       Yes.  May I explain  hy

5                No.   That s not my  uestion.  My  uestion

6    is:  If the 130 is still added to the base vehicle

7    value, but the 722 is not subtracted, then the base

8    vehicle value  ould be still -- it  ould be  722 less,

9    right

10               MR. LIN:  Ob ect to form.

11   BY MR. DeSTEFANO:

12               Do you understand ho  the base vehicle

13   value is calculated

14       A       John, I d like to clarify for you if I can.

15               I m asking the  uestion.  Do you understand

16   ho  the base vehicle value is calculated

17       A       Yes.

18               You said earlier it s a straight average of

19   the values of the comparable vehicles, right

20       A       Yes, sir.

21               So if the values of the comparable vehicles

22    as increased by  722, then that  ould increase the

23   average of them by 722, right

24               MR. LIN:  Ob ect to form.

25               THE WITNESS:  I ans ered that  uestion.

1                     ROBERT LOPEZ

2   BY MR. DeSTEFANO:

3               I m sorry.   What  as your ans er

4               MR. LIN:   Hold on.   Ob ect to form.

5               Go ahead, Rob.

6               Maybe the court reporter can read that

7   back, the  uestion.

8        (Reporter read back the record as re uested.)

9               THE WITNESS:   No.

10  BY MR. DeSTEFANO:

11              Why not

12       A      We gave credit to this member s -- for this

13  member s vehicle of 130.   So if  e re using this

14  example and  e remove that 722, it  ould increase the

15  value by 592.

16              I m not talking about the ad usted vehicle

17  value.   You re still incorporating 130 into it.   I m

18  talking about the base vehicle value  hich is

19  calculated based on the average of the comparables.

20       A      May I explain, John

21              No.   I m asking the  uestions.   The base

22  vehicle value is the average of the comparables only.

23  So you calculate the base vehicle value before you look

24  at the loss vehicle condition.   Removing that  722

25  ad ustment  ill increase the base vehicle value by 722,

1                    ROBERT LOPEZ

2    right

3        A       No.

4                Do you believe that the  722 ad ustment

5    does not reduce claim payments

6        A       No.

7                No  hat   No, you don t believe that

8        A       No, I don t believe that because the

9    ad usted vehicle value that you re referring to could

10   be impacted by the loss vehicle s condition and in this

11   case, it  as impacted by it.  If the member s vehicle

12   is rated very good do n the line meaning it s in the

13   same condition as the dealers, you may see a  722

14   ad ustment up.  So it could be net zero.

15               It could be a net zero, but these are t o

16   different ad ustments, right

17       A       No.

18               They re the same ad ustment

19       A       They are.

20               Ho  is that possible

21       A       If this member s vehicle  as in very good

22   condition all the  ay do n the line on page 6, there

23    ould be a positive condition ad ustment up of 722.

24               Where is that explained

25       A       May I read page 6

1                       ROBERT LOPEZ

2              You can revie  page 6.

3      A      May I read it

4              Go ahead.

5      A      USAA uses condition inspection guidelines

6   to determine the condition of key components of the

7   loss vehicle prior to the loss.  The guidelines

8   described physical characteristics for these key

9   components for the conditions selected based upon age.

10  Inspection notes reflect observations from the

11  appraiser regarding the loss vehicle s conditions.  CCC

12  makes dollar ad ustments that reflect the impact that a

13  reported condition has on the value of the loss vehicle

14  as compared to good.  These dollar ad ustments are

15  based upon intervie s  ith dealerships across the

16  United States.

17              I didn t hear you explain anything about

18  ho  the value impacts  ould add up to  722.

19     A      The mechanical is rated at very good and

20  received a positive 130 up.  If the tires  ere rated as

21  very good, there  ould be a positive condition up.  If

22  the paint  as rated very good, there  ould be a

23  positive ad ustment up.  If body  as rated very good,

24  positive ad ustment up.  Glass, positive ad ustment up.

25  Interior, positive ad ustment up.  If they  ere already

1                    ROBERT LOPEZ

2    very good, there  ould be a 722 positive ad ustment

3     hich  ould e uate to a net zero for that dollar

4    ad ustment to those comparables.

5              That s sufficiently explained in the report

6    is  hat you understand, right

7              MR. LIN:  Ob ect to form, argumentative.

8              THE WITNESS:  Total loss reps  ould explain

9    that to members if the member has  uestions and allo s

10   for us to explain it to them.

11   BY MR. DeSTEFANO:

12             So  hat is the amount that  ould be added

13   to the tires if there  as a positive value impact that

14   could add up to  722  What is the tires component of

15   that

16      A      May I read the description again

17             No.  I  ant you to give me the amount of

18   the ad ustment that  ould apply to tires in very good

19   condition.

20             MR. LIN:  You don t have to ans er that,

21   Rob.  That is  ell outside the scope of all of these

22   topics.  So asking for a specific dollar amount for a

23   specific condition ad ustment for a specific car is not

24   possible to prep any  itness regarding that level of

25   detail, so --

1                      ROBERT LOPEZ

2   claims.  So I don t kno  if I can give you a list of

3   scenarios, but either or could invoke it.  If  e  ere

4   at an impasse, invoking it  ill help resolve the

5   dispute.

6              Ho  often  ould you say the appraisal

7   clause is invoked

8              MR. LIN:  Ob ect to form.

9              THE WITNESS:  I don t kno .  I don t have

10  that.  I don t have context of  hat that  ould look

11  like, timeframe, state.  I don t kno .  I don t kno .

12  BY MR. DeSTEFANO:

13             Well, in the last -- since 2015 or so in

14  North Carolina, do you have an understanding of roughly

15  ho  often the appraisal clause is invoked

16      A     No.  I don t have that and I don t kno  if

17   e  ould collect that data either.

18             In your experience handling total loss

19  claims, do you remember if it  as more than half the

20  time or less than half the time

21      A     I  ould be surprised if it s more than

22  5 percent of the time.

23             Does Garrison regard appraisals as an

24  accurate  ay to determine the value of vehicles

25             MR. LIN:  Ob ect, form.

1                    ROBERT LOPEZ

2                THE WITNESS:  I think the use of CCC is an

3    accurate  ay of determining value.  Ho ever, the member

4    or USAA could deem it to be an appropriate -- an

5    accurate  ay of determining value.  It s  ust -- it s a

6    difficult  uestion.  I don t kno .

7    BY MR. DeSTEFANO:

8                Does Garrison have any studies of ho  often

9    appraisals occur

10       A      No, not that I m a are of.

11               Has Garrison ever conducted a study

12   comparing appraised value to CCC s valuations

13       A      No, not that I m a are of.

14               Does Garrison maintain a list of the

15   appraisers that it uses for North Carolina total loss

16   claims

17       A      No, I haven t seen one.

18               Does Garrison keep any kind of list of

19   payments made to appraisers for North Carolina claims

20       A      No, I m not a are of one.

21               Moving back to the relationship  ith CCC.

22   Ho  does Garrison compensate CCC for its total loss

23   valuation service

24       A      USAA is billed monthly.  We receive a flat

25   rate monthly for services that they provide.  The flat

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE DIVISION

| | |
|---|---|
| **ERIC PRUDHOMME, ET AL.** | **CIVIL ACTION NO. 15-0098** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **GEICO INSURANCE CO., ET AL.** | **MAG. JUDGE PATRICK J. HANNA** |

## RULING

Pending here are two related motions:   Defendants Government Employees Insurance Company and GEICO General Insurance Company's (collectively "GEICO Defendants") Motion to Exclude the Opinions of Johnette Hassell ("Motion to Exclude") [Doc. No. 180] and Plaintiffs Eric Prudhomme and Elvin Jack's Amended Motion for Class Certification [Doc. No. 183].   Plaintiffs oppose the GEICO Defendants' Motion to Exclude, and GEICO opposes Plaintiffs' Amended Motion for Class Certification.

The Court has reviewed the parties' briefs, the exhibits, and all other evidence.    An evidentiary hearing was held on November 9-11, 2020, in the United States District Courthouse, Lafayette, Louisiana.

For the following reasons, GEICO Defendants' Motion to Exclude is DENIED. Plaintiffs' Amended Motion for Class Certification is DENIED.

## I.    FINDINGS OF FACT AND PROCEDURAL HISTORY

This case involves the "valuation" that two GEICO entities, Government Employees Insurance Company and GEICO General Insurance Company, placed on vehicles determined to be total losses. Two insureds, Plaintiffs Eric Prudhomme ("Prudhomme") and Elvin Jack

("Jack"), contend that the GEICO Defendants undervalued their vehicles when they made claims for their respective total losses.

Prudhomme's 2008 Kia Rondo LX was involved in an automobile accident in Lafayette Parish. The Kia was so severely damaged that the estimates to repair the vehicle rendered it a total loss. Prudhomme made a claim against the collision coverage of his automobile policy written by Government Employees Insurance Company. NADA Valuation Reports for Prudhomme's vehicle estimated its clean retail value at $10,150.00. The GEICO entity did not use NADA value, but instead used a product developed by a third party valuation service, the "CCC One Market Valuation Report," which set the "base vehicle value" for Prudhomme's vehicle at $8,272.00.

Jack's vehicle, a 2000 Ford Ranger V-6 Supercab truck garaged in Ville Platte, was severely damaged in an accident. He filed a claim against the collision coverage of his automobile policy with GEICO General Insurance Company. The estimates to repair the vehicle rendered it a total loss. NADA Valuation Reports for Jack's vehicle estimated its clean retail value as $4,350.00. Also using the CCC One Market Valuation Report, the GEICO entity established the "base vehicle value" at $2,801.00 and deducted $43.00 for condition adjustment and $25.00 for prior damage, to arrive at an adjusted vehicle value of $2,733.00.

Plaintiffs allege that the GEICO Defendants' use of the CCC system violates Louisiana statutory law. Specifically, Plaintiffs allege that the GEICO Defendants' use of the CCC system violates LA. REV. STAT. 22:1892(B)(5), which provides:

> (5) When an insurance policy provides for the adjustment and settlement of first-party motor vehicle total losses on the basis of actual cash value or replacement with another of like kind and quality, and the insurer elects a cash settlement based on the actual cost to purchase a comparable motor vehicle, such costs shall

2

be derived by using one of the following:

(a) A fair market value survey conducted using qualified retail automobile dealers in the local market area as resources.  If there are no dealers in the local market area, the nearest reasonable market can be used.

(b) The retail cost as determined from a generally recognized used motor vehicle industry source;  such as, an electronic database, if the valuation documents generated by the database are provided to the first-party claimant, or a guidebook that is available to the general public.  If the insured demonstrates, by presenting two independent appraisals, based on measurable and discernable factors, including the vehicle's preloss condition, that the vehicle would have a higher cash value in the local market area than the value reflected in the source's database or the guidebook, the local market value shall be used in determining the actual cash value.

(c) A qualified expert appraiser selected and agreed upon by the insured and insurer.  The appraiser shall produce a written nonbinding appraisal establishing the actual cash value of the vehicle's preloss condition.

(d) For the purposes of this Paragraph, local market area shall mean a reasonable distance surrounding the area where a motor vehicle is principally garaged, or the usual location of the vehicle covered by the policy.

Plaintiffs argue that the GEICO Defendants' use of the CCC system does not meet the statutory standard and systematically undervalues the claims of similarly situated policy holders.

During the class period, the GEICO Defendants (both entities) used two products from CCC:   (1) one product was used to estimate the costs of repairs to insureds' damaged vehicles, and (2) the second product was used to determine the amount GEICO would pay as the actual cash value of the insured vehicle if there was a total loss. [Doc. No. 186-2, Exhibit 6, Deposition of CCC through John Gintvainis, pp. 84-85; Exhibit 7, Deposition of Louiviere, p. 47; Deposition of Simon, pp. 37-38].

After the GEICO Defendants were informed of a loss, an adjuster would visit the damaged vehicle (if available) and input basic data, such as the VIN and mileage, into the CCC

3

One system.   The adjuster would inspect and take pictures of the damage. The adjuster would then input which damaged parts needed repair and replacement, and the estimating system determined the cost of repair.   When damage estimates reached a certain percentage of the NADA value, a trigger was met, and the adjuster was then informed to make the determination of actual cash value of the vehicle and whether the vehicle was a total loss under Louisiana law. Adjusters would consult a NADA guidebook (either online or through an app available to the public) to determine the NADA value of the insured vehicle.

Louisiana law requires NADA values to be used to determine whether a vehicle is a total loss.   La. Rev. Stat. 32:702(11).   If the cost of the repairs exceeded 75% of NADA "clean retail," the vehicle was deemed a total loss pursuant to Louisiana law.   The NADA value was sometimes saved in the GEICO Defendants' claim file system, but any available NADA value was always saved in the CCC system.

If a vehicle was deemed a total loss under Louisiana law, the GEICO Defendants did not use the NADA value for the vehicle, but used a different product from CCC, CCC One Market Valuation Report, to determine the amount it would pay an insured for her totaled vehicle. The CCC One Market Valuation Report is not available to the general public, but is used by insurance companies and collision repair shops that perform appraisals on behalf of insurance companies.   Governmental units also use the product to value fleets or determine the value of a particular vehicle.

The CCC One Market Value Report methodology is a "four step" process which includes the identification of the loss vehicle, "configuration" of the lost vehicle, search for and adjustment for comparables, and then a determination of the final amount.   The first step is for

4

the insurance carrier to identify the vehicle through either the VIN or, lacking the VIN, information directly from the insurance carrier, such as the year, make, model, trim, level, body style, and engine size of the loss vehicle and submit that information to CCC.

The second step is for CCC to configure the loss vehicle by looking at information from the insurer regarding equipment, packages, mileage, condition, and refurbishments of the loss vehicle. CCC will also load all standard equipment on the loss vehicle.

At the third step, the CCC product searches for comparable vehicles in various databases. That search is ████████████████████████████████ ████████████████████████████████. (Before late 2015 or early 2016, ████ ████████████████████). ████████████████████████████████ ████████████████████.

The values of the comparables are "adjusted" for differences in configurations (package, trim, options) between the loss vehicles and the comparables. ████████████████ ████████████████████████. ████████████████████████ ████████████████████████████████ ████████████████ ████████████████████. Additionally, there is a mileage adjustment for vehicles ████████████████████████. Instead of taking an average of adjusted comparable values, CCC, for the GEICO Defendants, "weights" the comparables. More "adjustments" occur after "weighting," based on a four-condition scale to judge the condition of the loss vehicle: rough, average private, dealer, and exceptional. The GEICO Defendants conditioning is set that vehicles with average private condition do not have any dollar impact for conditioning. ████████████████████████

5

████████. This is a "monetary adjustment for the difference between a dealer-conditioned vehicle and one in the baseline or private owner-conditioned vehicle of the loss."

The fourth step is for the GEICO Defendants to reach a determination of the final amount to be paid to the insured.

However, as discussed more fully in analyzing the requirements of class certification below, testimony at the hearing and evidentiary submissions show that GEICO adjusters did not always use the CCC valuation to pay a total loss to customers. Troy Penry, GEICO's Assistant Vice President of Auto Damage Claims, who has been employed by GEICO for more than 25 years and who himself worked as an adjuster in Louisiana, testified that "each claim is handled differently" and that there are "several subjective factors" to the valuation process. Tr. (Penry) 551:1-5, 551:12-17, 558:24-25. His testimony was consistent with that of Daniel Stelly, GEICO's field claims manager with responsibility over most of Louisiana, who testified that there is no exact form or process. Tr. (Stelly) 25:24-26:9. Instead, adjusters had discretion and actually exercised that discretion in a statistically significant number of cases to adjust the CCC valuation in paying a total loss amount to customers.

Plaintiffs seek to represent a claim composed of "All persons insured by GEICO General Insurance Company and Government Employees Insurance Company who have made a claim for first party total loss, which claim GEICO evaluated using CCC One Market Valuation, or a predecessor product, from August 15, 2010 to the present date [date of class action notice.]" [Doc. No. 183]. They further move that Prudhomme and Jack be appointed as class representatives. *Id.* They also seek to have Plaintiffs' counsel, J. R. Whaley; Kenneth D. St. Pé; Stephen B. Murray, Sr.; Stephen B. Murray, Jr.; Arthur M. Murray; and Kenneth W. DeJean

6

appointed as class counsel.   In support of their motion, Plaintiffs rely, in part, on the expert

analysis of Dr. Johnette Hassell.

The GEICO Defendants oppose class certification.   They also move to exclude Dr.

Hassell's testimony.

## II.   LAW AND ANALYSIS

### A.   Motion to Exclude

The Court deferred ruling on GEICO Defendants' Motion to Exclude until after the

hearing.   However, prior to proceeding any further the Court must first address whether it may

properly rely on the opinions expressed by Plaintiffs' expert, Dr. Hassell.

Under Federal Rule of Evidence 702, an expert opinion on scientific, technical, or

specialized knowledge can be admitted only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the
> trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the
> case.

FED. R. EVID. 702.   When faced with expert scientific testimony, the court must

determine at the outset if the proponent of the evidence has proven its admissibility by a

preponderance of the evidence.   *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 592

n.10 (1993) (citing FED. R. EVID. 104(a) and *Bourjaily v. U.S.*, 483 U.S. 171, 175-76 (1987)).

Courts have considerable discretion in deciding whether to admit or exclude expert testimony.

*See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) ("[W]e conclude that the trial

7

judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."); *Gen. Elec. Co. v. Joiner*, <u>522 U.S. 136, 138-9</u> (1997).

However, as gatekeeper, the district court is not intended to replace the adversary system: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *United States v. 14.38 Acres of Land, More or Less Situated in Lefore County, Miss.,* <u>80 F.3d 1074, 1078</u> (5th Cir. 1996) (quoting *Daubert,* <u>509 U.S. at 596</u>).

In determining whether to allow expert opinion testimony, a court must first decide whether the witness is qualified as an expert by knowledge, skill, experience, training, or education. *See Moore v. Ashland Chemical, Inc.,* <u>126 F.3d 679, 684</u> (5th Cir. 1997). A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a particular subject. *Wilson v. Woods,* <u>163 F.3d 935</u> (5th Cir. 1999).

If a witness is qualified to testify, the court must then determine whether the proffered testimony is both relevant and reliable. Reliability and relevance, under Rule 702, are the hallmarks of admissible expert testimony. *Daubert*, <u>509 U.S. at 589</u>; *In re MBS Mgmt. Servs., Inc.*, <u>690 F.3d 352, 357</u> (5th Cir. 2012). In making its reliability determination, the court must assess whether the "reasoning or methodology underlying the testimony is scientifically valid." *Curtis v. M & S Petroleum, Inc.*, <u>174 F.3d 661, 668</u> (5th Cir. 1999). However, the focus of reliability "must be solely on principles and methodology, not on the conclusions they generate." *Daubert*, <u>509 U.S. at 595</u>.

8

Relevance includes not only the general requirement contained in Rule 401 that the testimony tend to make the existence of any fact more probable or less probable, but also the prerequisite that the expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702; *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.") (quoting 3 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 702[02], p. 702-18 (1988)). In assessing relevance, courts "must determine whether that reasoning or methodology can be properly applied to the facts in issue." *Id.* (citing *Daubert*, 509 U.S. at 592-93).

Ultimately, "[t]he district court's responsibility is 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002) (quoting *Kumho Tire Co.*, 526 U.S. at 152).

In this case, the GEICO Defendants do not challenge Hassell's general qualifications as an expert, but rather argues that "her opinions do not meet the standards required for admission, as set forth under Federal Rules of Evidence 104(b)[1], 401(a), 403, and 702, and the principles in *Daubert* . . . and its progeny." [Doc. No. 180]. The GEICO Defendants further contend that Dr. Hassell's opinions should be excluded "because they do not meet the standards set forth in *Chavez v. Plan Benefit Servs., Inc.,* 957 F.3d 542 (5th Cir. 2020)[,] and *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)." *Id.*

---

[1]Federal Rule of Evidence 104(b) provides: "When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later."

The GEICO Defendants characterize their arguments as being based on the "false premises" relied upon by Plaintiffs.

First, the GEICO Defendants argue that Dr. Hassell's opinions are based on the false premise that NADA values are valid benchmarks of total loss vehicles' "actual cash values." They argue that, under Rule 104(b), the GEICO Defendants must show that NADA valuation is an "actual cash value" and, therefore, a valid benchmark, but they cannot because NADA value represents ███████████████████████████████████████████. [Doc. No. 185, Decl. of Jonathan Banks of J.D. Power's NADA Used Car Guide, March 28, 2019 ("Banks Decl."), attached as Ex. 1, ¶¶ 10, 14-16.]. Thus, they contend that this method of proof does not tend to prove that the amounts GEICO paid Plaintiffs (or putative class members) are less than the "actual cash value" due under their Policies.

Second, the GEICO Defendants argue that Hassell also relies on the false premise that CCC's values equate to the amount GEICO paid for a total loss vehicle's "actual cash value." While Dr. Hassell opines that she can collect CCC values to compare against NADA, they argue that this is the wrong data. The undisputed record evidence shows that the CCC value does not always equate to the amount GEICO paid for a total loss vehicle's "actual cash value." Dr. Hassell's opinions using CCC values do not tend to prove that the amounts GEICO paid Plaintiffs (or putative class members) are less than "actual cash value" due under the Policies. *See* FED. R. EVID. 104(b), 401(a), and 702(a).

Third, the GEICO Defendants argue that a "single benchmark" comparison of CCC and NADA values shows what Plaintiffs must prove: that the putative class members received less than "actual cash value." The validity of this "single benchmark" comparison is also Plaintiffs'

burden to prove before the Court considers Dr. Hassell's opinions on class certification. They contend that the undisputed record evidence shows that when Kelley Blue Book ("KBB") (another method Plaintiffs allege could be used) replaces NADA the results are materially inconsistent. Many individuals identified as injured using NADA would be uninjured (and may even owe GEICO a refund) using KBB. And, as Louisiana courts have long recognized, "[w]hether a NADA Guide or a Kelley Blue Book valuation is superior to another calculation is a question of fact that must be examined on a case-by-case basis." *Clark v. McNabb*, 878 So.2d 677, 680-81 (La. Ct. App. 2004). Therefore, they conclude that Dr. Hassell's opinions using NADA as a single benchmark do not tend to prove putative class members were injured, even if it is found that GEICO's use of CCC did not comply with La. Rev. Stat. 22:1892. *See* Fed. R. Evid. 104(b), 401(a).

Plaintiffs respond that the GEICO Defendants have failed to raise a proper attack under *Daubert* because Hassell's opinions in this case deal with very simple database functioning of which there is no serious dispute. To the extent that GEICO's motion is based on objections to the factual foundation of Dr. Hassell's opinions, Plaintiffs argue that these are issues to address on cross examination, as credibility is to be determined by the trier of fact. Finally, Plaintiffs argue that the GEICO Defendants challenge the weight to be given her opinions, not the exclusion of those opinions.

In reply, the GEICO Defendants then place their arguments in the framework of *Daubert*, contending that Hassell's opinions should be excluded. They reiterate that her opinions are based on false premises. They argue further her "methodology" had not even been implemented.

11

Having heard the evidence adduced at the hearing, further elucidating the parties' positions, the Court finds that Dr. Hassell's opinions are properly admitted. The GEICO Defendants, as stated, do not challenge Dr. Hassell's qualifications or that she has testified as an expert in other cases. Further, Dr. Hassell explained the technical methodology she used for valuing total losses. Her analysis and testimony are admissible as offered.

The GEICO Defendants' real objection is that Dr. Hassell's comparison is incorrect and does not address all information that the GEICO Defendants rely upon in valuing total losses. That objection is addressed by the cross-examination of Dr. Hassell at her deposition and by presenting their own evidence and testimony at the class certification hearing. The Motion to Exclude is DENIED. The Court has considered Dr. Hassell's testimony in ruling on the Amended Motion for Class Certification.

## B. Amended Motion for Class Certification

The Court now turns to the class certification issue. Applying <u>Federal Rules of Civil Procedure 23(a)</u> and (b)(3) factors, Plaintiffs argue that the Court should find, as its sister courts did in *Slade v. Progressive Security Insurance Co.*, No. 11-2164, <u>2014 WL 6484588</u> (W.D. La. Oct. 31, 2014), rev'd and remanded, <u>856 F.3d 408</u> (5th Cir. 2017), and *Gautreaux v. Louisiana Farm Bureau,* 2019-17 (La. App. 3rd Cir. 10/2/19), <u>280 So. 3d 694, 709</u>, writ denied 2019-01782 (La. 6/03/20), – So.3d –, that certification is appropriate.

The GEICO Defendants contend that Plaintiffs have failed to meet their burden on the Rule 23 requirements, and the Amended Motion for Class Certification must be denied.

> The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki,* <u>442 U.S. 682, 700</u>–701, <u>99 S.Ct. 2545</u>, <u>61 L.Ed.2d 176</u> (1979). To come within the exception, a party seeking to maintain a class action "must affirmatively

12

demonstrate his compliance" with Rule 23. *Wal–Mart Stores, Inc. v. Dukes*, 564
U.S. ——, ——, 131 S.Ct. 2541, 2551–2552, 180 L.Ed.2d 374 (2011).

*Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). "Rule 23(a) ensures that the named

plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Dukes*,

564 U.S. at 349. Rule 23(a) has four requirements: numerosity, commonality, typicality, and

adequate representation. FED. R. CIV. P. 23(a); *see also Dukes,* 564 U.S. at 349. If these

perquisites are met, then a class may be certified if the moving party also meets the requirements

of Rule 23(b)(1), (b)(2), or (b)(3) for class type. Rule 23(b)(3), at issue in this case, provides

that the Court must find

> that the questions of law or fact common to class members predominate over any
> questions affecting only individual members, and that a class action is superior to
> other available methods for fairly and efficiently adjudicating the controversy.
> The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution or
> defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already
> begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in
> the particular forum; and
>
> (D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(3).

> The Fifth Circuit has instructed on the proper standard for certification under Rule 23:
>
> Certification is proper only where "the trial court is satisfied, after a rigorous
> analysis," . . . that the Rule's requirements are met. Put another way, "a district
> court must detail with sufficient specificity how the plaintiff has met the
> requirements of Rule 23." *Vizena v. Union Pac. R.R.*, 360 F.3d 496, 503 (5th Cir.
> 2004) (per curiam).

13

"Rule 23 does not set forth a mere pleading standard." *Dukes*, <u>564 U.S. at 350</u>,
<u>131 S.Ct. 2541</u>. Instead, "[a] party seeking class certification must affirmatively
demonstrate his compliance with the Rule—that is, he must be prepared to prove
that there are in fact sufficiently numerous parties, common questions of law or
fact," and so on. *Id.*

As a result, in weighing certification, the court will often have "to probe behind
the pleadings," *Falcon*, <u>457 U.S. at 160</u>, <u>102 S.Ct. 2364</u>, because "[t]he class
determination generally involves considerations that are enmeshed in the factual
and legal issues" of the case, *Dukes*, <u>564 U.S. at 351</u>, <u>131 S.Ct. 2541</u>. So the court
should seek to "understand the claims, defenses, relevant facts, and applicable
substantive law in order to make a meaningful determination[.]" *Flecha v.
Medicredit, Inc.*, <u>946 F.3d 762, 766</u> (5th Cir. 2020). "If some of the
determinations ... cannot be made without a look at the facts, then the judge must
undertake that investigation." *Spano v. Boeing Co.*, <u>633 F.3d 574, 583</u> (7th Cir.
2011). The judge cannot merely "review a complaint and ask whether, taking the
facts as the party seeking the class presents them, the case seems suitable for class
treatment." *Id.* (emphasis added). Much more is needed.

Thus, to satisfy the rigor requirement, a district court must detail with specificity
its reasons for certifying. *Vizena*, <u>360 F.3d at 503</u>. It must explain and apply the
substantive law governing the plaintiffs' claims to the relevant facts and defenses,
articulating why the issues are fit for classwide resolution. . . . The court should
respond to the defendants' legitimate protests of individualized issues that could
preclude class treatment. . . And its analysis must stay close to the facts and law
of the case, spurning reliance on generalizations about what types of disputes may
be fit for a class. . . . The court must rigorously consider both Rule 23(a)'s
prerequisites . . . and the Rule 23(b) class type. . .

This "rigorous analysis" mandate is not some pointless exercise that we foist on
this circuit's hardworking and conscientious district judges, such as the judge in
this case. It matters. A "class action is an exception to the usual rule that litigation
is conducted by and on behalf of the individual named parties only," *Behrend*,
<u>569 U.S. at 33</u>, <u>133 S.Ct. 1426</u> (quotation marks removed), and creative uses are
perilous. It is no secret that certification "can coerce a defendant into settling on
highly disadvantageous terms regardless of the merits of the suit." . . . And the
existence of a class fundamentally alters the rights of present and absent
members, particularly for mandatory classes such as the one here. . . . No less than
due process is implicated, so a careful look is necessary. *See Unger v. Amedisys
Inc.*, <u>401 F.3d 316, 320</u> (5th Cir. 2005).

*Chavez v. Plan Benefit Servs., Inc.*, <u>957 F.3d 542, 545</u>–48 (5th Cir. 2020) (citations omitted).

14

Analysis of a class certification motion "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).  Plaintiffs assert three claims:   a claim for breach of the insurance contract,   a claim for penalties under L A. R EV. S TAT. 22:1892(B)(1), and a claim for penalties under L A. R EV. S TAT. 22:1973(A) and (B)(5).   [Doc. No. 1-1 ¶¶ 21, 28, 30-35.].   "To state a claim for breach of an insurance contract under Louisiana law, a plaintiff must allege a breach of a specific policy provision." *Louque v. Allstate Ins. Co.*, 314 F.3d 776, 782 (5th Cir. 2002) (citing *Bergeron v. Pan Am. Assurance Co.*, 731 So.2d 1037, 1045 (La. App. 4th Cir. 1999).   Additionally, to recover damages under La. Rev. Stat. 22:1973 or La. Rev. Stat. 22:1892, the plaintiff must have a valid "underlying substantive claim." *Pelle v. Munos*, 296 So.3d 14,24-25 (La. App. 1st Cir. 2/19/20) ("In order to recover under La. R.S. 22:1973 and La. R.S. 22:1892, a plaintiff must first have a valid, underlying, substantive claim upon which insurance coverage is based. . . . The penalties authorized by these statutes do not stand alone; they do not provide a cause of action against an insurer absent a valid, underlying insurance claim. . . . Furthermore, breach of contract is a condition precedent to recovery for the breach of duty of good faith . . . ).

The duty under GEICO's insurance agreement is to pay the actual cash value of the loss vehicle in its pre-loss condition.  Exh.  63,  Prudhomme  Insurance  Agreement,  11. This value includes adjustments for the "physical condition of the" loss vehicle and for "depreciation/betterment." *Id.* at 17-18.   Thus, for the breach of contract claim, Plaintiffs must prove the settlement amount was less than the actual cash value of the loss vehicle, after all adjustments.

15

With the elements of these claims in mind, the Court will consider each of the four Rule 23(a) requirements, as well as the requirements of Rule 23(b)(3).

### 1. Numerosity

First, numerosity requires the examination of the specific facts of each case and imposes no absolute limitations. *See Gen. Tel. Co. of the Northwest, Inc. v. EEOC*, <u>446 U.S. 318, 329</u> (1980). There are no magic numbers. *See Phillips v. Joint Legis. Committee on Performance and Expenditure Review of the State of Miss.*, <u>637 F.2d 1014, 1022</u> (5th Cir. 1981) ("Ample case law can be cited to show that smaller classes have been certified and larger ones denied certification for lack of numerosity. . . Such number comparisons miss the point of the Rule. The proper focus is not on numbers alone, but on whether joinder of all members is practicable in view of the numerosity of the class and all other relevant factors.").

The interrogatories filed by the GEICO Defendants (Exhibit 55) show that from August 15, 2010-January 9, 2019, Government Employees Insurance Company adjusted 4,352 total losses for insureds whose policies were issued in Louisiana. GEICO General Insurance Company adjusted 8,920 total loss claims for insureds whose policies were issued in Louisiana. In total, the GEICO Defendants adjusted 13,272 total claims.

The GEICO Defendants concede that the total claims are sufficiently numerous to meet the numerosity requirements. However, the GEICO Defendants argue that Plaintiffs cannot prove that the number of insureds in the 13,272 claims that were allegedly harmed under Plaintiffs' theory of liability. The GEICO Defendants presented testimony from Kathy Simon and David Stelly, both of whom testified that adjusters have discretion and did not always pay the CCC value, but actually pay a higher amount than the CCC value approximately ███████ of

16

the time.   The GEICO Defendants also argue that that the number of claimants could only be

determined on an individual claim-by-claim review since the GEICO Defendants do not track the

number of claims in which they pay more than the CCC value.

However, even under the GEICO Defendants' argument ███████████████████

██████████████████████████, there would still be a sufficient number of

potential claims to meet the numerosity factor.   Therefore, the Court finds that Plaintiffs have

met their burden as to numerosity.

> ## 2.  Commonality

The Court next turns to the factor of commonality.   Commonality allows a class to be

maintained if there are questions of law or fact common to the class.   FED. R. CIV. P. 23(a)(2).

"The commonality test is met when there is at least one issue, the resolution of which will affect

all or a significant number of the putative class members." *Lightbourn v. County of El Paso*, 118

F.3d 421, 426 (5th Cir. 1997); *see also Slade*, 2014 WL 6484588, at *7 (quoting same).

Plaintiffs list five (5) issues which they believe are common to every class

member:

- Whether GEICO's use of CCC violates LA. REV. STAT. 22:1892(B)(5);

- Whether CCC's algorithm driven comparable methodology is a "fair
  market value survey conducted using qualified retail automobile dealers in
  the local market area as resources" pursuant to LA. REV. STAT.
  22:1892(B)(5)(a);

- Whether CCC's algorithm driven comparable methodology is a "generally
  recognized used motor vehicle industry source" pursuant to LA. REV.
  STAT. 1892(B)(5)(b);

- Whether the use of a system that violates LA. REV. STAT. 22:1892(B)(5)
  gives rise to penalties under LA. REV. STAT. 22:1973; and

- The criteria for individual class members' entitlement to damages and penalties under La. Rev. Stat. 22:1892 and La. Rev. Stat. 22:1973.

[Doc. No. 183-1, p. 18].   The first three issues all address the question of whether GEICO's use of the CCC value violates the provision of La. Rev. Stat. 22:1892(B)(5).   The fourth and fifth issues address whether each proposed claimant would be entitled to penalties and attorneys' fees under La. Rev. Stat. 22:1973 and La. Rev. Stat. 22:1892 in the even GEICO's use of the CCC values violates La. Rev. Stat. 22:1892(B)(5).

In *Slade v. Progressive*, 2014 WL 6484588 (W.D. La. Oct. 13, 2014), the District Court certified a very similar class action involving Progressive's use of the Work Center Total Loss ("WCTL") valuation system for total vehicle of Progressive insureds.   The District Court certified issues for the class involving the breach of the insurance contract, statutory penalties, and attorneys' fees under La. Rev. Stat. 22:1973 and fraud.   On appeal, the Fifth Circuit approved the class certification on those issues except for fraud.[2]  *See Slade v. Progressive*, 856 F.3d 408 (5th Cir. 2017).

*Slade* has many similarities to the present case.   It involved a class of Progressive insureds who had total losses calculated with the WCTL system that allegedly undervalued the insured's loss.   *Slade* was also similar to the present case in that the NADA clean-retail was used by the plaintiffs' expert, Hassell,[3] who testified that damages could be computed on a class-

---

[2] The Court held that fraud claims require individual proof of reliance by each claimant, and, therefore, certification was inappropriate.

[3] Hassell is the same expert in this case.

18

wide basis by computing the difference between the NADA lean rated value and the WCTL value by using Progressive's own information.[4]

However, there are some very important differences between *Slade* and the present case. Progressive used Manage Repair Representatives ("MRR"), who did not have discretion to deviate from the WCTL numerical value.   In contrast, GEICO's adjusters have extensive training which includes the discretion to settle total loss claims over the CCC value.   According to the testimony of Kathy Simon, ████████████████████████████████████ ████████████████.  Since Progressive always used the WCTL value, there was no need to look at each individual claim to see which claimants received more.   Dr. Hassell's damage model would fit more easily with the Progressive case than it would with GEICO's case.

Another important difference between *Slade* and the present case is that the Progressive adjusters were also able to determine the vehicle's NADA value by pressing an "NADA button" on his or her computer.   In contrast, the GEICO adjusters do not track the NADA clean retail value, and that information is not normally found in GEICO's claim files.

One other important difference is the value Progressive was computing versus the value GEICO is computing.   In *Slade*, the WCTL program had a condition rating of 3.00, which compared to the condition of a used vehicle on a dealer's lot.   In contrast, GEICO's CCC program attempts to calculate the actual cost value of the vehicle in the state where it was located just prior to the accident causing the loss.   Therefore, in *Slade,* the use of Dr. Hassell's model is an "apples versus apples" comparison (used vehicle on dealer's lot versus clean retain value). In the present case, her damages model is an "apples versus oranges" comparison because

---

[4]The Court notes that there is currently an issue in *Slade* as to whether the damages were as easy to calculate as Hassell had previously indicated.

19

NADA clean retain reflects the value of a used vehicle for sale on a dealer's lot versus the actual cost of the insured vehicle just before the accident.[5] Dr. Richardson testified that a vehicle on the road just prior to an accident would almost always be valued less than a used vehicle for sale on a dealer's lot.

Since GEICO pays more than the CCC value in approximately ▬▬▬ of its claims, all 13, 272 potential claims would have to be looked at individually to determine whether or not the CCC value was paid.   Additionally, in approximately ▬ of cases where the CCC system is used, the system evaluations are reviewed by a person ▬ or the evaluations are prepared manually ▬ by CCC adjusters.   Each individual claim will have to be looked at to find out in which claims GEICO paid more and/or in which claims manual valuations were used by CCC. Unlike *Slade*, Prudhomme's and Jack's claims cannot be resolved by reference to GEICO's own computer data.

In *Chavez v. Plan Benefit Servs., Inc.*, 957 F.3d 542 (5th Cir. 2020), the Court found the district court failed to meet the rigorous analysis required for class certification.   Specifically, the Court held the district judge failed to examine the asserted differences among the class members that could prevent the suit from generating common answers.

There are important differences between the GEICO insureds proposed to be class plaintiffs.   Apparently, ▬▬▬ were paid more than the CCC.   Also, apparently ▬ had manual evaluations used, rather than the CCC computer system.   It would be impossible to determine damages on a class-wide basis without examining all 13,272 claims.   Common questions could not be answered without fact-specific inquiries as to each claim.

─────────────────

[5]NADA Clean Retail reflects a used vehicle on a dealer's lot ready for sale.   (Dr. Richardson's testimony).

In *Curtis v. Progressive*, 2020 WL 2461482 (W.D. Ok. May 15, 2020), the district court denied a very similar class certification primarily on the commonality factors.   The Court found the plaintiffs did not show commonality where it was alleged that Progressive's use of the WCTL system to value vehicle total loss claims violated Oklahoma law.   In denying class certification, the court found there would not be a common answer for the purported class, as the class would require an in-depth look at specific claims, which contravenes the purpose of class litigation.

In this case, there will be no common answer of whether GEICO violated La. Rev. Stat. 22:1893(B)(5) without looking at each claim.   Therefore, the Court finds that the commonality factor is not met.

### 3.  Typicality

Typicality is a requirement that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."   Fed. R. Civ. P. 23(a)(3).   The test focuses on the similarity between the named plaintiffs' legal and remedial theories and the legal and remedial theories of those whom they wish to represent.   *See Lightbourn v. City of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997).   If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality.   *See James v. City of Dallas* 254 F.3d 551, 557 (5th Cir. 2001).

Prudhomme's 2008 Kia Rondo LX was involved in an automobile accident, resulting in a total loss.   Prudhomme maintains his vehicle's NADA clean retain value was $10,150.00, while he was only paid $8,272.00 under GEICO's CCC One valuation.

21

Jack's 2000 Ford Ranger V-6 Supercab truck was involved in an automobile accident, resulting in a total loss.   The NADA clean retail value was $4,350.00 while he was paid $2,733.00 under GEICO's CCC One valuation.   Jack believes his vehicle was worth even more than the NADA clean retail value.

GEICO maintains the plaintiffs are in conflict with each other, and Jack is subject to unique individual defenses.   Despite that, Prudhomme and Jack seek to represent GEICO insureds whose total loss vehicles were paid less than the NADA clean retail value.   The small differences are not enough to defeat typicality.

### 4.  Adequate Representation

Under the adequacy argument, Plaintiffs must show that they, their counsel, and the relationship between the two are adequate to protect the interests of the absent class members. *Unger v. Amedisys, Inc.*, 401 F.3d 316, 321 (5th Cir. 2005).

There is no argument challenging the adequacy of Plaintiffs' counsel.   Affidavits were filed [Exh. 59] by class counsel, Kenneth St. Pe, Kenneth DeJean, and J.R. Whaley.   Mr. DeJean testified live at trial.   Counsel are highly qualified to represent the interest of absent class members.

GEICO argues that Prudhomme and Jack have a conflict of interest due to Dr. Richardson's conclusion that more than one-fifth of the putative class benefited from GEICO using the CCC value instead of NADA Clean Retail value.   In other words, Prudhomme and Jack have a conflict of interest in that the method they contend should have been used would be to the detriment of more than 20% of the putative class.

22

Intraclass conflicts may negate adequacy under Rule 23(a)(4). *Langbecker v. Elec. Data Sys. Corp.,* 476 F.3d 299, 315 (5th Cir. 2007). In *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000), the plaintiff's representation was found to be inadequate where the class includes those "who claim harm from the very acts from which the other class members benefitted." That is the case here. According to Dr. Richardson's case study, approximately 21% of the proposed class members would receive less using the NADA Clean Retail value than they received by GEICO's CCC One Valuation. This is a substantial conflict with over 1/5 of the class. Due to this conflict of interest, Prudhomme and Jack are unable to provide adequate representation to the proposed class.

## 5. Rule 23(b) Class Type Requirements

"A class action may be maintained if Rule 23(a) is satisfied[,] and if the plaintiffs prove that the action meets the requirements of one of the options under Rule 23(b). In this, Plaintiffs contend that they have satisfied Rule 23(a) and that this is the type of action addressed in Rule 23(b)(3).

Rule 23(b)(3) requires that" questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." F<small>ED</small>. R. C<small>IV</small>. P. 23(b)(3); *see also Madison v. Chalmette Refining, LLC*, 637 F.3d 551, 555 (5th Cir. 2011). Rule 23(b)(3) then identifies four "pertinent" factors to consider:

(A)     the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)     the extent and nature of any litigation concerning the controversy already begun by or against class members;

<center>23</center>

(C)     the desirability or undesirability of concentrating the litigation of the
        claims in the particular forum; and

(D)     the likely difficulties in managing a class action.

Predominance, although reminiscent of the commonality requirement of Rule 23(a), is

more demanding "because it tests whether the proposed classes are sufficiently cohesive to

warrant adjudication by representation."   *Unger*, 401 F.3d at 320.

As discussed in the analysis of Rule 23(a), due to the very important differences between

the issues in this case and *Slade v. Progressive*, the commonality requirement was not met.

Under the more demanding standard of predominance, this requirement is not met either.   Since

████████████████   of the GEICO insureds were paid more than the CCC One Valuation

and/or manual evaluations were used in ████ of the cases, all 13,272 claims would have to be

examined, which defeats the purpose of a class action.   Dr. Hassell's damage formula cannot be

used for the entire class without examining each individual claim file.   Damages simply cannot

determined on a class-wide basis.

Also, without knowing the amount each potential GEICO claimant was paid over the

CCC One Valuation (which will require every file to be examined), it is also impossible to have

a common answer to the question of whether GEICO violated LA. REV. STAT. 22:1892(B)(5).

Although this case is similar to *Slade v. Progressive*, a "rigorous analysis" of the facts

show that there are vast differences which make it impossible to determine liability or damages

on a class-wide basis.   Therefore, Plaintiffs' Amended Motion for Class Certification is

DENIED.

24

## III.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Exclude [Doc. No. 180] is DENIED.

Plaintiffs' Amended Motion for Class Certification [Doc. No. 183] is DENIED.   As a result of

the Court's Ruling, it appears there is no longer subject-matter jurisdiction.   It is, therefore, the

intent of the Court to remand this matter to the Fifteenth Judicial District Court, Parish of

Lafayette, State of Louisiana.   Accordingly, any party opposing remand should file a

memorandum no later than fifteen (15) days from the date of this Order.

Monroe, Louisiana, this 22nd day of December, 2020.

**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**

TAB 59

DJA0823

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:19-CV-00294-CCE-JLW

| | |
|---|---|
| ELIZABETH V. FORTSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Judge Catherine C. Eagles |
| | ) Magistrate Judge Joe L. Webster |
| GARRISON PROPERTY AND | ) |
| CASUALTY INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DECLARATION OF JOHN BECK

I, **John Beck**, pursuant to 28 U.S.C. § 1746 declare:

1. I make this declaration based on personal knowledge. I could competently testify to the facts stated in this declaration if called upon to do so.

2. I am currently the Manager of Content Strategy for Cox Automotive, Inc., parent company of Kelley Blue Book Co., Inc. ("KBB") I provide services directly to KBB and have worked as their copywriter and content strategist for 11 years.

3. As part of those services, I maintain and periodically update a list of existing terms & definitions used on the site for the purposes of clarity and consistency.

4. I have personal knowledge of and am familiar with the text of the KBB web pages attached hereto.

5. Exhibit 1 attached hereto is a true and accurate depiction of the web page located at https://www.kbb.com/car-prices/ as of September 27 2021.

6. Exhibit 2 attached hereto is a true and accurate depiction of the web page located at https://www.kbb.com/company/terms-of-service/ as of September 27, 2021.

7. Exhibit 3 attached hereto is a true and accurate depiction of the web page located at https://www.kbb.com/faq/ico/as of September 27, 2021.

8. Exhibit 4 attached hereto is a true and accurate depiction of the web page located at https://www.kbb.com/faq/new-cars/ as of September 27, 2021.

9.  Exhibit 5 attached hereto is a true and accurate depiction of the web page located at https://www.kbb.com/faq/used-cars/ as of September 27, 2021.

10. Exhibit 6 attached hereto is a true and accurate depiction of the web page located at https://www.kbb.com/faq/values/ as of September 27, 2021.

11. Exhibit 7 attached hereto is a true and accurate depiction of the web page located at https://www.kbb.com/faq/others/ as of September 27, 2021.

12. Exhibit 8 attached hereto is a true and accurate depiction of the web page located at https://www.kbb.com/used-cars/ as of September 27, 2021.

13. Exhibit 9 attached hereto is a true and accurate depiction of the web page located at https://www.kbb.com/whats-my-car-worth/?ico=a as of September 27, 2021.

14. Exhibit 10 attached hereto is a true and accurate depiction of the vehicle Condition Descriptions on the KBB website as of September 27, 2021.

15. To view the Condition Descriptions in Exhibit 10, a user must input basic information about the vehicle that they are attempting to value. The vehicle information will then appear on the webpage inquiring about vehicle condition with the Condition Descriptions. KBB uses the same Condition Descriptions for all vehicles. The percentages applied to each condition is across all vehicles valued by KBB.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed on September 27, 2021 in Torrance, State of California.

John Beck

# EXHIBIT 1



Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 543 of 598

DJA0827

expect to pay for your next car. We call it the Kelley Blue Book® Price Advisor. It shows you the Kelley Blue Book® Fair Purchase Price, Kelley Blue Book® Fair Market Range and other pricing details to give you a real look at what a car should cost in your area. To help you with a fair car price, we update or validate our data weekly to provide market-reflective prices, relied upon by both consumers and the automotive industry.

## Car Pricing Questions

### What is the Kelley Blue Book Price Advisor?

The Kelley Blue Book® Price Advisor is a range-based pricing tool to help car buyers and sellers talk about price realistically. Research from a recent Cox Automotive Car Buying Journey Study showed that shoppers are looking for a fair car price not only for new vehicles, but also for used vehicles and the vehicles they currently own. Focusing on a single price doesn't consider all the variables associated with structuring a car deal. The Kelley Blue Book® Price Advisor is designed to reduce friction between buyers and sellers.

### How are car prices determined?

Kelley Blue Book has its own special formula, perfected over 90+ years of experience with car prices. Today, we look at hundreds of thousands of vehicle transactions each week and factor in items like supply & demand and seasonality. And because car prices aren't the same across the country, we have car pricing based on over 120 geographic regions in the US and analyze each region individually to reflect local pricing and economic conditions. We even tell you if the asking price that this dealer provides to us is a "Great Price" or a "Good Price" so you can feel more confident when you make your deal.

### How to get the best price on a new or used car?

- If you have a trade-in, learn the value of your current car.
- Determine a monthly payment and a term that works for you.
- Get pre-qualified for a car loan from your bank or credit union. Sometimes dealers can beat the rate you find; sometimes not.
- Know the Fair Market Range to be sure you don't overpay.
- If it's a new car, negotiate with a few dealerships online for the best price.

For more, see "10 Insider Tips for Car Buying"

### Are Kelley Blue Book® Values accurate?

The question "What's the Blue Book Value?" has been part of buying and selling a car for over 90 years. And simply put, no one has more experience with vehicle values and pricing than Kelley Blue Book. We've been the go-to source for both consumers and the automotive industry since 1926. We leverage massive amounts of data, including actual transactions - then adjust for local market conditions and seasonal trends. Our values reflect both wholesale and retail transactions to provide a 360 degree view of the market. We update our pricing at least weekly to reflect the market and give dealers and consumers the most up-to-date pricing.

  

## Info for New Car Shoppers



Midsize Pickup Truck

### Some Ford Maverick Buyers To Get Free AWD Upgrade

If you ordered a non-hybrid 2022 Ford Maverick in front-wheel-drive (FWD) with the optional 4K towing package, you're about to get a call from the dealership with some...

Sean Tucker | September 24, 2021



General

### Best Cars And Top 10 Lists

It seems every new vehicle we drive is both more powerful and more fuel-efficient than its predecessor. More comfortable and more fun. More refined, but similarly...

KBB Editors | September 24, 2021



General

### 10 Best Cars Worth Waiting For

Here is our list of the 12 Best Cars Worth Waiting For...

Nelson Ireson | September 21, 2020

## Popular New Cars and Trucks

| | | | |
|---|---|---|---|
| Ford F150 | Honda CR-V | Ford Escape | Nissan Sentra |
| Chevrolet Silverado | Honda Civic | Jeep Wrangler | Jeep Grand Cherokee |
| Ram 1500 | Nissan Altima | Ford Explorer | Ford Focus |
| Toyota Camry | Toyota RAV4 | Hyundai Elantra | GMC Sierra |
| Toyota Corolla | Nissan Rogue | Toyota Highlander | BMW 3-Series |
| Honda Accord | Chevrolet Equinox | Toyota Tacoma | Ford Mustang |



FAQ | Contact Us | Do Not Sell My Personal Information (CA Residents Only) | About Us | Careers | Corporate | Advertising |

Media | Site Map | KBB Brasil | KBB Canada

© 1995-2021 Kelley Blue Book Co®, Inc. All rights reserved. Copyrights & Trademarks | Terms of Service | Privacy Policy | Linking Policy | Accessibility Statement | Ad Choices

Case 1:19-cv-00294-CCE-JLW Document 96 Filed 11/01/21 Page 544 of 598

# EXHIBIT 2

# KBB.com General Terms of Service

Last Updated: March 30, 2021

## 1. Description of KBB.com and These Terms of Service

    a. Welcome to KBB.com! Kelley Blue Book Co., Inc. ("Kelley Blue Book", "us", "we", "our") provides its products and services subject to these Terms of Service ("Terms"). By using KBB.com, you agree to the following Terms. These Terms may be updated by us from time to time, and we encourage you to revisit this page often and review the Terms. In addition to these Terms, when using particular KBB.com owned or operated services, you may also be subject to any additional posted guidelines applicable to such services.

    b. KBB.com provides you with access to many valuable resources, including Kelley Blue Book **Used Car Values, New Car Pricing and quotes from dealerships, research, reviews and ratings, car buying advice, classified listings**, as well as links to sites where you can obtain vehicle services such as **financing** and **insurance**, and other existing services and those that may later be offered to you (the "Service"). The Service includes advertisements, which are necessary for Kelley Blue Book to provide the Service to you. Unless explicitly stated otherwise, any new features that we may add to KBB.com will also be subject to these Terms, and any other special terms of service referenced in the new feature.

## 2. KBB.com Privacy Policy

a. Click here to view the KBB.com **Privacy Policy**. You understand and agree that when you visit KBB.com, you are consenting to the collection and use of information provided by you and about your use of KBB.com and the Services, in accordance with the Privacy Policy.

## 3. Personal Use Only

a. You may make personal use of all of the information you access on KBB.com ("Information"), but you may not take any of the Information and re-format and display it, or copy it on your Web site or in any other format, and you may not store or migrate any of the Information or other data from KBB.com without Kelley Blue Book's written permission. By using the Service, you agree not to sell, store, distribute, transmit, display, reproduce, modify, migrate, create derivative works from, or otherwise exploit any of the Information content or data related to any portion of the Service. You may print a copy of particular vehicle values and prices and use the Information for your personal, non-commercial use, but you may not otherwise reproduce any material appearing on KBB.com. If you want to make commercial use of the Kelley Blue Book Information or Services, you must enter into an agreement with us to do so in advance, and **we would love to talk to you about that**.

## 4. Contributions to KBB.com

a. By submitting ratings, reviews, content, ideas, survey responses, suggestions, documents, comments, and/or proposals ("Contributions") to KBB.com through its surveys, "contact us", or suggestion or feedback Web pages, you acknowledge and agree that: (a) your Contributions do not contain confidential or proprietary information; (b) Kelley Blue Book is not under any obligation of confidentiality, express or implied, with respect to the Contributions; (c) your Contributions automatically become the property of Kelley Blue Book without any obligation of Kelley Blue Book to you and Kelley Blue Book shall be entitled to use, copy, modify, or disclose (or choose not to use or disclose), delete in its entirety, adapt, publish, translate, create derivative works from and/or sell and/or distribute such Contributions for any purpose, in any way, in any media worldwide; (d) Kelley Blue Book may have something similar to the Contributions already under consideration or in development; and (e) you are not entitled to any compensation or reimbursement of any kind from Kelley Blue Book under any circumstances for your Contributions.

b. You assume total responsibility and risk for your use of any interactive areas of KBB.com. You acknowledge that any of the Contributions posted or transmitted through KBB.com represents the views of the author, and not of Kelley Blue Book. You also acknowledge that your use of or reliance on such content is at your own risk.

c. When publishing anything to KBB.com or using any social media tools or interactive features, you agree that you will not post or transmit:

    i. any copyrighted material unless you own or control the copyright in and to such material;

    ii. material that is: knowingly false and/or defamatory, inaccurate, libelous, tortuous, abusive, vulgar, hateful, racist, bigoted, sexist, harassing, threatening, inflammatory, obscene, profane, sexually oriented, invasive of a person's privacy, or is otherwise objectionable or in violation of any applicable law, rule, or regulation;

    iii. material that violates or infringes the rights of any other party, including, without limitation, rights of privacy, rights of publicity, copyright, trademark, or other intellectual property rights;

    iv. profanity in subject lines, messages, or signatures;

    v. any material containing viruses, Trojan horses, worms, or any other disruptive or harmful component;

    vi. material that breaches another's privacy, i.e., containing phone numbers, addresses, or other personal information;

    vii. spam, including, but not limited to, junk mail, chain letters, unsolicited bulk email or duplicative messages, excessive cross-postings, and material that is unrelated to the forum in which it is posted;

    viii. material that contains advertisements or commercial solicitations; or

    ix. material discussing illegal activities or linking to websites that deal with such activities.

d. You further agree that you will not attempt or do any of the following:

      i. interfere with or disrupt KBB.com or our computer systems, servers, or networks;

      ii. attempt to gain unauthorized access to any part of KBB.com, to accounts that belong to other users, or to computer systems or networks connected to KBB.com;

      iii. engage in any systematic extraction of data or data fields, including, without limitation, email addresses, by use of any automated mechanism, such web robots, crawlers, or spiders or otherwise;

      iv. collect information about others without their consent;

      v. interfere with the use of KBB.com by any other individual or party;

      vi. impersonate any person, or otherwise attempt to mislead others about your identity, or post material under secondary user names or other aliases; or

      vii. share any user name and/or password you have on KBB.com with any other persons.

e. Without limiting any of Kelley Blue Book's other rights or remedies, a violation of any of the above may result in the removal of any content you have transmitted or posted, revocation of any accounts you have on KBB.com or on our affiliated websites and services, and/or a ban from creating new accounts.

f. Although Kelley Blue Book cannot monitor all of the listings and content posted to KBB.com, we reserve the right (but assume no obligation) to delete, move, condense or edit any ads, ratings, reviews, content or other postings that come to our attention that we consider unacceptable or inappropriate, whether for legal or other reasons. We retain the right to deny access to anyone who we believe has violated these terms or any other term of these Terms. We will not, in the ordinary course of business, review the content of private electronic messages that are not addressed to us. However, we may occasionally monitor such communications as we believe is appropriate to comply with applicable laws, respond to legal process or a law enforcement request, to enforce these Terms, or to protect the rights, property or safety of visitors to KBB.com, our advertisers, the public, us or our affiliates. Notwithstanding the foregoing, Kelley Blue Book takes no responsibility and assumes no liability for any content posted to KBB.com by you or by third parties.

## 5. Kelley Blue Book® Instant Cash Offer Program Terms

a. **Program Overview.** With the Kelley Blue Book Instant Cash Offer Program ("Instant Cash Offer Program") you can complete a questionnaire online or at a dealership and get a specific offer to buy your car for cash today ("Instant Cash Offer" or "Offer"). You can redeem your Instant Cash Offer for cash, or put the value of your Offer toward the purchase of another vehicle, subject to these Instant Cash Offer Program Terms and Conditions, the KBB.com Terms of Service including but not limited to the Arbitration and Class Action Waiver provisions, all of which are incorporated herein by reference, and other terms and conditions provided through the Instant Cash Offer Program. Kelley Blue Book and Autotrader do not redeem Instant Cash Offers or purchase vehicles; rather, the Instant Cash Offer is redeemable at dealers who have paid Kelley Blue Book or an affiliate to participate in the Instant Cash Offer Program ("Participating Dealers"). The Instant Cash Offer is valid at any Participating Dealer for seven (7) days after it was issued. It is important to note that the Instant Cash Offer is based on specific information about your vehicle, which may result in variations from the information collected in connection with a Kelley Blue Book® Value. The Offer may be less than the Kelley Blue Book® Trade-In Value and may be lower than the Trade-In Range for a similar vehicle.

Your Vehicle must pass a mandatory vehicle inspection by a Participating Dealer. If the inspection report differs from your description or online assessment of your vehicle's condition, the Participating Dealer may adjust the Offer amount, which may mean decreasing the Offer amount. Participating dealers are not owned or operated by, nor are they affiliated with or acting on behalf of, either Kelley Blue Book or Autotrader. Kelley Blue Book, Autotrader, and their affiliates expressly disclaim any liability resulting from an adjustment of the Offer or refusal to accept the vehicle by Participating Dealer(s).

b. **Program Requirements.** In addition to the other KBB.com Terms of Service and other terms to redeem an Instant Cash Offer that you have received through the Instant Cash Offer Program: (1) your vehicle must be located in a market in which the Instant Cash Offer Program is offered; (2) you must be the registered owner of the vehicle in question; (3) you must possess a valid driver's license or other form of valid government-issued photo ID; (4) you must not be an automobile dealer or an employee or agent of an automobile dealer; (5) the personal contact information and the information about your vehicle that you provide in response to our online questionnaire must be accurate, complete, and truthful; and (6) within seven (7) days of the issuance of your Instant Cash Offer, you must deliver your vehicle, with a valid registration and either clear and unencumbered title in your name, or complete documentation regarding any lease obligations or liens on your vehicle (including, for example, contact information for your lender or leasing company, relevant account information, and the current loan payoff amount or lease early termination fee for your vehicle) to a Participating Dealer. The Participating Dealer will inspect your vehicle to confirm its condition and verify the accuracy of the other information about your vehicle that you submitted online. Based on the results of this verification inspection (more information below) reported by the Participating Dealer, the dollar amount of your Instant Cash Offer may be adjusted up or down prior to redemption.

c. **Restrictions.** The Instant Cash Offer Program is not available in all areas and not all vehicles are eligible for Offers. The Instant Cash Offer Program may not be used to sell or to trade in certain categories of vehicles at Kelley Blue Book's discretion, including, without limitation: current model year (or newer) vehicles; exotic vehicles; commercial vehicles; vehicles subject to recall or investigation by a government agency; vehicles with a police, fire, livery, taxi, or rental history; reconstructed or salvage vehicles; vehicles without a valid Vehicle Identification Number (VIN); vehicles not originally built for the United States market or that were imported illegally or outside of official manufacturer channels (i.e., "gray market" vehicles); vehicles older than 24 model years; vehicles that have over 300,000 miles on the odometer; vehicles with altered drivelines or bodies or illegal or non-functioning emissions equipment; vehicles registered at an auto auction or offered for sale through any wholesale channel within 45 days; and vehicles that we would value at less than $1,000. You may use the Instant Cash Offer Program to sell or trade in a maximum of three vehicles in any six-month period. Vehicles with an Offer value greater than $75,000 may not be accepted by every Participating Dealer and may require an additional inspection.

d. **Some Offers Require Review.** Although the majority of Instant Cash Offers generated by the Instant Cash Offer Program will be delivered within moments of submitting a valid request, some requests require manual review. This manual review process usually will be completed within minutes of submitting a request but occasionally may take until the next business day.

e. **The Information You Provide in Connection with Your Offer.** By requesting an Offer, you represent and warrant that the information you provide is accurate and not false or misleading and that you are the sole owner or any images you submit in connection with the Offer and that the images will not violate the intellectual property rights of any third party, including copyright or other intellectual or proprietary rights. You further agree that by submitting any information or images in connection with an Offer, you grant to KBB and its affiliates a nonexclusive, royalty-free, perpetual, transferable, irrevocable and fully sub-licensable right to use, reproduce, modify, adapt, translate, distribute, publish, create derivative works from and publicly display and perform such information and images throughout the world in any media, now known or hereafter devised. You acknowledge that if you provide us with any false, incomplete or inaccurate information, including, without limitation, vehicle information or personal contact information, your Instant Cash Offer may be immediately invalidated. You further acknowledge that if vehicle images are inconsistent with other information you provide, this may affect the accuracy of your Offer. By requesting an Offer, you agree that we, our service providers, and Participating Dealers may contact you, by any method that you supplied for your contact information, about vehicles or other products and services that may be of interest to you. You will have to supply a phone number, but it doesn't have to be a mobile number. If you do supply a mobile number, you consent to receive calls or texts at that number, whether manually or automatically dialed, from us and from Participating Dealers.

f. **Participating Dealers**

    i. Participating Dealers pay a monthly subscription to participate in and receive leads through the Instant Cash Offer Program. Offers provided through the Instant Cash Offer Program are calculated and generated by a proprietary appraisal tool intended to generate a price reflecting a liquid cash offer to be honored by a Participating Dealer irrespective of whether you are purchasing another vehicle from that Participating Dealer. Instant Cash Offer Program guarantees to Participating Dealers that your vehicle will be worth at least the amount of the Offer. Participating Dealers are not owned or operated by, nor are they acting on behalf of, Kelley Blue Book, and, except as described herein, are not otherwise affiliated with Kelley Blue Book. If you redeem your Instant Cash Offer at a Participating Dealer, you will have the option of either using your Instant Cash Offer to trade in your vehicle or to sell your car for a check. If your Instant Cash Offer does not identify a Participating Dealer near you, please call our customer service department at 1-866-559-5268 or send us an email to request this information.

    ii. Although Participating Dealers are not obligated to purchase your vehicle or accept your vehicle for trade for any price other than the amount of your Instant Cash Offer, you are welcome to try to negotiate a more favorable price or trade-in amount for your vehicle and, of course, you are always free to sell or trade-in your vehicle outside of the Instant Cash Offer Program. Though we think the Offer allows for a convenient and easy way to sell your vehicle, it may not be the highest sale price or trade-in amount that you could receive for your vehicle outside of the Instant Cash Offer Program.

g. **Verification Inspections**

i. Participating Dealers will conduct a mandatory vehicle inspection free of charge to verify the accuracy of the vehicle description and condition information that you provided to us online. This verification inspection may include, for example, paint thickness measurements, a road test, a mechanical inspection, and a review of vehicle history reports and disclosure statements regarding flood, salvage, or odometer discrepancies (including rollbacks), and the like. The Participating Dealer will submit the results of the verification inspection to the Instant Cash Offer Program using the same online tool that you used to request your Instant Cash Offer, and we may raise or lower the dollar amount of your Instant Cash Offer prior to redemption based on the information revealed by the inspection. All decisions of the Participating Dealer regarding the condition of your vehicle will be final.

ii. At the conclusion of your vehicle verification inspection, you can redeem your Instant Cash Offer, subject to any applicable adjustments after the inspection, by delivering your vehicle on the spot or by returning your vehicle to your Participating Dealer's location by the end of the next business day in the same condition and with no more than 50 additional miles on the odometer.

h. **Redeeming Your Instant Cash Offer**

i. **Selling Your Vehicle to a Participating Dealer.** If you decide to redeem your Instant Cash Offer by selling your vehicle, the Participating Dealer will issue you a check following the release of all applicable liens and lease obligations and the Participating Dealer's receipt of a clear and unencumbered vehicle title, subject to Section 5.h.iii. All checks will be made payable to the vehicle owner(s) named on the vehicle title.

ii. **Redeeming Your Offer Towards the Purchase of Another Vehicle.** If you elect to apply your Instant Cash Offer to the purchase of another vehicle, your Participating Dealer will issue you a credit toward the price of any vehicle available in its inventory in exchange for your vehicle. The Offer credit will be given after the release of all applicable liens and lease obligations and the receipt of a clear and unencumbered vehicle title (see Section 5 h.iii).

iii. **Equity in Your Vehicle.** If there are outstanding lien or lease obligations on your vehicle, the following will apply:

1. **Negative Equity.** If you have negative equity in your vehicle (i.e., your outstanding loan balance or lease payment obligation exceeds the amount of your Instant Cash Offer), you will be responsible for paying the difference between the Instant Cash Offer and the amount needed to clear the title to your vehicle by certified check or other form of payment acceptable to the Participating Dealer before your transaction can be completed.

2. **Positive Equity.** If you have positive equity in your vehicle, the Participating Dealer will issue you a check or a trade-in credit, as applicable, for the difference between the amount needed to clear the title (including any related fees) to your vehicle and the Instant Cash Offer. Your Participating Dealer will assist you with the processing of the paperwork and payments necessary to settle your loan or lease obligations and to obtain a clear title to your vehicle. This process typically takes 10 to 14 business days following delivery of a vehicle to a Participating Dealer, but it could take longer in some circumstances.

i. **Release.** BY SUBMITTING YOUR INFORMATION TO RECEIVE AN OFFER, YOU AGREE NOT TO SUE KELLEY BLUE BOOK, ITS AFFILIATES, ITS SERVICE PROVIDERS, OR ITS OR THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS (COLLECTIVELY, THE "RELEASED PARTIES") FOR, AND AGREE TO RELEASE AND HOLD HARMLESS THE RELEASED PARTIES FROM AND AGAINST, ANY AND ALL CLAIMS RELATING TO OR ARISING OUT OF ANY VEHICLE SALE OR INSTANT CASH OFFER TRANSACTION THAT YOU ENTER INTO WITH A DEALER IN CONNECTION WITH THE INSTANT CASH OFFER PROGRAM. IN THE EVENT THAT ANY CLAIMS OR DISPUTES ARISE OUT OF SUCH A TRANSACTION, YOU AGREE TO LOOK SOLELY TO YOUR PARTICIPATING DEALER FOR YOUR REMEDY AND NOT TO THE RELEASED PARTIES.

# 6. Registration

a. To obtain access to certain services from KBB.com, you may be required to register on KBB.com. As part of the registration process, you will be required to select a user name and a password. You agree that the information you supply during that registration process will be accurate and complete, and that you will not register under the name of another person. Failure to provide accurate and timely information may result in your account being closed and/or your access to content provided through your account being suspended, discontinued, or removed. We reserve the right to disallow use of a user name that we deem offensive or inappropriate. You will be responsible for preserving the confidentiality of your password and for all actions of persons accessing KBB.com through any username/password assigned to you. You will notify Kelley Blue Book's Customer Service Department of any known or suspected unauthorized use of your account via email.

b. Kelley Blue Book reserves the right to disclose any information we collect through user accounts and registrations in accordance with our Privacy Policy.

# 7. Buying and Selling Vehicles

a. KBB.com offers a vehicle listing and information service that brings together buyers and sellers. Kelley Blue Book is not a party to any transaction between vehicle buyers and sellers that originates on or through KBB.com. Information about a particular vehicle is supplied by the seller, and may include data from third parties and/or machine learning. The price and other terms of any sale remain subject to direct negotiation between the buyer and the seller.

b. Though we hope that all who come to KBB.com will act honorably and treat each other fairly, we cannot verify the information about vehicles that sellers supply or guarantee the vehicles offered by sellers. Nor can we assure the seller of a vehicle that the payment he or she receives from the buyer is legitimate. When using KBB.com to find a buyer for your vehicle or a vehicle to purchase, we urge you to use the same common sense and good judgment you would use in selling a vehicle through, or responding to, a classified ad in the newspaper. There is no substitute for healthy skepticism and your own good judgment.

**c.** Buying a Vehicle

i. The prices listed by sellers on KBB.com often exclude sales tax, finance charges, title, license, regulatory, dealer documentary, emission testing, and compliance fees, any or all of which may be added to the listed price to arrive at the final sale price of a particular vehicle. Before purchasing a vehicle or any other good or service you have read about on KBB.com, you should confirm with the seller any information, including the price that is important to your purchasing decision. Kelley Blue Book is not responsible for, and does not guarantee the performance of, any such vehicles, goods or services listed or researched on KBB.com. We may remove or hide parts or all of a vehicle advertisement on KBB.com if we determine, in our sole discretion, that the vehicle advertisement or price violate the Vehicle Advertisements and Pricing Guidelines for Dealers.

ii. We may screen some email messages sent through KBB.com to sellers about vehicles listed on KBB.com. If it appears that your email message has not reached the seller of the vehicle you are inquiring about, you might try inquiring by telephone if the seller has provided a telephone number.

iii. Our used car listings include vehicles that have been "certified" as meeting certain standards established by manufacturers and/or dealers in connection with their pre-owned vehicle programs. The decision to certify any particular vehicle is made by the certifying manufacturer or dealer, and the vehicle information included in KBB.com' certified vehicle listing is provided by the listing dealer. Neither Kelley Blue Book nor the manufacturer is responsible for the accuracy of any information contained in a certified vehicle listing. Only the party that certifies a vehicle is responsible for the decision to certify that vehicle. You should familiarize yourself with the terms of the applicable certification program before buying a certified vehicle. Ads purchased by private sellers through our Sell Your Car service will not appear in any "certified" area of KBB.com. Ads for certified vehicles apply only to vehicles certified by dealers in accordance with the certification programs of the automobile manufacturers with which we have partnerships.

iv. Certain dealers who participate in an anonymous chat or anonymous texting service provided by Kelley Blue Book or its affiliates may offer you an option to inquire about a listed vehicle without disclosing your personal information (such as your name, e-mail address or telephone number). If you contact a dealer via an anonymous text, the dealer will be able to respond to that text and contact you without having access to your mobile number. Both you and the dealer have the option to end such chat or text conversation at any time. If, in the course of such chat or text conversation, you supply to the dealer your email address and/or telephone number, you consent to receive e-mail communications to such e-mail address and calls and texts at that number, whether manually or automatically generated. You are under no obligation to provide your name or contact information over the course of such chat or text conversation.

v. Anonymous chat and text service rely on infrastructure and services furnished by third-party providers. Neither Kelley Blue Book, nor its affiliates, nor participating dealers warrant the continuous availability or error-free operation of the anonymous chat and text services.

d. Listing Your Vehicle

i. KBB.com offers a variety of ad packages to private sellers, with combinations of features that may vary by market area. For information about the ad packages available to private sellers in your area, click the "Sell Your Car" tab or button on our home page. On the next page, enter your ZIP code to view our product offerings. For information about ad packages available to dealers (and private sellers wishing to list more than five vehicles for sale at a given time), please visit B2B.KBB.com.

ii. By offering a vehicle for sale through our Sell Your Car service for private sellers, you must agree to our Terms of Sale. The Terms of Sale require, among other things, that you be prepared to sell your vehicle at the price at which, and on the terms on which, you have listed it. You must have possession of the actual vehicle listed and the ability to transfer title. To list a vehicle for sale on KBB.com, sellers also are required to provide certain identifying and contact information. The information must accurately identify the seller and the method of contact must permit buyers to communicate directly with the seller. You may not charge any potential buyer for information about any vehicle listed for sale on KBB.com, nor may you use KBB.com to promote, without our prior written permission, any other website, product, or service.

iii. By using KBB.com to sell your vehicle as a private seller, you represent that you are at least 18 years of age, that you are not a motor vehicle dealer, that you are not listing a vehicle for sale in your capacity as an owner, employee or representative of a dealer, and that neither you nor anyone acting on your behalf will list more than five vehicles for sale simultaneously. A private seller who wishes to list more than five vehicles simultaneously, and any commercial dealer wishing to list any vehicle, must make arrangements with us before doing so. Please visit B2B.KBB.com for information.

iv. When you list a vehicle for sale through our Sell Your Car service, we may obtain additional distribution for your listing through our relationships with other websites. We also may promote your listing on or through third-party websites or services as an added value. Those providers may contact you about your ad on their website and may try to sell additional services to you, but you are not obligated or required to purchase any additional services and may be able to opt out of displaying your ad on their website. If other third parties contact you without your permission offering to sell you services, they have likely misused KBB.com and violated these Terms to exploit your listing information. If you receive any such solicitations that you did not authorize, please bring them to our attention by using our contact us form.

v.

vi. Listings are not to be used to advertise more than one vehicle, regardless of a listing's duration. For this reason, you cannot edit your vehicle's year, make, model, or VIN once you have purchased a listing. Always double-check this information before purchasing a listing. Listing fees are generally not refundable, so if you enter incorrect information in the year, make, model, or VIN fields, you will have to delete the listing and purchase a new one to create an accurate listing. By using KBB.com to sell your vehicle, you agree to pay the price of the package you select and the prices of any advertising upgrades, regardless of whether your vehicle sells as a result of the listing. You also agree to pay any applicable taxes relating to your use of the Sell Your Car service. See section 4 of the Terms of Sale for information on refunds.

vii. Responsibility for the information contained in each listing lies with each seller. You alone are responsible for the material you post, including listing information and photos of your vehicle, and for the content of all email messages you transmit through KBB.com. Nothing will undermine a user's confidence in the vehicle you are looking to sell faster than inaccurate statements or misleading representations about the vehicle. And since any erosion of user confidence in you is likely to be accompanied by erosion of user confidence in us, we care deeply about making sure that the information you supply is accurate and that, in all respects, you treat other users of KBB.com fairly and honorably.

viii. In connection with our efforts to combat Internet fraud, some listings may be screened before being posted publicly. This process may delay the publication of your listing. Though we cannot monitor every transaction that originates through a listing on KBB.com, we may, from time to time, perform random quality assurance tests to confirm that those who offer vehicles for sale over KBB.com are prepared to sell those vehicles at the prices and on the terms which such vehicles are advertised. By using KBB.com, you agree to cooperate in these quality assurance tests. If our tests reveal, or we otherwise learn, that a seller may be violating these Terms, we reserve the right to deny that seller use of services offered on KBB.com and any affiliated websites and remove that seller's listings from each site.

ix. By listing a vehicle for sale on KBB.com, you agree to use the email addresses of those responding to your listing only to communicate with them about the potential sale of that vehicle.

x. By listing a vehicle for sale on the KBB.com, you represent and warrant that: you are the sole author and owner of the intellectual property rights in any data, information, text, image, or other material ("Content") that you submit to KBB; you voluntarily waive all "moral rights" that you may have in such Content; the Content you submit is accurate and not false or misleading nor does it infringe any third party's copyright, patent, trademark, trade secret or other intellectual or proprietary rights or rights of publicity or privacy. You further agree that you shall not: submit any Content that is, or may reasonably be considered to be, defamatory, libelous, obscene, pornographic, indecent, lewd, suggestive, threatening, abusive, inflammatory, hateful, racially or religiously biased or offensive, harassing, fraudulent, or otherwise objectionable to any individual, partnership or corporation; or impersonate any person or entity or otherwise misrepresent your affiliation with a person or entity.

xi. By listing a vehicle for sale on the KBB.com, you grant to KBB and its affiliates a nonexclusive, royalty-free, perpetual, transferable, irrevocable and fully sub-licensable right to use, reproduce, modify, adapt, translate, distribute, publish, create derivative works from and publicly display and perform such Content throughout the world in any media, now known or hereafter devised.

# 8. Modifications and Termination of Service

a. Kelley Blue Book reserves the right at any time and from time to time to modify, update, suspend or discontinue all or part of the Service for any reason with or without notice to you. You agree that we may, under some circumstances and without prior notice to you, terminate your use of and access to any of the parts of KBB.com to which we restrict access, for example, by requiring registration. Some of the reasons for such termination may include, but are not limited to, (a) a breach or violation or suspected breach or violation of these Terms or other incorporated terms or guidelines, (b) a request by law enforcement or another government agency, (c) our decision to discontinue or change all or part of KBB.com, (d) technical or security issues, and (e) fraudulent or illegal activities. All terminations will be made in Kelley Blue Book's sole discretion and you agree that Kelley Blue Book will not be liable for any termination of your use of or access to the Service, KBB.com or any part of KBB.com.

# 9. Your Dealings with KBB.com Advertisers

a. Your correspondence or business dealings with, or participation in promotions of, advertisers found on or through the Service, including payment and delivery of related goods or services, and any other terms, conditions, warranties or representations associated with such dealings, are solely between you and such advertiser. You acknowledge and agree that Kelley Blue Book will not be responsible or liable for any loss or damage of any sort incurred as the result of any such dealings or as the result of the presence of such advertisers on the Service.

# 10. Links to Other Websites

a. KBB.com provides links to other Web sites. You acknowledge and agree that, because Kelley Blue Book has no control over such sites, we are not responsible for them or the resources and information they contain. In particular, we are not responsible for the availability of services related to another Web site that has a link on KBB.com; we do not necessarily endorse such sites, and we are not responsible or liable for any content, advertising, products or other materials on or available from such sites. You further acknowledge and agree that Kelley Blue Book will not be liable for any loss whatsoever for any damages caused by or incurred in connection with the use of or reliance on the information, goods or services available through any such site.

# 11. Kelley Blue Book's Proprietary Rights

a. You acknowledge and agree that the Service and all materials on KBB.com, contain proprietary information and data that is protected by applicable copyright, trademark and other intellectual property laws (Kelley Blue Book's "Proprietary Information"). All materials on KBB.com, including such Proprietary Information, may only be used for personal, non-commercial purposes, and you agree not to sell, transfer, reproduce, duplicate, distribute, publish, modify, migrate, store, copy or transmit any material from KBB.com unless and until you have obtained our prior written consent. The Proprietary Information covered by this prohibition includes, without limitation, the software programming and html and other code contained in the Web site, Kelley Blue Book Vehicle Values, Kelley Blue Book New Car Pricing information, compilations of vehicle specifications, any reviews, ratings, user generated content, text, graphics, logos, photographs, audio or video material or stills from audiovisual material available on KBB.com.

b. You are free to establish a hypertext link to KBB.com pursuant to the KBB.com Linking Policy. However, without our prior written permission, you may not frame any of the content of KBB.com, nor incorporate into another website or service any intellectual property of Kelley Blue Book or its licensors. Requests for permission to frame our content or use our content in any way that is not expressly described in these Terms should be sent to our Customer Service Manager.

c. Kelley Blue Book, KBB.com, and the Kelley Blue Book logo are all trademarks owned by us. The names of other products and services referred to on KBB.com may be the trademarks of their respective owners. You may not use any trademark or service mark appearing on KBB.com without the prior written consent of the owner of the mark.

d. You acknowledge that by transmitting or posting any material on or through KBB.com, you grant us, or anyone authorized by us, an unrestricted, non-exclusive, worldwide, royalty-free, perpetual, irrevocable, license to use, modify, perform, display, broadcast, reproduce, create derivative works from, transmit, sell or otherwise use, exploit or distribute, at no cost whatsoever, all such material (including, without limitation, all intellectual property rights embodied therein), in whole or in part, in any manner or medium (whether now known or hereafter developed), for any purpose. The foregoing license includes the right to exploit any proprietary rights in such material, including, but not limited to, rights under copyright, trademark, or patent laws that exist in any applicable jurisdiction. Also, in connection with the exercise of these rights, you grant us and anyone authorized by us, the right to identify you as the author of such material by name, email address or user name, and to use your image and likeness if provided, in connection with such material. You will not receive any compensation of any kind for the use of any material you transmit or post via KBB.com.

## 12. Use of Kelley Blue Book Logos

a. Click here to view the Kelley Blue Book logos ("Kelley Blue Book Marks"), and the terms of use governing downloads of the Kelley Blue Book Marks. You agree that all of the Kelley Blue Book Marks are the property of Kelley Blue Book, and agree that you will not use the Kelley Blue Book Marks without Kelley Blue Book's prior written permission.

## 13. No Illegal Use

a. As a condition of your use of and access to KBB.com, you agree not to use the Services for any unlawful purpose or in any way that violates these Terms. You also agree not to use the Services in any way that could damage, disable, overburden, or impair KBB.com or any Kelley Blue Book server, or the associated networks, or interfere with any other party's use and enjoyment of any Services.

# 14. Dispute Resolution – Mandatory Arbitration and Class

a. **Arbitration Agreement:** YOU AND KELLEY BLUE BOOK AGREE THAT ANY CLAIMS OR DISPUTES ("Claims") THAT ARISE OUT OF OR RELATE IN ANY WAY TO THESE TERMS, KBB.COM, OR THE SERVICES (INCLUDING BUT NOT LIMITED TO BILLING DISPUTES) SHALL BE RESOLVED BY FINAL AND BINDING ARBITRATION OR IN SMALL CLAIMS COURT. In arbitration, there is no judge and no jury. Instead, Claims are decided by an arbitrator whose authority is created by and governed by this arbitration agreement. Review of arbitration awards in the courts is very limited.

b. **Class Action Waiver:** YOU AND KELLEY BLUE BOOK AGREE THAT ALL CLAIMS BETWEEN US WILL BE RESOLVED IN AN INDIVIDUAL ARBITRATION. WE BOTH AGREE THAT THERE WILL BE NO CLASS, REPRESENTATIVE, OR CONSOLIDATED ACTIONS IN ARBITRATION. In addition, neither you nor Kelley Blue Book may participate in a class or representative action in court as a class member if the Claims asserted in the litigation would fall within the scope of this arbitration agreement if asserted directly by you or Kelley Blue Book. To be clear, you and Kelley Blue Book both waive any right to participate in any class action involving disputes between us.

c. This class action waiver is an essential part of our arbitration agreement and may not be severed. If for any reason this class action waiver is found unenforceable, then the entire arbitration agreement will not apply. However, the Jury Trial Waiver set forth in Section 15 of these Terms will remain in full force and effect.

d. **Arbitrator Authority:** The arbitrator's authority is governed by this arbitration agreement. You and Kelley Blue Book agree that the arbitrator may award the same relief that a court of competent jurisdiction could award – consistent with and limited by these Terms (including the limitations of liability set forth in Section 17), but the arbitrator may not award declaratory or injunctive relief that extends beyond you and your dealings with Kelley Blue Book. An arbitrator may award attorneys' fees and costs to the prevailing party if a court would be authorized to do so under the applicable law.

e. **Arbitration Procedures:** You and Kelley Blue Book agree that your agreement affects interstate commerce, and the Federal Arbitration Act applies. All arbitrations shall be conducted by JAMS Endispute under its Streamlined Arbitration Rules and Procedures ("JAMS"). These Rules are available on the JAMS website at http://www.jamsadr.com or by calling 1.800.352.5267. If there is a conflict between the JAMS Rules and this arbitration agreement, then this arbitration agreement shall control. Kelley Blue Book will pay all filing fees and costs associated with commencing an arbitration, but you will be responsible for paying your own attorneys' fees (if you chose to use an attorney in arbitration) unless you prevail in the arbitration and the arbitrator finds that you are entitled to recover your fees under the law. Except for claims determined to be frivolous, Kelley Blue Book agrees not to seek an award of attorneys' fees in arbitration even if an award is otherwise available under applicable law. If you bring an arbitration against Kelley Blue Book, the arbitration hearing will be held in your hometown area, unless we both agree on a different location.

f. **Survival:** This arbitration agreement survives the termination of these Terms between you and Kelley Blue Book.

# 15. Jury Trial Waiver.

a. You and Kelley Blue Book expressly and knowingly **WAIVE THE RIGHT TO TRIAL BY JURY**. This means that if for any reason the arbitration agreement contained in Section 14 is not enforced or is found inapplicable, our claims against each other will be resolved by a judge rather than a jury.

# 16. Disclaimer of Warranties:

You Expressly Understand and Agree That:

a. Your use of the Service is at your sole risk. Kelley Blue Book provides the Service to you on an "as is" and "as available" basis. Kelley Blue Book and its owners, shareholders, subsidiaries, affiliates, officers, employees, agents, partners and licensors expressly disclaim all warranties of any kind, whether express or implied, including, but not limited to the implied warranties of merchantability, fitness for a particular purpose and non-infringement.

b. Kelley Blue Book and its owners, shareholders, subsidiaries, affiliates, officers, employees, agents, partners and licensors make no warranty that (i) the Service will meet your requirements; (ii) the Service will be uninterrupted, timely, secure or error-free; (iii) the results that may be obtained from the use of the Service will be accurate or reliable; (iv) the quality of any products, services, information or other material accessed, purchased or obtained by you through the Service will meet your expectations; and (v) any errors will be corrected.

c. All material and information obtained through the use of the Service is accessed at your own discretion and risk, and you will be solely responsible for any damage to your computer system or loss of data that results from the accessing of any such material.

d. No advice or information, whether oral or written, obtained by you from KBB.com or its affiliates or partners through or from the Service shall create any warranty whatsoever.

e. **Vehicle valuations are opinions and may vary from vehicle to vehicle. Actual valuations are based upon current available information and analysis of market conditions, and will vary depending on specifications, vehicle condition or other particular circumstances pertinent to a particular vehicle or the transaction or the parties to the transaction. Kelley Blue Book assumes no responsibility for the accuracy of vehicle values and no responsibility for errors or omissions.**

## 17. Limitation of Liability

a. You expressly understand and agree that Kelley Blue Book and its owners, shareholders, subsidiaries, affiliates, officers, employees, agents, partners and licensors shall not be liable to you for any direct, indirect, incidental, special, consequential or exemplary damages, including, but not limited to, damages for loss of profits, goodwill, use, data or other intangible losses (even if Kelley Blue Book has been advised of the possibility of such damages), resulting from: (i) the use or the inability to use the Service; (ii) the cost of procurement of substitute goods or services resulting from any goods, data, information or services obtained or received or transactions entered into as a result of your use of the Service; (iii) statements or conduct of any third party related to the Service; or (iv) any other matter relating to the Service.

b. IF YOU RELY ON KBB.COM OR ANY INFORMATION, PRODUCT, OR SERVICE AVAILABLE THROUGH KBB.COM, YOU DO SO AT YOUR OWN RISK. YOU UNDERSTAND THAT THERE MAY BE DELAYS, OMISSIONS, INTERRUPTIONS, INACCURACIES, AND/OR OTHER PROBLEMS WITH THE INFORMATION, PRODUCTS, AND SERVICES PUBLISHED ON OR PROMOTED THROUGH KBB.COM. KBB.COM AND THE SERVICES ARE PROVIDED TO YOU "AS IS." KELLEY BLUE BOOK AND ITS AFFILIATES, AGENTS, AND LICENSORS CANNOT AND DO NOT WARRANT THE ACCURACY, COMPLETENESS, CURRENTNESS, NONINFRINGEMENT, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE INFORMATION OR SERVICES AVAILABLE THROUGH KBB.COM (OR ANY INFORMATION, GOODS, OR SERVICES THAT ARE REFERRED TO, ADVERTISED OR PROMOTED ON, OR SOLD THROUGH KBB.COM). NOR DO WE OR THEY GUARANTEE THAT KBB.COM OR THE SERVICES WILL BE ERROR FREE, OR CONTINUOUSLY AVAILABLE, OR THAT KBB.COM OR THE SERVICES WILL BE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. KELLEY BLUE BOOK AND ITS AFFILIATES, AGENTS, AND LICENSORS WILL NOT BE LIABLE FOR ANY CLAIMS, ACTIONS, OR JUDGMENTS ARISING OUT OF OR RELATED TO ANY CONTENT POSTED TO KBB.COM BY YOU OR ANY THIRD PARTY.

c. UNDER NO CIRCUMSTANCES WILL KELLEY BLUE BOOK OR ITS AFFILIATES, AGENTS, OR LICENSORS BE LIABLE TO YOU OR ANYONE ELSE FOR ANY DAMAGES ARISING OUT OF YOUR USE OF KBB.COM, THE SERVICES, OR ANY PRODUCT OR SERVICE LINKED TO OR FROM OR ADVERTISED OR PROMOTED ON KBB.COM, INCLUDING, WITHOUT LIMITATION, CONSEQUENTIAL, SPECIAL, INCIDENTAL, INDIRECT, PUNITIVE, EXEMPLARY, OR OTHER DAMAGES OF ANY KIND (INCLUDING LOST REVENUES OR PROFITS, LOSS OF BUSINESS, AND LOSS OF DATA), EVEN IF WE ARE ADVISED BEFOREHAND OF THE POSSIBILITY OF SUCH DAMAGES. YOU AGREE THAT THE LIABILITY OF KELLEY BLUE BOOK AND ITS AFFILIATES, AGENTS, AND LICENSORS, IF ANY, ARISING OUT OF ANY KIND OF LEGAL CLAIM ARISING OUT OF OR OTHERWISE RELATING KBB.COM OR THE SERVICES WILL NOT EXCEED THE AMOUNT YOU PAID, IF ANY, FOR THE USE OF KBB.COM OR THE SERVICES OUT OF WHICH SUCH LIABILITY ALLEGEDLY ARISES. WITHOUT LIMITING THE GENERALITY OF THE PRECEDING SENTENCE, YOU AGREE THAT WE ARE NOT RESPONSIBLE OR LIABLE TO YOU OR ANYONE ELSE FOR ANY THREATENING, DEFAMATORY, OBSCENE, OFFENSIVE, TORTIOUS, OR ILLEGAL CONDUCT BY YOU OR ANY OTHER PARTY OR ANY INFRINGEMENT OF YOUR OR ANOTHER'S RIGHTS ARISING FROM OR IN CONNECTION WITH KBB.COM.

d. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF CERTAIN WARRANTIES OR THE LIMITATION OR EXCLUSION OF LIABILITY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES. ACCORDINGLY, SOME OF THE ABOVE DISCLAIMERS AND LIMITATIONS OF LIABILITY MAY NOT APPLY.

## 18. Indemnity and Release

a. When you use KBB.com, you are agreeing to indemnify Kelley Blue Book, its owners, shareholders, subsidiaries, affiliates, officers, employees, partners, and licensors and hold them harmless from any and all claims and expenses, including attorney's fees, arising from your use of the KBB.com Web site, your use of the Service, or your submission of Contributions as set forth in Section 4 above. By using KBB.com you are agreeing to release Kelley Blue Book and its owners, shareholders, subsidiaries, affiliates, officers, employees, partners, and licensors from any and all claims, fees, costs, damages and obligations of any kind whatsoever that you may have against them arising out of or in any way related to such claims or obligations and to any disputes regarding use of ideas and/or related materials submitted to KBB.com. **You hereby agree to waive all laws that may limit such releases. For example, you specifically agree to waive the provisions of California civil code section 1542, which provides:**

**"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which is known by him must have materially affected his settlement with the debtor."**

## 19. Changes and Updates to These Terms of Service

a. Kelley Blue Book may occasionally update or change these Terms, so we encourage you to view them often. Your continued use of the Service constitutes your agreement to these Terms and any updates.

## 20. General Information

    a. Choice of Law. The Terms and the relationship between you and Kelley Blue Book shall be governed by the laws of the State of California without regard to its conflict of law provisions.

    b. Waiver and Severability of Terms. The failure of Kelley Blue Book to exercise or enforce any right or provision of the Terms shall not constitute a waiver of such right or provision. If any provision of the Terms is found by a court of competent jurisdiction to be invalid, the parties nevertheless agree that the court should endeavor to give effect to the parties' intentions as reflected in the provision, and the other provisions of the Terms remain in full force and effect.

    c. Entire Agreement. The Terms constitutes the entire agreement between you and Kelley Blue Book and governs your use of the Service, superseding any prior Terms with respect to the Service. You also may be subject to additional terms and conditions that may apply when you use or purchase certain other Kelley Blue Book services, affiliate or third-party services.

    d. Statute of Limitations. You agree that any claim, demand, or cause of action arising out of or related to the Service or your access or visit to KBB.com or these Terms must be filed by you within one (1) year after such claim, demand, or cause of action arose, or it is forever barred.

## 21. Reporting Violations to the Terms

a. Please report any violations of the Terms to Kelley Blue Book customer service.

## Other Important KBB.com Policies:

- **KBB.com** Privacy Policy

- **KBB Logo** Downloadable Trademark Usage Guidelines Policy

- **KBB.com** Linking Policy

Search

FAQ                                    Advertising

Contact Us                             Media

Don't Sell My Info                     Site Map

About Us                               KBB Brazil

Careers                                KBB Canada

Corporate

# EXHIBIT 3

 **Kelley Blue Book**
THE TRUSTED RESOURCE

Home    Car Values    Cars for Sale    Car Reviews    Car Repair    Research Tools

# Frequently Asked Questions

New Car    Used Car    My Car's Value    **Instant Cash Offer**    Motorcycle    Other Pricing    Technical

## Instant Cash Offer

What is a Kelley Blue Book® Instant Cash Offer?

How is my Instant Cash Offer calculated?

Am I obligated to redeem my Instant Cash Offer?

How is an Instant Cash Offer different from Trade-in Value Range?

How much does it cost to receive an Instant Cash Offer?

Do I have to purchase a car with my Instant Cash Offer?

How long is my Instant Cash Offer valid for?

How long do I have to accept my Offer after inspection?

How long will it take to receive my Instant Cash Offer?

What if the Participating Dealer I go to won't match the amount on my Instant Cash Offer?

Why do offers fall out of Trade-in Value Range?

My car isn't in perfect condition. Can I still get an Instant Cash Offer?

What makes a car ineligible for an Offer?

Can I sell my car if it's financed or leased?

How will my car's condition be verified?

Where can I find the Vehicle Identification Number (VIN)?

Where do I take my car to redeem my Instant Cash Offer?

How far away will the dealer be?

What information should I bring when I drop off my car?

How do I contact Kelley Blue Book about my offer?

### Contact Us

**Business Inquiries**
b2b.kbb.com

**Mailing Address**
195 Technology, Irvine, CA 92618
Map

### What Is A Kelley Blue Book® Instant Cash Offer?

The Kelley Blue Book® Instant Cash Offer is a real offer for a specific amount to purchase a consumer's car or apply the amount toward another car. The Offer is valid for 7 days and can be immediately redeemed during business hours at any Participating Dealer, pending inspection. It is based on specific elements of the consumer's car, like installed options, specific condition (such as dents and mechanical issues) and local market demand.

### How Is My Instant Cash Offer Calculated?

We calculate your Instant Cash Offer using a proprietary tool that accounts for fluctuating market conditions and used car prices that may vary from day to day, like home or stock prices. The calculation includes multiple data sources and is based on factors that affect used car pricing such as:

- Your Specific Vehicle Details

Our tool factors in details that are specific to your vehicle and critical to its evaluation, including mechanical condition, options, interior and exterior, mileage, year, make and model.

- Supply and Demand

Consumers have a large role in determining a car's value. When more buyers demand a particular vehicle, and its inventory is down, the value goes up. For example, when gas prices are at a premium, fuel-efficient vehicles may be in higher demand and sell for higher prices.

- Historical Trends

Historically, some cars hold their value and are in higher demand than others. Similarly, sometimes transaction prices for vehicles steadily increase over time, making those cars a more sought after commodity.

- Regional Differences

Buyers may be willing to pay sellers higher prices for the same vehicle depending on regional differences. For example, buyers in rural areas may consider large trucks more valuable than buyers in a city where parking spaces are tight.

DJA0869

- Local Market Influences

We also take into account comparable vehicle sales in your area – this information may include dealer sales data, auction prices, and private seller prices from local advertisements.

## Am I Obligated To Redeem My Instant Cash Offer?

No. There is no obligation to trade-in or sell your car by simply receiving an Offer. The choice is yours.

## How Is An Instant Cash Offer Different From Trade-In Value Range?

The Kelley Blue Book® Instant Cash Offer is:

- A fixed offer applied toward your next car purchase or used to sell your current car to a Participating Dealer (pending inspection)
- Valid for 7 days
- No need to negotiate because each offer is a fixed amount
- Based on specific details related to the condition and features of your car, like installed options, dents, mechanical issues, and local market demand

The Kelley Blue Book® Trade-In Value is:

- An estimated trade-in value used toward the purchase of another car only
- Updated weekly
- Applied to similar cars of the same year, make, model, style and general condition
- A useful tool for negotiating
- The general value Kelley Blue Book estimates consumers can expect to negotiate this week based on the style, condition, mileage and options of the vehicle when they trade it in to a dealer. However every dealer is different and values are not guaranteed

## How Much Does It Cost To Receive An Instant Cash Offer?

It's free! There is no fee to obtain or redeem the Offer.

## Do I Have To Purchase A Car With My Instant Cash Offer?

No. You can walk away with a check or use the Offer towards the purchase of another vehicle.

## How Long Is My Instant Cash Offer Valid For?

Your Instant Cash Offer is valid for 7 days. After that time, you can resubmit your request, but your Offer amount may change.

## How Long Do I Have To Accept My Offer After Inspection?

You'll have 1 day after inspection to redeem your Instant Cash Offer. If your car's condition changes or you add more than 50 miles from the time of inspection, your Offer may be recalculated.

## How Long Will It Take To Receive My Instant Cash Offer?

You will typically receive an Offer within minutes. In some cases, it may take longer, such as during periods of heavy volume. The Instant Cash Offer program is not available for all makes and models, so if your vehicle falls into one of the unavailable categories, you will not receive an Offer.

## What If The Participating Dealer I Go To Won't Match The Amount On My Instant Cash Offer?

Participating Dealers are required to honor your Instant Cash Offer, provided the information and condition you provided when creating your Offer are confirmed to be accurate by the Participating Dealer. If the information is not correct, the Participating Dealer can update the information using the same online tool you used to generate the Instant Cash Offer for your car, and the update may result in a modified Offer amount. So, the more details you enter about the condition of your car, the more accurate your Offer will be.

## Why Do Offers Fall Out Of Trade-In Value Range?

Most offers do fall within range. If they fall out of range, reasons include, but are not limited to, market volatility, rapid changes to the market, mechanical issues, excessive damage, reported issues, aftermarket equipment, modified suspension, or the vehicle's specific condition.

## My Car Isn't In Perfect Condition. Can I Still Get An Instant Cash Offer?

Yes, if your car is not in an otherwise excluded category.

## What Makes A Car Ineligible For An Offer?

There are a variety of reasons why cars may not be eligible. Some possible reasons include, but are not limited to, title issues (salvage, grey market, taxis or limousines), market volatility, lack of market data, unresolved recalls, low value due to age or condition, aftermarket equipment, or if the vehicle has been at an auction within the last 45 days.

## Can I Sell My Car If It's Financed Or Leased?

Yes. The Participating Dealer will process the necessary paperwork for you to pay off your vehicle and pay any related fees. Any remaining equity is yours to cash in or use toward the purchase of another vehicle. If your car is financed, bring your lienholder information, or if your car is leased, check with your leasing company to find out what paperwork they require.

Please note that, if your car still needs to be paid off, this can affect how quickly the Participating Dealer can send you a check if you opt to sell the car to the Dealer without buying another car from that Dealer.

## How Will My Car's Condition Be Verified?

When you present your Instant Cash Offer to the Participating Dealer, the dealer will conduct a visual inspection of the interior and exterior, then may test drive the vehicle to confirm its mechanical condition. If the inspection report doesn't match your online assessment

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 586 of 598

# EXHIBIT 4

**Kelley Blue Book**
THE TRUSTED RESOURCE

Home    Car Values    Cars for Sale    Car Reviews    Car Repair    Research Tools    

# Frequently Asked Questions

**New Car**    Used Car    My Car's Value    Instant Cash Offer    Motorcycle    Other Pricing    Technical

## New Car

What is the Kelley Blue Book® Price Advisor?

What is the Kelley Blue Book® Fair Purchase Price?

What is the Fair Market Range?

How is the Fair Market Range on the Price Advisor determined?

What is MSRP? Is that the same as "Sticker Price"?

What is Invoice?

What does the term "holdback" mean?

When will you have more new car pricing?

How often do you update your new car pricing?

Does your pricing account for my region?

What is the difference between factory, port, and dealer-installed options?

Do you have Canadian pricing?

Do you have pricing for other countries?

Does Kelley Blue Book provide escrow services for vehicle purchases or guarantee online vehicle purchase transactions?

I am buying a demo car from a new car dealer, but it already has 700 miles on the odometer. Is this car considered new or used? How do I find its value?

What do the abbreviations and symbols on your site mean?

### Contact Us

**Business Inquiries**
b2b.kbb.com

**Mailing Address**
195 Technology, Irvine, CA 92618
Map

### What Is The Kelley Blue Book® Price Advisor?
The Kelley Blue Book® Price Advisor is a range-based pricing tool to help car buyers and sellers talk about price realistically. Research from the Cox Automotive Car Buying Journey Study shows that shoppers are looking for a fair price not only for new vehicles, but also for used vehicles and the vehicles they currently own. When you limit your market-based pricing to a single price point, it doesn't consider all the variables associated with structuring a car deal. The Kelley Blue Book® Price Advisor is designed to reduce friction between buyers and sellers.

### What Is The Kelley Blue Book® Fair Purchase Price?
Fair Purchase Price reflects the price consumers are typically paying for this vehicle. The Fair Purchase Price is regionalized based on actual new-vehicle transactions collected from across the country and adjusted regularly as market conditions change. Fair Purchase Price is determined by collecting thousands of actual consumer vehicle purchase prices, plus data from national vehicle registration databases and several other reliable third-party sources. Kelley Blue Book's lead analysts and statisticians review and validate the data each week for reliability.

Some sites and tools purport to show you the drop-dead lowest prices, but the Kelley Blue Book Fair Purchase Price gives you a realistic view of what a new car is actually selling for.

### What Is The Fair Market Range?
The Fair Market Range reflects the range of prices that Kelley Blue Book estimates most people will pay for a specific vehicle this week based on its year, make, model and style. This range is determined using sophisticated statistical models that consider recent transactions, supply, demand and market changes. Sometimes people think that the lower part of the range represents a vehicle with less equipment and the top of the range shows a vehicle (or a style) with more equipment. This isn't the case. If you choose options, packages and colors when looking up a car, the Fair Market Range you see is for THAT vehicle with THAT equipment.

### How Is The Fair Market Range On The Price Advisor Determined?
The Fair Market Range for new cars is Kelley Blue Book's estimate of what a consumer can reasonably expect to pay this week in their area for a vehicle configured with their selected options, excluding taxes, title, fees and any available special offers. We determine values in the Fair Market Range by collecting hundreds of thousands of vehicle transactions each week and updating our values with that information.

### What Is MSRP? Is That The Same As "Sticker Price"?
The MSRP, or Manufacturer's Suggested Retail Price, is the price set by the new car manufacturer. The MSRP shown for a vehicle includes

DJA0873

destination charges and minimum required equipment. MSRP, destination charges and minimum required equipment appear as separate prices on the manufacturer's window sticker, so "MSRP" and "sticker price" aren't exactly the same. A dealer can choose to sell a vehicle above or below its listed MSRP.

## What Is Invoice?

Invoice price comes up often in price negotiations, so Kelley Blue Book provides it as a point of reference only. Consumers should know that the invoice price often bears little resemblance to how much the dealer really paid for the car. Invoice price is the price an automaker charges its franchise dealers for a new vehicle, but it does not include holdbacks and factory-to-dealer incentives, which can lower the effective cost to the dealer. The invoice price shown includes destination charges and minimum required equipment but it doesn't include any dealer costs for local and regional advertising, selling, preparing, displaying or financing the vehicle. Kelley Blue Book does not represent that the invoice price is the price a dealer actually paid for the vehicle.

## What Does The Term "Holdback" Mean?

Automakers offer holdbacks to help reduce some of the costs of a dealer acquiring a new car from the factory – and keeping it on his lot. Usually holdbacks are from one to three percent of the MSRP and vary in duration. Holdbacks help cover the interest on the dealer's vehicle loans. When a dealer can sell the car quickly, he keeps more of the holdback money. The longer the car stays on his lot, the less he gets. Once the holdback expires, the dealer can begin to lose money on the car. While holdbacks are not negotiable, it is possible to negotiate with the dealer by knowing how much holdback he/she will be keeping. If a car has been on the lot for two or three months, the dealer is far more likely to sell it at a better price to avoid building up more debt. Remember, the dealer's profit has to cover the cost of operating the dealership, paying his salesman, maintaining his inventory and advertising the vehicle. Also keep in mind that popular or hard-to-find models will often fetch top dollar, so dealers will be less inclined to reduce their price.

## When Will You Have More New Car Pricing?

As soon as a manufacturer releases pricing information, we map out the complex relationships that exist for any given vehicle. For example, maybe you can't get a sunroof all by itself; you might need to get heated seats too. We then upload the verified info to KBB.com once a week. Please be aware that many new models are advertised and may even appear in the dealerships before the manufacturer has finalized pricing.

## How Often Do You Update Your New Car Pricing?

We update or verify Fair Purchase Price and Fair Market Range at least once a week to account for market conditions and fluctuations. We update or verify other elements like MSRP and invoice as needed – when we get new info from the manufacturer.

## Does Your Pricing Account For My Region?

Yes. We understand how important it is to provide pricing that is geographically relevant. In order to better meet consumer and dealer need, we produce values based on 134 geographic regions in the U.S. and analyze each region individually to reflect local pricing and economic conditions.

In addition, we now produce valuations for Canada and several other countries.

## What Is The Difference Between Factory, Port, And Dealer-Installed Options?

Factory-installed options are add-ons that the factory adds, whereas port-installed options (PIO) are installed on the vehicle once it arrives in the United States – literally "at port." Both factory-installed options and port-installed options must be factory approved. Since there is some price control, we can consider them when providing Fair Purchase Price or Fair Market Range.

Dealer-installed options are items added to the vehicle once it arrives at the dealership. These might include alarm/security systems, upgraded wheels, etc. We don't include dealer-installed options when showing Fair Purchase Price or Fair Market Range, since these options can vary widely in price and quality. There are just too many variables to ensure any kind of accuracy when it comes to dealer-installed options.

## Do You Have Canadian Pricing?

Yes! Pricing and other data on KBB.com is specific to the U.S., but in 2020 Kelley Blue Book also started providing data for the Canadian market. Canadian pricing will be following soon and will be adjusted for each province & territory to reflect local economic and market conditions. You can find KBB Canada at KBB.ca

Please also remember that vehicles sold in Canada (and other countries) often differ from their U.S. counterparts in engine spec and optional equipment.

## Do You Have Pricing For Other Countries?

Pricing and specifications info on KBB.com is specific to the United States, but Kelley Blue Book also operates websites with pricing and information specific to these other countries:

- Brazil – kbb.com.br
- Canada – kbb.ca

In addition, you can find Kelley Blue Book data and valuations on websites in these countries

- Australia – kbb.com.au
- China – jingzhengu.com

Remember that vehicles sold in other countries may look the same as their U.S. counterparts, but often contain significant differences in engines, safety standards and optional equipment.

If you want a general idea of pricing for a country where we don't offer values, you can look up a vehicle in our Western Region – and, of course, convert from U.S. dollars to your country's currency. Use the ZIP code 92618. Keep in mind that since vehicles can vary significantly from country to country, it's tricky to compare prices internationally.

As we continue to offer more global websites, we will pass the info on to you via KBB.com.

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 590 of 598

DJA0874

**Does Kelley Blue Book Provide Escrow Services For Vehicle Purchases Or Guarantee Online Vehicle Purchase Transactions?**

No. While many dealers display the Kelley Blue Book Price Advisor to provide context on what might be a good deal or great deal, Kelley Blue Book does not participate in new or used vehicle transactions or guarantee pricing. To read more about how to help protect yourself from online fraud, More

**I Am Buying A Demo Car From A New Car Dealer, But It Already Has 700 Miles On The Odometer. Is This Car Considered New Or Used? How Do I Find Its Value?**

A vehicle is considered new until it has been registered by an owner, not by virtue of the number of miles on the odometer. Unfortunately we cannot provide you with a standard deduction for miles on a new car. The discount offered for a demo model would depend on the dealer and should be compared against incentives or changes made on the new model before making your decision.

**What Do The Abbreviations And Symbols On Your Site Mean?**

( □ ) – This bullet-symbol indicates the model(s) for which this line item is listed. Loosely, "Available for this price on... □ LS, GS, etc."

( * ) – The asterisk is used as the wildcard symbol. It is a place holder to signify any missing character. For example, D*B means D(any letter here)B.

2D – Two Door
4D – Four Door
5D – Five Door
2WD – Two-Wheel Drive
4WD – Four-Wheel Drive
6-CYL – Six-Cylinder Engine
8-CYL – Eight-Cylinder Engine
ABS – Anti-lock Braking System
AWD – All-Wheel Drive
CID – Cubic Inches Displacement
CVT – Continuously Variable Transmission
DOHC – Dual Overhead Cam
DRW – Dual Rear Wheels
DSL – Diesel
EFI – Electronic Fuel Injection
FFV – Flexible Fuel Vehicles
GVWR – Gross Vehicle Weight Rating
HO – High Output Engine
HP Turbo – High Performance Turbo
LP – Low Pressure Engine
MFI – Mulitport Fuel Injection
MSRP – Manufacturer's Suggested Retail Price
N/A – listed in the description text means that the item is Not Available. There is usually text describing the circumstances.
N/A – listed in the pricing columns means that at this time the pricing information is Not Available.
N/C – means that there is No Charge for this item.
PFI – Port Fuel Injection
PIO – Port Installed Options
PZEV – Partial Zero Emissions Vehicle
SFI – Sequential Fuel Injection
SOHC – Single Overhead Cam
SPRCHG – Supercharged Engine
SRW – Single Rear Wheels
SULEV – Super Ultra-Low Emission Vehicle
TG – Turbo Gas (fuel type)
Turbo – Turbocharged Engine
ULEV – Ultra Low Emissions Vehicle
V – Valve
V6 – Six-Cylinder Engine
V8 – Eight-Cylinder Engine
VTEC – Variable Timing and lift Electronic Control system
VVT – Variable Valve Timing
WB – Wheelbase



FAQ    |    Contact Us    |    Do Not Sell My Personal Information (CA Residents Only)    |    About Us    |    Careers    |    Corporate    |    Advertising    |

Media    |    Site Map    |    KBB Brazil    |    KBB Canada

Roku

© 1995-2021 Kelley Blue Book Co.®, Inc. All rights reserved. Copyrights & Trademarks | Vehicle Photos © Evox Images | Terms of Service | Privacy Policy | Linking Policy | Accessibility Statement | Ad Choices

Case 1:19-cv-00294-CCE-JLW   Document 96   Filed 11/01/21   Page 591 of 598

# EXHIBIT 5

**Kelley Blue Book**
THE TRUSTED RESOURCE

Home    Car Values    Cars for Sale    Car Reviews    Car Repair    Research Tools    

# Frequently Asked Questions

New Car    **Used Car**    My Car's Value    Instant Cash Offer    Motorcycle    Other Pricing    Technical

## Used Car

What is the Kelley Blue Book® Fair Purchase Price for used cars?

What is Fair Market Range for used cars?

What is Typical Listing Price?

What is Kelley Blue Book Typical Listing Price (Certified Pre-Owned)?

How often do you update your used car values and pricing?

How does mileage affect a car's price or value?

Does your used car pricing account for my region?

Do you have Canadian pricing?

Do you have pricing for other countries?

Does Kelley Blue Book provide escrow services for vehicle purchases or guarantee online vehicle purchase transactions?

I'm not in the United States. Can I still get a Used Car Report?

Do you still sell the printed editions of Kelley Blue Book?

What do the abbreviations on our site mean?

### Contact Us

**Business Inquiries**
b2b.kbb.com

**Mailing Address**
195 Technology, Irvine, CA 92618
Map

### What Is The Kelley Blue Book® Fair Purchase Price For Used Cars?

This is the price that Kelley Blue Book has determined people like you are typically paying a dealer for a used car with typical mileage in good condition or better. This price is based on actual used-car transactions and adjusted regularly as market conditions happen to change.

### What Is Fair Market Range For Used Cars?

The Fair Market Range is Kelley Blue Book's estimate of what you can reasonably expect to pay this week for a vehicle with typical mileage and options (or with the miles and options you specify), excluding taxes, title and fees when purchasing from a dealer. Each dealer sets and controls its own pricing.

### What Is Typical Listing Price?

Formerly known as Suggested Retail Price, the Kelley Blue Book Typical Listing Price is representative of dealers' asking prices. It assumes that the vehicle has been fully reconditioned and has a clean title history. This price also takes into account the dealer's profit, costs for advertising, sales commissions and other costs of doing business. The final sale price will likely be less depending on the vehicle's actual condition, popularity, type of warranty offered and local market conditions. In other words, it's the price you should expect a dealer to ask – not always the price you should pay.

### What Is Kelley Blue Book Typical Listing Price (Certified Pre-Owned)?

Formerly known as the Certified Pre-Owned (CPO) Price, the Kelley Blue Book® Typical Listing Price (CPO) is representative of dealers' asking prices for a used car covered by the manufacturer's warranty in its CPO program. It assumes that the vehicle has been fully reconditioned and has a clear title history. The price also takes into account the dealers' profit, costs for advertising, sales commissions and other costs of doing business, while also factoring in any value associated with the CPO program.

For most vehicles, CPO coverage typically increases market value between $1,000 and $2,000. The final sale price may vary according to the vehicle's actual condition, popularity, type of warranty offered and local market conditions. In other words, it's the price you should expect a dealer to ask – not always the price you should pay.

### How Often Do You Update Your Used Car Values And Pricing?

We update or verify Trade-In Values, Private Party Values and the used car Fair Purchase Price at least once a week. However, an update doesn't necessarily mean that every vehicle will change in value. The values we provide are based on several factors including the current marketplace conditions and trends, which can vary widely.

### How Does Mileage Affect A Car's Price Or Value?

Kelley Blue Book employs a team of statisticians who analyze millions of transaction records to determine the typical mileage of a vehicle based on its age and time spent on the road. The typical mileage for a particular car changes regularly based on the data in our transaction records. If a vehicle's mileage is higher or lower than the typical mileage, we adjust its value up or down accordingly.

## Does Your Used Car Pricing Account For My Region?

Yes. Kelley Blue Book understands the importance of providing pricing that is geographically relevant to consumers and dealers. In order to better meet the needs of the industry, we produce values based on 134 geographic regions in the US. Each region is analyzed individually to reflect local pricing and local economic conditions.

## Do You Have Canadian Pricing?

Yes. Pricing and other info on KBB.com is specific to the U.S., but in 2020, Kelley Blue Book started providing data for the Canadian market. Canadian pricing will follow soon and will be adjusted for each province & territory to reflect local economic and market conditions. You can find KBB Canada at KBB.ca.

Remember that vehicles sold in Canada (and other countries) often differ from their U.S. counterparts in engine spec and optional equipment.

## Do You Have Pricing For Other Countries?

Pricing and other info on KBB.com is specific to the U.S., but Kelley Blue Book also operates websites specific to these other countries:

- Brazil – kbb.com.br
- Canada – kbb.ca

In addition, Kelley Blue Book data and valuations can be found on websites in these countries.

- Australia – kbb.com.au
- China – jingzhengu.com

Remember that vehicles sold in other countries may look the same as their U.S. counterparts, but often contain significant differences in engines, safety standards and optional equipment.

If you just want a general idea of pricing for a country where we don't offer values, you can look up a vehicle in our Western region – and, of course, convert from U.S. dollars to your country's currency. Use the ZIP code 92618. Keep in mind that since vehicles can vary significantly from country to country, it's tricky to compare prices internationally.

As we continue to offer more global websites, we will pass the info on to you via KBB.com.

## Does Kelley Blue Book Provide Escrow Services For Vehicle Purchases Or Guarantee Online Purchase Transactions?

No. Kelley Blue Book does not participate in new or used vehicle transactions. Read more about protecting yourself from online fraud. More

## I'm Not In The United States. Can I Still Get A Used Car Report?

Kelley Blue Book information is based on cars originally sold in the United States that are now being bought or sold in the United States. You can get a report, but you'll have to enter a U.S. ZIP code, since regional factors affect the values.

## Do You Still Sell The Printed Editions Of Kelley Blue Book?

No. For over 90 years, Kelley Blue Book published *Used Car Guides* providing values for used cars and trucks. For over 40 years, Kelley Blue Book published the *Motorcycle Guide*, but in 2017, we published our last printed book. These decisions are never easy. The good news? If you need to get the value or your current car or are interested in what you should pay for your next car, you can still find 21 years of new and used car pricing right here on KBB.com.  In addition, we also offer values for motorcycles and ATVs.

If you would like to learn about other options to receive Kelley Blue Book® Values, or have any questions, please call KelleyKare at (800) 258-3266.

## What Do The Abbreviations On Your Site Mean?

( ☐ ) – This bullet-symbol indicates the model(s) for which this line item is listed. Loosely, "Available for this price on... ☐ LS, GS, etc."
( * ) – The asterisk is used as the wildcard symbol. It is a place holder to signify any missing character. For example, D*B means D(any letter here)B.
2D – Two Door
4D – Four Door
5D – Five Door
2WD – Two-Wheel Drive
4WD – Four-Wheel Drive
6-CYL – Six-Cylinder Engine
8-CYL – Eight-Cylinder Engine
ABS – Anti-lock Braking System
AWD – All-Wheel Drive
CID – Cubic Inches Displacement
CVT – Continuously Variable Transmission
DOHC – Dual Overhead Cam
DRW – Dual Rear Wheels
DSL – Diesel
EFI – Electronic Fuel Injection
FFV – Flexible Fuel Vehicles
GVWR – Gross Vehicle Weight Rating
HO – High Output Engine
HP Turbo – High Performance Turbo
LP – Low Pressure Engine
MFI – Multiport Fuel Injection
MSRP – Manufacturer's Suggested Retail Price
N/A – listed in the description text means that the item is Not Available. There is usually text describing the circumstances.
N/A – listed in the pricing columns means that at this time the pricing information is Not Available.
N/C – means that there is No Charge for this item

N/C – means that there is No Charge for this item.
PFI – Port Fuel Injection
PIO – Port Installed Options
PZEV – Partial Zero Emissions Vehicle
SFI – Sequential Fuel Injection
SOHC – Single Overhead Cam
SPRCHG – Supercharged Engine
SRW – Single Rear Wheels
SULEV – Super Ultra-Low Emission Vehicle
TG – Turbo Gas (fuel type)
Turbo – Turbocharged Engine
ULEV – Ultra Low Emissions Vehicle
V – Valve
V6 – Six-Cylinder Engine
V8 – Eight-Cylinder Engine
VTEC – Variable Timing and lift Electronic Control system
VVT – Variable Valve Timing
WB – Wheelbase



FAQ | Contact Us | Do Not Sell My Personal Information (CA Residents Only) | About Us | Careers | Corporate | Advertising |

Media | Site Map | KBB Brazil | KBB Canada

© 1995-2021 Kelley Blue Book Co.®, Inc. All rights reserved. Copyrights & Trademarks | Vehicle Photos © Evox Images | Terms of Service | Privacy Policy | Linking Policy | Accessibility Statement | Ad Choices

# EXHIBIT 6

DJA0880

**Kelley Blue Book**
THE TRUSTED RESOURCE

Home    Car Values    Cars for Sale    Car Reviews    Car Repair    Research Tools    

# Frequently Asked Questions

New Car    Used Car    **My Car's Value**    Instant Cash Offer    Motorcycle    Other Pricing    Technical

## My Car's Value

How can I get the value of my car on a past date?

How do I see the Blue Book® Value for my vehicle?

What are Trade-In Values?

What is the Trade-In Range?

What are Private Party Values?

What is the Kelley Blue Book® Instant Cash Offer?

How is an Instant Cash Offer different from Trade-In Range?

Is it better to trade in my car or sell it myself?

How do I determine what condition my current car is in?

My car has air conditioning, but it's broken; do I still check the box marked AC?

Can I sell my car on your site?

My car has a salvage title. How does that affect the value?

What about the value of equipment on my car that you don't have listed?

Why don't you value aftermarket equipment?

I purchased my car outside the US, but it is now registered here. What's the value of it?

I totaled my car. How will the insurance company determine what it was worth?

My car is more than 21 years old. How do I find its value?

Why doesn't Kelley Blue Book list trade-in values, private party values, or a used car Fair Purchase Price for Lotus, Ferrari, Bentley, etc.?

I bought a new car a few months ago and I would like to check its used value. When will it be listed?

What is the difference between the Trade-In Value I see on your site and the Blue Book® Lending Value?

### Contact Us

**Business Inquiries**
b2b.kbb.com

**Mailing Address**
195 Technology, Irvine, CA 92618
Map

### How Can I Get The Value Of My Car On A Past Date?

Occasionally we get a request for the value of a particular vehicle at a particular date in history. This request may be for litigation, estate planning, taxes, etc. The fee for a Valuation Certified Report is $35 per value. To request a Valuation Certified Report, please contact Customer Service at 1-800-258-2005, option 1. This service usually has a turnaround time of 3-5 business days. We usually send the Report via email, but we can also mail it if requested.

### How Do I See The Blue Book® Value For My Vehicle?

To get to the value for your car, navigate the path to the Blue Book Trade-In and Private Party Values:

- On the home page or under "Car Values" from the top navigation, select "My Car's Value". 
- Tell us the year, make, model and mileage of the car you own (2015> Honda> Civic>30000 miles). Verify the ZIP code.
- Choose your car's category (sedan vs wagon) and style (DX, EX, LX). Note: Many vehicles only come in one category, but most vehicles are sold in more that one style, which some sites call "trim". Whatever you call it, these are pre-packaged levels of equipment – and they definitely affect the price or value of a car.
- Add any additional equipment or options (packages, alloy wheels, moon roof, premium sound, etc.)
- Choose what you're most likely to do – Trade In to a Dealer or Sell to a Private Party.
- Tell us the car's condition (Excellent, Very Good, Good, or Fair) or, if you're not sure, take the Condition Quiz. Most cars we see are in "Good" condition.
- View the Blue Book Value based on your ZIP code and your car's age, mileage, equipment, and condition.

### What Are Trade-In Values?

Trade-In Value is what you can expect to receive for your current car when trading it in at a dealer, assuming you've chosen the accurate condition. (Most people overestimate the condition of their car. As a reference, most of the cars we see are in "Good" Condition.) The Trade-In Value presupposes that you're buying another vehicle from the same dealership. The Trade-In Value will be less than the Private Party Value because the reselling dealer has to pay to recondition the car, perform safety inspections and incur other costs of doing business.

### What Is The Trade-In Range?

The Trade-In Range is an estimate of what you can reasonably expect to receive for a vehicle with the miles and options you specify, when trading in the car at a dealer. It generally presumes that you will buy another car from the same dealer.

### What Are Private Party Values?

Private Party Value is what a buyer can expect to pay when buying a used car from a private party. It may also represent the value you might expect to receive when selling your own used car to another private party. The Private Party Value assumes the vehicle is sold "As Is" and carries no warranty (other than the continuing factory warranty, if any). The final sale price may vary depending on the vehicle's actual condition and local market conditions. This value may also be used to derive the vehicle's value for insurance and vehicle donation purposes.

### What Is The Kelley Blue Book® Instant Cash Offer?

The Kelley Blue Book® Instant Cash Offer is a real offer for a specific amount to purchase a consumer's car or apply the amount toward another car. The Offer is valid for 3 days (not counting Sundays) and can be immediately redeemed during business hours at any Participating Dealer, pending inspection. It is based on specific elements of the consumer's car, like installed options, specific condition (such as dents and mechanical issues) and local market demand.

### How Is An Instant Cash Offer Different From Trade-In Range?

The Kelley Blue Book® Instant Cash Offer is:

• A fixed offer applied toward your next car purchase or used to sell your current car to a Participating Dealer (pending inspection)
• Valid for 3 days (not counting Sundays)
• Based on specific details related to the condition and features of your car, like installed options, dents, mechanical issues, and local market demand

The Kelley Blue Book® Trade-In Value is:

• An estimated trade-in value used toward the purchase of another car only
• Updated weekly
• Applied to similar cars of the same year, make, model, style and general condition
• The general value Kelley Blue Book estimates consumers can expect to negotiate this week based on the style, condition, mileage and options of the vehicle when they trade it in to a dealer, however every dealer is different and values are not guaranteed

### Is It Better To Trade In My Car Or Sell It Myself?

This is a question of personal preference. When you trade a car in, the dealer must then absorb the cost of making the vehicle ready for sale, reconditioning, advertising, sales commissions, arranging financing and insurance and standing behind the vehicle for any mechanical or safety problems. You may get more for your car if you sell it yourself, but you need to consider the value of your time, the aggravation of performing at least some of the above tasks to get the vehicle into a suitable resale condition and the liability of making appointments and giving a test drive. See more about Selling vs. Trading in our Advice Section.

### How Do I Determine What Condition My Current Car Is In?

We know you're not an expert, but you also know your car best. Just be as honest with yourself as possible. Most people tend to overestimate the condition of their car. To help out, we post the percentage of vehicles we value that match each condition. For example, if only 3% of the vehicles in the market are considered "Excellent" condition, chances are that your car isn't one of them. If you aren't sure, take our condition quiz.

### My Car Has Air Conditioning, But It's Broken; Do I Still Check The Box Marked AC?

Yes. But in fairness, you would need to deduct the cost to repair the broken equipment from the total vehicle price. There is one exception: when the cost of the repair is higher than the value of the broken item, it's best not to include that item in the list of optional equipment.

### Can I Sell My Car On Your Site?

Yes. As private party, you've got the same opportunity as a dealership: to reach millions of serious car shoppers with a listing on KBB.com and Autotrader. To create, purchase and post your car's classified ad, get started here.

### My Car Has A Salvage Title. How Does That Affect The Value?

A salvaged, reconstructed or otherwise "clouded" title has a permanent negative effect on the value of a vehicle. The industry rule of thumb is to deduct 20% to 40% of the Blue Book® Value, but salvage title vehicles really should be privately appraised on a case-by-case basis in order to determine their market value.

### What About The Value Of Equipment On My Car That You Don't Have Listed?

There are some options (e.g., rims, alarm systems, heated seats, trip computers) that are not addressed on our site. Most of these are dealer-installed or aftermarket. These items don't have a consistent or reportable added value in the used marketplace. That is not to say that such options are worthless as they may make your vehicle more marketable against similar models; however we do not address options when there is not a consistent value to report.

### Why Don't You Value Aftermarket Equipment?

This can be confusing for a lot of people: "Why do you show a luggage rack as optional, but not the ski rack I installed myself?" We only value items which are either factory-installed or "factory quality." There is a tremendous variation in something like rims, so it would be impossible to list – and report values for – all the different options. Space does not allow us to identify the vast variety of aftermarket items.

### I Purchased My Car Outside The US, But It Is Now Registered Here. What's The Value Of It?

The values you see on KBB.com only apply to vehicles sold in the United States, but we do maintain sites in Canada and Brazil to supply the values for those markets. Cars imported through sources other than factory-authorized distributors are considered gray market vehicles