

# ANNUAL WHOLESALE RETENTION VALUE ANALYSIS

**AUTO DEPRECIATION INCREASED TO 16.8% IN 2019 AND IS EXPECTED TO REMAIN HIGH IN 2020**

Although new light vehicle sales volume decreased by 1.2% in 2019 to 17.0 million units, roughly the same level of sales seen in 2017, it was still a very good year. Buoyed by strong economic conditions, including low unemployment, strong GDP, and attractive interest rates, sales came in ahead of forecast, marking the fifth straight year of greater than 17 million new car sales. Leasing has continued to be a strong driver of new car sales, accounting for nearly 30% of all transactions, resulting in 4.3 million units in 2019.

According to Black Book, the annual depreciation rate on two-to-six-year old vehicles increased to 16.8% in 2019 from 12.4% in 2018. This was a typical depreciation rate prior to the Great Recession. The largest drop in values, repeating the pattern of the last three years, came in the fourth quarter – the values decreased by 9.9% as manufacturers increased incentives on new sales to prop up

sales volume. As with previous years, we observed substantial differences among the segments with most luxury segments depreciation above 20% and pickup trucks staying below 13%. Full-Size Vans were the strongest segment last year, depreciating only slightly more than 10%. This was driven primarily by the decreased supply in the used market as new production units continue to be in short supply due to the increased popularity of online shopping, as delivery services such as Amazon, UPS, and FedEx have increased the demand for this segment.

Given the potential variance and volatility across segments, it has become more important for lenders to have a widely diversified portfolio. Portfolios concentrated in particular vehicle segments could experience higher volatility, with the potential for increased losses. With longer terms and softening used vehicle values, measuring portfolio equity on a regular basis becomes increasingly important.

Increased depreciation in 2019 is partially attributed to record high

lease returns – we estimate that close to 4.0 million returned to the market. Many of these off-lease vehicles, especially younger models with low miles, have made their way into the various Certified Pre-Owned vehicle programs offered by the manufacturers and other industry groups. CPO sales grew 4.12% last year, which, when combined with increased adoption of upstream remarketing channels, has removed vehicles from the supply traditionally sent to auctions, keeping inventory in the lanes from growing beyond the current supported demand and helping contribute to the observed stability in wholesale values throughout the majority of 2019.

With the COVID-19-caused recession, we project the depreciation rate will approach 20% this year even as we see record-breaking price increases during the summer months. As the economy begins to recover in 2021 and used supply shrinks due to current production cuts, we expect the annual depreciation rate to get back to sub-15% levels.

### 12-MONTH DEPRECIATION RATES BY SEGMENT, JAN 1, 2019 - JAN 1, 2020
#### (Two-to-Six-Year Old Vehicles)





EXHIBIT 24
SECTION 14

## BLACK BOOK SEASONALY ADJUSTED RETENTION INDEX



### BLACK BOOK USED VEHICLE RETENTION INDEX

The Black Book Used Vehicle Retention Index is calculated using Black Book's published Wholesale Average value on two-to-six-year-old used vehicles, as a percent of original typically-equipped MSRP. It is weighted based on registration volume and adjusted for seasonality, vehicle age, mileage, and condition. The Index offers an accurate, representative, and unbiased view of the strength of used vehicle market values. It measures an 'apples-to-apples' year-over-year retention comparison.

The Index originated in January 2005, when Black Book first published a benchmark Index value of 100.0 for the market. During 2008, the Index dropped by 14%, while

in 2016, the Index fell by just 6.4%. During 2011, the Index rose strongly from 113.3 to 123.0 by the end of the year as the economy picked up steam and used vehicle values rose higher. It remained relatively stable after 2011, rising slightly until May of 2014, when it hit a peak of 128.1.

The Index decreased 0.8% from 115.4 in January 2019 to 114.5 in January 2020. The large depreciations experienced at the end of Q4 2019 carried over into the start of 2020, but early Spring buying led to an increase for February 2020 to almost the same level as January 2019. However, by the end of March 2020, impacts of COVID-19 on the market caused the Index to reverse direction as auction sales volume drastically declined along with corresponding

wholesale values. The first full month of pandemic impacts on the market pushed the April Index down by the largest drop in the history of the Index to 106.7, the lowest reading since May 2010. As we entered July, wholesale prices continued the rebound that began during the second half of May and continued through the month of June, with June's Retention Index climbing back to pre-COVID-19 levels with a record jump of 9.1 points. July's Index value jumped above 2019 to 126.0 points as wholesale prices continue their climb. During the last recession (2007-2009), the Index declined by about 15 points in a span of 12 months before recovery started. We project that the Index will decline over the reminder of 2020 and into 2021.

### THREE-YEAR RETENTION

Our residual forecast this year is lower for off-lease three-year-old vehicles due to significant downturn in economy. We expect the retention to gradually improve as we move forward. The effects of the pandemic will continue to be felt, but we continue to project that in 36 months values will return to the pre-COVID-19 baseline as used supply will decline as a result of cuts in retail and fleet sales throughout the remainder of 2020 and into 2021.

## THREE-YEAR RETENTION (JANUARY)



2007 2008 2009 2010 2011 2012 2013 2014 2015 2016 2017 2018 2019 2020 2021 2022 2023

Black Book Wholesale Average Value as Percent of New Typically-Equipped MSRP;
Published January Values Averaged across All Three-Year Old Models;
Forecast using Black Book Residual Values

■ Pre-COVID-19 Projections    ■ Aug 2020 Projections

Case 1:19-cv-00294-CCE-JLW   Document 102   Filed 11/01/21   Page 2 of 138

## WHOLESALE MARKET IN 2020

This year was projected to have a stable automotive market with a slight decline in new sales and wholesale values. Instead, we are on a roller-coaster ride that is characterized by two main themes: short term economic unpredictability and adherence of wholesale prices to a classical law of supply and demand.

The graph at right tracks weekly price changes for two-to-eight-year old vehicles in the first 7 months of 2020.



US - WEIGHTED % CHANGE IN VALUE BY SEGMENT FOR 2-8 YEAR OLD MODELS

### JANUARY – FEBRUARY

Wholesale prices started 2020 slightly below 2019 levels, but the market showed early strength in February and March. Used retail listing inventory was above the previous year's levels and wholesale sales volume was on par with 2019. New vehicle sales were 8% higher than the year before.

### MARCH

At the onset of the pandemic, wholesale prices went up as dealers were stocking up on the inventory for the spring market. At the same time, new sales collapsed by 38% compared to 2019. Wholesale prices were increasing every week in March, except the last one. As shelter-in-place orders went into effect, sales rates at the auctions quickly tumbled into the teens. The number of sales bottomed out around an 80% year-over-year decline when most auctions closed their physical sales (and some closed entirely) at the end of March.

### APRIL

Wholesale prices dropped significantly in April as uncertainty over COVID-19's impact and response dampened retail vehicle demand, resulting in an overall wholesale price decline of 5.9%. Most of the physical auctions remained closed through the month and storage of inventory became an issue.

In April, wholesale prices declined at a higher rate compared to retail prices. As margins grew, dealers reported healthy profits on a per vehicle basis although retail sales volume collapsed. Retail prices displayed stickiness on the way down and decreased only by about 2%.

### MAY

As many Southern states re-opened, we saw a substantial improvement in wholesale prices during the last two weeks of May, and the monthly decrease was limited to only -1.5%. From the peak in early April until the end of April, retail listing prices decreased by about 4.2%

### JUNE-AUGUST

Despite most auctions continuing to operate under an all-digital platform, sales volume has rebounded to a level consistent with, and on some days higher than, this time last year. Sales rates have been climbing each week since April. Independents that have been operating a traditional physical sale continue to report the highest sale rates, many consistently exceeding 70% week after week. Used inventory levels remain low, with days' supply hovering around the 30-day mark. It was common for us to get reports from dealers that are at a 50% deficit of their typical used inventory levels.

In June, wholesale prices continued to increase, and the overall market

appreciated by a record 5.7%. As a comparison, last year's prices declined by 0.9% over the same period. Wholesale prices increased again in July by a record 7.0%. In August, prices were expected to remain flat.

As wholesale prices came roaring back to pre-COVID-19 levels, retail prices are slow to recover, exhibiting the same stickiness on the way up. Since the second week of June, we saw a stabilization of used retail prices fueled by higher consumer demand due to stimulus payments, the federal Paycheck Protection Program (PPP), and limited used and new inventory. At the beginning of August, used retail prices rebounded to above pre-COVID-19 levels as the retail listing volume dropped to about 8% below 2019 numbers. As wholesale to retail margins shrink, dealers' margins declined substantially over the summer.

### SEPTEMBER – DECEMBER

Black Book projects a higher than expected used vehicle supply in the wholesale marketplace for the rest of 2020 due to several factors:
- Delayed lease returns resulting from lease extensions offered by OEMs – more than 560,000 additional three-year-old units in the second half of 2020
- Extensive de-fleeting by rental car companies due to lack of consumer and business traveler demand and financial pressure to raise cash – at least 250,000 one- to two-year-old vehicles will be added to the market in the second part of 2020
- Dramatic reduction in auction activities due to COVID-19 in March, April, and May
- Increased repossessions due to deteriorating economic conditions in addition to delayed repossessions in April / May - we expect the volume of repossessed vehicles to at least double in the next 6 months compared to last year

We project a drop in wholesale prices compared to a pre-COVID-19 baseline this fall, as the US economy suffers through the effects of COVID-19. We anticipate that, later this fall, wholesale prices will be about 5% lower than originally projected before the pandemic, due to a glut in supply and much weaker demand. On another hand, we expect that newer (zero- to one-year old) models in good condition will retain their strength in the early fall due to continuous shortage of new inventory.

Due to continuous production disruptions and much weaker demand due to the economic slowdown, we project a 25% drop (compared to pre-COVID-19 projections) in new sales in 2020 to 12.7 million units in our base economic scenario.

We expect used retail prices to decline in the fall as stimulus payments are exhausted and the protection of PPP expires.

## BEYOND

Prices will start to recover in 2021 as the economy becomes stronger. We also anticipate that older (>6-year-old), cheaper vehicles in average condition will not decline as much due to increased demand for these value units.

With the reduction in retail and fleet sales over the next several years, we project a substantial drop of used returns in 2023, compared 2019 levels. This lower level of used inventory will be beneficial to used vehicle prices as supply will be limited, helping to bolster valuations.

The effects of the pandemic will continue to be felt up to 36 months from now. We anticipate that values will return to the pre-COVID-19 baseline as used supply will decline due to cuts in retail and fleet sales throughout the remainder of 2020 and into 2021.

Case 1:19-cv-00294-CCE-JLW   Document 102   Filed 11/01/21   Page 3 of 138



# THE TRUSTWORTHY BRIDGE
# BETWEEN BUYERS & SELLERS



**AiM Insights**

PERSONALIZED BUSINESS INTELLIGENCE

Real-time vehicle remarketing trend insights
for successful selling strategies

**AiM Exchange**

PRIVATE TRADING MADE EASY

Reduce transaction costs and time to wholesale vehicles
by accessing AiM's private marketplace for direct sales



**MarketConnect**

MULTI-PLATFORM LISTING SOLUTION

Leverage leading online wholesale marketplaces
to improve success rates, drive out inefficiencies and sell faster

## INSPECT — POST — SELL

Find out more
**562.432.5050**
**WWW.AIMINSPECTIONS.COM**





**SECTION 15**





## INDUSTRY'S THOUGHTS TURN FROM SUCCESS TO SURVIVAL

By Jonathan Smoke

Heading into 2020, the auto industry's primary concerns were affordability, credit and inventory. As tax refund season began in early March, it looked as though used car dealers would have their best spring since 2014.

But as the coronavirus turned into a pandemic, hopes for a record year quickly shifted to concerns about survival, as the industry and the economy experienced the most dramatic and sudden decline on record.

In the second quarter, the used market benefited from pent-up demand created by the March and April lockdowns, a build-up in wholesale supply and unprecedented stimulus provided to businesses and consumers by the federal government.

Used retail sales began to improve as stimulus payments were distributed. By June, the majority of markets showed year-over-year growth in vehicle sales.

Through June, new vehicle sales were down 23 percent and retail used vehicle sales were down 18.5 percent.

Entering the back half of the year, conditions started to change, becoming less favorable for dealers.

COVID-19 cases, which had been declining from late April to mid-June, began increasing and set daily records. As new restrictions were added by state and local governments and fear grew, consumer activity declined again.

The vehicle recovery lost momentum, especially in areas contending with more virus outbreaks. Until the risk of spread has diminished greatly, we cannot expect to return to a more normal activity level.

In addition to the virus, there is rising economic uncertainty caused by high unemployment and waning fiscal support – not to mention perhaps the most heated and polarizing presidential election since 1968.

Given the virus and the economic and political challenges, consumer sentiment is not likely to recover.

Dealers are now contending with tighter new and used supply, which has led to record used vehicle values.

A new stimulus package, including payments to consumers, seemed likely to be approved at press time, which could drive fall demand for used vehicles.

Additional enhanced unemployment benefits would help prevent consumer credit deterioration. And on the supply side, an increase in off-rental and repossessed vehicles in the wholesale market should stop used prices from appreciating as they did this summer and provide much-needed inventory to align with additional demand.

According to the Cox Automotive Dealer Sentiment Index, there were more independent auto dealers with a negative outlook for the summer than a positive outlook.

Top concerns for independent dealers were the business impacts of COVID-19, the economy, market conditions, consumer confidence and inventory.

With those challenges and uncertainties, the majority of independent dealers identified staying in business as their top priority.



JONATHAN SMOKE IS CHIEF ECONOMIST OF COX AUTOMOTIVE. SMOKE LEADS THE COX AUTOMOTIVE ECONOMIC INDUSTRY INSIGHTS OFFICE AND REGULARLY PUBLISHES INSIGHTS ON SMOKE ON CARS AND @SMOKEONCARS ON TWITTER.

## USED CAR MARKET RECOVERS WITH A SWOOSH

By Tom Kontos

In the more than 25 years I have been an industry analyst and economist studying and reporting on trends in the used vehicle market, I have never encountered an event so impactful as the COVID-19 crisis.

There have been recessions, 9/11, wars, hurricanes, floods and other cataclysmic events, but they all seem to pale in comparison to the current pandemic.

One can start with the impacts of the disease itself on human health and lives.

COVID-19 has certainly generated an alarming level of cases and deaths. The disease's patterns and efforts to control them have created an impact on society, not only in economic terms but in disrupting and accelerating our lifestyle choices from the way we work, play, shop and travel to the focus we place on jobs, family, leisure and material goods.

Some of those changes might be temporary, but many will be transformative.

Which brings us to the vehicle remarketing industry and the used vehicle market.

After the global pandemic was officially acknowledged in early March, wholesale volumes and prices tanked. The question became whether we would have a V-shaped recovery or a U-shaped one – would the duration of the downturn be short-term or long-term?

As events have played out, the recovery has resembled the Nike swoosh: a rapid decline followed by a gradual uptick.

At press time, volumes had recovered to about 90 percent of pre-COVID levels, and prices have exceeded them.

I hasten to add this recovery is quite a departure from those of the past. The remarketing industry has transitioned to a largely online-only environment and the composition of sales is not only more restricted in quantity, but biased towards higher quality vehicles as well.

The efforts of the industry to enroll and train dealers who had never before bought online and make them active bidders and buyers in short order has been truly impressive.

The industry appears to be striking a healthy balance between offered supply and dealer demand. Building on a May rebound from April's record drop, wholesale prices in June rose by nearly 10 percent month-over-month.

Though the price rises might be a bit alarming to independent dealers buying vehicles at auction, the strength of retail prices and consumer demand for used vehicles should provide good gross margin opportunities.

And with a likely wave of more off-rental, off-lease and repo units in the second half, the wholesale market should be good for buyers for the remainder of 2020.



TOM KONTOS, CHIEF ECONOMIST FOR KAR GLOBAL, HAS MORE THAN 25 YEARS OF EXPERIENCE IN THE WHOLESALE VEHICLE REMARKETING INDUSTRY AND IS A PIONEER IN THE ANALYSIS OF USED VEHICLE MARKET TRENDS. FOLLOW HIS MONTHLY KONTOS KOMMENTARY, OFFERING ANALYSIS OF THE WHOLESALE USED VEHICLE MARKET, AT WWW.KARGLOBAL.COM/TAG/KONTOS-KOMMENTARY.

Case 1:19-cv-00294-CCE-JLW   Document 102   Filed 11/01/21   Page 5 of 138

**EXHIBIT 24**





# Association
# EXCELLENCE

**www.naaa.com**
*(Available 24/7)*

*Annual Auction Industry Survey Reports, Resources, Tools, Industry and Safety Updates, Legislative News & Monitoring, Current Events, Training & Certification, Standards, Best Practices, Policies, Preparedness, and Industry Recognition.*







## NAVIGATING TODAY'S DIGITAL BUSINESS ENVIRONMENT

By George Chamoun

A move to digital was just an item on the to-do list for tens of thousands of independent vehicle dealers across the country until the COVID-19 pandemic made a swift transition necessary for both the retail and wholesale side of their businesses.

Dealers who have taken their wholesale operations digital are no longer limited by their location for access to customers. Independent dealers are buying and selling vehicles wholesale with instant access to a national marketplace of inventory and buyers.

Today we're seeing firsthand the difference digital brings to dealers, including providing critical operational efficiencies that impact the bottom line.

As dealers continue along that path, there are three key business areas to address.

**Smart inventory management:** Unsold cars sitting idle on a dealer's lot can cost $37 a day per vehicle, which is why it's important to understand what sells and acquire vehicles to fill the gaps.

To make inventory sourcing more efficient and transparent, a vehicle inspection service that conducts on-site, contactless inspections helps ensure thorough condition reports.

The reports, attached to each car at auction, give buyers confidence in their purchase without needing to be physically present, and in turn give sellers a fast method of inventory liquidation.

**Digital auctions with access to unlimited markets:** Online auctions enable dealers to accomplish in 20 minutes what used to take hours at physical auctions.

Now, with comprehensive condition reports, dealers have more data available than ever before, including dozens of images and videos for informed decision-making.

Filters and alerts within the platform also help dealers target vehicles that match their inventory needs. And that can all be done from a desk or mobile device, providing access to a national marketplace from anywhere.

**Give consumers confidence:** A digital-first retailing approach can help consumers make informed purchasing decisions.

Vehicle description pages that offer vehicle information and detailed condition and performance data result in consumers spending more time on the page learning about the vehicle's condition, validating their decision to purchase.

Complete profiles help consumers trust the information – and ultimately the dealer behind the page – and can lead to a quicker sale.

The new bottom line: The shift to digital has happened, and it happened swiftly. Digital has proven to be a great partner for dealers, giving them the tools they need to thrive.

Digital is making dealers more efficient, providing them access to more information and transparency into a vehicle's condition than ever before. And it's allowing dealers to advance their entire wholesale strategy.



GEORGE CHAMOUN HAS BEEN CEO OF ACV AUCTIONS SINCE SEPTEMBER 2016, DRAWN AS AN EARLY ANGEL INVESTOR BY THE COMPANY'S LONG-TERM POTENTIAL. HE HAS A SUCCESSFUL TRACK RECORD AS AN ENTREPRENEUR AND SENIOR EXECUTIVE. FOR MORE INFORMATION, VISIT ACVAUCTIONS.COM.

## SERVNET AUCTIONS SUPPORT DEALERS IN COVID CLIMATE

By Bruce Beam

ServNet auctions are working tirelessly to navigate the business of remarketing vehicles in a COVID climate.

ServNet auctions have maintained a strong presence in the market since the onset of the COVID-19 pandemic with online-only sale events, and many of the group's locations are again holding live sales following local and state guidelines.

As retail sales have begun to recover dealers are eager to buy and sell at the auction, and are again benefiting from doing business with their local ServNet auction.

In the current COVID climate, however, dealers are looking farther afield for the right vehicles to buy, making use of the many technological tools available to search for and purchase inventory from areas far beyond their geographic base.

As dealers add online buying to their arsenal of purchasing tools, they are realizing more than ever before the benefits of doing business with ServNet auctions.

Auto dealers are sourcing their inventory nationally in ever-increasing numbers, and ServNet auctions have been recording major increases in their online audience since before the pandemic.

The beauty of purchasing a vehicle from anywhere within ServNet's national network of auctions is an online transaction can be made with confidence, with the benefits offered by a dealer's local ServNet auction.

Even before the COVID pandemic hit this spring, a vehicle's average destination was greater than 500 miles from the selling auction in the majority of online sales.

Within the ServNet community, no matter how far away the selling auction is, there's a ServNet auction nearby to stand behind the transaction.

An online transaction at a ServNet auction goes far beyond the computer technology that makes nationally sourcing and purchasing possible.

Our independent auction owners work together, so following the sale the customer receives the follow-up and support from their local ServNet auction, working with people they have known for years and do business with on a regular basis.

If the dealer buys a vehicle online and discovers an issue with the car when it arrives at his dealership, he can contact his local ServNet auction and it will work with the selling auction to resolve the problem.

ServNet auctions honor payment methods established by a dealer's local auction. They have transportation contacts nationwide and they all use Auction Access to ease in cross registration.

Dealers buying a vehicle from a ServNet auction have the benefit of the entire network of auctions. Even with social distancing restrictions in place, a dealer can buy a vehicle anywhere – but when it comes to experience, dependability and a full range of services, ServNet has you covered.



BRUCE BEAM IS PRESIDENT OF SERVNET AUCTIONS AND GENERAL MANAGER OF DEALERS AUTO AUCTION OF OKLAHOMA CITY.

Case 1:19-cv-00294-CCE-JLW   Document 102   Filed 11/01/21   Page 7 of 138



# YOU'RE IN
# THE DRIVER'S SEAT.

*More Inventory. Industry-Leading Condition Reports. Efficient Wholesale.*



1-800-553-4070 | ACVAuctions.com



## SECTION 15





## INDEPENDENT AUCTIONS READY FOR REBOUND

By Lynn Weaver

Since the outbreak of COVID-19, the independent auction community has been working with industry and government leaders, altering its processes to allow the important business of buying and selling vehicles to continue.

The country's independent auctions have not only maintained a presence in the market, they've been hard at work behind the scenes to prepare for business in a post-COVID world.

From the earliest days of the pandemic, independent auto auctions moved immediately and seamlessly to a digital selling environment, earning praise from dealers and major national accounts.

Simulcast sales were held at most IAG locations, some providing for on-site dealer previews and some accommodating dealer presence in the lanes to the extent safely allowable in those geographies.

As restrictions are easing, IAG auctions are prepared and ready for physical sales following state guidelines.

Independents are bringing dealers back into the lane as local regulations allow, which not only boosts the energy of the auction process – it brings the best return.

IAG leadership has been in touch with other industry leaders to review news developments and share expertise and practices as they formulate ways for the entire automotive redistribution process to move forward.

As predominantly family-owned and operated businesses, IAG auctions are deeply committed to protecting the health of their staff and customers while contributing enthusiastically with their experience and resources to not just build their own businesses but to advance the industry.

IAG locations moved quickly to prepare for the return of customers and employees to the auctions, taking multiple actions to ensure their facilities would be safe and efficient.

That included auction lane adjustments, plexiglass barriers at service counters and auction blocks, and social-distancing protocol stickers throughout the facilities, as well as changes to vehicle and customer traffic patterns through the auction.

Many also instituted process changes to the flow of titles and other paperwork to keep contact to a minimum.

The adjustments made the quick turn to online-only sales possible – and made the auctions ready the moment physical sales (with limited dealers in attendance) were allowed.

Not surprisingly, IAG auctions have charted a significant increase in online attendance at their sales events since the onset of the pandemic. Many newcomers to online bidding logged on as active participants while live sales were scarce, and IAG auctions have worked to make those dealers comfortable with online transactions.

As auctions are re-opening to dealers in the lanes, the bidding activity is gaining momentum, with increases in both online and in-lane buying.

IAG auctions are working hard to rebuild the health and strength of the auction industry. They are in business, they are building business and they are ready for more business.



LYNN WEAVER IS EXECUTIVE DIRECTOR OF INDEPENDENT AUCTION GROUP.

## AUCTIONS BACK IN FULL SWING – IN-LANE AND ONLINE

By Ben Lange

America's Auto Auction takes great pride in providing the highest level of customer service at each of our locations.

A commitment to the safety and success of our employees, their families and our customers has always been our top priority, and while 2020 has not been without its challenges, our auction teams have shown incredible resilience and have exemplified the America's Auto Auction spirit.

All 23 of our locations are holding weekly sales events with inventory offered both in-lane and online via simulcast.

We are also proud to announce that in June of this year, America's Auto Auction 365 was launched.

The AAA365 program offers a variety of fresh wholesale inventory, including new car trades and commercial consignment. AAA365 allows America's Auto Auction to reach outlier markets in addition to our existing physical auction sites.

Auction events are held live each Tuesday at 1 p.m. Central Time. The user-friendly auction integrates a variety of tools, providing sellers and buyers the ultimate digital auction experience.

All inventory is supplied with full 360 interactive condition reports, including engine diagnostics that incorporate OBD2 scans and electronic vehicle reporting. The comprehensive CRs provide full transparency and allow buyers to bid with confidence.

In the last quarter of 2020 we will continue to look for fresh, innovative ways to serve our buyers and sellers. We will proceed as always with our commitment to providing clean, safe auction facilities for our employees and in-lane customers, as well as providing a seamless, top-quality online experience for those customers who choose to join us virtually.



BEN LANGE IS PRESIDENT AND CEO OF AMERICA'S AUTO AUCTION, THE THIRD-LARGEST AUTO AUCTION COMPANY IN THE U.S. WITH 23 LOCATIONS INCLUDING FACILITIES IN ALABAMA, FLORIDA, GEORGIA, ILLINOIS, KENTUCKY, LOUISIANA, MASSACHUSETTS, MICHIGAN, MISSOURI, OHIO, OKLAHOMA, PENNSYLVANIA, SOUTH CAROLINA, TEXAS AND VIRGINIA. FOR MORE INFORMATION, CONTACT CYNTHIA BUTLER AT (214) 736-7900 OR CYNTHIA.BUTLER@AMERICASAUTOAUCTION.COM, OR VISIT WWW.AMERICASAUTOAUCTION.COM.

Case 1:19-cv-00294-CCE-JLW   Document 102   Filed 11/01/21   Page 9 of 138

# Reach, Connect and Convert More Used Car Buyers




Drive sales with TrueCar's solutions designed for the success of independent dealerships.

### Reach

Leverage the power of our exclusive network of **500+ affinity sites** to drive visibility to your dealership and reach more car buyers.

### Connect

With an **88%** YoY increase in used car leads submitted, more shoppers than ever are relying on TrueCar to find and purchase their next used car.

### Convert

In-market shoppers are ready to purchase now; **80%** of used car buyers complete their purchase within a week.

truecar.com/independentdealer





# TARGET SHOPPERS
# THE RIGHT WAY

## Looking to enhance your digital strategy?

Innovation continues with new display-advertising products designed to drive the most qualified shoppers to listings on Autotrader.



### < eLot

Displays the most relevant inventory from a dealer's lot to high-quality shoppers on Autotrader and KBB.com.

*Power What's Next*



### Advanced Ads >

Customizable display product that targets highly-engaged shoppers from Autotrader and KBB.com across the Internet.

To learn how these products enhance your listings on Autotrader, visit
**b2b.Autotrader.com**

COX AUTOMOTIVE

EXHIBIT 25

DJA1259

| Del Date | Del Stock # | Del Yr | Del Make | Del Model | Internet Price | Total Cost | Vehicle Profit | Finance Profit | TotalProfit | Age |
|---|---|---|---|---|---|---|---|---|---|---|
| 7/1/2021 | M6881A | 2018 | Mitsubishi | Outlander Sport | $ 19,490 | $ 14,634 | $ 3,288 | $ 814 | $ 4,101 | 27 |
| 7/2/2021 | P11208 | 2018 | Jeep | Renegade | $ 20,994 | $ 19,334 | $ (81) | $ 3,482 | $ 3,401 | 31 |
| 7/3/2021 | PDY11226A | 2014 | BMW | 5 Series | $ 19,490 | $ 15,834 | $ 3,841 | $ 1,931 | $ 5,772 | 13 |
| 7/5/2021 | P11234 | 2015 | Chevrolet | Camaro | $ 22,490 | $ 17,834 | $ 2,051 | $ 1,179 | $ 3,230 | 7 |
| 7/7/2021 | M6806A | 2018 | Mitsubishi | Mirage | $ 12,990 | $ 10,634 | $ 1,016 | $ 665 | $ 1,681 | 43 |
| 7/7/2021 | M6552A | 2016 | Mitsubishi | Outlander Sport | $ 15,295 | $ 11,634 | $ 1,340 | $ 150 | $ 1,490 | 52 |
| 7/7/2021 | M6706A | 2018 | Kia | Forte | $ 14,990 | $ 9,034 | $ 3,645 | $ 2,170 | $ 5,815 | 114 |
| 7/7/2021 | WP8365 | 2016 | Dodge | Charger | $ - | $ 15,100 | $ 10,443 | $ - | $ 10,443 | 820 |
| 7/8/2021 | M6671A | 2014 | Volkswagen | Jetta TDI | $ 12,990 | $ 9,634 | $ 1,938 | $ 560 | $ 2,498 | 39 |
| 7/9/2021 | P11260 | 2017 | Dodge | Charger | $ - | $ 24,519 | $ 512 | $ 1,669 | $ 2,181 | 1 |
| 7/9/2021 | P11245 | 2017 | Nissan | Sentra | $ 16,490 | $ 14,734 | $ 925 | $ 365 | $ 1,290 | 14 |
| 7/9/2021 | PDY11243 | 2015 | Honda | Crosstour | $ 18,995 | $ 16,604 | $ 1,946 | $ 1,520 | $ 3,466 | 15 |
| 7/10/2021 | P11261 | 2019 | Toyota | Camry | $ 30,738 | $ 33,088 | $ 912 | $ 2,179 | $ 3,091 | 1 |
| 7/10/2021 | M6901A | 2018 | Nissan | Altima | $ 17,998 | $ 15,634 | $ 1,611 | $ 2,429 | $ 4,040 | 16 |
| 7/13/2021 | M6710A | 2019 | Mitsubishi | Mirage G4 | $ 14,490 | $ 12,634 | $ (1,028) | $ 594 | $ (434) | 37 |
| 7/13/2021 | P11172 | 2013 | Ford | F450 Cab-Chassis 2WD | $ 19,990 | $ 15,134 | $ 4,444 | $ - | $ 4,444 | 61 |
| 7/14/2021 | PDY11231 | 2018 | Acura | RDX | $ 27,900 | $ 27,684 | $ (470) | $ 2,277 | $ 1,807 | 26 |
| 7/14/2021 | PDY11209A | 2009 | Toyota | Camry | $ 8,990 | $ 5,634 | $ 762 | $ 200 | $ 962 | 26 |
| 7/15/2021 | P11274 | 2016 | Kia | Forte | $ - | $ 11,718 | $ 1,699 | $ 1,065 | $ 2,764 | 1 |
| 7/16/2021 | M6921A | 2016 | Mitsubishi | Outlander Sport | $ 14,990 | $ 12,134 | $ 1,069 | $ - | $ 1,069 | 7 |
| 7/16/2021 | M6904A | 2018 | Mitsubishi | Mirage G4 | $ 12,995 | $ 8,634 | $ 1,973 | $ 1,010 | $ 2,983 | 30 |
| 7/17/2021 | M6948T1 | 2019 | Hyundai | Sonata | $ 21,990 | $ 19,634 | $ 3,250 | $ 1,645 | $ 4,895 | 10 |
| 7/19/2021 | P11271 | 2015 | Chevrolet | Cruze | $ 12,290 | $ 8,795 | $ 782 | $ 1,125 | $ 1,907 | 4 |
| 7/19/2021 | M6828B | 2017 | Mitsubishi | Mirage G4 | $ 10,990 | $ 7,634 | $ 2,277 | $ - | $ 2,277 | 37 |
| 7/19/2021 | P11265 | 2017 | Hyundai | Veloster | $ 14,990 | $ 12,333 | $ 2,557 | $ 1,567 | $ 4,124 | 4 |
| 7/21/2021 | PDY11204 | 2016 | Volvo | XC60 | $ 19,990 | $ 18,179 | $ 579 | $ 2,278 | $ 2,857 | 55 |
| 7/23/2021 | P11262 | 2017 | Chevrolet | Cruze | $ 15,490 | $ 13,233 | $ 1,363 | $ 1,413 | $ 2,776 | 8 |
| 7/23/2021 | M6954A | 2015 | Mercedes-Benz | CLA-Class | $ 22,490 | $ - | $ 21,735 | $ 2,369 | $ 24,104 | 7 |
| 7/24/2021 | P11267 | 2016 | Kia | Optima | $ 15,990 | $ 14,534 | $ 318 | $ 695 | $ 1,013 | 10 |

Note : Yellow cell indicates missing data from dealer.



RSS SUBSCRIBE | 2 MIN READ

**CAMIO**

## CPO Beats Sales Forecast, Sets All-Time Record in 2019

Thursday January 16, 2020

Share

SHARE
TWEET
SHARE
EMAIL

Certified pre-owned (CPO) sales volume set another record in 2019 – marking the ninth consecutive year of record-breaking sales. CPO sales reached 2.80 million vehicles in 2019, up 4% from 2018, exceeding the Cox Automotive forecast of 2.75 million.



2019 was the last big year of growth in off-lease units as we reached a total of 4.1 million leased vehicles hitting the end of their lease term. That volume isn't changing for 2020. The high tide in off–lease units will continue to fuel strong sales of higher priced "gently used" vehicles and CPO units. Off-lease vehicles are very competitive products that returning to dealerships that are selling at a 30-50% discount compared to very similar high-contented brand-new counterparts that are in the market today.

### Article Highlights

1. Certified pre-owned (CPO) sales volume set another record in 2019 – marking the ninth consecutive year of record-breaking sales.

2. CPO sales reached 2.80 million vehicles in 2019, up 4% from 2018, exceeding the Cox Automotive forecast of 2.75 million.

3. Toyota, Honda and Chevy continue to be the biggest players in the CPO market, collectively representing almost a third of all CPO sales.

*Sign up here to receive bi-weekly updates on news and*



Given their younger age, CPO vehicles are likely equipped with highly desired technology such as blind-spot monitors, Bluetooth, navigation and backup cameras. And because SUVs and crossovers have been popular with new-vehicle buyers for the past several years, there are more of them coming back off lease and available for certification.

The CPO market remains top-heavy with a few brands accounting for the majority of sales. Toyota, Honda and Chevy continue to be the biggest players in the CPO market, collectively representing almost a third of all CPO sales. Those three plus Ford and Nissan accounted for 47% of CPO sales in 2019, reflecting that more brands increased CPO sales. In 2018, Toyota, Honda, Chevy and Nissan accounted for 48% of the total industry CPO sales.

In 2020, a headwind to CPO units will be incentives on new vehicles. Cox Automotive Rates & Incentives reported that 2019 was a **record year for new-vehicle incentives** – both in terms of volume and percentage of average transaction price. At the same time, favorable supply and demand for used retail units will continue to provide strong tailwinds to the CPO market. The Cox Automotive 2020 CPO sales forecast is 2.80 million units.

*Related Content*

EXHIBIT 27

SEPTEMBER 30, 2019

DJA1262

SUPPLEMENT TO

# Automotive News

© 2019 Crain Communications Inc. All rights reserved.

# GUIDE TO CERTIFIED PRE-OWNED VEHICLE PROGRAMS

# Experts see more growth ahead

**David Muller**
dmuller@crain.com

2019 is on pace for a ninth straight year of record sales of certified pre-owned vehicles. New-vehicle affordability challenges, automakers' efforts to increase awareness of their CPO programs and the sheer number of vehicles coming off lease are driving the rise.

Through August, CPO vehicle sales rose 3.1 percent from a year earlier to 1,900,713, according to the Automotive News Data Center. That compares with a 2.5 percent increase through the first eight months of 2018. For all of last year, CPO vehicle sales rose 2.1 percent to 2.7 million. If 2019's pace through August continues, CPO vehicle sales will finish this year at 2.8 million.

Waves of vehicles are coming off lease in the wake of record new-vehicle sales in recent years, and prices of new vehicles continue to climb. So CPO vehicles, with their automaker-backed warranties, will continue to be looked as a value proposition, said Tom Kontos, chief economist for KAR Auction Services Inc.

"Affordability is an issue on the new-car side of the business," Kontos said. "There's probably some increased consideration among consumers of CPO as a good choice that they may not have thought about before, and so I think there's still some headroom for that trend to continue in the next couple of years."

The Toyota brand, after certified used sales fell last year, posted a 9.8 percent jump through the first eight months of 2019, with 256,593 CPO vehicles sold. Toyota is the industry leader in CPO vehicle sales for the past 10 years and has sold more than 6 million certified used cars and trucks since 1996.

Toyota in May updated its certified program's warranty to start at the original date of purchase of a certified vehicle, rather than when the vehicle was bought new, as most other programs do. Toyota offers a 12-month/12,000-mile comprehensive warranty and a 7-year/1-million-mile limited powertrain warranty.

## Honda adds perks

Honda, the No. 2 brand behind Toyota in certified volume, recorded an 8.3 percent gain in CPO sales through August to 196,724 vehicles. In August, American Honda Motor Co. upgraded its certified programs, adding a second tier of certification for Honda and extending warranty coverage for Acura. The automaker added complimentary perks such as roadside assistance for Honda and free scheduled service for Acura.

Chevrolet, in third place, experienced a 7.7 percent drop in sales through August to 157,683 vehicles.

The Volkswagen brand continued 2018's strong performance with a 16 percent jump to 74,400 vehicles through August. Mazda also is increasing its certified used sales, with a 19 percent increase to 41,832 vehicles through August

After a drop in 2018, Ram rebounded through August, with certified sales soaring 32 percent to 39,665 vehicles. Eric Swanson, head of certified used vehicles at FCA US, attributed Ram's spike in part to a 2018 recall that hurt last year's sales of certified used vehicles, which can't be sold with an open recall.

"It really took a lot of inventory out of the system last year," Swanson said.

Jeep continues to perform well, with the brand's certified used sales rising 13 percent to 95,052 vehicles through August. Just more than 60 percent of FCA's 2,600 dealerships participate in its CPO program, the highest participation rate ever, Swanson said. FCA expects to sell more than 280,000 certified used vehicles this year, which would give the automaker its best year on record. FCA's certified used sales are up 8.9 percent through August to 198,800 vehicles.

## Plenty of supply

Forecasters expect overall U.S. used-vehicle sales of around 40 million this year. Only a third of those will be sold by franchised dealerships, Swanson said, with the balance being sold by independent dealerships, companies such as CarMax and Carvana and through private sales.

For automakers such as FCA, the competition is not so much with other brands. The bigger opportunity is going after the vehicles sold outside the franchised pipeline.

"I'm more interested in getting people to not go to independents and not buy cars out of people's driveways off of Craigslist," Swanson said.

There should be plenty of supply, with more than 4 million cars and trucks expected to come off lease this year. Analysts have said off-lease volume should peak in 2019 and continue to be strong for the next few years. CPO programs were developed to find the next home for a such vehicles while protecting brands' residual values and also building relationships with customers, said KAR's Kontos.

He said, "This growth in off-lease volume and the acceptance and growth in certified pre-owned is hand in glove." **AN**



## GUIDE TO
## CERTIFIED PRE-OWNED VEHICLE PROGRAMS
# contents

Acura, Audi, Bentley, BMW, Cadillac.......................3

FCA US, Ford, General Motors, Honda,
Hyundai...................................................................4

Infiniti, Jaguar, Kia, Land Rover, Lexus ...................5

Lincoln, Maserati, Mazda, McLaren,
Mercedes-Benz.......................................................6

Mini, Mitsubishi, Nissan, Porsche,
Rolls-Royce.............................................................7

Smart, Subaru, Toyota, Volkswagen, Volvo ..........8

Certified pre-owned vehicle sales,
2018 by month.......................................................9

Data highlights, glossary of terms......................10

The Automotive News Data Center surveys automakers directly to gather the information in this supplement, except as noted.

2

Case 1:19-cv-00294-CCE-JLW   Document 102   Filed 11/01/21   Page 16 of 138

**EXHIBIT 27**

| Program name/Top executive/Web address | No. of dealers in program/ Total new-vehicle dealers | Dealer fees per vehicle | Dealer criteria | Vehicle criteria | Independent third-party inspection | Warranty details | Is there a warranty deductible?/ cost | Is the warranty transferable?/ fee | Dealer return/ exchange program |
|---|---|---|---|---|---|---|---|---|---|
| **Acura\*** Acura Certified Pre-Owned Vehicles Daniel Rodriguez manager, automobile remarketing acuracertified.com *See website for additional program details | 270/ N.A. | $595-$3,035 | Dealers sign voluntary participation agreement | •182-point inspection •6 model years or newer •Less than 80,000 miles | Yes | •CPO limited warranty extends the powertrain coverage to 7 years/100,000 miles from original in-service date •CPO limited warranty extends the non-powertrain coverage up to 2 years/100,000 miles following expiration of new-vehicle limited warranty •Emergency roadside assistance, trip interruption/rental vehicle expense reimbursement, concierge service, complimentary 3-month SiriusXM Radio trial and complimentary first maintenance | No/$0 | Yes/$0 | 3-days exchange only |
| **Audi\*** Audi Certified Pre-Owned Jim O Brien director, Audi business development audiusa.com/certified-pre-owned *Reflects 2019 Audi Certified pre-owned program details | 303/ N.A. | $750-$1,500 | Audi franchise dealer in good standing | •300+ point inspection •5 model years or newer •Less than 60,000 miles | Yes | •Remainder of new-car limited warranty •5-year/unlimited-mileage from original in-service date if vehicle is still under new-vehicle limited warranty at time of purchase; limited warranty coverage begins when the new-vehicle limited warranty expires •12-month/unlimited-mileage for vehicles no longer covered under new-vehicle limited warranty at time of purchase (transferable between private parties) •24-hour roadside assistance, emergency towing and Audi assist | No/$0 | Yes/$0 | Dealer option |
| **Bentley** Bentley Pre-Owned Michael Rice regional manager, CPO bentleymotors.com/en/models/pre-owned | 51/ N.A. | N.A. | Bentley trained and certified staff | •Pass demanding technical inspection by Bentley-certified technicians; vehicle specifications must match original OEM build records | No | •Comprehensive and limited warranty, unlimited-mileage Bentley warranty valid for a minimum of 12 months with the option to extend coverage for 12 or 24 months at time of purchase •Roadside assistance to nearest Bentley servicing location; trip interruption assistance provided to home location | No/$0 | Yes/$50 | Varies by dealer |
| **BMW\*** Certified Pre-Owned by BMW Shaun Bugbee executive vice president, operations bmwusa.com/cpo *See website for program details | 348/ 348 | $800-$4,500 | Dealers sign a participation agreement; recondition with only genuine BMW parts | •Comprehensive inspection •5 model years or newer •Less than 60,000 miles | Yes | •BMW CPO: 5-year/unlimited-mile comprehensive after new-car warranty expires •BMW CPO: 6-year/unlimited-mile comprehensive after new-car warranty expires •CPO: 5-year/unlimited-mile roadside assistance; 6-year/unlimited-mile roadside assistance •Complimentary SiriusXM Radio 3-month subscription | No/$0 | Yes/$300 | Dealer option based on store's specific return policy |
| **Cadillac** Cadillac Certified Pre-Owned Vehicles Adam Ritter manager, sales remarketing cadillac.com | 753/ N.A. | $1,095-$1,295 | Dealers must be enrolled, active in program and meet minimum compliance standards | •172-point inspection •60 months from original in-service date/less than 60,000 miles | No | •6-year/100,000-mile limited warranty from original in-service date •3 months of OnStar and SiriusXM Radio at no additional cost •Roadside assistance, courtesy transportation, fully transferable | Yes/$50 | Yes/$0 | None |

Note: Total new-vehicle dealers as of September 2019. Dealer fees may Include per-vehicle certification fees, advertising fees and warranty fees.

N.A. = Not available

Source: Automotive News Data Center

# EXHIBIT 27

| Program name/Top executive/Web address | No. of dealers in program/Total new-vehicle dealers | Dealer fees per vehicle | Dealer criteria | Vehicle criteria | Independent third-party inspection | Warranty details | Is there a warranty deductible?/Transferable?/cost | Is the warranty transferable?/fee | Dealer return/exchange program |
|---|---|---|---|---|---|---|---|---|---|
| **FCA US\*** Certified Pre-Owned Vehicles<br>Eric Swanson<br>head of certified pre-owned vehicle sales<br>certifiedpreowned.chrysler.com<br>*\*Reflects certified pre-owned vehicle program details for Chrysler, Dodge, Fiat, Jeep and Ram brands.* | 1,854/ *2,652* | $375 | Dealers must complete dealership installation program | • 125-point inspection<br>• 5 model years or newer<br>• Less than 75,000 miles | No | • Powertrain: Up to 7 years/100,000 miles depending on model year, from original in-service date<br>• 3-month/3,000-mile Maximum Care warranty from sale date<br>• Upgraded warranty program available, including industry-exclusive lifetime warranty upgrade | Yes/$100-$150 | Yes/$150 | None |
| **Ford** Ford Certified Pre-Owned Program<br>Jim Muller<br>brand manager, Ford CPO<br>ford.com/certified-used | 2,500/ *N.A.* | $620 (F series, E series, Ranger & Transit) $520 (all other vehicles) | Meet training requirements; signed agreement; $1,000-$2,000 annual fee per dealer planning volume | • 172-point inspection<br>• Current model year + 5 model years<br>• Less than 80,000 miles | Yes | • Powertrain: 7-year/100,000-mile limited warranty from original in-service date<br>• 12-month/12,000-mile comprehensive limited warranty from end of new-car warranty or CPO purchase date, whichever comes first<br>• 7-year/100,000-mile 24-hour road assistance from original in-service date<br>• Free CarFax vehicle history report | Yes/$100 | Yes/$0 | None |
| **General Motors** Certified Pre-Owned Vehicles from Chevrolet, Buick and GMC<br>Dan Aheam<br>senior manager, pre-owned vehicle operations<br>gmcertified.com | 3,400/ *3,600* | $499 | Dealers sign a participation agreement | • 172-point inspection and reconditioning process<br>• 6 model years or newer<br>• Less than 75,000 miles<br>• No open recalls | No | • Powertrain: 6-year/100,000-mile limited warranty from original in-service date<br>• Bumper-to-Bumper: 12-month/12,000-mile limited warranty after new-car warranty expires, or from date of purchase if new-car warranty has expired<br>• Two included maintenance visits within 2 years/24,000 miles of purchase<br>• 24/7 roadside assistance for duration of powertrain warranty<br>• SiriusXM Radio and OnStar 3-month basic trial | No/$0 | Yes/$0 | 3-day/150-mile exchange of purchase only |
| **Honda\*** Honda Certified Pre-Owned Vehicles<br>Daniel Rodriguez<br>manager, automobile remarketing<br>hondacertified.com<br>*\*See website for additional program details* | 1,053/ *N.A.* | $470-$750 | Dealers sign voluntary participation agreement | • 182-point inspection<br>• 6 model years or newer<br>• Less than 80,000 miles | Yes | • CPO limited warranty extends the powertrain coverage to 7 years/100,000 miles from original in-service date<br>• CPO limited warranty extends the non-powertrain coverage up to 12 or 24-months/12,000 miles following expiration of new-vehicle limited warranty<br>• Emergency roadside assistance, trip interruption expense reimbursement, concierge service, complimentary 3-month SiriusXM Radio trial and 2 complimentary oil changes | No/$0 | Yes/$0 | None |
| **Hyundai** Hyundai Certified Pre-Owned<br>Tom Lee<br>senior group manager, retail operations<br>hyundaiusa.com/certified-pre-owned | 724/ *829* | $399-$499 | Dealers must enroll in data extraction and abide by program operating guidelines | • 173-point inspection (higher for Equus and EV/Hybrid/Plug-in)<br>• 5 model years or newer<br>• Less than 60,000 miles<br>• Must pass CarFax vehicle history report | No | • Remainder of 5-year/60,000-mile new-car limited warranty from original in-service date and 0 miles<br>• CPO powertrain limited warranty: 10 years/100,000 miles from original in-service date and 0 miles<br>• 10-year/unlimited-mile roadside assistance, travel interruption and rental car reimbursement for covered repairs, free 3-month trial of SiriusXM Radio | Yes/$50 | No/$0 | None |

Note: Total new-vehicle dealers as of September 2019. Dealer fees may include per-vehicle certification fees, advertising fees and warranty fees.

N.A. = Not available

Source: Automotive News Data Center

4

# EXHIBIT 27

| Program name/Top executive/Web address | No. of dealers in program/ *Total new-vehicle dealers* | Dealer fees per vehicle | Dealer criteria | Vehicle criteria | Independent third-party inspection | Warranty details | Is there a warranty deductible?/ transferable?/ cost | Is the warranty transferable?/ fee | Dealer return/ exchange program |
|---|---|---|---|---|---|---|---|---|---|
| **Infiniti**<br>**Infiniti Certified Pre-Owned**<br>Jon Finkel<br>director, Infiniti sales operations<br>cpo.infinitiusa.com | 205/<br>*N.A.* | $599-<br>$1,489 | Dealers sign agreement to comply with all CPO program guidelines | •167-point inspection<br>•Less than 72 months from original in-service date<br>•Less than 70,000 miles<br>•Clean title history<br>•Clean vehicle history | No | •Vehicles with less than 15,000 miles receive a 6-year/ 75,000-mile warranty from original in-service date<br>•Vehicles with more than 15,000 miles and are less than 48 months from the original in-service date are covered by a 6-year/unlimited-mileage warranty from the vehicle's original in-service date<br>•Vehicles with more than 15,000 miles and are more than 48 months beyond their original in-service date receive a 2-year/unlimited-mileage warranty that begins from the CPO sale date | No/$0 | Yes/$50 | 3-day/ 300-mile exchange policy where applicable by law |
| **Jaguar**<br>**Jaguar Approved Certified Pre-Owned**<br>Joe Torpey<br>remarketing director, JLR North America<br>jaguarusa.com/certified-preowned | 175/<br>*175* | Varies by model | Available to all Jaguar dealers | •165-point inspection<br>•5 years from in-service date<br>•Less than 60,000 miles | Yes | •Up to 7 years/100,000 miles from original in-service date<br>•Up to 24 months/50,000 miles limited warranty after new-car warranty expires<br>•24-hour roadside assistance, trip interruption benefits and rental car reimbursement | No/$0 | Yes/$0 | None |
| **Kia***<br>**Kia Certified Pre-Owned Program**<br>William Peffer<br>vice president, sales<br>kia-cpo.com<br>*•See website for additional program details* | 734/<br>*762* | $450 | Enrollment and adherence to certification policy and procedures | •164-point inspection<br>•5 model years or newer<br>•Less than 60,000 miles | No | •Powertrain: 10-year/100,000-mile limited warranty from original in-service date<br>•Basic: 5-year/60,000-mile comprehensive warranty from original in-service date<br>•Factory: 10-year/100,000-mile warranty is non-transferrable<br>•12-month/12,000-mile Platinum mechanical coverage from CPO date of sale<br>•Roadside Assistance: 10-year/unlimited mile roadside assistance program | Yes/$50 | Yes/$40 | See dealers for details |
| **Land Rover**<br>**Land Rover Approved Certified Pre-Owned**<br>Joe Torpey<br>remarketing director, JLR North America<br>landroverusa.com/certified-pre-owned | 185/<br>*185* | Varies by model | Available to all Land Rover dealers | •165-point inspection<br>•5 years from in-service date<br>•Less than 60,000 miles | Yes | •Up to 7 years/100,000 miles from original in-service date<br>•Up to 36 months/50,000 miles limited warranty after new-car warranty expires<br>•24-hour roadside assistance, trip interruption benefits and rental car reimbursement | No/$0 | Yes/$0 | None |
| **Lexus**<br>**L/Certified by Lexus**<br>Eric Schuttee<br>operations manager, L/Certified<br>lexus.com/certified | 241/<br>*N.A.* | $995-<br>$1,395 | Dealer signs L/Certified enrollment form | •161-point inspection<br>•6 model years or newer<br>•Less than 80,000 miles | Yes | •Unlimited-mileage vehicle warranty up to 6 years<br>•24-hour roadside assistance, trip interruption coverage, loaner vehicle, factory-recommended maintenance for two years or 20,000 miles, whichever comes first | No/$0 | No/$0 | None |

Note: Total new-vehicle dealers as of September 2019. Dealer fees may include per-vehicle certification fees, advertising fees and warranty fees.

N.A. = Not available

Source: Automotive News Data Center

| Program name/Top executive/Web address | No. of dealers in program/ Total new-vehicle dealers | Dealer fees per vehicle | Dealer criteria | Vehicle criteria | Independent third-party inspection | Warranty details | Is there a warranty deductible?/ cost | Is the warranty transferable?/ fee | Dealer return/ exchange program |
|---|---|---|---|---|---|---|---|---|---|
| **Lincoln**<br>**Lincoln Certified Pre-Owned**<br>Chad McCardle<br>brand manager, Lincoln CPO<br>lincoln.com/certified-used | 750/ N.A. | $1,395 (Black Label), $1,095 (all others) | Compliance test required; $500-$1,500 annual fee based on dealer planning volume | • 200-point inspection<br>• 6 model years or newer<br>• Less than 60,000 miles | Yes | • 6-year/100,000-mile comprehensive limited warranty from original in-service date<br>• Complimentary roadside assistance 24 hours/7 days a week, rental car expense reimbursement, destination expense assistance<br>• Free CarFax vehicle history report and covered by CarFax Buyback Guarantee | Yes/$100 | Yes/$0 | None |
| **Maserati**<br>**Maserati Approved Certified Pre-Owned**<br>Joe Scarpa<br>manager, national remarketing & CPO<br>maseratiusa.com/certifiedpreowned | 122/ 122 | 2 yr/$2,095-$2,445, 1 yr/$1,245-$1,495 both with $250 inspection credit | Franchised dealers are eligible | • Less than 48 months from original in-service date<br>• Less than 50,000 miles<br>• Maintained in accordance with factory warranty, comprehensive inspection and reconditioning | No | • Up to 24-month/unlimited-mile comprehensive Named Exclusion coverage after new-car 48-month/50,000-mile warranty expires for a total of up to 6-year/unlimited-mile coverage<br>• Roadside assistance | No/$0 | Yes/$0 | Dealer option |
| **Mazda**<br>**Mazda Certified Pre-Owned Vehicle Program**<br>Preston Hammontree<br>national program manager, CPO<br>mazdausa.com | 556/ 560 | $0 enrollment, $399 per vehicle certification fee | Dealers sign a participation agreement | • 160-point inspection<br>• 6 model years or newer<br>• Less than 80,000 miles | No | • Powertrain: 7-year/100,000-mile limited warranty from original in-service date<br>• 12-month/12,000-mile additional limited warranty that begins at the end of the new-car factory warranty or on CPO purchase date<br>• 24-hour roadside assistance for the duration of the warranty<br>• 3-year Buyback Protection offer with Autocheck | No/$0 | Yes/$0 | None |
| **McLaren**<br>**McLaren Qualified**<br>Tony Joseph<br>president, McLaren North America<br>preowned.mclaren.com | 24/ N.A. | Zero or purchase of the qualified warranty | Meeting the customer promise and presentation standards (showroom and online) | • Inspection<br>• Up to 10 years old<br>• Less than 100,000 miles | No | • Minimum 12 months, up to 24 months, renewable via Extended Warranty<br>• All components except wear and tear or acoustic | No/$0 | Yes/$0 | None |
| **Mercedes-Benz**<br>**Mercedes-Benz Certified Pre-Owned Program**<br>Adam Chamberlain<br>vice president, sales<br>mbusa.com/mercedes/cpo | 388/ 388 | $595-$1,580 MBCPO base warranty | Dealer must meet training and performance criteria as outlined in the Mercedes-Benz Standards and Reconditioning Manual | • Rigorous inspection process<br>• 6 model years or newer<br>• Less than 75,000 miles | Yes | • Remainder of new-car limited warranty, plus CPO limited warranty with no mileage maximum until 5 years from original in-service date<br>• 12-month or 24-month extended limited warranty available also with no mileage maximum<br>• 24-hour roadside assistance<br>• 3-month trial of Mercedes-Benz mbrace connected-car services<br>• 3-month trial of SiriusXM Radio | No/$0 | Yes/$0 | 7-day/ 500-mile exchange |

N.A. = Not available

Source: Automotive News Data Center

Note: Total new-vehicle dealers as of September 2019. Dealer fees may Include per-vehicle certification fees, advertising fees and warranty fees.

EXHIBIT 27

DJA1268

| Program name/Top executive/Web address | No. of dealers in program/ *Total new-vehicle dealers* | Dealer fees per vehicle | Dealer criteria | Vehicle criteria | Independent third-party inspection | Warranty details | Is there a warranty deductible?/ transferable?/ cost | Is the warranty transferable?/ fee | Dealer return/ exchange program |
|---|---|---|---|---|---|---|---|---|---|
| **Mini***<br>**Mini Certified Pre-Owned**<br>Claude Bruni<br>department head, sales & operations Mini USA<br>miniusa.com/minicpo<br>*See Mini dealer for complete warranty /transferable fee details* | 124/<br>124 | CPO enrollment fee: $715 for all Coopers, reconditioning with $850 for all JCWs | Dealers sign a participation agreement; recondition with only genuine Mini parts | •Mini CPO vehicle inspection checklist<br>•5 model years or newer<br>•Less than 60,000 miles | Yes | •Mini CPO: 5-year/unlimited-mile comprehensive after new-car warranty expires<br>•Mini CPO: 6-year/unlimited-mile comprehensive after new-car warranty expires<br>•CPO: 5-year/unlimited-mile roadside assistance;<br>6-year/unlimited-mile roadside assistance | No/$0 | Yes/$300 | None |
| **Mitsubishi**<br>**Mitsubishi Certified Pre-Owned Program**<br>Doug Yordy<br>manager, fleet sales<br>mitsubishicars.com/certified-pre-owned | 343/<br>*N.A.* | $399 | One-time enrollment fee of $595; all Mitsubishi dealers are eligible to participate | •123-point inspection<br>•5 model years or newer<br>•Less than 60,000 miles | No | •10-year/100,000-mile powertrain warranty from original in-service date | No/$0 | Yes/$40 | None |
| **Nissan**<br>**Nissan Certified Pre-Owned**<br>Arcangelo Lofaro<br>director, sales operations<br>nissanusa.com/cpo | 1,000/<br>*N.A.* | $399 | Dealers sign agreement to comply with all CPO program guidelines | •167-point inspection<br>•Less than 6 years from original in-service date<br>•Less than 80,000 miles<br>•Clean title history | Yes | •Powertrain: 7 years/100,000 miles from original in-service date<br>•Roadside assistance: 7 years/100,000 miles from original in-service date<br>•3-year CarFax Buyback Guarantee and free 3-month trial of SiriusXM Radio<br>•Optional Security-Plus Extended Protection Plan available for 7 years/100,000 miles or 8 years/120,000 miles | Yes/$50 | Yes/$50 | None |
| **Porsche**<br>**Porsche Approved Certified Pre-Owned Vehicle Program**<br>Kevin Harvey<br>manager, pre-owned business<br>nationalpreownedporsche.com/approved | 191/<br>*N.A.* | $2,390 (midengine) $2,690 (911, Cayenne, Macan & Panamera) | Compliance with CPO policy and procedures | •111+ point inspection<br>•Vehicles up to 13 model years from the original in-service date, with less than 124,000 miles on the odometer | Yes | •2-year/unlimited-miles from expiration of new-vehicle limited warranty or from the date of sale if new vehicle limited warranty has expired<br>•Porsche Assistance: 24-hour/365-days-a-year breakdown assistance in the U.S. and Canada<br>•Porsche Financial Services: flexible lease and financing options that vary in both length and payment structure for Porsche-approved Certified Pre-Owned vehicles | No/$0 | Yes/$0 | None |
| **Rolls-Royce**<br>**Provenance - The Certified Pre-Owned Collection**<br>Martin Fritsches<br>president<br>rolls-roycemotorcars.com | 36/<br>*N.A.* | N.A. | N.A. | •Uncompromising pre-delivery inspection<br>•In-service 6 months or 6,000 miles<br>•Less than 10 years from original start-of-service date | No | •1- or 2-year warranties available<br>•Complimentary standard servicing using genuine Rolls-Royce parts<br>•24-hour roadside assistance and all the benefits of a new-car warranty, including maintenance<br>•Warranty can be extended beyond original manufacturer warranty | No/$0 | Yes/$0 | None |

N.A. = Not available

Note: Total new-vehicle dealers as of September 2019. Dealer fees may Include per-vehicle certification fees, advertising fees and warranty fees.

Source: Automotive News Data Center

7

EXHIBIT 27

8

DJA1269

| Program name/Top executive/Web address | No. of dealers in program/Total new-vehicle dealers | Dealer fees per vehicle | Dealer criteria | Vehicle criteria | Independent third-party inspection | Warranty details | Is there a warranty deductible?/cost | Is the warranty transferable?/fee | Dealer return/exchange program |
|---|---|---|---|---|---|---|---|---|---|
| **Smart**<br>**Smart Certified Pre-Owned**<br>Adam Chamberlain<br>vice president, sales<br>smartusa.com/certified-pre-owned | 27/27 | N.A. | Dealers must meet training and performance criteria as outlined in the Smart CPO program | •Comprehensive inspection<br>•6 model years or newer<br>•Less than 75,000 miles | No | •Remainder of new-vehicle limited warranty, plus 1-year/1-million-mile CPO warranty<br>•24-hour roadside assistance for the life of Smart CPO limited warranty | No/$0 | Yes/$0 | 7-day/500-mile vehicle exchange |
| **Subaru**<br>**Subaru Certified Pre-Owned Vehicles**<br>Jeff Walters<br>senior vice president, sales<br>subaru.com | 600/631 | $495 + surcharges | Retailers sign a participation agreement | •152-point inspection<br>•5 model years or newer<br>•Less than 80,000 miles<br>•Clean CarFax Report | Yes | •Powertrain: 7 years/100,000 miles and $0 deductible from original in-service date<br>•$500 Owner Loyalty Coupon (see dealer for details)<br>•3-month free trial of SiriusXM Radio<br>•No-charge Subaru Starlinks subscription with properly equipped vehicles<br>•Roadside assistance | No/$0 | Yes/$35 | None |
| **Toyota***<br>**Toyota Certified Used Vehicles**<br>Matt Kaleba<br>general manager, Toyota sales operations<br>toyotacertified.com<br>*Go to toyotacertifiedhybrids.com for details on Toyota's Hybrid CPO program | 1,094/1,239 | $450 | Must be a franchised Toyota dealership and sign a participation agreement | •160-point inspection<br>•6 model years or newer<br>•Less than 85,000 miles<br>•Must pass a CarFax History<br>•Hybrid vehicles have 14 additional inspection points | Yes | •7-year/1-million-mile limited Toyota Powertrain Warranty from date of TCUV purchase<br>•12-month/12,000-mile comprehensive warranty coverage from date of TCUV purchase<br>•1-year roadside assistance with unlimited miles | Yes/$50 | Yes/$0 | Dealer option |
| **Volkswagen***<br>**Volkswagen Certified Pre-Owned**<br>Michael Ashton<br>senior manager, used car operations<br>vwcpo.com<br>*See website for additional program details | 608/649 | $199-$770 depending upon vehicle class | Volkswagen dealers in good standing and a minimum of 3 CPO units in inventory | •100+-point inspection<br>•Current or previous 6 model years<br>•Less than 75,000 miles | Yes | •24-month/24,000-mile comprehensive added to the remaining factory warranty or from the date of CPO sale if no warranty remains<br>•3-month trial subscription of SiriusXM Radio on all factory-equipped CPO units<br>•3-month all-access trial of CarNet on all factory-equipped CPO units<br>•2 years roadside assistance | Yes/$50 | Yes/$0 | None |
| **Volvo**<br>**Certified by Volvo**<br>Brian Palmer<br>senior portfolio manager, pre-owned sales, operations & remarketing<br>certifiedbyvolvo.com | 288/288 | $895 | Volvo dealers in good standing | •170+-point inspection<br>•Up to 5 years from in-service date<br>•Less than 80,000 miles | Yes | •1-year/unlimited miles; an additional 5 years of protection may be added based on customer needs<br>•12-month Volvo On Call subscription<br>•3-month trial subscription of SiriusXM Radio<br>•Volvo roadside assistance<br>•Special financing for qualified customers | No/$0 | Yes/$0 | None |

N.A. = Not available

Source: Automotive News Data Center

**Note:** Total new-vehicle dealers as of September 2019. Dealer fees may include per-vehicle certification fees, advertising fees and warranty fees.

# CERTIFIED PRE-OWNED VEHICLE SALES 2018

| | January | February | March | April | May | June | July | August | September | October | November | December | 2018 Total | 2017 Total | Percent change |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BMW | 9,113 | 9,568 | 11,665 | 10,507 | 12,145 | 11,604 | 10,291 | 11,101 | 9,857 | 9,072 | 8,509 | 9,858 | 123,290 | 135,864 | -9.3% |
| Mini | 718 | 860 | 1,122 | 1,065 | 1,381 | 1,554 | 1,334 | 1,370 | 1,193 | 983 | 971 | 988 | 13,539 | 10,922 | 24.0% |
| BMW GROUP | 9,831 | 10,428 | 12,787 | 11,572 | 13,526 | 13,158 | 11,625 | 12,471 | 11,050 | 10,055 | 9,480 | 10,846 | 136,829 | 146,786 | -6.8% |
| Chrysler | 2,356 | 2,808 | 4,030 | 3,450 | 3,927 | 3,469 | 3,037 | 2,965 | 2,676 | 2,814 | 2,788 | 2,862 | 37,202 | 39,129 | -4.9% |
| Dodge | 4,620 | 5,139 | 6,319 | 4,859 | 5,310 | 4,492 | 4,513 | 4,840 | 4,557 | 4,598 | 4,432 | 4,628 | 58,307 | 62,335 | -6.5% |
| Fiat | 86 | 100 | 94 | 84 | 100 | 117 | 95 | 105 | 82 | 102 | 85 | 91 | 1,141 | 1,068 | 6.8% |
| Jeep | 9,054 | 9,616 | 11,681 | 9,990 | 11,494 | 10,874 | 10,571 | 11,106 | 10,072 | 9,942 | 9,996 | 10,241 | 124,637 | 102,860 | 21.2% |
| Ram | 3,220 | 3,590 | 4,492 | 3,929 | 4,698 | 4,392 | 4,102 | 1,750 | 2,788 | 4,338 | 4,311 | 4,735 | 46,325 | 49,467 | -7.1% |
| FCA US | 19,336 | 21,253 | 26,616 | 22,312 | 25,529 | 23,344 | 22,318 | 20,766 | 20,175 | 21,794 | 21,612 | 22,557 | 267,612 | 255,259 | 4.8% |
| Maserati | 92 | 94 | 136 | 116 | 154 | 132 | 136 | 151 | 150 | 157 | 122 | 146 | 1,586 | 845 | 87.7% |
| FIAT CHRYSLER AUTOMOBILES | 19,428 | 21,347 | 26,752 | 22,428 | 25,683 | 23,476 | 22,454 | 20,917 | 20,325 | 21,951 | 21,734 | 22,703 | 269,198 | 256,104 | 5.1% |
| Ford | 17,338 | 18,014 | 21,285 | 17,744 | 20,762 | 20,410 | 18,825 | 19,214 | 17,828 | 16,638 | 16,175 | 17,104 | 221,341 | 238,496 | -7.2% |
| Lincoln | 2,192 | 2,084 | 2,636 | 2,318 | 2,396 | 2,487 | 2,209 | 2,442 | 2,166 | 2,082 | 2,057 | 2,339 | 27,410 | 27,791 | -1.4% |
| FORD MOTOR CO. | 19,530 | 20,098 | 23,921 | 20,066 | 23,160 | 22,897 | 21,034 | 21,656 | 19,994 | 18,720 | 18,232 | 19,443 | 248,751 | 266,287 | -6.6% |
| Buick | 2,596 | 2,890 | 3,702 | 3,030 | 3,413 | 3,318 | 2,897 | 3,018 | 2,560 | 2,428 | 2,138 | 2,248 | 34,238 | 32,505 | 5.3% |
| Chevrolet | 19,148 | 20,297 | 25,732 | 19,681 | 21,879 | 22,542 | 20,747 | 20,838 | 18,381 | 18,021 | 17,007 | 17,492 | 241,765 | 237,806 | 1.7% |
| GMC | 5,891 | 6,042 | 7,710 | 6,132 | 6,758 | 6,900 | 6,353 | 6,627 | 5,710 | 5,676 | 5,398 | 5,773 | 74,970 | 68,413 | 9.6% |
| GM Certified | 27,635 | 29,229 | 37,144 | 28,843 | 32,050 | 32,760 | 29,997 | 30,483 | 26,651 | 26,125 | 24,543 | 25,513 | 350,973 | 338,724 | 3.6% |
| Cadillac | 3,859 | 3,882 | 4,798 | 3,872 | 4,011 | 4,123 | 3,578 | 3,589 | 3,691 | 3,296 | 3,181 | 4,103 | 45,983 | 48,245 | -4.7% |
| GENERAL MOTORS | 31,494 | 33,111 | 41,942 | 32,715 | 36,061 | 36,883 | 33,575 | 34,072 | 30,342 | 29,421 | 27,724 | 29,616 | 396,956 | 386,969 | 2.6% |
| Acura | 3,069 | 3,213 | 3,986 | 3,695 | 4,085 | 3,885 | 3,750 | 4,154 | 4,097 | 4,012 | 3,490 | 4,277 | 45,713 | 45,221 | 1.1% |
| Honda | 18,110 | 18,354 | 23,236 | 22,028 | 26,192 | 25,274 | 23,130 | 25,261 | 21,619 | 21,826 | 19,755 | 20,335 | 265,120 | 260,125 | 1.9% |
| AMERICAN HONDA | 21,179 | 21,567 | 27,222 | 25,723 | 30,277 | 29,159 | 26,880 | 29,415 | 25,716 | 25,838 | 23,245 | 24,612 | 310,833 | 305,346 | 1.8% |
| Hyundai | 6,042 | 6,323 | 7,585 | 6,163 | 7,006 | 6,747 | 6,524 | 6,899 | 6,029 | 6,112 | 6,122 | 6,241 | 77,793 | 84,900 | -8.4% |
| Kia | 5,830 | 5,983 | 7,698 | 6,078 | 7,140 | 7,225 | 6,644 | 6,575 | 6,201 | 6,057 | 5,724 | 5,740 | 76,895 | 75,424 | 2.0% |
| HYUNDAI-KIA AUTOMOTIVE | 11,872 | 12,306 | 15,283 | 12,241 | 14,146 | 13,972 | 13,168 | 13,474 | 12,230 | 12,169 | 11,846 | 11,981 | 154,688 | 160,324 | -3.5% |
| Jaguar | 605 | 556 | 776 | 587 | 749 | 920 | 695 | 694 | 705 | 724 | 672 | 831 | 8,514 | 8,242 | 3.3% |
| Land Rover | 1,306 | 1,415 | 1,794 | 1,455 | 1,689 | 2,051 | 1,540 | 1,790 | 1,893 | 1,774 | 1,804 | 2,265 | 20,776 | 18,490 | 12.4% |
| JAGUAR LAND ROVER N.A. | 1,911 | 1,971 | 2,570 | 2,042 | 2,438 | 2,971 | 2,235 | 2,484 | 2,598 | 2,498 | 2,476 | 3,096 | 29,290 | 26,732 | 9.6% |
| MAZDA | 3,561 | 3,669 | 4,552 | 4,090 | 4,823 | 4,604 | 4,693 | 5,201 | 4,642 | 4,305 | 4,249 | 4,388 | 52,777 | 43,730 | 20.7% |
| Mercedes-Benz | 9,431 | 9,744 | 10,549 | 9,289 | 12,030 | 11,044 | 10,490 | 12,671 | 10,268 | 9,903 | 10,601 | 12,743 | 128,763 | 112,534 | 14.4% |
| Smart | 6 | 6 | 5 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 7 | 72 | 136 | -47.1% |
| MERCEDES-BENZ USA | 9,437 | 9,750 | 10,554 | 9,294 | 12,036 | 11,050 | 10,496 | 12,678 | 10,274 | 9,909 | 10,607 | 12,750 | 128,835 | 112,670 | 14.3% |
| MITSUBISHI | 236 | 208 | 278 | 201 | 271 | 277 | 242 | 225 | 260 | 200 | 258 | 238 | 2,894 | 1,897 | 52.6% |
| Infiniti | 2,812 | 2,943 | 3,501 | 3,077 | 3,342 | 3,440 | 3,173 | 3,547 | 3,168 | 3,013 | 3,167 | 3,812 | 39,295 | 37,630 | 4.4% |
| Nissan | 16,269 | 18,196 | 21,963 | 19,390 | 20,689 | 18,528 | 17,025 | 17,397 | 16,072 | 16,689 | 17,564 | 17,387 | 217,169 | 202,057 | 7.5% |
| NISSAN GROUP | 19,081 | 21,139 | 25,764 | 22,467 | 24,031 | 21,968 | 20,198 | 20,944 | 19,240 | 19,702 | 20,731 | 21,199 | 256,464 | 239,687 | 7.0% |
| SUBARU | 6,131 | 5,665 | 6,261 | 6,261 | 7,142 | 7,219 | 6,976 | 7,812 | 7,344 | 7,407 | 6,713 | 6,673 | 82,265 | 75,409 | 9.1% |
| Lexus | 6,969 | 7,053 | 8,188 | 7,680 | 8,825 | 8,569 | 7,456 | 8,303 | 7,558 | 7,431 | 7,010 | 8,643 | 93,705 | 92,805 | 1.0% |
| Toyota | 28,949 | 29,557 | 34,713 | 28,391 | 29,800 | 28,388 | 26,494 | 27,351 | 27,635 | 27,156 | 26,033 | 29,429 | 344,796 | 369,650 | -6.8% |
| TOYOTA MOTOR N.A. | 35,918 | 36,610 | 42,901 | 36,071 | 38,625 | 36,977 | 33,950 | 35,654 | 35,193 | 34,587 | 33,943 | 38,072 | 438,501 | 462,655 | -5.2% |
| Audi | 4,114 | 4,469 | 4,999 | 4,887 | 4,300 | 3,716 | 3,353 | 3,999 | 3,612 | 4,201 | 4,184 | 5,209 | 51,043 | 47,487 | 7.0% |
| Bentley | 69 | 73 | 69 | 81 | 92 | 78 | 86 | 66 | 71 | 93 | 80 | 95 | 993 | 925 | 7.4% |
| Porsche | 1,598 | 1,714 | 2,024 | 1,807 | 2,146 | 2,249 | 1,748 | 2,099 | 1,822 | 1,715 | 1,846 | 2,278 | 23,046 | 19,104 | 20.6% |
| Volkswagen | 6,258 | 6,729 | 8,466 | 7,770 | 8,604 | 8,651 | 8,608 | 9,080 | 6,992 | 8,062 | 7,553 | 8,653 | 95,426 | 75,985 | 25.6% |
| VW GROUP OF AMERICA | 12,039 | 12,985 | 15,578 | 14,545 | 15,142 | 14,694 | 13,795 | 15,264 | 12,497 | 14,071 | 13,663 | 16,235 | 170,508 | 143,701 | 18.6% |
| VOLVO CAR USA | 1,663 | 1,505 | 1,823 | 1,606 | 1,798 | 1,960 | 1,913 | 2,149 | 1,966 | 2,590 | 1,567 | 2,015 | 22,557 | 18,576 | 21.4% |
| TOTAL CERTIFIED | 203,311 | 212,359 | 258,849 | 221,322 | 249,159 | 241,265 | 223,234 | 234,416 | 213,673 | 213,423 | 206,468 | 223,067 | 2,701,346 | 2,646,873 | 2.1% |

Case 1:19-cv-00294-CCE-JLW   Document 102   Filed 11/01/21   Page 23 of 138

## GLOSSARY OF CERTIFIED PRE-OWNED VEHICLE TERMS

**Certified pre-owned vehicle:** A previously owned vehicle sold with the original manufacturer's certification that the vehicle is in optimal condition. The manufacturers select vehicles based on age, mileage and a multiple-point inspection process. Age, mileage and inspection criteria vary by manufacturer.

**Point inspection:** A comprehensive vehicle inspection to ensure that the vehicle is in excellent working order. The point inspection is a list of the parts of the vehicle that are examined. Each manufacturer has its own inspection list, but most are similar. All inspections are performed under strict manufacturer guidelines.

**Transferable warranty:** If the owner of a certified pre-owned vehicle sells the vehicle and it is within the warranty period, the new owner may be eligible for a transfer of the warranty. Some manufacturers require the new owner to pay a transfer fee.

**Vehicle criteria:** To be considered for certification, a vehicle must be a recent model year, have limited mileage and pass a multiple-point inspection. Each manufacturer has its own requirements.

**Warranty deductible:** The amount the owner is responsible for when repair work is performed under CPO warranty. Many manufacturers do not require a deductible.

**Warranty details:** Most certified pre-owned warranty programs transfer and extend the existing new-car warranty terms or add terms and mileage. Warranty coverage varies by manufacturer.

10

### Perspective
How the past 10 years rank for U.S. CPO vehicle sales

| | | |
|---|---|---|
| 1. | 2018 | 2,701,346 |
| 2. | 2017 | 2,646,873 |
| 3. | 2016 | 2,643,504 |
| 4. | 2015 | 2,553,973 |
| 5. | 2014 | 2,340,775 |
| 6. | 2013 | 2,112,667 |
| 7. | 2012 | 1,834,839 |
| 8. | 2011 | 1,742,890 |
| 9. | 2010 | 1,636,735 |
| 10. | 2009 | 1,529,284 |

Source: Automotive News Data Center

### Brand scorecard - 2018
Change in CPO sales from 2017

**Up**

| | |
|---|---|
| 1. Maserati | 88% |
| 2. Mitsubishi | 53% |
| 3. Volkswagen | 26% |
| 4. Mini | 24% |
| 5. Volvo | 21% |

**Down**

| | |
|---|---|
| 1. Smart | -47% |
| 2. BMW | -9.3% |
| 3. Hyundai | -8.4% |
| 4. Ford | -7.2% |
| 5. Ram | -7.1% |

Source: Automotive News Data Center

### Top 10 CPO brands 2018

| | |
|---|---|
| 1. Toyota | 344,796 |
| 2. Honda | 265,120 |
| 3. Chevrolet | 241,765 |
| 4. Ford | 221,341 |
| 5. Nissan | 217,169 |
| 6. Mercedes-Benz | 128,763 |
| 7. Jeep | 124,637 |
| 8. BMW | 123,290 |
| 9. Volkswagen | 95,426 |
| 10. Lexus | 93,705 |

Source: Automotive News Data Center

### Top-selling CPO brand history

| | | |
|---|---|---|
| 2018 | Toyota | 344,796 |
| 2017 | Toyota | 369,850 |
| 2016 | Toyota | 417,171 |
| 2015 | Toyota | 371,713 |
| 2014 | Toyota | 355,988 |
| 2013 | Toyota | 369,671 |
| 2012 | Toyota | 330,814 |
| 2011 | Toyota | 331,805 |
| 2010 | Toyota | 315,440 |
| 2009 | Toyota | 265,887 |

Source: Automotive News Data Center

Confidential – Subject to Protective Order

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Civil Action No. 1:19-cv-00294-CCE-JLW

| | |
|---|---|
| ELIZABETH V. FORTSON, on behalf of herself and all others similarly situated, | |
| Plaintiff, | |
| v. | Judge Catherine C. Eagles |
| | Magistrate Judge Joe L. Webster |
| GARRISON PROPERTY AND CASUALTY INSURANCE COMPANY, | |
| Defendant. | |

## EXPERT REPORT OF THOMAS RYAN

The following report is provided at the request of Garrison Property and Casualty Insurance Company.

## I.  BACKGROUND AND QUALIFICATIONS

I received a Bachelor of Arts degree from the University of Virginia, then was employed by the NADA Official Used Car Guide Company from 1999 to 2015 in various vehicle valuation roles. I began leading the vehicle valuation team as Senior Manager, Vehicle Analysis in 2012 and continued in that role with NADA until the Used Car Guide was acquired by JD Power. I then led the Vehicle Analysis team for JD Power Valuation Services from 2015 to 2020.

I am currently the Director of Strategic Innovation of J.D. Power Valuation Services ("JDPVS"), which is a division of J.D. Power. J.D. Power purchased NADA Used Car Guide from the National Automobile Dealers Association ("NADA") on July 1, 2015. By March, 2021, the NADA Used Car Guide products were rebranded as JD Power Values ("JDPVS"/"JDP Used Car Guide"/"JDP Guidebooks"). In my current role, I am responsible for integrating valuation components, processes, and methodologies of the JD Power Values and Automotive Lease Guide ("ALG") product lines. This includes development and deployment of strategies to align data and analytical efforts for JDPVS valuation products.

In addition to the qualifications listed above, I have attached my curriculum vitae, which lists my employment history and relevant experience. All my opinions below are given to a reasonable degree of professional certainty.

## II.     STATEMENT OF OPINIONS IN THIS CASE

### A.     *JDPVS's Used Car Guide*

JDPVS sells a variety of products and services that offer customers the opportunity to obtain Used Car Valuations, including printed guidebooks, online guides, downloadable products, and software applications. The regional guidebooks and valuations—online, print, or software—are only available for purchase, either by subscription or by payment per vehicle lookup. The regional guides, including the Southeastern regional guide that covers North Carolina, have all been available online to paid subscribers or business-to-business clients since 2001. JDP's Used Car Guide valuations are monthly estimates of a vehicle's retained value for the time period in which they are published. As the printed guidebooks, online guides, and datasets are all updated monthly, the JDP Used Car Guide valuation for a particular car in a particular time frame would be the same regardless of whether a printed regional guidebook or the corresponding online guide or software product for that region is used. The JDP Guidebooks are not designed or intended to provide specific valuations for specific vehicles at a particular time. Rather, they are designed to give users a starting point for valuing a vehicle at a particular time.

The JDP Guidebook includes national vehicle valuation information and regional vehicle valuation information for 10 different U.S. regions. The JDP Guidebook national values are not adjusted to account for any regional differences in vehicle pricing. For regional values, the JDP Guidebook divides the United States into 10 regions. The region that includes North Carolina—the "Southeastern Region"—also includes Mississippi, Alabama, Georgia, South Carolina, Florida, and Tennessee. The JDP Guidebook regional values do not account for any differences in pricing within a particular region or local market area. Thus, a regional vehicle value is the same in North Carolina as in Northwestern Tennessee, Southern Mississippi, or Florida, and it is the same in Miami as it would be in Greensboro or Chapel Hill.  The JDP Guidebook offers values on the most recent 20 model years of vehicles; additionally, it offers an archival value lookup service that allows customers to view values dating back to the January 2000 period.

### B.     *Used Car Guide Data and Methodology*

JDP Used Car Guide valuations are estimates based on wholesale and retail transaction datasets, comprised of data from actual sales. Retail values are calculated based on information about dealer-to-consumer transactions, so the retail values reflect the dealer's acquisition cost for the vehicle, the cost to recondition the vehicle for sale, and dealer overhead and profit. By contrast, trade-in and loan values are based on wholesale transactions data, including auction or dealer-to-dealer purchases.

JDPVS updates its datasets on a monthly basis and does not use data older than six months old to value any vehicle. For newer vehicles with more sales and more data points, JDPVS typically only uses data that is between one to two months old for the valuation. JDPVS recognizes that the process by which users of the JDP Guidebook determine the value of a vehicle is inherently subjective. Moreover, individual vehicles almost certainly will have an actual value that is higher or lower than the estimated values published in the JDP Guidebook. The JDP Guidebook does not give a precise value for a particular vehicle.

3

The JDP Guidebook is based on proprietary methodology. The JDP Used Car Guide valuations are calculated using proprietary analytical modeling, expert review, and subjective judgment by JDPVS's Analytical staff. JDPVS's proprietary modeling allows our Analytical staff to analyze and identify trends for specific vehicle makes/models in order to understand price volatility, market and seasonal cycles, and rates of depreciation. JDPVS's Analytical staff review and edit calculated valuations based on their collective, industry expert knowledge surrounding vehicle markets. JDPVS uses statistical methods to determine whether a reported sales price is an outlier relative the overall set of reported prices for a specific vehicle. The sum of these efforts are JDPVS's Used Car Guide values.

Whether at the national or regional level, consumers do not have access to the data that was used to create the valuation, or to the proprietary methodology. Sales prices are reported to JDPVS by dealers through JDPVS's Power Information Network ("PIN"), which collects sales data directly from dealer management systems ("DMS systems"). The specific dealers who report sales data to JDPVS may change over time as new dealers are added or existing dealers opt out, and JDPVS only collects retail sales data from dealers who have opted into the PIN Network. Prices are also reported by proprietary finance companies and by auction houses or auction sales through the National Auto Auction Association. There are no dealers or other sources in North Carolina that are intentionally excluded from JDPVS's data collection efforts, nor does JDPVS utilize any statistical methods that are specialized or unique for North Carolina.

The condition of a vehicle can have a significant impact on the vehicle value, both in the context of a trade-in and a retail sale. The condition of a vehicle at a particular point in time—and how users of JDP values determine valuation—is inherently subjective. The actual sales price for any vehicle may be higher or lower than the JDP Used Car Guide valuation because the actual condition of a used vehicle can vary greatly. Using proprietary analytical modeling, expert review, and subjective judgment, JDPVS calculates several valuations for each vehicle make/model: (a) a "clean retail" valuation based on reported retail sales data, as JDPVS's market understanding is that dealers typically only sell good-condition vehicles at retail; (b) three "conditions" estimates for trade-in—"clean," "average," and "rough"—based on the price distribution of reported wholesale data, with "clean" vehicles estimated to command above-average prices and "rough" vehicles estimated as being sold for below-average prices; and (c) a "clean loan" valuation based on the amount of credit that could be obtained for a clean trade-in valuation. Each of these valuations is available online and in JDP's printed guidebooks, except for "clean loan" valuations, which are only available online and not available in the printed guidebooks. The JDP Guidebook does not take into account specific condition-based factors that may require individual adjustment. Dealers do not report information regarding the condition of specific sold vehicles when estimating a valuation.

Mileage is a factor in determining the value of a used vehicle, although the effect of mileage varies according to the class and age of the vehicle. JDPVS's analysis is based on an "expected" mileage range for a vehicle given its age, and adjustments are made to the valuation if the vehicle's mileage falls outside the expected range. The mileage range covered in the JDP Guidebook is limited, and for mileage outside this range the mileage must be accounted for on an individual basis by the user. As a general matter, the mileage adjustment is less significant for older vehicles. In other words, if there are two cars with the same mileage, the older vehicle will receive a smaller

4

adjustment to its valuation than the newer vehicle would. The mileage adjustment is the same whether using a printed regional guidebook or the corresponding online guide for that region.

The JDP Guidebook valuation assumes that vehicles are equipped with standard equipment (e.g., automatic transmission, air conditioning, power steering) and may take into account selected popular optional equipment "packages" created by the manufacturer when valuing vehicles. However, the JDP Guidebook does not account for all OEM optional equipment or after-market equipment when estimating a valuation. The Used Car Guide valuation also does not consider the car's color or any preferences that may affect the subjective valuation of a car by a purchaser. The JDP Guidebook valuations assume that the vehicle has a "clean title" and does not take into account salvage titles.

JDP's Used Car Guide products are used as a stand-alone means of valuation, which customers use for a variety of functions. Customers include automotive dealers, financial institutions, government agencies, and insurance companies. For example, government agencies use the values to assess personal property taxes, and insurance companies may use values to establish a total-loss threshold. A bank may use the JDP online guide, while a dealer may want to access valuations through a mobile application when they are out in a parking lot. Depending on the product or service, customers are charged per "look-up," JDPVS's valuation information for a particular vehicle, for approximately $0.40 to $0.70 each. Customers also have an option to pay $60 for a 10 archival Trade-In Value look-ups.

In addition to the stand-alone valuation guides, JDP's Used Car Guide valuations are licensed to customers as a component of products and services sold by JDPVS. For example, Used Car Guide valuations are licensed (in data form) to the three providers of total-loss valuation systems; CCC, Mitchell, and Audatex. These firms incorporate JDPVS's data into their total loss valuation systems, which insurance companies then use to generate appraisals when the repair cost of a vehicle exceeds its replacement cost. I do not know how each of these firms specifically use JDPVS valuations data; though, on information and belief, I believe it is used along with other variables as an input into a formulated total loss solution.

JDPVS does not view these providers of total-loss valuation systems as competitors; rather, these firms are JDPVS customers and purchase JDPVS data for their use in their total-loss valuation products. The total loss valuation systems offered by CCC, Mitchell, and Audatex are different from JDP's Used Car Guide valuations for at least three reasons.

*First*, JDPVS's products are not formulated to comply with specific state regulations. Several states have legislation designating acceptable sources from which a total loss valuation may be determined. For some of these states, the JDP Used Car Guide has been deemed an acceptable source. Other states require vehicle valuation to be calculated specifically for a local market area. Because JDPVS organizes its valuations by ten broad U.S. regions, the Used Car Guide valuations are too broad to comply with those states' requirements. JDPVS's main consumer website, www.nadaguides.com, offers a single National estimated value (and only collects user ZIP codes for tracking purposes). Total loss valuation systems, on the other hand, must adhere to specific geographic based rules and regulations in order to be legally used by insurance companies in those particular states.

5

*Second*, total loss valuation systems serve a different function than the JDP Used Car Guide valuations. Total loss valuation systems offer customers, typically insurance companies, a comprehensive and thorough solution to the automotive repair and replacement process. For example, total loss valuation systems integrate valuation products with complementary software products that can estimate repair costs, so that an insurance adjuster can easily compare the repair cost to replacement cost. Total loss valuation systems may also provide comparison valuations from non-J.D. Power services, or software to store, retrieve, or revise appraisals. Thus, insurance companies can use total loss valuation systems as all-in-one systems for valuation, repair appraisal, and claim adjustment. JDPVS does not offer a comparable total-loss valuation solution, as it does not offer an appraisal or comparison system. CCC, Mitchell, and Audatex sell a process, while JDPVS's products are components of that process.

*Third*, total loss valuation systems and the JDP Used Car Guide employ different core methodologies. JDP Used Car Guide valuations provide a generalized benchmark price for a make/model of vehicle, and do not consider specific attributes of specific vehicles that may affect its price in an actual marketplace. On information and belief, total loss vehicle systems use a process that attempts to price a specific vehicle by taking into account color, condition, optional equipment, vehicle history, and other differences that may affect used vehicle pricing.

In light of these and other differences between the JDP Used Car Guide and the total-loss valuation systems referenced above, the values estimated by the JDP Used Car Guide are not a substitute for the values generated by the total-loss valuation systems.

## III.    PRIOR TESTIMONY PROVIDED BY TOM RYAN

I have not previously provided expert testimony.

## IV.    COMPENSATION

My consulting rate in this case is $800 per hour.

Thomas Ryan

Sept. 30, 2021

TAB 65

DJA1277

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**Civil Action No. 1:19-cv-00294-CCE-JLW**

| |
ELIZABETH V. FORTSON, on behalf of |
herself and all others similarly situated, |
|
Plaintiff, |
v. |
|
GARRISON PROPERTY AND |
CASUALTY INSURANCE COMPANY, |
|
Defendant. |
|

Judge Catherine C. Eagles
Magistrate Judge Joe L. Webster

DECLARATION OF JONATHAN WALKER, Ph.D.

I, Jonathan Walker, declare as follows:

## INTRODUCTION

1. I am an economist. Industrial organization is one of my areas of expertise. I have a bachelor's degree in economics from the University of California at Berkeley and a doctorate in economics from the Massachusetts Institute of Technology. As part of my undergraduate and graduate training, I took advanced courses dealing with topics such as corporate behavior, the valuation of physical assets and the general functioning of markets of all types.

2. I am currently a Managing Director at Secretariat Economists LLC ("SE"). I was formerly the President and Chief Executive Officer of Economists Incorporated ("EI") until its recent acquisition by Secretariat Advisors LLC and conversion into SE. EI was founded in 1981 for the primary purpose of providing microeconomics-related advice to individuals, corporations, non-profit organizations and governments. Among other business activities, SE regularly advises law firms and litigants about economics issues that arise in the context of litigation.

3. On prior occasions, I have been retained as an economic expert in litigation matters. I have worked for the U.S. government, Fortune 500 corporations and their private equivalents, nonprofit entities and individual persons. My analyses have addressed a range of issues including proof and measurement of financial damages and class certification. I have testified about my opinions in writing, at deposition, and in state and federal court, and courts have relied upon my analysis in their written opinions. I have attached my curriculum vitae as Exhibit A to this report. Therein I explain my qualifications and experience in greater detail, and I include all my publications from the last ten years and all my testimony in the last four years.

4. Counsel for Garrison Property and Casualty Insurance Company ("Garrison" or "Defendant") retained me on Garrison's behalf to consider economics-related issues in this lawsuit. I analyzed the feasibility of applying class-wide methods to prove the existence and amount of financial damages for all the individual members of the putative class or for any potential subclass that includes more than one member. I also assessed Plaintiff's experts' opinions that they had in fact identified a reliable method to prove the existence and amount

Secretariat Economists

of damages for all putative class members individually using class-wide methods.

5. I found that there is too much variation in the putative class members' circumstances to prove injury or quantify damages by common proof. Because of the variation across loss vehicles, comparable vehicles, and local market conditions over time, the only way to know whether any claimant's loss vehicle was undervalued would be to investigate that claimant's case individually. Relatedly, condition varies across vehicles and the impact of condition on market value varies too—by vehicle, by local market and over time. Consequently, it would also require individualized proof to demonstrate that the condition adjustments at issue in this case disfavored any claimant, regardless of how the condition adjustments were arrived at. Plaintiff's experts have not identified a reliable method to overcome these problems. Their opinions to the contrary rely on invalid assumptions and illogical, unsupported assertions having nothing to do with either a) comparison of the amount claimants were entitled to and the amounts they received or b) whether the condition adjustments that Defendant applied were economically warranted.

6. To form my opinions in this case, I have relied on my training and experience as an economist, public information and material in the case docket and discovery record. I have attached a complete list of the materials that I have considered in preparing this declaration as Exhibit B. My research and analysis are ongoing. As additional documents or information are made available to me, I will review such documents and information and may incorporate them into my analysis and opinions.

7. SE is being compensated for my work in this case at my standard hourly billing rate of $775. Other economists and research staff at SE have assisted me on this matter. SE is being compensated for their time at their standard hourly rates which range from $325 to $650. Neither my compensation nor SE's compensation for work on this matter depend in any way on the litigation outcome.

## SUMMARY

8. Plaintiff challenges Garrison's and CCC Information Services, Inc.'s ("CCC's") method of estimating the actual cash value of total loss vehicles. Specifically, she challenges CCC's condition adjustments to comparable vehicles for sale by auto dealers. Plaintiff seeks to represent a putative class of "[A]ll persons or entities insured by Garrison under a Garrison

Secretariat Economists

motor vehicle policy issued in North Carolina who, from the earliest allowable time to the date of judgment, received a first-party total loss settlement or settlement offer based in whole or in part on comparable vehicles in a CCC market valuation report whose prices were reduced by a 'Condition Adjustment.'"[1] Plaintiff says that all putative class members suffered economic harm as a result of Garrison utilizing these adjustments.

9.  Proving injury and quantifying damages in this case are inherently individualized. Plaintiff alleges that she and putative class members were entitled to insurance settlements based on the amount it would cost to buy a comparable vehicle, i.e., the actual cash value ("ACV") of their loss-vehicles, with adjustments for deductibles, taxes and other items.[2] Therefore, proving that any particular putative class member suffered injury and quantifying his or her damages would require proof that the condition adjustments to comparable vehicle values lowered the settlement amount below that putative class member's vehicle's actual cash value. This cannot be done reliably using common proof. Claims varied in the physical characteristics and values of the loss-vehicles, the physical characteristics and values of the comparable vehicles, the dates of the losses and the magnitude of the challenged adjustments. Proving that Defendant undervalued a given loss vehicle by applying condition adjustments to comparable vehicles would not imply that any other loss vehicles differing in make, model, options, mileage, condition, location lor time of loss must have been undervalued too. Nor would it disprove that condition adjustments to other comparable vehicles made other valuations more accurate rather than harming putative class members in some way. An accurate valuation would have to account for differences in condition between the loss-vehicle and the comparable vehicles, and it is individualized whether CCC's method of doing so was inaccurate and to a particular insured's disfavor.

10. Settlements may have equaled or exceeded actual cash value even if the condition adjustments were unwarranted in full or in part. All aspects of the estimation process are subject to measurement error, and the cumulative measurement error in other aspects of a given valuation may offset any mismeasurement related to the condition of the comparable vehicles. For example, potential measurement errors in putative class members' favor include

---

[1] Plaintiff's Motion for Class Certification ("MCC"), p. 14.
[2] First Amended Complaint ("FAC"), paragraphs 2-5. MCC, p. 2.

Confidential – Subject to Protective Order

but are not limited to understating the negative effect of mileage on the actual cash value of the total-loss-vehicle, overstating the effect of options or upgraded trim levels on the actual cash value of the loss-vehicle, understating the degree to which the loss-vehicle's value was diminished due to its own condition, etc. This possibility is particularly relevant in this litigation because the condition adjustments were small relative to estimated vehicle value and because CCC's methodology utilizes asking prices rather than transaction prices. The smallness makes it more likely that any error related to the condition of comparable vehicles will be offset by other measurement errors. Relying on asking prices biases the CCC valuation in putative class members' favor because asking prices for vehicles exceed final sales prices on average. Financial awards to putative class members who were already paid more than actual cash value for their total-loss-vehicles would constitute windfalls for them and penalties for Defendant.

11. Plaintiffs rely on their experts Larry Hausman-Cohen and Lance Kaufman to address damages issues. Mr. Hausman-Cohen created a searchable electronic database of information from CCC valuation reports (Market Valuation Reports or "MVRs"). He identified 6,330 MVRs relating to total-loss claims during the class period and including at least one comparable vehicle with a nonzero condition adjustment.[3] He reports certain calculations related to these 6,330 MVRs such as average negative condition adjustment across these reports and the sum of all negative condition adjustments included in them. Mr. Hausman-Cohen does not claim that these tabulations represent damages, and they do not. For a variety of reasons, Mr. Hausman-Cohen's tabulations do not accurately reflect the impact of condition adjustments on valuations. Moreover, the impact of condition adjustments on valuations is not necessarily damages. As discussed, some or all adjustments may be economically proper, and some or all final settlements may exceed actual cash value even if their underlying condition adjustments are hypothetically too large.

12. It is Dr. Kaufman who purports to demonstrate that class injury and class damages are subject to common proof. According to Dr. Kaufman, all putative class members received a settlement offer that was affected negatively by condition adjustments to comparable

---

[3] Hausman-Cohen report, paragraphs 21-22, 25.

vehicles, and he asserts that the impact of condition adjustments constitutes economic harm.[4] Dr. Kaufman further asserts that to the extent putative class members had their vehicles appraised, appraisal costs incurred by the insured would constitute damages.[5] He opines that aggregate class damages can be estimated by measuring the impact of condition adjustments from a sample and extrapolating the results for the sampled putative class members to the class as a whole.

13. Dr. Kaufman's opinion is unfounded, and he does not identify a manageable way to prove injury and measure damages at the individual level. Dr. Kaufman's assertion that the effect of condition adjustments on settlement values always constitutes economic harm is baseless. He offers no means to calculate the actual cash value of any putative class member's vehicle.[6] He does not even attempt to show that any of CCC's estimates are too low. In reality, a putative class member whose settlement was based in part on condition adjustments to comparable vehicles can only have suffered economic loss from Defendant's use of condition adjustments if the adjustment was excessive and caused the putative class member to receive less compensation than he or she was entitled to. Dr. Kaufman does not discuss a method to do either of these things using common proof or even a reliable method to do either of these things on an individualized basis. Even individualized proof may be impossible for some putative class members given the passage of time since their vehicles were totaled.

14. Not only does Dr. Kaufman fail to demonstrate a reliable method of proving class damages and individual injury, but analysis of the sample of claims he considered shows that Defendants may have settled a large percentage of claims in excess of settlement value arrived at using an explicitly permissible method and *without* adjusting for condition. The North Carolina Administrative Code discusses how to settle total loss claims when the insurer and claimant disagree about the value of the loss vehicle. I have applied the methodology referred to in the Code to the sample of claims that Dr. Kaufman reviewed in this case. Depending on how the Code is interpreted, 64% or more of the settlements Defendant paid for the sampled claims were more than an explicitly permissible method for

---

[4] Kaufman Declaration, pp. 3-4.
[5] Kaufman Declaration p. 6, footnote 5. An initial sample of 178 claim files selected by Dr. Kaufman and produced by Defendant did not include any third-party appraisals.
[6] Deposition of Lance Kaufman, August 24, 2021 ("Kaufman Deposition"), p. 177.

use in instances when the insurer and claimant disagree about value. The Code refers to a valuation method to apply when insurers and claimants disagree and does not explicitly assert that actual cash value is necessarily equal to the value derived by applying the methodology. Therefore, the remaining 36% of claimants may be uninjured too since they did not dispute the final valuation used for settlement and that valuation may have been accurate. Proving injury to these 36% of claimants would still require individualized analysis.

## BACKGROUND

### *CCC Methodology*

15. Generally, CCC values loss-vehicles through an automated multistep process based on the asking prices of comparable vehicles after adjusting for differences between the comparable vehicles and the loss-vehicles.[7] After determining a loss vehicle's characteristics from the VIN number and physical inspection by Garrison, CCC searches its Comparable Vehicle Database for comparable vehicles to use in the valuation process.[8]



---

[7] I do not purport to have personal knowledge of CCC's valuation process. My understanding of the process and the description which follows is based on material in the discovery record. To my knowledge, Plaintiffs do not allege that these documents and materials describing CCC's valuation process are inaccurate. To the extent that Plaintiffs do dispute that the materials I rely upon accurately describe CCC's process, I am not opining whether Plaintiffs are correct.

[8] Exhibit 16 to the 30(b)(6) Deposition of CCC by John Gintvainis, June 23, 2021 ("Gintvainis Deposition"), pp. 18-22 (CCC_FORTSON000109696-700).

[9] CCCIS109377, CCCIS109380.

[10] Gintvainis Deposition, p. 190.

[11] Gintvainis Deposition Exhibit 21, p. 30 (Garrison P&C 00008074).

[12] Gintvainis Deposition, pp. 43, 114.

[13] Gintvainis Deposition, pp. 113-114; Gintvainis Deposition Exhibit 16, p. 11 (CCC_FORTSON000109689).

████████████████████████████████████████████████████

16. CCC adjusts the asking prices of comparable vehicles to account for differences between comparable vehicles and the loss-vehicle in mileage, options, packages, model and trim level.[15] Then CCC accounts for differences between comparable vehicles and loss-vehicles in terms of condition. CCC accounts for differences in condition in two steps. First, CCC adjusts the comparable vehicle prices to reflect known or assumed differences in market value between the comparable vehicles' condition and the baseline condition level of good. This adjustment to the comparable vehicles' asking prices occurs prior to calculating the Base Vehicle Value. In a later step, CCC adjusts the Base Vehicle Value to reflect differences between the loss-vehicle's condition level and the baseline condition level.[16]

17. The net result of the two-step process is to account for differences between the observed or assumed condition of the comparable vehicles and the observed condition of the loss-vehicle. For loss-vehicles that are in better condition than the baseline level, the difference in value between the comparable vehicles and baseline (accounted for prior to calculating the Base Vehicle Value and represented by a negative number if the comparable vehicles are in better condition than baseline) plus the additional value attributable to the loss-vehicle being in superior condition than the baseline condition level (accounted for after calculating the Base Vehicle Value and represented by a positive number) equals the condition-related value difference between the comparable vehicles and the loss-vehicle. For loss-vehicles that are in inferior condition to the baseline level, the difference in value between the comparable vehicles and baseline minus the subtractive value attributable to the loss-vehicle being in worse condition than the baseline condition level equals the condition-related value difference between the comparable vehicles and the loss-vehicle. For loss-vehicles at the baseline condition level, the difference in value between the comparable vehicles and the baseline equals the condition-related value difference between the comparable vehicles and the loss-vehicle.

18. ██████████████████████████████████████████████████

---

[14] Gintvainis Deposition Exhibit 16, p. 22 (CCC_FORTSON000109700).
[15] Gintvainis Deposition Exhibit 16, p. 22 (CCC_FORTSON000109700).
[16] Gintvainis Deposition Exhibit 16, pp. 25-26 (CCC_FORTSON000109703-704).

Confidential — Subject to Protective Order

[BLACK REDACTION BLOCK]

"Very good" is defined based on the typical condition of vehicles for sale on dealer lots.[18] Based on its research, CCC has collected information regarding the market value difference between this condition level and the baseline condition of good. In addition, CCC excludes from its database and does not use in its valuations any used car that it inspects on a dealer lot that does not meet or exceed this condition level.[19]

19. CCC adjusts the prices of comparable vehicles that are for sale by dealers down by the estimated amount by which the components of vehicles in dealer-ready condition are more valuable than the components of vehicles in normal/private owner condition.[20] This is the first step in the process of accounting for differences in condition between comparable vehicles which are for sale by dealers and the loss-vehicle. This is also the step in the valuation process that Plaintiff is complaining about. In the second valuation step, CCC adjusts the Base Vehicle Value to account for the loss-vehicle's condition relative to the baseline, after-factory equipment, refurbishment and unrelated prior damage to arrive at the Adjusted Vehicle Value.[21]

20. If the automated process fails one or more of CCC's quality checks, the valuation is routed for manual processing.[22] [BLACK REDACTION BLOCK]

21. Based on my review of MVRs, CCC does not always apply condition adjustments to comparable vehicles' prices. For example, CCC does not apply a condition adjustment to the prices of comparable vehicles for sale by private individuals rather than dealers, effectively assuming that these comparable vehicles have normal wear, i.e., they are at the baseline condition level used in the valuation analysis.[24] [BLACK REDACTION BLOCK]

---

[17] USAA 30(b)(6) Deposition of Robert Lopez, May 21, 2021, pp. 74, 99-100.
[18] Gintvainis Deposition, pp. 35-36.
[19] Gintvainis Deposition, pp. 41, 113-114.
[20] As explained on page 9 of Ms. Fortson's Market Valuation Report, "The Condition Adjustment sets that comparable vehicle to Good condition, which the loss vehicle is also compared to in the Vehicle Condition section." Garrison P&C 0000214.
[21] Gintvainis Deposition, pp. 36-37, 42.
[22] CCCIS109381.
[23] Gintvainis Deposition, p. 205.
[24] Garrison claim 0113566670000000016001 (CCC00000013.pdf.txt) provides an example.

Secretariat Economists

**_Mr. Hausman-Cohen's Report_**

22. Mr. Hausman-Cohen extracted data from the CCC Market Valuation Reports ("MVRs")
pertaining to the Insurer Defendants' total loss claims in North Carolina during the class
period. He inputted those data into a database that could be searched and tabulated. One of
the tables in the database he created is "CCC_Comps" which contains information
regarding comparable vehicles, including but not limited to the condition adjustment, if
any.

23. In addition to describing his database and his process for building it, Mr. Hausman-Cohen
reports summary information regarding certain data fields, and he also reports the results
from various calculations.

I understand that condition adjustments to previous valuations relate to the
condition of the loss-vehicle rather than the condition of comparable vehicles.

24. Mr. Hausman-Cohen reports various averages and sums of condition adjustments.

---

[25] Garrison claim 02054355600000004001 (CCC00023040.pdf.txt) provides an example.
[26] Garrison claim 02538157700000002001(CCC00000382.pdf.txt) provides an example.
[27] Hausman-Cohen Report, par. 24.
[28] Hausman-Cohen Report, par. 22.
[29] Hausman-Cohen Report, pars. 27-29.

Secretariat Economists

██████████████████████████████████████████████████████

25. ████████████████████████████████████████████████████████ Economic loss depends on a) the amount, if any, by which CCC understated the value of each comparable vehicle by applying the condition adjustment that it did, b) the degree, if any, to which CCC relied on each adjusted comparable vehicle value in its valuations and c) the amount, if any, by which each loss vehicle's estimated actual cash value was underestimated as a result of excessive condition adjustments to comparable vehicles. Mr. Hausman-Cohen does not address these issues.

26. These issues that Mr. Hausman-Cohen ignores determine on an individual level whether the impact of condition adjustments on settlement values are damages. The fact that Mr. Hausman-Cohen ignores them is one reason that his calculations are not damages. Moreover, leaving aside whether the impact of condition adjustments on settlement values correlates to economic loss, Mr. Hausman-Cohen's calculations and tabulations do not measure the impact of condition adjustments on settlement values.

27. It would be necessary to review additional information to determine whether Garrison relied on the CCC valuation for settlement purposes. Some putative class members' settlements may have been based on appraisals. In other cases, Garrison may have based settlement values on a higher actual cash value than CCC estimated notwithstanding that there was no independent appraisal. For example, Mr. Hausman-Cohen's "CCC_Main" table includes an "OtherAdjustmentText" field which captures descriptions of additional adjustments in the valuation summaries on MVRs. ██████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

███████████████████████████ Further, I understand that USAA guarantees a minimum

---

[30] Garrison claim 01946152900000003001 (CCC00103295.pdf.txt).
[31] See, e.g., Garrison claim 01195096900000009001 (CCC00004675.pdf.txt).
[32] See, e.g., Garrison claims 02040733100000001001 (CCC00079095.pdf.txt) and 02560793900000002001 (CCC00074464.pdf.txt).

Confidential — Subject to Protective Order

DJA1288

"transportation value" in settling total loss claims. This value, which varied over time, is paid to insureds even if CCC's estimated value is less.

### Dr. Kaufman's Report

28. Dr. Kaufman purported to present "a method of calculating economic harm common to all class members in this case."[33] He summarized and numbered his findings on pages 3 and 4 of his report as follows:

    1. Individuals with CCC Report valuations based on Condition Adjustments to comparable vehicles are identifiable from data already available.

    2. The Condition Adjustment systematically reduces the valuation of the loss vehicle because all dealer comparable vehicles were assumed to be in Very Good condition.

    3. Insofar as it relates to the value of the loss vehicle, settlement payments are based on CCC Report valuations.

    4. The economic harm to class members is the difference between the actual settlement payment for the loss vehicle and a counterfactual settlement payment adjusted to exclude all impact of the Condition Adjustment.

    5. Total harm for all class members could be estimated with a known confidence precision using a sample of class members.

    6. The harm for any individual class member can be estimated with a known confidence and precision.

29. None of these findings are logically supported. Begin with Finding #1 that all individuals with CCC Report valuations based on Condition Adjustments to comparable vehicles are identifiable from data already available. ███████████████████████

---

[33] Kaufman Report, p. 3.
[34] 56 loss vehicles have a prior valuation comparable vehicle, and one additional loss vehicle has 10 comparable vehicles designated as "prior valuation." This 57th example with 10 supposed prior valuations may be a coding error. Mr. Hausman-Cohen counts 35 final valuations based on prior valuations because he does not count the

████████████████████████████████████████████ In these cases,
CCC will rely exclusively on the preexisting valuation. It will include comparable vehicles
on the new MVR, for purposes of comparison to the prior valuation, but give them zero
weight. The negative condition adjustments applied to these comparable vehicles have no
impact on the estimated value of the loss vehicle, yet Mr. Hausman-Cohen included them
in his tabulations. This is one of the reasons why Mr. Hausman-Cohen's tabulations do not
accurately measure the impact of condition adjustments on the putative class in the
aggregate or on average. As for class membership, it is impossible to tell from these 57
MVRs whether the policyholders associated with them meet the class definition. It would
be necessary to review the MVRs from the prior valuation or other information in the claim
files to determine whether the prior valuation was based in part on comparable vehicles that
had been subject to a negative condition adjustment. The new MVRs show condition
adjustments to the prior valuation, and some of those adjustments are negative, but I
understand that those condition adjustments relate to the condition of the loss-vehicle. They
are not condition adjustments to comparable vehicles.

30. Dr. Kaufman's next finding is that condition adjustments systematically reduce the value of
loss-vehicles. As a threshold matter, Dr. Kaufman apparently means to say that every
condition adjustment reduces CCC's *estimate* of the loss-vehicle's value. The actual cash
value of the loss-vehicle is determined by market forces, local supply and demand for
similar vehicles to the loss-vehicle at the time of loss. Neither CCC nor Garrison can
change the fair market value of a loss-vehicle. The distinction is important because
reducing fair market value causes economic loss by definition but reducing an estimate of
value does not. Reducing an estimate may make the estimate more accurate without
causing the putative class member to receive any less than he or she was entitled to under
his or her policy. Dr. Kaufman asserts that the condition adjustments are generic and not
itemized.[35] Then he relies on Plaintiff's claims that improperly itemized or researched
condition adjustments are unlawful as the basis for his economic opinion that their effect

---

additional 22 such valuations in which the prior valuation comparable vehicles had a zero condition adjustment.
(Hausman-Cohen Declaration, pp. 6-7.)

[35] Kaufman Report, p. 3.

Confidential – Subject to Protective Order

constitutes economic loss.[36] Dr. Kaufman's opinion has no basis in economics.

31. It is a factual economic matter, not a legal matter, whether any given adjustment made a value estimate more accurate or less accurate. This economic fact is independent of how the adjustment was arrived at or whether the adjustment was properly itemized. For example, if the three comparable vehicles in a valuation are worth $500, $600 and $700 more than similar vehicles in private use because of their superior condition, and CCC applies a flat $400 condition adjustment to all of them, then the adjustment makes the valuation more accurate than it would be with no adjustments at all, and applying the adjustment does not cause the policyholder to suffer economic loss. There would be no loss even if CCC selected the $400 adjustment figure in an arbitrary way and failed to itemize it appropriately. Dr. Kaufman does not explain why a purported failure to itemize condition adjustments to comparable vehicles would be expected to harm any putative class members economically let alone offer a common-proof method to show fact and quantum of harm individually.

32. Dr. Kaufman's third finding that "[i]nsofar as it relates to the value of the loss vehicle, settlement payments are based on CCC Report valuations" is belied by the discovery record. For example, Plaintiffs selected a sample of 178 claims for scrutiny.[37] For five of the 178 sampled claims there is no CCC MVR, including one incomplete claim file and one claim file that does not show a payment to the insured.[38] Also, as discussed, USAA may base settlement on appraisal or on its minimum "transportation value" rather than the CCC valuation. When Garrison did rely on CCC valuations that were impacted by condition adjustments to comparable vehicles, it was not necessarily the case that the insured was also impacted by the adjustments. Garrison occasionally waived deductibles or otherwise modified the settlement offer. These adjustments may have been to reach a target

---

[36] Kaufman Report, p. 4 citing paragraphs 6 and 57 of the First Amended Complaint. At deposition, Dr. Kaufman conceded that if the Court determines that the comparable vehicle condition adjustment is not illegal, then the assumption underlying his report is not applicable. (Kaufman Deposition, p. 88.)

[37] Plaintiff originally selected a random sample of 200 claims, of which 178 claim files were made available. Dr. Kaufman's "Claim File Sampling(1562912.1).pdf" workpaper includes information for an additional 5 claims from the initial sample of 200, one of which indicates "No payment made/No MVR" and two others which indicate "No MVR."

[38] See, e.g., 2021.07.15 FINAL_Claim File Sample(1574700.1).pdf. The five claim files with no CCC MVR are 017007494-3, 021066830-13, 021066830-13, 033759079-9 and 045270015-6. One of these, 045270015-006, appears to have been settled based on the Estimate of Record.

settlement figure that the insured had in mind. If the CCC valuation had been higher, that does not necessarily mean that the final settlement would also have increased at all or by as much.

33. Dr. Kaufman's fourth finding was that economic harm is equal to the difference between the actual settlement payment for the loss vehicle and a counterfactual settlement payment adjusted to exclude all impact of the Condition Adjustment. This "finding" is not based on any analysis or consideration of the amounts insureds were supposed to receive. It is not rooted in the field of economics either. Dr. Kaufman simply asserts that the sampled claim files confirm that settlement payments were based on the CCC valuations. There is no consideration of whether condition adjustments to comparable vehicles caused CCC valuations to be less than ACV or whether CCC valuations were ever less than ACV for any reason.

34. By Dr. Kaufman's definition, putative class members who received settlements greater than the actual cash value for their total-loss-vehicles may still have suffered economic harm so long as the CCC valuation process relied in part on a negative condition adjustment to a comparable vehicle. Dr. Kaufman does not explain why economic harm should be defined this way; it is illogical and inconsistent with Plaintiff's arguments and allegations. Plaintiff says that, per North Carolina law, policyholders suffering a total loss were entitled ACV.[39] Therefore, a putative class member who received actual cash value or more did not suffer economic loss. This is the case regardless of how CCC or Garrison arrived at the final settlement amount. In order to cause an economic loss, it is not enough that a condition adjustment is allegedly improper or improperly itemized. To cause an economic loss, the adjustment must overstate the condition of the comparable vehicles and have the effect of reducing the final settlement below actual cash value. Dr. Kaufman conducted no analysis to indicate that any of the condition adjustments were inaccurate.[40] The only record evidence is that dealer cars typically are in better condition than vehicles in private use.[41]

---

[39] MCC, p. 3.
[40] Kaufman Deposition, p. 139: "And -- and the reality is that we don't know what the comps are. We don't know what an appropriate adjustment to the comps are, and so I'm proposing to remove that adjustment."
[41] For example, CCC will only add dealerships to its network if a visual inspection of the dealership's vehicles indicates that they are typically in very good condition or better. If CCC subsequently determines that many vehicles

35. As for putative class members who settled by appraisal, Dr. Kaufman says that their appraisal costs constitute economic harm, but he does not explain why. If a putative class member incurred appraisal costs, such costs could only be relevant to economic harm from the challenged conduct if Garrison's use of condition adjustments caused the putative class member to seek an appraisal, and the putative class member was worse off after the appraisal than he or she would have been if Garrison had behaved as Plaintiff says it should have.[42] Dr. Kaufman does not propose a manageable method of proving either of these facts on a class-wide basis. Dr. Kaufman simply ignores causation (i.e., whether the condition adjustments at issue caused the putative class member to seek an appraisal rather than the putative class member seeking an appraisal for some unrelated reason), ignores the difficulties in identifying which putative class members paid for appraisals and ignores whether invoking the appraisal option benefited putative class members or harmed them. If an appraisal process increased estimated actual cash value, the putative class member may have been made better off than he or she would have been if Garrison had followed the CCC valuation methodology but had omitted condition adjustments to comparable vehicles. In fact, the only reasonable explanation for a policyholder to voluntarily incur appraisal costs is that the policyholder expects that the appraised value will be so much higher than the CCC estimated value that the appraisal more than pays for itself.

36. Dr. Kaufman's fifth finding is that aggregate harm for the class as a whole could be estimated by extrapolation based on the harm to a representative sample. Dr. Kaufman has not demonstrated that he can estimate economic loss for a sample, even by his own definition of economic harm. Dr. Kaufman has not estimated loss for the putative class members associated with the sample of 178 claim files.[43] Relevant data were unavailable for several of the 178 claims. Thus, quantifying the effect of condition adjustments on

---

at a dealership are not in very good condition or better, it will drop the dealership from the network. CCC field inventory representatives will only inspect and submit to CCC's database vehicles that are in very good condition or better. (Gintvainis Deposition, pp. 39-41.) Also see the Declaration of Gregory Goebel in Support of Garrison Property and Casualty Insurance Company's Opposition to Class Certification ("Goebel Dec."), pp. 20-22.

[42] Throughout this report, I am assuming for argument that Garrison's use of CCC valuation reports that contain condition adjustments to comparable vehicles violates North Carolina law, but not that the condition adjustments necessarily cause the undervaluation of the comparable vehicles or of any loss vehicle. The mere fact that conduct violates a law and separately that a plaintiff had an expense does not imply that the violation caused the expense or that the expense constitutes economic loss attributable to the violation. The violation and the expense are not necessarily causally related.

[43] Kaufman Deposition, p. 87.

aggregate settlement payments to the sample would require additional work that Dr. Kaufman did not do. Moreover, Dr. Kaufman has explicitly avoided saying that the 178-claim sample is large enough for his purposes.[44] Consequently, he has no basis to say whether it would be manageable to evaluate the impact of condition adjustments on an acceptably large sample.

37. More importantly, economic harm depends on condition adjustments causing the amount received to be below the amount due. Dr. Kaufman does not show that any condition adjustments in his sample were excessive, nor does he show that data are available to determine whether any adjustments were excessive. He does not show that any final settlement in the sample was for less than actual cash value or that there are data available to make that determination either. In short, Dr. Kaufman does not demonstrate that it is possible to estimate economic loss for a statistically representative sample of claims.

38. Dr. Kaufman's final finding is that harm to any individual putative class member can be estimated with a known confidence and precision. He writes: "Both ratio estimation and regression estimation [two of the three estimation techniques he discusses in his report] can be used to estimate harm specific to individual class members. This is possible because the CCC Report Data provides detailed class member data."[45] Apparently, Dr. Kaufman means that it would be possible to extrapolate from a random sample to the class and allocate the aggregate award to individual putative class members in a way such that the average error at the individual level could be estimated reliably. This finding ignores that Dr. Kaufman has not demonstrated that he can estimate economic loss for a sample if economic loss means getting less than the policyholder was entitled to due to the challenged conduct by the Defendant. Moreover, ratio estimation and regression analysis cannot prove that any particular putative class member received less than he or she was entitled to or even that his or her settlement was impacted by condition adjustments to comparable vehicles. Dr. Kaufman's proposal to estimate harm to a sample, extrapolate to the class and allocate the aggregate award using statistics awards damages to all putative class members whether they suffered economic loss or not. Any uninjured putative class members' awards would

---

[44] At deposition, Dr. Kaufman stated that he will determine whether a larger sample needs to be drawn when he analyzes damages. (Kaufman Deposition, p. 185.)

[45] Kaufman Report, p. 12.

Confidential – Subject to Protective Order

be funded by undercompensating injured putative class members.

## ANALYSIS AND AFFIRMATIVE OPINIONS

39. The proper measure of economic harm in this case is the shortfall, if any, between the settlement Plaintiff and putative class members were entitled to under their policies and the settlement they received. There is no dispute that Plaintiff and putative class members were only entitled to actual cash value for their loss-vehicles, so it would constitute a windfall to grant damages awards when settlements already equaled or exceeded that amount. Also, economic loss must be caused by the challenged conduct. For example, it would not be economic loss attributable to the conduct at issue for a putative class member to receive less than actual cash value because he or she failed to notify the relevant insurer of refurbishments to his loss-vehicle or the addition of aftermarket parts. Therefore, to prove common economic harm, Plaintiff must show that all putative class members received less than actual cash value for their settlement as a result of economically unwarranted condition adjustments to comparable vehicles' values. With that in mind, I have conducted various analyses demonstrating that there is great variation across the relevant loss-vehicles, comparable vehicles and claim files. This variation casts doubt on the premise that proof that any one putative class member or group of class members suffered economic harm would imply that all others suffered harm too. I found that there was variation in a) putative class members' exposure to the challenged conduct, b) physical characteristics of the loss-vehicles, c) absolute sizes of condition adjustments across claims and d) the size of condition adjustments as a percentage of Adjusted Vehicle Value across claims.

40. Based on my review of Mr. Hausman-Cohen's database and Dr. Kaufman's random sample, I found that condition adjustments tended to be small as a percentage of Adjusted Vehicle Value. To put the ratio of condition adjustment to Adjusted Vehicle Value into perspective, I collected evidence regarding the percentage by which list prices overstate selling prices for used vehicles. In addition to random measurement error, this difference between list price and selling price is another source of error that may offset the impact of any economically unwarranted condition adjustments to comparable vehicle values. Generally speaking, I found that condition adjustments were so small that they may be

offset by measurement error in the valuation process even if they overstate the condition of the comparable vehicles.

41. In light of what it means for there to be economic loss in this case, I came to additional conclusions. First, Plaintiff offers no reliable, manageable method to prove individual injury across the putative class, and I am unaware that any such methods exist. Second, Plaintiff offers no reliable and manageable way to estimate individual or aggregate class damages, and I am unaware that any such methods exist. Finally, Plaintiff offers no reliable and manageable way to show that any putative class members' condition adjustments were economically unwarranted. That is, she has not shown that any condition adjustment affecting any total-loss settlement during the class period was unnecessary to make the relevant valuation more accurate. Not only are there no data indicating that any putative class members suffered economic loss, but many putative class members are demonstrably uninjured based on one of the ways of estimating actual cash value that is explicitly endorsed by the North Carolina total loss statute.

### *Variation Mandates Individualized Analysis of Condition Adjustments*

42. There is wide variation across putative class members' total loss vehicles that needs to be accounted for to prove economic loss reliably at the individual level. For example, consider a hypothetical 5-year-old loss vehicle and a hypothetical 10-year-old loss vehicle. All else being equal, 5-year-old vehicles are more valuable than 10-year-old vehicles and a given dollar condition adjustment will have a different likelihood of driving an *estimated* value **below** *true* actual cash value. Being in very good condition will have a different impact on value between the two vehicles and CCC will apply different condition adjustments in the two cases. Differences in age must be accounted for to determine whether condition adjustments were uniformly excessive. The analysis is all the more individualized if the two vehicles are different makes or models or differ in terms of mileage or options. Plaintiff's experts offer no method to account for the differences across loss vehicles that are relevant to whether the observed condition adjustments were appropriate or likely to result in putative class members receiving less than actual cash value in settlement. **Table 1** is based on Mr. Hausman-Cohen's database and concerns variation across the putative class in terms of model years of the loss-vehicles. █████████████████████████████

DJA1296



43. **Table 2**, also based on Mr. Hausman-Cohen's database, concerns the ages of loss-vehicles at the time of loss. I measure age at time of loss as the loss year minus the model year of the loss-vehicle. For example, if a model-year 2015 vehicle was totaled in an accident in 2018, I estimate that that vehicle was three years old at the time of loss. Age is relevant to condition and value. The error rate of the CCC methodology may vary based on vehicle age, so demonstrating that the method understates or overstates the value of vehicles in one age group on average would not necessarily imply that it also understated or overstated the value of vehicles in any other age group on average. It would be necessary to develop data regarding CCC's valuation accuracy and test for consistent error rates by age to draw conclusions about vehicles of one age based on the accuracy of the valuation of a vehicle or vehicles of any other age.

44.         Because the amount of condition adjustment varies by vehicle age and the accuracy of the adjustment may vary too, the likelihood and amount of economic injury may vary over the putative class based on variation across the putative class in vehicle age.

---

[46] The missing data undoubtedly include more recent model year loss vehicles. As discussed below, more detailed information is available for a sample of 178 claims (Fortson v Garrison - 178 claim sample with Loss Rpt Sequence Number.xlsx). The average model year for the 176 loss vehicles in the sample for which model year information is available was 2009 while the average model year for the 910 vehicles in Mr. Hausman-Cohen's database for which model year information was available was 2007.
[47] Gintvainis Deposition, p. 203. For an example, see Garrison claim 025381577000000002001 (CCC00000382.pdf.txt).

45. There also was wide variation across loss-vehicles in terms of mileage. ████████████

████████████████████████████████████████████████████████████████████████████

For loss-vehicles with missing mileage information, CCC assumes the vehicle had average mileage for its region, age and type.[48] Valuations of total-loss-vehicles with missing mileage information are subject to different error rates than valuations of other vehicles because they rely on assumed mileage information rather than actual mileage information. Even limiting attention to vehicles with known mileage, if the amount of condition adjustment or accuracy of the adjustment varies by mileage, the likelihood and amount of economic injury may vary over the putative class based on variation across loss-vehicles in terms of mileage.

46. The loss-vehicles also span a variety of makes, models and trim levels. ████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ On the other hand, there were hundreds of vehicle types with only one total-loss-vehicle in Mr. Hausman-Cohen's database. See **Table 5** for a listing of the various types of vehicles where type is defined as a particular model at the trim level. As the accuracy and amount of condition adjustment may vary by model or trim level, this variation is another impediment to common proof of injury and quantification of damages.

47. Adjusted Vehicle Values varied greatly over the total-loss-vehicles in Mr. Hausman-Cohen's database. ████████████████████████████████████████

---

[48] CCCIS109368.

48. In sum, there is a significant degree of variation among the total-loss-vehicles that Garrison covered in North Carolina over the class period. There was variation in loss-vehicles' model years, age at time of loss, make/model and trim, and in vehicles' values.

### *Variation Among Claims in Plaintiff's Sample*

49. Defendant produced claim files for a sample of 178 claims. MVRs were missing from four of the claims, so the Plaintiff's final sample of MVRs is actually 174.[49] In addition, CCC's valuation did not include condition adjustments to comparable vehicles for seven of the 174 claims. One of the remaining 167 reports is based on a previous valuation and one claim was reversed from a total loss to repairable. Therefore, the final sample of total loss vehicle MVRs with condition adjustments to comparable vehicles was 165.

50. There is significant variation across Plaintiff's sample that would reasonably affect the likelihood of injury and amount of damages related to the condition adjustment of comparable vehicles' asking prices.

51. **Table 7** lists the 165 average condition adjustments to comparable vehicles from Plaintiff's sample of MVRs.

---

[49] One of the four files without an MVR was an incomplete claim file.

[50] 11 of the 178 sampled claims for which claim file information was available did not appear in Mr. Hausman-Cohen's data. As noted above, model year information was missing from Mr. Hausman-Cohen's data for a large majority of loss vehicles. The model year and age information discussed here is based on USAA data (Fortson v Garrison - 178 claim sample with Loss Rpt Sequence Number.xlsx) and Mr. Hausman-Cohen's data.

[51] Among the 200 claims in Plaintiff's original sample, Garrison produced 178 claim files. From among the 178 claim files, 1 claim was reversed from a total loss to repairable, 4 files had no MVR, 1 MVR had an adjustment based on a previous valuation, but I do not have the earlier report, and 7 MVRs had no condition adjustment to a comparable vehicle.

DJA1299



52. Although the condition adjustments ranged widely, they were usually a small fraction of Adjusted Vehicle Value.



The adjustments are typically small enough to be offset by random error in insureds' favor or upward bias due to CCC's estimation of asking prices rather than market value.

53. Condition adjustments to Base Vehicle Value account for differences between the loss vehicle's condition and the baseline condition level. These adjustments also varied markedly across Plaintiff's sample. **Table 7** shows the condition adjustments to Base Vehicle Value for all of the MVRs Plaintiff selected.



*Garrison Does Not Settle All Claims Based on CCC Valuations*

54. Garrison did not uniformly adopt the CCC valuations for purposes of calculating settlements. Defendant may have settled some claims by appraisal or based on

transportation value. As discussed, based on Mr. Hausman-Cohen's database, Defendant occasionally made other changes to valuations that may have had the effect of offsetting any error related to the condition of comparable vehicles. Finally, Defendant occasionally waived deductibles or made other accommodations that were not called for under the policy, as it did for the Plaintiff, and these accommodations could offset any error related to the condition of comparable vehicles. To demonstrate individual injury would require reviewing the relevant case file for any such accommodations, assessing whether the accommodations would have offset any harm related to condition adjustments and also determining that the final settlement was below ACV.

### CCC Inspections Validated Condition Adjustments

55. Plaintiff complains that Garrison relied on assumptions about the superior condition of dealer-owned comparable vehicles and the concomitantly higher values without actually or sufficiently inspecting them. However, as discussed, CCC does inspect many of the vehicles in its database. CCC finds that many of the vehicles it inspects are in *better* condition than it relies upon for valuation purposes, and it excludes from its database any inspected vehicles that are not at least in very good condition.[52]

56. Based on Dr. Kaufman's sample, uninspected vehicles on dealer lots tend to be similarly valuable on a controlled basis as the vehicles CCC inspects and knows to be in very good condition. CCC's assumption seems to be true that condition adjustments that are appropriate on average for the vehicles it inspects are also appropriate on average for the dealer-owned comparable vehicles that it does not inspect. Within an MVR, comparable vehicles are the same make, model and model year. CCC calculates an adjusted value for each comparable vehicle that controls for differences in trim, options, mileage. Thus, the primary cause for differences in adjusted value among the comparable vehicles within an MVR is condition. The other major causes for differences in value are controlled for: make, model, model year, age, mileage, trim and options. If inspected vehicles were in the same

---

[52] Gintvainis Deposition, pp. 39-41.

condition as uninspected vehicles within an MVR, the inspected vehicles within an MVR should have the same adjusted value as the uninspected vehicles. Consequently, the ratio of inspected vehicles' average value to the uninspected vehicle's average should be one. The actual ratio will vary from MVR to MVR based on the particular comparable vehicles in the MVR, but the average across MVRs should be approximately one if inspected dealer-owned comparable vehicles which CCC knows to be in at least very good condition and better than that on average tend to be in similar condition as uninspected dealer-owned vehicles which it assumes to be only very good on average.

57. I had my staff calculate this ratio for each MVR in Mr. Hausman-Cohen's data which included CCC-inspected comparable vehicles subject to a negative condition adjustment (the average adjusted value of CCC-inspected vehicles to the average adjusted value of other dealer-owned comparable vehicles).

58. To summarize, CCC does inspect many dealer-owned comparable vehicles including more than 6,000 of the comparable vehicles relevant to this litigation. CCC knows that all of the vehicles in its database that it has inspected are at least in very good condition. It also knows that some are in excellent condition, so the average condition of vehicles in its database that it has inspected is *better* than very good. Nearly 300 of the CCC valuations in this case are based exclusively on comparable vehicles that CCC inspected. Many more were based in part on vehicles that CCC had inspected. Based on Mr. Hausman-Cohen's data, the dealer-owned vehicles that CCC did not inspect were in similarly good condition as the vehicles that it did, i.e., better than very good on average.

### *List Price is an Upwardly Biased Estimate of Cash Value*

59. A further complication related to common proof of injury and damages is that CCC's valuation tool estimates asking prices rather than market values except in rare cases where sales data are used. Asking prices reflect sellers' aspirations rather than final market reality. Used car buyers usually pay less than asking prices. Moreover, the observed asking prices in the market at any given time will exceed the final asking prices that prevail prior to a sale. That is because sellers systematically mark down asking prices for their inventory if it does not sell. CCC's estimates will tend to overstate actual cash values because they are based on prevailing asking prices rather than final selling prices.

60. **Table 8** shows the average ratio of transaction price to asking price for used vehicles as reported by CNW Research from January 2012 to January 2015. As shown, the ratio varied over time. ██████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████Average monthly discounts off of asking price exceed many of the aggregate condition adjustments discussed above when expressed as a percentage of Adjusted Vehicle Value. Moreover, these are averages, suggesting that many discounts would be higher. As a result, even if the condition adjustments to comparable vehicle prices were excessive in any given valuation, the Adjusted Vehicle Value may still have exceeded the true cash value of the total-loss-vehicle due to the defendants basing settlements on asking prices rather than sales prices.

61. Markdowns to list prices are further evidence that observed list prices exceed final sales prices. The fact that dealers routinely markdown inventory that does not move means that at any point in time current list prices are greater than final list prices. On average final sale prices, i.e., fair market value or actual cash value, will be even less due to haggling. On rare occasions, dealers may revise their asking prices up, but it would be rarer still for a buyer to offer to pay more than list price for a used automobile. This would only be expected for a collectible vehicle with multiple competing bidders.

62. I analyzed Mr. Hausman-Cohen's database to identify markdowns and measure the degree to which observed list prices may overstate later list prices. There were many vehicles in Mr. Hausman-Cohen's comparable vehicle database that appear in multiple MVRs but

with different list prices. Some of these comparable vehicles may have been bought by an end-user and then sold back to the original dealer or some other dealer. In these cases, any change in list price may reflect depreciation. To exclude these vehicles for which price changes may have been due to depreciation, I limited my analysis to 198 vehicles that appeared in multiple MVRs and accumulated 100 miles or less in mileage between MVRs. As expected, the norm was for price to fall.

63. This markdown analysis may understate the degree to which observed list prices may overstate final list prices and fair market value. Some vehicles in Mr. Hausman-Cohen's database may have already been marked down before first appearing in an MVR relevant to this litigation. Other vehicles may have been marked down after last appearing in an MVR relevant to this litigation. The analysis described here may understate both the frequency and magnitude of markdowns by overlooking markdowns that occurred before or after vehicles appeared in Mr. Hausman-Cohen's database.

*Vehicle Valuation is Subjective and Intrinsically Imprecise*

64. Vehicle valuation is highly individualized. Vehicles vary in value due to differences in make, model, age, mileage, configuration, options and condition. Moreover, these various factors affect value interactively, and their interactive effect may vary over time and location. For all these reasons, there may be great variation in asking prices and values for seemingly similar vehicles that are on the market in the same general area at the same time. Under these circumstances, it would require highly detailed analysis to determine that relatively small systematic errors in the valuation process, such as Plaintiff alleges here, would result in underpayment of actual cash value.

65. To illustrate, consider the comparable vehicles that CCC identified in its final MVR for Ms. Fortson.[53] The comparable vehicles are all the same make, model, model year and age, yet they varied widely in asking prices. The highest asking price was $8,995 and the

---

[53] Garrison P&C 0000206.

lowest asking price was $5,450, a difference of $3,545 or 65% of the minimum asking price.

66. Much of the observed price variation is attributable to differences in mileage and options. CCC attempts to control for such differences by calculating an adjusted comparable value. Even after controlling for mileage and options, much price disparity remains. The highest adjusted comparable vehicle value on Ms. Fortson's final MVR was $7,705 and the lowest was $5,437. The difference is $2,268 or 42% of the minimum adjusted value.

67. Mileage and vehicle options offer further potential for subjective variance. The impact of mileage and options will vary over time, by location and interactively with other vehicle characteristics. For example, an additional 5,000 miles may have a different effect in 2016 on the value of a 2014 model-year, fully-optioned VW Golf in Greenville with 30,000 miles than it has in 2020 on the value of a 2020 model-year, base model Tesla S in Charlotte with 1,500 miles. Similarly, the presence or absence of specific options may affect the value of the hypothetical Golf and the hypothetical Tesla differently.

68. The markdown analysis discussed above also demonstrates that vehicle valuation is uncertain and imprecise. Most of the vehicles in that analysis were for sale by dealers— experts regarding their local vehicle markets who were financially motivated to price their inventory appropriately—yet there were nearly two hundred identifiable instances in Mr. Hausman-Cohen's database in which vehicles were originally mispriced. The intrinsic error in vehicle valuation means that it would require individualized analysis to determine whether a policyholder received less than actual cash value even if it were known that a particular valuation component, e.g., a condition adjustment, was unwarranted.

*Valuations Based on Comparable Vehicles and Guidebook Valuations Indicate the Absence of Injury*

69. North Carolina's Administrative Code references a methodology for insurers to use when policyholders dispute their valuation of loss vehicles. I am unaware of any evidence that

---

[54] This 10% figure is an average of the absolute values of the pricing errors. The 9% figure above is the average of the nominal values of the pricing errors; in calculating this average, overpricing and underpricing offset each other

any putative class members disagreed with the final valuation that Defendant relied upon for settlement purposes so as to trigger application of this section of the Code. Nevertheless, comparison of CCC's valuations to valuations derived by the Code's prescribed method for resolving disputes suggest that most settlements exceeded the amount required by law.

70. The current version of 11 N.C.A.C. 4.0418 stipulates that if an insurance company and claimant are unable to agree upon the actual cash value of the total loss vehicle, the settlement shall be based upon the published regional average values of substantially similar motor vehicles and the retail cost of at least two substantially similar motor vehicles in the local market area when available. The previous version of 11 N.C.A.C. 4.0418, effective up to October 2020, required such a settlement to be based on the local market price of at least one comparable vehicle, not two. As discussed below, depending upon how this Code is interpreted. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

71. Counsel for Defendant provided me with individual pdfs containing historical KBB and NADA (J.D. POWER) estimates for similar vehicles to Plaintiff's loss vehicle and the 178 loss vehicles in Plaintiff's sample as these data are not generally, readily available.[55] I understand that Defendant's counsel provided the CCC reports for each of these vehicles to KBB and J.D. POWER, and that KBB and J.D. Power generated the historical valuation estimates based on the loss incident date, location and vehicle mileage, equipment and options. The option selections available to the two companies differ. I further understand that all KBB historical estimates assume that the loss vehicle is in "excellent condition." NADA provides five historical estimates for each vehicle – three for trade-ins of varying condition, a "Clean Loan" value and "Clean Retail." "Clean Retail" is the only value among these which corresponds to the price at which a policyholder could acquire a similar vehicle as his or her loss vehicle, so that is the valuation I used in my analysis.

72. My analyses will tend to understate the frequency at which valuations based on the Code methodology would be less than CCC valuations. As discussed above, in CCC documents

---

[55] I understand that NADA is unable to provide estimates for vehicles that are 20 model years old or older, as are 5 of the loss vehicles in Plaintiff's sample.

and in Mr. Goebel's report, most cars in private use are not in Clean Retail condition.[56] Similarly, most of the comparable vehicles in the analysis below are dealer-owned. At deposition, Plaintiff's expert agreed that dealer owned vehicles are generally in better condition than total loss vehicles.[57] Therefore, both the guidebook values and the comparable vehicles' asking prices would need to be adjusted down for more accurate valuation.[58] Asking prices for the comparable vehicles would need to be adjusted down further to reflect fair market values because asking prices exceed transaction prices on average as discussed above. For these three reasons—the guidebooks are based on clean retail, the comparable vehicles are also on average in better condition than cars in private use and the comparable vehicles' asking prices will exceed fair market value on average, the analyses below are biased against the Defendant.

73. CCC valued Ms. Fortson's car at $6,690. The lowest asking price of a comparable vehicle in her valuation report was $5,450 before adjusting the comparable prices for mileage and options and $6,159 after.[59] Of course, the condition adjustment to dealer-owned comparable vehicles is either negative or zero, implying that the settlement was also higher than the lowest comparable vehicle's asking price if that price was further adjusted for condition too. At the time of her loss, the KBB suggested retail value for a car in excellent condition but otherwise similar vehicle to her loss-vehicle was $7,135.[60] The NADA estimate of the value of a similar vehicle in clean retail condition was $6,950.[61] The average of the lowest CCC comparable price (*before* adjusting for comparable vehicles' mileage and options) and the KBB price is $6,293 and the average of the lowest CCC comparable price and the NADA price is $6,200. Both averages are less than the value that Defendant relied upon for settlement purposes. Similarly, the average of the lowest CCC comparable price (*after* adjusting for comparable vehicles' mileage and

---

[56] Goebel Dec., pp. 48-50, 68-70.
[57] McCathern Deposition, pp. 210-211 and 222.
[58] See Berglund-Deposition, pp. 97-98, 105, 126, McCathern Deposition, pp. 221-223 and Goebel Dec., Paragraphs 8-11, 23-25, 46, 53 that it is appropriate to adjust for condition in the valuation process.
[59] Garrison P&C 0000206.
[60] Fortson-2004_Cadillac CTS_ KBB Report.pdf; Garrison P&C 0000206. The KBB estimated value is for a clean vehicle ready for resale and includes the base suggested retail value plus an adjustment for mileage.
[61] Fortson NADA Report.pdf. Ms. Fortson's total loss accident occurred on October 2, 2016, and I understand that the prior version of 11 N.C.A.C. 4.0418 requiring a settlement to be based upon published regional averages and the local market price of at least one comparable vehicle was in effect on that date.

options) and the KBB price is $6,647 and the average of the lowest CCC comparable price and the NADA price is $6,555. Both averages are also less than the value that Defendant relied upon for settlement purposes.

74. **Table 9** summarizes similar analysis for the CCC valuation reports in Dr. Kaufman's sample.[62] For each of the CCC valuation reports in Dr. Kaufman's sample, I show a) the lowest price for a CCC comparable vehicle before making any adjustments to asking prices, b) the lowest price for a CCC comparable vehicle after adjusting for differences among comparable vehicles in terms mileage and equipment but not condition, c) the KBB estimate of similar vehicles' value, d) the NADA estimate of similar vehicles' value, e) the unweighted average of the lowest comparable vehicle price *without* adjustments for mileage and options and the KBB estimate, f) the unweighted average of the lowest comparable vehicle price *with* adjustments and the KBB estimate, g) the unweighted average of the lowest comparable vehicle price *without* adjustments and the NADA estimate, h) the unweighted average of the lowest comparable vehicle price *with* adjustments and the NADA estimate, h) CCC's final valuation of the loss vehicle, and i) four indicators each identifying instances in which CCC's valuation exceeded one of the four respective averages (based either on unadjusted or adjusted comparable prices and either KBB or NADA valuations. The table shows that CCC's valuations often exceeded one or both averages regardless of whether the comparable vehicles' prices were adjusted for options and mileage.

75. **Table 10** summarizes some of the information from **Table 9**. **Table 10** shows by year and in total the percentage of sampled claims for which CCCs' final valuations was greater than each of the four potential averages. (As discussed above, there are different averages depending on whether or not the comparable vehicle prices are adjusted for mileage and options and whether the averages are based on NADA or KBB.) **Table 10** also shows the percentage of sampled claims for which CCC's valuation exceeded at least one of the local market comparable/guidebook averages. Depending on the year, 38% to 71% of the sampled claims that could be evaluated in this way were settled based on a valuation

---

[62] None of the claims in Dr. Kaufman's sample or Mr. Hausman-Cohen's database related to losses during or after October 2020 when the Code was revised to call for two local comparable vehicles rather than one.

exceeding one or more of the four averages. Across all years, 62% were settled based on valuations exceeding one or more of the averages.

76. **Table 9 and 10** are based on simple averages of comparable vehicle asking prices and guidebook prices. But North Carolina's Administrative Code does not explicitly prescribe simple unweighted averaging. Rather, the Code states that the settlement offer shall be based "not only on published regional average values of similar vehicles, but also on the value of the vehicle in the local market."[63] Consequently, in the event of a dispute, the insurance company or the policyholder could argue that a figure closer to the local comparable vehicle price was more relevant and thus should be weighted more heavily or vice versa. It would require consideration of the circumstances of the claim to disprove such an assertion. In **Tables 11a and 11b**, I show the percentages of sampled vehicles for which the CCC valuation exceeded the weighted average of guidebook and local market valuations using different weights for the guidebook and the local market vehicle. I allow for the guidebook to be weighted by 0%, 10%, 25%, 50%, 75%, 90% and 100%. Correspondingly, the weight applied to the local market comparable vehicle is 100% minus the weight applied to the guidebook valuation. Weighting both the guidebook and the local market vehicle by 50% corresponds to the unweighted average. I report alternative results depending on whether the local vehicle asking price is adjusted for differences from the loss vehicle in mileage, trim and options. When the local market vehicle was given 90% weight, 62% of the sampled claims that could be evaluated in this way were settled based on valuations exceeding the weighted average of local market vehicle asking price and a guidebook valuation and 64% of the claims exceeded the average after adjusting the local market comparable vehicle for mileage, trim and options.[64] The overwhelming majority of claims in Dr. Kaufman's sample were settled based on a value that could be justified based on an interpretation of the North Carolina

---

[63] 2019 11 N.C.A.C. 4.0418.

[64] None of the sampled claims involved a total loss that occurred during the period when North Carolina's Administrative Code prescribes the use of two local market vehicles. However, I also calculated the percentages of sampled vehicles for which the CCC valuation exceeded the weighted average of guidebook and local market valuations using the average of the two lowest-priced comparable vehicles rather than a single comparable vehicle. When the weighting for local market comparable vehicles varies from 50% to 100%, the percentage of sampled vehicles for the CCC value exceeds the local market / comparable vehicle average varies from 39.3% to 50.3%. See **Tables 12a and 12b**.

Secretariat Economists

Administrative Code's prescriptions regarding methodology to apply in the event of disagreement between an insurer and a policyholder.

## **CONCLUSIONS**

### *No Reliable, Manageable Method to Prove Injury or Measure Damages*

77. Mr. Hausman-Cohen tabulates and summarizes negative condition adjustments, contained within MVRs but neither he nor Dr. Kaufman claim these tabulations are damages estimates. Separately, Dr. Kaufman claims to have proven injury to all putative class members and to have identified a way to measure aggregate damages, but his opinion is based upon invalid logic and a baseless assertion about what economic loss means. By his definition, it does not matter to the determination of economic loss whether the challenged conduct improved the accuracy of valuations or whether Plaintiff and putative class members received or were offered all that Plaintiff says they were legally entitled to. According to Dr. Kaufman, negative condition adjustments are economic loss regardless of whether equally large or larger condition adjustments were economically warranted and regardless of whether Plaintiff and putative class members received or were offered 100% or more of actual cash value for their loss-vehicles. There is no basis in economics for these opinions. Reasonably, economic loss must have been caused by the alleged breach or misconduct, and it must leave the Plaintiff or putative class member with less than he or she was entitled to. With that in mind, Dr. Kaufman does not discuss economic loss let alone demonstrate that it can be proven or reliably measured on an individualized basis by common proof.

78. To my knowledge, the only way to prove economic loss to the Plaintiff or putative class member would be to appraise his or her total-loss-vehicle as of the time of loss, establish that the new appraised value is both higher and more reliable than the CCC valuation, and calculate how much higher the settlement would have been if it had been based on the new, appraised value. Such analysis is necessarily individualized. Any common method would necessarily rely on similar averages and assumptions as the Plaintiff complains about here. For example, modifying the CCC method to eliminate condition adjustments to comparable vehicles corresponds to an assumption that cars for sale on dealer lots are in the same condition as cars in use. The analysis above showing that dealer-owned vehicles in CCC's

Comparable Vehicle Database tend to be in better than very good condition refutes this assumption. Moreover, showing that this second methodology renders a more accurate estimate of the actual cash value of the comparable vehicles and consequently a more accurate estimate of the actual cash value of the loss-vehicle in any particular case would require consideration of the condition of the comparable vehicles, to see if the condition adjustment was warranted, and also an appraisal of the loss vehicle. Given that the class period extends back to 2015, the data may not exist today to conduct the analysis reliably for the entire putative class even on an individualized basis.

79. Dr. Kaufman has not demonstrated a method to prove economic injury or estimate damages even for a sample and by his own definition of economic loss.

### *No Manageable Way to Establish That Individual Condition Adjustments Were Improper*

80. Leaving aside the more relevant and more difficult question of whether the Plaintiff or any particular putative class member was undercompensated in light of the totality of his or her circumstances, it would require individualized proof to show that any particular condition adjustments were improper. The only way to establish that CCC misstated the effect of condition on a particular comparable vehicle's value would be to assess the condition of the comparable vehicle as of the time of the loss and evaluate the impact of condition on that car's value in light of the make, model, mileage, trim, and market conditions during the relevant time period in the relevant geographic area. Of course, this would be time-consuming to do now for many of the comparable vehicles at issue, and I am unaware of any common method to do so. Neither the Defendant nor the Plaintiff ever owned the comparable vehicles that CCC used in its valuations, so most or all of them are unavailable for inspection. Moreover, many, most or all of the comparable vehicles have endured wear since the total loss events, so an inspection today would be uninformative even if the comparable vehicles were available. It would be difficult and time consuming to determine whether any comparable vehicle's price should have been adjusted differently to account for its condition at the time of loss.

81. The loss-vehicles were wildly dissimilar from each other, varying dramatically in physical characteristics and value. There was analogous variation across comparable vehicles. It is this lack of similarity which fundamentally renders Plaintiff's claims incompatible with

common proof. If it were possible to show that some loss-vehicle or group of loss vehicles were undervalued, that would not mean that other dissimilar vehicles were also undervalued. Whether a putative class member received less than actual cash value depends on whether the comparable vehicles' conditions are measured properly and also whether all other aspects of value are measured properly too. Even to demonstrate that the condition adjustments were overstated on average, for a particular vehicle type, model year, and age at a given loss date, that would not mean that condition adjustments were also overstated on average for different vehicle types, model years, ages or at different loss dates. Of course, proving that condition adjustments were wrong on average for a given type, model year, vehicle age and loss date would not mean that the condition adjustments were economically unwarranted for the particular comparable vehicles in a particular valuation. Even if it were shown that condition adjustments to comparable vehicles in a given valuation were excessive, it would not follow that the policyholder received less than actual cash value. If the CCC methodology overestimated value prior to consideration of the comparable vehicles' condition, then there may be no loss. This could occur because of CCC's use of asking prices rather than transaction prices, or it could occur due to other factors such as understating the effects of mileage or age. Finally, it could occur due to random error in the valuation process. To my knowledge, the only way to show that the Plaintiff or any putative class member was injured would be to analyze the relevant loss-vehicle and comparable vehicles on an individualized basis.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on **September 30, 2021**

Jonathan Walker

Confidential – Subject to Protective Order

# Exhibit A



**JONATHAN L. WALKER**

**Office**

> Secretariat Economists LLC
> 101 Mission Street, Suite 1000
> San Francisco, CA  94105
> Direct:  (415) 975-3223
> Main Office:  (415) 975-5510
> Fax: (415) 281-9151
> jwalker@secretariat-intl.com

**Education**

> Ph.D., Economics, Massachusetts Institute of Technology
>
> A.B., Economics, University of California, Berkeley

**Fellowships, Honors and Awards**

> American Economic Association Doctoral Fellowship
>
> National Science Foundation Graduate Fellowship
>
> Honors in General Studies, University of California, Berkeley

**Fields of Concentration**

> Industrial Organization, Labor Economics

**Professional Experience**

> 2021 – Present:  Managing Director, Secretariat Economists LLC
>
> 2003 – 2021:  President, Economists Incorporated
>
> 2001 – 2002:  Principal, Economists Incorporated
>
> 1998 – 2000:  Senior Vice President, Economists Incorporated
>
> 1996 – 1998:  Vice President, Economists Incorporated



**Professional Experience (continued)**

      1990 – 1996:  Senior Economist, Economists Incorporated

      1988 – 1990:  Management Consultant, Monitor Company, Cambridge, Massachusetts

      1987 – 1988:  Visiting Research Fellow, Federal Reserve Bank of Boston, Boston, Massachusetts

      1987:  Teaching Assistant Massachusetts Institute of Technology

**Dissertation**

      *Essays on the Commercial Banking Industry*

**Publications**

      "The Franchise No Poach Liability Continuum," *Economists Ink*, Summer 2020

      "Discounting Lost Future Earnings," *Economists Ink*, Summer 2015 (with Erica Greulich)

      "DTB and the Use of Regression Analysis to Assess Market Definition and Competitive Effects," *Antitrust Law Section of the American Bar Association*, Economics Committee Newsletter, Spring 2011 (with Erica Greulich)

      "Preparing for Trial:  Expert Economic Testimony," *Antitrust Section of the American Bar Association 59th Spring Meeting*, Continuing Legal Education Written Materials, March 2011

      "The Single Entity Issue in American Needle and DTB," *Westlaw Journal Antitrust*, Volume 18, Issue 1, April 2010 (with Erica Greulich)

      "Event Studies, Toxic Stock and Non-Compete Provisions," *Economists Ink*, Fall 2005

      "Statistical Evidence and a Daubert Challenge in a Recent Discrimination Case," *Economists Ink*, Summer 2004



**Publications (continued)**

"Price Increases Attributable to Patent Infringement or Entry," *Economists Ink*, Spring 2004 (with Tessie Su)

"Ninth Circuit Expounds on Antitrust Injury," *Economists Ink*, Fall 2003

"The Deterrence Value of Punitive Damages," *Economists Ink*, Fall 2001 (with Laura Malowane)

"Recent Development in Bank Merger Competition Policy," *Banking Law Review*, Spring 1992 (with Bruce Snapp and David Balto)

"U.S. Bank Merger Competition Policy," *International Merger Law 16*, December 1991 (with Bruce Snapp)

"Not So Safe Harbor for Bank Mergers," *Economists Ink*, Winter 1991

**Panels**

*87th Annual Conference of the Western Economics Association International, "Sports Economics on Trial,"* June 30, 2012 – Symposium panelist

*American Bar Association Antitrust Section Annual Meetings, March 9, 2011* – Presentation concerning preparation for economic trial testimony

*American Law Institute – American Bar Association Course of Study, "Antitrust Law in the 21st Century," September 14-15, 2000* – Presentation concerning the economics of professional sports leagues

*American Bar Association Antitrust Section Annual Meetings, April 14, 1999* – Presentation concerning the economic foundations of antitrust law

*National Economists Club Educational Foundation, "What Effect Will Financial Restructuring Have On Banks?"* August 13, 1991 – Moderator

**Board Memberships**

Economists Incorporated 2001 – 2021

SF-Marin Food Bank 2012 – 2018, 2019 – present



**Expert Reports and Testimony**

*Jeff Olberg, et al. v. Allstate Insurance Co. et al.* – Declaration and deposition testimony in support of defendants' opposition to class certification

*Lynnett Myers, et al. v. Marietta Health Care Inc., et al.* – Declaration on behalf of defendants concerning statistical analysis, expert report, rebuttal report and deposition testimony regarding class damages

*Ameenjohn Stanikzy v. Progressive Direct Insurance Co.* – Expert report in support of defendant's opposition to class certification

*Gina Signor v. Safeco Insurance Company of Illinois* – Declaration and deposition testimony in support of defendant's opposition to class certification

*In Re Ellis* – Damages reports (2) on behalf of respondent in arbitration concerning alleged breach of contract, defamation and false light

*Audrey Heredia et al. v. Sunrise Senior Living, LLC and Sunrise Senior Living Management, Inc.* – Declaration and deposition testimony in support of defendants' opposition to class certification

*William South v. Progressive Select Insurance Co.* – Declaration and deposition testimony in support of defendant's opposition to class certification

*Cameron Lundquist et al. v. First National Insurance Company of America, et al.* – Declaration and deposition testimony in support of defendants' opposition to class certification

*Linus Gilbert and James Jn-Marie v. Spartan Concrete Products, LLC and Heavy Materials, LLC* – Declarations (2) in support of defendants' opposition to class certification

*Jeremy Richardson and Mandy Larson v. Progressive American Insurance Co., et al.* - Declaration in support of defendants' opposition to class certification

*North American Soccer League, LLC v. United States Soccer Federation, Inc. and Major League Soccer, LLC* – Expert report and deposition testimony on behalf of Major League Soccer, LLC concerning antitrust liability



**Expert Reports and Testimony (continued)**

*The Kroger Co., Safeway Inc., et al. v. United Egg Producers, Inc., et al.* – Trial testimony on behalf of defendants concerning antitrust liability

*Rachel Curtis v. Progressive Northern Insurance Company* – Expert report on behalf of defendant concerning class certification and damages

*E & J Gallo Winery v. Strategic Materials, Inc.* – Expert reports (3), declaration and deposition testimony (2) on behalf of defendant and counterclaim plaintiff regarding contract damages

*Erin Kis et al. v. Covelli Enterprises, Inc.* – Declaration, expert report and deposition testimony on behalf of defendant regarding liability

*In Re: Daniel Fegan* – Arbitration testimony on behalf of claimant concerning contract damages

*In Re:  Processed Egg Products Litigation* – Expert reports (4), class decertification declaration, hearing testimony, deposition testimony and class action trial testimony on behalf of defendants concerning antitrust damages and liability

*Anne Roty and Mary Neff v. Battelle Memorial Institute, et al.* – Expert report on behalf of defendants concerning statistics

*Bobby Jones et al. v. Progressive Direct Insurance Co. et al.* – Expert report and declaration on behalf of defendant concerning class certification and damages

*In Re: Aaron Slator* – Export report and arbitration testimony on behalf of respondent concerning contract damages

*All-South Subcontractors, Inc. v. Sunbelt Rentals, Inc.* – Expert report on behalf of defendant concerning class certification

*Federal Deposit Insurance Corporation v. PricewaterhouseCoopers LLP and Crowe Horwath LLP* – Expert report and deposition testimony on behalf of plaintiffs concerning damages

*Precision Spine, Inc. and Spinal USA, Inc. v. Zavation, LLC et al.* – Expert report and deposition testimony on behalf of plaintiffs concerning damages



**Expert Reports and Testimony (continued)**

*Chicago Teachers Union et al. v. Board of Education of the City of Chicago et al. (Case No. 12-C-10311)* – Expert reports (3), declaration and deposition testimony on behalf of plaintiffs concerning liability

*Chicago Teachers Union et al. v. Board of Education of the City of Chicago et al. (Case No. 12-C-10338)* – Expert reports (2) and deposition testimony on behalf of plaintiffs concerning liability

*Charles Ridgeway, et al. v. Wal-Mart Stores, Inc.* – Expert report, trial and deposition testimony on behalf of defendant concerning class injury and damages

*Daniel Villalpando, et al. v. Exel Direct Inc., et al.* – Expert report and deposition testimony on behalf of defendants concerning class damages

*United States* ex rel. *Landis v. Tailwind Sports Corp., et al.* – Expert report, declaration and deposition testimony of behalf of plaintiff concerning damages

*The West Virginia Investment Management Board et al. v. The Variable Annuity Life Insurance Company* – Expert report and deposition testimony on behalf of defendant concerning damages

*In Re: Taco Bell Wage and Hour Actions* – Expert reports (2), deposition and trial testimony on behalf of defendant concerning liability and remedies

*Peter Sripramot v. Nor Cal Freight Mgmt., Inc., et al.* – Expert report on behalf of defendant concerning damages

*Moroccanoil Inc., v. Marc Anthony Cosmetics, Inc., et al.* – Expert report and deposition testimony on behalf of plaintiff concerning trademark infringement remedies

*Isidro Baricuatro, Jr., et al. v. Industrial Personnel and Management Services, Inc., et al.* – Expert report and deposition testimony on behalf of defendants concerning Fair Labor Standards Act and contract damages

*Ameira Watters v. General Motors LLC, et al.* – Expert report on behalf of defendants concerning damages



**Expert Reports and Testimony (continued)**

*Louis Cimaglia v. Royal Pontiac Buick GMC Inc., et al.* – Expert report on behalf of defendants concerning damages

*Harris County, Texas et al. v. International Paper Company, et al.* – Expert report and deposition testimony on behalf of defendants concerning punitive damages

*United States v. Bank of America Corp. et al.* – Expert report and deposition testimony on behalf of defendants concerning financial harm

*Diane Zwarg v. BB&T Insurance Services of California, Inc., et al.* – Trial and deposition testimony on behalf of defendants concerning damages

*Ritchie Risk – Linked Strategies Trading (Ireland), Ltd., et al. v. Coventry First LLC, et al.* – Expert report and deposition testimony on behalf of defendants concerning economic loss

*In Re: BDO Seidman* – Expert report and deposition testimony on behalf of defendant concerning damages from alleged breach of professional responsibility

*U.S. SEC v. Ralph Cioffi* – Deposition testimony on behalf of defendant concerning hedge fund operations

*Ultra Internet Media, S.A., et al. v. Caesars License Company, LLC et al.* – Expert report on behalf of defendants concerning damages

*Lauren Knowles v. Kelly Buick, Inc., et al.* – Expert report on behalf of defendants concerning economic loss

*Kenneth D. Klaas, et al. v. Vestin Mortgage Inc., et al.* – Expert reports (2) on behalf of defendants concerning contract damages

*Tyr Sport, Inc. v. Warnaco Swimwear, Inc., United States Swimming, Inc., et al.* – Expert report on behalf of defendants concerning antitrust liability

*United States of America v. Ralph Cioffi and Matthew Tannin* – Testimony at criminal trial on behalf of defendants concerning hedge fund operations



**Expert Reports and Testimony (continued)**

*Charles M. Felton et al. v. Vestin Realty Mortgage II, et al.* – Deposition testimony and testimony at a bench trial on behalf of defendants concerning contract damages

*National Union Fire Insurance Co. of Pittsburgh, PA v. Puget Plastics Corporation et al.* – Deposition testimony and testimony at a bench trial on behalf of plaintiff concerning lost profits and diminution in business value

*Deutscher Tennis Bund, et al. v. ATP Tour Inc.* – Expert reports (2), deposition testimony and testimony at a jury trial on behalf of defendant concerning antitrust liability

*John Johnson, et al. v. Big Lots Stores, Inc.* – Expert reports (2), declarations (2), deposition testimony, and testimony at a bench trial on behalf of defendant concerning alleged violation of Fair Labor Standards Act.

*MGP Ingredients, Inc. v. Mars, Inc. and S&M NuTec, LLC* – Expert report and deposition testimony on behalf of defendant concerning damages

*In Re: H Street Building Corporation* – Deposition testimony on behalf of defendant concerning damages

*In Re: The National Benevolent Association of the Christian Church (Disciples of Christ), et al.* – Expert report, rebuttal report and deposition testimony on behalf of plaintiff concerning damages

*Chemical Overseas Holdings Inc., et al. v. Republica Oriental Del Uruguay, et al.* – Expert report, supplemental report and arbitration testimony on behalf of respondents concerning damages

*In Re: Lockheed Meridian, MS Shooting Incident* – Expert reports (3) and deposition testimony on behalf of defendant concerning damages

*John D. Wee v. Charles Schwab & Co., Inc.* – Arbitration testimony on behalf of plaintiff concerning damages

*In Re: Robin Singh d/b/a Test Masters* – Expert reports (2), declaration and deposition testimony on behalf of plaintiff concerning damages



**Expert Reports and Testimony (continued)**

*Patrick J. Cunningham and Anton N. Zanki v. International Business Machines Corporation* – Expert report, rebuttal report and deposition testimony on behalf of defendant concerning alleged breach of contract

*Mark Hodges, et al. v. Greater Canton Ford Mercury, Inc., et al.* – Expert report on behalf of defendant concerning punitive damages

*In Re: Frank T. Vega* – Declaration on behalf of defendant concerning damages

*Martin Leach v. Ford Motor Co.* – Expert report on behalf of defendant concerning the corporate officer labor market in a breach of contract suit

*Westways World Travel, Inc. and Sundance Travel Service v. AMR Corp., et al.* – Expert report and deposition testimony on behalf of defendants concerning compensatory damages

*Traci A. Savage v. Ford Motor Co.* – Expert report on behalf of defendant concerning the economics of punitive damages

*Randy Eugene Wheeler v. Ford Motor Co.* – Deposition testimony on behalf of defendant concerning lost NFL earnings and other alleged damages

*David Braswell v. Holley Performance Products Inc.* – Expert report and rebuttal on behalf of defendant concerning antitrust liability and antitrust damages

*Ertha Mae Williams v. CSX Transportation Inc., et al.* – Deposition testimony on behalf of defendants concerning the economics of punitive damages

*R. Straman Co. and Newport Convertible Engineering, Inc. v. Volkswagen of America, et al.* – Deposition testimony on behalf of defendants concerning antitrust liability and antitrust injury

*Roll International Corporation and Paramount Farms, Inc. v. Unilever United States, Inc. and Conopco, Inc.* – Testimony at jury trial on behalf of defendants regarding compensatory damages for alleged breach of contract and false promise

_____

**Curriculum Vitæ**
**Jonathan L. Walker**
**pg. 9**



**Expert Reports and Testimony (continued)**

*Newhall Land and Farming Co. v. Kerr McGee Operating Corporation, et al.* – Deposition testimony on behalf of defendants concerning the economics of punitive damages

*Marcia Spielholz, et al. v. Los Angeles Cellular Telephone Company, et al.* – Expert report on behalf of defendants concerning remedies in a class action false advertising suit

*David N. Orrik v. Stryker Corporation, et al.* - Deposition testimony on behalf of defendants concerning the economics of punitive damages

*Agneta Karlsson, et al. v. Michael A. Savage* – Deposition testimony on behalf of defendants concerning the economics of punitive damages and product liability

*Homestore, Inc. v. America Online* – Expert report and arbitration testimony on behalf of respondent concerning damages from breach of contract

*Michael Meitus, et al. v. Dain Rauscher Wessels, Dain Rauscher Corporation and Dain Rauscher Inc.* – Arbitration testimony on behalf of claimants concerning the competitive structure of the securities industry and other economic matters

*In Re: 1994 Exxon Chemical Plant Fire* – Expert report on behalf of defendant concerning the economics of punitive damages

*Avis Buchanan, et al v. Consolidated Stores Corp.* – Declaration and deposition testimony on behalf of defendant concerning statistical and other economic analyses in a class action public accommodations suit

*State of Alabama v. Exxon Corporation* – Affidavit and testimony at post- trial hearing on behalf of defendant concerning the economics of punitive damages

*Aspen Knolls Corp., et al v. McDermott Will & Emery* – Expert report on behalf of defendant concerning damages in a legal malpractice suit

*Legi-Slate Inc. v. Thomson Information Services Inc.* – Expert reports (2) and deposition testimony on behalf of plaintiff concerning damages from breach of contract



**Expert Reports and Testimony (continued)**

*United States of America ex rel., William I. Koch and William A. Presley v. Koch Industries, Inc., et al.* – Expert report, deposition testimony and testimony at jury trial on behalf of defendants concerning economic issues in a False Claims Act suit

*Ronald O. Lewis v. Booz-Allen & Hamilton Inc.* – Expert reports (4) and deposition testimony on behalf of plaintiff regarding statistics and damages in an employment discrimination suit

*Richard Rogers Mason v. Ford Motor Company* – Expert report and deposition testimony on behalf of defendant regarding liability in a product liability suit

*Dr. Michael J. Galvin v. The New York Racing Association, Inc., et al.* – Expert report and declaration on behalf of defendant regarding commercial damages in breach of due process and tortious interference suit

*Roll International Corporation and Paramount Farms, Inc. v. Unilever United States, Inc., et al.* – Deposition and bench trial testimony on behalf of defendants regarding business valuation and damages in a breach of contract and fraudulent misrepresentation suit

*Yvonne Trout, et al. v. John Dalton, et al.* – Affidavit and declaration on behalf of the United States concerning prejudgment interest

*Willie Brown Jr., et al. v. General Motors Corporation* – Testimony at deposition and jury trial concerning lost NFL player earnings

*Royer Homes of Mississippi, Inc., et al. v. Redman Homes, Inc., et al.* – Affidavits (2), expert reports (2) and deposition testimony on behalf of defendants concerning antitrust liability and damages

*W. C. and A. N. Miller Companies v. United States of America* – Expert report and deposition testimony on behalf of defendant concerning commercial damages in a Federal Tort Claims Act suit

*SMS Systems Maintenance Services, Inc. v. Digital Equipment Corporation* – Expert report and deposition testimony on behalf of defendant concerning antitrust damages and liability



**Expert Reports and Testimony (continued)**

*Francis W. Murray and FWM Corporation v. National Football League, et al.* – Expert report and deposition testimony on behalf of defendants regarding market definition, alleged anticompetitive conduct and alleged antitrust injury

*Michael A. Willner v. Dow Jones & Company, Inc., et al.* – Deposition testimony on behalf of defendants regarding damages in a breach of contract and unfair dealing suit

*Dream Team Collectibles, Inc. v. NBA Properties, Inc.* – Expert reports (2) and deposition testimony on behalf of NBA Properties regarding damages and other economic issues in a trademark infringement suit and counter suit

*Breezevale Limited v. Timothy L. Dickinson, et al.* – Deposition and jury trial testimony on behalf of defendants regarding commercial damages in a legal malpractice suit

*Sonja Lumpkin v. Citizens Bank of Maryland, Incorporated* – Affidavit on behalf of defendant regarding damages in a wrongful termination suit

*Carolee Brady Hartman, et al. v. Joseph Duffey* – Declarations (7) and live testimony at four Teamsters Hearings on behalf of the defendant, the United States Government, regarding damage estimation in a class action sex discrimination suit

*Robert B. Reich v. Charles I. Brown, Peter M. Mazula, and Ronald F. Nuzman* – Affidavit and deposition testimony for the United States Department of Labor regarding alleged breach of fiduciary responsibility under ERISA

*United Farmers Agents Association, Inc. v. Farmers Insurance Exchange, et al. and Thomas J. Vinson, et al. v Farmers Insurance Exchange, et al.* – Affidavit and deposition testimony for plaintiffs regarding antitrust liability

*Anthony Brown, et al. v. Pro Football, Inc.* – Testimony for defendants, the member clubs of the NFL, at jury trial regarding antitrust damages

*Robert E. Connor, et al. v. Harris County, et al.* – Deposition testimony and a written declaration for plaintiffs, members of a class of job applicants, regarding a cost defense for allegedly discriminatory employment practices



**Expert Reports and Testimony (continued)**

> *Laura Kelber against Forest Electric Corp. and Forest Datacom* – Affidavit in opposition to defendants' motion for summary judgement in a sex discrimination suit

**Selected Consulting Matters**

> *Ernst & Young/ KPMG* – Antitrust consulting regarding potential consolidation

> *NASCAR Souvenirs* – Consulting for defendants concerning class certification in an antitrust matter

> *First Databank* – Antitrust consulting regarding acquisition of Medi-Span Inc.

> *Metal Supermarkets* – Consulting for plaintiff regarding commercial damages arising from legal malpractice

> *Vulcan* – Antitrust consulting regarding the acquisition of an Atlanta quarry
> *Brodus v. Children's National Medical Center* – Consulting regarding damages in a wrongful termination suit

> *International Paper* – Antitrust consulting regarding photographic paper and other photographic material

> *St. Louis Convention and Visitors Commission v. National Football League, et al.* – Antitrust consulting regarding franchise relocation

> *The Baltimore City Paper* – Consulting regarding commercial damages allegedly arising from libel

> *Allied Domecq* – Consulting for liquor supplier regarding terminated dealer's lost profits

> *National Football League* – Consulting regarding trademark and antitrust issues in suits between the Dallas Cowboys and its affiliates and the NFL

> *IndyCar Racing* – Antitrust consulting

> *Albertson's* – Antitrust consulting for potential plaintiff in a price-fixing matter

Secretariat Economists

**Selected Consulting Matters (continued)**

*New Orleans Hospitals* – Antitrust consulting regarding joint venture among New Orleans hospitals

*General Dynamics* – Consulting for plaintiff regarding damages in commercial litigation

*Telecom Technical Services, et al. v. ROLM* – Consulting for plaintiffs in antitrust litigation

*The Boston Herald* – Consulting regarding damages allegedly caused by publication of a news story

*Automotive Dismantlers and Recyclers Association v. ADP Claims Solutions Group, Inc.* – Antitrust consulting regarding used automobile parts databases

*Mercy/St. Vincent* – Consulting regarding the merger of two hospital systems in Toledo, Ohio

*Kalium/IMC* – Consulting regarding the merger of Kalium and IMC

*Agricultural Chemicals Antitrust Litigation* – Antitrust consulting for defendants, Zeneca Corp., Helena Corp. and Terra Corp. in an RPM class action suit

*The Clorox Company v. Sterling Winthrop, Inc., et al.* – Antitrust consulting for plaintiffs in litigation alleging misuse of trademark protections for anticompetitive gain

*Chittenden Corporation* – Antitrust consulting regarding a bank holding company's acquisition plans

*National Basketball Association* – Damage estimation for the NBA in antitrust suit brought against it by Independent Entertainment Group Incorporated

*Magic Line Inc.* – Merger of ATM networks

*Home Shopping Network* – Ex-post valuation of contingent contract concerning software and consulting services

**Selected Consulting Matters (continued)**

*Lenfest Group, Comcast Corporation and Telecommunications Incorporated* – Consultation regarding Delaware Public Service Commission rules to implement the Telecommunications Technology Investment Act

*Worthen Financial Corporation* – Acquisition of Union National Bank of Arkansas

*Intrust Bank* – Merger with Kansas State Bank & Trust

*Iowa National Bankshares* – Merger with MidAmerica Savings Banks

*First National Bank of Kerrville* – Acquisition of Bank of Kerrville

*Peoples Heritage Financial Group* – Acquisitions of Mid Maine Savings Bank, Bank of New Hampshire, CFX, and certain branches of Fleet Bank of Maine

*Potash Antitrust Litigation* – Antitrust consulting for defendants in a class action suit alleging price fixing in the potash industry

*R&D Business Systems, et al. v. Xerox Corporation* – Antitrust consulting for plaintiffs in a class action suit alleging tying and monopolization in the copier and printer industries

*Society Corp.* – Acquisition of Ameritrust

*VDDE Holm, Voest Alpina, Bohler* – Antitrust consulting in connection with the merger of two European steel manufacturers

*McNeil, et al. v. NFL* – Estimation of damages resulting from player reservation system

*U.S Department of Justice v. City of Alhambra, California* – Analysis of evidence of discriminatory hiring practice

*Christiana Mortgage Brokers, et al. v. Delaware Trust, et al.* – Estimation of damages resulting from tortious interference in the mortgage brokerage industry in New Castle County, Delaware



**Selected Consulting Matters (continued)**

> *Merger of Two Savings and Loan Assns.* – Antitrust consulting in connection with the merger of two thrift institutions
>
> *Mid Atlantic Coca-Cola* – Analysis of evidence of price fixing and estimation of resulting damages

**Professional Societies**

> American Economic Association
>
> American Bar Association
>
> Industrial Organization Society
>
> Western Economics Association
>
> American Law and Economics Association
>
> Society of Labor Economics

# Exhibit B

**MATERIALS CONSIDERED**

**Category**

**Bates-Stamped Documents**
CCCIS000032.pdf
CCCIS000301.pdf
CCCIS000417.pdf
CCCIS001059.pdf
CCCIS003921.pdf
CCCIS004286.pdf
CCCIS004505.pdf
CCCIS005124.pdf
CCCIS005167.pdf
CCCIS005278.pdf
CCCIS006093.pdf
CCCIS008609.pdf
CCCIS008852.pdf
CCCIS009032.pdf
CCCIS012806.pdf
CCCIS012968.pdf
CCCIS013555.pdf
CCCIS013687.pdf
CCCIS015542.pdf
CCCIS015613.pdf
CCCIS015868.pdf
CCCIS016029.pdf
CCCIS019238.pdf
CCCIS019457.pdf
CCCIS021010.pdf
CCCIS021232.pdf
CCCIS021364.pdf
CCCIS021734.pdf
CCCIS022171.pdf
CCCIS022276.pdf
CCCIS022315.pdf
CCCIS022346.pdf
CCCIS023970.pdf
CCCIS027199.pdf
CCCIS027746.pdf
CCCIS028003.pdf
CCCIS028460.pdf
CCCIS029822.pdf
CCCIS032467.pdf
CCCIS033069.pdf
CCCIS035454.pdf
CCCIS035651.pdf
CCCIS036070.pdf
CCCIS036611.pdf
CCCIS036883.pdf
CCCIS037025.pdf
CCCIS037539.pdf
CCCIS037960.pdf
CCCIS038347.pdf
CCCIS038542.pdf

DJA1331

CCCIS039956.pdf
CCCIS040818.pdf
CCCIS041347.pdf
CCCIS044107.pdf
CCCIS044778.pdf
CCCIS044872.pdf
CCCIS045801.pdf
CCCIS046246.pdf
CCCIS046442.pdf
CCCIS047001.pdf
CCCIS048192.pdf
CCCIS048913.pdf
CCCIS050191.pdf
CCCIS050456.pdf
CCCIS051123.pdf
CCCIS052180.pdf
CCCIS055195.pdf
CCCIS057682.pdf
CCCIS058815.pdf
CCCIS060804.pdf
CCCIS061939.pdf
CCCIS062431.pdf
CCCIS062775.pdf
CCCIS062987.pdf
CCCIS063261.pdf
CCCIS063434.pdf
CCCIS064299.pdf
CCCIS064347.pdf
CCCIS065658.pdf
CCCIS067081.pdf
CCCIS069117.pdf
CCCIS069244.pdf
CCCIS069736.pdf
CCCIS069991.pdf
CCCIS070204.pdf
CCCIS070762.pdf
CCCIS070862.pdf
CCCIS071145.pdf
CCCIS071667.pdf
CCCIS072768.pdf
CCCIS073964.pdf
CCCIS074295.pdf
CCCIS075136.pdf
CCCIS076140.pdf
CCCIS076269.pdf
CCCIS076483.pdf
CCCIS076544.pdf
CCCIS076599.pdf
CCCIS076844.pdf
CCCIS076860.pdf
CCCIS076877.pdf
CCCIS077102.pdf
CCCIS077285.pdf
CCCIS078177.pdf
CCCIS078798.pdf

CCCIS078811.pdf
CCCIS080095.pdf
CCCIS080788.pdf
CCCIS083069.pdf
CCCIS083781.pdf
CCCIS084600.pdf
CCCIS084889.pdf
CCCIS085102.pdf
CCCIS085308.pdf
CCCIS085905.pdf
CCCIS085950.pdf
CCCIS086492.pdf
CCCIS088077.pdf
CCCIS091227.pdf
CCCIS091440.pdf
CCCIS091913.pdf
CCCIS092006.pdf
CCCIS093464.pdf
CCCIS094397.pdf
CCCIS095029.pdf
CCCIS095218.pdf
CCCIS095742.pdf
CCCIS095817.pdf
CCCIS096124.pdf
CCCIS096538.pdf
CCCIS096662.pdf
CCCIS096944.pdf
CCCIS097874.pdf
CCCIS098911.pdf
CCCIS099149.pdf
CCCIS099576.pdf
CCCIS099610.pdf
CCCIS101749.pdf
CCCIS102579.pdf
CCCIS102796.pdf
CCCIS102841.pdf
CCCIS105456.pdf
CCCIS106633.pdf
CCCIS107681.pdf
CCCIS108006.pdf
CCCIS109366-109385.pdf
CTRL00006389.pdf
CTRL00006589.pdf
CTRL00006595.pdf
CTRL00006603.pdf
CTRL00006609.pdf
CTRL00006661.pdf
CTRL00006837.pdf
CTRL00006879.pdf
CTRL00006954.pdf
CTRL00007083.pdf
CTRL00007237.pdf
CTRL00007286.pdf
CTRL00007489.pdf
CTRL00007580.pdf

CTRL00007604.pdf
CTRL00007854.pdf
CTRL00007951.pdf
CTRL00008026.pdf
CTRL00008204.pdf
CTRL00008266.pdf
CTRL00008379.pdf
CTRL00008643.pdf
CTRL00009035.pdf
CTRL00009098.pdf
CTRL00009120.pdf
CTRL00009137.pdf
CTRL00009342.pdf
Garrison P&C 0000001 - Garrison P&C 0000411
Garrison P&C 0002504.xlsx
Garrison P&C 00025453 - Garrison P&C 00025556
Garrison P&C 00025557 - Garrison P&C 00025695
Garrison P&C 00025696 - Garrison P&C 00025805
Garrison P&C 00025806 - Garrison P&C 00025909
Garrison P&C 00025910 - Garrison P&C 00026031
Garrison P&C 00026032 - Garrison P&C 00026151
Garrison P&C 00026152 - Garrison P&C 00026372
Garrison P&C 00026373 - Garrison P&C 00026561
Garrison P&C 00026562 - Garrison P&C 00026630
Garrison P&C 00026631 - Garrison P&C 00026714
Garrison P&C 00026715 - Garrison P&C 00026822
Garrison P&C 00026823
Garrison P&C 00026829 - Garrison P&C 00027150
Garrison P&C 00027151 - Garrison P&C 00027171
Garrison P&C 00027172 - Garrison P&C 00027284
Garrison P&C 00027285 - Garrison P&C 00027359
Garrison P&C 00027360 - Garrison P&C 00027518
Garrison P&C 00027519 - Garrison P&C 00027690
Garrison P&C 00027691 - Garrison P&C 00027778
Garrison P&C 00027779 - Garrison P&C 00027821
Garrison P&C 00027822 - Garrison P&C 00027932
Garrison P&C 00027933 - Garrison P&C 00028006
Garrison P&C 00028007 - Garrison P&C 00028269
Garrison P&C 00028270 - Garrison P&C 00028420
Garrison P&C 00028421 - Garrison P&C 00028560
Garrison P&C 00028561 - Garrison P&C 00028631
Garrison P&C 00028632 - Garrison P&C 00028714
Garrison P&C 00028715 - Garrison P&C 00028872
Garrison P&C 00028873 - Garrison P&C 00028974
Garrison P&C 00028975 - Garrison P&C 00029122
Garrison P&C 00029123 - Garrison P&C 00029251
Garrison P&C 00029252 - Garrison P&C 00029408
Garrison P&C 00029409 - Garrison P&C 00029778
Garrison P&C 00029780 - Garrison P&C 00029920
Garrison P&C 00029921 - Garrison P&C 00030160
Garrison P&C 00030161 - Garrison P&C 00030469
Garrison P&C 00030470 - Garrison P&C 00030598
Garrison P&C 00030599 - Garrison P&C 00030789
Garrison P&C 00030790 - Garrison P&C 00030895
Garrison P&C 00030896 - Garrison P&C 00030998

Garrison P&C 00030999  - Garrison P&C 00031096
Garrison P&C 00031097 - Garrison P&C 00031310
Garrison P&C 00031311 - Garrison P&C 00031380
Garrison P&C 00031381 - Garrison P&C 00031448
Garrison P&C 00031449 -Garrison P&C 00031541
Garrison P&C 00031542 - Garrison P&C 00031654
Garrison P&C 00031655 - Garrison P&C 00031808
Garrison P&C 00031809 - Garrison P&C 00031903
Garrison P&C 00031904 - Garrison P&C 00032146
Garrison P&C 00032147 - Garrison P&C 00032224
Garrison P&C 00032225 - Garrison P&C 00032304
Garrison P&C 00032305 - Garrison P&C 00032379
Garrison P&C 00032380 - Garrison P&C 00032607
Garrison P&C 00032608 - Garrison P&C 00032715
Garrison P&C 00032716 - Garrison P&C 00032864
Garrison P&C 00032865 - Garrison P&C 00032923
Garrison P&C 00032924 - Garrison P&C 00032961
Garrison P&C 00032962 - Garrison P&C 00033015
Garrison P&C 00033016 - Garrison P&C 00033080
Garrison P&C 00033081 - Garrison P&C 00033264
Garrison P&C 00033265 - Garrison P&C 00033366
Garrison P&C 00033367 - Garrison P&C 00033494
Garrison P&C 00033495 - Garrison P&C 00033568
Garrison P&C 00033569 - Garrison P&C 00033758
Garrison P&C 00033759 - Garrison P&C 00033836
Garrison P&C 00033837 - Garrison P&C 00033980
Garrison P&C 00033981 - Garrison P&C 00034192
Garrison P&C 00034193 - Garrison P&C 00034344
Garrison P&C 00034345 - Garrison P&C 00034448
Garrison P&C 00034449 - Garrison P&C 00034751
Garrison P&C 00034752 - Garrison P&C 00034807
Garrison P&C 00034808 - Garrison P&C 00034919
Garrison P&C 00034920 - Garrison P&C 00034994
Garrison P&C 00034995 - Garrison P&C 00035186
Garrison P&C 00035187 - Garrison P&C 00035333
Garrison P&C 00035334 - Garrison P&C 00035462
Garrison P&C 00035463 - Garrison P&C 00035543
Garrison P&C 00035544 - Garrison P&C 00035711
Garrison P&C 00035712 - Garrison P&C 00035787
Garrison P&C 00035788 - Garrison P&C 00035916
Garrison P&C 00035917 - Garrison P&C 00035976
Garrison P&C 00035977 - Garrison P&C 00036184
Garrison P&C 00036185 - Garrison P&C 00036261
Garrison P&C 00036262 - Garrison P&C 00036364
Garrison P&C 00036365 - Garrison P&C 00036503
Garrison P&C 00036504 - Garrison P&C 00036891
Garrison P&C 00036892 - Garrison P&C 00037035
Garrison P&C 00037036 - Garrison P&C 00037130
Garrison P&C 00037131 - Garrison P&C 00037237
Garrison P&C 00037238 - Garrison P&C 00037379
Garrison P&C 00037380 - Garrison P&C 00037464
Garrison P&C 00037465 - Garrison P&C 00037577
Garrison P&C 00037578 - Garrison P&C 00037743
Garrison P&C 00037744 - Garrison P&C 00037910
Garrison P&C 00037911 - Garrison P&C 00037955

Garrison P&C 00037956 - Garrison P&C 00038153
Garrison P&C 00038154 - Garrison P&C 00038280
Garrison P&C 00038281 - Garrison P&C 00038370
Garrison P&C 00038371 - Garrison P&C 00038546
Garrison P&C 00038547 - Garrison P&C 00038643
Garrison P&C 00038644 - Garrison P&C 00038733
Garrison P&C 00038734 - Garrison P&C 00038854
Garrison P&C 00038855 - Garrison P&C 00039026
Garrison P&C 00039027 - Garrison P&C 00039124
Garrison P&C 00039125 - Garrison P&C 00039237
Garrison P&C 00039238 - Garrison P&C 00039353
Garrison P&C 00039354 - Garrison P&C 00039519
Garrison P&C 00039520 - Garrison P&C 00039712
Garrison P&C 00039713 - Garrison P&C 00039885
Garrison P&C 00039886 - Garrison P&C 00039962
Garrison P&C 00039963 - Garrison P&C 00040092
Garrison P&C 00040093 - Garrison P&C 00040247
Garrison P&C 00040248 - Garrison P&C 00040622
Garrison P&C 00040623 - Garrison P&C 00040728
Garrison P&C 00040729 - Garrison P&C 00040801
Garrison P&C 00040802 - Garrison P&C 00040901
Garrison P&C 00040902 - Garrison P&C 00040999
Garrison P&C 00041000 - Garrison P&C 00041209
Garrison P&C 00041210 - Garrison P&C 00041354
Garrison P&C 00041355 - Garrison P&C 00041687
Garrison P&C 00041688 - Garrison P&C 00041882
Garrison P&C 00041883 - Garrison P&C 00041913
Garrison P&C 00041915 - Garrison P&C 00042529
Garrison P&C 00042530 - Garrison P&C 00042634
Garrison P&C 00042635 - Garrison P&C 00043166
Garrison P&C 00043167 - Garrison P&C 00043242
Garrison P&C 00043243 - Garrison P&C 00043307
Garrison P&C 00043308 - Garrison P&C 00043400
Garrison P&C 00043401 - Garrison P&C 00043555
Garrison P&C 00043556 - Garrison P&C 00043798
Garrison P&C 00043799 - Garrison P&C 00043859
Garrison P&C 00043860 - Garrison P&C 00043994
Garrison P&C 00043995 - Garrison P&C 00044037
Garrison P&C 00044038- Garrison P&C 00044220
Garrison P&C 00044221 - Garrison P&C 00044365
Garrison P&C 00044366 - Garrison P&C 00044486
Garrison P&C 00044487 - Garrison P&C 00044589
Garrison P&C 00044590 - Garrison P&C 00033782
Garrison P&C 00044783 - Garrison P&C 00044879
Garrison P&C 00044880 - Garrison P&C 00044983
Garrison P&C 00044984 - Garrison P&C 00045103
Garrison P&C 00045104 - Garrison P&C 00045391
Garrison P&C 00045393 - Garrison P&C 00045513
Garrison P&C 00045514 - Garrison P&C 00045602
Garrison P&C 00045603 - Garrison P&C 00045774
Garrison P&C 00045775 - Garrison P&C 00046024
Garrison P&C 00046025 - Garrison P&C 00046150
Garrison P&C 00046151 - Garrison P&C 00046190
Garrison P&C 00046191 - Garrison P&C 00046275
Garrison P&C 00046276 - Garrison P&C 00046392

Garrison P&C 00046393 - Garrison P&C 00046500
Garrison P&C 00046501 - Garrison P&C 00046580
Garrison P&C 00046581 - Garrison P&C 00046664
Garrison P&C 00046665 - Garrison P&C 00046755
Garrison P&C 00046756 - Garrison P&C 00046837
Garrison P&C 00046838 - Garrison P&C 00046928
Garrison P&C 00046929 - Garrison P&C 00047011
Garrison P&C 00047012 - Garrison P&C 00047101
Garrison P&C 00047102 - Garrison P&C 00047177
Garrison P&C 00047178 - Garrison P&C 00047295
Garrison P&C 00047296 - Garrison P&C 00047420
Garrison P&C 00047421 - Garrison P&C 00047532
Garrison P&C 00047533 - Garrison P&C 00047695
Garrison P&C 00047696 - Garrison P&C 00047800
Garrison P&C 00047801 - Garrison P&C 00047879
Garrison P&C 00047896 - Garrison P&C 00047943
Garrison P&C 00047944 - Garrison P&C 00048226
Garrison P&C 00048227 - Garrison P&C 00048333
Garrison P&C 00048334 - Garrison P&C 00048477
Garrison P&C 00048478 - Garrison P&C 00048551
Garrison P&C 00048552 - Garrison P&C 00048677
Garrison P&C 00048678 - Garrison P&C 00048755
Garrison P&C 00048756 - Garrison P&C 00048834
Garrison P&C 00048835 - Garrison P&C 00048923
Garrison P&C 00048924 - Garrison P&C 00049016
Garrison P&C 00049017 - Garrison P&C 00049091
Garrison P&C 00049092 - Garrison P&C 00049190
Garrison P&C 00049191 - Garrison P&C 00049336
Garrison P&C 00049337 - Garrison P&C 00049427
Garrison P&C 00049428 - Garrison P&C 00049521
Garrison P&C 00049522 - Garrison P&C 00049707
Garrison P&C 00049708 - Garrison P&C 00049763
Garrison P&C 00049764 - Garrison P&C 00049992

## Declarations

Declaration of GREGORY GOEBEL in Support of Garrison Property and Casualty Insurance Company's Opposition to Class Certification, 27 September, 2021.
Declaration of LANCE KAUFMAN, in Support of Plaintiff's Montion for Class Certification, 15 July, 2021.
Declaration of LARRY HAUSMAN-COHEN, June, 2021.
Declaration of WILLIAM J. BERGLUND in Support of Plaintiff's Montion for Class Certification, 31 August, 2021.

## Depositions And Associated Exhibits

Deposition of ELIZABETH VAIL FORTSON, February 17, 2021.
Deposition of JAMES P. CALLAGHAN, June 25, 2021.
Deposition of ROBERT LOPEZ, May 21, 2021.
Video Conference Deposition of CCC by JOHN GINTVAINIS, June 23, 2021, and Exhibits 1-22.
Videotaped Deposition of RANDALL MCCATHREN, August 17, 2021.
Videotaped Remote Deposition of DR. LANCE DARSHANA KAUFMAN, August 24, 2021, and Exhibits 1-9.
Zoom Video Deposition of WILLIAM BERGLUND, September 2, 2021.

## Discovery Documents

Responses and Objections of Defendant Garrison Property and Casualty Insurance Company to Plaintiff's First Set of Interrogatories, Requests for Admission, and Requests for Production of Documents, 4 November, 2019.
Responses and Objections of Defendant Garrison Property and Casualty Insurance Company to Plaintiff's Second Set of Interrogatories, Requests for Admission, and Requests for Production of Documents, 18 November, 2019.

Plaintiff's Responses to Defendant Garrison Property and Casualty Insurance Company'S First Set of Interrogatories, Requests For Admission, and Requests For Production of Documents, 3 January, 2020.

**KBB Reports**

Fortson-2004_Cadillac CTS_ KBB Report
19XFA1F59AE051120.pdf
1B3BD1FB6BN556736.pdf
1B3CB9HB6AD59247.pdf
1B3ES56C95D213724.pdf
1C3EL45R56N182810.pdf
1C4RDHAG3DC67253.pdf
1C6RREBT8KN76939.pdf
1D4GP24R35B16343.pdf
1D7HG38K54S61455.pdf
1D7RV1CT0AS207066.pdf
1FA6P8TH1F5422186.pdf
1FADP3F24EL42551.pdf
1FADP3F28DL1360 - POWERSHIFT.pdf
1FADP3F28DL1360 - PWRSHFT SELSHFT.pdf
1FAHP3E26CL37014.pdf
1FAHP3K27CL33216.pdf
1FMCU0JX3EUE3338.pdf
1FTNX21F1XEB70865.pdf
1G1ZJ57B19F179340.pdf
1G2AS18H397166021.pdf
1G4PP5SK5D418628.pdf
1G6DE1E36E0104417.pdf
1G6KD57YX6U1178.pdf
1G8AL55F46Z115074.pdf
1G8MG35X08Y107299.pdf
1GTDT136268205487.pdf
1HGCF86682A01721.pdf
1HGCG56742A12202.pdf
1HGCM66536A04355.pdf
1HGEM21935L00588.pdf
1HGES16344L00714.pdf
1HGFA16597L06770.pdf
1J4FJ68S7PL512907.pdf
1J8GS48K27C55658.pdf
1N4AL21E49C100590.pdf
1N4AL21E57N4116.pdf
1N4AL3AP4EC1833.pdf
1N4AL3AP9GN32792.pdf
1N4BA41EX4C878147.pdf
2C3CDYAG6DH581585.pdf
2C3JA63H95H110879.pdf
2CTALUEC9B6338064.pdf
2G1FB1E39D9179916.pdf
2GCEC19R2W1199828.pdf
2HGFB6E5XDH709890.pdf
2HGFG12639H512438.pdf
2HKYF18553H558330.pdf
2HNYD28817H532693.pdf
2T1BU4EE7AC522754.pdf
2T3WFREV4GW300406.pdf

3CZRE3H55BG701023.pdf
3FA6P0H77GR337272.pdf
3FAFP11351R163089.pdf
3FAHP07138R113553.pdf
3FAHP07Z47R180943.pdf
3FAHP0HA2AR278952.pdf
3G5DA03E55S551604.pdf
3GNEK18R8XG158270.pdf
3GYEK63N83G312636.pdf
3HGCM56426G711780.pdf
3HGCM56476G706333.pdf
3N1AB61E29L6917.pdf
3N1AB61E78L761637.pdf
3N1AB7AP6DL691.pdf
3VW2K7AJ9DM25664.pdf
3VWD17AJ7EM26817.pdf
3VWD17AJ7EM30215.pdf
4A32B2FF9BE024603.pdf
5FNRL38705B07146.pdf
5GZCZ534X7S807251.pdf
5J6RE4H72BL04478.pdf
5LMEU27A6YLJ22921.pdf
5NPEU46F46H012449.pdf
5XXGM4A77FG361206.pdf
5XXGN4A72FG385913.pdf
5Y2SL63875Z470260.pdf
JA4AD2A34GZ040661.pdf
JHMFA36237S015414.pdf
JHMGD38688S037289.pdf
JHMGE8H29AS004637.pdf
JM1GL1U59H1103.pdf
JM3KE2CY7G0651912.pdf
JN1CV6AR9BM35412.pdf
JNKCV51E35M215215.pdf
JT3HN86R7V0100651.pdf
JTEES42A382036306.pdf
JTEZU5JR3D5060283.pdf
JTHBE262775015721.pdf
JTHBE5C26B502807.pdf
JTJHF10U230315393.pdf
KNAFX5A81E5234517.pdf
KNALN4D73G5214357.pdf
KNDJN2A29F7156197.pdf
KNDJP3A56E7048354.pdf
WBAET37434NJ4676.pdf
WDBRN40J53A415322.pdf
YS3FB49S531006237.pdf
YV1RS59V742389043.pdf
1B3ES56C34D646017.pdf
1FM5K7F85FGA10167.pdf
1FMCU0GD0JUC54842.pdf
1FMDU74K13UA837.pdf
1FTPX12504NC54325.pdf
1FTXW42R18EA76695.pdf
1G1AD5F50A719403.pdf

1G1BE5SM0G7238755.pdf
1G1PH5SB2E7461209.pdf
1G2ZG57B38419864.pdf
1G4AG85M1T641011.pdf
1G4HR54K71U301341.pdf
1G6DJ5EV6A0125962.pdf
1GCCS148658288547.pdf
1GKDS13S622473394.pdf
1GNEK13T41R106886.pdf
1GNET16S866102915.pdf
1HGCM56347A04239.pdf
1J8FT47W97D158481.pdf
1N4AL2AP4AN450036.pdf
1N4AL3AP6FC49169.pdf
1N4AL3AP8FC16643.pdf
1N4AL3APXDN522108.pdf
1N4BA41E77C854263.pdf
1N6AD0ER3AC407677.pdf
2A4RR4DE8AR34703.pdf
2C3CA6CT7BH580823.pdf
2C3CDXEJ0CH109607.pdf
2C3LA53G96H337517.pdf
2G1FA1E37C9194061.pdf
2G1FC1E34D91757.pdf
2G1WU581669313232.pdf
2G1WX15K529160947.pdf
2HGEJ6673TH516591.pdf
2HGFG12648H519395.pdf
2HGFG1B88BH514273.pdf
2HGFG21528H708626.pdf
2HKRL1861XH5454.pdf
2HNYD2H61AH523465.pdf
2T1BR32E58C901567.pdf
2T1BURHE3EC038554.pdf
2T1KU40E39C068859.pdf
3C3CFFCRXCT140318.pdf
3C4PDCDG3CT341332.pdf
3CZRU5H5XJM707236.pdf
3FADP4BJ4JM108071.pdf
3FAFP37N15R120329.pdf
3G5DA03746S627817.pdf
3MZBM1U79FM153294.pdf
3N1AB7AP0DL7835.pdf
3N1CN7AP5GL889.pdf
4JGBF71E88A419399.pdf
5FNRL18864B14871.pdf
5GRGN23U83H133894.pdf
5N1ED28T73C663813.pdf
5NPEB4AC9CH387574.pdf
5NPEC4AC0CH327938.pdf
5TBRT34112S313442.pdf
5TDZK23C17S067460.pdf
5Y2SL628X3Z413663.pdf
JA32U8FW9GU003391.pdf
JH4CL96806C013066.pdf

JHLRD1856VC039234.pdf
JM1NC26F480147566.pdf
JTDKN3DU7D1721716.pdf
JTDKTUD31ED580449.pdf
JTHBH96SX65023603.pdf
JTHBK262872038144.pdf
KM8JU3AG8FU972271.pdf
KNDCC3LC5H5071267.pdf
SALSK25468A12564.pdf
WBAAM5330XKG09860.pdf
WBAKC8C59ACY68453.pdf
WBAUL73528VE864.pdf
WDDGF8BB2BR17938.pdf
WMWZP3C58ET298649.pdf
WVVAR71K16W159831.pdf
YV1M5382452083537.pdf
YV1SW61R5120722.pdf
YV4902DZ4D2445456.pdf

**Motions and Filings**

Joint Appendix Related to Plaintiff's Motion for Class Certification, 31 August, 2021.
Memorandum In Support of Motion for Class Certification, 16 July, 2021.
Plaintiff's First Amended Complaint, April 10, 2019.

**NADA Reports**

Fortson NADA Report
CCCIS000032_JDP.pdf
CCCIS000301_JDP.pdf
CCCIS000417_JDP.pdf
CCCIS001059_JDP.pdf
CCCIS003921_JDP.pdf
CCCIS004286_JDP.pdf
CCCIS004505_JDP.pdf
CCCIS005124_JDP.pdf
CCCIS005167_JDP.pdf
CCCIS005278_JDP.pdf
CCCIS006093_JDP.pdf
CCCIS008609_JDP.pdf
CCCIS008852_JDP.pdf
CCCIS009032_JDP.pdf
CCCIS012806_JDP.pdf
CCCIS012968_JDP.pdf
CCCIS013555_JDP.pdf
CCCIS013687_JDP.pdf
CCCIS015542_JDP.pdf
CCCIS015613_JDP.pdf
CCCIS015868_JDP.pdf
CCCIS016029_JDP.pdf
CCCIS019238_JDP.pdf
CCCIS019457_JDP.pdf
CCCIS021010_JDP.pdf
CCCIS021232_JDP.pdf
CCCIS021364_JDP.pdf
CCCIS021734_JDP.pdf
CCCIS022171_JDP.pdf

CCCIS022276_JDP.pdf
CCCIS022315_JDP.pdf
CCCIS022346_JDP.pdf
CCCIS023970_JDP.pdf
CCCIS027199_JDP.pdf
CCCIS027746_JDP.pdf
CCCIS028003_JDP.pdf
CCCIS028460_JDP.pdf
CCCIS029822_JDP.pdf
CCCIS032467_JDP.pdf
CCCIS033069_JDP.pdf
CCCIS035454_JDP.pdf
CCCIS035651_JDP.pdf
CCCIS036070_JDP.pdf
CCCIS036611_JDP.pdf
CCCIS036883_JDP.pdf
CCCIS037025_JDP.pdf
CCCIS037539_JDP.pdf
CCCIS037960_JDP.pdf
CCCIS038347_JDP.pdf
CCCIS038542_JDP.pdf
CCCIS039956_JDP.pdf
CCCIS040818_JDP.pdf
CCCIS041347_JDP.pdf
CCCIS044107_JDP.pdf
CCCIS044778_JDP.pdf
CCCIS044872_JDP.pdf
CCCIS045801_JDP.pdf
CCCIS046246_JDP.pdf
CCCIS046442_JDP.pdf
CCCIS047001_JDP.pdf
CCCIS048192_JDP.pdf
CCCIS048913_JDP.pdf
CCCIS050191_JDP.pdf
CCCIS050456_JDP.pdf
CCCIS051123_JDP.pdf
CCCIS052180_JDP.pdf
CCCIS055195_JDP.pdf
CCCIS057682_JDP.pdf
CCCIS058815_JDP.pdf
CCCIS060804_JDP.pdf
CCCIS061939_JDP.pdf
CCCIS062431_JDP.pdf
CCCIS062775_JDP.pdf
CCCIS062987_JDP.pdf
CCCIS063261_JDP.pdf
CCCIS063434_JDP.pdf
CCCIS064299_JDP.pdf
CCCIS064347_JDP.pdf
CCCIS065658_JDP.pdf
CCCIS067081_JDP.pdf
CCCIS069117_JDP.pdf
CCCIS069244_JDP.pdf
CCCIS069736_JDP.pdf
CCCIS069991_JDP.pdf

CCCIS070204_JDP.pdf
CCCIS070762_JDP.pdf
CCCIS070862_JDP.pdf
CCCIS071145_JDP.pdf
CCCIS071667_JDP.pdf
CCCIS072768_JDP.pdf
CCCIS073964_JDP.pdf
CCCIS074295_JDP.pdf
CCCIS075136_JDP.pdf
CCCIS076140_JDP.pdf
CCCIS076269_JDP.pdf
CCCIS076483_JDP.pdf
CCCIS076544_JDP.pdf
CCCIS076599_JDP.pdf
CCCIS076844_JDP.pdf
CCCIS076860_JDP.pdf
CCCIS076877_JDP.pdf
CCCIS077102_JDP.pdf
CCCIS077285_JDP.pdf
CCCIS078177_JDP.pdf
CCCIS078798_JDP.pdf
CCCIS078811_JDP.pdf
CCCIS080095_JDP.pdf
CCCIS080788_JDP.pdf
CCCIS083069_JDP.pdf
CCCIS083781_JDP.pdf
CCCIS084600_JDP.pdf
CCCIS084889_JDP.pdf
CCCIS085102_JDP.pdf
CCCIS085308_JDP.pdf
CCCIS085905_JDP.pdf
CCCIS085950_JDP.pdf
CCCIS086492_JDP.pdf
CCCIS088077_JDP.pdf
CCCIS091227_JDP.pdf
CCCIS091440_JDP.pdf
CCCIS091913_JDP.pdf
CCCIS092006_JDP.pdf
CCCIS093464_JDP.pdf
CCCIS094397_JDP.pdf
CCCIS095029_JDP.pdf
CCCIS095218_JDP.pdf
CCCIS095742_JDP.pdf
CCCIS095817_JDP.pdf
CCCIS096124_JDP.pdf
CCCIS096538_JDP.pdf
CCCIS096662_JDP.pdf
CCCIS096944_JDP.pdf
CCCIS097874_JDP.pdf
CCCIS098911_JDP.pdf
CCCIS099149_JDP.pdf
CCCIS099576_JDP.pdf
CCCIS099610_JDP.pdf
CCCIS101749_JDP.pdf
CCCIS102579_JDP.pdf

CCCIS102796_JDP.pdf
CCCIS102841_JDP.pdf
CCCIS105456_JDP.pdf
CCCIS106633_JDP.pdf
CCCIS107681_JDP.pdf
CCCIS108006_JDP.pdf
CTRL00006389_JDP.pdf
CTRL00006589_JDP.pdf
CTRL00006595_JDP.pdf
CTRL00006603_JDP.pdf
CTRL00006609_JDP.pdf
CTRL00006661_JDP.pdf
CTRL00006837_JDP.pdf
CTRL00006879_JDP.pdf
CTRL00006954_JDP.pdf
CTRL00007083_JDP.pdf
CTRL00007237_JDP.pdf
CTRL00007286_JDP.pdf
CTRL00007489_JDP.pdf
CTRL00007580_JDP.pdf
CTRL00007604_JDP.pdf
CTRL00007854_JDP.pdf
CTRL00007951_JDP.pdf
CTRL00008026_JDP.pdf
CTRL00008204_JDP.pdf
CTRL00008266_JDP.pdf
CTRL00008379_JDP.pdf
CTRL00008643_JDP.pdf
CTRL00009035_JDP.pdf
CTRL00009098_JDP.pdf
CTRL00009120_JDP.pdf
CTRL00009137_JDP.pdf
CTRL00009342_JDP.pdf

**Plaintiff's Experts' Workpapers**

2021.07.15 FINAL_Claim File Sample(1574700.1).
Claim File Sampling(1562912.1).
Hausman-Cohen CCC.db3 database, including CCC_Allowances, CCC_Comps, CCC_Conditions, CCC_Main, CCC_Notes and CCC_Refurbishments tables.
Hausman-Cohen text file versions of CCCIS000001.pdf – CCCIS190287.pdf (Obscured5402693.pdf.txt – Obscured98646710.pdf.txt).

**Other**

11 N.C.A.C. 4.0418  (current version).pdf.
11 N.C.A.C. 4.0418 (2019 version).pdf.
Confidential - 2021.03.15.Fortson v Garrison - Claim Sample.xlsx.
Fortson v Garrison - 178 claim sample with Loss Rpt Sequence Number.xlsx.
Fortson v. Garrison - CCC Report Data Collection [200 Claims].xlsx.
Fortson v. Garrison - CCC Report Data Collection for 178 Claim Sample.xlsx.
Fortson v. Garrison - Claim File Review Spreadsheet.xlsx.



**Source:** CCC.db3

Secretariat Economists
Privileged & Confidential



**Source:** CCC.db3

Secretariat Economists
Privileged & Confidential



**Source:** CCC.db3

Secretariat Economists
Privileged & Confidential

DJA1347

Secretariat Economists
Privileged & Confidential





Secretariat Economists
Privileged & Confidential
Page 2 of 21

Case 1:19-cv-00294-CCE-JLW   Document 102   Filed 11/01/21   Page 102 of 138



Secretariat Economists
Privileged & Confidential
Page 3 of 21



Secretariat Economists
Privileged & Confidential
Page 4 of 21



Secretariat Economists
Privileged & Confidential
Page 5 of 21



Secretariat Economists
Privileged & Confidential
Page 6 of 21



Secretariat Economists
Privileged & Confidential
Page 7 of 21



Secretariat Economists
Privileged & Confidential
Page 8 of 21

Case 1:19-cv-00294-CCE-JLW   Document 102   Filed 11/01/21   Page 108 of 138





Secretariat Economists
Privileged & Confidential
Page 10 of 21



Case 1:19-cv-00294-CCE-JLW   Document 102   Filed 11/01/21   Page 111 of 138



Secretariat Economists
Privileged & Confidential
Page 12 of 21



Secretariat Economists
Privileged & Confidential
Page 13 of 21



Secretariat Economists
Privileged & Confidential
Page 14 of 21





Case 1:19-cv-00294-CCE-JLW   Document 102   Filed 11/01/21   Page 116 of 138



Secretariat Economists
Privileged & Confidential
Page 17 of 21

Case 1:19-cv-00294-CCE-JLW   Document 102   Filed 11/01/21   Page 117 of 138



Secretariat Economists
Privileged & Confidential
Page 18 of 21



Secretariat Economists
Privileged & Confidential
Page 19 of 21



Secretariat Economists
Privileged & Confidential
Page 20 of 21

DJA1368



Source: CCC.db3

Secretariat Economists
Privileged & Confidential
Page 21 of 21

Case 1:19-cv-00294-CCE-JLW   Document 102   Filed 11/01/21   Page 121 of 138

DJA1369



Secretariat Economists
Privileged & Confidential

Secretariat Economists
Privileged & Confidential
Page 1 of 5

DJA1370

Secretariat Economists
Privileged & Confidential
Page 2 of 5

Secretariat Economists
Privileged & Confidential
Page 3 of 5

Secretariat Economists
Privileged & Confidential
Page 4 of 5

**Sources:**
1  2021 07 15 FINAL_Claim File Sample(574700 1) pdf (referred to as Plaintiffs' Sample)
2  Claim File Sampling(562912 1) pdf
3  Confidential - 2021 03 15 Fortson v Garrison - Claim Sample xlsx
4  CCC db3: Comps and Main Tables (referred to as Hausman-Cohen's data)
5  Fortson Claim Files: Garrison P&C 00046160 pdf; Garrison P&C 00046279 pdf; Garrison P&C 00049801 pdf; Garrison P&C 00041041 pdf; Garrison P&C 00048681 pdf;
    Garrison P&C 00027706 pdf; Garrison P&C 00040802 pdf; Garrison P&C 00031410 pdf; Garrison P&C 00035559 pdf; Garrison P&C 00046097 pdf; Garrison P&C 00028741 pdf

Secretariat Economists
Privileged & Confidential
Page 5 of 5

## Table 8. Ratio of Transaction Price to Asking Price

| Month | Year | Franchised Dealer | Independent Dealer |
|-------|------|-------------------|--------------------|
| Jan | 2012 | 94.26% | 92.67% |
| Feb | 2012 | 95.17% | 93.04% |
| Mar | 2012 | 95.16% | 93.22% |
| Apr | 2012 | 95.23% | 93.74% |
| May | 2012 | 93.21% | 90.83% |
| Jun | 2012 | 92.45% | 91.27% |
| Jul | 2012 | 92.16% | 90.87% |
| Aug | 2012 | 92.02% | 90.73% |
| Sep | 2012 | 92.11% | 90.64% |
| Oct | 2012 | 92.42% | 91.36% |
| Nov | 2012 | 94.05% | 93.42% |
| Dec | 2012 | 95.24% | 93.14% |
| Jan | 2013 | 93.14% | 92.81% |
| Feb | 2013 | 93.21% | 92.74% |
| Mar | 2013 | 94.12% | 93.81% |
| Apr | 2013 | 94.25% | 93.95% |
| May | 2013 | 94.33% | 93.26% |
| Jun | 2013 | 94.69% | 94.07% |
| Jul | 2013 | 95.22% | 94.32% |
| Aug | 2013 | 95.39% | 94.72% |
| Sep | 2013 | 95.43% | 94.88% |
| Oct | 2013 | 94.28% | 94.56% |
| Nov | 2013 | 94.31% | 94.32% |
| Dec | 2013 | 95.06% | 95.61% |
| Jan | 2014 | 94.87% | 95.68% |
| Feb | 2014 | 94.98% | 95.84% |
| Mar | 2014 | 96.05% | 96.37% |
| Apr | 2014 | 96.12% | 96.51% |
| May | 2014 | 96.24% | 96.53% |
| Jun | 2014 | 96.93% | 96.44% |
| Jul | 2014 | 96.94% | 96.26% |
| Aug | 2014 | 96.92% | 96.61% |
| Sep | 2014 | 96.94% | 96.93% |
| Oct | 2014 | 96.87% | 96.04% |
| Nov | 2014 | 96.92% | 96.34% |
| Dec | 2014 | 96.88% | 96.57% |
| Jan | 2015 | 95.16% | 95.83% |
| Average | | 94.83% | 94.21% |

**Sources:**

1. https://automotivedigest.com/wp-content/uploads/2013/01/Retail-Automotive-Summary-Jan.-2013.pdf, page 6.

2. https://automotivedigest.com/wp-content/uploads/2013/09/Retail-Automotive-Summary-September-2013.pdf, page 9.

3. https://automotivedigest.com/wp-content/uploads/2014/10/Retail-Automotive-Summary-September-2014.pdf, page 3.

4. https://automotivedigest.com/wp-content/uploads/2015/01/Retail-Automotive-Summary-January-2015.pdf, page 7.

Secretariat Economists
Privileged & Confidential

Secretariat Economists
Privileged & Confidential
Page 1 of 5

Secretariat Economists
Privileged & Confidential
Page 2 of 5

DJA1378

Secretariat Economists
Privileged & Confidential
Page 3 of 5

DJA1379

**Sources**

1 Hausman-Cohen wor papers, CCC db3_Comps and Main Table
2 Kaufman wor papers, 2021 07 15 FINAL_Claim File Sample(1574700 1) pdf
3 USAA Data, Fortson v Garrison - 178 claim sample with Loss Rpt Sequence Number.xlsx
4 Kelley Blue Boo "_uic_Value" Reports 3rd Batch_ip, 4th Batch_ip, 5th Batch
5 Nada Reports, Forston- Complete20210902100914_ip
6 Fortson Claim Files_Garrison P&C 0004616) pdf_Garrison P&C 00046279 pdf_Garrison P&C 0004580) pdf_Garrison P&C 00041041 pdf_Garrison P&C 00048681 pdf
   Garrison P&C 00027706 pdf_Garrison P&C 00040802 pdf_Garrison P&C 0003 l410 pdf_Garrison P&C 00035559 pdf_Garrison P&C 00046097 pdf_Garrison P&C 00028741 pdf

DJA1380

Secretariat Economists
Privileged & Confidential
Page 5 of 5



**Sources:**

1  Hausman-Cohen workpapers, CCC db3: Comps and Main Table
2  Kaufman workpapers, 2021 07 15 FINAL_Claim File Sample(1574700 1) pdf
3  USAA Data, Fortson v Garrison - 178 claim sample with Loss Rpt Sequence Number xlsx
4  Kelley Blue Book "Quick Values" Reports; 3rd Batch zip, 4th Batch zip, 5th Batch zip
5  J D  POWER Used Cars/Trucks Values, Forston- Complete2021090210 0914 zip
6  Fortson Claim Files: Garrison P&C 00046160 pdf; Garrison P&C 00046279 pdf; Garrison P&C 00049801 pdf; Garrison P&C 00041041 pdf; Garrison P&C 00048681 pdf;
   Garrison P&C 00027706 pdf; Garrison P&C 00040802 pdf; Garrison P&C 00031410 pdf; Garrison P&C 00035559 pdf; Garrison P&C 00046097 pdf; Garrison P&C 00028741 pdf

Secretariat Economists
Privileged & Confidential



**Sources:**

1. Hausman-Cohen workpapers, CCC.db3: Comps and Main Table
2. Kaufman workpapers, 2021.07.15 FINAL_Claim File Sample(1574700.1).pdf
3. USAA Data, Fortson v Garrison - 178 claim sample with Loss Rpt Sequence Number.xlsx
4. Kelley Blue Book "Quick Values" Reports; 3rd Batch.zip, 4th Batch.zip, 5th Batch.zip
5. J.D. POWER Used Cars/Trucks Values, Forston- Complete20210902100914.zip
6. Fortson Claim Files: Garrison P&C 00046160.pdf; Garrison P&C 00046279.pdf; Garrison P&C 00049801.pdf; Garrison P&C 00041041.pdf; Garrison P&C 00048681.pdf;
   Garrison P&C 00027706.pdf; Garrison P&C 00040802.pdf; Garrison P&C 00031410.pdf; Garrison P&C 00035559.pdf; Garrison P&C 00046097.pdf; Garrison P&C 00028741.pdf

Secretariat Economists
Privileged & Confidential



**Sources:**

1. Hausman-Cohen workpapers, CCC.db3: Comps and Main Table

2. Kaufman workpapers, 2021.07.15 FINAL_Claim File Sample(1574700.1).pdf

3. USAA Data, Fortson v Garrison - 178 claim sample with Loss Rpt Sequence Number.xlsx

4. Kelley Blue Book "Quick Values" Reports; 3rd Batch.zip, 4th Batch.zip, 5th Batch.zip

5. J.D. POWER Used Cars/Trucks Values, Forston- Complete20210902100914.zip

6. Fortson Claim Files: Garrison P&C 00046160.pdf; Garrison P&C 00046279.pdf; Garrison P&C 00049801.pdf; Garrison P&C 00041041.pdf; Garrison P&C 00048681.pdf; Garrison P&C 00027706.pdf; Garrison P&C 00040802.pdf; Garrison P&C 00031410.pdf; Garrison P&C 00035559.pdf; Garrison P&C 00046097.pdf; Garrison P&C 00028741.pdf

Secretariat Economists
Privileged & Confidential

DJA1384

**Sources:**
1. Hausman-Cohen workpapers, CCC.db3: Comps and Main Table
2. Kaufman workpapers, 2021.07.15 FINAL_Claim File Sample(1574700.1).pdf
3. USAA Data, Fortson v Garrison - 178 claim sample with Loss Rpt Sequence Number.xlsx
4. Kelley Blue Book "Quick Values" Reports; 3rd Batch.zip, 4th Batch.zip, 5th Batch.zip
5. J.D. POWER Used Cars/Trucks Values, Forston- Complete20210902100914.zip
6. Fortson Claim Files: Garrison P&C 00046160.pdf; Garrison P&C 00046279.pdf; Garrison P&C 00049801.pdf; Garrison P&C 00041041.pdf; Garrison P&C 0004868l.pdf; Garrison P&C 00027706.pdf; Garrison P&C 00040802.pdf; Garrison P&C 00031410.pdf; Garrison P&C 00035559.pdf; Garrison P&C 00046097.pdf; Garrison P&C 00028741.pdf

Secretariat Economists
Privileged & Confidential



**Sources:**

1. Hausman-Cohen workpapers, CCC.db3: Comps and Main Table
2. Kaufman workpapers, 2021.07.15 FINAL_Claim File Sample(1574700.1).pdf
3. USAA Data, Fortson v Garrison - 178 claim sample with Loss Rpt Sequence Number.xlsx
4. Kelley Blue Book "Quick Values" Reports; 3rd Batch.zip, 4th Batch.zip, 5th Batch.zip
5. J.D. POWER Used Cars/Trucks Values, Forston- Complete20210902100914.zip
6. Fortson Claim Files: Garrison P&C 00046160.pdf; Garrison P&C 00046279.pdf; Garrison P&C 00046279.pdf; Garrison P&C 00049801.pdf; Garrison P&C 00041041.pdf; Garrison P&C 00048681.pdf; Garrison P&C 00027706.pdf; Garrison P&C 00040802.pdf; Garrison P&C 00031410.pdf; Garrison P&C 00035559.pdf; Garrison P&C 00046097.pdf; Garrison P&C 0002874.pdf

Secretariat Economists
Privileged & Confidential