# Exhibit A



Deposition of:
## Elizabeth Vail Fortson

*February 17, 2021*

In the Matter of:

## Fortson, Elizabeth V et al v. Garrison Property & Casualty Insurance Co

Veritext Legal Solutions
800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Page 1

1               UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2           Civil Action No. 1:19-cv-00294-CCE-JLW
3

ELIZABETH V. FORTSON, on      :
4   behalf of herself and all    :
others similarly situated,    :
5                              :
                Plaintiff,     :
6                              :
           vs.                 :
7                              :
GARRISON PROPERTY AND          :
8   CASUALTY INSURANCE           :
COMPANY,                       :
9                              :
                Defendant.     :
10

                         - - -

11
12
            VIDEO DEPOSITION OF ELIZABETH FORTSON
13                (Taken by the Defendant)
              Raleigh, North Carolina
14                February 17, 2021
15
16
17
18
19
20
21
          Reported by:  Jackie Johnson Milam
22                      Court Reporter
                        Notary Public
23
24
25

Page 2

```
1          A P P E A R A N C E S :
2
3    Hendren Redwine & Malone, PLLC
     BY:  J. MICHAEL MALONE, ESQUIRE
          (Via Virtual Zoom)
4    4600 Marriott Drive
     Suite 150
5    Raleigh, North Carolina  27612
     mmalone@hendrenmalone.com
6
     Hagens Berman Sobol Shapiro LLP
7    BY:  TORY BEARDSLEY, ESQUIRE
          (Via Virtual Zoom)
8    11 West Jefferson Street
     Suite 1000
9    Phoenix, Arizona  85003
     toryb@hbss.com
10   Attorneys for Plaintiff
11   Baker & Hostetler LLP
     BY:  ANDREA C. WILTROUT, ESQUIRE
12       RODGER L. ECKELBERRY, ESQUIRE
          (Via Virtual Zoom)
13   200 Civic Center Drive
     Suite 2200
14   Columbus, Ohio  43215
     awiltrout@bakerlaw.com
15   reckelberry@bakerlaw.com
     Attorneys for Defendant
16
17
18
                  - - -
19
20
21       Video Deposition of ELIZABETH FORTSON, taken by
     the Defendant in Raleigh, North Carolina, on the 17th
22   day of February, 2021 at 11:00 a.m., before Jackie
     Johnson Milam, Court Reporter and Notary Public.
23
24
25
```

Page 3

## C O N T E N T S

```
1          C O N T E N T S
2
3
4    The Witness:  ELIZABETH FORTSON
5      By Ms. Wiltrout...........................6
6
7        I N D E X   O F   T H E   E X H I B I T S
8    For the Defendant
9
```

10  Exhibit 1   Photographs........................24
11  Exhibit 2   Claims File........................38
12  Exhibit 3   CCC One Market Valuation Report
13              10/26/18...........................58
14  Exhibit 4   Garrison Loss Summary..............91
15  Exhibit 5   Letter from J. Michael Malone to
16              USAA 11/14/17......................95
17  Exhibit 6   Certified Policy..................106

```
18
19
20
21
22
23
24
25
```

Page 4

```
1              P R O C E E D I N G S :
2        THE VIDEOGRAPHER:  Good morning everyone.
3    We are going on the Record.  The time on the monitor
4    is approximately 11:00 a.m. Eastern standard time.
5        The date is February 17, 2021.  This is
6    media unit #1 of the video recorded deposition of
7    Elizabeth Vail Fortson taken by counsel for the
8    Defendant in the matter of Elizabeth V. Fortson on
9    behalf of herself and all other similarly situated,
10   Plaintiff versus Garrison Property and Casualty,
11   Defendant.
12       The case is filed in the United States
13   District Court for the Middle District of North
14   Carolina.  Case No. 1:19-cv-00294-CCE-JLW.
15       This deposition is being held virtually on
16   Zoom.  My name is Sean Lowther.  I'm the
17   videographer, and the court reporter is Jackie
18   Johnson, and we're representing Veritext Legal
19   Solutions.
20       If counsel would please introduce
21   themselves and whom they are representing, starting
22   with Attorney Wiltrout.
23       MS. WILTROUT:  Andrea Wiltrout on behalf of
24   the Defendant, Garrison.
25       MR. MALONE:  Mike Malone on behalf of the
```

Page 5

```
1    Plaintiff.
2        MR. ECKELBERRY:  Rodger Eckelberry also for
3    Defendant.
4        MS. BEARDSLEY:  Tory Beardsley of Hagens
5    Berman Sobol Shapiro on behalf of Plaintiff.
6        THE VIDEOGRAPHER:  Thank you.
7        And at this time, if the court reporter
8    would please swear in the witness.
9            Whereupon,
10           ELIZABETH FORTSON,
11       having been duly sworn,
12   was examined and testified as follows:
13       MS. WILTRUT:  Okay.  Hi there.  My name is
14   Andrea Wiltrout, and I'm just going to ask you a
15   couple of questions.
16       First, before we get started, what name do
17   you prefer?  Do you prefer --
18       MR. MALONE:  Andrea, real quick -- Andrea,
19   real quick.  We wanted to knock out that stipulation.
20       MS. WILTROUT:  I'm going to.  Okay.  I was
21   going to do that --
22       MR. MALONE:  Okay.
23       MS. WILTROUT:  -- after I got through the
24   formalities.
25       MR. MALONE:  Okay.
```

2 (Pages 2 - 5)

1      MS. WILTROUT: So just --
2      MR. MALONE: Oh, I got you. I apologize.
3  Okay.
4      MS. WILTROUT: -- real quick. Yeah.
5      MR. MALONE: I just didn't want us to
6  forget. Okay.
7      MS. WILTROUT: Ms. Fortson -- I have it
8  written down.
9      MR. MALONE: Okay. Got it.
10      EXAMINATION BY COUNSEL FOR THE DEFENDANT
11  BY MS. WILTROUT:
12  Q. Ms. Fortson, what should I call you?
13  A. You can call me Vail.
14  Q. Vail. Okay.
15      Could you please state your full name for the
16  Record?
17  A. Elizabeth Vail Fortson.
18      MS. WILTROUT: Okay. So I'm going to ask
19  you a series of questions today.
20      I wanted to state, for the Record, that we
21  have agreed, prior to the beginning of this
22  deposition, that all objections are reserved except
23  as to form.
24      MR. MALONE: Agreed.
25      MS. WILTROUT: Thank you.

1      THE WITNESS: A phone call came in.
2      MS. WILTROUT: Oh, are you good?
3      THE WITNESS: Yeah, I'm good. I just
4  declined it. Sorry.
5      MS. WILTROUT: Okay. Cool.
6      This is, you know, still unchartered -- new
7  territory for everybody here. So if there's
8  technical issues, I've been on enough of these calls,
9  we can fix anything. You can get back on. So it's
10  okay.
11      THE WITNESS: Okay. Good.
12      MS. WILTROUT: So the court reporter is
13  going to take down everything that you or I or your
14  attorney or anyone says. So to that end, it's
15  important that you give your answers out loud. She's
16  not going to be able to record if you nod your head
17  or shake your head or just give an uh-huh. So it's
18  just important to audibly answer all of my questions
19  with a clear yes or no or a response. Got it?
20      THE WITNESS: Okay.
21      MS. WILTROUT: Okay. Cool.
22      It's also important if you wait until my
23  question is done before you answer. I will try to
24  make sure to wait until you're done with your answer
25  before I ask my next question.

1      I don't expect this to last all day, but we
2  can take breaks if we need them. So if you need to
3  take a break, just let me know, and I'll be happy to
4  accommodate.
5      The only thing I ask is that we take a
6  break after you've answered the question that's
7  happening at the time.
8      THE WITNESS: Okay.
9      MS. WILTROUT: Okay. Your lawyer may object
10  to some of the questions that I ask today. That's
11  his right to do that. He's making the objections to
12  preserve them for the Record, although he might make
13  less than normal.
14      You are still required to answer the
15  question even over your lawyer's objection, unless he
16  specifically instructs you not to do that; is that
17  good?
18      THE WITNESS: Yes.
19      MS. WILTROUT: Okay. Great.
20  BY MS. WILTROUT:
21  Q. All right. I'm going to start out with an easy
22  one. What is your birthday?
23  A. 10/4/87.
24  Q. Okay. So that makes you how old?
25  A. I'm 33.

1  Q. What is your address?
2  A. My current address?
3  Q. Yes.
4  A. 201 South Elliott Road, Apartment 734, Chapel
5  Hill, North Carolina 27514.
6  Q. Did you just move there?
7  A. I moved here about three years ago.
8  Q. Oh, okay. So you've been there for a while.
9      Okay. Are you married?
10  A. No.
11  Q. Do you have any kids?
12  A. No.
13  Q. What is the highest level of education that
14  you've completed?
15  A. I have a Bachelor's.
16  Q. Where did you get your Bachelor's?
17  A. I finished it at the University of Alabama.
18  Q. What did you study?
19  A. I ended up having a history, geography, and
20  forestry.
21  Q. Do you have any certifications?
22  A. I don't think so.
23  Q. Okay. Are you currently employed?
24  A. No.
25  Q. What was your last job?

3 (Pages 6 - 9)

Veritext Legal Solutions
800.743.DEPO (3376)        calendar-carolinas@veritext.com        www.veritext.com
Case 1:19-cv-00294-CCE-JLW   Document 134-1   Filed 12/03/21   Page 5 of 55

1 A. Oh, actually, I'm technically employed through my
2 father.
3 Q. Okay. What do you do for him?
4 A. Whatever work he needs me to do.
5 Q. Okay. What's his business?
6 A. It's a consulting business. He does IT
7 consulting work.
8 Q. How long have you worked for him?
9 A. Several years.
10 Q. Okay. Have you ever had a job in the insurance
11 industry before?
12 A. No.
13 Q. Have you ever worked for a car dealer before?
14 A. No.
15 Q. Have you ever worked for a car manufacturer?
16 A. No.
17 Q. Any jobs at all in the automotive industry?
18 A. No.
19 Q. Okay. Is there any reason -- I have to ask this
20 next couple of questions, even though they might sound
21 kind of weird.
22   Is there any reason that you can't proceed with
23 the deposition today?
24 A. No.
25 Q. Are you on any medications or drugs that might

1 impact your ability to remember events or give truthful
2 testimony?
3 A. No.
4 Q. Have you ever been deposed before?
5 A. Yes.
6 Q. When were you deposed before?
7 A. Like in 2017, I think. I can't remember quite
8 the year.
9 Q. Okay. What case was that in?
10 A. That was in my settlement case for USAA for my
11 car accident.
12 Q. Okay. Was that the only time that you were
13 deposed before then?
14 A. Yes.
15   MR. MALONE: Andrea, if I may interject,
16 just to clarify.
17   That was actually an examination under oath
18 under the terms of the UM coverage as part of her
19 injury claim, as opposed to a deposition, but there
20 was a court reporter nonetheless.
21   MS. WILTROUT: Okay.
22   MR. MALONE: So it was actually an
23 examination under oath, but anyway.
24   MS. WILTROUT: Okay. Okay.
25   Was there a formal lawsuit filed?

1   MR. MALONE: No, that was --
2   THE WITNESS: No, there was not a lawsuit.
3   MS. WILTROUT: Okay. Okay.
4   MR. MALONE: No.
5   USAA Garrison has the right to conduct an
6 examination under oath, and they exercised that right
7 as part of their investigation of the injury claim.
8   MS. WILTROUT: Okay. All right.
9 BY MS. WILTROUT:
10 Q. So other than that, have you ever been a party to
11 a lawsuit?
12 A. No.
13 Q. Okay. Have you ever been a member of a class
14 action or -- I'm sorry. Let me start over.
15   Have you ever been a class member in a class
16 action lawsuit, that you are aware of?
17 A. No.
18 Q. Have you ever testified under oath before --
19 A. No.
20 Q. -- other than the examination that we just talked
21 about?
22 A. No.
23 Q. What did you do to prepare for your deposition
24 today?
25 A. I worked with my lawyers. I studied and, you

1 know, I've been involved in the case from the get-go.
2 So kind of that.
3 Q. Okay. I don't want to hear -- I don't want --
4 I'm not asking you about conversations that you had with
5 your attorney, but I just want to know something about
6 your prep.
7   When did you meet with your attorney?
8 A. We met last Thursday and then yesterday.
9 Q. For about how long did you guys meet?
10 A. I guess each time was about 45 minutes, and then
11 I studied on top of that.
12 Q. What did you study?
13 A. An outline, and then I made flash cards.
14 Q. Did you write the outline?
15 A. No.
16 Q. Who wrote the outline?
17 A. I'm not really -- that's my lawyers, because I do
18 not know.
19 Q. Did you go through any documents?
20 A. Yes.
21 Q. You went through documents.
22   Do you recall which documents?
23 A. There was a CCC report. There was a document
24 from October 2016 from USAA. There was some other
25 documents, but I can't remember specifically.

Case 1:19-cv-00294-CCE-JLW   Document 134-1   Filed 12/03/21   Page 6 of 55

1    I'm more of a visual person.  So if I see it, I
2  could tell you.
3    Q.  Okay.  Okay.  Did you just speak with Mr. Malone
4  or were there other lawyers present?
5    A.  There were lawyers from Hagens Berman as well.
6    Q.  Do you remember their names?
7    A.  Tory and, I think -- oh, what was the other guy's
8  name?
9    Q.  John?
10   A.  Was it John?  Yeah, John.
11   Q.  Okay.  John.  So Tory, John, and Mike.  Okay.
12      Were you guys in person?
13   A.  Yes.  On Zoom.
14   Q.  Have you talked with anybody else about this
15  deposition?
16   A.  No.
17   Q.  So do you understand that we're here today to
18  talk about the claims that you've made in a lawsuit
19  against Garrison?
20   A.  Yes.
21   Q.  All right.  I'd like to begin by asking you to
22  tell us, in your own words, what it is that you contend
23  that Garrison did wrong?
24      MR. MALONE:  I'll object to the form.  I
25  would object to the form.

1      But you can go ahead and answer, Vail.
2      THE WITNESS:  They did an unlawful or an
3  illegal, and they broke the law and the insurance
4  policy by doing an unitemized and random condition
5  adjustment that -- to adjust the payment claim -- to
6  adjust the payments.
7  BY MS. WILTROUT:
8    Q.  And just to clarify.  Who -- which entity are you
9  alleging did that in this lawsuit, which company?
10   A.  I guess Garrison.
11   Q.  Garrison.  Okay.  I just wanted to clarify that.
12      Okay.  So you said that they -- let me -- they
13  used an unitemized and random condition adjustment.
14  Tell me how you know that it was random.  Tell me more
15  about that.
16   A.  Well, if you look on the CCC report, you can see
17  that they tell you when the mileage is, and they deduct
18  that, and where they do like the -- you know, if you
19  have more, you know, amenities or not on your car,
20  whatever you say, you know, and then -- but there's this
21  other one that they don't clarify what it is.  It just
22  says condition, and they deduct $722.00 off of every
23  other comparable -- comparable vehicle, and there's no
24  reason or statement why.  That's why we're arguing.
25   Q.  Okay.  What should they have done?

1    A.  Well, it doesn't even map it out on the like --
2  on the graph they have or chart.  It doesn't even
3  explain it.
4    Q.  Okay.
5    A.  And how can every car be the same deduction?
6    Q.  Well, let's talk about your car.
7      Tell me what car you had that is the subject of
8  your claim.
9    A.  I had a Cadillac CTS, I believe it was, that my
10  grandfather had gifted me three months prior.
11   Q.  Do you remember what year it was?
12   A.  It was like a 2014, I think, or something around
13  then.
14   Q.  Could it have been a little older, like maybe a
15  2004?
16   A.  Maybe that.  I don't -- I have a brain injury.
17  I'm sorry.
18   Q.  Oh, that's fine.
19      So you said you got it.  You had it for about
20  three months; is that right?
21   A.  Uh-huh.
22   Q.  So did your grandpa give it to you as like a
23  present or do you --
24   A.  Yes.
25   Q.  Okay.  So tell me what you remember about when he

1  gave you the car.
2    A.  He wanted to give it to me for a while, but I
3  wasn't able to come down until the summer, and they had
4  it, and so they gave it to me.  He had gotten it -- when
5  I came down, I was down for like a week, and they -- he
6  got it serviced while I was there, fully serviced.  We
7  took it to the shop.  We got new tires put on it,
8  everything like that, and then I took it back.
9      It had been running fine, and then all of a
10  sudden something happened, and it died, and then I had
11  my accident.  But it was in really good condition, and
12  it was a good car.
13   Q.  It was a good car?
14   A.  Uh-huh.
15   Q.  Just to break down what you just said.
16      Do you remember when your grandpa got the
17  vehicle?
18   A.  I think he had it for about like four months
19  prior to that.  He had gotten it from my dad's cousin,
20  and she had bought it brand new.  So --
21   Q.  So had your dad's cousin purchased it in 2004?
22   A.  Yes, from a Cadillac dealership.
23      And she had only had it serviced at the Cadillac
24  dealership.
25   Q.  Okay.  And when did she -- when did he buy it

5 (Pages 14 - 17)

Veritext Legal Solutions
800.743.DEPO (3376)        calendar-carolinas@veritext.com        www.veritext.com
Case 1:19-cv-00294-CCE-JLW   Document 134-1   Filed 12/03/21   Page 7 of 55

1 from her? When did your grandpa buy the car from your
2 dad's cousin?
3 A. Technically, when I went down there in the
4 summer, but she was just storing it there for four
5 months, because she had just gotten a new car, and my
6 grandparents had a very big driveway in Florida.
7 So I mean, she'd come by and get it sometimes,
8 but -- and they were also elderly, but they also had it
9 there just to take care of family and knowing that it
10 was going to go to me at some point.
11 Q. Okay. So this was in Florida.
12 Did you have to -- did you have to travel down
13 from North Carolina to get the car --
14 A. Yes.
15 Q. -- from Florida?
16 Okay. Do you know if your grandpa paid for the
17 car --
18 A. Yes.
19 Q. -- paid your -- do you know how much he paid?
20 A. I think around like $6,000.
21 Q. Okay. So the car sat for four months, and then
22 you came down, and then what happened next?
23 A. It didn't really sit for four months, because it
24 was still driven.
25 Q. Oh, it was still driven during that time?

1 A. Yeah.
2 Q. Okay. Who was driving it?
3 A. My grandparents and then, also, as I said, my
4 cousin would still come down and get it sometimes as
5 well.
6 Q. Okay. During that time, do you know if there was
7 any service performed on the car?
8 A. Personally me, no, I do not.
9 Q. Okay. Do you remember any services performed on
10 the car after you came down to Florida?
11 A. Me, I do not remember any services done on the
12 car while I had it. No.
13 Q. Okay. Do you remember your grandpa having
14 services performed on the car before he gave it to you?
15 A. Yes, I was -- I was there. He had it fully
16 serviced and put new tires on it.
17 Q. Okay. So you were present at the service --
18 A. Yes.
19 Q. -- that your grandpa did?
20 Okay. Okay. So tell me -- tell me about that.
21 A. We went to the shop that's just around the corner
22 and they took it to before, and then they did a full
23 servicing on it and then -- like, you know, oil change,
24 alignment, everything, and brakes, whatever, and then
25 put new tires on it.

1 Q. What was the name of the shop that they took it
2 to that was around the corner?
3 A. I'm not -- I'm not sure I recall that. I just
4 know where it is.
5 Q. You just know where it is. That's how I am with
6 car places, too.
7 Do you remember if it was a local store or if it
8 was a national chain?
9 A. I think it's a local place.
10 Q. Okay. And I heard in your answer that they took
11 it somewhere else from the shop?
12 A. That's not what I -- no.
13 Q. Oh, okay. Did they do all the maintenance
14 there --
15 A. Yes.
16 Q. -- at the shop?
17 Okay. Did they do it all in the same day?
18 A. Yes.
19 Q. Did you guys wait at the service appointment?
20 A. No, because we drove two cars there. So we took
21 one back.
22 Q. Okay. Do you know how long the car -- how long
23 it was before you picked up the car?
24 A. It was like all day or it might have been the
25 next day, but it was -- it was a really -- it was a

1 while. So --
2 Q. Do you know how long it took for them to work on
3 the car?
4 A. It was at least all day or we might have picked
5 it up the next day, but it was a very long time, because
6 we took it in the morning, and I know we were there --
7 it was there for a long time.
8 Q. Okay. And so you said they gave you new brakes,
9 right?
10 A. Yes, I believe so.
11 Q. Did they do anything to the tires?
12 A. They gave us new tires and an alignment.
13 Q. Did you go anywhere else with your grandpa to get
14 work done on the vehicle?
15 A. No.
16 Q. Do you remember who paid for the services?
17 A. My grandfather.
18 Q. That was very nice of him.
19 Do you know how much it was?
20 A. No. He wouldn't have let me know that.
21 Q. Did he pay like that day?
22 A. Yes.
23 Q. Okay. So about what time of year did this
24 happen?
25 A. Summer 2016.

6 (Pages 18 - 21)

Veritext Legal Solutions
800.743.DEPO (3376) calendar-carolinas@veritext.com www.veritext.com
Case 1:19-cv-00294-CCE-JLW Document 134-1 Filed 12/03/21 Page 8 of 55

1   Q.  Do you remember doing any service on the car
2   after the summer of 2016?
3   A.  Not that I recall.
4   Q.  Did you do anything to the vehicle after you
5   received it?
6   A.  No.
7   Q.  Do you remember how many miles the car had on it
8   when you received it?
9   A.  No idea.
10  Q.  Okay.  Do you know how many miles you drove it
11  after you received it?
12  A.  Probably not a lot.
13      My mom had cancer at the time.  So I wasn't going
14  anywhere.
15  Q.  Okay.  So I might have already asked you this,
16  but I just want to confirm.
17      Did you have any maintenance performed on the
18  car --
19  A.  No.
20  Q.  -- after receiving it?
21  A.  Not that I recall.
22  Q.  And approximately how long did you have the
23  vehicle before the accident?
24  A.  Three months.
25  Q.  All right.  Can you pull up a document that is

1   labeled as Garrison P&C --
2   A.  Okay.  One second.  I've got to log back into the
3   computer.  I was off it too long.
4   Q.  Are you on your phone?
5   A.  Yes.
6      Garrison P&C, yes.
7   Q.  Let me know when you've got it up.
8   A.  Okay.  Okay.  I see it.
9   Q.  Do you see the little -- do you see the little
10  numbers on the bottom of the pages?
11  A.  Yes.
12  Q.  Okay.  Can you go to the one that is 73 which, I
13  think, is like the seventh page of the document.
14  A.  I'll need to open up the right one.  Garrison
15  P&C, this one has 11 pages on it.
16  Q.  Yeah, that should be right.
17  A.  Okay.  I thought you said you wanted me to go to
18  -- I thought you said Page 76.  Which page do you want
19  me to go to?
20  Q.  There should be little numbers on the bottom of
21  the page.
22  A.  Oh, okay.  Got you.
23      Okay.  I see.  I see.
24  Q.  Okay.  Do you see a sticker or a picture?  Tell
25  me what you see in the picture.

1   A.  I see my totaled car.
2   Q.  Okay.  I want you to go to the Page No. 7 of
3   those pictures.
4   A.  Okay.
5   Q.  And look on the bottom right-hand corner, and you
6   should see Garrison P&C 00073; do you see that?
7   A.  Yes.
8   Q.  Okay.  What do you see in that picture?
9   A.  I see that it's an oil change for 11/15 and the
10  miles at 73,555.
11      MS. WILTROUT:  I'd like to mark this
12  document as Exhibit 1 to the deposition.
13      (Defendant's Exhibit No. 1 was marked for
14  identification)
15  BY MS. WILTROUT:
16  Q.  Do you remember having this sticker on your car?
17  A.  No.
18  Q.  No?
19  A.  I mean, I guess it was there, but I don't
20  remember it there.
21  Q.  Okay.  Do you remember getting a sticker like
22  this when you had the maintenance done with your
23  grandpa?
24  A.  That wouldn't have been the right year, because I
25  wouldn't have had the car then.

1   Q.  Okay.  But do you remember getting another
2   sticker or notice showing you when the oil was changed
3   after that?
4   A.  I should have, because the oil was changed.
5   Q.  Okay.  So as of -- and so what date did the
6   accident happen?
7   A.  October 2, 2016.
8   Q.  Okay.  So as of -- by that day, was the vehicle
9   in pretty good condition?
10  A.  It was in really good condition.
11  Q.  Had the interior been shampooed?
12  A.  Yeah.  It was in good condition.
13  Q.  Okay.  Do you remember having the interior
14  shampooed?
15  A.  Yeah.  I would take it to the -- to the car wash.
16  Q.  Okay.  Did you get the exterior cleaned at the
17  car wash?
18  A.  Yes.
19  Q.  And did you get the inside cleaned too?
20  A.  Sometimes you take it to the place -- there's a
21  particular place they get it done inside, the detailing
22  place.
23  Q.  Did you take the car to that detailing place?
24  A.  Yeah.  There's a good one in Fayetteville.
25  Q.  Okay.  Do you remember when you took that car --

Page 26

1 took your Cadillac CTS to the interior detailing place?
2    A. No, I can't remember that time.
3    Q. But do you remember that you did it?
4    A. I know that I would do it around that time, yes,
5 but I can't remember the exact date.  No.
6    Q. Okay.  Did you ever have the leather
7 reconditioned in the car?
8    A. If I did the shampooing, it probably would do
9 that too.
10    Q. Go ahead and look at the pictures again, if you
11 would, and go to the third picture, which is Garrison
12 P&C 00068.
13      Do you remember having the scratch on the
14 leather?  Actually, tell me -- tell me what you see in
15 this picture.
16    A. I see a leather with a scratch in it.
17    Q. Okay.  Do you remember how that happened?
18    A. I think I got it that way.
19    Q. Okay.  So this was before your dad's cousin --
20    A. I think so.
21    Q. Okay.  And just to be clear.
22      Is this what your seats looked like on the day of
23 your accident?
24      MR. MALONE:  Objection.
25      You can answer, Vail.

Page 27

1      THE WITNESS:  I guess so.
2      I mean, the seats are really, really soft.
3 They were like buttery soft, except for that scratch.
4 But I honestly don't remember that scratch being that
5 big.  So --
6 BY MS. WILTROUT:
7    Q. Okay.  Does this look like a picture that was
8 taken of your -- of the seat of your car?
9    A. Yes.
10    Q. Okay.  And there's a scratch on it, right?
11    A. Yes.
12    Q. Do you know how old the brakes were on the
13 vehicle?
14    A. They were new.
15    Q. They were -- all the brakes were brand new?
16    A. All.  I would guess so.  I don't know.
17    Q. What about the exterior, were there any -- tell
18 me about the condition of the exterior.
19      MR. MALONE:  Objection.
20      THE WITNESS:  The exterior had been --
21      MR. MALONE:  Hold on.  Objection.
22      You can answer, Vail.
23      MS. WILTROUT:  I'm sorry.  I'll rephrase my
24 question.
25 BY MS. WILTROUT:

Page 28

1    Q. Tell me what you remember about the exterior of
2 your car.
3      THE WITNESS:  The exterior was --
4      MR. MALONE:  Objection to form.
5      You can answer.
6      THE WITNESS:  The exterior was in really
7 good condition.  There were no scratches or fading.
8 BY MS. WILTROUT:
9    Q. Okay.  All right.  So I don't need to know the
10 details of the accident, but generally speaking, tell me
11 how the car was involved in the accident.
12    A. That's hard to answer that about the accident.
13    Q. I don't want to -- I don't want to get into, you
14 know, to what happened to you, you know.  I just wanted
15 to know --
16    A. I was stuck on the side of the road waiting for a
17 tow truck, and this guy was high on heroin, and he hit
18 me going 75 miles an hour, and I went 100 feet against
19 the concrete barrier, and so the -- his car went into my
20 car and pushed me 100 feet into a concrete barrier.
21 That's what happened.  My car was completely stopped.
22 So --
23    Q. I'm so sorry.  That sounds horrible.
24    A. It was.
25    Q. And so you were stopped because your car had lost

Page 29

1 speed, right?
2    A. Uh-huh.
3    Q. Okay.  So was that the first time that it ever
4 happened?
5    A. Yes.
6    Q. So describe to me, in your own words, what
7 happened.
8    A. I was driving, and all of a sudden it lost power,
9 and so then I tried to get as much on the shoulder as I
10 could, and then I was waiting for a tow truck, and then,
11 bam, it happened.
12    Q. When the car lost power, did the interior lights
13 shut off?
14    A. Everything shut off.
15    Q. Everything shut off.  Okay.  So it completely
16 stopped.
17      How long had you been driving at that point?
18    A. Two hours.
19    Q. So you were two -- were you driving away from
20 your home two hours?
21    A. No.  I was on the way back.  I was coming from
22 the beach.
23    Q. Were you alone?
24    A. Yes.
25    Q. And had the car ever done anything like this

8 (Pages 26 - 29)

Veritext Legal Solutions
800.743.DEPO (3376)       calendar-carolinas@veritext.com       www.veritext.com
Case 1:19-cv-00294-CCE-JLW    Document 134-1    Filed 12/03/21    Page 10 of 55

Page 30

1 before?
2   A. No.
3   Q. Had your grandpa ever reported that this happened
4 or any mechanical issues?
5   A. No, nobody -- any -- this car had never had
6 mechanical issues before.
7   Q. And who were you insured by at the time of the
8 accident?
9   A. USAA Garrison.
10  Q. And what day did you report the accident to
11 Garrison?
12  A. I cannot recall that, because I was in the
13 hospital. So I can't personally state that date
14 exactly.
15  Q. Okay. Do you remember -- do you ever remember
16 making the call?
17  A. No.
18  Q. Okay. So what do you know about the reporting of
19 the accident?
20  A. Do you mean to the police? I --
21  Q. I mean to -- I'm sorry.
22     What do you recall about reporting the accident
23 to Garrison?
24  A. Not much at all.
25  Q. Do you remember who made the call?

Page 31

1   A. I know that it was probably my parents or my dad,
2 and I had to give them permission to talk to USAA,
3 because I could not do it.
4   Q. Okay. Did you authorize your dad to continue
5 conversations with Garrison for you on your behalf?
6   A. I authorized him to speak on my behalf. I did
7 not authorize him to do anything else but speak.
8   Q. Okay. And do you remember how you did that; was
9 it like a verbal or was it in writing?
10  A. It was a verbal.
11  Q. Was it a verbal on the phone with Garrison?
12  A. With USAA, yes.
13  Q. Just to be clear. Garrison and USAA are separate
14 entities.
15  A. But it's on the USAA app.
16  Q. So you were speaking through the USAA app?
17  A. I mean, like you go through the USAA app. Like
18 your insurance is on the app.
19     It's very confusing, because it's on the app, and
20 you set up your insurance through USAA. It doesn't say
21 Garrison. It says USAA.
22  Q. Did you have a phone conversation when you
23 authorized your dad to speak with Garrison on your
24 behalf or was it like through an app chat program?
25  A. No. It was on the phone.

Page 32

1   Q. It was on the phone. Okay.
2     Did Garrison inspect your car after that?
3   A. I will rely on my lawyers for that, because I do
4 not know.
5   Q. All right. So I'm mostly -- I'm 100 percent only
6 interested in what you know and what you remember.
7     So why don't you just tell me about what you
8 remember about --
9   A. I can't honestly not say, because I don't
10 remember. That first year is really vague for me.
11  Q. Understood. Okay.
12     Do you remember finding out that your car had
13 been totaled?
14  A. Yes.
15  Q. Okay. What do you remember about that?
16  A. I just knew that it was totaled. That's all I
17 knew.
18  Q. Do you remember who told you?
19  A. It was probably --
20     MR. MALONE: Objection.
21     THE WITNESS: -- one of my parents.
22     MR. MALONE: Hold on. I was going to object
23 if that required Vail to disclose attorney/client
24 communications.
25     If you can answer that Vail, without

Page 33

1 revealing attorney/client communications, you can
2 answer.
3     THE WITNESS: I think it was really one of
4 my parents that told me, but I don't honestly know.
5 BY MS. WILTROUT:
6   Q. Do you remember about when you had that
7 conversation with your parents?
8   A. No idea.
9   Q. How long were you in a -- I had a concussion. So
10 I call it like a brain fog. I know what you had is much
11 more than that.
12     But how long were you in that space where you
13 couldn't remember things?
14  A. Well, I was in the ICU for like two months. So
15 other than beyond that, it's foggy for a while.
16  Q. Okay. When you found out from your parents that
17 the car had been judged a total loss, were you
18 surprised?
19  A. No.
20     MR. MALONE: Objection.
21     You can answer.
22     THE WITNESS: No.
23 BY MS. WILTROUT:
24  Q. Has Garrison paid you for the claim to your car?
25  A. They gave me a check, but I did not believe it

9 (Pages 30 - 33)

Veritext Legal Solutions
800.743.DEPO (3376)        calendar-carolinas@veritext.com        www.veritext.com
Case 1:19-cv-00294-CCE-JLW    Document 134-1    Filed 12/03/21    Page 11 of 55

Page 34

1 was -- I never believed it was for the total -- a full
2 settlement for the total amount.
3    Q. Do you remember when you got the check?
4    A. No.
5    Q. Okay. Do you remember hearing that there would
6 be additional funds coming after you received the check?
7    A. No, I did not.
8    Q. Okay. Did you deposit the check?
9    A. Yes.
10    Q. Do you remember when you deposited the check?
11    A. No.
12    Q. So who would have deposited the check in your
13 checking account?
14    A. It actually was my father.
15    Q. Did he tell you -- did he discuss the value of
16 the car with you before he deposited the check?
17    A. No.
18    Q. Did he discuss the check with you?
19    A. I think he did some, but I -- I think that he did
20 more so later, not at the time.
21    Q. Okay. Do you remember when you guys talked about
22 it?
23    A. You mean at the time or later?
24    Q. Yeah. I meant later. I was asking when that --
25 when later referred to?

Page 35

1    A. Probably a year later.
2    Q. So at the time of the accident, did you have any
3 understanding of how Garrison came to the value it gave
4 your vehicle?
5    A. No.
6    Q. But do you think that your dad did?
7       MR. MALONE: Objection. Calls for
8 speculation.
9       You can answer, if you know.
10       THE WITNESS: I don't think I know.
11 BY MS. WILTROUT:
12    Q. Okay. I should have -- a better question, which
13 might have not gotten an objection, would be, do you
14 remember talking to your dad about how -- about the
15 value of the car at that time?
16    A. No.
17    Q. Do you remember talking to anybody about the
18 value of the car at that time?
19       MR. MALONE: Objection. To the extent that
20 it would ask that Vail reveal attorney/client
21 communications, I would instruct her not to answer.
22       If she discussed the value of her car with
23 someone other than an attorney, she can answer that
24 question.
25 BY MS. WILTROUT:

Page 36

1    Q. And just to be clear. If you were speaking with
2 an attorney, I'm not asking the contents of the
3 conversation. I'm just asking, you know, if you had
4 that conversation?
5       MR. MALONE: If you're -- I'm going to
6 sustain -- maintain the objection that she should not
7 answer the question if -- that even if the car says,
8 "Did you discuss the value of the vehicle with
9 anyone?" If the answer is, "Yes, my attorney." Then
10 don't answer the question, because that question
11 seeks to reveal the content of attorney/client
12 communications, and we're not waiving that privilege
13 at this point.
14       But you can go ahead and answer, Vail.
15       THE WITNESS: I don't think I discussed it
16 with anyone else --
17 BY MS. WILTROUT:
18    Q. I mean --
19    A. -- other than my father.
20       What did you say?
21    Q. Did you discuss it with anybody other than your
22 father?
23    A. I don't -- I don't think we discussed the value
24 of it with my father beforehand.
25    Q. Okay. So you don't think you discussed it with

Page 37

1 anybody?
2    A. Uh-uh.
3    Q. Okay. So go ahead and pull up the document that
4 is saved as 2016.10.17, and let me know if you have any
5 issues getting that up.
6       And I'm going to be referring to this document in
7 terms of the little numbers on the bottom right. So
8 make sure you can see those clearly.
9    A. Okay.
10    Q. So the first page of the document that I'm
11 looking at is 130; is that the same as yours?
12    A. 130?
13       MR. MALONE: I'm not following that that's
14 the same page.
15       Are you saying --
16       MS. WILTROUT: That is why I asked, to make
17 sure.
18       THE WITNESS: I'm not seeing a 130.
19       MR. MALONE: I see a 107.
20       THE WITNESS: That's what I'm seeing.
21       MS. WILTROUT: Okay. Yep. That is fine.
22 Yep, that's the same one. Okay. Sorry about that.
23       So I'd like to mark -- have the court
24 reporter mark this as an exhibit, Deposition
25 Exhibit 2 I believe we're at.

10 (Pages 34 - 37)

Veritext Legal Solutions
800.743.DEPO (3376)       calendar-carolinas@veritext.com       www.veritext.com
Case 1:19-cv-00294-CCE-JLW   Document 134-1   Filed 12/03/21   Page 12 of 55

Page 38

1       (Defendant's Exhibit No. 2 was marked for
2   identification)
3   BY MS. WILTROUT:
4       Q.  Okay.  Take a look at this document and tell me
5   if you remember receiving it.
6       MR. MALONE:  Andrea, I hate to interject
7   here, but just for purpose of clarity.
8       Are you asking whether she received it now
9   or whether she remembers receiving it back in October
10  of 2017?
11      MS. WILTROUT:  Those are both good
12  questions.  We'll start with the first one.
13  BY MS. WILTROUT:
14      Q.  Vail, do you remember receiving this document in
15  October of 2016?
16      A.  I wouldn't have received it then, because I would
17  have been in the hospital.
18      Q.  Okay.  Have you seen this document before?
19      A.  Yes.
20      Q.  Do you know if this document was received and/or
21  reviewed by anyone on your behalf?
22      MR. MALONE:  Objection.
23      You can answer, if you know.
24      THE WITNESS:  I don't know.
25  BY MS. WILTROUT:

Page 39

1       Q.  So I'm sorry.  Have you ever seen this document
2   before?
3       A.  Yes.
4       Q.  Okay.  All right.  So go to -- and I apologize,
5   because my bates numbers are messed up, but I believe
6   it's the -- actually, let me pull it up on here.
7       MR. MALONE:  Andrea, I hate to again
8   interject, but when we talk about this document,
9   there's a letter, and then there's a CCC One report
10  that's attached to it.
11      So when you say this document, are you
12  talking about the letter or the CCC report?
13      MS. WILTROUT:  I was talking about the
14  letter in the entirety.
15      MR. MALONE:  So the letter with the report
16  attached to it?
17      MS. WILTROUT:  Yes, because that's how it
18  was transmitted.
19      MR. MALONE:  I got you.  Okay.  I'm just
20  trying to understand.  You're good.
21      MS. WILTROUT:  I'm happy to provide any
22  clarification necessary.
23      MR. MALONE:  That's fine.
24      MS. WILTROUT:  Okay.  Great.  I'll move on
25  then.

Page 40

1       MR. MALONE:  I was just trying to
2   understand.  That's all.  Thank you.
3       MS. WILTROUT:  Okay.  Let me know if you
4   need -- if you need help.
5   BY MS. WILTROUT:
6       Q.  So the document that has the title Claim and
7   Payment Information, which is 111 Garrison --
8       THE WITNESS:  Once again, my computer shut
9   off.
10      MS. WILTROUT:  It's Page 5.
11      THE WITNESS:  I'm trying to get it reopened.
12      MS. WILTROUT:  Okay.  If we get into a
13  pinch, I can always just bring it up on the screen,
14  too.
15      THE WITNESS:  I might need you to do that,
16  because right now, my computer is not wanting to open
17  it.  It was open, and then it just froze, and then it
18  closed out.
19      MS. WILTROUT:  Really annoying.
20      THE WITNESS:  It is.
21      MS. WILTROUT:  Okay.
22      MR. MALONE:  You were doing so good.
23      THE WITNESS:  I know.
24      MS. WILTROUT:  Okay.  Let me set myself up
25  for screen sharing.

Page 41

1       THE WITNESS:  I'm so sorry.
2       MS. WILTROUT:  No, it's all good.
3       We can also take a break if you want to try
4   to get it back up but, like I said, I'm happy to do
5   this.
6       Yeah, do you want to take a break and see
7   if you can restart your computer?
8       THE WITNESS:  Yeah, I can try and do that
9   real quick.
10      MS. WILTROUT:  Okay.  So we can go off the
11  Record.
12      THE VIDEOGRAPHER:  The time on the monitor
13  is approximately 11:48 a.m., and we're off the
14  Record.
15      (A brief recess was taken in the deposition)
16      THE VIDEOGRAPHER:  The time on the monitor
17  is approximately 12:01 p.m., and we're back on the
18  Record.
19  BY MS. WILTROUT:
20      Q.  All right.  Ms. Fortson, right before we left, we
21  were starting to look at a document that you have up.
22      Do you have that document up in front of you?
23  It's the document that we marked as Exhibit 2 to the
24  deposition.
25      A.  Yes, I have it.

11 (Pages 38 - 41)

Page 42

1    Q. Okay. Great.
2        All right. So if you would go to, I believe, the
3  fifth page in that letter that says Claim and Payment
4  Information.
5    A. Claim and Payment Information. Five. Okay. All
6  right. Okay. Oh, my gosh. I see where it says Market
7  Valuation Report on the fifth page.
8    Q. Okay. I'm going to go ahead and pull up the one
9  that I've got. And of course, it's not working. I
10 should have had this up before. Give me one second. I
11 think I jinxed myself.
12       Yes. Yeah. So go to Page 5 of the document. It
13 should be Garrison P&C 111.
14   A. 111.
15   Q. It's Page 5 of the PDF.
16   A. Okay. Got you. I see it now.
17   Q. Okay. All right. So can you tell from this
18 document what the vehicle's actual cash value was
19 reported as being in this report?
20   A. You mean the -- it says $6,690.00.
21   Q. Yes. And what other items do you see under that
22 number?
23   A. I see the Sales Tax is $200.70. I see the
24 Registration and Plate Fee is $20.00. I see the Title
25 Fee is $52.00, and the net --

Page 43

1    Q. And what --
2    A. Go ahead.
3    Q. I broke my own rule. Finish what you were
4  saying.
5    A. And the net total being $6,982.70.
6    Q. Okay. Is that what you remember receiving as
7  payment from Garrison?
8    A. I believe so.
9    Q. We'll talk more about the actual cash value, but
10 I just want to make sure that you remember receiving the
11 sales tax payment, registration fee, and title fee?
12   A. Okay.
13   Q. Correct?
14   A. Yes.
15   Q. Okay. So then go ahead, skip a couple pages up,
16 just the next page.
17   A. Okay.
18   Q. What do you see here?
19   A. Report Summary.
20   Q. And this is from CCC, right, CCC One?
21   A. Yes.
22   Q. Okay. Tell me what it says here for Base Vehicle
23 Value.
24   A. Base Vehicle Value? Did you say Bates Vehicle
25 Value or Base Vehicle Value?

Page 44

1    Q. Base Vehicle Value.
2    A. It says $6,560.00, plus a different Condition
3  Adjustment of $130.00.
4    Q. And I just realized right before we got off the
5  break, there was a little confusion about whether or not
6  you actually looked at this report.
7    Do you remember seeing this before preparing for
8  your deposition today?
9    A. Yes.
10   Q. Okay. But do you remember seeing this report
11 after your accident?
12   A. You mean right after my accident? No.
13   Q. Okay. Go ahead and look at -- I'm sorry to make
14 you go back and do this.
15   Go to the second page of the document of
16 Exhibit 2. Do you see a transmittal page?
17   A. Yes.
18   Q. Who is the document showing that it was sent to?
19   A. It says Salvage Recovery.
20   Q. So I'm looking at the second page, 00108, of the
21 actual PDF.
22   A. Oh, that's the wrong page. Sorry. It says it
23 was sent to my e-mail.
24   Q. Okay. That evfortson@gmail.com is your e-mail?
25   A. Yes.

Page 45

1    Q. Okay. And so do you have any reason to believe
2  that this document that we're talking about right now
3  was not sent to your e-mail?
4    A. No.
5    Q. And were you having somebody check your e-mail
6  during that time for correspondence about your
7  automobile accident?
8    A. Probably, because I couldn't even be on my phone
9  at the time. I couldn't even -- I wasn't even allowed
10 to look at my phone.
11   Q. Okay. All right. So let's take a look at the
12 Base Vehicle Value. I think you might have answered
13 that. I apologize if I asked that already.
14   But what do you see here?
15   A. You're going back to that other page?
16   Q. Yes. Go back to that other page.
17   A. So the Base Vehicle Value says $6,560.00.
18   Q. Okay. And do you see a Condition Adjustment?
19   A. Yes, a different Condition Adjustment. It says
20 $130.00.
21   Q. And is that a positive or a negative Condition
22 Adjustment?
23   A. It's a positive Condition Adjustment.
24   Q. And so then you have -- and what is the Adjusted
25 Vehicle Value?

12 (Pages 42 - 45)

Veritext Legal Solutions

800.743.DEPO (3376)        calendar-carolinas@veritext.com        www.veritext.com
Case 1:19-cv-00294-CCE-JLW    Document 134-1    Filed 12/03/21    Page 14 of 55

Page 46

1    A. It is $130.00.
2    Q. So I have -- the Adjusted Vehicle Value on my
3  copy says $6,690.00; is that what you see on yours?
4    A. Oh, yes. Sorry. I was -- I didn't understand
5  what you said. Yes, I see that.
6    Q. Okay. So would you agree with me that the
7  Adjusted Vehicle Value represented in this report is
8  $6,690.00?
9    A. Yes.
10    Q. And then do you see a tax payment calculated
11 here?
12    A. Yes.
13    Q. And then what is the total?
14    A. It is $6,890.70.
15    Q. All right. Go to the page -- the eighth page in
16 the PDF, Garrison P&C 114. It should say Vehicle
17 Information on it.
18    A. Okay. Okay.
19    Q. Okay. Does this report accurately describe your
20 vehicle?
21        MR. MALONE: I'm sorry. I'm going to
22 object.
23        Are you saying this page or the entire
24 report?
25 BY MS. WILTROUT:

Page 47

1    Q. I'm sorry. This page. Does this page of the
2  report accurately describe your vehicle?
3    A. Well, there's a lot more to a vehicle than just
4  that, I think.
5    Q. Are there any -- is there any information in the
6  Vehicle Details box that is incorrect?
7        MR. MALONE: Objection. Foundation.
8        You can answer.
9        THE WITNESS: I think so. I guess so.
10 BY MS. WILTROUT:
11    Q. Underneath the Vehicle Details box, there is a
12 Vehicle History Summary; do you see that?
13    A. Vehicle History Summary. Yes, I see that.
14    Q. Okay. And it looks like there's a note there
15 showing one previous collision; do you see that?
16    A. Yes.
17    Q. Okay. And it looks like the accident was on
18 September 29, 2009, right?
19    A. That's what it says.
20    Q. Okay. Do you remember hearing about that
21 accident?
22    A. I have no knowledge of that accident.
23    Q. Okay. Your dad's -- what is your dad's cousin's
24 name who previously owned the vehicle?
25    A. Leslie Ann Freeman.

Page 48

1    Q. Is that Freeman, F --
2    A. F-R-E -- I mean, F-R-E-E-M-A-N.
3    Q. Okay. Were you close with Leslie Ann Freeman?
4    A. Not particularly.
5    Q. Would you have known if she got into a car
6  accident?
7    A. No.
8    Q. Okay. All right. So she never told you about
9  the car accident before?
10    A. No.
11    Q. Did you even know that the car was in a previous
12 accident?
13    A. No.
14        MR. MALONE: Objection.
15        You can answer.
16        THE WITNESS: No, I did not.
17 BY MS. WILTROUT:
18    Q. Okay. Do you think that a car that has been in
19 an accident is worth more than a car that has been --
20 that was not involved in an accident?
21        MR. MALONE: I'll object. Lack of
22 foundation.
23        You can answer, if you know.
24        THE WITNESS: I do not know.
25 BY MS. WILTROUT:

Page 49

1    Q. Let me ask it this way: If you were going to
2  provide a value on a car, and you had a car that had
3  been involved in an accident and then a car that had not
4  been involved in an accident, which car would you value
5  higher?
6        MR. MALONE: Objection.
7        You can answer.
8        THE WITNESS: I do not know.
9  BY MS. WILTROUT:
10    Q. Do you think there would be a difference?
11        MR. MALONE: Objection.
12        You can answer.
13        THE WITNESS: I do not know.
14 BY MS. WILTROUT:
15    Q. Okay. Take a look at the Vehicle Information
16 page on the next three pages. That first is -- I'm
17 sorry -- next two pages, Vehicle Information, and there
18 are several options that are listed here.
19        Go ahead and let me know if you see anything on
20 these two pages that looks inaccurate to you.
21    A. Okay. Everything looks accurate.
22    Q. And then go to the next page, the Vehicle
23 Condition page.
24    A. Okay.
25    Q. And take a look at the conditions of each of

13 (Pages 46 - 49)

Veritext Legal Solutions
800.743.DEPO (3376)      calendar-carolinas@veritext.com      www.veritext.com
Case 1:19-cv-00294-CCE-JLW   Document 134-1   Filed 12/03/21   Page 15 of 55

Page 50

1 those categories.  We can walk through them together.
2     The Mechanical here is rated very good.  What is
3 the Value Impact noted here?
4     A.  It's $130.00.
5     Q.  And that lines up with the first page of the
6 report where the Base Vehicle Value was increased by
7 130, correct?
8     A.  Correct.
9     Q.  Okay.  Let's look at the Tires.  What condition
10 are the tires rated in?
11     A.  It says, "6 average" or -- no.  They're good.
12 The tires are good.
13     Q.  And the inspection is 6 average?
14     A.  Yes.
15     Q.  So the tires were not rated very good or
16 excellent, correct?
17     A.  That's what it says.
18     Q.  Do you remember getting new tires four
19 months before with your grandpa?
20     A.  Yes.
21     Q.  Okay.  And by the way, what is your grandpa's --
22 I don't actually have your grandfather's name.  What is
23 your grandfather's name?
24     A.  Robert Malcolm Fortson.
25     Q.  And where did he live?

Page 51

1     A.  Jacksonville, Florida.
2     Q.  What was his address?
3     A.  3875 Ortega Boulevard.
4     Q.  3875.
5        And you said that the body shop or the -- sorry.
6 You said that the shop that you got brand new tires on
7 or at was right down the street from him at that
8 address?
9     A.  It's close by.
10     Q.  Approximately how far away?
11     A.  I'm not good with distance, but it's close by.
12     Q.  How long would it take you to drive there?
13     A.  Like five minutes maybe, if that.
14     Q.  And here you have the Paint.  What condition was
15 the paint in?
16     A.  It was in good condition.
17     Q.  Okay.  What do the inspection notes show?
18     A.  Headlight lenses clouse -- cloused, cloused.
19     Q.  I think that might be the body.
20     A.  Oh.  "Slight fading and surface scratches."
21     Q.  Do you remember there being slight fading to your
22 car to the paint?
23     A.  No.
24     Q.  Do you remember the paint being in excellent
25 condition?

Page 52

1     A.  It was in good condition.
2     Q.  Did you have the paint retouched at the detailing
3 appointment with your grandfather?
4     A.  No.
5     Q.  Do you know if the paint had been retouched since
6 the car was purchased in 2004?
7     A.  No.
8     Q.  And I believe you were reading from the Body
9 section.  What does the Body section say?
10     A.  "Headlight lenses cloused, dings (veh seen in
11 rain)."
12     Q.  I looked at that a couple times.  I think they
13 might be saying clouded.
14        Would you agree that the headlight lenses were
15 clouded?
16     A.  I do not know.
17     Q.  And what does it say for the Glass?
18     A.  It says, "Pitting."
19     Q.  And what condition?
20     A.  It says, "Good."
21     Q.  And then tell me what it says for the Interior.
22     A.  It says, "Good."  And it says, "Tear, soiled,
23 leather wear, trim soiled."
24     Q.  Okay.  So do you remember, on the day of the
25 accident, the interior of your car being soiled?

Page 53

1     A.  No.
2     Q.  How long had it been since you had had the car
3 shampooed?
4     A.  I'm not going to remember that.
5     Q.  Okay.  Do you remember the place that you got the
6 car shampooed?
7     A.  It's this Mexican -- it's in this old like -- I
8 don't even know the name of it, but it's in this old
9 like gas station thing, and these Mexicans do it by hand
10 in Fayetteville on Bragg Boulevard.  I don't even know
11 if they have a name, but it's all cash.  They do a
12 really good job, though.
13     Q.  It's off what?
14     A.  Bragg Boulevard in Fayetteville.
15     Q.  And how did you pay them?
16     A.  Cash.  They only take cash.
17     Q.  And do you remember at all how long it had been
18 since you -- like months, three months, weeks since you
19 had gotten the car detailed?
20     A.  I don't remember.
21     Q.  Do you have any pictures of the car from before
22 the accident?
23     A.  I don't think so.
24     Q.  Do you know if you ever took a picture of
25 yourself in the car that you got before the accident?

14 (Pages 50 - 53)

Veritext Legal Solutions

800.743.DEPO (3376)      calendar-carolinas@veritext.com      www.veritext.com
Case 1:19-cv-00294-CCE-JLW    Document 134-1    Filed 12/03/21    Page 16 of 55

Page 54

1  A. I'd have to go through my pictures, but I'm not
2  sure.
3  Q. But there might be a picture of you in the car?
4  A. I'm not saying yes or no, but I'm not sure.
5  Q. Were you ever asked to look for pictures of the
6  interior of the car?
7  A. Not that I know of.
8  Q. And you've never looked for pictures in the car
9  inside?
10  A. I don't think I really had that -- any, though,
11  because I've gone through my photos recently looking for
12  something for my sister, and I don't really recall any.
13  Q. Okay. So is the component condition listed for
14  the interior, is that an accurate description of your
15  vehicle at the time of the accident?
16  A. I would say there was some -- there was a tear
17  and a little bit of leather wear, but I wouldn't say it
18  was really soiled that much.
19  Q. Let's move on to the next page of comparable
20  vehicles, the next two pages. Actually, it's four
21  pages.
22      So over on the right-hand side of the page,
23  you'll see a list of the comparables; do you see that?
24  A. Yes.
25  Q. Take a look at that, and I'm going to ask you

Page 55

1  some questions about what you see.
2  A. Okay.
3  Q. Would you agree with me that there are four
4  comparables -- or there are four comparable vehicles in
5  this report?
6  A. Yes.
7  Q. Do you agree with me that all of the vehicles are
8  around the same year as your car?
9  A. Yes.
10  Q. Do you agree that they're all within 25 to
11  50 miles away from your -- from your address?
12  A. Yes.
13  Q. From Fayetteville, North Carolina, to be
14  specific.
15      So take a look at the first comp, comparable
16  vehicle. Here tell me what the list price here is, what
17  you see for the list price for the first comp vehicle.
18  A. It is $7,449.00.
19  Q. Do you see a series of adjustments for that
20  vehicle?
21  A. Yes. I see an addition for options of $229.00,
22  and then an addition for mileage of $749.00, and then a
23  deduction for condition of $722.00.
24  Q. Let's look at the Options ones. Do you see a
25  difference in the options listed between the Loss

Page 56

1  Vehicle, that's another word for your car, and Comp 1?
2  A. Yes.
3  Q. And would you agree with me that they -- that
4  there are more options on your vehicle than there were
5  on Comp 1?
6  A. Yes.
7  Q. And so do you see how in the Options line, they
8  have given you a positive -- they've given a positive
9  $229.00 amount to account for the difference in options?
10  A. Yes.
11  Q. Same question with respect to mileage. Which car
12  had more mileage, your -- the loss vehicle or Comp 1?
13  A. Comp 1.
14  Q. And do you see the increase in the mileage
15  adjustment?
16  A. Yes.
17  Q. And then you see and -- and then there's a
18  condition adjustment of 722, correct?
19  A. Yes.
20  Q. And would you agree with me that the same process
21  is repeated for cars labeled Comp 2, Comp 3, and Comp 4?
22  A. Yes.
23  Q. Do you understand at all why Garrison used these
24  comparable vehicles to value your car?
25  A. Yes, I understand the comparable vehicles part.

Page 57

1  Q. Okay. Tell me what you understand about that.
2  A. So they took comparable vehicles, and they
3  compared them all to my car, and then they added or
4  subtracted what they did or did not have, in my case,
5  didn't have. So they would add on to it to give me a
6  price range for my car.
7      But then the condition part, they took out the
8  same piece every single time for the same three -- the
9  exact same three cars, which is on there.
10  Q. Yeah, were there any particular comparable
11  vehicles from this report that you feel were not actual
12  comparable vehicles to your car and should not have been
13  used?
14  A. No. Or I don't know.
15  Q. Okay. All right. I'm going to ask you to open
16  up the letter that was -- the next document, which is a
17  2016.10.26 letter and CCC report.
18  A. Okay.
19  Q. I'm opening it up on my end, too, to make sure I
20  can give you the right page numbers.
21  A. All right.
22  Q. Okay. So tell me what -- I'd like to mark this
23  document as -- actually, let me see.
24      Have you ever seen this document before?
25  A. Yes.

15 (Pages 54 - 57)

Veritext Legal Solutions
800.743.DEPO (3376)        calendar-carolinas@veritext.com        www.veritext.com
Case 1:19-cv-00294-CCE-JLW   Document 134-1   Filed 12/03/21   Page 17 of 55

Page 58

1    Q.  When do you remember seeing this document?
2    A.  Within the last two years.
3    Q.  And what is this document?
4    A.  This document is also a CCC One Market Valuation.
5    Q.  For your car?
6    A.  Yes.
7        MS. WILTROUT:  I'd like to mark this as
8    Exhibit 4 or Exhibit 3 to this deposition.
9        THE VIDEOGRAPHER:  Exhibit 3.
10       MS. WILTROUT:  Thank you.
11       (Defendant's Exhibit No. 3 was marked for
12   identification)
13   BY MS. WILTROUT:
14   Q.  Okay.  I'm looking at the first page of this PDF.
15   It looks like a fax cover letter.  Can you tell me who
16   this was sent to?
17   A.  This was sent to Mike Malone.
18   Q.  And I see Mike Malone's here in the deposition
19   today.
20       Who is Mr. Malone to you?
21   A.  He is my lawyer.
22   Q.  How long has he been your lawyer for?
23   A.  For over four years now.
24   Q.  And again, I do not want to hear about your
25   conversations with Mr. Malone, but what led you to seek

Page 59

1    out him as your lawyer?
2        MR. MALONE:  Objection.
3        You can answer.
4        THE WITNESS:  Make me hire him or make me
5    get a lawyer?
6    BY MS. WILTROUT:
7    Q.  Let's ask both questions.
8        Why did you -- four years ago, why did you get a
9    lawyer?
10   A.  I got a lawyer to help me with my settlement
11   insurance case, firstly, because I wanted to go against
12   the guy who hit me, but then he didn't have insurance,
13   and then but -- and then I was referred to him by a
14   friend, and then -- and then also -- what was the second
15   part of the question?  Sorry.
16   Q.  No, that's okay.
17       So you hired a lawyer to help you proceed against
18   the guy who hit you in the car accident?
19   A.  Yes.  First off, yeah.
20   Q.  Okay.
21   A.  But then that didn't work out.  So --
22   Q.  Okay.  Did you hire -- and you ultimately hired
23   Mr. Malone, correct?
24   A.  Yes.  And then we went through to get my
25   settlement from USAA.  Yeah.  He helped me with that,

Page 60

1    too.
2    Q.  Do you remember when you asked Mr. Malone to
3    first -- to help you with your settlement for USAA?
4    A.  No, I do not.
5    Q.  So this was sent -- I'm looking at the second
6    page of this letter.  This letter looks to be sent to
7    Mr. Malone on October 26, 2016; would you agree with me?
8    A.  Yes.
9    Q.  And the accident occurred on October 3rd,
10   correct?
11   A.  2nd.
12   Q.  2nd.  Okay.
13       Were you in the hospital on October 26, 2016?
14   A.  Yes.
15   Q.  Had you been in the hospital since your accident
16   on that date?
17   A.  Mostly, yes.
18   Q.  Mostly.
19       So do you remember when you went in and when you
20   left?
21   A.  I don't remember the exact days.  No.
22   Q.  Generally speaking, what do you remember about
23   coming in and out of the hospital during that time?
24       MR. MALONE:  Objection.
25       You can answer.

Page 61

1        THE WITNESS:  I was in immediate -- I went
2    in, and then they didn't immediately catch what
3    happened, and then I went back in a week later, and
4    then I was in the ICU after that.
5        Then they took me out again, and then they
6    -- within a day, I was back in the hospital, because
7    it had gotten worse, and then I was in for a very
8    long time after that.
9    BY MS. WILTROUT:
10   Q.  How long were you in the ICU for?
11   A.  I don't remember the exact amount of time, but it
12   was -- it was a long time.
13   Q.  When you say a long time, do you mean it was, you
14   know, several days, several weeks?
15   A.  Several weeks, over a month.
16   Q.  And then how long were you out after your initial
17   ICU stay?
18   A.  You mean out like --
19   Q.  How long were you out of the hospital?
20   A.  A day.
21   Q.  And then you went back to the hospital, correct?
22   A.  Yes.
23   Q.  And how long were you in the hospital then?
24   A.  Okay.  So no.  This is how it went.  So let me go
25   back, backtrack real quick.  I don't think I explained

16 (Pages 58 - 61)

Veritext Legal Solutions
800.743.DEPO (3376)        calendar-carolinas@veritext.com        www.veritext.com
Case 1:19-cv-00294-CCE-JLW    Document 134-1    Filed 12/03/21    Page 18 of 55

Page 62

1  this right.
2      So I went to the ER that night when I got hit,
3  and they -- I was there all night, and then they
4  discharged me, because they didn't catch that I had torn
5  both my carotid arteries.
6      So then a week later, I was in massive pain, and
7  I went to the ER, and then they realized I had torn my
8  carotid arteries, and then they sent me to UNC.  So then
9  when I was at UNC, that's when I was in ICU.
10     So I was there for two and-a-half weeks, and then
11 they didn't think I was going to survive.  So they sent
12 me home, but then a day later, they got some scans back.
13 They realized it was a lot worse.  So they brought me
14 back in.  I mean, a day later they brought me back in,
15 not even a day later.  It was really about like
16 12 hours, and so I came back in.  Then from there, I was
17 in for at least a month, if not five to six weeks
18 longer.
19     Does that make sense now?
20 Q.  Were you in the ICU during that last six weeks to
21 -- a month to six weeks?
22 A.  Yes.
23 Q.  Were you conscious in the ICU that second time?
24 A.  Yes, kind of -- yes, technically --
25 Q.  Were you --

Page 63

1  A.  -- but not --
2  Q.  -- conscious at the time?
3  A.  Like I was on a lot of medications, though.  I
4  couldn't really speak, and I couldn't really -- you
5  know, I couldn't do a lot of things.
6  Q.  And you were in the ICU under 24-hour medical
7  supervision?
8  A.  Yes.
9  Q.  So just looking at that timeline that we just
10 went through -- and I appreciate you talking about this
11 horrible thing that happened to you in your life -- it
12 seems like you were -- you might have been in the
13 hospital on October 26th when you got this letter?
14 A.  Yes.
15 Q.  Were you getting updates in the hospital about
16 the settlement of your claim?
17 A.  Yeah.
18     MR. MALONE:  I would object.  I'm going to
19 object to the extent that that seeks disclosure of
20 attorney/client communications.
21     But you can go ahead and answer otherwise.
22     THE WITNESS:  No, I was not.
23 BY MS. WILTROUT:
24 Q.  Do you remember -- I understand that you were in
25 the ICU, so you might not remember well.

Page 64

1      Do you remember authorizing Mr. Malone to
2  negotiate your settlement of your total loss vehicle
3  with USAA?
4      A.  I remember him giving -- he was able to --
5  authorizing him to speak on my behalf, but -- and
6  authorizing him to negotiate, but I know that he -- it
7  was -- we never thought it was the -- we never agreed to
8  that he -- he never -- he does not believe -- we never
9  believed it was agreed it was a total loss settlement.
10 Q.  Let's unpack that.  Do you remember -- I just
11 want to clarify.
12     When do you remember authorizing him to speak
13 with USAA or Garrison on your behalf?
14 A.  I don't remember.
15 Q.  Would you agree with me that it was in October of
16 2016?
17 A.  Yes.
18 Q.  Would you agree with me that it was before
19 October 26, 2016?
20 A.  Yes.
21 Q.  Was it within a week of your accident which
22 happened on October 2nd?
23 A.  I don't know.
24 Q.  You previously testified that you authorized your
25 father to speak with Garrison on your behalf; is that

Page 65

1  correct?
2  A.  Yes.  I authorized them, yes, to speak.
3  Q.  Did you authorize your father, before you
4  authorized Mr. Malone, to speak to USAA?
5  A.  Yes.  Yes, because he was explaining the wreck.
6  Q.  Sorry.  Say that again.
7  A.  Because he was explaining the wreck.
8  Q.  He was explaining the wreck to -- who was he
9  explaining the wreck to?
10 A.  The USAA.
11 Q.  Do you remember why you made the decision to hire
12 or to ask Mr. Malone to speak on your behalf to
13 Garrison?
14     MR. MALONE:  Objection.
15     You can answer, if you can answer with --
16 if you can answer without disclosing attorney/client
17 privileged communications, you can answer that
18 question.
19     THE WITNESS:  I don't know how to answer
20 that.
21 BY MS. WILTROUT:
22 Q.  I can ask it a different way.
23     What do you remember prompted you to have
24 somebody other than your dad speak with Garrison about
25 your settlement with Garrison?

17 (Pages 62 - 65)

Veritext Legal Solutions
800.743.DEPO (3376)        calendar-carolinas@veritext.com        www.veritext.com
Case 1:19-cv-00294-CCE-JLW    Document 134-1    Filed 12/03/21    Page 19 of 55

Page 66

1        MR. MALONE:  Objection.
2        You can answer.  If you can answer that
3    question without disclosing attorney/client
4    communications, you can answer.
5    BY MS. WILTROUT:
6    Q.  To be clear, I'm asking about what facts
7    happened, what events happened in your life.  Not what
8    your attorney might have told you.
9    A.  I think we -- it was just in my best interest to
10   have someone representing me in the case, in my
11   settlement, I think.
12   Q.  Had Mr. Malone represented you before?
13   A.  No.
14   Q.  Had he represented your father before?
15   A.  No.
16   Q.  Okay.  So do you know -- I'm going to -- going
17   back to the document we were looking at.
18       Do you know why this document -- why this report
19   was run?
20   A.  I don't know.
21   Q.  And do you remember seeing this document in 2016?
22   A.  No, I do not.
23   Q.  When do you remember seeing this document for the
24   first time?
25       MR. MALONE:  Objection.

Page 67

1        THE WITNESS:  Sometime within the last --
2    so --
3        MR. MALONE:  Objection.
4        You can answer, Vail.
5        THE WITNESS:  Sometime within the last two
6    years.
7    BY MS. WILTROUT:
8    Q.  Okay.  So 2019?
9    A.  I can't say for sure.
10   Q.  Do you remember seeing any CCC reports prior to
11   the first -- prior to the past two years?
12   A.  No.
13   Q.  So let's move to the fifth page of the document.
14   And what do you see?
15   A.  I see Vehicle Information.
16   Q.  Okay.  I'm looking at a copy of the CC One --
17   CCC Market Valuation Report.  Take a look at it, and let
18   me know when you find the document that says Report
19   Summary on it.  I think it says Page 1 of 21 on one of
20   the parts.  It's also Page 5 of 25 of the document.
21   A.  Report Summary, Vehicle Information.  Okay.  I
22   see it now.
23   Q.  Would you agree that the numbers in the Valuation
24   Summary are identical to the previous report that we
25   looked at?

Page 68

1    A.  Yes.
2    Q.  And take a look at the fourth page of this
3    report, which is the eighth page of the PDF.
4        Tell me if there's any discrepancies in the
5    vehicle equipment listed on this page.
6        MR. MALONE:  Objection.
7        I'm not sure if I understand your meaning
8    of the term discrepancies.
9    BY MS. WILTROUT:
10   Q.  Okay.  Are there any options listed in the
11   Vehicle Information page that are incorrectly noted,
12   anything missing, anything that's there that should not
13   be?
14   A.  Everything looks good.
15   Q.  And turn to the page that says Vehicle Condition.
16   A.  What page is that?
17   Q.  That is Page 10 of the PDF.
18       Would you agree with me that those are the same
19   values as the previous report that we saw?
20   A.  Yes.
21   Q.  All right.  Now I'd like you to look at Pages 11
22   through 17 of this document which are the comparable
23   vehicles.
24   A.  Okay.
25   Q.  How many comparable vehicles do you see on this

Page 69

1    report?
2    A.  Ten.
3    Q.  Of these comparable vehicles, what is the date of
4    manufacturer for these ten comparable vehicles?  What
5    year were these -- what years were these comparable
6    vehicles manufactured in?
7    A.  2004.
8    Q.  Just like your car, right?
9    A.  Yes.
10   Q.  Would you agree with me that the comparables in
11   this report are from a greater geographic area than the
12   ones in the first report?
13   A.  Yes.
14   Q.  What is the lowest comparable vehicle list price?
15   A.  5,437.
16   Q.  And what is the highest?
17   A.  7,705.
18       MR. MALONE:  Andrea, are you talking about
19   List Price or Adjusted Comparable Value?
20   BY MS. WILTROUT:
21   Q.  I believe you gave me the Adjusted Comparable
22   Value, which is fine.
23       If you'll notice, there's two values there.
24   There's List Price and Adjusted Comparable Value.  Would
25   you agree with me that those two vehicles also have the

18 (Pages 66 - 69)

Page 70

1 lowest and the highest --
2   A.  Yes.
3   Q.  -- list prices?
4       Take a look at the calculation for the Loss
5 Vehicle and Comp 1 which is on Page 11 of the document.
6 I'm sorry on Page 12 of the document is where the actual
7 calculation is.
8       Would you agree with me that this report applied
9 the same adjustments as the previous report that we
10 looked at?
11   A.  Yes.
12   Q.  So we talked about this before when we looked at
13 the previous report, but you agree that this report --
14 would you agree that this report adjusts the value of
15 these vehicles for mileage?
16   A.  Yes.
17       MR. MALONE:  Objection.
18       You can answer.
19       THE WITNESS:  Yes.
20 BY MS. WILTROUT:
21   Q.  Would you agree that the amount of mileage on a
22 car affects its value?
23       MR. MALONE:  Objection.
24       THE WITNESS:  I don't know.
25 BY MS. WILTROUT:

Page 71

1   Q.  You don't know?
2   A.  Yes.
3   Q.  Okay.  Well, which would you want to purchase
4 more, a car with a lot of miles on it or a car with not
5 very many miles on it?
6       MR. MALONE:  Objection, foundation, and
7       asked and answered previously.
8       THE WITNESS:  I don't know.
9 BY MS. WILTROUT:
10   Q.  You can see the -- do you see the adjustments for
11 options in this report?
12   A.  Yes.
13   Q.  Would you agree that the type of options on a car
14 affects its value?
15       MR. MALONE:  Objection.
16       You can answer.
17       THE WITNESS:  I don't know.
18 BY MS. WILTROUT:
19   Q.  Take a look at Comp 1 versus your car.  You can
20 see that there is a positive 229 options adjustment,
21 correct?
22   A.  Yes.
23   Q.  Why do you think they put that adjustment on?
24       MR. MALONE:  Objection.  Calls for
25 speculation.

Page 72

1       You can answer if you know.  You can
2 answer, Vail.
3       THE WITNESS:  Because I might have more
4 options than the other car.
5 BY MS. WILTROUT:
6   Q.  So would you agree that when this company was
7 valuing your car, they considered a car with more
8 options on it to be more valuable than a car with less
9 options on it?
10   A.  I guess you could say that.
11   Q.  Would you agree that the car with more options on
12 it should properly be valued higher than a car with less
13 options on it?
14       MR. MALONE:  Objection.
15       You can answer.
16       THE WITNESS:  I don't know.
17 BY MS. WILTROUT:
18   Q.  Have you ever bought a new car before?
19   A.  Yes.
20   Q.  Did you get to pick out the options on it?
21   A.  Yes.
22   Q.  What options did you choose?
23   A.  A lot of safety options.
24   Q.  Okay.  Did those options make the price of the
25 car go up?

Page 73

1   A.  Yes.
2   Q.  And would you agree that that would increase the
3 value of the car, the presence of those options?
4   A.  I guess so.
5   Q.  Let's look at the Condition Adjustment.  We've
6 talked about how you reconditioned the car.
7       Would you agree with me that it's typical for the
8 condition of a vehicle to change as someone uses it in
9 their ordinary lives?
10       MR. MALONE:  Objection.  Foundation.
11       You can answer.
12       THE WITNESS:  Yes.
13 BY MS. WILTROUT:
14   Q.  Did you try to keep your car in perfect
15 condition?
16   A.  I tried to keep --
17       MR. MALONE:  Objection.
18       THE WITNESS:  -- it --
19       MR. MALONE:  You can answer.
20       THE WITNESS:  I tried to keep it in as good
21 a condition as I got it.
22 BY MS. WILTROUT:
23   Q.  Did you?
24   A.  I thought so.
25   Q.  Do you know if Leslie, the previous owner of the

19 (Pages 70 - 73)

Veritext Legal Solutions
800.743.DEPO (3376)      calendar-carolinas@veritext.com      www.veritext.com
Case 1:19-cv-00294-CCE-JLW   Document 134-1   Filed 12/03/21   Page 21 of 55

Page 74

1  car, kept the car in as good of a condition as it was
2  the day she bought it?
3     A. I don't know.
4     Q. Tell me what you did to keep the car in great
5  condition while you had it.
6     A. I didn't drive it much. I took it to get it
7  cleaned and detailed. I just took care of it.
8     Q. Did you ever smoke in the car?
9     A. No. I don't smoke.
10    Q. Did you ever eat in the car?
11    A. I think I would only drink in the car. I don't
12  think I ate in the car.
13    Q. Did you allow any kids in the car?
14    A. No.
15    Q. Did you ever scratch the seats?
16    A. Not that I'm aware of.
17    Q. Did you ever ding a door next to you -- parked
18  next to you?
19    A. I don't know. I don't think so.
20    Q. Have you ever seen anybody not take such great
21  care of their car?
22       MR. MALONE: Objection, foundation.
23       You can answer.
24       THE WITNESS: I mean, yeah. When my mom had
25  us when we were little, like the van got totaled, but

Page 75

1    I mean not like totaled totaled, but like we were
2  just kids. So we just wrecked it, you know.
3  BY MS. WILTROUT:
4     Q. Yeah. Yeah. I can tell you kids do a number on
5  a car.
6       So have you ever been in a car that someone had
7  smoked in?
8     A. Yes, in college.
9     Q. Tell me what that was like.
10    A. It smells awful.
11    Q. Have you ever been in a car where someone
12  regularly ate in it?
13    A. Yeah. It's kind of grimy.
14    Q. Yeah. Have you ever been in a car where someone
15  has opened their doors a lot and had dings on the sides
16  of the panels?
17    A. I don't know if I've ever noticed that before.
18    Q. Have you ever noticed a car from the outside with
19  a lot of scratches on the car?
20    A. Yes. Yes.
21    Q. Have you ever noticed a car that had tires that
22  looked like they were really old?
23    A. Yes.
24    Q. Have you ever known anybody to not take their car
25  in for regular maintenance?

Page 76

1     A. No.
2     Q. No. Okay.
3        So let's think of that car that you drove in or
4  that you were in that had been smoked in.
5     A. Okay.
6     Q. What kind of car was that?
7     A. It was a 4Runner. It was just people were
8  smoking in it, and it smelled awful.
9     Q. So if you were going to buy a 4Runner, and you
10  had the option of buying that 4Runner or a 4Runner that
11  had not been smoked in, everything else is even, which
12  one would you have bought?
13       MR. MALONE: Objection.
14       THE WITNESS: The not -- okay.
15       MR. MALONE: You can answer.
16       THE WITNESS: The not been smoked in one.
17  BY MS. WILTROUT:
18    Q. And why is that?
19    A. Because the smell was just horrible.
20    Q. All right. So let's use the minivan example.
21       If you have -- if you're looking to buy a
22  minivan, and there's a minivan that had been eaten in
23  with stained seats and a minivan that had not been eaten
24  in, which would you have rather paid for -- which would
25  you have rather bought?

Page 77

1        MR. MALONE: Objection. Objection.
2        You can answer.
3        THE WITNESS: Probably the one without --
4     that's not been eaten in.
5  BY MS. WILTROUT:
6     Q. Which car do you think you would have paid more
7  for?
8        MR. MALONE: Objection.
9        You can answer.
10       THE WITNESS: Probably the nicer ones.
11  BY MS. WILTROUT:
12    Q. And why is that?
13    A. Because they're better taken care of.
14    Q. Have you ever gone to a used car lot to look at
15  cars?
16    A. Yes.
17    Q. Are those cars clean inside?
18       MR. MALONE: Objection.
19       THE WITNESS: I never looked on the inside.
20  I just was looking outside.
21  BY MS. WILTROUT:
22    Q. Okay. What did the cars look like on the
23  outside?
24    A. Oh, no. It was when I was young. So I really
25  didn't pay that much attention.

20 (Pages 74 - 77)

Veritext Legal Solutions
800.743.DEPO (3376)        calendar-carolinas@veritext.com        www.veritext.com
Case 1:19-cv-00294-CCE-JLW    Document 134-1    Filed 12/03/21    Page 22 of 55

Page 78

1    Q.  Do you know anything about work that dealers do
2  to get a used car in condition to sell it?
3    A.  I know like what Kelley Blue Book is, and they
4  use that to help gauge it, but other than that, I don't
5  know much about it.
6    Q.  Do you know of anybody whose ever traded their
7  car in to a dealership?
8    A.  Yes.
9    Q.  Who was that?
10    A.  My sister has.  My parents have.
11    Q.  What car did your sister trade in?
12    A.  A Mercedes, which one, 350 or CGL -- oh, what is
13  it, the GL -- she had a blue, the blue one, the blue
14  tech one.  I don't know.  It was one of the SUVs.  And
15  then my parents, they've traded -- they've traded in a
16  couple of cars.
17    Q.  Did you ever go with them when they were trading
18  in the cars?
19    A.  I think once or twice.
20    Q.  So when you went with your parents to trade in
21  the car, do you remember if the car that they traded in
22  was completely clean on the inside?
23        MR. MALONE:  Objection.
24        You can answer.
25        THE WITNESS:  Not that I -- I don't

Page 79

1  remember.
2  BY MS. WILTROUT:
3    Q.  Did your mom trade in that minivan that she drove
4  you guys around in?
5    A.  Oh, what happened to that thing?  I think they
6  actually drove that until it died.
7        MS. WILTROUT:  So this is probably a good
8  time if you want to take a break for lunch.
9        THE WITNESS:  Okay.
10        MS. WILTROUT:  So we can come back here in
11  like a half an hour.
12        THE WITNESS:  Okay.
13        MR. MALONE:  Andrea --
14        THE VIDEOGRAPHER:  Let me take you off the
15  Record.  Is that alright?
16        MR. MALONE:  How do you feel about extending
17  that out to 40 minutes so I can actually make it to
18  get lunch?
19        MS. WILTROUT:  That's fine with me.
20        MR. MALONE:  Okay.
21        THE VIDEOGRAPHER:  That's the end of media
22  #1 in the deposition of Elizabeth Vail Fortson.  The
23  time on the monitor is approximately 1:00 p.m., and
24  we're off the Record.
25        (A brief recess was taken in the deposition)

Page 80

1        THE VIDEOGRAPHER:  This is the beginning of
2  media #2 in the deposition of Elizabeth Vail Fortson.
3  The time on the monitor is approximately 1:43 p.m.,
4  and we're back on the Record.
5        MS. WILTROUT:  Welcome back.
6  BY MS. WILTROUT:
7    Q.  Okay.  So before we left on our break, we were
8  talking about the value of your car, and you testified
9  that your car was in very good condition, right?
10    A.  Yes, it was in good condition.
11    Q.  And it was in good condition, because your
12  grandfather took care of the car, right?
13    A.  Well, I mean, I had the car, and then he had the
14  car for a little bit, and then before that, Leslie had
15  the car, but it was in good condition when I got it from
16  my grandfather.  Before that, I do not know.
17    Q.  Okay.  Would you agree with me that the car was
18  in good condition because of the care that you took of
19  the car?
20    A.  Yes.
21    Q.  And would you agree that the car was in good
22  condition, because your grandfather put on new tires and
23  brakes?
24        MR. MALONE:  Objection.
25        You can answer.

Page 81

1        THE WITNESS:  I don't know.  I think -- I
2  think it was other things than that.  So I don't
3  know.
4  BY MS. WILTROUT:
5    Q.  Okay.  That's fair.
6        You agree with me, though, that your grandfather
7  put on new tires and brakes on the car?
8    A.  Yes.
9    Q.  And he had it serviced?
10    A.  Yes.
11    Q.  And you had it detailed?
12    A.  Yes.
13    Q.  And because you and your grandfather took such
14  good care of the car, it was worth more than another
15  2004 Cadillac that had been smoked in or stained
16  interior or scratches, wouldn't you agree?
17        MR. MALONE:  Objection, foundation.
18        You can answer.
19        THE WITNESS:  Well, smoked in, yes.
20  BY MS. WILTROUT:
21    Q.  So you would pay more for your car -- for a
22  version of -- you would pay more for your version of
23  your car than a version of your car that had been smoked
24  in, right?
25    A.  If it was me personally, I would say yes for the

21 (Pages 78 - 81)

Veritext Legal Solutions
800.743.DEPO (3376)        calendar-carolinas@veritext.com        www.veritext.com
Case 1:19-cv-00294-CCE-JLW    Document 134-1    Filed 12/03/21    Page 23 of 55

Page 82

1  smoked in -- not a smoked in car.  Yes.
2     Q.  So the value of a car depends on its condition,
3  doesn't it?
4           MR. MALONE:  Objection, foundation.
5           You can answer, if you know.
6           THE WITNESS:  I don't know.  I don't think
7  smoking or anything has anything to do with
8  condition.  I think condition is what it is, with
9  like options and mileage and whatever.
10          And you all had already stated that my
11  condition was good.  You all actually added to my
12  condition with the $130.00.
13 BY MS. WILTROUT:
14    Q.  Okay.  What do you think goes into the condition
15 of a car?
16          MR. MALONE:  Objection.  Objection.
17          You can answer.  You can answer, Vail.
18          THE WITNESS:  I don't know, because I'm not
19 a specialist in that.
20 BY MS. WILTROUT:
21    Q.  So what about a car that had been -- that has
22 been smoked in makes it more valuable than a car that's
23 not been smoked in?
24          MR. MALONE:  Objection.  Misstates prior
25 testimony.

Page 83

1           I think you inverted that, Andrea.
2  BY MS. WILTROUT:
3     Q.  Oh, okay.  Would you agree that a car that had
4  been smoked in was worth less money than a car that had
5  not been smoked in?
6           MR. MALONE:  Objection, foundation.
7           You can answer, Vail.
8           THE WITNESS:  Yes.
9  BY MS. WILTROUT:
10    Q.  Would you agree that a car -- the same car that
11 had -- the same make and model of a car that had stained
12 seats would be worth less than a car of the same make
13 and model with pristine seats?
14          MR. MALONE:  Objection, foundation.
15          You can answer.
16          THE WITNESS:  Yes.
17 BY MS. WILTROUT:
18    Q.  So would you agree with me that the smell of a
19 car and the cleanliness of the seats are --
20    A.  Wait.  Wouldn't that also -- wait.  Wait.
21 Wouldn't it also like be conditional on like there's
22 other things a car has value on?
23          So if like say it's stained seats, but it's got
24 other things of value on it that makes it more valuable,
25 you can't actually say that this one is more precedent

Page 84

1  over this thing.  So it could actually be that that car
2  is more valuable than this car.  So you can't actually
3  say that one thing is more valuable than the other
4  thing.
5  BY MS. WILTROUT:
6     Q.  Right.  So in my hypothetical, I'm assuming that
7  the cars have the same mileage and the same options.
8     A.  Okay.
9     Q.  The cars have the same mileage and the same
10 options, and one has -- smells like smoke, stains in the
11 seats, rips in the leather; would that car be worth less
12 to you than a car that smelled good, had clean seats
13 that weren't scratched?
14    A.  Yes.
15    Q.  So would you agree with me that the value of a
16 car depends on its condition?
17          MR. MALONE:  Objection, foundation.
18          THE WITNESS:  So you're saying all those
19 things, those four things, are a condition to the
20 basis of your condition?
21 BY MS. WILTROUT:
22    Q.  I'm asking you:  Would you consider those to be a
23 condition of a car?
24    A.  I think a condition of a car is more than that, I
25 guess.

Page 85

1     Q.  Okay.  Well, let's look at what CCC does, because
2  they actually describe the four things that they do --
3  the four components that go into the vehicle condition.
4           If you look at that report we were looking at
5  before --
6     A.  Okay.
7           MR. MALONE:  Andrea, there were two
8  different reports that we looked at.
9           MS. WILTROUT:  -- on Page -- yeah.  The one
10 that we most recently looked at.  The --
11          MR. MALONE:  Okay.
12          MS. WILTROUT:  I think that's No. 3.
13          MR. MALONE:  Okay.
14          MS. WILTROUT:  Page 10 of that document.
15          THE WITNESS:  It's not working again.  Oh,
16 there it is.
17          It's Page 10.  Which one is it?  It's the
18 Value Condition component.
19 BY MS. WILTROUT:
20    Q.  Vehicle Condition, yes.
21          So would you agree with me that CCC here lists
22 six components that make up the vehicle condition?
23    A.  Yes.
24    Q.  And would you also agree with me that later in
25 the Valuation Report, they account for differences in

22 (Pages 82 - 85)

Veritext Legal Solutions
800.743.DEPO (3376)        calendar-carolinas@veritext.com        www.veritext.com
Case 1:19-cv-00294-CCE-JLW   Document 134-1   Filed 12/03/21   Page 24 of 55

Page 86

1  mileage and in options?
2  A.  Yes.
3  Q.  Okay.  So --
4  A.  But this is not the Condition Report that they
5  put on with -- they added in the other Condition Report.
6  Q.  Say that -- I'm sorry.  What did you say?
7  A.  This is not -- like this is a separate condition
8  adjustment that they put on with the other condition
9  adjustment.  The other condition adjustment is not this
10  one.
11  Q.  What is the other condition adjustment?
12  A.  They minus $722.00, which they do not explain,
13  and this one is saying that they're adding it onto it,
14  because my condition -- my vehicle -- they say that my
15  vehicle condition is in good condition.  So that's why
16  they're adding it.
17  Q.  Okay.  So let's look at the page right after the
18  Vehicle Condition for some guidance on this.
19  Do you see the Comparable Vehicles?
20  A.  Yes.
21  Q.  So look at the bottom right-hand corner and read
22  the Footnote 1.
23  A.  "The Condition Adjustment sets that comparable
24  vehicles due in Good condition, which the loss vehicle
25  is also compared to in the Vehicle section."

Page 87

1  Q.  So would you agree with me that in that section
2  of the report, CCC is explaining that they use the
3  condition adjustment to set all of the cars at good
4  condition?
5  A.  No, because that makes no sense.
6  Q.  Okay.
7  A.  "Sets the comparable value to Good condition
8  which the loss value is also compared to."
9  Q.  So what do you understand goes into the condition
10  of a car?
11  MR. MALONE:  Objection.  Asked and answered.
12  THE WITNESS:  I think we just reviewed that.
13  BY MS. WILTROUT:
14  Q.  Well, I'm asking you -- let me ask it another
15  way.
16  Other than the components listed in this Vehicle
17  Condition Report, are there any other conditions -- or
18  are there any other components that you would consider
19  to go into the condition of a car?
20  A.  I don't know.
21  Q.  Okay.  So let's just go back to this.
22  If your car -- if you -- if Garrison had paid you
23  for your car based on the value of a car that had not
24  been taken care of, you would not have been happy about
25  that, would you?

Page 88

1  MR. MALONE:  Objection.  Calls for
2  speculation.
3  You can answer.
4  THE WITNESS:  There's no way of knowing if
5  it was or was not, and they did it against many
6  comparables.  So I don't think I can answer that
7  question.
8  BY MS. WILTROUT:
9  Q.  Taking it into the context of a private sale, if
10  your car was being compared against, by a private buyer,
11  against a car with the same options and the same
12  mileage, but had been smoked in and had stains on the --
13  stains on the seats, would you expect to receive more
14  money for your car versus the other car?
15  MR. MALONE:  Objection.  Calls for
16  speculation.  Foundation.
17  You can answer.
18  THE WITNESS:  I don't -- I don't know how to
19  answer that.
20  BY MS. WILTROUT:
21  Q.  When do you remember receiving payment for your
22  car from Garrison?
23  MR. MALONE:  Objection.  Asked and answered.
24  You can answer.
25  THE WITNESS:  I don't remember hearing about

Page 89

1  the payment until a year later when my father told me
2  about it.
3  BY MS. WILTROUT:
4  Q.  So before -- let me back up.
5  Was the -- I apologize if this was asked before.
6  Was the -- was the check that you received from Garrison
7  -- was the check that was received from Garrison
8  deposited into your checking account?
9  A.  I don't know if it was deposited in my checking
10  account.  I know my dad deposited it into an account of
11  mine, but I do not think it was in a checking account.
12  Q.  Was it deposited into an account that you have
13  access to?
14  A.  Yes, but I don't see often.
15  Q.  And do you have any understanding of how much
16  that check was for?
17  A.  Yes.
18  Q.  How much was the check for?
19  A.  Is it not the listed price on the CCC One?
20  Q.  So the listed price on the Market Report is
21  6,890.00, but that does not include some of the other
22  fees that were paid.
23  Maybe if you look at the Claim and Payment
24  Information page on that report, that might help you.
25  A.  So it was $6,962.70.

23 (Pages 86 - 89)

Veritext Legal Solutions
800.743.DEPO (3376)    calendar-carolinas@veritext.com    www.veritext.com
Case 1:19-cv-00294-CCE-JLW    Document 134-1    Filed 12/03/21    Page 25 of 55

1  Q. Did you receive any other money from Garrison?
2      MR. MALONE: Objection.
3      Andrea, are we talking about with respect
4  to the total loss claim or with respect to her bodily
5  injury claim?
6      MS. WILTROUT: I'm asking for payments
7  received as a result of the accident. So that would
8  include the bodily loss claim, but --
9      THE WITNESS: Yes.
10 BY MS. WILTROUT:
11 Q. When do you remember getting the payments? How
12 many -- I'm sorry. Let's back up.
13     How many payments did you receive?
14 A. That would be, correct me if I'm wrong, Mike, but
15 I think it's two.
16 Q. You should testify to what you remember.
17 A. I believe it was two.
18 Q. And how much -- Mike, did you want to say
19 something? I saw you --
20     MR. MALONE: Oh, no.
21     MS. WILTROUT: Okay.
22     MR. MALONE: I mean, she asked me a
23 question, but I'm going to adhere to your request
24 that I will not testify for her.
25     MS. WILTROUT: Thank you.

1  BY MS. WILTROUT:
2  Q. How much were the payments for?
3  A. Well, they're the one that I just told you, this
4  one for $6,962.70, and then the other one I do not know
5  the exact figure, but I think it was around 300,000.
6  Q. Okay. Could you go to the document that I titled
7  Loss Summary in your folder.
8  A. Okay.
9  Q. Take a look at these payments. This is a
10 screenshot of Garrison's payment systems.
11     And first of all, I'd like to mark this as
12 Exhibit 4 to this deposition. Thank you.
13     (Defendant's Exhibit No. 4 was marked for
14 identification)
15 BY MS. WILTROUT:
16 Q. So I'm not -- I think that -- would you agree
17 with me that the first two payments on here, the 50,000
18 and the 5,000 relate to your injury claims?
19 A. Likely, yes.
20 Q. And then do you see the 6,962?
21 A. Yes.
22 Q. And what date was that on?
23 A. December -- sorry. It's a little hard to see --
24 5, 2016.
25 Q. And then do you see any other payments?

1  A. There was $1,350.00 on November 14, 2016 and $400
2  also on that day.
3  Q. Do you remember why -- like do you remember what
4  those payments are for?
5  A. I don't know.
6  Q. Were those payments deposited into your account?
7  A. I don't know.
8  Q. Who would know if those payments were deposited
9  into your account?
10     MR. MALONE: Objection. Calls for
11 speculation.
12     You can answer.
13     THE WITNESS: I don't know. I'm the only
14 one with access to my main accounts.
15 BY MS. WILTROUT:
16 Q. Okay. In preparing for this deposition, did you
17 look to see what money you had received from Garrison as
18 a result of your total loss claim?
19 A. No.
20 Q. You did not.
21     So you don't know, sitting here, how much you've
22 received for your claim from Garrison?
23 A. Not in like my total accident plus this. I saw
24 from my like -- my initial one from my claim, my like
25 what this case is about, yes. But not if we're looking

1  at both cases together. No.
2  Q. Okay. So let's talk about payments that were
3  made in 2016.
4  A. Okay.
5  Q. Can you tell me which payments that were made on
6  -- that are represented to have been made on -- in 2016
7  you received?
8  A. The $6,962.70, and the 1,000 -- the $1,350.00 and
9  the $400.00.
10 Q. You remember receiving the 13 -- the $1,350.00
11 payment on 11/14/2016?
12 A. No.
13 Q. Okay.
14 A. You just -- you just told me which payments came
15 through in 2016, and I just told you.
16 Q. I'm sorry. I think you misunderstood my
17 question.
18     I asked you which payments do you remember
19 receiving?
20 A. Oh, I don't remember receiving any of those
21 payments.
22 Q. Tell me which payments you remember receiving in
23 2016.
24 A. Oh, none of them.
25 Q. None of them. Okay.

Veritext Legal Solutions
800.743.DEPO (3376)        calendar-carolinas@veritext.com        www.veritext.com
Case 1:19-cv-00294-CCE-JLW    Document 134-1    Filed 12/03/21    Page 26 of 55

Page 94

1      You don't remember receiving the 6,962 payment?
2   A. Uh-uh. I told you I didn't know about that until
3   a year later.
4   Q. Okay. Did you ever learn of the payment for
5   $1,350.00?
6   A. I don't know.
7   Q. What about the 400?
8   A. I don't know.
9   Q. So tell me about when you learned about the
10  $6,962.00.
11  A. I asked -- I kind of came across -- I kind of
12  asked my dad, I was like, "Did -- about the car and
13  whatever and what had happened with it, and he told me
14  he had put the money into a stock account. And I was
15  talking about it with Mike, I think, as well.
16      I think I talked about it with Mike, and then I
17  asked my dad about it, and he told me what he did with
18  the money.
19  Q. Had you ever talked with him before about the
20  money that you were to receive from the total loss?
21      MR. MALONE: Objection.
22  BY MS. WILTROUT:
23  Q. Have you ever talked with your dad?
24  A. No.
25  Q. Were you driving after your accident? Were you

Page 95

1   driving within the first three months after your
2   accident?
3   A. I wasn't driving until the -- I had to do driving
4   lessons again, but it wasn't until 2017 I was driving.
5   Q. Take a look at the document I saved as
6   2017.11.14.
7   A. 2017. Okay.
8   Q. Have you seen this letter before?
9   A. One second.
10      Yes, I believe so.
11  Q. Do you remember -- let me take a moment to mark
12  this as Exhibit 5 to this deposition.
13      (Defendant's Exhibit No. 5 was marked for
14  identification.)
15  BY MS. WILTROUT:
16  Q. What does this letter appear to you to be?
17  A. It's a letter from my attorney going back to USAA
18  asking about the adjust -- the $722.00 adjustment.
19  Q. And when is it -- when is it dated?
20  A. It's dated in November of -- 14, 2017.
21  Q. And would you agree with me that this letter was
22  sent almost a year after you received your payment for
23  the $6,962.00?
24  A. Yes.
25  Q. Did you see this letter at the time that it went

Page 96

1   out?
2   A. I don't know.
3   Q. So you testified that you thought -- never
4   thought that the payment you received from Garrison for
5   your car was the final payment, right?
6   A. Yes.
7   Q. So from the time that you received the payment in
8   December 2016, did you ever ask Garrison for more money
9   for your car?
10  A. No, not that I know of. No.
11  Q. Did you ever direct your dad to?
12  A. No.
13  Q. Did you ever direct Mr. Malone to?
14      MR. MALONE: Objection.
15      Don't answer it. That would call for
16  attorney/client communications. Don't answer.
17  BY MS. WILTROUT:
18  Q. Do you remember your dad asking for more money on
19  your behalf from Garrison?
20  A. No.
21  Q. And do you remember Mr. Malone asking for more
22  money from Garrison on your behalf for your total loss?
23  A. Am I allowed to answer that one?
24      MR. MALONE: Yeah, to the extent that you do
25  not -- to the extent you can answer that without

Page 97

1   disclosing attorney/client communications.
2      If you cannot answer that without
3   disclosing attorney/client communications, you are
4   instructed to decline to answer.
5      THE WITNESS: I don't think so.
6   BY MS. WILTROUT:
7   Q. So from the time of payment in December 2016
8   until you filed the Complaint in 2019, did you ever
9   communicate to Garrison that you expected any money,
10  additional money for your car?
11  A. No.
12  Q. Do you know if your dad ever communicated that to
13  Garrison, that you expected additional money for your
14  car?
15  A. I don't know.
16  Q. Do you know if Mr. Malone ever communicated that
17  you expected additional money for your car?
18  A. I don't know.
19  Q. So the letter that we're looking at is dated
20  almost a year after you received the check, correct?
21  A. Yes.
22  Q. Why do you think Mr. Malone waited a year to send
23  that letter?
24      MR. MALONE: Objection. Calls for
25  speculation. Also calls for the potential disclosure

25 (Pages 94 - 97)

Page 98

1  of attorney/client communications.
2        And I would instruct you, Vail, not to
3  answer that question.
4  BY MS. WILTROUT:
5    Q. So what did you drive after your -- what was the
6  next vehicle that you drove when you started driving in
7  2017?
8    A. Well, I didn't get another vehicle for a year
9  and-a-half, but I was driving my parents' cars whenever
10 they would let me. I wasn't allowed to drive a lot, and
11 I wasn't driving a lot. I was scared to drive for a
12 long time.
13   Q. So did you purchase another vehicle to replace
14 your lost vehicle?
15   A. A year and-a-half later, yes.
16   Q. What did you buy?
17   A. A 2019 Subaru Ascent.
18   Q. And was that a new car?
19   A. Yes.
20   Q. And how much did you pay for it?
21   A. I honestly don't know the exact amount.
22   Q. Were you there when you purchased it?
23   A. Yes.
24   Q. Did you negotiate the price yourself?
25   A. I probably didn't do that great a job of

Page 99

1  negotiating, but yeah.
2    Q. Was anybody with you when you bought the car?
3    A. No.
4    Q. Did you buy it -- did you pick it up right from
5  the lot at the dealership?
6    A. I had to wait like a few days, but then I got it.
7    Q. And you said you bought the one with all the
8  safety features, right?
9    A. Uh-huh.
10   Q. Did you consider other cars that had different
11 options?
12   A. They all had safety features, but I did consider
13 other cars.
14   Q. Do you remember if you paid the sticker price or
15 the full price for the car?
16   A. Yeah.
17   Q. You did pay. I've done that too before. So
18 that's okay.
19      Did you do any research before you went in to
20 determine whether or not that was a fair price for your
21 car?
22   A. I did a lot of research on other cars, and this
23 one was the cheapest, but with the most safety features
24 and the most features I wanted. So -- and I liked it a
25 lot. So it just kind of worked out.

Page 100

1    Q. So besides the Ascent and the CTS, what other
2  vehicles have you purchased in your lifetime?
3    A. I --
4        MR. MALONE: Objection. I'm sorry. Hold
5  on. Misstates prior testimony regarding the Cadillac
6  CTS and whether she purchased that.
7        But go ahead and answer nonetheless.
8        THE WITNESS: The Subaru is the only one
9  I've ever actually purchased myself. The other ones
10 were gifted to me.
11       I had a Mercedes C230 Kompressor was my
12 first car, and then I had -- my dad and I switched
13 cars when that -- the Mercedes started having
14 problems when I was in -- later in college, and I got
15 his old Nissan Sentra.
16       And then I took that all over the country
17 until it kind of died, and then that's when my
18 grandfather gave me the Cadillac, because I was
19 really in need of a car, and then I have the Subaru.
20 BY MS. WILTROUT:
21   Q. Did you purchase the Kompressor, the Mercedes 320
22 Kompressor?
23   A. It was a gift -- it was a gift from my parents.
24 Technically, it was still in their name.
25       All of my cars, except for the Cadillac and the

Page 101

1  Subaru have been in their names.
2    Q. Were you present at the sale of the Mercedes 320
3  Kompressor?
4    A. No. It was a surprise.
5    Q. Were you present at the sale of the Nissan
6  Sentra?
7    A. No.
8        My dad got it when he -- for himself first, and
9  then we just switched cars.
10   Q. Do you know what the Kelley Blue Book is?
11   A. Yes, I've heard of it. I know what it does.
12   Q. What does it do?
13   A. Dealers use it to help value cars and help them
14 figure out what it's going to resale, but other than
15 that I don't know.
16   Q. Have you ever looked up what the Kelley Blue Book
17 would have been for the 2004 Cadillac CTS?
18   A. No.
19   Q. Do you know what NADA is?
20   A. I've heard of it, but I am not that familiar.
21   Q. Did you look at Kelley Blue Book when you were
22 deciding whether or not to buy your 2019 Ascent?
23   A. I don't know if I looked at it for the Ascent,
24 because I honestly didn't think I was going to buy that
25 car, but I looked at it probably for some other similar

26 (Pages 98 - 101)

Veritext Legal Solutions
800.743.DEPO (3376)    calendar-carolinas@veritext.com    www.veritext.com
Case 1:19-cv-00294-CCE-JLW    Document 134-1    Filed 12/03/21    Page 28 of 55

1 cars.
2    Q. So in your Complaint, you are challenging the
3 value of your loss vehicle which you received -- of your
4 car which you received in December 2016, right?
5    A. No.  Well, sort of, but what I really am is like
6 I am challenging that you all -- USAA did an illegal,
7 and they violated the law and the insurance policy with
8 the unitemized and random adjustment, I mean, condition
9 adjustment.  That's what I'm kind of saying.
10   Q. Okay.  So you're challenging the calculation of
11 the value and the payment that was made to you for your
12 vehicle, right?
13   A. Yes.
14   Q. Okay.  So that payment was made in December 2016,
15 right?
16   A. Yes.
17   Q. So why -- did you have -- you previously
18 testified that you believe that that payment was not the
19 final payment; is that right?
20   A. It was never a settlement for the total loss,
21 yeah.  It wasn't the complete one, but yes.
22   Q. Okay.  So why did you -- why didn't you ask
23 Garrison for more money for your vehicle before you
24 filed the Complaint more than two years later?
25        MR. MALONE:  Objection.

1        You can answer, if you know.
2        THE WITNESS:  To be honest, I was probably
3   in a better mental space and actually able to think
4   about it then.
5 BY MS. WILTROUT:
6    Q. Where are you taking this -- where are you
7 answering these questions from today?
8    A. My apartment in Chapel Hill.
9    Q. Do you have any roommates?
10   A. Nope.
11   Q. Are you alone in the room?
12   A. Yep.
13   Q. During this deposition, other than on breaks,
14 have you received text messages from anybody?
15   A. Yes, but just family or like random ones that
16 told me I have a package here.
17   Q. Who did you receive messages from during the
18 deposition today?
19   A. I got one telling me that -- from a shop telling
20 me that something I ordered is in.  I got one from a
21 package concierge.  What else?  Let's see.  One from the
22 family, my sister, and I think that's while I'm on
23 the deposition.
24   Q. During the deposition, have you been referring to
25 any notes?

1    A. No.
2    Q. On the outline, you said you referred to -- that
3 you looked at before, do you have that in front of you
4 during this deposition today?
5    A. Nope.
6    Q. So Ms. Fortson, you represent that you -- you
7 understand that you're representing a class in this
8 case, right?
9    A. Yes.
10   Q. And I should have asked you this before:  Have
11 you received any e-mails during the course of this
12 deposition?
13   A. If I have, I haven't looked at it.
14   Q. Have you sent any text messages?
15   A. No.
16   Q. Have you sent any e-mails?
17   A. No.
18   Q. Have you received any instant messages?
19   A. I don't do that.
20   Q. Have you received any --
21   A. I don't even have that.  So --
22   Q. So what do you know about the class of people
23 that you are representing in this case; how would you
24 describe them?
25   A. You mean like the total class?  It's a group out

1 of North Carolina who are in a similar situation as me.
2    Q. And what situation is that?  How are they similar
3 to you?
4    A. They are also owed money by -- they also have
5 been afflicted by this condition adjustment from
6 Garrison and have been -- they are owed money, as well,
7 from Garrison.
8    Q. So this class that you're seeking to represent,
9 do you understand why Garrison owes them money?
10   A. Yes.
11   Q. And why is that?
12   A. Because they also deducted the same deduction
13 from their total loss as they did mine to their totaled
14 cars.
15   Q. Was it the same exact amount?
16        MR. MALONE:  Objection.  Calls for
17   speculation.  Lack of foundation.
18        THE WITNESS:  I don't know.
19 BY MS. WILTROUT:
20   Q. Have you reviewed any other claim histories of
21 anybody else in the class?
22   A. No, I have not.
23   Q. Have you seen any other Market One reports from
24 anybody else in the class?
25   A. No.

27 (Pages 102 - 105)

Veritext Legal Solutions
800.743.DEPO (3376)     calendar-carolinas@veritext.com     www.veritext.com
Case 1:19-cv-00294-CCE-JLW   Document 134-1   Filed 12/03/21   Page 29 of 55

1    Q. Would you agree that Garrison owed you the actual
2  cash value of your vehicle --
3         MR. MALONE: Objection.
4  BY MS. WILTROUT:
5    Q. -- under the insurance policy?
6         MR. MALONE: Objection. Calls for a legal
7  conclusion.
8         You can answer.
9         THE WITNESS: What do you mean by cash
10  value? I don't understand.
11  BY MS. WILTROUT:
12    Q. So take a look at the document that I saved as
13  certified policy.
14    A. Okay.
15    Q. And go to -- well, first of all, take a look at
16  it and tell me what -- tell me what the document appears
17  to be.
18    A. Notary.
19    Q. It may make it easier to ask if you would agree
20  with me that this is your insurance policy with
21  Garrison?
22    A. Yes, it looks like it.
23         MS. WILTROUT: Okay. I'd like to mark this
24  as Exhibit 5 to the deposition -- 6. 6. Thank you.
25         (Defendant's Exhibit No. 6 was marked for

1  identification)
2  BY MS. WILTROUT:
3    Q. And would you agree that this was the policy that
4  was in place from June of 2016 to October 30, 2016?
5    A. Yes.
6    Q. Would you agree that that is within the date
7  ranges that your accident happened?
8    A. Yes.
9    Q. So if you would, turn to Page 32 of the PDF.
10         And under the section Limit of Liability, what
11  does it say there?
12    A. I'm not at 32 yet. I've gone too far.
13         Limit of Liability?
14    Q. You know what. It's actually okay.
15    A. No, I'm right here.
16         It says, "Our limit of liability will be the
17  lesser -- will be the lesser of the actual cash value of
18  the stolen or damaged property or the amount necessary
19  to repair or replace the property with other property of
20  the like and kind of quality.
21         This amount does not include any reduction in
22  value of the property after it has been repaired, as
23  compared to its value before it was damaged. Subject to
24  above or --
25    Q. That's okay.

1    A. -- limit -- okay.
2    Q. Sorry.
3         Okay. Would you agree that Garrison owed you the
4  value of your vehicle?
5    A. Yes.
6    Q. And how would you -- like how would you describe
7  what that value should have been calculated?
8         MR. MALONE: Objection.
9         You can answer.
10         THE WITNESS: Fairly. The way, I guess, you
11  know, a dealer or somebody like regularly does it,
12  but other than that, I don't know, but fairly.
13  BY MS. WILTROUT:
14    Q. And is it fair to consider condition when
15  determining that value?
16         MR. MALONE: Objection. Lack of foundation.
17         You can answer.
18         THE WITNESS: Yes. I mean, you all gave me
19  the additional 130. So yes.
20  BY MS. WILTROUT:
21    Q. So how would you propose handling the difference
22  between class members and the different condition of
23  those vehicles?
24         MR. MALONE: Objection.
25         THE WITNESS: I don't know. That's in the

1  realm of my lawyers to figure out.
2  BY MS. WILTROUT:
3    Q. Well, I'm asking you, because you represent the
4  class of these people, and I'm wondering if one of your
5  class members had a car that was in worse condition than
6  yours, do you think that you two should receive the same
7  amount of money?
8         MR. MALONE: Objection. Calls for
9  speculation. Lack of foundation.
10         THE WITNESS: That's not for me to say.
11  BY MS. WILTROUT:
12    Q. Is it your understanding that everybody in the
13  class had a condition adjustment applied to their
14  vehicle settlement?
15    A. It is my understanding that everybody had a
16  negative condition adjustment applied to their vehicle.
17    Q. Do you know what those condition adjustments were
18  for each of the alleged class members, punitive class
19  members?
20    A. I do not know the total. I do not know like the
21  amount. I just know that it was an unitemized and
22  random condition adjustment that wasn't explained.
23    Q. Do you know that the condition adjustments that
24  were applied were inaccurate?
25         MR. MALONE: Objection. Foundation.

28 (Pages 106 - 109)

Veritext Legal Solutions
800.743.DEPO (3376)        calendar-carolinas@veritext.com        www.veritext.com
Case 1:19-cv-00294-CCE-JLW   Document 134-1   Filed 12/03/21   Page 30 of 55

1      THE WITNESS:  If they're random and
2  unitemized, you can say they are inaccurate, because
3  they came out of nowhere, and they're not explained.
4  BY MS. WILTROUT:
5      Q.  So when you say that the condition adjustment is
6  random, what do you mean?
7      A.  Okay.  So the condition adjustment that you all
8  gave me that's $130.00 was explained.  It explained why.
9  It explained how you came to that adjustment.  It
10  explained every single measure, correct, in the graph,
11  in the chart on the CCC report -- on both of the CCC One
12  reports, but the CCC One report does not explain how
13  they came to the amount of the negative $722.00.  That
14  condition adjustment is not explained.  It doesn't -- it
15  doesn't explain how they got to that amount, where that
16  amount comes from, and why it is taken out.
17      Q.  Do you know if that condition adjustment -- well,
18  let me ask you this:  Do you have any understanding of
19  whether or not you had the ability to ask for more
20  information about how the condition adjustment was
21  calculated?
22      A.  Once -- well, didn't Mike Malone do that in a
23  letter in November of 2017?
24      Q.  So you're saying that that was -- that was --
25  that in 2017, your attorney asked for more information

1  about the condition adjustment?
2      A.  Well, I remember seeing in that whatever letter
3  it was, I don't know if it was doing that or not, but it
4  says, "Why is that there?"  If that's asking for
5  information or not, I don't know, but --
6      Q.  And that letter was sent almost a year after the
7  payment was made, correct?
8      A.  Yes.
9      MS. WILTROUT:  All right.  Let's take a ten
10  minute break.
11      THE WITNESS:  Okay.
12      MR. MALONE:  All right.  Thank you.
13      THE VIDEOGRAPHER:  The time on the monitor
14  is approximately 2:39 p.m., and we're off the Record.
15      (A brief recess was taken in the deposition.)
16      THE VIDEOGRAPHER:  The time on the monitor
17  is approximately 2:50 p.m., and we're back on the
18  Record.
19      MS. WILTROUT:  Welcome back.
20  BY MS. WILTROUT:
21      Q.  Ms. Fortson, do you understand that you filed
22  this class -- this case as an alleged class action?
23      A.  Yes.
24      Q.  And what is your understanding of what it means
25  to have filed a case as an alleged class action?

1      A.  That I am doing it as a class, not just for
2  myself, for other people as well, and that I am
3  representing everybody else in the case, not just
4  myself.
5      Q.  Why did you bring -- decide to bring this case as
6  an alleged class action?
7      MR. MALONE:  Objection.
8      Vail, if you can answer that without
9  disclosing attorney/client communications, you can
10  answer that.
11      But if you cannot answer it without
12  disclosing attorney/client communications, I would
13  ask that you not answer that.
14      THE WITNESS:  I will not answer that.
15  BY MS. WILTROUT:
16      Q.  So you understand that you are seeking to
17  represent a class of other people that include insureds
18  of Garrison, right?
19      A.  Yes.  We're all within North Carolina.
20      Q.  All within North Carolina.
21      Including the time you've spent preparing for
22  this deposition, could you estimate the time you've
23  spent in your role as potential class representative in
24  this lawsuit?
25      A.  Time is really hard for me to calculate with my

1  brain injury, but I can tell you what I've done.  Would
2  that be easier for you?
3      Q.  Sure.
4      A.  So I participate in case and discovery.  I'm
5  really involved with the lawyers and what they do, and I
6  continue to be involved.  I am constantly involved in
7  the case.  You know, I provide information.  You know, I
8  stay involved with the case.  I keep updated, things
9  like that, and I do everything that's required.
10      Q.  Do you know whether there's a trial date set in
11  the lawsuit?
12      A.  I don't believe there's a trial date set, but I
13  know it's in Federal Court under Judge Eagles in
14  Greensboro.
15      Q.  Do you know what the current status of the
16  lawsuit is?
17      MR. MALONE:  Objection.
18      You can answer.
19      THE WITNESS:  I do not.
20  BY MS. WILTROUT:
21      Q.  Do you understand -- do you have an understanding
22  as to who has the authority to settle the lawsuit?
23      A.  I do not.
24      Q.  What damages are you personally seeking in this
25  lawsuit?

29 (Pages 110 - 113)

Veritext Legal Solutions
800.743.DEPO (3376)        calendar-carolinas@veritext.com        www.veritext.com
Case 1:19-cv-00294-CCE-JLW    Document 134-1    Filed 12/03/21    Page 31 of 55

Page 114

1  A. Personally? I'm doing this as a class. So I'm
2 representing everybody, putting their interests before
3 mine.
4     But damages, I would like my -- the damages of
5 the $722.00 plus anything else my lawyers think would be
6 necessary or appropriate. I think that would be right
7 if you're just seeking damages.
8     I'm also seeking punitive damages, attorney's
9 fees, and a Court Order for everyone for USAA to stop
10 using this condition adjustment.
11  Q. What is your understanding of who would receive
12 the punitive damages in this case?
13  A. Punitive damages would go to everybody that's,
14 from my understanding at least, that is involved that's
15 under the class action. That's my understanding.
16  Q. What damages are you seeking on behalf of the
17 class members in this lawsuit?
18  A. I am seeking attorney's fees and punitive
19 damages, a Court Order for USAA to stop doing it. I
20 want USAA not to be able to hurt drivers any -- drivers
21 anymore, not do this to anybody, and the money that
22 they're owed to other drivers that they've done this to.
23  Q. Do you know how that money would be calculated,
24 the money that they were owed, the other class members
25 were owed?

Page 115

1  A. I do not. I would leave that to my lawyers.
2 They probably would know that.
3  Q. Do you remember getting a -- the condition
4 adjustment of positive 130?
5  A. Yes.
6  Q. What should happen with class members who were
7 given the upward condition adjustment on their vehicle;
8 should they get those?
9     MR. MALONE: Objection.
10     THE WITNESS: I'm not disputing -- okay.
11     MR. MALONE: Objection.
12     You can answer, Vail.
13     THE WITNESS: I'm not disputing that
14 condition adjustment. That condition adjustment is
15 explained and understood and given.
16     I am disputing the unitemized and the
17 random arbitrary adjustment that is the 722 which is
18 under where you see Options and then Mileage, and
19 then there's a negative $722 across the board on
20 every single comparable vehicle. I don't care if
21 it's under the three or under ten, it's $722 every
22 single time, and that is not explained or understood.
23 BY MS. WILTROUT:
24  Q. So CCC explained it in their report that the
25 condition adjustment takes the comparable vehicles to a

Page 116

1 good condition; do you remember seeing that when we
2 looked at that together in the report?
3  A. And that's at 130, not at -- not at negative 722.
4  Q. So let's look at the -- let's look at the report
5 again.
6  A. Okay. Which one, the 2016 or 2017?
7  Q. I only have 2016 reports. The second one is from
8 2016, October 25, 2016 or October 26, 2016, rather.
9  A. Okay.
10  Q. That is Exhibit No. 4, I believe.
11     If you go to Page 10 of the report says, "CCC
12 makes dollar adjustments that reflect the impact the
13 reported condition has on the value of the loss vehicle
14 as compared to good condition. These dollar adjustments
15 are based upon interviews with dealerships across the
16 United States."
17     Do you see that?
18  A. Yes.
19  Q. So that is why your mechanical condition was
20 increased -- the value was increased to 130, because it
21 was not good; it was very good. Do you have --
22  A. I'm not disputing that.
23  Q. Huh?
24  A. I'm not disputing that. I understand that.
25  Q. Then let's go to the next page, and let's read

Page 117

1 the language on the bottom right-hand corner again. It
2 says, "The Condition Adjustment sets that comparable
3 vehicle to Good condition which the loss vehicle is also
4 compared to in the Vehicle Condition section."
5  A. Okay.
6  Q. So this condition -- would you agree with me that
7 the condition adjustment that's applied, which was 722
8 in your case, set the comparable vehicles to a good
9 condition?
10  A. No.
11  Q. Why not?
12  A. Because if that was the case, then there would be
13 the 130 right there which explains, not the 100 --
14 negative 100 and -- I mean, 722, which is not explained,
15 and it comes -- a number that comes out of nowhere.
16  Q. So if there's a trial in this case, would you be
17 prepared to testify?
18  A. Yes.
19  Q. Are you prepared to participate in a trial even
20 if it lasts several weeks?
21  A. Yes.
22  Q. And would you be able to attend a trial that
23 lasted several weeks even if it meant missing work?
24  A. Yes.
25  Q. And do you have any expectation that you would be

30 (Pages 114 - 117)

Veritext Legal Solutions
800.743.DEPO (3376)        calendar-carolinas@veritext.com        www.veritext.com
Case 1:19-cv-00294-CCE-JLW    Document 134-1    Filed 12/03/21    Page 32 of 55

Page 118

1 compensated in your role as class representative through
2 something like a Service Award?
3    A. I understand that that's a possibility. I was
4 recently explained what that is, but only recently, and
5 I know it's not a guarantee, but I also don't expect any
6 special treatment out of this.
7    Q. So what are your expectations for a Service Award
8 currently?
9    A. I --
10       MR. MALONE: Objection. Asked and answered.
11 Go ahead.
12       THE WITNESS: I just said I don't expect
13 that. I don't expect any special treatment. I'm
14 here for everybody.
15       MS. WILTROUT: I think that's all my
16 questions.
17       MR. MALONE: All right. We're going to take
18 maybe a quick two minute break, if that's okay.
19       MS. WILTROUT: Okay.
20       THE VIDEOGRAPHER: The time on the monitor
21 is approximately 3:01 p.m. We're off the Record.
22    (A brief recess was taken in the deposition)
23       THE VIDEOGRAPHER: The time on the monitor
24 is approximately 3:04 p.m., and we're back on the
25 Record.

Page 119

1       MR. MALONE: All right. We do not have any
2 questions. We will read and sign, though, and that's
3 it.
4       THE VIDEOGRAPHER: That's the end of media
5 #2 in the deposition of Elizabeth Vail Fortson. The
6 time on the monitor is approximately 3:04 p.m., and
7 we're off the Record.
8       (The deposition was concluded at 3:04 p.m.
9 Reading and signing were reserved)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 120

1       CERTIFICATE OF REPORTER
2
3 STATE OF NORTH CAROLINA  )
4
5 COUNTY OF GASTON         )
6
7       I, JACKIE JOHNSON, the official before
8 whom the foregoing deposition was taken, according to
9 the emergency video notarization requirements contained
10 in G.S. 10B-25, do hereby certify that the witness whose
11 testimony appears in the foregoing deposition was duly
12 sworn by me; that the testimony of said witness was
13 taken by me to the best of my ability and thereafter
14 reduced to typewriting under my direction; that I am
15 neither counsel for nor employed by any of the parties
16 to the action in which this deposition was taken, and
17 further, that I am not a relative or employee of any
18 attorney or counsel employed by the parties thereto, nor
19 financially or otherwise interested in the outcome of
20 the action.
21
   *Jackie J Johnson*
22
23       JACKIE JOHNSON
24       MY COMMISSION EXPIRES: August 30, 2021
25

Page 121

1       ERRATA PAGE
2 PAGE # - LINE #  CHANGE AND/OR CORRECTION
3            (AND EXPLANATION)
4
5
6
7
8
9
10
11
12
13
14
15
16
17 THE ABOVE CHANGES WERE NOTED BY ME ON THIS ERRATA PAGE
   BEFORE SIGNING THE ATTACHED ERRATA PAGE. I HAVE
18 RETAINED A COPY OF THIS ERRATA PAGE FOR MY RECORDS, AND
   THE COURT REPORTER IS TO ATTACH THIS PAGE TO THE
19 ORIGINAL TRANSCRIPT.
20 DATED:
21
22 IN WITNESS WHEREOF, I HAVE SET
   MY HAND AND SEAL THIS ____ DAY
23 OF ____, 2021.
24 NOTARY PUBLIC: _____
25 MY COMMISSION EXPIRES:

31 (Pages 118 - 121)

Veritext Legal Solutions

800.743.DEPO (3376)        calendar-carolinas@veritext.com        www.veritext.com
Case 1:19-cv-00294-CCE-JLW    Document 134-1    Filed 12/03/21    Page 33 of 55

**&**

**&** 2:2,11

**0**

**00068** 26:12
**00073** 24:6
**00108** 44:20
**00294** 1:2 4:14

**1**

**1** 3:10 4:6 24:12
   24:13 56:1,5,12,13
   67:19 70:5 71:19
   79:22 86:22
**1,000** 93:8
**1,350.00** 92:1 93:8
   93:10 94:5
**10** 68:17 85:14,17
   116:11
**10/26/18** 3:13
**10/4/87** 8:23
**100** 28:18,20 32:5
   117:13,14
**1000** 2:8
**106** 3:17
**107** 37:19
**10b** 120:10
**11** 2:8 23:15 68:21
   70:5
**11/14/17** 3:16
**11/14/2016** 93:11
**11/15** 24:9
**111** 40:7 42:13,14
**114** 46:16
**11:00** 2:22 4:4
**11:48** 41:13
**12** 62:16 70:6
**12:01** 41:17
**13** 93:10
**130** 37:11,12,18
   50:7 108:19 115:4
   116:3,20 117:13

**130.00** 110:8
**130.00.** 44:3 45:20
   46:1 50:4 82:12
**14** 92:1 95:20
**150** 2:4
**17** 1:14 4:5 68:22
**17th** 2:21
**1:00** 79:23
**1:19** 1:2 4:14
**1:43** 80:3

**2**

**2** 3:11 25:7 37:25
   38:1 41:23 44:16
   56:21 80:2 119:5
**20.00.** 42:24
**200** 2:13
**200.70.** 42:23
**2004** 16:15 17:21
   52:6 69:7 81:15
   101:17
**2009** 47:18
**201** 9:4
**2014** 16:12
**2016** 13:24 21:25
   22:2 25:7 38:15
   60:7,13 64:16,19
   66:21 91:24 92:1
   93:3,6,15,23 96:8
   97:7 102:4,14
   107:4,4 116:6,7,8
   116:8,8
**2016.10.17** 37:4
**2016.10.26** 57:17
**2017** 11:7 38:10
   95:4,7,20 98:7
   110:23,25 116:6
**2017.11.14.** 95:6
**2019** 67:8 97:8
   98:17 101:22
**2021** 1:14 2:22 4:5
   120:24 121:23

**21** 67:19
**2200** 2:13
**22198** 120:21
**229** 71:20
**229.00** 55:21 56:9
**24** 3:10 63:6
**25** 55:10 67:20
   116:8 120:10
**26** 60:7,13 64:19
   116:8
**26th** 63:13
**27514** 9:5
**27612** 2:5
**29** 47:18
**2:39** 111:14
**2:50** 111:17
**2nd** 60:11,12
   64:22

**3**

**3** 3:12 56:21 58:8
   58:9,11 85:12
**30** 107:4 120:24
**300,000** 91:5
**32** 107:9,12
**320** 100:21 101:2
**33** 8:25
**350** 78:12
**38** 3:11
**3875** 51:3,4
**3:01** 118:21
**3:04** 118:24 119:6
   119:8
**3rd** 60:9

**4**

**4** 3:14 56:21 58:8
   91:12,13 116:10
**40** 79:17
**400** 92:1 94:7
**400.00.** 93:9

**43215** 2:14
**45** 13:10
**4600** 2:4
**4runner** 76:7,9,10
   76:10

**5**

**5** 3:15 40:10 42:12
   42:15 67:20 91:24
   95:12,13 106:24
**5,000** 91:18
**5,437** 69:15
**50** 55:11
**50,000** 91:17
**52.00** 42:25
**58** 3:13

**6**

**6** 3:5,17 50:11,13
   106:24,24,25
**6,000** 18:20
**6,560.00** 44:2
**6,560.00.** 45:17
**6,690.00** 46:3,8
**6,690.00.** 42:20
**6,890.00** 89:21
**6,890.70.** 46:14
**6,962** 91:20 94:1
**6,962.00** 95:23
**6,962.00.** 94:10
**6,962.70** 91:4 93:8
**6,962.70.** 89:25
**6,982.70.** 43:5

**7**

**7** 24:2
**7,449.00.** 55:18
**7,705** 69:17
**722** 56:18 115:17
   115:19,21 116:3
   117:7,14
**722.00** 15:22 86:12
   95:18 114:5

**722.00.** 55:23
110:13
**73** 23:12
**73,555** 24:10
**734** 9:4
**749.00** 55:22
**75** 28:18
**76** 23:18

**8**

**85003** 2:9

**9**

**91** 3:14
**95** 3:16

**a**

**a.m.** 2:22 4:4
41:13
**ability** 11:1 110:19
120:13
**able** 7:16 17:3
64:4 103:3 114:20
117:22
**access** 89:13 92:14
**accident** 11:11
17:11 22:23 25:6
26:23 28:10,11,12
30:8,10,19,22 35:2
44:11,12 45:7
47:17,21,22 48:6,9
48:12,19,20 49:3,4
52:25 53:22,25
54:15 59:18 60:9
60:15 64:21 90:7
92:23 94:25 95:2
107:7
**accommodate** 8:4
**account** 34:13
56:9 85:25 89:8
89:10,10,11,12
92:6,9 94:14

**accounts** 92:14
**accurate** 49:21
54:14
**accurately** 46:19
47:2
**action** 1:2 12:14
12:16 111:22,25
112:6 114:15
120:16,20
**actual** 42:18 43:9
44:21 57:11 70:6
106:1 107:17
**add** 57:5
**added** 57:3 82:11
86:5
**adding** 86:13,16
**addition** 55:21,22
**additional** 34:6
97:10,13,17
108:19
**address** 9:1,2 51:2
51:8 55:11
**adhere** 90:23
**adjust** 15:5,6
95:18
**adjusted** 45:24
46:2,7 69:19,21,24
**adjustment** 15:5
15:13 44:3 45:18
45:19,22,23 56:15
56:18 71:20,23
73:5 86:8,9,9,11
86:23 87:3 95:18
102:8,9 105:5
109:13,16,22
110:5,7,9,14,17,20
111:1 114:10
115:4,7,14,14,17
115:25 117:2,7
**adjustments** 55:19
70:9 71:10 109:17

109:23 116:12,14
**adjusts** 70:14
**afflicted** 105:5
**ago** 9:7 59:8
**agree** 46:6 52:14
55:3,7,10 56:3,20
60:7 64:15,18
67:23 68:18 69:10
69:25 70:8,13,14
70:21 71:13 72:6
72:11 73:2,7
80:17,21 81:6,16
83:3,10,18 84:15
85:21,24 87:1
91:16 95:21 106:1
106:19 107:3,6
108:3 117:6
**agreed** 6:21,24
64:7,9
**ahead** 15:1 26:10
36:14 37:3 42:8
43:2,15 44:13
49:19 63:21 100:7
118:11
**alabama** 9:17
**alignment** 19:24
21:12
**alleged** 109:18
111:22,25 112:6
**alleging** 15:9
**allow** 74:13
**allowed** 45:9
96:23 98:10
**alright** 79:15
**amenities** 15:19
**amount** 34:2 56:9
61:11 70:21 98:21
105:15 107:18,21
109:7,21 110:13
110:15,16

**andrea** 2:11 4:23
5:14,18,18 11:15
38:6 39:7 69:18
79:13 83:1 85:7
90:3
**ann** 47:25 48:3
**annoying** 40:19
**answer** 7:18,23,24
8:14 15:1 20:10
26:25 27:22 28:5
28:12 32:25 33:2
33:21 35:9,21,23
36:7,9,10,14 38:23
47:8 48:15,23
49:7,12 59:3
60:25 63:21 65:15
65:15,16,17,19
66:2,2,4 67:4
70:18 71:16 72:1
72:2,15 73:11,19
74:23 76:15 77:2
77:9 78:24 80:25
81:18 82:5,17,17
83:7,15 88:3,6,17
88:19,24 92:12
96:15,16,23,25
97:2,4 98:3 100:7
103:1 106:8 108:9
108:17 112:8,10
112:11,13,14
113:18 115:12
**answered** 8:6
45:12 71:7 87:11
88:23 118:10
**answering** 103:7
**answers** 7:15
**anybody** 14:14
35:17 36:21 37:1
74:20 75:24 78:6
99:2 103:14
105:21,24 114:21

anymore   114:21
anyway   11:23
apartment   9:4
  103:8
apologize   6:2 39:4
  45:13 89:5
app   31:15,16,17
  31:18,19,24
appear   95:16
appears   106:16
  120:11
applied   70:8
  109:13,16,24
  117:7
appointment
  20:19 52:3
appreciate   63:10
appropriate   114:6
approximately   4:4
  22:22 41:13,17
  51:10 79:23 80:3
  111:14,17 118:21
  118:24 119:6
arbitrary   115:17
area   69:11
arguing   15:24
arizona   2:9
arteries   62:5,8
ascent   98:17 100:1
  101:22,23
asked   22:15 37:16
  45:13 54:5 60:2
  71:7 87:11 88:23
  89:5 90:22 93:18
  94:11,12,17
  104:10 110:25
  118:10
asking   13:4 14:21
  34:24 36:2,3 38:8
  66:6 84:22 87:14
  90:6 95:18 96:18

96:21 109:3 111:4
assuming   84:6
ate   74:12 75:12
attach   121:18
attached   39:10,16
  121:17
attend   117:22
attention   77:25
attorney   4:22 7:14
  13:5,7 32:23 33:1
  35:20,23 36:2,9,11
  63:20 65:16 66:3
  66:8 95:17 96:16
  97:1,3 98:1
  110:25 112:9,12
  120:18
attorney's   114:8
  114:18
attorneys   2:10,15
audibly   7:18
august   120:24
authority   113:22
authorize   31:4,7
  65:3
authorized   31:6
  31:23 64:24 65:2
  65:4
authorizing   64:1,5
  64:6,12
automobile   45:7
automotive   10:17
average   50:11,13
award   118:2,7
aware   12:16 74:16
awful   75:10 76:8
awiltrout   2:14

**b**

b   3:7
bachelor's   9:15,16
back   7:9 17:8
  20:21 23:2 29:21

38:9 41:4,17
  44:14 45:15,16
  61:3,6,21,25 62:12
  62:14,14,16 66:17
  79:10 80:4,5
  87:21 89:4 90:12
  95:17 111:17,19
  118:24
backtrack   61:25
baker   2:11
bakerlaw.com
  2:14,15
bam   29:11
barrier   28:19,20
base   43:22,24,25
  44:1 45:12,17
  50:6
based   87:23
  116:15
basis   84:20
bates   39:5 43:24
beach   29:22
beardsley   2:7 5:4
  5:4
beginning   6:21
  80:1
behalf   1:4 4:9,23
  4:25 5:5 31:5,6,24
  38:21 64:5,13,25
  65:12 96:19,22
  114:16
believe   16:9 21:10
  33:25 37:25 39:5
  42:2 43:8 45:1
  52:8 64:8 69:21
  90:17 95:10
  102:18 113:12
  116:10
believed   34:1 64:9
berman   2:6 5:5
  14:5

best   66:9 120:13
better   35:12 77:13
  103:3
beyond   33:15
big   18:6 27:5
birthday   8:22
bit   54:17 80:14
blue   78:3,13,13,13
  101:10,16,21
board   115:19
bodily   90:4,8
body   51:5,19 52:8
  52:9
book   78:3 101:10
  101:16,21
bottom   23:10,20
  24:5 37:7 86:21
  117:1
bought   17:20
  72:18 74:2 76:12
  76:25 99:2,7
boulevard   51:3
  53:10,14
box   47:6,11
bragg   53:10,14
brain   16:16 33:10
  113:1
brakes   19:24 21:8
  27:12,15 80:23
  81:7
brand   17:20 27:15
  51:6
break   8:3,6 17:15
  41:3,6 44:5 79:8
  80:7 111:10
  118:18
breaks   8:2 103:13
brief   41:15 79:25
  111:15 118:22
bring   40:13 112:5
  112:5

broke   15:3 43:3
brought   62:13,14
business   10:5,6
buttery   27:3
buy   17:25 18:1
   76:9,21 98:16
   99:4 101:22,24
buyer   88:10
buying   76:10

**c**

c   2:1,11 3:1 4:1
c230   100:11
cadillac   16:9
   17:22,23 26:1
   81:15 100:5,18,25
   101:17
calculate   112:25
calculated   46:10
   108:7 110:21
   114:23
calculation   70:4,7
   102:10
call   6:12,13 7:1
   30:16,25 33:10
   96:15
calls   7:8 35:7
   71:24 88:1,15
   92:10 97:24,25
   105:16 106:6
   109:8
cancer   22:13
car   10:13,15 11:11
   15:19 16:5,6,7
   17:1,12,13 18:1,5
   18:13,17,21 19:7
   19:10,12,14 20:6
   20:22,23 21:3
   22:1,7,18 24:1,16
   24:25 25:15,17,23
   25:25 26:7 27:8
   28:2,11,19,20,21

28:25 29:12,25
30:5 32:2,12
33:17,24 34:16
35:15,18,22 36:7
48:5,9,11,18,19
49:2,2,3,4 51:22
52:6,25 53:2,6,19
53:21,25 54:3,6,8
55:8 56:1,11,24
57:3,6,12 58:5
59:18 69:8 70:22
71:4,4,13,19 72:4
72:7,7,8,11,12,18
72:25 73:3,6,14
74:1,1,4,8,10,11
74:12,13,21 75:5,6
75:11,14,18,19,21
75:24 76:3,6 77:6
77:14 78:2,7,11,21
78:21 80:8,9,12,13
80:14,15,17,19,21
81:7,14,21,23,23
82:1,2,15,21,22
83:3,4,10,10,11,12
83:19,22 84:1,2,11
84:12,16,23,24
87:10,19,22,23,23
88:10,11,14,14,22
94:12 96:5,9
97:10,14,17 98:18
99:2,15,21 100:12
100:19 101:25
102:4 109:5
cards   13:13
care   18:9 74:7,21
   77:13 80:12,18
   81:14 87:24
   115:20
carolina   1:1,13 2:5
   2:21 4:14 9:5
   18:13 55:13 105:1

112:19,20 120:3
carotid   62:5,8
cars   20:20 56:21
   57:9 77:15,17,22
   78:16,18 84:7,9
   87:3 98:9 99:10
   99:13,22 100:13
   100:25 101:9,13
   102:1 105:14
case   4:12,14 11:9
   11:10 13:1 57:4
   59:11 66:10 92:25
   104:8,23 111:22
   111:25 112:3,5
   113:4,7,8 114:12
   117:8,12,16
cases   93:1
cash   42:18 43:9
   53:11,16,16 106:2
   106:9 107:17
casualty   1:8 4:10
catch   61:2 62:4
categories   50:1
cc   67:16
ccc   3:12 13:23
   15:16 39:9,12
   43:20,20 57:17
   58:4 67:10,17
   85:1,21 87:2
   89:19 110:11,11
   110:12 115:24
   116:11
cce   1:2 4:14
center   2:13
certificate   120:1
certifications   9:21
certified   3:17
   106:13
certify   120:10
cgl   78:12

chain   20:8
challenging   102:2
   102:6,10
change   19:23 24:9
   73:8 121:2
changed   25:2,4
changes   121:17
chapel   9:4 103:8
chart   16:2 110:11
chat   31:24
cheapest   99:23
check   33:25 34:3,6
   34:8,10,12,16,18
   45:5 89:6,7,16,18
   97:20
checking   34:13
   89:8,9,11
choose   72:22
civic   2:13
civil   1:2
claim   11:19 12:7
   15:5 16:8 33:24
   40:6 42:3,5 63:16
   89:23 90:4,5,8
   92:18,22,24
   105:20
claims   3:11 14:18
   91:18
clarification   39:22
clarify   11:16 15:8
   15:11,21 64:11
clarity   38:7
class   12:13,15,15
   104:7,22,25 105:8
   105:21,24 108:22
   109:4,5,13,18,18
   111:22,22,25
   112:1,6,17,23
   114:1,15,17,24
   115:6 118:1

clean   77:17 78:22
  84:12
cleaned   25:16,19
  74:7
cleanliness   83:19
clear   7:19 26:21
  31:13 36:1 66:6
clearly   37:8
client   32:23 33:1
  35:20 36:11 63:20
  65:16 66:3 96:16
  97:1,3 98:1 112:9
  112:12
close   48:3 51:9,11
closed   40:18
clouded   52:13,15
clouse   51:18
cloused   51:18,18
  52:10
college   75:8
  100:14
collision   47:15
columbus   2:14
come   17:3 18:7
  19:4 79:10
comes   110:16
  117:15,15
coming   29:21 34:6
  60:23
commission
  120:24 121:25
communicate   97:9
communicated
  97:12,16
communications
  32:24 33:1 35:21
  36:12 63:20 65:17
  66:4 96:16 97:1,3
  98:1 112:9,12
comp   55:15,17
  56:1,5,12,13,21,21

56:21 70:5 71:19
company   1:8 15:9
  72:6
comparable   15:23
  15:23 54:19 55:4
  55:15 56:24,25
  57:2,10,12 68:22
  68:25 69:3,4,5,14
  69:19,21,24 86:19
  86:23 87:7 115:20
  115:25 117:2,8
comparables
  54:23 55:4 69:10
  88:6
compared   57:3
  86:25 87:8 88:10
  107:23 116:14
  117:4
compensated
  118:1
complaint   97:8
  102:2,24
complete   102:21
completed   9:14
completely   28:21
  29:15 78:22
component   54:13
  85:18
components   85:3
  85:22 87:16,18
computer   23:3
  40:8,16 41:7
concierge   103:21
concluded   119:8
conclusion   106:7
concrete   28:19,20
concussion   33:9
condition   15:4,13
  15:22 17:11 25:9
  25:10,12 27:18
  28:7 44:2 45:18

45:19,21,23 49:23
  50:9 51:14,16,25
  52:1,19 54:13
  55:23 56:18 57:7
  68:15 73:5,8,15,21
  74:1,5 78:2 80:9
  80:10,11,15,18,22
  82:2,8,8,11,12,14
  84:16,19,20,23,24
  85:3,18,20,22 86:4
  86:5,7,8,9,11,14
  86:15,15,18,23,24
  87:3,4,7,9,17,19
  102:8 105:5
  108:14,22 109:5
  109:13,16,17,22
  109:23 110:5,7,14
  110:17,20 111:1
  114:10 115:3,7,14
  115:14,25 116:1
  116:13,14,19
  117:2,3,4,6,7,9
conditional   83:21
conditions   49:25
  87:17
conduct   12:5
confirm   22:16
confusing   31:19
confusion   44:5
conscious   62:23
  63:2
consider   84:22
  87:18 99:10,12
  108:14
considered   72:7
constantly   113:6
consulting   10:6,7
contained   120:9
contend   14:22
content   36:11

contents   36:2
context   88:9
continue   31:4
  113:6
conversation
  31:22 33:7 36:3,4
conversations
  13:4 31:5 58:25
cool   7:5,21
copy   46:3 67:16
  121:18
corner   19:21 20:2
  24:5 86:21 117:1
correct   43:13 50:7
  50:8,16 56:18
  59:23 60:10 61:21
  65:1 71:21 90:14
  97:20 110:10
  111:7
correction   121:2
correspondence
  45:6
counsel   4:7,20
  6:10 120:15,18
country   100:16
county   120:5
couple   5:15 10:20
  43:15 52:12 78:16
course   42:9
  104:11
court   1:1,22 2:22
  4:13,17 5:7 7:12
  11:20 37:23
  113:13 114:9,19
  121:18
cousin   17:19,21
  18:2 19:4 26:19
cousin's   47:23
cover   58:15
coverage   11:18

**cts** 16:9 26:1 100:1
100:6 101:17
**current** 9:2 113:15
**currently** 9:23
118:8
**cv** 1:2 4:14

**d**

**d** 3:7 4:1
**dad** 31:1,4,23 35:6
35:14 65:24 89:10
94:12,17,23 96:11
96:18 97:12
100:12 101:8
**dad's** 17:19,21
18:2 26:19 47:23
47:23
**damaged** 107:18
107:23
**damages** 113:24
114:4,4,7,8,12,13
114:16,19
**date** 4:5 25:5 26:5
30:13 60:16 69:3
91:22 107:6
113:10,12
**dated** 95:19,20
97:19 121:20
**day** 2:22 8:1 20:17
20:24,25 21:4,5,21
25:8 26:22 30:10
52:24 61:6,20
62:12,14,15 74:2
92:2 121:22
**days** 60:21 61:14
99:6
**dealer** 10:13
108:11
**dealers** 78:1
101:13
**dealership** 17:22
17:24 78:7 99:5

**dealerships**
116:15
**december** 91:23
96:8 97:7 102:4
102:14
**decide** 112:5
**deciding** 101:22
**decision** 65:11
**decline** 97:4
**declined** 7:4
**deduct** 15:17,22
**deducted** 105:12
**deduction** 16:5
55:23 105:12
**defendant** 1:9,13
2:15,21 3:8 4:8,11
4:24 5:3 6:10
**defendant's** 24:13
38:1 58:11 91:13
95:13 106:25
**depends** 82:2
84:16
**deposed** 11:4,6,13
**deposit** 34:8
**deposited** 34:10
34:12,16 89:8,9,10
89:12 92:6,8
**deposition** 1:12
2:21 4:6,15 6:22
10:23 11:19 12:23
14:15 24:12 37:24
41:15,24 44:8
58:8,18 79:22,25
80:2 91:12 92:16
95:12 103:13,18
103:23,24 104:4
104:12 106:24
111:15 112:22
118:22 119:5,8
120:8,11,16

**describe** 29:6
46:19 47:2 85:2
104:24 108:6
**description** 54:14
**detailed** 53:19
74:7 81:11
**detailing** 25:21,23
26:1 52:2
**details** 28:10 47:6
47:11
**determine** 99:20
**determining**
108:15
**died** 17:10 79:6
100:17
**difference** 49:10
55:25 56:9 108:21
**differences** 85:25
**different** 44:2
45:19 65:22 85:8
99:10 108:22
**ding** 74:17
**dings** 52:10 75:15
**direct** 96:11,13
**direction** 120:14
**discharged** 62:4
**disclose** 32:23
**disclosing** 65:16
66:3 97:1,3 112:9
112:12
**disclosure** 63:19
97:25
**discovery** 113:4
**discrepancies** 68:4
68:8
**discuss** 34:15,18
36:8,21
**discussed** 35:22
36:15,23,25
**disputing** 115:10
115:13,16 116:22

116:24
**distance** 51:11
**district** 1:1,1 4:13
4:13
**document** 13:23
22:25 23:13 24:12
37:3,6,10 38:4,14
38:18,20 39:1,8,11
40:6 41:21,22,23
42:12,18 44:15,18
45:2 57:16,23,24
58:1,3,4 66:17,18
66:21,23 67:13,18
67:20 68:22 70:5
70:6 85:14 91:6
95:5 106:12,16
**documents** 13:19
13:21,22,25
**doing** 15:4 22:1
40:22 111:3 112:1
114:1,19
**dollar** 116:12,14
**door** 74:17
**doors** 75:15
**drink** 74:11
**drive** 2:4,13 51:12
74:6 98:5,10,11
**driven** 18:24,25
**drivers** 114:20,20
114:22
**driveway** 18:6
**driving** 19:2 29:8
29:17,19 94:25
95:1,3,3,4 98:6,9
98:11
**drove** 20:20 22:10
76:3 79:3,6 98:6
**drugs** 10:25
**due** 86:24
**duly** 5:11 120:11

| e | | | |
|---|---|---|---|
| **e** 2:1,1 3:1,7,7,7 4:1,1 44:23,24 45:3,5 48:2,2,2 104:11,16 | **everybody** 7:7 109:12,15 112:3 114:2,13 118:14 | **explains** 117:13 | **file** 3:11 |
| **eagles** 113:13 | **evfortson** 44:24 | **explanation** 121:3 | **filed** 4:12 11:25 97:8 102:24 111:21,25 |
| **easier** 106:19 113:2 | **exact** 26:5 57:9 60:21 61:11 91:5 98:21 105:15 | **extending** 79:16 | **final** 96:5 102:19 |
| **eastern** 4:4 | **exactly** 30:14 | **extent** 35:19 63:19 96:24,25 | **financially** 120:19 |
| **easy** 8:21 | **examination** 6:10 11:17,23 12:6,20 | **exterior** 25:16 27:17,18,20 28:1,3 28:6 | **find** 67:18 |
| **eat** 74:10 | **examined** 5:12 | | **finding** 32:12 |
| **eaten** 76:22,23 77:4 | **example** 76:20 | **f** | **fine** 16:18 17:9 37:21 39:23 69:22 79:19 |
| **eckelberry** 2:12 5:2,2 | **excellent** 50:16 51:24 | **f** 3:7 48:1,2,2 | **finish** 43:3 |
| **education** 9:13 | **exercised** 12:6 | **facts** 66:6 | **finished** 9:17 |
| **eighth** 46:15 68:3 | **exhibit** 3:10,11,12 3:14,15,17 24:12 24:13 37:24,25 38:1 41:23 44:16 58:8,8,9,11 91:12 91:13 95:12,13 106:24,25 116:10 | **fading** 28:7 51:20 51:21 | **first** 5:16 29:3 32:10 37:10 38:12 49:16 50:5 55:15 55:17 58:14 59:19 60:3 66:24 67:11 69:12 91:11,17 95:1 100:12 101:8 106:15 |
| **elderly** 18:8 | | **fair** 81:5 99:20 108:14 | |
| **elizabeth** 1:3,12 2:21 3:4 4:7,8 5:10 6:17 79:22 80:2 119:5 | | **fairly** 108:10,12 | |
| | | **familiar** 101:20 | |
| | | **family** 18:9 103:15 103:22 | |
| **elliott** 9:4 | **expect** 8:1 88:13 118:5,12,13 | **far** 51:10 107:12 | **firstly** 59:11 |
| **emergency** 120:9 | **expectation** 117:25 | **father** 10:2 34:14 36:19,22,24 64:25 65:3 66:14 89:1 | **five** 42:5 51:13 62:17 |
| **employed** 9:23 10:1 120:15,18 | **expectations** 118:7 | **fax** 58:15 | **fix** 7:9 |
| **employee** 120:17 | **expected** 97:9,13 97:17 | **fayetteville** 25:24 53:10,14 55:13 | **flash** 13:13 |
| **ended** 9:19 | | | **florida** 18:6,11,15 19:10 51:1 |
| **entire** 46:23 | **expires** 120:24 121:25 | **features** 99:8,12 99:23,24 | **fog** 33:10 |
| **entirety** 39:14 | **explain** 16:3 86:12 110:12,15 | **february** 1:14 2:22 4:5 | **foggy** 33:15 |
| **entities** 31:14 | **explained** 61:25 109:22 110:3,8,8,9 110:10,14 115:15 115:22,24 117:14 118:4 | **federal** 113:13 | **folder** 91:7 |
| **entity** 15:8 | | **fee** 42:24,25 43:11 43:11 | **following** 37:13 |
| **equipment** 68:5 | | **feel** 57:11 79:16 | **follows** 5:12 |
| **er** 62:2,7 | | **fees** 89:22 114:9 114:18 | **footnote** 86:22 |
| **errata** 121:1,17,17 121:18 | | **feet** 28:18,20 | **foregoing** 120:8 120:11 |
| **esquire** 2:3,7,11 2:12 | **explaining** 65:5,7 65:8,9 87:2 | **fifth** 42:3,7 67:13 | **forestry** 9:20 |
| **estimate** 112:22 | | **figure** 91:5 101:14 109:1 | **forget** 6:6 |
| **events** 11:1 66:7 | | | **form** 6:23 14:24 14:25 28:4 |

**formal** 11:25
**formalities** 5:24
**fortson** 1:3,12
2:21 3:4 4:7,8
5:10 6:7,12,17
41:20 50:24 79:22
80:2 104:6 111:21
119:5
**found** 33:16
**foundation** 47:7
48:22 71:6 73:10
74:22 81:17 82:4
83:6,14 84:17
88:16 105:17
108:16 109:9,25
**four** 17:18 18:4,21
18:23 50:18 54:20
55:3,4 58:23 59:8
84:19 85:2,3
**fourth** 68:2
**freeman** 47:25
48:1,3
**friend** 59:14
**front** 41:22 104:3
**froze** 40:17
**full** 6:15 19:22
34:1 99:15
**fully** 17:6 19:15
**funds** 34:6
**further** 120:17

**g**

**g** 4:1
**g.s.** 120:10
**garrison** 1:7 3:14
4:10,24 12:5
14:19,23 15:10,11
23:1,6,14 24:6
26:11 30:9,11,23
31:5,11,13,21,23
32:2 33:24 35:3
40:7 42:13 43:7

46:16 56:23 64:13
64:25 65:13,24,25
87:22 88:22 89:6
89:7 90:1 92:17
92:22 96:4,8,19,22
97:9,13 102:23
105:6,7,9 106:1,21
108:3 112:18
**garrison's** 91:10
**gas** 53:9
**gaston** 120:5
**gauge** 78:4
**generally** 28:10
60:22
**geographic** 69:11
**geography** 9:19
**getting** 24:21 25:1
37:5 50:18 63:15
90:11 115:3
**gift** 100:23,23
**gifted** 16:10
100:10
**give** 7:15,17 11:1
16:22 17:2 31:2
42:10 57:5,20
**given** 56:8,8 115:7
115:15
**giving** 64:4
**gl** 78:13
**glass** 52:17
**gmail.com** 44:24
**go** 13:1,19 15:1
18:10 21:13 23:12
23:17,19 24:2
26:10,11 31:17
36:14 37:3 39:4
41:10 42:2,8,12
43:2,15 44:13,14
44:15 45:16 46:15
49:19,22 54:1
59:11 61:24 63:21

72:25 78:17 85:3
87:19,21 91:6
100:7 106:15
114:13 116:11,25
118:11
**goes** 82:14 87:9
**going** 4:3 5:14,20
5:21 6:18 7:13,16
8:21 18:10 22:13
28:18 32:22 36:5
37:6 42:8 45:15
46:21 49:1 53:4
54:25 57:15 62:11
63:18 66:16,16
76:9 90:23 95:17
101:14,24 118:17
**good** 4:2 7:2,3,11
8:17 17:11,12,13
25:9,10,12,24 28:7
38:11 39:20 40:22
41:2 50:2,11,12,15
51:11,16 52:1,20
52:22 53:12 68:14
73:20 74:1 79:7
80:9,10,11,15,18
80:21 81:14 82:11
84:12 86:15,24
87:3,7 116:1,14,21
116:21 117:3,8
**gosh** 42:6
**gotten** 17:4,19
18:5 35:13 53:19
61:7
**grandfather** 16:10
21:17 52:3 80:12
80:16,22 81:6,13
100:18
**grandfather's**
50:22,23
**grandpa** 16:22
17:16 18:1,16

19:13,19 21:13
24:23 30:3 50:19
**grandpa's** 50:21
**grandparents** 18:6
19:3
**graph** 16:2 110:10
**great** 8:19 39:24
42:1 74:4,20
98:25
**greater** 69:11
**greensboro** 113:14
**grimy** 75:13
**group** 104:25
**guarantee** 118:5
**guess** 13:10 15:10
24:19 27:1,16
47:9 72:10 73:4
84:25 108:10
**guidance** 86:18
**guy** 28:17 59:12
59:18
**guy's** 14:7
**guys** 13:9 14:12
20:19 34:21 79:4

**h**

**h** 3:7,7
**hagens** 2:6 5:4
14:5
**half** 62:10 79:11
98:9,15
**hand** 24:5 53:9
54:22 86:21 117:1
121:22
**handling** 108:21
**happen** 21:24 25:6
115:6
**happened** 17:10
18:22 26:17 28:14
28:21 29:4,7,11
30:3 61:3 63:11
64:22 66:7,7 79:5

94:13 107:7
**happening** 8:7
**happy** 8:3 39:21 41:4 87:24
**hard** 28:12 91:23 112:25
**hate** 38:6 39:7
**hbss.com** 2:9
**head** 7:16,17
**headlight** 51:18 52:10,14
**hear** 13:3 58:24
**heard** 20:10 101:11,20
**hearing** 34:5 47:20 88:25
**held** 4:15
**help** 40:4 59:10,17 60:3 78:4 89:24 101:13,13
**helped** 59:25
**hendren** 2:2
**hendrenmalone....** 2:5
**heroin** 28:17
**hi** 5:13
**high** 28:17
**higher** 49:5 72:12
**highest** 9:13 69:16 70:1
**hill** 9:5 103:8
**hire** 59:4,22 65:11
**hired** 59:17,22
**histories** 105:20
**history** 9:19 47:12 47:13
**hit** 28:17 59:12,18 62:2
**hold** 27:21 32:22 100:4

**home** 29:20 62:12
**honest** 103:2
**honestly** 27:4 32:9 33:4 98:21 101:24
**horrible** 28:23 63:11 76:19
**hospital** 30:13 38:17 60:13,15,23 61:6,19,21,23 63:13,15
**hostetler** 2:11
**hour** 28:18 63:6 79:11
**hours** 29:18,20 62:16
**huh** 7:17 16:21 17:14 29:2 99:9 116:23
**hurt** 114:20
**hypothetical** 84:6

**i**

**icu** 33:14 61:4,10 61:17 62:9,20,23 63:6,25
**idea** 22:9 33:8
**identical** 67:24
**identification** 24:14 38:2 58:12 91:14 95:14 107:1
**illegal** 15:3 102:6
**immediate** 61:1
**immediately** 61:2
**impact** 11:1 50:3 116:12
**important** 7:15,18 7:22
**inaccurate** 49:20 109:24 110:2
**include** 89:21 90:8 107:21 112:17

**including** 112:21
**incorrect** 47:6
**incorrectly** 68:11
**increase** 56:14 73:2
**increased** 50:6 116:20,20
**industry** 10:11,17
**information** 40:7 42:4,5 46:17 47:5 49:15,17 67:15,21 68:11 89:24 110:20,25 111:5 113:7
**initial** 61:16 92:24
**injury** 11:19 12:7 16:16 90:5 91:18 113:1
**inside** 25:19,21 54:9 77:17,19 78:22
**inspect** 32:2
**inspection** 50:13 51:17
**instant** 104:18
**instruct** 35:21 98:2
**instructed** 97:4
**instructs** 8:16
**insurance** 1:8 10:10 15:3 31:18 31:20 59:11,12 102:7 106:5,20
**insured** 30:7
**insureds** 112:17
**interest** 66:9
**interested** 32:6 120:19
**interests** 114:2
**interior** 25:11,13 26:1 29:12 52:21

52:25 54:6,14 81:16
**interject** 11:15 38:6 39:8
**interviews** 116:15
**introduce** 4:20
**inverted** 83:1
**investigation** 12:7
**involved** 13:1 28:11 48:20 49:3 49:4 113:5,6,6,8 114:14
**issues** 7:8 30:4,6 37:5
**items** 42:21

**j**

**j** 2:3 3:15
**jackie** 1:21 2:22 4:17 120:7,23
**jacksonville** 51:1
**jefferson** 2:8
**jinxed** 42:11
**jlw** 1:2 4:14
**job** 9:25 10:10 53:12 98:25
**jobs** 10:17
**john** 14:9,10,10,11 14:11
**johnson** 1:21 2:22 4:18 120:7,23
**judge** 113:13
**judged** 33:17
**june** 107:4

**k**

**keep** 73:14,16,20 74:4 113:8
**kelley** 78:3 101:10 101:16,21
**kept** 74:1

**kids** 9:11 74:13
75:2,4
**kind** 10:21 13:2
62:24 75:13 76:6
94:11,11 99:25
100:17 102:9
107:20
**knew** 32:16,17
**knock** 5:19
**know** 7:6 8:3 13:1
13:5,18 15:14,18
15:19,20 18:16,19
19:6,23 20:4,5,22
21:2,6,19,20 22:10
23:7 26:4 27:12
27:16 28:9,14,14
28:15 30:18 31:1
32:4,6 33:4,10
35:9,10 36:3 37:4
38:20,23,24 40:3
40:23 48:11,23,24
49:8,13,19 52:5,16
53:8,10,24 54:7
57:14 61:14 63:5
64:6,23 65:19
66:16,18,20 67:18
70:24 71:1,8,17
72:1,16 73:25
74:3,19 75:2,17
78:1,3,5,6,14
80:16 81:1,3 82:5
82:6,18 87:20
88:18 89:9,10
91:4 92:5,7,8,13
92:21 94:2,6,8
96:2,10 97:12,15
97:16,18 98:21
101:10,11,15,19
101:23 103:1
104:22 105:18
107:14 108:11,12

108:25 109:17,20
109:20,21,23
110:17 111:3,5
113:7,7,10,13,15
114:23 115:2
118:5
**knowing** 18:9 88:4
**knowledge** 47:22
**known** 48:5 75:24
**kompressor**
100:11,21,22
101:3

**l**

**l** 2:12
**labeled** 23:1 56:21
**lack** 48:21 105:17
108:16 109:9
**language** 117:1
**lasted** 117:23
**lasts** 117:20
**law** 15:3 102:7
**lawsuit** 11:25 12:2
12:11,16 14:18
15:9 112:24
113:11,16,22,25
114:17
**lawyer** 8:9 58:21
58:22 59:1,5,9,10
59:17
**lawyer's** 8:15
**lawyers** 12:25
13:17 14:4,5 32:3
109:1 113:5 114:5
115:1
**learn** 94:4
**learned** 94:9
**leather** 26:6,14,16
52:23 54:17 84:11
**leave** 115:1
**led** 58:25

**left** 41:20 60:20
80:7
**legal** 4:18 106:6
**lenses** 51:18 52:10
52:14
**leslie** 47:25 48:3
73:25 80:14
**lesser** 107:17,17
**lessons** 95:4
**letter** 3:15 39:9,12
39:14,15 42:3
57:16,17 58:15
60:6,6 63:13 95:8
95:16,17,21,25
97:19,23 110:23
111:2,6
**level** 9:13
**liability** 107:10,13
107:16
**life** 63:11 66:7
**lifetime** 100:2
**lights** 29:12
**liked** 99:24
**limit** 107:10,13,16
108:1
**line** 56:7 121:2
**lines** 50:5
**list** 54:23 55:16,17
69:14,19,24 70:3
**listed** 49:18 54:13
55:25 68:5,10
87:16 89:19,20
**lists** 85:21
**little** 16:14 23:9,9
23:20 37:7 44:5
54:17 74:25 80:14
91:23
**live** 50:25
**lives** 73:9
**llp** 2:6,11

**local** 20:7,9
**log** 23:2
**long** 10:8 13:9
20:22,22 21:2,5,7
22:22 23:3 29:17
33:9,12 51:12
53:2,17 58:22
61:8,10,12,13,16
61:19,23 98:12
**longer** 62:18
**look** 15:16 24:5
26:10 27:7 38:4
41:21 44:13 45:10
45:11 49:15,25
50:9 54:5,25
55:15,24 67:17
68:2,21 70:4
71:19 73:5 77:14
77:22 85:1,4
86:17,21 89:23
91:9 92:17 95:5
101:21 106:12,15
116:4,4
**looked** 26:22 44:6
52:12 54:8 67:25
70:10,12 75:22
77:19 85:8,10
101:16,23,25
104:3,13 116:2
**looking** 37:11
44:20 54:11 58:14
60:5 63:9 66:17
67:16 76:21 77:20
85:4 92:25 97:19
**looks** 47:14,17
49:20,21 58:15
60:6 68:14 106:22
**loss** 3:14 33:17
55:25 56:12 64:2
64:9 70:4 86:24
87:8 90:4,8 91:7

92:18 94:20 96:22
102:3,20 105:13
116:13 117:3
**lost** 28:25 29:8,12
98:14
**lot** 22:12 47:3
62:13 63:3,5 71:4
72:23 75:15,19
77:14 98:10,11
99:5,22,25
**loud** 7:15
**lowest** 69:14 70:1
**lowther** 4:16
**lunch** 79:8,18

**m**

**m** 48:2
**mail** 44:23,24 45:3
45:5
**mails** 104:11,16
**main** 92:14
**maintain** 36:6
**maintenance**
20:13 22:17 24:22
75:25
**making** 8:11 30:16
**malcolm** 50:24
**malone** 2:2,3 3:15
4:25,25 5:18,22,25
6:2,5,9,24 11:15
11:22 12:1,4 14:3
14:24 26:24 27:19
27:21 28:4 32:20
32:22 33:20 35:7
35:19 36:5 37:13
37:19 38:6,22
39:7,15,19,23 40:1
40:22 46:21 47:7
48:14,21 49:6,11
58:17,20,25 59:2
59:23 60:2,7,24
63:18 64:1 65:4

65:12,14 66:1,12
66:25 67:3 68:6
69:18 70:17,23
71:6,15,24 72:14
73:10,17,19 74:22
76:13,15 77:1,8,18
78:23 79:13,16,20
80:24 81:17 82:4
82:16,24 83:6,14
84:17 85:7,11,13
87:11 88:1,15,23
90:2,20,22 92:10
94:21 96:13,14,21
96:24 97:16,22,24
100:4 102:25
105:16 106:3,6
108:8,16,24 109:8
109:25 110:22
111:12 112:7
113:17 115:9,11
118:10,17 119:1
**malone's** 58:18
**manufactured**
69:6
**manufacturer**
10:15 69:4
**map** 16:1
**mark** 24:11 37:23
37:24 57:22 58:7
91:11 95:11
106:23
**marked** 24:13
38:1 41:23 58:11
91:13 95:13
106:25
**market** 3:12 42:6
58:4 67:17 89:20
105:23
**married** 9:9
**marriott** 2:4

**massive** 62:6
**matter** 4:8
**mean** 18:7 24:19
27:2 30:20,21
31:17 34:23 36:18
42:20 44:12 48:2
61:13,18 62:14
74:24 75:1 80:13
90:22 102:8
104:25 106:9
108:18 110:6
117:14
**meaning** 68:7
**means** 111:24
**meant** 34:24
117:23
**measure** 110:10
**mechanical** 30:4,6
50:2 116:19
**media** 4:6 79:21
80:2 119:4
**medical** 63:6
**medications** 10:25
63:3
**meet** 13:7,9
**member** 12:13,15
**members** 108:22
109:5,18,19
114:17,24 115:6
**mental** 103:3
**mercedes** 78:12
100:11,13,21
101:2
**messages** 103:14
103:17 104:14,18
**messed** 39:5
**met** 13:8
**mexican** 53:7
**mexicans** 53:9
**michael** 2:3 3:15

**middle** 1:1 4:13
**mike** 4:25 14:11
58:17,18 90:14,18
94:15,16 110:22
**milam** 1:21 2:22
**mileage** 15:17
55:22 56:11,12,14
70:15,21 82:9
84:7,9 86:1 88:12
115:18
**miles** 22:7,10
24:10 28:18 55:11
71:4,5
**mine** 89:11 105:13
114:3
**minivan** 76:20,22
76:22,23 79:3
**minus** 86:12
**minute** 111:10
118:18
**minutes** 13:10
51:13 79:17
**missing** 68:12
117:23
**misstates** 82:24
100:5
**misunderstood**
93:16
**mmalone** 2:5
**model** 83:11,13
**mom** 22:13 74:24
79:3
**moment** 95:11
**money** 83:4 88:14
90:1 92:17 94:14
94:18,20 96:8,18
96:22 97:9,10,13
97:17 102:23
105:4,6,9 109:7
114:21,23,24

monitor 4:3 41:12
41:16 79:23 80:3
111:13,16 118:20
118:23 119:6
month 61:15
62:17,21
months 16:10,20
17:18 18:5,21,23
22:24 33:14 50:19
53:18,18 95:1
morning 4:2 21:6
move 9:6 39:24
54:19 67:13
moved 9:7

**n**

n 2:1 3:1,1,7 4:1
48:2
nada 101:19
name 4:16 5:13,16
6:15 14:8 20:1
47:24 50:22,23
53:8,11 100:24
names 14:6 101:1
national 20:8
necessary 39:22
107:18 114:6
need 8:2,2 23:14
28:9 40:4,4,15
100:19
needs 10:4
negative 45:21
109:16 110:13
115:19 116:3
117:14
negotiate 64:2,6
98:24
negotiating 99:1
neither 120:15
net 42:25 43:5
never 30:5 34:1
48:8 54:8 64:7,7,8

64:8 77:19 96:3
102:20
new 7:6 17:7,20
18:5 19:16,25
21:8,12 27:14,15
50:18 51:6 72:18
80:22 81:7 98:18
nice 21:18
nicer 77:10
night 62:2,3
nissan 100:15
101:5
nod 7:16
nope 103:10 104:5
normal 8:13
north 1:1,13 2:5
2:21 4:13 9:5
18:13 55:13 105:1
112:19,20 120:3
notarization 120:9
notary 1:22 2:22
106:18 121:24
note 47:14
noted 50:3 68:11
121:17
notes 51:17 103:25
notice 25:2 69:23
noticed 75:17,18
75:21
november 92:1
95:20 110:23
number 42:22
75:4 117:15
numbers 23:10,20
37:7 39:5 57:20
67:23

**o**

o 3:1,7 4:1
oath 11:17,23 12:6
12:18

object 8:9 14:24
14:25 32:22 46:22
48:21 63:18,19
objection 8:15
26:24 27:19,21
28:4 32:20 33:20
35:7,13,19 36:6
38:22 47:7 48:14
49:6,11 59:2
60:24 65:14 66:1
66:25 67:3 68:6
70:17,23 71:6,15
71:24 72:14 73:10
73:17 74:22 76:13
77:1,1,8,18 78:23
80:24 81:17 82:4
82:16,16,24 83:6
83:14 84:17 87:11
88:1,15,23 90:2
92:10 94:21 96:14
97:24 100:4
102:25 105:16
106:3,6 108:8,16
108:24 109:8,25
112:7 113:17
115:9,11 118:10
objections 6:22
8:11
occurred 60:9
october 13:24 25:7
38:9,15 60:7,9,13
63:13 64:15,19,22
107:4 116:8,8
official 120:7
oh 6:2 7:2 9:8 10:1
14:7 16:18 18:25
20:13 23:22 42:6
44:22 46:4 51:20
77:24 78:12 79:5
83:3 85:15 90:20
93:20,24

ohio 2:14
oil 19:23 24:9 25:2
25:4
okay 5:13,20,22
5:25 6:3,6,9,14,18
7:5,10,11,20,21
8:8,9,19,24 9:8,9
9:23 10:3,5,10,19
11:9,12,21,24,24
12:3,3,8,13 13:3
14:3,3,11,11 15:11
15:12,25 16:4,25
17:25 18:11,16,21
19:2,6,9,13,17,20
19:20 20:10,13,17
20:22 21:8,23
22:10,15 23:2,8,8
23:12,17,22,23,24
24:2,4,8,21 25:1,5
25:8,13,16,25 26:6
26:17,19,21 27:7
27:10 28:9 29:3
29:15 30:15,18
31:4,8 32:1,11,15
33:16 34:5,8,21
35:12 36:25 37:3
37:9,21,22 38:4,18
39:4,19,24 40:3,12
40:21,24 41:10
42:1,5,6,8,16,17
43:6,12,15,17,22
44:10,13,24 45:1
45:11,18 46:6,18
46:18,19 47:14,17
47:20,23 48:3,8,18
49:15,21,24 50:9
50:18,21 51:17
52:24 53:5 54:13
55:2 57:1,15,18,22
58:14 59:16,20,22
60:12 61:24 66:16

Case 1:19-cv-00294-CCE-JLW   Document 134-1   Filed 12/03/21   Page 45 of 55

67:8,16,21 68:10
68:24 71:3 72:24
76:2,5,14 77:22
79:9,12,20 80:7,17
81:5 82:14 83:3
84:8 85:1,6,11,13
86:3,17 87:6,21
90:21 91:6,8
92:16 93:2,4,13,25
94:4 95:7 99:18
102:10,14,22
106:14,23 107:14
107:25 108:1,3
110:7 111:11
115:10 116:6,9
117:5 118:18,19

**old** 8:24 27:12
53:7,8 75:22
100:15

**older** 16:14

**once** 40:8 78:19
110:22

**ones** 55:24 69:12
77:10 100:9
103:15

**open** 23:14 40:16
40:17 57:15

**opened** 75:15

**opening** 57:19

**opposed** 11:19

**option** 76:10

**options** 49:18
55:21,24,25 56:4,7
56:9 68:10 71:11
71:13,20 72:4,8,9
72:11,13,20,22,23
72:24 73:3 82:9
84:7,10 86:1
88:11 99:11
115:18

**order** 114:9,19

**ordered** 103:20

**ordinary** 73:9

**original** 121:19

**ortega** 51:3

**outcome** 120:19

**outline** 13:13,14
13:16 104:2

**outside** 75:18
77:20,23

**owed** 105:4,6
106:1 108:3
114:22,24,25

**owes** 105:9

**owned** 47:24

**owner** 73:25

### p

**p** 2:1,1 4:1

**p&c** 23:1,6,15
24:6 26:12 42:13
46:16

**p.m.** 41:17 79:23
80:3 111:14,17
118:21,24 119:6,8

**package** 103:16,21

**page** 23:13,18,18
23:21 24:2 37:10
37:14 40:10 42:3
42:7,12,15 43:16
44:15,16,20,22
45:15,16 46:15,15
46:23 47:1,1
49:16,22,23 50:5
54:19,22 57:20
58:14 60:6 67:13
67:19,20 68:2,3,5
68:11,15,16,17
70:5,6 85:9,14,17
86:17 89:24 107:9
116:11,25 121:1,2
121:17,17,18,18

**pages** 23:10,15
43:15 49:16,17,20
54:20,21 68:21

**paid** 18:16,19,19
21:16 33:24 76:24
77:6 87:22 89:22
99:14

**pain** 62:6

**paint** 51:14,15,22
51:24 52:2,5

**panels** 75:16

**parents** 31:1 32:21
33:4,7,16 78:10,15
78:20 98:9 100:23

**parked** 74:17

**part** 11:18 12:7
56:25 57:7 59:15

**participate** 113:4
117:19

**particular** 25:21
57:10

**particularly** 48:4

**parties** 120:15,18

**parts** 67:20

**party** 12:10

**pay** 21:21 53:15
77:25 81:21,22
98:20 99:17

**payment** 15:5 40:7
42:3,5 43:7,11
46:10 88:21 89:1
89:23 91:10 93:11
94:1,4 95:22 96:4
96:5,7 97:7
102:11,14,18,19
111:7

**payments** 15:6
90:6,11,13 91:2,9
91:17,25 92:4,6,8
93:2,5,14,18,21,22

**pdf** 42:15 44:21
46:16 58:14 68:3
68:17 107:9

**people** 76:7
104:22 109:4
112:2,17

**percent** 32:5

**perfect** 73:14

**performed** 19:7,9
19:14 22:17

**permission** 31:2

**person** 14:1,12

**personally** 19:8
30:13 81:25
113:24 114:1

**phoenix** 2:9

**phone** 7:1 23:4
31:11,22,25 32:1
45:8,10

**photographs** 3:10

**photos** 54:11

**pick** 72:20 99:4

**picked** 20:23 21:4

**picture** 23:24,25
24:8 26:11,15
27:7 53:24 54:3

**pictures** 24:3
26:10 53:21 54:1
54:5,8

**piece** 57:8

**pinch** 40:13

**pitting** 52:18

**place** 20:9 25:20
25:21,22,23 26:1
53:5 107:4

**places** 20:6

**plaintiff** 1:5 2:10
4:10 5:1,5

**plate** 42:24

**please** 4:20 5:8
6:15

pllc 2:2
plus 44:2 92:23
    114:5
point 18:10 29:17
    36:13
police 30:20
policy 3:17 15:4
    102:7 106:5,13,20
    107:3
positive 45:21,23
    56:8,8 71:20
    115:4
possibility 118:3
potential 97:25
    112:23
power 29:8,12
precedent 83:25
prefer 5:17,17
prep 13:6
prepare 12:23
prepared 117:17
    117:19
preparing 44:7
    92:16 112:21
presence 73:3
present 14:4 16:23
    19:17 101:2,5
preserve 8:12
pretty 25:9
previous 47:15
    48:11 67:24 68:19
    70:9,13 73:25
previously 47:24
    64:24 71:7 102:17
price 55:16,17
    57:6 69:14,19,24
    72:24 89:19,20
    98:24 99:14,15,20
prices 70:3
prior 6:21 16:10
    17:19 67:10,11

82:24 100:5
pristine 83:13
private 88:9,10
privilege 36:12
privileged 65:17
probably 22:12
    26:8 31:1 32:19
    35:1 45:8 77:3,10
    79:7 98:25 101:25
    103:2 115:2
problems 100:14
proceed 10:22
    59:17
process 56:20
program 31:24
prompted 65:23
properly 72:12
property 1:7 4:10
    107:18,19,19,22
propose 108:21
provide 39:21
    49:2 113:7
public 1:22 2:22
    121:24
pull 22:25 37:3
    39:6 42:8
punitive 109:18
    114:8,12,13,18
purchase 71:3
    98:13 100:21
purchased 17:21
    52:6 98:22 100:2
    100:6,9
purpose 38:7
pushed 28:20
put 17:7 19:16,25
    71:23 80:22 81:7
    86:5,8 94:14
putting 114:2

q

quality 107:20
question 7:23,25
    8:6,15 27:24
    35:12,24 36:7,10
    36:10 56:11 59:15
    65:18 66:3 88:7
    90:23 93:17 98:3
questions 5:15
    6:19 7:18 8:10
    10:20 38:12 55:1
    59:7 103:7 118:16
    119:2
quick 5:18,19 6:4
    41:9 61:25 118:18
quite 11:7

r

r 2:1 4:1 48:2,2
rain 52:11
raleigh 1:13 2:5,21
random 15:4,13
    15:14 102:8
    103:15 109:22
    110:1,6 115:17
range 57:6
ranges 107:7
rated 50:2,10,15
read 86:21 116:25
    119:2
reading 52:8
    119:9
real 5:18,19 6:4
    41:9 61:25
realized 44:4 62:7
    62:13
really 13:17 17:11
    18:23 20:25 25:10
    27:2,2 28:6 32:10
    33:3 40:19 53:12
    54:10,12,18 62:15

63:4,4 75:22
    77:24 100:19
    102:5 112:25
    113:5
realm 109:1
reason 10:19,22
    15:24 45:1
recall 13:22 20:3
    22:3,21 30:12,22
    54:12
receive 88:13 90:1
    90:13 94:20
    103:17 109:6
    114:11
received 22:5,8,11
    34:6 38:8,16,20
    89:6,7 90:7 92:17
    92:22 93:7 95:22
    96:4,7 97:20
    102:3,4 103:14
    104:11,18,20
receiving 22:20
    38:5,9,14 43:6,10
    88:21 93:10,19,20
    93:22 94:1
recess 41:15 79:25
    111:15 118:22
reckelberry 2:15
reconditioned
    26:7 73:6
record 4:3 6:16,20
    7:16 8:12 41:11
    41:14,18 79:15,24
    80:4 111:14,18
    118:21,25 119:7
recorded 4:6
records 121:18
recovery 44:19
reduced 120:14
reduction 107:21

Case 1:19-cv-00294-CCE-JLW Document 134-1 Filed 12/03/21 Page 47 of 55

redwine 2:2
referred 34:25
  59:13 104:2
referring 37:6
  103:24
reflect 116:12
regarding 100:5
registration 42:24
  43:11
regular 75:25
regularly 75:12
  108:11
relate 91:18
relative 120:17
rely 32:3
remember 11:1,7
  13:25 14:6 16:11
  16:25 17:16 19:9
  19:11,13 20:7
  21:16 22:1,7
  24:16,20,21 25:1
  25:13,25 26:2,3,5
  26:13,17 27:4
  28:1 30:15,15,25
  31:8 32:6,8,10,12
  32:15,18 33:6,13
  34:3,5,10,21 35:14
  35:17 38:5,14
  43:6,10 44:7,10
  47:20 50:18 51:21
  51:24 52:24 53:4
  53:5,17,20 58:1
  60:2,19,21,22
  61:11 63:24,25
  64:1,4,10,12,14
  65:11,23 66:21,23
  67:10 78:21 79:1
  88:21,25 90:11,16
  92:3,3 93:10,18,20
  93:22 94:1 95:11
  96:18,21 99:14

111:2 115:3 116:1
remembers 38:9
reopened 40:11
repair 107:19
repaired 107:22
repeated 56:21
rephrase 27:23
replace 98:13
  107:19
report 3:12 13:23
  15:16 30:10 39:9
  39:12,15 42:7,19
  43:19 44:6,10
  46:7,19,24 47:2
  50:6 55:5 57:11
  57:17 66:18 67:17
  67:18,21,24 68:3
  68:19 69:1,11,12
  70:8,9,13,13,14
  71:11 85:4,25
  86:4,5 87:2,17
  89:20,24 110:11
  110:12 115:24
  116:2,4,11
reported 1:21 30:3
  42:19 116:13
reporter 1:22 2:22
  4:17 5:7 7:12
  11:20 37:24 120:1
  121:18
reporting 30:18
  30:22
reports 67:10 85:8
  105:23 110:12
  116:7
represent 104:6
  105:8 109:3
  112:17
representative
  112:23 118:1

represented 46:7
  66:12,14 93:6
representing 4:18
  4:21 66:10 104:7
  104:23 112:3
  114:2
request 90:23
required 8:14
  32:23 113:9
requirements
  120:9
resale 101:14
research 99:19,22
reserved 6:22
  119:9
respect 56:11 90:3
  90:4
response 7:19
restart 41:7
result 90:7 92:18
retained 121:18
retouched 52:2,5
reveal 35:20 36:11
revealing 33:1
reviewed 38:21
  87:12 105:20
right 8:11,21 12:5
  12:6,8 14:21
  16:20 21:9 22:25
  23:14,16 24:5,24
  27:10 28:9 29:1
  32:5 37:7 39:4
  40:16 41:20,20
  42:2,6,17 43:20
  44:4,12 45:2,11
  46:15 47:18 48:8
  51:7 54:22 57:15
  57:20,21 62:1
  68:21 69:8 76:20
  80:9,12 81:24
  84:6 86:17,21

96:5 99:4,8 102:4
  102:12,15,19
  104:8 107:15
  111:9,12 112:18
  114:6 117:1,13
  118:17 119:1
rips 84:11
road 9:4 28:16
robert 50:24
rodger 2:12 5:2
role 112:23 118:1
room 103:11
roommates 103:9
rule 43:3
run 66:19
running 17:9

s

s 2:1 3:1,7 4:1
safety 72:23 99:8
  99:12,23
sale 88:9 101:2,5
sales 42:23 43:11
salvage 44:19
sat 18:21
saved 37:4 95:5
  106:12
saw 68:19 90:19
  92:23
saying 37:15 43:4
  46:23 52:13 54:4
  84:18 86:13 102:9
  110:24
says 7:14 15:22
  31:21 36:7 42:3,6
  42:20 43:22 44:2
  44:19,22 45:17,19
  46:3 47:19 50:11
  50:17 52:18,20,21
  52:22,22 67:18,19
  68:15 107:16
  111:4 116:11

Case 1:19-cv-00294-CCE-JLW Document 134-1 Filed 12/03/21 Page 48 of 55

117:2
scans 62:12
scared 98:11
scratch 26:13,16
  27:3,4,10 74:15
scratched 84:13
scratches 28:7
  51:20 75:19 81:16
screen 40:13,25
screenshot 91:10
seal 121:22
sean 4:16
seat 27:8
seats 26:22 27:2
  74:15 76:23 83:12
  83:13,19,23 84:11
  84:12 88:13
second 23:2 42:10
  44:15,20 59:14
  60:5 62:23 95:9
  116:7
section 52:9,9
  86:25 87:1 107:10
  117:4
see 14:1 15:16
  23:8,9,9,23,23,24
  23:25 24:1,6,6,8,9
  26:14,16 37:8,19
  41:6 42:6,16,21,23
  42:23,24 43:18
  44:16 45:14,18
  46:3,5,10 47:12,13
  47:15 49:19 54:23
  54:23 55:1,17,19
  55:21,24 56:7,14
  56:17 57:23 58:18
  67:14,15,22 68:25
  71:10,10,20 86:19
  89:14 91:20,23,25
  92:17 95:25
  103:21 115:18

116:17
seeing 37:18,20
  44:7,10 58:1
  66:21,23 67:10
  111:2 116:1
seek 58:25
seeking 105:8
  112:16 113:24
  114:7,8,16,18
seeks 36:11 63:19
seen 38:18 39:1
  52:10 57:24 74:20
  95:8 105:23
sell 78:2
send 97:22
sense 62:19 87:5
sent 44:18,23 45:3
  58:16,17 60:5,6
  62:8,11 95:22
  104:14,16 111:6
sentra 100:15
  101:6
separate 31:13
  86:7
september 47:18
series 6:19 55:19
service 19:7,17
  20:19 22:1 118:2
  118:7
serviced 17:6,6,23
  19:16 81:9
services 19:9,11
  19:14 21:16
servicing 19:23
set 31:20 40:24
  87:3 113:10,12
  117:8 121:22
sets 86:23 87:7
  117:2
settle 113:22

settlement 11:10
  34:2 59:10,25
  60:3 63:16 64:2,9
  65:25 66:11
  102:20 109:14
seventh 23:13
shake 7:17
shampooed 25:11
  25:14 53:3,6
shampooing 26:8
shapiro 2:6 5:5
sharing 40:25
she'd 18:7
shop 17:7 19:21
  20:1,11,16 51:5,6
  103:19
shoulder 29:9
show 51:17
showing 25:2
  44:18 47:15
shut 29:13,14,15
  40:8
side 28:16 54:22
sides 75:15
sign 119:2
signature 120:21
signing 119:9
  121:17
similar 101:25
  105:1,2
similarly 1:4 4:9
single 57:8 110:10
  115:20,22
sister 54:12 78:10
  78:11 103:22
sit 18:23
sitting 92:21
situated 1:4 4:9
situation 105:1,2
six 62:17,20,21
  85:22

skip 43:15
slight 51:20,21
smell 76:19 83:18
smelled 76:8 84:12
smells 75:10 84:10
smoke 74:8,9
  84:10
smoked 75:7 76:4
  76:11,16 81:15,19
  81:23 82:1,1,22,23
  83:4,5 88:12
smoking 76:8 82:7
sobol 2:6 5:5
soft 27:2,3
soiled 52:22,23,25
  54:18
solutions 4:19
somebody 45:5
  65:24 108:11
sorry 7:4 12:14
  16:17 27:23 28:23
  30:21 37:22 39:1
  41:1 44:13,22
  46:4,21 47:1
  49:17 51:5 59:15
  65:6 70:6 86:6
  90:12 91:23 93:16
  100:4 108:2
sort 102:5
sound 10:20
sounds 28:23
south 9:4
space 33:12 103:3
speak 14:3 31:6,7
  31:23 63:4 64:5
  64:12,25 65:2,4,12
  65:24
speaking 28:10
  31:16 36:1 60:22
special 118:6,13

specialist 82:19
specific 55:14
specifically 8:16
 13:25
speculation 35:8
 71:25 88:2,16
 92:11 97:25
 105:17 109:9
speed 29:1
spent 112:21,23
stained 76:23
 81:15 83:11,23
stains 84:10 88:12
 88:13
standard 4:4
start 8:21 12:14
 38:12
started 5:16 98:6
 100:13
starting 4:21
 41:21
state 6:15,20 30:13
 120:3
stated 82:10
statement 15:24
states 1:1 4:12
 116:16
station 53:9
status 113:15
stay 61:17 113:8
sticker 23:24
 24:16,21 25:2
 99:14
stipulation 5:19
stock 94:14
stolen 107:18
stop 114:9,19
stopped 28:21,25
 29:16
store 20:7

storing 18:4
street 2:8 51:7
stuck 28:16
studied 12:25
 13:11
study 9:18 13:12
subaru 98:17
 100:8,19 101:1
subject 16:7
 107:23
subtracted 57:4
sudden 17:10 29:8
suite 2:4,8,13
summary 3:14
 43:19 47:12,13
 67:19,21,24 91:7
summer 17:3 18:4
 21:25 22:2
supervision 63:7
sure 7:24 20:3
 37:8,17 43:10
 54:2,4 57:19 67:9
 68:7 113:3
surface 51:20
surprise 101:4
surprised 33:18
survive 62:11
sustain 36:6
suvs 78:14
swear 5:8
switched 100:12
 101:9
sworn 5:11 120:12
systems 91:10

          t

t 3:1,1,7,7
take 7:13 8:2,3,5
 18:9 25:15,20,23
 38:4 41:3,6 45:11
 49:15,25 51:12
 53:16 54:25 55:15

67:17 68:2 70:4
 71:19 74:20 75:24
 79:8,14 91:9 95:5
 95:11 106:12,15
 111:9 118:17
taken 1:13 2:21
 4:7 27:8 41:15
 77:13 79:25 87:24
 110:16 111:15
 118:22 120:8,13
 120:16
takes 115:25
talk 14:18 16:6
 31:2 39:8 43:9
 93:2
talked 12:20 14:14
 34:21 70:12 73:6
 94:16,19,23
talking 35:14,17
 39:12,13 45:2
 63:10 69:18 80:8
 90:3 94:15
tax 42:23 43:11
 46:10
tear 52:22 54:16
tech 78:14
technical 7:8
technically 10:1
 18:3 62:24 100:24
tell 14:2,22 15:14
 15:14,17 16:7,25
 19:20,20 23:24
 26:14,14 27:17
 28:1,10 32:7
 34:15 38:4 42:17
 43:22 52:21 55:16
 57:1,22 58:15
 68:4 74:4 75:4,9
 93:5,22 94:9
 106:16,16 113:1

telling 103:19,19
ten 69:2,4 111:9
 115:21
term 68:8
terms 11:18 37:7
territory 7:7
testified 5:12
 12:18 64:24 80:8
 96:3 102:18
testify 90:16,24
 117:17
testimony 11:2
 82:25 100:5
 120:11,12
text 103:14 104:14
thank 5:6 6:25
 40:2 58:10 90:25
 91:12 106:24
 111:12
thereto 120:18
thing 8:5 53:9
 63:11 79:5 84:1,3
 84:4
things 33:13 63:5
 81:2 83:22,24
 84:19,19 85:2
 113:8
think 9:22 11:7
 14:7 16:12 17:18
 18:20 20:9 23:13
 26:18,20 33:3
 34:19,19 35:6,10
 36:15,23,25 42:11
 45:12 47:4,9
 48:18 49:10 51:19
 52:12 53:23 54:10
 61:25 62:11 66:9
 66:11 67:19 71:23
 74:11,12,19 76:3
 77:6 78:19 79:5
 81:1,2 82:6,8,14

83:1 84:24 85:12
87:12 88:6 89:11
90:15 91:5,16
93:16 94:15,16
97:5,22 101:24
103:3,22 109:6
114:5,6 118:15
**third** 26:11
**thought** 23:17,18
64:7 73:24 96:3,4
**three** 9:7 16:10,20
22:24 49:16 53:18
57:8,9 95:1
115:21
**thursday** 13:8
**time** 4:3,4 5:7 8:7
11:12 13:10 18:25
19:6 21:5,7,23
22:13 26:2,4 29:3
30:7 34:20,23
35:2,15,18 41:12
41:16 45:6,9
54:15 57:8 60:23
61:8,11,12,13
62:23 63:2 66:24
79:8,23 80:3
95:25 96:7 97:7
98:12 111:13,16
112:21,22,25
115:22 118:20,23
119:6
**timeline** 63:9
**times** 52:12
**tires** 17:7 19:16,25
21:11,12 50:9,10
50:12,15,18 51:6
75:21 80:22 81:7
**title** 40:6 42:24
43:11
**titled** 91:6

**today** 6:19 8:10
10:23 12:24 14:17
44:8 58:19 103:7
103:18 104:4
**told** 32:18 33:4
48:8 66:8 89:1
91:3 93:14,15
94:2,13,17 103:16
**top** 13:11
**torn** 62:4,7
**tory** 2:7 5:4 14:7
14:11
**toryb** 2:9
**total** 33:17 34:1,2
43:5 46:13 64:2,9
90:4 92:18,23
94:20 96:22
102:20 104:25
105:13 109:20
**totaled** 24:1 32:13
32:16 74:25 75:1
75:1 105:13
**tow** 28:17 29:10
**trade** 78:11,20
79:3
**traded** 78:6,15,15
78:21
**trading** 78:17
**transcript** 121:19
**transmittal** 44:16
**transmitted** 39:18
**travel** 18:12
**treatment** 118:6
118:13
**trial** 113:10,12
117:16,19,22
**tried** 29:9 73:16
73:20
**trim** 52:23
**truck** 28:17 29:10

**truthful** 11:1
**try** 7:23 41:3,8
73:14
**trying** 39:20 40:1
40:11
**turn** 68:15 107:9
**twice** 78:19
**two** 20:20 29:18
29:19,20 33:14
49:17,20 54:20
58:2 62:10 67:5
67:11 69:23,25
85:7 90:15,17
91:17 102:24
109:6 118:18
**type** 71:13
**typewriting**
120:14
**typical** 73:7

**u**

**uh** 7:17 16:21
17:14 29:2 37:2,2
94:2,2 99:9
**ultimately** 59:22
**um** 11:18
**unc** 62:8,9
**unchartered** 7:6
**underneath** 47:11
**understand** 14:17
39:20 40:2 46:4
56:23,25 57:1
63:24 68:7 87:9
104:7 105:9
106:10 111:21
112:16 113:21
116:24 118:3
**understanding**
35:3 89:15 109:12
109:15 110:18
111:24 113:21
114:11,14,15

**understood** 32:11
115:15,22
**unit** 4:6
**united** 1:1 4:12
116:16
**unitemized** 15:4
15:13 102:8
109:21 110:2
115:16
**university** 9:17
**unlawful** 15:2
**unpack** 64:10
**updated** 113:8
**updates** 63:15
**upward** 115:7
**usaa** 3:16 11:10
12:5 13:24 30:9
31:2,12,13,15,16
31:17,20,21 59:25
60:3 64:3,13 65:4
65:10 95:17 102:6
114:9,19,20
**use** 76:20 78:4
87:2 101:13
**uses** 73:8

**v**

**v** 1:3 4:8
**vague** 32:10
**vail** 4:7 6:13,14,17
15:1 26:25 27:22
32:23,25 35:20
36:14 38:14 67:4
72:2 79:22 80:2
82:17 83:7 98:2
112:8 115:12
119:5
**valuable** 72:8
82:22 83:24 84:2
84:3
**valuation** 3:12
42:7 58:4 67:17

67:23 85:25
**value** 34:15 35:3
35:15,18,22 36:8
36:23 42:18 43:9
43:23,24,25,25
44:1 45:12,17,25
46:2,7 49:2,4 50:3
50:6 56:24 69:19
69:22,24 70:14,22
71:14 73:3 80:8
82:2 83:22,24
84:15 85:18 87:7
87:8,23 101:13
102:3,11 106:2,10
107:17,22,23
108:4,7,15 116:13
116:20
**valued** 72:12
**values** 68:19 69:23
**valuing** 72:7
**van** 74:25
**veh** 52:10
**vehicle** 15:23
17:17 21:14 22:4
22:23 25:8 27:13
35:4 36:8 43:22
43:24,24,25 44:1
45:12,17,25 46:2,7
46:16,20 47:2,3,6
47:11,12,13,24
49:15,17,22 50:6
54:15 55:16,17,20
56:1,4,12 64:2
67:15,21 68:5,11
68:15 69:14 70:5
73:8 85:3,20,22
86:14,15,18,24,25
87:16 98:6,8,13,14
102:3,12,23 106:2
108:4 109:14,16
115:7,20 116:13

117:3,3,4
**vehicle's** 42:18
**vehicles** 54:20
55:4,7 56:24,25
57:2,11,12 68:23
68:25 69:3,4,6,25
70:15 86:19,24
100:2 108:23
115:25 117:8
**verbal** 31:9,10,11
**veritext** 4:18
**version** 81:22,22
81:23
**versus** 4:10 71:19
88:14
**video** 1:12 2:21
4:6 120:9
**videographer** 4:2
4:17 5:6 41:12,16
58:9 79:14,21
80:1 111:13,16
118:20,23 119:4
**violated** 102:7
**virtual** 2:3,7,12
**virtually** 4:15
**visual** 14:1
**vs** 1:6

**w**

**wait** 7:22,24 20:19
83:20,20,20 99:6
**waited** 97:22
**waiting** 28:16
29:10
**waiving** 36:12
**walk** 50:1
**want** 6:5 13:3,3,5
22:16 23:18 24:2
28:13,13 41:3,6
43:10 58:24 64:11
71:3 79:8 90:18
114:20

**wanted** 5:19 6:20
15:11 17:2 23:17
28:14 59:11 99:24
**wanting** 40:16
**wash** 25:15,17
**way** 26:18 29:21
49:1 50:21 65:22
87:15 88:4 108:10
**we've** 73:5
**wear** 52:23 54:17
**week** 17:5 61:3
62:6 64:21
**weeks** 53:18 61:14
61:15 62:10,17,20
62:21 117:20,23
**weird** 10:21
**welcome** 80:5
111:19
**went** 13:21 18:3
19:21 28:18,19
59:24 60:19 61:1
61:3,21,24 62:2,7
63:10 78:20 95:25
99:19
**west** 2:8
**whereof** 121:22
**wiltrout** 2:11 3:5
4:22,23,23 5:13,14
5:20,23 6:1,4,7,11
6:18,25 7:2,5,12
7:21 8:9,19,20
11:21,24 12:3,8,9
15:7 24:11,15
27:6,23,25 28:8
33:5,23 35:11,25
36:17 37:16,21
38:3,11,13,25
39:13,17,21,24
40:3,5,10,12,19,21
40:24 41:2,10,19
46:25 47:10 48:17

48:25 49:9,14
58:7,10,13 59:6
61:9 63:23 65:21
66:5 67:7 68:9
69:20 70:20,25
71:9,18 72:5,17
73:13,22 75:3
76:17 77:5,11,21
79:2,7,10,19 80:5
80:6 81:4,20
82:13,20 83:2,9,17
84:5,21 85:9,12,14
85:19 87:13 88:8
88:20 89:3 90:6
90:10,21,25 91:1
91:15 92:15 94:22
95:15 96:17 97:6
98:4 100:20 103:5
105:19 106:4,11
106:23 107:2
108:13,20 109:2
109:11 110:4
111:9,19,20
112:15 113:20
115:23 118:15,19
**witness** 3:4 5:8 7:1
7:3,11,20 8:8,18
12:2 15:2 27:1,20
28:3,6 32:21 33:3
33:22 35:10 36:15
37:18,20 38:24
40:8,11,15,20,23
41:1,8 47:9 48:16
48:24 49:8,13
59:4 61:1 63:22
65:19 67:1,5
70:19,24 71:8,17
72:3,16 73:12,18
73:20 74:24 76:14
76:16 77:3,10,19
78:25 79:9,12

81:1,19 82:6,18
83:8,16 84:18
85:15 87:12 88:4
88:18,25 90:9
92:13 97:5 100:8
103:2 105:18
106:9 108:10,18
108:25 109:10
110:1 111:11
112:14 113:19
115:10,13 118:12
120:10,12 121:22
**wondering**  109:4
**word**  56:1
**words**  14:22 29:6
**work**  10:4,7 21:2
21:14 59:21 78:1
117:23
**worked**  10:8,13,15
12:25 99:25
**working**  42:9
85:15
**worse**  61:7 62:13
109:5
**worth**  48:19 81:14
83:4,12 84:11
**wreck**  65:5,7,8,9
**wrecked**  75:2
**write**  13:14
**writing**  31:9
**written**  6:8
**wrong**  14:23 44:22
90:14
**wrote**  13:16

| x |
| --- |

**x**  3:7,7

| y |
| --- |

**yeah**  6:4 7:3 14:10
19:1 23:16 25:12
25:15,24 34:24

41:6,8 42:12
57:10 59:19,25
63:17 74:24 75:4
75:4,13,14 85:9
96:24 99:1,16
102:21
**year**  11:8 16:11
21:23 24:24 32:10
35:1 55:8 69:5
89:1 94:3 95:22
97:20,22 98:8,15
111:6
**years**  9:7 10:9
58:2,23 59:8 67:6
67:11 69:5 102:24
**yep**  37:21,22
103:12
**yesterday**  13:8
**young**  77:24

| z |
| --- |

**zoom**  2:3,7,12
4:16 14:13

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.