IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ELIZABETH V. FORTSON, on behalf of herself and all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:19-CV-294 |
| GARRISON PROPERTY AND CASUALTY INSURANCE COMPANY, | ) ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER**
**Filed under Temporary Seal**

Catherine C. Eagles, District Judge.

The plaintiff, Elizabeth Fortson, had a car insurance policy with the defendant, Garrison Property and Casualty Insurance Company, when her car was totaled in an accident with an uninsured driver. Ms. Fortson contends that Garrison engaged in unfair and deceptive trade practices in the way it calculated the actual cash value of her vehicle when settling her claim. To estimate the actual cash value of Ms. Fortson's car, Garrison relied on a detailed inspection of her car, a report by an independent third party based on that inspection, and comparable sales obtained from a large database. Insurance regulators throughout the country have approved use of the third-party's reports and there is no evidence that any court or regulator has ever found the third-party's valuation process to be unreasonable or unfair. Because no reasonable juror could find that Garrison acted in bad faith or adopted unreasonable standards for investigation on this

evidence, Garrison's motion for summary judgment as to Ms. Fortson's Chapter 75 claims will be granted.

## I.    Overview of the Issues

Ms. Fortson's car insurance policy with Garrison contained a provision that required Garrison to pay for losses stemming from an accident with another vehicle, Doc. 95 at 185, including paying the "actual cash value" of the car if it was totaled. *Id.* at 188. After her car was totaled in an accident, *id.* at 148, 211, she made a claim for the value of the car and other losses covered by her policy. *Id.* at 207.

In developing its offer for the actual cash value of Ms. Fortson's car, Garrison relied on its inspection of Ms. Fortson's car and the list price information on four comparable used vehicles in the same or similar geographic area obtained from a report prepared for Garrison by CCC Information Services, Inc., a third-party service. Doc. 94 at 11–28; Doc. 103 at 12, 56, 58. CCC obtained the pricing information from its database of comparator vehicles. Doc. 103 at 23, 57, 77–78. Because CCC is of the view that comparator vehicles in its database listed for sale by dealerships are generally in better condition than average cars on the road, like Ms. Fortson's car, CCC usually deducts a set amount of money from the actual cash value of all comparator vehicles listed for sale by dealerships. *Id.* at 58–59, 77–78. For a given report, the same deduction is applied to all dealer vehicles. *Id.* at 59. This deduction, called a "comparable vehicle condition adjustment" by CCC and Garrison, thus reduces the value of the comparator vehicles. *See generally* Doc. 95 at 221–23; Doc. 103 at 58–59.

2

Here, CCC applied the condition adjustment to the list prices of the four vehicles it located to compare to Ms. Fortson's car, and it used the reduced amount as part of the process when determining the actual cash value of Ms. Fortson's car. Doc. 95 at 221–23. Neither CCC nor Garrison inspected the four comparator vehicles. Doc. 103 at 22.

Ms. Fortson contends that Garrison's routine deduction for a "condition adjustment" to comparable vehicles is automatic, artificially understates the actual cash value of insured vehicles, including her own, and results in consistent underpayment on claims, including her own. *See* Doc. 14. Specifically, she contends that Garrison's use of this categorical reduction to dealer prices is an unfair and deceptive trade practice because it violates Garrison's statutory duties:

(1) to act in good faith to effectuate a prompt, fair and equitable settlement of claims in which liability has become reasonably clear, N.C. Gen. Stat. § 58-63-15(11)(f);

(2) not to compel the insured to initiate litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions by such insured, § 58-63-15(11)(g);

(3) to reasonably investigate claims based upon all available information before refusing to pay a claim, § 58-63-15(11)(d); and

(4) to adopt and implement reasonable standards for the prompt investigation of claims arising under its insurance policy, § 58-63-15(11)(c).

## II.     Unfair and Deceptive Trade Practices Act

3

By statute, it is unlawful in North Carolina to engage in "[u]nfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1. To prove a claim for unfair trade practices, "a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001).

Whether defendants have performed the act asserted by plaintiffs is a question of fact for a jury if it is disputed. *See United Lab'ys, Inc. v. Kuykendall*, 322 N.C. 643, 664, 370 S.E.2d 375, 389 (1988); *First Atl. Mgmt. Corp. v. Dunlea Realty Co.*, 131 N.C. App. 242, 252, 507 S.E.2d 56, 63 (1998). It is then a question of law for the court as to whether these proven facts constitute an unfair or deceptive trade practice. *See Kuykendall*, 322 N.C. at 664; *Eastover Ridge, L.L.C. v. Metric Constructors, Inc.*, 139 N.C. App. 360, 363, 533 S.E.2d 827, 830 (2000); *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000). At the summary judgment stage, "it is a question of law for the court to determine whether the facts, taken in the light most favorable to the party opposing summary judgment, constitute an unfair or deceptive trade practice." *Brinkman v. Barrett Kays & Assocs., P.A.*, 155 N.C. App. 738, 743, 575 S.E.2d 40, 44 (2003). A court may grant summary judgment for the defendant "only if it concludes that the evidence could not permit a reasonable jury to return a favorable verdict" for the plaintiff. *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021).

4

Chapter 75 operates in conjunction with the North Carolina unfair insurance claim

settlement practices statute codified at N.C. Gen. Stat. § 58-63-15(11). *See Elliott v. Am.*

*States Ins. Co.*, 883 F.3d 384, 396 (4th Cir. 2018) ("[T]he remedy for a violation of

section 58-63-15 is the filing of a section 75-1.1 claim."). Section 58-63-15(11) lists

certain practices that courts look to "for examples of conduct to support a finding of

unfair or deceptive acts or practices." *Gray*, 352 N.C. at 71. And conduct that violates

§ 58-63-15(11) "constitutes a violation of . . . § 75-1-1 as a matter of law" because it is

"inherently unfair, unscrupulous, immoral, and injurious to consumers."[1] *Id.*

All of Ms. Fortson's Chapter 75 claims are based on her disagreement with the

condition adjustment that CCC applied in its market valuation of her car, which she

alleges artificially reduced the baseline value of her vehicle. The material facts

concerning CCC's condition adjustment are not in dispute.

### III. Undisputed Facts

In 2016, Ms. Fortson owned a car insured by the defendant Garrison. Doc. 95 at

160. Her policy contained a "total loss" provision requiring Garrison to pay the "direct

and accidental loss to [Ms. Fortson's] covered auto" caused by collision with another

vehicle. *Id.* at 185. Garrison's limit of liability for this loss was the "[a]ctual cash value

---

[1] Because conduct that violates N.C. Gen. Stat. § 58-63-15(11) is "inherently unfair, unscrupulous, immoral, and injurious to consumers," the statute's requirement to show a "general business practice" does not apply in the Chapter 75 context. *Gray*, 352 N.C. at 68, 71 (holding as to violations of § 58-63-15(11)(f), specifically); *Country Club of Johnston Cnty, Inc. v. U.S. Fid. & Guar. Co.*, 150 N.C. App. 231, 246, 563 S.E.2d 269, 279 (2002) (extending *Gray* to apply to all conduct described in § 58-63-15(11)).

5

of the . . . damaged property." *Id.* at 188. Garrison interprets "actual cash value" as the "fair market value of the vehicle at the time of loss." Doc. 103 at 11. The policy states that "[a]n adjustment for depreciation and physical condition will be made in determining actual cash value at the time of loss." Doc. 95 at 189.

Ms. Fortson's policy also contained a provision that if Ms. Fortson and Garrison did not agree on the amount to settle the claim for her totaled vehicle, "either may demand an appraisal of the loss." *Id.* If the appraisal provision was invoked, each party would select an appraiser; the two appraisers would select an umpire; each appraiser would independently determine the total loss, including the actual cash value of insured vehicle; and if the appraisers did not agree, the umpire would make a final determination of the total loss value binding on the parties. *Id*; *see also* Doc. 96 at 13.

When her vehicle was totaled in an accident, Doc. 95 at 148, 211, Ms. Fortson submitted a claim for the actual cash value of the car and other losses covered by her policy. *Id.* at 207. Garrison made a written offer to pay Ms. Fortson $6,962.70 to settle her total loss claim—$6,690 for her vehicle's actual cash value, plus $272.70 for taxes and fees. *Id.* at 211–13. Garrison used CCC Information Services, Inc., a third-party service, to calculate the actual cash value of Ms. Fortson's totaled vehicle. Doc. 94 at 11–28.

After receiving Garrison's offer letter, Ms. Fortson's attorney disputed the valuation and sought coverage for other losses under different provisions of the policy. Doc. 95 at 131–35, 249–50, 252. Eventually, after a back and forth between Ms. Fortson's attorney and Garrison about the appropriate amount to resolve her claims,

6

Garrison sent Ms. Fortson three checks—one for loss of use, one for the difference between deductibles under different parts of her coverage, and one for the total loss payment, which included the actual cash value of Fortson's vehicle plus taxes and fees. *Id.* at 252; Doc. 96 at 10–12. Ms. Fortson cashed all three checks. Doc. 96 at 10–12.

Almost a year passed with no communications between Ms. Fortson or her attorney and Garrison, and she never invoked the appraisal provision. Doc. 95 at 150. Then, Ms. Fortson's attorney contacted Garrison about the amount paid for the total loss of the car with questions about the "condition adjustment" Garrison had applied to each comparable vehicle when calculating the actual cash value of her vehicle. *Id.* at 234.

Eventually, Ms. Fortson filed this lawsuit, contending that Garrison breached the insurance contract by not offering to settle and by not settling claims based upon the appropriate value of loss vehicles and that Garrison's use of the condition adjustment to determine value and settling claims constituted an unfair and deceptive trade practice. Doc. 14 at ¶¶ 59–80. Garrison immediately invoked the appraisal provision in Ms. Fortson's policy, *see* Doc. 10-3, which resulted in a determination that the actual cash value of her car was $7,800. Doc. 96 at 13. After the appraisal, Garrison promptly tendered the difference to Ms. Garrison. *Id.* at 14. According to Ms. Fortson's counsel, she did not cash this check. Doc. 93-2 at 19.

As noted, to determine the actual cash value of totaled vehicles, Garrison relies on reports that CCC prepares. CCC uses its database of comparable vehicles for sale or sold in the same or similar geographic area as reference points to determine the actual cash value of a totaled vehicle. Doc. 103 at 56–58. CCC primarily uses dealer sales

7

advertisements of comparable cars as the starting point for determining a totaled vehicle's value, but it also considers the configuration of the totaled vehicle, including options, mileage, and condition. *Id.* at 56.

In Ms. Fortson's case, CCC generated a report on the actual cash value of her car, and Garrison gave her a copy when it made its initial offer. Doc. 95 at 210–31. The report shows a negative "condition adjustment" of $722 subtracted from the dealer's list price of four comparator vehicles. *Id.* at 221–23. Neither CCC nor Garrison inspected the comparator vehicles. Doc. 103 at 22. The explanation of the negative condition adjustment comes in a footnote, where CCC's report states that "[t]he Condition Adjustment sets that comparable vehicle to Good condition, which the loss vehicle is also compared to in the Vehicle Condition section." Doc. 95 at 222.

CCC routinely applies negative condition adjustments to all comparator vehicles listed for sale on dealer lots (but not condition adjustments to vehicles for sale by private parties) to account for its belief that cars on dealer lots are in better condition than cars on the road. Doc. 103 at 24, 58–59. CCC often uses the dealer's list price as the starting point, *id.* at 99, instead of the actual sales price that would often be lower. *Id.* at 283–84; Doc. 104 at 8 ¶ 30. In reports issued for Garrison, CCC sets the baseline condition rating for vehicles on the road in North Carolina at "good." Doc. 103 at 58. CCC regards the condition of dealer vehicles to be "very good." *Id.* To account for this difference, CCC applies what it calls a "negative condition adjustment," which means it subtracts an amount of money from the list price of all comparator vehicles in North Carolina for sale

8

on dealer lots and uses this smaller number to determine the actual cash value of the totaled car. *Id.* at 58–59.

In other words, CCC believes that as a general rule a car sold from a dealer's lot is worth more than a similar car on the road, so it adjusts its actual cash value determinations by deducting an amount from the list price of comparator vehicles and then using the reduced amount to establish the actual cash value of the totaled vehicle. Thus, in North Carolina, CCC's condition adjustment is meant to reflect the difference in actual cash value based on a comparator vehicle's "very good" condition on the dealership lot and its "good" condition if it were on the road. *Id.*

The amount of a condition adjustment depends on CCC's research with dealers in a particular market. *Id.* at 21–22. Dealers provide dollar amounts for what consumers are willing to pay for a particular vehicle in better condition than "good," and CCC averages those amounts to determine the appropriate condition adjustment, which is usually applied to every comparator for sale by dealers used in a particular report. *Id.* at 22. In Ms. Fortson's case, CCC applied a negative condition adjustment of $722 to each comparator vehicle. Doc. 95 at 221–23.

CCC also applies condition adjustments to the value of the insured's total loss vehicle based on Garrison's inspection of the vehicle; these adjustments may raise or lower the vehicle's actual cash value. Doc. 103 at 12, 58, 60. In other words, it starts out on the assumption that the insured's vehicle is in good condition, like the adjusted value of the comparator vehicles, but it can adjust the value up or down depending on the actual condition of the insured's car. Ms. Fortson received a $130 positive condition adjustment

9

because Garrison's inspection of her vehicle showed it had better mechanical components than the average car in good condition. Doc. 95 at 219.

The CCC database for comparator vehicles includes over half of the vehicles sold in the United States. Doc. 103 at 57. CCC's database is comprised of vehicles from dealerships, data feeds from online car sale platforms, and advertisements from car sale publications. *Id.* at 77–78. Some of the vehicles in the database are non-dealer vehicles from private party sales; these comparable vehicles are sometimes used to value total losses, *id.* at 23, but not in Ms. Fortson's case. *Id.* at 21.

While CCC did not inspect the comparator vehicles used to calculate the actual cash value of Ms. Fortson's car, *id.* at 22, 85, it does physically inspect some seven to nine percent of the comparator vehicles in its database. *Id.* at 59. CCC employees inspect the used car inventory at approximately 3,000 dealerships every month, reviewing the general condition of each vehicle at the dealership and collecting information such as mileage, condition, and price. *Id.* at 77, 87. These physical inspections consist of visually inspecting the vehicle exterior and inspecting the interior of the vehicle when possible—they do not involve inspecting underneath the hood or measuring tire tread depth. *Id.* at 87. The time these inspections take varies depending on the car and the inspector, but it is possible they could take as little as five or ten minutes. *Id.* at 89–90.

Garrison's physical inspections of its insureds' totaled vehicles involve more steps, including measuring tire tread depth and inspecting the engine, mechanical components, and the interior. *Id.* at 14. These inspections—which may include validating a vehicle's options, taking pictures of the car's interior and exterior, opening

10

the hood to get a sense of the mechanical components, making notes on the market valuation report, and possibly talking with the vehicle owner to ask questions about refurbishments, history, or recent work—take upwards of 45 minutes. *Id.*

CCC and Garrison rely on conditioning criteria set forth in a "conditioning matrix" to rate the condition of totaled vehicles and comparable vehicles. *Id.* at 14–16, 60. The matrix describes, for each component category, the condition required for a vehicle to merit a certain rating, though there is some subjectivity involved. *Id.* at 60–61. When CCC inspectors review comparator vehicles, they are determining whether the vehicle as a whole is in "dealer-ready" or "very good" condition. *Id.* at 92. When Garrison inspectors review total loss vehicles belonging to insureds, they review individual vehicle components using the same criteria and assign the components a certain rating. *Id.* at 14, 19.

CCC has adopted some measures to remove cars that are not in dealer-ready condition from its database. If an inspector determines that a vehicle is not in dealer-ready condition, it is not included in CCC's database. *Id.* at 77–78. Before adding uninspected vehicles to the database, CCC checks for words or phrases in a vehicle's advertisement that would indicate it is not in dealer-ready condition, *id.* at 60, 78, but dealer advertisements do not always disclose the flaws in a vehicle. *Id.* at 83. CCC automatically excludes from its database vehicles sold by dealerships that it determines historically do not sell high-quality vehicles. *Id.* at 60.

Before CCC will prepare a valuation, it requires its clients, such as Garrison, to visually inspect the condition of the insureds' totaled vehicles. *Id.* After CCC uses

11

comparator vehicles in its database to establish a starting point for the totaled vehicle's actual cash value, it compares the actual condition of the totaled vehicle based on information provided by the insurer to the baseline condition that CCC sets for average vehicles on the road. *Id.* at 58, 60. The base value of the totaled vehicle is then adjusted up or down based on whether it is in better or worse condition than the average car on the road. *Id.* at 58; Doc. 95 at 219. As previously mentioned, Garrison increased the valuation of Ms. Fortson's car.

CCC has used third-party services to analyze the validity of its condition adjustment descriptors when determining the recommended fair market value of used vehicles. It commissioned a 2012 survey of dealers qualified as used vehicle pricing subject matter experts by a large research firm, Doc. 104 at 82, 84–85, and asked a consultant to compare the vehicle values obtained using the condition adjustment to information gathered from car dealers. *Id.* at 97. The consultant concluded that CCC's condition adjustment factors yielded higher vehicle values than vehicle values using condition factors derived from subject matter experts. *Id.* It also commissioned a study in 2011 by a litigation support group experienced in the field, Doc. 105 at 26, which conducted focus groups, evaluated an inter-rater agreement study, and undertook a survey before concluding that CCC's vehicle condition descriptors were valid, accurate, and appropriate. Doc. 107 at 21; Doc. 108 at 1.

In North Carolina, approximately 75% of the top ten automobile insurance carriers by market share use CCC reports to determine actual cash value of total loss vehicles. Doc. 108 at 28–29. The North Carolina Department of Insurance has previously

reviewed total loss settlements that use CCC, in whole or in part. The Department published a market report in 2011 in which it reviewed the insurance activities of USAA Casualty Insurance Company, of which Garrison is a subsidiary, Doc. 96 at 160, between January 1, 2006, and December 31, 2008. *Id.* at 161–62. The Department randomly selected 50 total loss settlement claims of 4,025 total claims and evaluated whether the settlements were equitable and timely. *Id.* at 176. The Department noted that USAA "primarily used CCC Information Services, Inc. to establish the actual cash value of totaled vehicles" and that "[a]ll settlements were deemed equitable." *Id.*

Between 2008 and 2014, the Department published similar market reports on the insurance activities of various companies that provided insurance services in North Carolina.[2] In each report, the Department randomly selected a number of total loss settlement claims and reviewed if the settlements were equitable and timely. *Id.* at 194, 206, 222, 236, 250, 270, 281, 294, 310, 330, 349. In the market report on Geico, the Department deemed all total loss settlements equitable and noted that "[t]he Company primarily used CCC Valuescope to establish the actual cash value of totaled vehicles." *Id.* at 281. In all the remaining reports, the Department stated that "all settlements were

---

[2] These included market reports for State Farm Mutual Automobile Insurance Company in 2014, Doc. 96 at 181–83, Allstate Property and Casualty Insurance Company in 2011, *id.* at 196–98, Titan Indemnity Company in 2011, *id.* at 211–13, Victoria Fire & Casualty Company in 2011, *id.* at 226–27, Discovery Insurance Company in 2010, *id.* at 240, Selective Insurance Company of the Southeast in 2008, *id.* at 255–57, Geico Indemnity Company and Government Employees Insurance Company in 2010, *id.* at 275–76, Peak Property and Casualty Insurance Corporation in 2013, *id.* at 284–86, the Members Insurance Company in 2013, *id.* at 297–99, Nationwide Mutual Insurance Company in 2014, *id.* at 316–18, and Builders Mutual Insurance Company in 2013. *Id.* at 334–36.

deemed equitable" and that the insurance companies "primarily used CCC Information Services, Inc. in addition to on-site independent adjusters to establish the actual cash value of totaled vehicles." *Id.* at 194, 207, 222, 236, 250, 270, 294, 310, 330, 349.

There is no evidence that any state regulator or court has ever found CCC's evaluations to be improper, illegal, unethical, unfair, or otherwise inappropriate. In recent years, regulators in a number of other states have explicitly approved or endorsed the use of CCC Information Services to value total loss claims.

As of July 2021, the New Jersey Department of Banking & Insurance lists "CCC" as an approved source for use in determining fair market values for totaled vehicles. *Id.* at 112. In 2020, the New Hampshire Insurance Department listed CCC Information Services' "CCC ONE Valuation" product as one of the "accepted" guides "for insurers to use in determining total loss settlements based on a motor vehicle's fair market value." *Id.* at 126. In 2017, the Pennsylvania Insurance Commissioner listed CCC Information Services as an "Approved Guide Source Vendor" to "calculate the replacement value of total loss . . . vehicles." *Id.* at 122. In 2020, the Office of the Insurance Commissioner for West Virginia released an approved list of companies for use as an Official Used Car Guide, and included CCC Information Services, Inc., and its valuation product, CCC Valuescope Claim Services. *Id.* at 84. In an undated report called "Understanding Your Auto Claim," the Missouri Department of Insurance Financial Institutions and Professional Registration said that insureds can determine the fair market value of their vehicle by "receiving information from recognized groups such as 'CCC.'" *Id.* at 118. The Office of the Commission of Insurance in Wisconsin published a "Consumer's Guide

14

to Auto Insurance" in 2018 that listed CCC Information Services as a source that insurance companies use to value totaled cars. *Id.* at 91, 102. By statute in Indiana, "fair market value" is defined to include 'vehicle valuations determined by CCC Information Services, Inc." in a statutory chapter governing salvage motor vehicles. Ind. Code Ann. § 9-22-3-2 (2016).[3]

Experts proffered by both parties agree that a vehicle's condition affects its value, Doc. 96 at 429–30; Doc. 102 at 27; Doc. 108 at 45 ¶ 11, and that dealer vehicles listed for sale are generally in better condition than vehicles on the road. Doc. 104 at 4 ¶ 10; Doc. 96 at 430–31. As seems obvious, not every vehicle listed for sale by a dealer is in better condition than every comparable vehicle on the road. Doc. 103 at 192; Doc. 96 at 430–31. The expert witnesses also agree that it is not feasible for CCC to inspect every vehicle in its database, Doc. 103 at 283; Doc. 108 at 30 ¶ 67; that trade-offs are involved in deciding between a bigger database with more information and a smaller one with better inspections, Doc. 103 at 283, Doc. 108 at 30 ¶ 67; and that use of the list price benefits insureds. Doc. 103 at 283–84; Doc. 104 at 8 ¶ 30.

## IV. Analysis

### A. Failure to Act in Good Faith as to Settlement

---

[3] Longer ago, New York and Wyoming state regulators approved CCC as a valuation service for totaled vehicles. In 2001, the Wyoming Insurance Department sent CCC Information Services a letter in which it stated that CCC could be used "by insurers in determining a fair retail value for the consumers of Wyoming that may suffer a total loss to their vehicle." Doc. 96 at 132. In 1995, the New York State Insurance Department approved CCC "as a computerized database that produces statistically valid fair market values for substantially similar automobiles." *Id.* at 125. There is no evidence that these states have since disapproved of CCC as a valuation service.

15

It is an unfair trade practice for an insurer to "not attempt[ ] in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." § 58-63-15(11)(f). There is no dispute that Garrison's liability for Ms. Fortson's total loss claim was reasonably clear under her insurance policy,[4] but the parties disagree as to whether Garrison acted in good faith.

Conduct that violates § 58-63-15(11)(f) requires more than honest disagreements over the value of a claim. *See Clear Creek Landing Home Owners' Ass'n, Inc. v. Travelers Indem. Co. of Conn.*, No. 1:12-CV-157, 2012 WL 6641901, at *4 (W.D.N.C. Dec. 20, 2012); *Lemons v. Pa. Nat. Mut. Cas. Ins. Co.*, No. 1:11-CV-257, 2011 WL 2565617, at *4 (M.D.N.C. June 28, 2011); *Blis Day Spa, LLC v. Hartford Ins. Grp.*, 427 F. Supp. 2d 621, 634–35 (W.D.N.C. 2006). For example, an insurer did not act in bad faith when it denied an insured's claim for the replacement cost of damaged roofs because the insurer promptly inspected the damaged roofs, re-inspected the roofs at the insured's request, issued settlement checks to cover losses from the damage, and provided the insured with its rationale for not covering the entire replacement costs for the roofs. *Clear Creek Landing Home Owners' Ass'n*, 2012 WL 6641901, at *4. Likewise, an insurer did not act in bad faith when it denied an insured's claim for business-related losses stemming from a fire because the insurer never recognized the

---

[4] Garrison asserts that § 58-63-15(11)(f) does not apply because it is "not 'reasonably clear' that Garrison is prohibited from using CCC Reports or applying condition adjustments in North Carolina." Doc. 93-1 at 27; *see also* Doc. 93-3 at 13–14. But the "reasonably clear" language concerns whether an insurer's coverage liability under an insurance policy is reasonably clear. *See Elliott*, 883 F.3d at 397–98; *Neshat v. Nationwide Mut. Fire Ins. Co.*, No. 5:20-CV-664-D, 2021 WL 2168906, at *4 (E.D.N.C. May 27, 2021) (collecting cases).

16

validity of the insured's estimates, paid all undisputed amounts under the insured's policy, and communicated its grounds for disagreement about the disputed claims. *Blis Day Spa*, 427 F. Supp. 2d at 627–28, 634–35. The mere fact that a court or arbitrator later awards more than the insurer offered is not, by itself, enough to show an unfair settlement practice, as "[t]he value of an insured's claim under an insurance policy is not an exact science." *Lemons*, 2011 WL 2565617, at *4.

On the other hand, evidence that an insurer refused to settle a claim unless the insured accepted an amount substantially lower than an adjuster's estimate supported a finding that the insurer violated § 58-63-15(11)(f). *Gray*, 352 N.C. at 63–64, 73. Similarly, there was "ample support" for a finding that an insurer violated § 58-63-15(11)(f) when, *inter alia*, it did not acknowledge an insured's defense and indemnity claim and closed the insured's claim file rather than decide on coverage obligations. *ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 472 F.3d 99, 107–08, 110, 125 (4th Cir. 2006). Evidence of intentional deception or misrepresentations when settling a claim can also support a finding that an insurer violated § 58-63-15(11)(f). *See Country Club of Johnston Cnty., Inc. v. U.S. Fid. & Guar. Co.*, 150 N.C. App. 231, 247, 563 S.E.2d 269, 279–80 (2002).

The undisputed evidence shows that Garrison did not act in bad faith. After being notified of Ms. Fortson's claim, Garrison promptly inspected Ms. Fortson's car and obtained a report from an independent third party regularly used by North Carolina insurers that compared the value of Ms. Fortson's car to the list price of four comparator vehicles for sale at dealerships. Roughly two weeks after she submitted her claim,

17

Garrison made an offer for the value of Ms. Fortson's totaled vehicle and included CCC's valuation report that explained the amount of its offer. Doc. 95 at 206–08, 211–31. Thereafter, Garrison negotiated with Ms. Fortson's attorney and promptly mailed checks to Ms. Fortson for claims made under various provisions of policy. *Id.* at 131–35, 249–50, 252; Doc. 96 at 10–12. Ms. Fortson received and cashed these checks from Garrison. Doc. 96 at 10–12. When Ms. Fortson filed suit, Garrison immediately sought to resolve her claim by invoking the appraisal provision and promptly sent a check for the difference when the appraisal was completed. Doc. 10-3; Doc. 96 at 13–14.

This conduct is a far cry from an outright refusal to settle a claim based upon valid estimates, *see Gray*, 352 N.C. at 63–64, 73, or from neglecting an insured's claim altogether. *See ABT Building Prods. Corp.*, 472 F.3d at 125. Nothing else appearing, offering an amount of money based on a report prepared by an independent third party approved by regulators and used by many other insurers in many states is not a bad faith refusal to settle. *Compare Topsail Reef Homeowners Ass'n v. Zurich Specialties London, Ltd.*, 11 F. App'x 225, 234 (4th Cir. 2001) (finding no bad faith refusal to settle when insurer rejected insured's uncorroborated damages estimates) *and Lenoir Mall, LLC v. State Farm Fire & Cas. Ins. Co.*, No. 5:10-CV-00040-RLV, 2013 WL 3984511, at *3 (W.D.N.C. Aug. 1, 2013) (finding no bad faith refusal to settle when insurer relied on "the conclusions of multiple, independent, professional engineers") *with Gray*, 352 N.C. at 72 (finding evidence sufficient to support bad faith based in part on an "apparently arbitrary rejection" of the insured's damages estimate).

18

Beyond her claim that Garrison offered and paid her too little money, Ms. Fortson's bad faith claim boils down to her contention that Garrison failed to adequately explain the basis for the condition adjustment it applied to comparator vehicles. Doc. 93-2 at 29–31. But subsection (f) is not a disclosure provision, and nothing in that subsection of the statute or in any regulation in effect at the time required Garrison to provide the kind of detail justifying its offer that Ms. Fortson says should be required.[5] Garrison did not conceal the application of the condition adjustment or misrepresent it during the claim settlement process. *See Country Club of Johnston Cnty., Inc.*, 150 N.C. App. at 247 (referring to an insurer's misrepresentations that it was investigating insurance coverage as conduct that arguably violated § 58-63-15(11)(f)). Indeed, Garrison explicitly included a line item under each comparator vehicle it used to value Ms. Fortson's car stating that it applied a $722 negative condition adjustment, Doc. 95 at 221–23, and it included a short explanation of the condition adjustment in Ms. Fortson's valuation report. *Id.* at 222.[6] If Ms. Fortson was dissatisfied with the explanation or the offer, she had a readily available alternative in the appraisal process set forth in her policy. *Id.* at 189.

---

[5] The language in the regulation on which Ms. Fortson relies, 11 N.C. Admin. Code 04.0418(h) (2020) (requiring "[a]ny deductions from the actual cash value of the total loss motor vehicle . . . shall be itemized") was not in effect when Garrison settled her total loss claim in 2016. *See* N.C. Admin Code 04.0418(h) (2016).

[6] As noted *supra*, the report contains the explanation that "[t]he Condition Adjustment sets that comparable vehicle to Good condition, which the loss vehicle is also compared to in the Vehicle Condition section." Doc. 95 at 222.

19

In sum, Garrison promptly processed Ms. Fortson's claim, did not conceal or misrepresent the negative condition adjustment it applied to comparator vehicles, and promptly offered Ms. Fortson an amount based on a valuation by an independent third party routinely used by insurance companies and approved by regulators in other states. The fact that she later received more money through the appraisal process does not show bad faith. Based on the undisputed evidence, there are no disputed questions of material fact as to this aspect of Ms. Fortson's Chapter 75 claim, which will be dismissed.

## B. Compelled to Initiate Litigation to Recover Amounts Due Under an Insurance Policy

It is an unfair trade practice for an insurer to "compel[] the insured to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insured." § 58-63-15(11)(g). Ms. Fortson asserts that Garrison violated § 58-63-15(11)(g) because its "tactics of undervaluation" compelled her to "institute litigation just to recover what she was owed." Doc. 92-2 at 29.

By its express terms, § 58-63-15(11)(g) prohibits an insurer "from compelling an insured to institute litigation to recover *amounts due* under a policy." *Cent. Carolina Bank & Tr. Co. v. Sec. Life of Denver Ins. Co.*, 247 F. Supp. 2d 791, 801 (M.D.N.C. 2003); *see also Elliott*, 883 F.3d at 398. But here, there is no evidence that Garrison had any reason to believe that Ms. Fortson was not satisfied with the amount of the check it sent her until approximately a year after she cashed the check. In any event, Ms. Fortson did not have to resort to litigation to recover any amount due under her insurance

policy—she could have invoked her policy's appraisal provision, Doc. 95 at 189, rather than filing this suit. *See Blis Day Spa*, 427 F. Supp. 2d at 635–36. Ms. Fortson has not raised an issue of material fact about whether Garrison violated § 58-63-15(11)(g).

## C. Refusal to Pay Without Conducting a Reasonable Investigation[7]

It is an unfair trade practice for an insurer to "refus[e] to pay claims without conducting a reasonable investigation based upon all available information." § 58-63-15(11)(d). Here, Garrison did not "refuse to pay" Ms. Fortson. It sent her a check for an amount based on CCC's valuation of comparable vehicles and Garrison's inspection of Ms. Fortson's vehicle, and Ms. Fortson cashed the check without objection. After the appraisal, Garrison promptly tendered the difference. This does not constitute a refusal to pay. *See, e.g., Nelson v. Hartford Underwriters Ins. Co.*, 177 N.C. App. 595, 599, 611–12, 630 S.E.2d 221, 225, 232–33 (2006) (reviewing a § 58-63-15(11)(d) claim after insurer denied coverage of a claim); *Lenoir Mall, LLC*, 2013 WL 3984511, at *1, 3 (same); *Busch v. Ohio Nat. Life Assur. Corp.*, No. 5:09-CV-355-D, 2011 WL 902298, at *4, 6 (E.D.N.C. Mar. 14, 2011) (same); *DENC, LLC v. Phila. Indem. Ins. Co.*, 426 F. Supp. 3d 151, 158 (M.D.N.C. 2019) (same). Ms. Fortson's § 58-63-15(11)(d) claim will be dismissed.

## D. Reasonable Standards for Investigation

---

[7] Garrison points out that neither Ms. Fortson's § 58-63-15(11)(c) nor (d) claims appear in her complaint, Doc. 92-3 at 11, but it does not explicitly contend that the Court should disregard these claims. In her complaint, Ms. Fortson generally states that Garrison "act[ed] in . . . ways as more fully described herein which constitute a violation of the statutory obligations set forth in N.C. Gen. Stat. § 58-63-15(11)." Doc. 14 at 14. In the absence of a supported argument that it would be error to consider claims under these subsections, the Court proceeds to the merits.

21

It is an unfair trade practice for an insurer to "fail[] to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies." § 58-63-15(11)(c). The case law discussing the Subsection (c) requirement for "reasonable standards for prompt investigation" is quite thin. Almost all the cases that mention "reasonable standards for prompt investigation" briefly discuss it in the context of non-specific allegations in a complaint or claims unsupported by any evidence.[8]

In this case, it is undisputed that Garrison had standards in place; the question is whether those standards were "reasonable."[9] Whatever "reasonable" means, it does not mean "perfect" or "the best practice." *See Whitworth v. Nationwide Mut. Ins. Co.*, No. 1:17-CV-1124, 2018 WL 4494885, at *7 (M.D.N.C. Sept. 19, 2018), *report and*

---

[8] *See, e.g., Busch*, 2011 WL 902298, at *6; *Nelson*, 177 N.C. App. at 611; *Cash v. State Farm Mut. Auto. Ins. Co.*, 137 N.C. App. 192, 199, 528 S.E.2d 372, 376 (2000), *aff'd*, 353 N.C. 257, 538 S.E.2d 569 (2000).

[9] The parties assume without discussion that the reasonableness of Garrison's standards for investigation is a question of fact and thus appropriate for the jury if there is evidence sufficient to support a verdict in Ms. Fortson's favor. *See* Doc. 144 at 39–42 (parties' proposed verdict sheets). The Court assumes without deciding that this is so, as North Carolina courts hold that "reasonableness" is usually a factual issue for the jury in many different types of cases. *See Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 350 N.C. 214, 224, 513 S.E.2d 320, 327 (1999) (the question of justifiable reliance in negligent misrepresentation cases is "analogous to that of reasonable reliance in fraud actions, where it is generally for the jury to decide whether plaintiff relied upon the representations made by defendant") (cleaned up); *NationsBank of N.C., N.A. v. Am. Doubloon Corp.*, 125 N.C. App. 494, 499, 481 S.E.2d 387, 390 (1997) (the commercial reasonableness of a bank's retention of collateral after default on a loan "is a jury question and does not readily lend itself to summary judgment" because "reasonable minds may differ over what is commercially reasonable"); *Smith v. Martin*, 124 N.C. App. 592, 600, 478 S.E.2d 228, 233 (1996) (the reasonableness of a plaintiff's mitigation efforts in an action for wrongful cancellation of a deed of trust "is a jury question except in the clearest of cases"); *Snead v. Holloman*, 101 N.C. App. 462, 467–68, 400 S.E.2d 91, 94 (1991) (the reasonableness of a plaintiff's failure to follow medical advice in a negligence action is a jury question that is relevant to the amount of damages the plaintiff may recover).

22

*recommendation adopted,* No. 1:17-CV-1124, 2018 WL 6573472 (M.D.N.C. Oct. 19, 2018) (holding that an insurer's "good" standards for investigation of claims did not violate Subsection (c) even though the insurer did not follow its own best practices). What is reasonable is usually evaluated in light of all the facts and circumstances surrounding the act or decision at issue. *See, e.g., N.C. Dep't of Transp. v. Laxmi Hotels of Spring Lake, Inc.,* 259 N.C. App. 610, 619, 817 S.E.2d 62, 70 (2018) ("What constitutes a reasonable time [to file a Rule 60(b) motion] depends on the circumstances of the individual case."); *Chrismon v. Guilford Cnty.,* 322 N.C. 611, 628, 370 S.E.2d 579, 589 (1988) (noting that in deciding if there was a reasonable basis for spot zoning, "the criteria are flexible, and the specific analysis used depends on the facts and circumstances of a particular case"); *Smith v. Martin,* 124 N.C. App. 592, 600, 478 S.E.2d 228, 233 (1996) (the reasonableness of a plaintiff's mitigation efforts in an action for wrongful cancellation of a deed of trust "depends upon the facts and circumstances of the particular case"); *Radford v. Norris,* 63 N.C. App. 501, 503, 305 S.E.2d 64, 65 (1983) (stating the test for whether the plaintiff could have avoided the consequences of the tortfeasor's act is "one of reasonableness, and depends upon the circumstances of the particular case").

Ms. Fortson contends that Garrison's standards are unreasonable because of the reliance on CCC reports that routinely apply a negative condition adjustment to uninspected comparator vehicles. Doc. 93-2 at 27.[10] But these standards cannot be

---

[10] Ms. Fortson in her pleadings, evidence, and briefing has made it difficult to figure out exactly what she contends is unreasonable about Garrison's use of the negative condition adjustment by regularly adjusting and changing her claims and arguments. At different times,

divorced from the overall system of valuation that Garrison uses. Based on the undisputed facts, this claim is without merit.

It is undisputed, as multiple experts testified, that a vehicle's condition affects its value. Doc. 102 at 27; Doc. 108 at 45 ¶ 11. All of the evidence is that cars sold on dealer lots are generally in better condition than cars on the road. Doc. 96 at 430–31; Doc. 104 at 4. So, if vehicles on dealer lots are used as a comparator, some sort of adjustment not only makes sense but is necessary, subject to correction when an insured's car is an exception to the general rule. Garrison makes those corrections based on its inspections of the insured's vehicles, Doc. 103 at 12, 58, and it made an upward correction for Ms. Fortson's vehicle based on the better-than-usual quality of her vehicle's mechanical components. Doc. 95 at 219. Use of a negative condition adjustment in this context is not unreasonable.

To the extent she contends it is unreasonable to adjust prices of comparator vehicles down when the comparator vehicles have not been inspected, her evidence is also insufficient. Multiple experts acknowledge that it would not be feasible to personally inspect every car in CCC's database, Doc. 103 at 283; Doc. 108 at 30 ¶ 67,

---

she has mentioned, for example, the methodology used to calculate the adjustment, the fact that the comparator vehicles were not personally inspected, the inadequacy of the inspections of the subset of vehicles in the database that were inspected, and the different standards Garrison and CCC applied when inspecting totaled vehicles and comparator vehicles. It is difficult to evaluate whether the evidence supports an argument that a particular standard of investigation is unreasonable when the plaintiff fails to clearly and consistently identify both the particular standard at issue and the location of evidence to support her theory. The Court has evaluated the arguments the plaintiff has clearly made but declines to spend substantial time on conclusory arguments made in passing or to scour the record to find unidentified support for her claims.

which contains over half the cars sold in the country. Doc. 103 at 57. And it is obvious that if only inspected cars are in the database and used for comparison purposes, many potentially relevant dealer listings will be missed, as Ms. Fortson's expert acknowledged. Doc. 103 at 283; *see also id.* at 57 (CCC's representative testifying that the size of CCC's database is a strength of CCC's valuation service).

Ms. Fortson contends that the data in CCC's database is unreliable because of the failure to inspect the cars, absence of audits, and the allegedly poor standards and procedures used for those cars that are inspected. Doc. 93-4 at 1–2. It is undisputed that CCC's inspections of comparator vehicles are less detailed and involve fewer steps than Garrison's inspections of total loss vehicles. Doc. 103 at 14, 87, 89–90. But it is also undisputed that CCC makes a substantial effort to remove vehicles from the database that do not meet its standards. *Id.* at 59 (CCC removes inspected vehicles that are not in dealer-ready condition); *id.* at 60, 78 (CCC removes vehicles when advertisement indicates they are not in dealer-ready condition); *id.* at 60 (CCC removes dealers from database if dealer does not sell high-quality vehicles). It is also undisputed that Garrison adjusts the actual cash value of a totaled car upwards when the totaled car is of better than usual quality—as it did for Ms. Fortson's car. *Id.* at 12, 58; Doc. 95 at 219. And, as Ms. Fortson's expert acknowledged, some of CCC's supposedly untested assumptions benefit the insured, such as the practice of often using the dealer's list price instead of the actual sales price, which would usually be lower. Doc. 103 at 283. Insurance regulators in many states have approved use of CCC reports, and the North Carolina Department of Insurance has found settlements reached by relying on CCC reports, at least in part, to be

fair. The fact that CCC's system is not perfect or could be more accurate does not mean that it is not reasonable.

Ms. Fortson has also offered expert testimony that Garrison's use of CCC reports "violated the established standards of the insurance industry." *See, e.g., id.* at 254. But the source of those purported standards is not identified, and Ms. Fortson has not pointed to any pre-existing regulations, statutes, written standards, or documented guidelines or procedures reflecting these purported standards. Nor has Ms. Fortson rebutted testimony from a former Commissioner of Insurance in North Carolina that approximately 75% of the top ten automobile insurance carriers by North Carolina market share use CCC to determine actual cash value of total loss vehicles, Doc. 108 at 28–29 ¶ 63, or the undisputed evidence that regulators in many other states have either explicitly approved or recognized CCC as a valuation service to calculate a vehicle's actual cash value. *Id.* at 23–24 ¶ 46; *see also* Doc. 96 at 84–85, 102, 112, 118, 122, 126.

Neither perfection nor "best practice" is the appropriate lens through which to view the reasonableness of Garrison's standards. Determining the "actual cash value" of an item that has been destroyed is always a hypothetical exercise subject to some amount of unavoidable uncertainty. Yet, Ms. Fortson's theory of liability under § 58-63-15(11)(c) demands a degree of precision and fine-tuning that is inconsistent with both the nature of a reasonable estimate and the undisputed evidence.

Ms. Fortson's theory ignores the benefits from Garrison's standards, such as a very large pool of comparator vehicles, quick processing time, and common use of list prices rather than actual sales prices—benefits that would be lost, or at least affected, by

26

requiring inspections of all comparator vehicles or by an arguably more accurate process. *See* Doc. 103 at 283 (testimony from plaintiff's expert that it is not possible to inspect every vehicle in CCC's database); *id.* at 283–284 (testimony from plaintiff's expert that use of actual sales price for comparators would be more accurate but often would not benefit the insured). She does not account for feasibility or for the trade-offs required in developing standards for processing claims efficiently and quickly. She wrongly assumes there is only one reasonable way to determine actual cash value, and she ignores the facts that Garrison increased the value of her car after personally inspecting it.

Garrison relied on an estimate provided by a national independent company with no negative regulatory history that is used by many insurers. That independent company based its estimate on recent sales of similar vehicles taken from a large database, adjusting the estimate because dealer-listed vehicles are generally in better condition than cars on the road and based on the condition of Ms. Fortson's car after a detailed inspection. The undisputed facts establish that there was nothing unreasonable about Garrison's standards for investigating Ms. Fortson's claim. A reasonable juror could not conclude Garrison violated § 58-63-15(11)(c).

## V.    Conclusion

When it received Ms. Fortson's total loss claim for her vehicle, Garrison obtained an evaluation from a national service approved by multiple state regulators and used by most of the large insurance providers in North Carolina to calculate the actual cash value of Ms. Fortson's vehicle. The valuation service based its estimate on recent sales of similar dealer-listed vehicles from its large database, adjusting the estimate based on the

27

usual condition of dealer-listed vehicles and the inspected condition of Ms. Fortson's vehicle. Garrison promptly processed Ms. Fortson's claim, informed Ms. Fortson it applied the condition adjustment to the value of her vehicle, and promptly offered Ms. Fortson an amount based on the estimate provided by the national valuation service. After Ms. Fortson filed this suit, Garrison invoked the appraisal provision in Ms. Fortson's policy and promptly tendered the difference between its valuation and the appraiser's valuation to Ms. Garrison.

Based on the undisputed evidence, a reasonable juror could not conclude that Garrison acted in bad faith or unreasonably when settling or investigating Ms. Fortson's claim or in establishing reasonable standards. For these reasons, Garrison's motion for summary judgment as to Ms. Fortson's unfair and deceptive trade practices claim is granted and her request for declaratory and injunctive relief is denied.

It is **ORDERED** that the defendant's motion for summary judgment as to Ms. Fortson's Chapter 75 claims, Doc. 78, is **GRANTED.**

The Clerk is directed to file this unredacted Order under temporary seal, with access only for counsel of record for the parties and non-party CCC Intelligent Solutions Inc., pending review by CCC, a non-party who claims its commercial interests in private business information outweigh the public's right of access to that information, and further order of the Court. The public redacted version is being filed concomitantly herewith.

This the 13th day of January, 2022.

_____
UNITED STATES DISTRICT JUDGE